


**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 29, 2023

**VIA ECF & Email**
Hon. Robert W. Lehrburger
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

      Re:    *United States v. Yanping Wang, a/k/a "Yvette,"* 23 Mag. 2007 (UA)

Dear Judge Lehrburger:

      The Government respectfully submits this letter in opposition to the motion ("Mot.") and memorandum of law filed on March 24, 2023 by Yanping Wang, a/k/a "Yvette" ("Wang" or the "defendant") in support of her motion for an order directing that she has complied with the terms of her bail conditions ("Mem.") (Dkts. 8, 9). For the reasons set forth below, the defendant's motion, which amounts to a second motion for reconsideration, should be denied.

    I.     **Overview**

      The defendant is charged with playing a key role in a sprawling and complex fraud spearheaded by Ho Wan Kwok, a/k/a "Miles Guo," a/k/a "Miles Kwok," a/k/a "Guo Wengui," a/k/a "Brother Seven," a/k/a "The Principal" ("Kwok") and his and Wang's co-conspirator, King Ming Je, a/k/a "William Je" ("Je") that defrauded thousands of victims to invest more than $1 billion into Kwok's extensive, sophisticated, interrelated fraudulent offerings through material misrepresentations. The fraud relied on at least four interrelated parts: the GTV Media Group, Inc. ("GTV") Private Placement, the Farm Loan Program, G Club Operations, LLC ("G|CLUBS"), and the Himalaya Exchange. Kwok, Je, Wang, and their co-conspirators then laundered their fraud proceeds and misappropriated hundreds of millions of dollars of fraud proceeds for Kwok's and others' personal use. As described in charging documents and during prior court appearances in this case, the defendant effectively served as the chief of staff for Kwok and managed the day-to-day operations of the various entities that Kwok controlled and used to operate the fraud scheme. In that role, the defendant had access to, and signatory authority over, bank accounts that were used to obtain and launder fraud proceeds.

      The defendant presents a serious risk of flight based on her lack of ties to the United States, the nature of the charges, her key role in this serious offense conduct, her substantial financial resources, the significant sentence that she faces, the strong evidence of her guilt, her ties to foreign jurisdictions, and her relationship with co-conspirator and international money launderer William Je, who remains at large. The defendant is a Chinese citizen who emigrated from China to the United States in approximately 2017, filing an application seeking political asylum from the Chinese Communist Party ("CCP"), which remains pending. As a general matter, if an asylee is charged with serious criminal conduct while in the United States, the criminal charges can serve

as a bar to a grant of asylum.  The defendant has no family in the United States. (Mem. at 1.)  Not only are the defendant's connections in the United States limited, but she also has substantial connections and resources abroad.  She has held passports from various foreign jurisdictions and is the sole director of foreign entities used to facilitate the fraud, including at least one company registered in the British Virgin Islands.  Her co-defendant, Je, lives in the United Kingdom and is presently believed to be hiding in the United Arab Emirates ("UAE").  The defendant also has access to and the support of an extensive network of Kwok's loyal followers dispersed throughout the world.  The defendant's only son lives in China, and she has not seen him since she immigrated to the United States.

The defendant also has the financial means to flee.  As described in greater detail below, the defendant has more than $1 million in cash in her personal bank accounts and had more than $130,000 in bulk cash in a safe in her apartment at the time of her arrest.  The defendant also likely has access to assets secreted by co-conspirators abroad, including Je, who personally received millions from the fraud and is a fugitive.  Moreover, the defendant has an extremely powerful incentive to flee.  The defendant is facing charges that, in total, carry a statutory maximum sentence of approximately 55 years in prison. A conservative estimate of her applicable Sentencing Guidelines range reflects an exposure of approximately 292 to 365 months in prison.  Given the substantial evidence of the defendant's guilt and the expected length of her potential sentence, any individual would be highly incentivized to flee; with the defendant's lack of ties to the United States, her ties abroad (including to Je, who is aware of the charges against him and yet remains at large), and the prospect of likely deportation after serving her sentence, the incentives to flee are even greater.

## II.     Procedural History

### A.  Criminal Charges Against the Defendant

On March 10, 2023, the Hon. Gabriel W. Gorenstein signed a sealed complaint (the "Complaint") charging the defendant with conspiracy to commit wire and securities fraud, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and money laundering, in violation of 18 U.S.C. §§ 1957 and 2.  The Complaint is attached hereto as Exhibit A.

### B.  The Defendant's Arrest

The defendant was arrested on March 15, 2023 at her Manhattan apartment.  That same day, the FBI conducted a judicially authorized search of Wang's apartment.  During that search, the FBI recovered bulk U.S. and foreign currency from inside a safe; specifically, more than approximately $138,000 in U.S. currency, approximately £3,000, approximately 1180 Hong Kong dollars, and approximately 600 Chinese Yuan.  Additional items inside the safe included expired foreign passports for both the defendant and Kwok from Vanuatu[1] and China.  (Ex. C at 8:24-

---

[1] Vanuatu is a small island nation in the South Pacific.  It has been publicly reported that Vanuatu permits foreign nationals to acquire Vanuatu citizenship in exchange for investments in the country.  *See* "Citizenship for sale: fugitives, politicians and disgraced businesspeople buying Vanuatu passports," The Guardian, dated July 14, 2021 (available at

14:10). The FBI also recovered approximately 12 cellphones, two computers, and more than 25 USB flashdrives from the defendant's apartment. Many of the cellphones had been concealed inside original iPhone packaging, in an apparent attempt to conceal that they, in fact, contained data. Other electronics similarly were concealed; for example, a cellphone was found between the mattresses of the defendant's bed and a laptop was tucked between sweaters in the defendant's closet.

### C. Criminal Charges Against Kwok and Je

An indictment (the "Indictment") charging Kwok and Je was unsealed on March 15, 2023. *United States v. Kwok et al.*, 23 Cr. 118 (AT) (Dkt. 2). The Indictment is attached hereto as Exhibit B. Kwok was arrested in Manhattan on March 15, 2023, and the Federal Bureau of Investigation ("FBI") conducted judicially authorized searches of three of his residences—his Manhattan penthouse apartment, his Greenwich, Connecticut residence, and his Mahwah, New Jersey mansion. During those searches, the FBI recovered approximately 30 cellphones, approximately 25 computers, and dozens of hard drives and flash drives. One of the cellphones that was recovered from Kwok's Manhattan apartment was located between the mattresses in Kwok's bedroom (*i.e.*, concealed in the same manner as one of the defendant's cellphones had been, in her apartment). The FBI also recovered luxury furniture and goods that had been purchased with fraud proceeds. During the search of a safe located in the Mahwah mansion, the FBI recovered bulk U.S. and foreign currency; specifically, more than approximately $394,000 in U.S. currency, approximately €5,000, approximately 188,050 in Hong Kong dollars, and approximately 250 Chinese Yuan. The FBI also recovered evidence of Kwok's foreign travel documents from the Mahwah mansion, including a current Hong Kong passport and a copy of an expired UAE passport. The Government is seeking Kwok's pretrial detention and filed a detention letter in support of its position on March 15, 2023. *See* 23 Cr. 118 (AT) (Dkt. 7) ("Kwok Detention Ltr.").

That same day, U.K. law enforcement attempted to arrest Je in London and executed a judicially authorized search of Je's London residence. During the search, law enforcement recovered, among other items, cellphones, bulk cash in various currencies, and two cryptocurrency hardware wallets. While Je remains at large, he is believed to be in the UAE. Kwok and Je have significant ties to the UAE—they moved substantial proceeds of the fraud scheme into and through at least one of Je's UAE bank accounts, which received at least approximately $128 million in fraud proceeds that was subsequently misappropriated to Kwok, Je, and their family members or wired to Kwok- and Je-controlled entities. *See* Kwok Detention Ltr. at 9-10. For example, in January 2021, Kwok and Je arranged for the transfer of approximately $11 million in fraud proceeds from Je's UAE bank account to a bank account held in the name of one of the Kwok family office entities, which is purportedly owned by a close relative of Kwok. The defendant was the authorized signatory on the particular family office bank account that received the $11 million in fraud funds, which was misappropriated for personal lifestyle expenses (*e.g.*, flight crew services on a private jet, luxury automobiles, and yacht expenses). Moreover, as described in greater detail in the Kwok detention letter, Kwok recently undertook efforts to move the Himalaya Exchange's operations, and its money, to the UAE so it will be beyond the "long arm jurisdiction of the U.S." *See* Kwok Detention Ltr. at 19. Indeed, between in or about January and March 2023, at least two individuals who work for the Kwok-controlled entity HCHK Technologies, Inc. spent

---

https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports).

more than approximately six weeks in the UAE, apparently to assist in moving Kwok's and Je's operations abroad. As of at least on or about May 23, 2022, the defendant was the 99.9999% shareholder of both HCHK Technologies, Inc. and HCHK Property Management, Inc. through a BVI-registered shell company called Holy City Hong Kong Venture Ltd.[2]

### D. The Defendant's Presentment and Bail Hearing

The defendant was presented before the Honorable Katharine H. Parker on March 15, 2023. The transcript of that proceeding is attached hereto as Exhibit C. During that proceeding, the Government presented the agreed-upon terms of a proposed bail package for Judge Parker's consideration, which included, among other conditions, a $5 million personal recognizance bond to be co-signed by two financial responsible persons approved by the Government and secured by $1 million in real property and/or cash. (Ex. C at 6-7.) The Government then noted the following proposed conditions that were in dispute: (a) the defendant's release to home detention, reinforced by GPS location monitoring, and (b) the defendant's release from detention only upon satisfaction of all bail conditions. (Ex. C at 8:5-10). The Pretrial Services report recommended conditions of release consistent in all meaningful respects with the Government's proposed conditions, including home detention reinforced with electronic monitoring, that a bond be both secured in part and co-signed by two financially responsible persons, and that the defendant remain detained pending satisfaction of all conditions.

Judge Parker heard arguments from the Government and from the defendant's counsel on the two issues in dispute. Regarding its basis for seeking home detention, the Government emphasized the defendant's significant risk of flight based on, among other things, the large dollar amount associated with the billion-dollar fraud scheme (including, in particular, the $100 million wire transfer of fraudulent proceeds that the defendant had sole authorization to conduct); the defendant's access to significant assets; the defendant's control of more than a dozen shell entities used to perpetrate the fraud; the defendant's lack of legal status in the United States; the defendant's access to an extensive worldwide network of Kwok followers and supporters who could facilitate the defendant's flight; the defendant's lack of ties to the United States; the strength of the Government's evidence against the defendant; and evidence that had been recovered from the defendant's apartment during the FBI's search earlier that day.

Defense counsel argued that, based on the defendant's personal background and the circumstances of her seeking political asylum in the United States, the defendant posed essentially no risk of flight to China or "anywhere China can get their hands on her again." (Ex. C at 14:17-16:10). Defense counsel further argued that releasing the defendant on her own signature "is easy to do without the Court really worrying that they will never see her again." (Ex. C at 16:23-24). Judge Parker asked whether defense counsel had identified financial suretors; defense counsel advised that it had "offered some people not yet acceptable" but noted that the Government had "agreed to have a dialogue with" defense counsel regarding the evaluation of potential co-signers. 17:21-18:2.)

---

[2] The defendant is listed as the sole director of Holy City Hong Kong Ventures Ltd., and she signed various HCHK corporate documents, including shareholder resolutions, in that capacity on behalf of Holy City Hong Kong Ventures Ltd.

In response, the Government emphasized the defendant's connections to jurisdictions other than China, including the British Virgin Islands and the UAE, and the amount of bulk cash that was recovered from the defendant's apartment. (Ex. C at 18:15-19:21). The Government also confirmed that it would work with defense counsel regarding the approval process for potential co-signers, but noted for Judge Parker that the two co-signers defense counsel had proposed to the Government prior to the proceeding were individuals whom the Government alleged to be involved with the defendant in the charged fraud. (Ex. C at 20:15-21:3). Defense counsel then replied, in brief, that the defendant "ended up with a lot of cash in her safe" because "nearly a dozen normal banks" closed the defendant's accounts in the wake of banking issues arising from the GTV private placement civil enforcement action, and that the Government's suggestion that the defendant may have access to additional cash was speculative. (Ex. C at 21:5-22:4).

Following argument, Judge Parker ruled for the Government and determined that the defendant should not be released until all conditions were met. Specifically, Judge Parker stated that the following conditions were "the least restrictive I believe are necessary to" assure the defendant's return to court and the safety of the community:

> Ms. Wang will be released subject to meeting all of the conditions. In other words, she's going to be detained until all of the following conditions are met: $5 million bond co-signed by two financially responsible persons approved by the government, and it will be secured by $1 million in cash or property. Travel restricted to the Southern District, Eastern District of New York. Surrender all travel documents and make no new applications. Pretrial supervision as directed by Pretrial Services. Home detention enforced by location monitoring technology as directed by Pretrial Services. Defendant will disclose all assets to Pretrial Services and the U.S. Attorney's Office, including any accounts in her name or controlled by her or by companies in which she has an interest,[3] any cryptocurrency, any cash and any other property. Ms. Wang shall have no contact with Mr. Kwok or Mr. Je or other co-conspirators outside the presence of counsel. She shall have no contact with any alleged victims or witnesses outside presence of counsel. She shall reside at the residence at 188 East 64th Street and may not relocate absent permission from Pretrial Services. Defendant shall not open any new bank accounts, lines of credit or loans without prior approval of Pretrial Services.

(Ex. C at 22:6-23:16.)

### E. Discussions with Defense Counsel (March 15, 2023 – March 21, 2023)

As described above, in magistrate court prior to the defendant's presentment on March 15, 2023, defense counsel proffered the Government the names of two potential co-signers—

---

[3] The defendant has disclosed three bank accounts to the U.S. Attorney's Office and Pretrial Services; specifically, she provided an estimate of the balances in her two personal bank accounts (although she has not provided account numbers or detailed account balances), and the account number for a bank account in the name of one of the Kwok family offices that employed the defendant. The defendant has not disclosed any bank accounts associated any other companies that she controls or in which she has an interest, including Holy City Hong Kong Ventures Ltd. *See supra* at 4 n.2.

▇▇▇▇▇▇ and ▇▇▇▇▇▇. The Government informed defense counsel that it was aware of both proposed co-signers through its investigation and, because it viewed both individuals as subjects, it did not anticipate that it could approve either ▇ or ▇ as a co-signer. As an example, the Government advised defense counsel that millions of dollars traceable to the fraud had been misappropriated to purchase luxury items for the benefit of Kwok and his family, including a Rolls Royce that was purchased in ▇▇ name. *See* Ex. B at ¶ 54(x).

On Friday, March 17, 2023, defense counsel called the Government and provided the names and contact information for three other proposed co-signers: ▇▇▇▇▇▇▇▇▇▇, ▇▇▇▇▇▇▇▇▇▇, and ▇▇▇▇▇▇▇▇▇▇. That same day, the Government unsuccessfully attempted to call all three and left messages for two of them; ▇▇▇▇ voicemail was full. The Government updated defense counsel regarding its efforts and advised defense counsel that the potential co-signers needed to collect and provide the following documentation: (1) email address for contact; (2) proof of identity and address; (3) proof of citizenship or lawful residency; (4) most recent bank statements; (5) most recent pay stubs; and (6) most recent tax returns.

The morning of Monday, March 20, 2023, defense counsel called the Government to inquire into the status of its assessment of ▇▇▇▇▇▇, and ▇▇▇▇▇▇. The Government advised that it had received documentation over the weekend and had scheduled telephonic co-signer interviews for that day. During that call, defense counsel proposed various modifications to the bond conditions that Judge Parker had imposed. For example, defense counsel offered that the defendant could secure the bond with additional cash from one of her bank accounts. Defense counsel also suggested that the bond could be modified to provide for five co-signers, in light of the fact that the defendant's proposed co-signers were unlikely to exercise a strong degree of moral suasion. Defense counsel also identified several individuals as potential moral suasion co-signers, including ▇▇▇▇, the defendant's purported best friend ▇▇▇▇▇▇▇▇▇▇▇▇. The Government responded that it could not approve ▇▇▇▇—an alleged co-conspirator who exercised control over various entities used to perpetrate the fraud scheme and who was alleged in the Indictment to have received millions of dollars in misappropriated fraud proceeds. *See, e.g.*, Ex. B at ¶ 13(f).

On March 20, 2023, the Government interviewed ▇▇▇▇▇▇, and ▇▇▇▇▇▇ and determined that they were not qualified co-signers, for the reasons outlined below.

- ▇▇▇▇▇▇▇▇: Insufficient moral suasion; not a financially responsible person; incomplete documentation; personal investment in the fraud scheme.

    <u>Insufficient Moral Suasion</u>

    o ▇▇▇▇ reported that he met the defendant approximately two years ago at an event.

    o ▇▇▇▇ reported that he knows the defendant socially, and estimated that he has seen her a few times a year in the two years since they met.

    o ▇▇▇▇ reported that the defendant "works for Mr. Guo" (*i.e.*, Kwok).

    o ▇▇▇▇ reported having texted the defendant one or two times and said he did not know her email address.

Financial Responsibility Assessment

- o   During ▓▓▓ interview with the Government, he reported having an annual salary of approximately $700,000. However, ▓▓▓ 2021 tax return reflects a gross income of approximately $63,583. (Def. Ex. G-4).
- o   ▓▓▓ reported having approximately $70,000 in his bank accounts, but he provided account statements that reflect a balance of only approximately $13,000. (Def. Ex. G-3).

Status as an Apparent Victim of the Fraud Scheme

- o   ▓▓▓ invested approximately $100,000 into GTV in 2020.
- o   ▓▓▓ invested approximately $50,000 into G|CLUBS in March 2021.
- o   ▓▓▓ invested approximately $12,000 in the Himalaya Exchange.wired money into a Himalaya Clearing FV Bank account (which the Government subsequently seized), including approximately $2,000 in July 2021 and $10,000 in October 2021.

- ▓▓▓: Insufficient moral suasion; not a financially responsible person; incomplete documentation; personal investment in the fraud scheme.

    Insufficient Moral Suasion

    - o   ▓▓▓ reported having first met the defendant at an "event" in June 2021.
    - o   ▓▓▓ stated that he has seen the defendant approximately once or twice per month since mid-2022.
    - o   ▓▓▓ reported that the defendant works at HCHK Technologies.[4]
    - o   When asked where the defendant lives, ▓▓▓ replied, in sum and substance, "New York City not sure where."

    Financial Responsibility Assessment

    - o   ▓▓▓ reported having approximately $1.08 million in assets (in the form of properties and cash) and an annual income of approximately $150,000 per year. However, ▓▓▓ did not provide documentation sufficient to corroborate those purported assets (*e.g.*, most recent tax return; account statements or information for a second bank account; details regarding two purported properties).

    Status as an Apparent Victim of the Fraud Scheme

    - o   ▓▓▓ invested approximately $520,000 in GTV in May 2020.
    - o   ▓▓▓ invested approximately $20,000 in G|CLUBS in November 2020.
    - o   ▓▓▓ invested approximately $60,000 in the Himalaya Exchange in March 2022.

---

[4] As described above, the defendant is the 99.9999% shareholder of that company. *See supra* at 4 n.2. However, the defendant does not appear to hold any formal position at HCHK Technologies.

- ▮▮▮▮: Insufficient moral suasion; not a financially responsible person; personal investment in the fraud scheme.

    Insufficient Moral Suasion

    - ▮▮▮ reported having met the defendant when he "nearly started working with" the defendant at a company called Gettr.[5]
    - ▮▮▮ reported having spoken with the defendant approximately 4-5 times during the Gettr interview process.
    - ▮▮▮ reported that the defendant works at Gettr. However, the defendant does not hold any formal position at Gettr.
    - ▮▮▮ reported that he speaks to the defendant approximately two to three times a year.

    Financial Responsibility Assessment

    - During ▮▮▮ interview with the Government, he reported having an annual salary of approximately $159,000, which was generally corroborated by provided documents. (Def. Ex. A-3, A-4).
    - ▮▮▮ has approximately $2,768 in two bank accounts. (Def. Ex. A-3).
    - ▮▮▮ annual rent is approximately $36,851. (Def. Ex. A-5).
    - ▮▮▮ reported having approximately $11,000 in credit card debt.

    Status as an Apparent Victim of the Fraud Scheme

    - ▮▮▮ and his wife invested $34,000 into GTV in May 2020.
    - ▮▮▮ also reported that he and his wife invested in the Himalaya Exchange.

The Government informed defense counsel that it could not approve ▮▮▮, or ▮▮▮, for the reasons stated above.

On March 21, 2023, defense counsel called the Government to propose further modifications of the bond conditions that Judge Parker had imposed. During that call, defense counsel said a person ("Individual-1") may be able to post $2.2 million in equity in an unidentified property to further secure the bond. Only after the Government asked the identity of that person did defense counsel provide Individual-1's name. When the Government advised that it would need to interview Individual-1, defense counsel replied that Individual-1 was not a proposed co-signer, and therefore no interview was required. The Government stated that it would consider the

---

[5] As described in the Kwok Detention Letter, GETTR USA, Inc. ("Gettr") is a social media company that Kwok controls through a series of shell companies. *See* 23 Cr. 118 (AT) (Dkt. 7 at 10). Gettr and the HCHK entities described herein operate out of the same office location in New York, New York.

suggestion in good faith, but still needed additional information, including details about the property in question, to conduct its due diligence.

Approximately 90 minutes later—still having received no details regarding the property that could be posted by Individual-1—the Government informed defense counsel that it was not comfortable with the abstract proposal, including due to Individual-1's criminal history and involvement in certain core conduct underlying the fraud scheme. Defense counsel again put forth ▇▇▇ as a potential co-signer with moral suasion and stated that its initial proposed co-signers (▇ and ▇), individuals who had personal relationships with the defendant, were additional moral suasion co-signers that the Government had rejected. The Government replied that, although it was skeptical that ▇ and ▇ would be approved, it was willing to interview them in good faith, based on counsel's representations regarding their personal connections to the defendant. Defense counsel asked the Government to proceed with those interviews without first receiving and reviewing ▇ and ▇ documentation. The Government advised that it needed to follow its normal procedures, but would interview ▇ and ▇ promptly after receiving and reviewing their documentation. Upon receiving the documentation that afternoon, the Government interviewed ▇ and determined that he was not a qualified co-signer, for the reasons outlined below.[6]

- ▇▇▇▇▇: Insufficient moral suasion; not a financially responsible person; incomplete documentation; personal investment and involvement in the fraud scheme.

    Insufficient Moral Suasion
    - ▇ reported seeing the defendant "a few times a year."
    - ▇ reported that he did not know where the defendant works.

    Financial Responsibility Assessment
    - At the time of ▇ interview with the Government, ▇ did not have an understanding of what it meant to be a co-signer. The Government explained the charges in the Complaint and the responsibilities of a co-signer.
    - During his interview, ▇ provided three different addresses as his purported home address.
    - ▇ stated that he is a student, but ▇ reported approximately $93,738 in income on his 2021 taxes. (Def. Ex. C-2).
    - When asked about the source of his income during his interview with the Government, ▇ claimed that he served as "director" for two departments

---

[6] The Government also attempted to interview ▇ at that time, but determined that a Mandarin interpreter would be needed to assist with the interview. The Government scheduled an interview with ▇ for March 28, 2023 at 11:00 a.m., but the call went directly to voicemail. The Government did reach ▇ later that day, but by the time the Government called back with a Mandarin interpreter on the line, the calls again went to voicemail. To date, ▇ has not responded to the Government's follow-up calls and emails (including a Mandarin-language email) attempting to reschedule the interview.

at one of the Kwok family offices that the defendant manages. However, the Government has not identified payroll records indicating that ▮ is an employee of that company.

- ▮ disclosed two cars as assets—a Mini Cooper and a Range Rover Defender—and reported having no further assets, beyond approximately $1,649 in a bank account.

- When the Government asked about luxury cars that he owned or previously owned, ▮ initially stated that he had bought a Lamborghini and a Rolls Royce before the COVID-19 pandemic with his own money, which he generated selling stocks in China.

- When the Government asked about luxury cars that had been purchased in ▮ name in 2021, registered to ▮, and delivered to ▮ at Kwok's Greenwich, CT residence—specifically, the 2021 Lamborghini and the 2021 Rolls Royce identified in the Indictment, see Ex. B at ¶ 54(x), (y)—▮ said he was "not sure" if he knows anyone with those cars and did not know why those cars would be registered in his name. The 2021 Lamborghini registered to ▮ was seized from Kwok's Greenwich residence on March 15, 2023. ▮ was present at the Greenwich residence at the time the FBI executed the premises warrant and seized the 2021 Lamborghini.

<u>Involvement in the Fraud Scheme</u>

- As described above, ▮ is the listed purchaser and registrant of a 2021 Lamborghini and a 2021 Rolls Royce, both of which were purchased with funds traceable to the fraud scheme.

- In certain invoices, the billing address associated with ▮ is Kwok's Mahwah, New Jersey mansion, which was purchased in the name of an entity controlled by Je for approximately $26.5 million in funds traceable to the fraud scheme.

- In April 2022, ▮ transferred $20,000 into a Himalaya Exchange bank account (which the Government has subsequently seized).

The Government informed defense counsel that it could not approve ▮, and defense counsel replied that it was going to request that a "Nebbia" bail hearing be held the following day to address what counsel characterized as the Government's "unreasonable refusal" to approve any co-signers. The Government arranged for the defendant's production and secured a Mandarin-speaking interpreter.

### F. Conference Regarding the Defendant's First Request for Reconsideration of Bail Conditions (March 22, 2023)

A conference was scheduled for 11:00 a.m. on March 22, 2023[7] before the Honorable Sarah Netburn. A transcript of that conference is attached hereto as Exhibit D. In advance of the

---

[7] At approximately 10:15 a.m. on March 22, 2023—less than approximately one hour before the scheduled bail hearing—defense counsel called the Government with another proposed modification of the bail conditions imposed by Judge Parker. Counsel stated that it had identified

conference, the Government provided Judge Netburn with the transcript of the presentment and bail argument before Judge Parker (*i.e.*, Ex. C), and Pretrial Services furnished its report. Defense counsel did not file any motions or other submissions in advance of that conference. At the outset, defense counsel informed Judge Netburn that it was asking Judge Netburn "to either [ap]prove the people we've proposed [as co-signers] or change the bail conditions in such a way that Ms. Wang can satisfy the bail conditions and be released." (Ex. D at 5:10-22). Judge Netburn then stated:

> I'm not really inclined to overrule my colleague [Judge Parker] who heard bail arguments and set a bail condition. So I'm not sure that's what I want to do, if that's what you're asking me to do. If you're asking me to consider the reasonableness of the proposed sureters I understand under the law, I can do that. I don't know anything about what that standard of review is, and I don't have any names or documents, so I don't know that that's something I can do from the bench.

(Ex. D at 6:3-13).

Defense counsel then proceeded to proffer information about the defendant's background, including that "the only people with whom [the defendant] has contact are people who are part of this [anti-CCP] movement or in some way related to the main defendant in this case. The Government is well aware of this. When we actually agreed to the $5 million bond and two cosigners, when we did that we understood that the Government understood . . . that the people who would cosign for her are not going to be her family members." (Ex. D at 7:9-20). Judge Netburn confirmed that the defendant had been living in the United States since 2017 and confirmed that defense counsel was representing that, "in those six years," the defendant had not "befriended anybody who's not within that movement." (Ex. D at 7:21-8:1). During the ensuing colloquy, defense counsel referenced the various proposed bail modifications that it had discussed with the Government. (Ex. D at 8:2-11:7).

The Government responded that the conference was premature, noted that Judge Parker had agreed with both Pretrial Services and the Government that all conditions—including the approval of two co-signers—needed to be met before the defendant could be released, and explained that the Government follows a process to evaluate potential co-signers' qualifications. (Ex. D at 11:10-23). Regarding defense counsel's proposed bail modifications, the Government noted that it had not received basic information from defense counsel (such as, for example, the address of Individual-1's property) sufficient to conduct the basic due diligence required to seriously consider those proposals. (Ex. D at 11:24-12:18). The Government summarized its efforts to evaluate the proposed co-signers and its rationale for concluding that those individuals were not qualified. (Ex. D at 12:19-14:20). The Government then outlined the legal standard for a court to consider the appropriateness of an unapproved surety under 18 U.S.C. § 3142(c)(1)(B)(xii), which requires a court to assess the surety's financial situation to determine

---

two (unnamed) individuals who were members of Kwok's anti-CCP movement who, although they did not know the defendant, were willing to post property with approximately $3 million in collectively equity. Defense counsel did not provide the individuals' names or any details regarding the purported properties, but nonetheless asked the Government to agree in the abstract to the proposal. The Government advised that it could not do so.

whether the surety has a net worth of sufficient unencumbered value to pay the amount of the bond. (Ex. D at 14:21-15:7).

After further discussion with defense counsel, Judge Netburn asked what relief the defendant was seeking. (Ex. D at 15:20-18:4). Defense counsel replied that it was asking the Court either to "direct" the Government to accept three of the individuals it had deemed to be unqualified as co-signers or, alternatively, to modify the bail conditions. (Ex. D at 18:5-19:12). In response, the Government reiterated its view that there was no issue ripe for the Court. (Ex. D at 19:13-20). The Government further noted that, even if the Government could get comfortable treating the three individuals in question as financially responsible persons, they were all victims of the fraud scheme and therefore exercised no degree of moral suasion over the defendant. (Ex. D at 19:21-20:12).

Judge Netburn agreed that there was no ripe issue before the Court and declined to "direct the Government to accept these miscellaneous John Does as sureties. That's not how this works." (Ex. D 21:9-17). Judge Netburn then inquired into the defendant's proposed timing for next steps and set a defense motion deadline of March 24, 2023, a Government response deadline of March 29, 2023, and a March 31, 2023 conference before this Court. (Ex. D at 22:5-18, 24:19-21, 25:24-26:14).

### G. Additional Proposed Co-Signers (March 22, 2023 – March 24, 2023)

In the evening on March 22, 2023, defense counsel provided contact information and certain supporting documentation for three additional proposed co-signers—███████, and ███████. In the email, defense counsel expressed its view that the following proposed co-signers ███████, and ███ all exercised moral suasion over the defendant.

The Government requested additional required documentation, reviewed that documentation, and interviewed ███████, and ███. The Government determined that they were not qualified co-signers, for the reasons outlined below.

- ███: No moral suasion; not a financially responsible person (incomplete documentation); personal investment in the fraud scheme.

    <u>No Moral Suasion</u>
    - ███ reported that she does not know and has never spoken with the defendant.

    <u>Financial Responsibility Assessment</u>
    - ███ has approximately $209,408 in two bank accounts. (Def. Ex. E-3).
    - During ███ interview with the Government, she reported that she and her husband own a home in ███████ worth approximately $1.7 million.
    - Defense counsel submitted a settlement statement (HUD-1) for the ███ property (erroneously filed under Ex. F-2), which appears to reflect that ███ and her husband took out a mortgage in the amount of approximately

  $752,474 for the ▮ property in 2014. ▮ did not provide any documentation reflecting the current status of that mortgage.

- ○ ▮ 2021 tax returns reflect that she and her husband generate $24,000 in rental income from that same property in ▮. (Def. Ex. E-4). From the provided documentation, it is unclear whether ▮ lives in that home (for which she is claiming rental income) or at some other unknown residence.
- ○ During her interview with the Government, ▮ reported that she holds approximately $200,000 worth of Ethereum cryptocurrency. ▮ did not provide documentation corroborating her purported cryptocurrency holdings.

Status as an Apparent Victim of the Fraud Scheme

- ○ ▮ invested approximately $50,000 in G|CLUBS in October 2020.
- ○ ▮ invested approximately $12,000 in the Himalaya Exchange in July 2021.

- ▮▮▮▮▮▮: Insufficient moral suasion; not a financially responsible person (insufficient documentation); personal investment in the fraud scheme.

Insufficient Moral Suasion

- ○ ▮ reported that she "came to know of" the defendant through Kwok in or about 2017.
- ○ ▮ reported that she has met the defendant in person at "events."
- ○ ▮ reported that she has spoken on the phone with the defendant, but "not often."
- ○ ▮ does not appear to have a relationship with the defendant—for example, ▮ was unsure what the defendant does for work or where she lives.

Financial Responsibility Assessment

- ○ ▮ has approximately $52,550 in two bank accounts. (Def. Ex. F-1).
- ○ ▮ joint tax returns reflect that she and her husband had $18,452 in taxable income in 2021.
- ○ ▮ provided several low-resolution image files that are illegible (which seems to show some sort of document, two checks, and tax returns). The Government requested, but did not receive, legible replacements for those files from defense counsel.
- ○ During her interview with the Government, ▮ reported that she works as an accountant and has an annual salary of approximately $60,000. ▮ did not provide any recent paystubs or corroboration of her salary.
- ○ During her interview with the Government, ▮ stated, in sum and substance, that she has family money that is not in her own accounts and that her mother and husband support her financially.

- o   During her interview with the Government, ▮ reported that she has approximately $1.6 million in equity (and no debt) in her residence. ▮ did not provide any documentation corroborating the value of that property or her ownership of the property.

  <u>Status as an Apparent Victim of the Fraud Scheme</u>

  - o   ▮ invested approximately $100,000 into GTV in 2020.
  - o   ▮ invested approximately $50,000 into G|CLUBS in October 2020.

- ▮▮▮▮▮▮▮▮▮: Insufficient moral suasion; not a financially responsible person (insufficient documentation); personal investment in the fraud scheme.

  <u>Insufficient Moral Suasion</u>

  - o   ▮ relationship with the defendant is limited to his following her on social media.
  - o   ▮ reported that he met the defendant at an "event" two years ago. However, ▮ reported that he has not spoken with the defendant directly.
  - o   ▮ does not know where the defendant works or lives.

  <u>Financial Responsibility Assessment</u>

  - o   ▮ has approximately $27,325 a joint bank account. (Def. Ex. D-3).
  - o   ▮ joint tax returns reflect taxable income of approximately $217,604 in 2021, which consists primarily of capital gains. (Def. Ex. D-4).
  - o   During his interview with the Government, ▮ reported that he owns two rental properties worth approximately $500,000 each. ▮ did not provide documentation regarding those properties.
  - o   During his interview with the Government, ▮ reported that he purchased his primary residence for approximately $1.9 million. Defense counsel provided a screenshot from Zillow.com reflecting the estimated home value of the property as purported corroboration of ▮ equity in the home, but no additional documentation. (Def. Ex. D-6).

  <u>Status as an Apparent Victim of the Fraud Scheme</u>

  - o   ▮ invested approximately $290,000 into GDollar (relating to GTV).
  - o   ▮ invested approximately $100,000 into G|CLUBS.

On March 24, 2023, the Government informed defense counsel that it was unable to approve ▮ ▮, and ▮ as co-signers for the reasons explained above.

### H. The Defendant's Instant Motion

On March 24, 2023, the defendant filed the Motion, which was fashioned as a motion "For an Order Directing Defendant Has Complied with the Terms of her Bail Conditions." Mot. The defendant also filed a memorandum of law in support of that motion, which attached documentation for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and ▮ as exhibits. *See* Dkts. 8, 9. The defendant argues that the Government's "refusal to approve [the defendant's] bond co-signers has been arbitrary." (Mem. at 1). The defendant claims that each of her proffered sureties

"is eminently qualified to serve" as a co-signer on the $5 million personal recognizance bond that Judge Parker imposed as a condition of the defendant's release. (Mem. at 6).

The defendant moves this Court either to approve two of the defendant's proposed co-signers (without identifying which two) or, alternatively, to modify the bail conditions "such that [the defendant's] inability to secure co-signers . . . does not prevent her release." Mem. at 3. Specifically, assuming the Court does not find that the proffered co-signers satisfy the requirements of financial responsibility and/or moral suasion, the defendant asks this Court to set aside Judge Parker's bail finding and "eliminat[e] the use of co-signers altogether." Mem. at 10.

### III.   Discussion

#### A.  Legal Standard

Under the Bail Reform Act, a defendant shall be detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). The Court must consider a number of factors when deciding an application for bail, including: (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence, (3) the history and characteristics of the defendant, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The Government bears the burden of proof as to risk of flight by a preponderance of the evidence, and as to danger to the community by clear and convincing evidence. 18 U.S.C. § 3142(f); *United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007).

Where the Court determines that pretrial release is appropriate, the Court should release the defendant subject to the least restrictive condition or combination of conditions, "which may include the condition that the person include the condition that the person . . . execute a bail bond with "solvent" sureties, with a "net worth which shall have sufficient unencumbered value to pay the amount of the bail bond"). 18 U.S.C. § 3142(c)(1)(B)(xii); *see United States v. Batista*, 163 F. Supp. 2d 222, 225-26 (S.D.N.Y. 2001). Regarding a determination regarding whether a proposed suretor is "financially responsible," courts have reasoned that "the relevant standard is 'the ability to pay the amount specified in the bond if [the defendant] fails to appear at trial.'" *Batista*, 163 F. Supp. 2d at 224 (quoting *United States v. Gotay*, 609 F. Supp. 156, 156 (S.D.N.Y. 1985)). "In addition to the requirement of financial responsibility, a defendant must show that the proposed suretors exercise moral suasion to ensure the defendant's presence at trial." *Batista*, 163 F. Supp. 2d at 224.

The Second Circuit has noted that "sureties are assessed for 'their ability to exercise moral suasion' over the defendant, 'should he decide to flee.'" *United States v. Baig*, 536 F. App'x 91, 93 (2d Cir. 2013) (describing and quoting *United States v. Martinez*, 151 F.3d 68, 71 (2d Cir.1998)) (emphasis added); *see also Christoffel v. United States*, 196 F.2d 560, 565 (D.C. Cir. 1951) (noting that "the reliability" of a co-signer is relevant "where he [is] promis[ing] to pay in the event of non-appearance of the defendant" and collecting cases).

Even where the least restrictive set of conditions are imposed as conditions of bail, it is "not unique" for a defendant to be unable to meet those conditions and therefore to remain detained pending trial. *United States v. Stanton*, No. 91-CR-889-CSH, 1992 WL 27130, at *1 (S.D.N.Y. Feb. 4, 1992). In *Stanton*, the Honorable Charles S. Haight noted that defendants confronted with

pretrial detention resulting from an inability to satisfy bail conditions "have invoked § 3142(c)(2), which provides: 'The judicial officer may not impose a financial condition that results in the pre-trial detention of the person.'" *Id.* The *Stanton* Court cited its prior analysis of § 3142(c)(2) in *Gotay*, where it viewed that provision "in the context of the Bail Reform Act and its legislative history and concluded that if a defendant cannot meet economic conditions of release reasonably necessary to assure his appearance, he must remain in pre-trial detention." *Id.* (citing *Gotay*, 609 F. Supp. at 156).

A party seeking reconsideration faces a high burden.[8] "Reconsideration of a previous order by the court is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources. A motion for reconsideration may not be used to advance . . . facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." *Jackson v. Goord*, 664 F. Supp. 2d 307, 313 (S.D.N.Y. 2009) (internal quotations omitted). Under Title 18, United States Code, Section 3142(f), a detention hearing "[m]ay be reopened . . . if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." "A court may properly reject an attempt to reopen a detention hearing where the new information presented is immaterial to the issue of flight risk or danger to the community." *United States v. Petrov*, No. 15-CR-66-LTS, 2015 WL 11022886, at *2 (S.D.N.Y. Mar. 26, 2015), *aff'd*, 604 F. App'x 66 (2d Cir. 2015) (citing *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989)).

**B. Discussion**

    1) <u>The Government's Decision to Reject Proposed Co-Signers Was Not Arbitrary</u>

The Government's determination that none of the eight proposed co-signers is qualified is both reasonable and supported by the record. The defendant's proposed suretors are neither financially responsible nor able to exercise moral suasion over the defendant. The Government's individualized assessments also appropriately considered whether any of the proposed co-signers was either a co-conspirator of the defendant and/or an apparent victim of Kwok's, Je's, and the defendant's fraud.

*First,* none of the eight proposed co-signers exerts moral suasion over the defendant sufficient to "reasonably assure" her presence at future court appearances, even if her non-

---

[8] There is no specific rule providing for the reconsideration of a ruling on a criminal matter. *See, e.g., United States v. James*, No. 02 CR 0778, 2007 WL 914242, at *3 (E.D.N.Y. Mar. 21, 2007). However, "[w]here the Rules of Criminal Procedure do not speak specifically to a matter, a court conducting a criminal case is permitted to draw from and mirror a practice that is sanctioned by the Federal Rules of Civil Procedure." *Id.* (citation and internal quotation marks omitted). In that regard, Federal Rule of Criminal Procedure 57(b), which is entitled "Procedure When There Is No Controlling Law," provides in part that "[a] judge may regulate practice in any manner consistent with federal law, these rules, and the local rules of the district." Fed. R. Crim. P. 57(b). "Thus, when deciding motions for reconsideration in criminal matters, courts in this district have resolved such motions according to the same principles that apply in the civil context." *Id.* (citations and internal quotation marks omitted).

appearance were to cause a second, financially responsible co-signer to owe the full amount of the bond. As described above, most of the proposed co-signers barely know the defendant, only recently met her, and have sporadic (if any) communications with her. Without sufficient moral suasion, the defendant is unlikely to be concerned that her flight would saddle individuals (with whom she does not have relationships) with debt.

*Second*, all of the defendant's proposed co-signers are involved in the very conduct with which the defendant has been charged, either as subjects of the Government's investigation or as apparent victims of the fraud. Either status renders these individuals unqualified to serve as co-signers who will exert moral suasion over the defendant. To the extent the co-signers are members of the criminal conspiracy, their interests lie just as easily in facilitating the defendant's flight and, given the staggering amount of funds collected involved in this international criminal conspiracy, even losses in the millions could be reimbursed. To the extent the proposed co-signers are victims of the fraud, their status as co-signers provides no assurance whatsoever that the defendant would be dissuaded from flight out of concern for their financial welfare. After all, the defendant is charged with defrauding this very same class of victims

*Third*, even if they had sufficient moral suasion over the defendant, the proposed suretors are not financially responsible. *See, e.g.*, *Batista*, 163 F. Supp. 2d at 225-26 (holding that the Government's decision to reject two proffered suretors was not arbitrary where the individuals reported low income and, in addition, were unable to provide credible documentation that they owned assets they claimed to own). For example, ▮ failed to provide the Government with nearly all categories of requested documentation, including proof of address, proof of citizenship or lawful residency, most recent bank statements, and most recent paystubs; and the financial documentation ▮ did provide (specifically, his recent taxes) is insufficiently detailed to corroborate or confirm the source of his reported income. Here, where each of the eight proffered sureties is "other than an approved surety," the sureties (or the defendant, on their behalf) is required to "provide the court with information regarding the value of the assets and liabilities of the surety . . . and the nature and extent of encumbrances against the surety's property" so the Court can determine whether such surety has "a net worth which shall have sufficient *unencumbered* value to pay the amount of the bail bond." 18 U.S.C. § 3142(c)(1)(B)(xii) (emphasis added). The defendant has not provided adequate documentation or information to the Court for it to make such an independent determination. However, even based on the documentation that was provided to this Court, none of the proposed suretors qualifies as a "financially responsible person," because none has "the ability to pay the [$5 million] bond if [the defendant] fails to appear at trial." *Gotay*, 609 F. Supp. at 156.

### 2) Reconsideration of the Defendant's Bail Conditions is Unwarranted

As described above, a party seeking reconsideration of a prior court order faces a high burden. The law is clear that a motion of reconsideration may not be used to relitigate issues already decided by the Court. *Jackson*, 664 F. Supp. 2d at 313. Yet that is precisely what the defendant is asking this Court to do: overrule Judge Parker's well-reasoned determination that the bail conditions the court imposed—including both the requirement of two approved co-signers and the defendant's continued detention until all conditions are satisfied—are the *least* restrictive conditions that can reasonably assure the defendant's presence at future court appearances. (Ex. C at 22:6-23:16.) The defendant goes even further, summarily rejecting Judge Parker's ruling by asserting, in a footnote, that the defendant's bail package would be sufficient to serve the ends of

18 U.S.C. § 3142 even without the requirement of *any* co-signers—a requirement Judge Parker specifically ruled on after hearing argument from both parties. (Mem. at 11, n.3).

The instant motion is not the defendant's first attempt to seek reconsideration of the bail conditions Judge Parker imposed. The defendant fails to acknowledge that she already attempted an improper motion for reconsideration of Judge Parker's bail determination, before Judge Netburn. During the conference on March 22, 2023, as here, defense counsel asked Judge Netburn to "change the bail conditions in such a way that Ms. Wang can satisfy the bail conditions and be released." (Ex. D at 5:10-22). Yet defense counsel pointed to no information that was not known to the defendant (*i.e.*, the movant) at the time of the initial bail argument before Judge Parker that may have material bearing on an evaluation of conditions of bail. 18 U.S.C. § 3142(f).

To the contrary, in the Government's view, new information that has come to light since the defendant's initial bail hearing that arguably may have justified *more* restrictive bail conditions. First, the Government did not previously know that the defendant apparently has no acquaintances (or even unacquainted financially responsible persons) to put forth as qualified co-signers. Second, since the defendant's initial appearance, the Government has learned that Je remains at large and is likely in the UAE, where he and Kwok have access to substantial resources and fraud proceeds and are believed to be establishing the new operational and financial base of their fraudulent operations. Je is the financier of the fraud scheme and an international fugitive with access to substantial funds and the ability to facilitate and fund Kwok's or the defendant's flight. Finally, as described above, various of the proffered co-signers understand the defendant to work for Gettr and/or HCHK Technologies—Kwok- and Je-controlled companies that are funded, in part, using fraud proceeds—despite the defendant disclaiming any formal affiliation or employment with those entities. That new fact further underscores not only the complexity of Kwok's shell game, but also the defendant's instrumental role as Kwok's trusted chief of staff who is tasked with managing operations at even those entities with which she has no formal affiliation.

### IV. Conclusion

As described herein, the defendant poses an extraordinary risk of flight. During the defendant's initial presentment and bail hearing, Judge Parker carefully considered the recommendation of Pretrial Services and the arguments by the parties regarding what conditions of release, if any, could reasonably assure the defendant's future court appearances or the safety of the community. Judge Parker then made a ruling that the set of bail conditions currently imposed were the least restrictive and further ruled that the defendant needed to satisfy all those conditions before release. The defendant, having failed to do so, now attempts a second end-run around judicial process by asking this Court to approve unquestionably unqualified co-signers or, in the alternative, overrule bail-related decisions by both Judge Parker and Judge Netburn. The defendant has failed to provide any evidence to support her claim that the Government's evaluation of the proposed co-signers is arbitrary or unreasonable, and has presented no evidence sufficient

to warrant the "extraordinary" remedy of reconsideration of a bail determination. Accordingly, the defendant's motion should be denied.

>                           Very truly yours,
>
>                           DAMIAN WILLIAMS
>                           United States Attorney
>
>                       By: /s/ Juliana N. Murray
>                           Juliana N. Murray
>                           Ryan B. Finkel
>                           Micah F. Fergenson
>                           Assistant United States Attorneys
>                           (212) 637-2314 / 6612 / 2190

Enclosures

Cc: Alex Lipman, Esq. (by ECF and Email)
    Priya Choudhry, Esq. (by ECF and Email)