

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 12, 2023

**VIA ECF and Email**
Hon. Robert W. Lehrburger
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Yanping Wang, a/k/a "Yvette,"* S1 23 Cr. 118 (AT)

Dear Judge Lehrburger:

    The Government respectfully submits this letter in response to the Court's Order, dated April 10, 2023 (Dkt. 39), and in opposition to the pending motion ("Mot.") by Yanping Wang, a/k/a "Yvette" ("Wang" or the "defendant") seeking an order directing the Government to accept the defendant's proposed cosigners or modification of the terms of her bail conditions. (Dkts. 9, 37). As previously argued, and for the additional reasons set forth below, the defendant's motions should be denied, and the defendant should be detained pending trial.

    **I.**    **Response to the Court's April 10, 2023 Order**

        1) <u>Documents</u>

    The Government is submitting under seal as exhibits the following documents, some of which were referenced in the Government's letter in opposition dated March 31, 2023 (Dkt. 22), and most of which were either seized from, or photographed during, the execution of the premises search warrant at the defendant's apartment on March 15, 2023, as indicated in the table below:

| Exhibit | Description | Source |
|---|---|---|
| A | HCN Allocation at USD0.1 | Seized from the defendant's apartment |
| B | Himalaya Coin Distribution Table at launch on 1 November 2021 | Seized from the defendant's apartment |
| C | Holy City Hong Kong Ventures Ltd. Resolution of Director | Photographed at the defendant's apartment |
| D | Bank Questionnaire for New Accounts – Holy City Hong Kong Ventures Ltd. | Photographed at the defendant's apartment |
| E | Documents reflecting $55,593,292.60 in six bank accounts as of 3/13/2023 | Photographed at the defendant's apartment |

| Exhibit | Description | Source |
|---|---|---|
| F | Document reflecting the defendant's signature on "February Payroll" for entities including G Music, G Fashion, GCLUBS, and Rule of Law Foundation, dated as of 3/16/2023 | Photographed at the defendant's apartment |
| G | The defendant's Statement of Purpose of Travel, submitted to the Department of Homeland Security on January 11, 2023 | Obtained in connection with the investigation |

The Government sets forth below how these materials establish that the defendant lied to Pretrial Services and did not fully disclose her financial holdings to the Government and the Court, as required by the conditions of release that Judge Parker imposed. The defendant's lack of candor further demonstrates that she should be detained pending trial.

    a) *Exhibits A & B: The Defendant's HCN Holdings*

Contrary to representations to the Court and to the Government, Exhibit A demonstrates that the defendant holds a significant amount of "HCN." The Indictment alleges that the fraud operated through, among other vehicles, the Himalaya Exchange—a purported cryptocurrency "ecosystem." *See* S1 23 Cr. 118 (AT) at ¶¶ 12, 17-23. As described in the Indictment, the initial coin offering of the purported trading coin, Himalaya Coin (or HCN) and the purported stablecoin, Himalaya Dollar (or HDO), occurred on or about November 1, 2021. *Id.* at ¶ 19. At the time of the initial coin offering, HCN reportedly began "trading" at 10 cents per HCN. Approximately two weeks after the initial coin offering, the then-CEO of the Himalaya Exchange publicly announced that 1 billion HCN had been issued; according to pricing data on the Himalaya Exchange website, at that two-week mark, each HCN purportedly was worth approximately 27 HDO (*i.e.*, $27), which represented a 26,900% increase in valuation. *Id.*

A document entitled "HCN Allocation at USD0.1" that was recovered from the defendant's apartment reflects that 6,999,800 HCN was allocated to "Yanping Wang," *i.e.*, the defendant, at the initial coin offering price. Ex. A. The chart reflects a total of 1 billion in allocated HCN—that is, the number of HCN that reportedly was "issued" on November 1, 2021. Notably, the majority of HCN was allocated to other arms of the fraud, including G|CLUBS and various Himalaya Farm "investors." Ex. A (emphasis added).

Law enforcement also recovered a document entitled "Himalaya Coin Distribution Table at launch on 1 November 2021" from the defendant's apartment. Ex. B. The Distribution Table is annotated with Mandarin writing in red ink and reflects that 100 million HCN were allegedly "minted." *Id.* Exhibit B further reflects the distribution of certain of the "HCN (in US dollar terms)," including 700,000 to "Yvette" (*i.e.*, the defendant) (which is consistent with the defendant being issued 6,999,800 HCN worth $.10 per HCN), as well as 1,000,000 to "William" (*i.e.*, co-defendant William Je).

According to the Himalaya Exchange website, as of approximately 12:13 p.m. on April 12, 2023, HCN was purportedly trading at 19.34 HDO. Stated otherwise, 1 HCN equals approximately $19.34. Thus, the defendant's apparent 700,000 HCN holdings are worth

approximately $13,537,613.20. Wang's failure to disclose her ownership of HCN as an asset was a lie to Pretrial Services, the Government, and the Court. These holdings also represent assets that the defendant could draw upon to assist in her flight,[1] as the assets are likely accessible to others located abroad, including Je (*i.e.*, the founder of the Himalaya Exchange and the signatory on bank accounts that received Himalaya Exchange-related investments), who can assist the defendant.

  b) *Exhibits C & D: The Defendant's BVI Entity*

Photographs of a document entitled "Resolution of Director Consented to in Writing Of Holy City Hong Kong Ventures Ltd. Company No. 2063047" reflect the following, among other things: Holy City Hong Kong Ventures Ltd. was registered in the British Virgin Islands on or about May 13, 2021; the defendant ("Yanping Wang") was appointed as its sole director; and the defendant signed the Resolution of Director on or about May 13, 2021 in her capacity as the entity's sole director. Ex. C.

Photographs of a bank account application for a corporate account in the name of Holy City Hong Kong Ventures Ltd. at a particular bank in Saint Lucia reflect, among other things, that "Yvette Wang" is the point of contact for the account application; an estimated 21-40 monthly transactions were expected in the account, totaling approximately $2-3 million per month; that the defendant "Yanping Wang" is the beneficial owner of the account;[2] and that the defendant's source of wealth is "employment." Ex. D. As described in part below, the Government is still seeking records (including from foreign jurisdictions) to try to determine whether Wang opened any bank accounts in the name of Holy City Hong Kong Ventures Ltd.

  c) *Exhibits E: Evidence of Funds in Affiliated Entities' Accounts*

Photographs of annotated documents located inside a folder *in the defendant's purse* at her apartment appear to reflect, in substance and in part, certain transactions and balances for six bank accounts held in the names of HCHK Technologies and HCHK Property Management (entities that the defendant effectively controls, as the 99.9999% shareholder), GFNY, Inc. (*i.e.*, GFashion), and GF Italy (*i.e.*, GFashion Italy) as of on or about March 13, 2023 (*i.e.*, two days before the defendant's arrest). Ex. E. The combined balance of the six accounts is approximately $55,593,292.60. Wang's failure to disclose these accounts was plainly a violation of Judge Parker's order, and further demonstrates the defendant has access to substantial assets to assist her flight. Indeed, these six accounts held approximately $55 million just days before the defendant's arrest.

  d) *Exhibit F: February 2023 Payroll Document*

A photograph of another document located inside the folder *in the defendant's purse* at her apartment appears to reflect, in sum and in substance, that *the defendant* signed payroll expenses associated with various Kwok-controlled entities—including G Music, GF (*i.e.*, GFashion), GC

---

[1] As alleged in the Indictment, following the Government's seizure of certain fraud proceeds, Je attempted to effectuate a "redemption" of approximately $46 million of his own HCN holdings. *See* S1 23 Cr. 118 (AT) at ¶ 24.

[2] The defendant's email account listed on this bank account application is an account hosted @protonmail.com. Proton Mail is an encrypted email service hosted in Switzerland.

(*i.e.*, G|CLUBS), ROLF (*i.e.*, Rule of Law Foundation), and OTC (*i.e.*, Orbit Technology Corporation, which provides customer service support for G|CLUBS)—for February 2023. Ex. F. The document further indicates how certain payroll expenses were to be allocated among affiliated entities, including HCHK. The defendant's signature on the payroll document is dated March 16, 2023 (*i.e.*, forward dated for the day after the defendant was arrested). This document belies the defendant's claim to Pretrial Services that she has been unemployed since September 2022.

e) *Exhibit G: The Defendant's Statement of Purpose of Travel*

On January 11, 2023, the defendant submitted a Statement of Purpose of Travel to the U.S. Department of Homeland Security, in connection with her request for an application for advance parole. Ex. G. The Statement of Purpose of Travel reflects that the defendant sought permission to make "multiple trips" to the United Kingdom (in her role as "the *authorized representative* for two companies that have litigation seeking $500M USD in damages" in the UK) and to the British Virgin Islands (relating to additional litigation pending in the BVIs "that may impact the companies [she] serves as an *authorized representative*"). Ex. G (emphasis added). The defendant signed and attested to the truthfulness of the Statement of Purpose of Travel. This document demonstrates both that Wang was employed when she claimed otherwise to Pretrial Services, and further demonstrates that she is willing to travel internationally, which undermines the defense's general claim that international travel would be unthinkable because of the defendant's concerns regarding the Chinese Communist Party.

\* \* \*

Taking these documents together, they make plain several salient facts. *First*, the defendant lied to Pretrial Services and the Court about her employment status, in an apparent effort to distance herself from the fraud-affiliated entities. Specifically, during her Pretrial Services interview on March 15, 2023, the defendant stated that she has been unemployed since September 2022. *See* 4/4/23 Tr. at 52. However, in her sworn statement to the U.S. Department of Homeland Security in January 2023, the defendant held herself out as the authorized representative for two companies. Ex. G. Moreover, when the Government advised the Court of the company-related documents that were recovered from the defendant's apartment, some of which were dated March 13, 2023, defense counsel represented that the defendant "continued to do certain kind of work, but she did not get paid. She was volunteering." *Id.* at 67. This "volunteer" explanation of the defendant's lie is simply implausible, particularly when viewed in combination with the other evidence that the defendant received benefits—such as her HCN stake—and had control over tens of millions of dollars in company assets. The simplest explanation is the only plausible one: the defendant lied to Pretrial Services to minimize her role and active involvement in the crime and to conceal assets from the Government. *Second*, the defendant willfully concealed assets from Pretrial Services and already has violated Judge Parker's order to disclose all accounts over which she has direct or constructive control. This is apparent from the documents described above, some dated just two days before her arrest, which make clear that the defendant has control over, and access to, millions of dollars. The defendant has demonstrated that she is willing to lie to the Court and to Pretrial Services for her own self-serving purposes. The Court therefore can derive no comfort that any bond conditions, which (necessarily) rely on the defendant's own representations, will assure the defendant's appearance at future court proceedings or mitigate the significant risk of flight.

*Third*, the defendant's willingness and desire to travel internationally—anticipating "multiple trips" to the UK and the BVIs throughout 2023—significantly undermines defense counsel's argument that the defendant poses no flight risk because she "is not someone who is risking going anywhere where China can get their hands on her again." 3/15/23 Tr. at 16. The defendant was willing to travel internationally as recently as January 2023, and the Government contends that she would attempt to do so again if she were released.

2) <u>Information Regarding the Saint Lucia Bank Account Application</u>

The Court requested additional information relating to the St. Lucia bank account application that the Government identified in its March 31, 2023 submission. *See* Dkt. 39 at 1; Dkt. 36 at 2; *see also* Ex. D. The Government will be seeking records from this foreign bank through a Mutual Legal Assistance Treaty, but has not yet been able to determine (a) whether the account was opened, or (b) if so, whether that account contained assets at the time of the defendant's arrest.

3) <u>Details Regarding the Defendant's Pretrial Services Interview</u>

The Court requested additional detail regarding the defendant's March 15, 2023 Pretrial Services interview including, specifically, what Pretrial Services asked the defendant to disclose regarding her assets. (Dkt. 39). On April 10 and 11, 2023, the Government conferred with the Pretrial Services Officer who interviewed the defendant on March 15, 2023. The Pretrial Services Officer advised that she asked the defendant the following questions, and the defendant gave the following answers, in sum and substance:

> Q: At the time of your arrest, *or within your residence*, or on your person, did you have any cash to your name? (emphasis added)
> A: No.
>
> Q: Do you have any savings or checking accounts under your name or under your businesses?
> A: [The defendant disclosed two[3] personal accounts, one at Bank-1 and another at Bank-2, which are reflected in the Pretrial Services Report.]
>
> Q: Are there any business accounts under your name or that you oversee, *or any additional cash anywhere else*?
> A: No.
>
> Q: Are there any stocks, bonds, or retirement accounts that you have?

---

[3] The Government learned today from Bank-1 that the defendant, in fact, holds two accounts at Bank-1—a savings account with a current balance of $540,139.15, and a checking account with a current balance of $13,382.29. The Government is awaiting information from Bank-2 about the defendant's account(s) there. Also today, a Bank-3 representative informed the Government that the defendant appears to be the controlling manager of three business checking accounts at Bank-3, and that those Bank-3 accounts hold funds. The Government will supplement this filing with additional information about the Bank-3 accounts, including the names of the businesses in which they are held and the amount of funds in the accounts, when it receives that further information from Bank-3.

A: No.

Contrary to defense counsel's recollection, *see* 4/4/23 Tr. at 20, Pretrial Services did not only ask the extremely narrow question whether the defendant had any money or cash "on her" when she was arrested. As reflected above, the questions that Pretrial Services posed to the defendant during her interview were broad and—without question—should have elicited the defendant's disclosure of the more than $138,000 in cash that was in the safe in her apartment when she was arrested. Yet the defendant twice lied to Pretrial Services and concealed assets.

    4) <u>Details Regarding the Defendant's Subsequent Disclosure of Assets</u>

The Court inquired into the date(s) of any subsequent interviews of the defendant by Pretrial Services and/or the Government in which the defendant was asked to disclose any additional assets. Pretrial Services has not conducted any further interviews with the defendant, and the Government has not spoken with the defendant. However, to determine whether the defendant had satisfied the bond condition requiring her to "disclose all assets to Pretrial Services and the U.S. Attorney's Office, including any assets over which she has possession, custody or control; and to include any joint or business accounts and any cash, cryptocurrency or digital assets," *see* Dkt. 10 Ex. C, 3/15/23 Tr. at 7, the Government conferred with defense counsel between March 17-19, 2023. The Government specifically identified three entities that the defendant had not previously disclosed that the Government had information suggesting that the defendant controlled. One such entity identified was Holy City Hong Kong Ventures Ltd., which is the same entity referred to in Exhibit C. Defense counsel indicated that the defendant did not have bank accounts in the name of, or associated with, any of those companies or any other companies, and further advised that the defendant is not a signatory or authorized user of any of the HCHK bank accounts.

The documents found in the defendant's apartment, which include evidence that the defendant possessed detailed records of multiple bank accounts and that the defendant signed off on various payroll expenses, *see* Exs. E and F, reflect that the defendant had "control" over the assets in those accounts. She therefore was obligated to disclose them to satisfy that condition of her bond, and her failure to do so amounts to an attempt to subvert the bail conditions that Judge Parker imposed.

**II.  Response to the Defendant's April 6, 2023 Submission**

For the reasons previously stated and set forth herein, the defendant's motion should be denied, and the Court should order the defendant detained pending trial.

*First*, none of the defendant's proposed suretors has a relationship that in any way suggests that they exercise moral suasion over the defendant. *See United States v. Batista*, 163 F. Supp. 2d 222, 224 (S.D.N.Y. 2001) ("Appropriate factors to consider when weighing whether a proposed suretor exercises moral suasion vary from case to case, but may include the strength of the tie between the suretor and defendant"). As outlined in the Government's March 29, 2023 opposition, the Government interviewed the four individuals the defendant has offered as suretors—███████ ██████████████████████████████████████████████████████. None of these individuals has a sufficient personal relationship with the defendant where the loss of their proffered property

"might be expected to exert some 'moral suasion' over" the defendant to honor her bond.[4] *United States v. Martinez*, 151 F.3d 68, 71 (2d Cir. 1998).

▇ does not know the defendant at all. ▇ has never spoken with the defendant; at most, he met the defendant at an "event," but clarified that his relationship with the defendant primarily consists of his following her on social media. ▇ met the defendant at an event in June 2021 and claims to have "seen" her once or twice a month since June 2021. ▇ understands that Wang works for HCHK Technologies.[5] ▇ met the defendant at "events" but does not appear to have any relationship with her; for example, ▇ does not know basic personal information about the defendant, including where she lives or works. Because these proposed suretors have little (or absolutely no) relationship with the defendant, they do not provide any motivation for Wang to remain in the United States, given that her exposure in this case strongly incentivizes her not to appear in court as required.

*Second*, not only do the proposed suretors lack a sufficient personal relationship with the defendant, but they all appear to be victims of the charged fraud—that is, Wang and Kwok have *already* defrauded them. Accordingly, they do not exercise any moral suasion for Wang to remain. The proposed suretors have collectively invested at least approximately $1.36 million into the fraud scheme through the Rule of Law organizations, GTV, G|CLUBS, and the Himalaya Exchange. They were all induced to send money to Kwok-affiliated accounts, some of which the defendant directly controlled, based on false representations about how their money would be used. Their willingness now to provide even more money to the defendant, in the form of property as collateral for her $5 million personal recognizance bond, does nothing to assure the Court that the potential loss of their property will disincentivize the defendant from fleeing.[6] The defendant already stole these individuals' money once—there can be no reasonable assurance that a judgment being issued against them will incentivize Wang to appear in court as required.

*Third*, even if a $5 million bond were fully secured with the cash and/or property the defendant has presented to the Court, such condition would not provide reasonable assurance that the defendant will appear at future court proceedings. As this Court noted during the April 4, 2023 conference, quoting *United States v. Melville*, 309 F. Supp. 824, 826-27 (S.D.N.Y. 1970), "[b]ail is not for the purpose of providing funds to the Government to seek the defendant should he go

---

[4] The defendant's April 6, 2023 filing provides supporting documentation about ▇ (▇ husband), who co-owns the property that has been proposed as collateral for the bond with her husband, ▇. *See* Dkt. 37, Def. Ex. B. The defense has not provided the Government with contact information for ▇, so the Government has no information about ▇ relationship (if any) with the defendant.

[5] As described above, Wang has effectively tried to disclaim any association with the entities. She denied working anywhere at the time of her arrest (although she was employed by HCHK), and she denied having control over any assets related to those entities, when she plainly had access to (or effective control over the assets in) HCHK accounts. HCHK Technologies—a Kwok-controlled company that the defendant effectively owns through her BVI-registered shell company—sent employees to the UAE earlier this year to establish bank accounts that, as Kwok claimed, would be beyond the "long-arm jurisdiction" of the United States.

[6] The Government has not yet interviewed the suretors as victims of the crimes charged in the Indictment or asked them questions of substance about their investments.

Case 1:23-cr-00118-AT   Document 42   Filed 04/12/23   Page 8 of 9

Page 8

underground or flee the jurisdiction. Bail is intended as a catalyst to aid the appearance of the defendant when warranted." (4/4/23 Tr. at 37-38). A secured $5 million bond, here, would simply represent the amount of money the defendant is willing to pay to flee. Indeed, while the Government has seized approximately $630 million in fraud proceeds to date, a substantial amount of proceeds from the charged fraud scheme—which is ongoing—remain unrecovered. For example, documents recovered from the defendant's apartment at the time of her arrest on March 15, 2023 reflect balances in six bank accounts held in the name of various fraud-related entities (*i.e.*, HCHK Technologies, HCHK Property, and G Fashion) totaling approximately $55.5 million as of March 13, 2023. *See* Ex. E. It is therefore reasonable to conclude that the defendant is in a position to compensate any suretor who sustains a loss as a result of her flight—if it is even necessary for her to recompensate them. *United States v. Shelikhov*, 468 Fed. Appx. 54, 56, 2012 WL 899260 (2d Cir. 2012) (affirming denial of pretrial release and noting "in light of the vast unrecovered proceeds from the charged fraud scheme, the district court could reasonably have concluded that Shelikhov was in a position to compensate any suretors who sustained a loss as a result of his flight"). This risk is particularly pronounced here given that the defendant did not inform Pretrial Services about the cash in her apartment or her "cryptocurrency" assets, nor has she been forthright about the accounts under her control or even whether she is employed. Thus, there exists funding to finance the defendant's flight.

\* \* \*

As described in prior briefing and during the conference on April 4, 2023, the defendant poses an extraordinary risk of flight. This serious risk of flight arises from the defendant's lack of ties to the United States, the nature of the charges, her key role in this serious offense conduct, her substantial financial resources, the significant sentence that she faces, the strong evidence of her guilt, her ties to foreign jurisdictions, and her relationship with co-conspirator and international money launderer William Je, who remains at large. The defendant has access to and the financial support of an extensive network of Kwok's loyal followers dispersed throughout the world—as evidenced by the willingness of people who have never even met her to post property as security for a bond. The defendant also has a powerful incentive to flee, given the sentence she faces and the likelihood of her deportation following criminal proceedings.

For all these reasons, the defendant's motion should be denied. The Government has established, by a preponderance of the evidence, that the defendant presents a serious risk of flight if not detained, and that there are no conditions of release can reasonably assure the defendant's

presence at future court proceedings.  Accordingly, this Court should order the defendant detained pending trial.

      Respectfully submitted,

      DAMIAN WILLIAMS
      United States Attorney

By: *[signature]*
      Juliana N. Murray
      Ryan B. Finkel
      Micah F. Fergenson
      Assistant United States Attorneys
      (212) 637-2314 / 6612 / 2190

Cc:    Alex Lipman, Esq. (by ECF and Email)
       Priya Choudhry, Esq. (by ECF and Email)