**LIPMAN LAW PLLC**

April 14, 2023

<u>Via **ECF**</u>
The Honorable Robert W. Lehrburger
United States Magistrate Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, New York 10007-1312

   **Re:**  *United States v. Yanping Wang*, 23-CR-118-AT
       Response to the Government's Answers to the Court's Bail Hearing Questions

Dear Judge Lehrburger:

  Along with ChaudhryLaw PLLC, and on behalf of Yanping Wang, we submit this letter in response to the government's April 12, 2023, letter (the "Letter") responding to the Court's April 10, 2023, Order regarding the bail hearing held on April 4, 2023 (the "Order"). In its Order, the Court asked the government to provide certain documents and to lay a foundation to support the inferences it makes in support of its factual assertions. The government has failed to do this because it cannot.

  Rather than provide requested documents and straightforward answers to the follow-up questions posed by the Court in its Order, the government introduces new evidence and reargues the same points it had already made in prior written submissions and orally in court. For the reasons stated in our prior written submissions and oral argument, which we will not attempt to reproduce here, Ms. Wang is not a flight risk. We will, therefore, limit ourselves to addressing the government's points and answering the Court's questions.

  Previously, the government argued for the bail package that is in place. This constitutes an admission that there is a set of conditions that can reasonably assure the defendant's appearance at trial. But now, based on claims of "changed circumstances," the government argues that no conditions exist that can reasonably assure the defendant's appearance at trial. As the discussion below makes clear, nothing in the government's latest submission—including none of the purported new evidence—constitutes a material change from what the government knew when it agreed that bail was appropriate; indeed, much of the government's purported new evidence is neither new nor evidence and could not support the government's factual assertions in any event. For these reasons, we respectfully ask the Court to approve two or more of Ms. Wang's proffered co-signers or eliminate this requirement altogether.

**1.**  **Documents related to HCN.**

  The government asserts that "[c]ontrary to the representations to the Court and to the Government, Exhibit A ("GXA") demonstrates that the defendant holds a significant amount [sic] of 'HCN.'" (Letter at 2). This is a misrepresentation of what the relevant exhibits show. GXA is a schedule that the government calls, "HCN Allocation at USD0.1." What counsel

actually told the Court was that GXA showed only an allocation of HCN; it did not show what happened with that allocation: "They're looking at a schedule that says allocation, okay, allocation. They're not looking at an account at H Coin." (April 4, 2023, Bail Hearing Tr. at 24:2–5). Counsel then informed the Court that, based on our inquiry, which included reaching out to people with relevant knowledge, we were unable to ascertain what happened with that allocation, i.e., we do not know whether the HCN that were allocated were ever exercised and turned into Himalayan Coin or Himalayan Dollar: "I've been trying to figure out what happened to that allocation. The best I can ascertain is that [Ms. Wang] has no idea what happened. I'm not saying that something didn't happen with it. I'm saying that she has no idea." (*Id.* at 24:5–9).

Rather than simply admitting that it, too, does not know and providing GXA as the Court ordered, the government now proffers an additional, new document, Exhibit B ("GXB"), which was not referenced in its March 31, 2023, submission, and, likewise, does not support the government's factual assertion. GXB is no different than GXA in that it is hearsay and not at all clear on its face. The government claims—without any supporting evidence or testimony from a person with knowledge—that GXB shows that a certain number of HCN were "minted" and that GXB reflects a distribution of HCN to various people and entities, including to "Yvette." (Letter at 2). A close examination of GXB shows no support for this claim.

There is nothing on the face of GXB that confirms either the date on which it was created or whether it reflects an *anticipated* distribution or one that has already taken place.[1] In fact, GXB seems to contemplate that a distribution of HCN would be accompanied by payments in U.S. dollars to reflect the acquisition of the distributed HCN; it appears to show a total sum of all such payments. In other words, as the government well knows and does not dispute, the allocation of HCN was to be effectuated by a payment by the recipient of the allocation—much the same as a purchase of an option by an employee to whom the option is granted. The government has offered no proof—not even an allegation—that Ms. Wang personally had paid $700,000.00 for the HCN purportedly allocated and "distributed" to her. The government will not find any such evidence. As we said to the Court at the last hearing, after making inquiries, we do not know what happened with this allocation, and neither does the government. (April 4, 2023, Bail Hearing Tr. at 24:2–5). In fact, the government already admitted that it cannot prove

---

[1] GXB also contains untranslated Chinese writing as well as hand-written cross-outs of certain numbers, including the number matching the name "Yvette," and no explanation as to why those numbers are crossed out.

that Ms. Wang holds the assets it claims are hers. (*See id.* at 55:8–56:3).[2] All the government has are two hearsay documents that are not at all clear on their face, that are undated, that contain untranslated Chinese writing, and for which there is no context or explanation.

But the government's claims about HCN are also highly misleading: contrary to the government's claims, one cannot convert HCN holdings into cash except in limited amounts wholly insufficient to fund an escape. And the government knows this. The value the government assigns to 700 HCN is entirely theoretical. The government correctly asserts that "on April 12, 2023, HCN was purportedly trading at 19.34 HDO [HDollars]." (Letter at 2). This means that the value of HCN listed on the Himalayan Exchange represents what bidders are willing to pay in HDollars ("HDO"), not in U.S dollars, or any other fiat currency. The government follows this true assertion with a sleight of hand by claiming next that "Stated otherwise, 1 HCN equals approximately $19.34." (*Id.*). That would be true if 1 HDO were actually convertible into 1 U.S. dollar, but, as the government well knows, it is not. Indeed, according to the government and to the U.S. Securities and Exchange Commission, investors who have attempted to convert their HDO into dollars were unable to do so, and the fraud allegations relating to the Himalayan Exchange (both in the Indictment and in the SEC Complaint) include allegations that, contrary to defendants' representations, HDO were *not* convertible into USD and could *not* be used to purchase goods and services. (*See* Indictment; SEC Complaint (No. 23-CV-02200, March 15, 2023, ECF No. 1 ¶ 128)).

---

[2] Consider the following admission by the government:

> *Your Honor is correct, defense is correct, there's no way for the Government to prove that Ms. Wang holds that money*, and, in fact, *the Government's allegation is that it's not cryptocurrency*, but we're not alleging it's valueless. We're alleging that certain people have it and the people who are quickest to redeem can basically have an exit scam and get out with their money. I would note while, again, we don't have access to an account that Ms. Wang has where the money is held, Your Honor correctly identified approximately $7 million worth of a cryptocurrency asset would be something you would want to keep track of. The allocation indicates Yanping Wang, and then it has the allocation, it's in her name.

(April 4, 2023, Bail Hearing Tr. at 55:8–56:3 (emphasis added)).

In other words, the government claims that Ms. Wang lied, but it also admits that it does not know what the truth is, i.e., it has no basis for determining whether any statement by Ms. Wang comports with the truth. Note also, that it is too late for the "exit scam" supposition offered by the government. As discussed elsewhere here, the Himalayan Exchange has been deprived of its reserves and has set limitations on redemptions. Note, too, in the same paragraph, the government first claims that these assets are not cryptocurrency and then takes Ms. Wang to task for not reporting it as cryptocurrency.

In any event, one reason HDO cannot be converted into U.S. dollars now is that the government seized from the Himalayan Exchange much, if not all, of the cash that would be the reserve Himalayan Exchange could use to allow HDO holders to redeem HDO for USD. (*See* Indictment at ¶ 25(b) ("Following the seizures, the Himalayan Exchange website continued to represent that HDO was backed by a 'Reserve consisting of USD and cash-equivalent assert' when, in truth, it was not.")). And, as the government is undoubtedly well aware, the Himalayan Exchange has notified its customers that it is unable to redeem HDO for USD except in $5,000.00 increments and only once a month. (*See* Defendant's Exhibit A attached hereto).[3] In sum, even if Ms. Wang held 700,000 HCN now, contrary to the government's representations, she could not fund her escape, and it is not worth, in the real world, anything like $13,537,613.20 that the government falsely claims it is worth. (*See* Letter at 2–3).

**2.     Documents related to the BVI entity.**

The government has repeatedly and falsely but, nonetheless, boldly asserted that Ms. Wang has failed to disclose any bank accounts held in the name of a BVI entity, Holy City Hong Kong Ventures. (*Id.* at 2). In support of that assertion, the government offers two documents: (a) an account application form that is undated and bears no marking indicating that it was either sent to, handed to, or received by anyone; and (b) a board of directors' resolution that has nothing whatsoever to do with opening or maintaining any bank account.

In fact, as is the case with the HCN, the government admits it does not know what the truth is, to wit: "As described in part below, the Government is still seeking records (including from foreign jurisdictions) *to try to determine whether* Wang opened any bank accounts in the name of Holy City Hong Kong Ventures Ltd." (*Id.* at 3 (emphasis added)). As to the bank for which it claims to possess an application proving the existence of a bank account—and the only document the Court asked about—the government admits that it *will be* seeking this information:

> The Court requested additional information relating to the St. Lucia bank account application that the Government identified in its March 32, 2023[,] submission. *See* Dkt. 39 at 1; Dkt. 36 at 2; *see also* Ex. D. The Government will be seeking records from this foreign bank through a Mutual Legal Assistance Treaty, *but has not yet been able to determine (a) whether the account was opened, or*

---

[3] The government's mention of William Je is similarly misleading and, in any event, wholly irrelevant. The government references in its indictment allegations that after the government had seized hundreds of millions in assets, "including accounts that purported to hold [Himalayan Exchange] cash reserves," (Indictment ¶ 25(a)), Mr. Je *attempted* to redeem $46 million. The operative verb there is "attempted"; it is clear from the Indictment that Mr. Je did not succeed. It is also irrelevant to consideration of bail for Ms. Wang what Mr. Je may or may not have done with any HCN he had held; the government does not claim that Ms. Wang had any claim to any of Mr. Je's resources.

> *(b) if so, whether that account contained assets at the time of the defendant's arrest.*

(*Id.* at 5 (emphasis added)).

In other words, having asserted that Ms. Wang should be deprived of her liberty and denied bail in part because she purportedly "lied" about the existence of a bank account in St. Lucia, the government now admits—only because it was asked a direct question by the Court—that it has no idea whatsoever whether any such account even exists.[4]  In doing so, the government has failed to impeach Ms. Wang's credibility and has instead called into question its own.

3. **Documents related to accounts of affiliated entities and payroll documents.**

As the government knows full well, ownership of an account by an entity one controls or does work for does not by itself translate into one's ability to transact in that account or to take money out of any such account.  For example, one of the owners of a private business may review and approve expenditures from a bank account that is administered by the company's chief financial officer or controller.  Unless that owner's name is on the account as an authorized user, the bank will not—cannot—take direction from that owner to transact in the account.

The government admits that it conferred with defense counsel about accounts for three entities that Ms. Wang controlled.  (*Id.* at 6).  But it is misleading for the government to assert that Ms. Wang improperly failed to disclose any accounts related to these entities.  As we understand it, and as the government seems to concede, Ms. Wang does not have the ability to administer any of these accounts, and she cannot write checks or make withdrawals.  At Ms. Wang's direction, counsel attempted to ascertain what, if any, corporate accounts existed in which Ms. Wang was able to transact directly, meaning accounts on which she is personally listed as an account manager, such that she could write checks or make withdrawals.  Counsel were able to identify one such account and obtained and provided the account number for that account to the government.  If there are other such accounts, counsel was unaware of them after inquiring.

---

[4] This, as the Court is aware, is not the only misrepresentation the government made to support its efforts to deny Ms. Wang bail and thereby deprive her of her liberty.  Among other things, the government repeatedly—both orally and in writing—misrepresented the results of the search of Ms. Wang's apartment by claiming that (1) certain iPhones were found secreted in boxes to make them look new when they were not, (ECF No. 10 at 3; March 15, 2023, Presentment Tr. at 12:5–15; April 4, 2023, Bail Hearing Tr. at 73:12–16); (2) that a phone was found in between Ms. Wang's mattresses, (ECF No. 10 at 3); and (3) that documents were found hidden in the cushions of Ms. Wang's couch or between her mattress and box spring, (March 15, 2023, Presentment Tr. at 12:19–21).  There are no evidence log entries (which include agents' descriptions of where evidence was found), no photo log entries, and no photographs from the search that support these assertions.  (*See* Defendant's Exhibits B and C attached hereto).

Further, in conversations with the government, counsel made clear that the account information being provided related only to accounts Ms. Wang could administer personally, having acknowledged that there are corporate accounts that belong to entities Ms. Wang may own or control. This was an explicit conversation in the courtroom on the fifth floor of 500 Pearl Street and the purpose, as counsel understood it, was to identify accounts that Ms. Wang could access and use personally. With this as backdrop, there is no basis for the government's assertion that Ms. Wang has "control over, and access to, millions of dollars" or that she lied about any such accounts or withheld information about them. (*Id.* at 4). As for payroll documents, again, evidence that Ms. Wang reviewed and signed off on payroll is not evidence that she is able to take money out of those accounts for herself.[5]

**4. The statement for purpose of travel.**

The Court did not ask for this document or any information about Ms. Wang's proposed travel. Yet the government offers this document for two reasons. One is that the government asserts that the statement shows that Ms. Wang was employed at the relevant time. The document shows no such thing. It is possible to be an authorized representative for two companies in litigation and to do that without compensation and without being an employee of those companies (or of any other person or company). Ms. Wang was asked by Pretrial Services whether she was employed. She said she was not because that was the truth; her employment ended last year, and she stopped being compensated then. Whether the government likes it or not, Ms. Wang is free to spend her time as she wishes, including by working for free or volunteering. Working for free or volunteering is not the same as being employed in that word's common English meaning.[6]

---

[5] Also misleadingly, the government claims that failure to disclose accounts in which Ms. Wang could not transact but which belonged to entities she owned or did work for is a failure to disclose accounts over which she had "control." For the reasons stated above, at the time of discussion with counsel, the government appeared to have been content to be informed about only the accounts which Ms. Wang administered personally. Regardless, in the context of a bail application, the most natural understanding of the word "control" is the ability to withdraw funds personally so as to finance an escape or a life as a fugitive. Any ambiguity in the meaning of the word "control" cannot be held against Ms. Wang, and her understanding of the word in a narrower sense is both justified and reasonable. It is not a lie or a violation of bail conditions to answer truthfully based on one's reasonable understanding of a word, especially when that understanding was shared by one's counsel based on interactions with the government.

[6] For the same reasons, if what Ms. Wang wants to do with her free time is review and sign off on payroll, she is free to do so and, in the absence of some arrangement that incudes compensation, she is not "employed." As well, the idea that, post-indictment, Ms. Wang is trying to distance herself from the activities that are described in the Indictment by claiming that she is no longer employed makes no sense because she was aware that she signed off on the payroll and also aware that the documents with her sign-off were at her home (indeed, in her purse, according to the government) when her home was searched.

The second reason the government offered this document is to reargue the flight risk point. We will simply reiterate what we already said and what is very much self-evident: Ms. Wang knew since the fall of last year that the government was investigating and that it seized hundreds of millions of dollars. Not only did she not flee, but she gave notice to the government that she wanted to travel without needing to do so. Put differently, consistent with her desire to maintain her U.S. asylum application and inconsistent with an intent to flee, she sought the U.S. government's permission to travel and, when her first proposed travel plan did not pan out, she applied again. As for the risk of being deported to China, Ms. Wang asked to travel to the United Kingdom and to the British Virgin Islands; she did not ask to travel to places with a high risk of being deported to China.[7]

### 5. Ms. Wang's pretrial interview.

The government presents what looks like a transcript of a pretrial interview conducted on the day of Ms. Wang's arrest. The government was not there, and there is no official recording (video, audio, or stenographic). Hence, what the government has created is more like an imagined dramatic reenactment and should be weighed as such. Needless to say, there is no such transcript, and the government offers no exhibits to support the precise language that it presents as a recorded dialogue. The presentation of this purported transcript also fails to mention that Ms. Wang's interview was conducted with the aid of an interpreter, meaning what the government presents as the precise question posed to Ms. Wang is not necessarily what Ms. Wang was actually asked. As anyone who has had to face this issue, language translation is often imprecise, and that is especially true with Mandarin.

Separately, counsel for Ms. Wang *were* present for the interview and took notes. Both counsel remember that the questions were certainly not asked in the way that the government claims they were: (a) "At the time of your arrest, or within your residence, or on your person, did you have any cash to your name?" or (b) "Are there any business accounts under your name or that you oversee, or any additional cash anywhere else?" In fact, counsel do not recall any questions whatsoever about cash in Ms. Wong's residence nor questions about additional cash anywhere else. Instead, counsels' notes—both sets taken contemporaneously, simultaneously, and out of sight of each other—are consistent with a different relevant question, i.e., in substance, "Did you have any cash on you when you were arrested?" One counsel's notes contain the following: "No cash on her when arrested." The second has a note stating: "No cash on person." This is what counsel remember and their recollection is consistent with their notes.

Finally, the cash found in Ms. Wang's apartment was not hidden in the floorboards or in the refrigerator. It was in the safe—together with passports and other things that are normally found in safes—and government agents had no difficulty locating the safe and accessing its contents. Ms. Wang saw the agents begin the search of her apartment. The idea that Ms. Wang

---

[7] The government's assertion that Ms. Wang has a motive to flee because she would be returned to China after serving her sentence is contradicted by this country's participation in the Geneva Convention, as the government either knows or should know.

would lie about cash stored in her safe at home in the hope that a search by nine agents would not result in the discovery of her safe makes no sense whatsoever.

**6.  Submission relating to co-signers.**

Here, again, rather than limit itself to what the Court asked, the government took an opportunity to reargue. We will abstain, except to say the following: even individuals who do not know the defendant personally may serve as co-signers as long as at least one co-signer has moral suasion over the defendant. *See United States v. Batista*, 163 F. Supp. 222, 226 (S.D.N.Y. 2001) ("[I]t may not always be possible to find individuals with sufficient assets to post who also may exert moral suasion over a defendant. A person with moral suasion over the defendant will be able to influence him to appear in court regardless of whether the money at stake is put up by a third party. Therefore, a defendant who presents some individuals with moral suasion and others who are financially responsible may satisfy the requirements of bail."); *United States v. Hammond*, 204 F. Supp. 2d 1157, 1166 (E.D. Wisc. 2002) (citing *Batista*, the court found that although several of the bail "posters [did] not personally know defendant, . . . this [was] not an adequate reason to deny release."). The government's efforts to eliminate all the co-signers is, therefore, contrary to law.[8] In any event, for the reasons we presented at the hearing, as a member of the anti-CCP movement, this potential co-signer does have moral suasion over Ms. Wang, even if they are not personally acquainted. In addition to that potential co-signer who is willing to post property to secure the bond, we have presented the Court with several others who know Ms. Wang.

\* \* \*

For all of the foregoing reasons and for the reasons set forth in Ms. Wang's prior written and oral submissions and arguments, Ms. Wang respectfully requests that this Court grant her Motion for an Order Directing She Has Complied with the Terms of Her Bail Conditions and to rule that the government's refusal to approve her bond co-signers has been arbitrary; or alternatively, to grant her request to amend her bail conditions to eliminate the requirement that she obtain two financially responsible persons to co-sign her bond.

Best regards,

**Lipman Law PLLC**

Alex Lipman

---

[8] In light of the government's multiple misstatements and material omissions described above—all made for the purpose of detaining Ms. Wang without bail—the court should be highly skeptical of the government's representation that it has legitimate concerns about the qualifications of Ms. Wang's co-signers and has rejected them for that reason.