N44QkowC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     UNITED STATES OF AMERICA
 3              v.                          23 CR 118 (AT)
                                            Arraignment/Bail
 4   HO WAN KWOK
     YANPING WANG
 5              Defendants
     ------------------------------x
 6                                          New York, N.Y.
                                            April 4, 2023
 7                                          11:30 a.m.

 8

     Before:
 9                        HON. ANALISA TORRES
                                            District Judge
10

11                        APPEARANCES
     DAMIAN WILLIAMS
12        United States Attorney for the
          Southern District of New York
13   RYAN B. FINKEL
     JULIE MURRAY
14   MICAH FERGENSON
          Assistant United States Attorneys
15
     BROWN RUDNICK LLP
16        Attorneys for Defendant Kwok
     STEPHEN COOK
17   WILLIAM BALDIGA

18   LIPMAN LAW PLLC
          Attorney for Defendant Wang
19   ALEX LIPMAN

20   CHAUDHRY LAW PLLC
          Attorney for Defendant Wang
21   PRIYA CHAUDHRY

22   ALSO PRESENT:  KARINA CHIN VILLEFORT, PTS (SDNY)
                    GEOFFREY MEARNS, Paralegal Specialist (USAO)
23                  BRENDA CHEN, Interpreter (Mandarin)

24

25
```

N44QkowC

1              (In open court)

2              THE COURT:  Good morning.

3              We are here in the matter of the United States v. Ho

4    Wan Kwok and Yanping Wang.

5              Would you make your appearances, please.

6              MR. FINKEL:  Good morning, your Honor.  Ryan Finkel

7    Julie Murray and Micah Fergenson for the United States.  We're

8    joined today at counsel table by Geoffrey Mearns, who is a

9    paralegal in our office.

10             MR. COOK:  Stephen Cook and William Baldiga on behalf

11   of Mr. Kwok, who is present in custody and being assisted by a

12   Mandarin interpreter.

13             MR. LIPMAN:  Your Honor, Alex Lipman of Lipman Law

14   Firm PLLC, and at counsel table also Priya Chaudhry of the

15   Chaudhry Law Firm PLLC for defendant Yanping.  Ms. Wang is

16   here, she is present, and she is being assisted by a Mandarin

17   interpreter.

18             THE COURT:  Please be seated.

19             I would like the interpreter to identify herself,

20   please.

21             THE INTERPRETER:  Good morning, your Honor.  My name

22   is Brenda Chen.  I'm a certified court Mandarin interpreter.

23             THE COURT:  Please swear in the defendants.

24             (Defendants sworn)

25             THE COURT:  Please be seated.

N44QkowC

1          Mr. Kwok and Ms. Wang, I'm going to ask some

2    questions.  Wait for me to call your name, and then you

3    may answer.

4          Do you understand what the interpreter is saying?

5          Mr. Kwok?

6          DEFENDANT KWOK:  Yes, your Honor.

7          THE COURT:  Ms. Wang?

8          DEFENDANT WANG:  Yes, I do.

9          THE COURT:  Do you understand that you're now under

10   oath, and that if you answer any of my questions falsely, you

11   may be prosecuted for perjury based on any false answers?

12         Mr. Kwok?

13         DEFENDANT KWOK:  Yes.

14         THE COURT:  Ms. Wang?

15         DEFENDANT WANG:  Yes.

16         THE COURT:  I understand that I must first arraign

17   both defendants, correct?

18         MR. FINKEL:  Yes, your Honor.

19         THE COURT:  Do you each have a copy of superseding

20   indictment?

21         Mr. Kwok?

22         DEFENDANT KWOK:  Yes.

23         THE COURT:  And Ms. Wang?

24         DEFENDANT WANG:  Yes, your Honor.

25         THE COURT:  Has the document been translated for you?

N44QkowC

1              Mr. Kwok?

2              DEFENDANT KWOK:  Yes.

3              THE COURT:  Ms. Wang?

4              DEFENDANT WANG:  Yes.

5              THE COURT:  Do you want me to read it to you or do you

6    waive its public reading?

7              Mr. Kwok?

8              MR. COOK:  Mr. Kwok waives reading of the indictment,

9    your Honor.

10             THE COURT:  Ms. Wang?

11             MR. LIPMAN:  Your Honor, Ms. Wang waives the reading

12   of the indictment and asks a plea of not guilty be entered.

13             THE COURT:  How do you plead, guilty or not guilty?

14             Mr. Kwok?

15             DEFENDANT KWOK:  Not guilty.

16             THE COURT:  And Ms. Wang?

17             DEFENDANT WANG:  Not guilty.

18             THE COURT:  A plea of not guilty will be entered for

19   each defendant, and the record should reflect that both

20   defendants have been arraigned.

21             I'm now going to address Mr. Kwok's bail application,

22   which the government opposes.

23             I have reviewed the parties' submissions dated

24   March 15, 28, and 31 of this year, and April 3 of this year.  I

25   have also reviewed the pretrial services report dated March 15

N44QkowC

1    of this year.  Judge Lehrburger will hear Ms. Wang's bail

2    application today at 2:00 p.m.

3            Mr. Kwok has been detained since March 15, the date of

4    his arrest.  He was arraigned on the preceding indictment

5    before the Honorable Katharine H. Parker and detained on

6    consent without prejudice to a future bail application.

7            Pursuant to 18 United States Code, Section 3142(e),

8    the question I must resolve is whether there is a condition or

9    combination of conditions that will reasonably assure the

10   appearance of the defendant as required and the safety of any

11   other person and the community.

12           To make this bail determination, I must undertake a

13   two-step inquiry.  First, I must determine whether the

14   government has established by a preponderance of the evidence

15   that Mr. Kwok presents a serious risk of flight or obstruction

16   of justice.  18 United States Code, Section 3142(f)(2).  *United*

17   *States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988).  If the

18   government carries this initial burden, I must then determine

19   whether there are reasonable conditions of release that can be

20   set or whether detention is appropriate.  To support detention

21   based on danger, the government's proof must be clear and

22   convincing.  18 United States Code, Section 3142(f)(2).

23           The factors that I must consider in making my

24   determination are set forth in 18 United States Code, Section

25   3142(g).  They include the nature and circumstances of the

N44QkowC

1    offense charged, including whether the offense is a crime of

2    violence, a violation of United States Code, Section 1591, a

3    federal crime of terrorism, or involves a minor victim or a

4    controlled substance, firearm, explosive or destructive device;

5    the weight of the evidence against the defendant; the history

6    and characteristics of the defendant, including his or her

7    physical and mental condition, family ties, employment,

8    financial resources, length of residence in the community,

9    community ties, past conduct, history relating to drug or

10   alcohol abuse, criminal history, record concerning appearance

11   at court proceedings and whether at the time of the current

12   offense or arrest the defendant was on probation, on parole or

13   other release pending trial, sentencing, appeal or completion

14   of a sentence for an offense under federal, state and/or local

15   law; and the nature and seriousness of the danger to any person

16   or the community that would be posed by defendant's release.

17           I have carefully considered all of these factors and

18   the parties' written submissions.

19           Does the government wish to be heard?

20           MR. FINKEL:  Yes, your Honor.

21           Your Honor, there are many aspects of this case, as

22   the Court may be familiar with the indictment, that are

23   extraordinary.  This is a billion dollar fraud case, in which

24   Mr. Kwok preyed on thousands of individuals to line his own

25   pockets with extraordinary luxurious items.  But the issue

N44QkowC

1   today, your Honor, isn't extraordinary.  It's actually quite

2   straightforward.  A simple application of the factors that the

3   government has outlined in its letters to the legal framework

4   that the Court just went through makes clear that detention is

5   appropriate is in this case.

6           As this Court knows, pretrial services doesn't often

7   recommend detention in a fraud case, but they've recommended it

8   here, and for good reason.  This court should adopt that

9   recommendation.

10          I want to start first with the risk of flight.  As the

11  Court mentioned, the government's obligation is to demonstrate

12  just by a preponderance that there is a risk of flight with

13  respect to the defendant.  So what we have here again, pretty

14  straightforward:  An exceptionally wealthy, exceptionally

15  well-connected, exceptionally sophisticated, deeply experienced

16  world traveler, who is 54 and has barely spent five continuous

17  years in this country.  He has at least three, and as many as

18  eleven, different passports.  He has a co-defendant who's

19  currently fugitive who's in the UAE right now, or believed to

20  be.  The defendant has access to private aircraft and a

21  compelling, exceptionally compelling, motive to flee, your

22  Honor.

23          As a result of the charges in this case, the defendant

24  faces decades in prison.  The evidence is incredibly strong.

25  It's not even really disputed by the defense in their briefing.

N44QkowC

The indictment itself describes it in detail.  At the end of
the day, your Honor, simply following the money that the
defendant collected, following the money into the pockets of
his wife, his children, and himself demonstrates his
involvement in this epic fraud.

So, again, given the incentive structure, why would
the defendant stay?  It's simple rational thinking.  Why would
he subject himself to the court process, to potentially decades
in prison, followed by likely deportation, if he can take
advantage of an alternative, the alternative of flight.

So the defense claims in its briefing that he
essentially is incentivized to remain for two primary reasons:
The first is that his wife and his daughter are here in the
United States, but his wife and his daughter have been here
even less time than he has been, and they have an incentive to
flee as well.  They're referred to in the indictment; they were
recipients of the fraud money; and they can leave the country
just as easily as the defendant can.

And, in any event, the defendant has a son in the
United Kingdom, in a foreign country.  He certainly would be
incentivized to spend time with his son, to be with his son in
the same way the defense claims he is incentivized to stay to
be with his wife and daughter.

Defendants, your Honor, in this courthouse flee with
far less global reach than Kwok has.  People are willing to

N44QkowC

1    rearrange their lives who have been here for decades to avoid

2    prison.  Kwok doesn't even have any meaningful ties in this

3    country that make such a rearrangement impossible or even

4    difficult.  He's been here, according to the defense,

5    continually since approximately 2017.  That's it.  And

6    according to the indictment, he's been involved in this

7    conspiracy since 2018, which means his ties to the United

8    States, your Honor, are about laying the groundwork for and

9    committing a billion dollar fraud.

10           That brings us to the second reason the defense says

11   he's incentivized to stay.  They claim he cannot travel

12   anywhere because of fear of being repatriated to China.  But

13   that argument doesn't withstand scrutiny either, as we've

14   outlined, your Honor.  According to the defense, the defendant

15   fled China in 2015 to escape China.  If he was concerned about

16   the Chinese trying to capture him or repatriate him at that

17   time, according to the defense, he wouldn't travel

18   internationally; yet, he did.  Even the defense concedes he

19   traveled from 2015 to 2017.  His passports make that clear.  So

20   he traveled.  He wasn't afraid to travel internationally.  He

21   wouldn't be afraid to travel internationally now.

22           Then we turn to does the defendant have the ability to

23   flee?  This too, your Honor, is fairly straightforward.  Kwok

24   has means; he has sophistication; and he has connections, which

25   all make his ability to flee, like I said, straightforward.

N44QkowC

1          I mentioned the passports.  But that's not all he has.

2    As the government outlined, your Honor, he had $394,000 in

3    cash - cash that he didn't tell pretrial services about - in

4    his safe in his mansion in New Jersey.  He had another hundred

5    thousand worth of gold coins, foreign currency; and his

6    co-defendant had more than a hundred thousand dollars in a safe

7    in her condo.

8          There was also a document in his co-defendant's

9    apartment demonstrating that Kwok has access to $34 million in

10   bank accounts.  And, your Honor, I can tell the Court that the

11   government has worked quite hard in tracing the fraud proceeds

12   in this case, and we've traced it not just throughout the

13   United States, but we've tried to trace it internationally.

14   And what we've seen is money flowing to Switzerland, to the

15   UAE -- which I'm going to talk more about -- to England, and

16   possibly even Kazakhstan.  Yet, the defendant claims that he --

17   let me take a step back for a second.

18         So does the defendant have the financial means to

19   flee?  Absolutely.  And it's impossible for this Court to have

20   any reasonable assurance of where that bottom is, where his

21   money is, particularly because he lied to pretrial services

22   about the $394 plus thousand that he had in his mansion.

23         So let's turn to know-how.  Does the defendant have

24   the know-how, the sophistication to flee.  Again, simple,

25   straightforward.  Yes, he does.  This is a man who has

N44QkowC

cellphone scramblers, Faraday bags, burner phones, obfuscates

his funds, uses shell companies, uses intermediaries, and, as I

mentioned, has at least three and possibly as many as eleven

passports.  He's a deeply experienced world traveler, who

admitted to pretrial services to traveling to over 50 different

countries.  That's exceptional.  He certainly has a

sophistication and know-how to flee.

Then the question becomes does he actually have

anywhere to go?  And the answer to that, your Honor, again

simple, straightforward.  Yes, he clearly does.  He has a UAE

passport somewhere.  We don't know where it is.  We have a copy

of it.  But what that UAE passport shows is that he's likely a

citizen of that country because when you hold a passport that

indicates citizenship for a particular country -- and we

checked with the office of international affairs, DOJ's OIA

office on this -- the UAE does not extradite citizens.

And, of course, your Honor, his co-defendant is in the

UAE right now, or at least we believe him to be.  There are

operations for G Clubs, which is an arm of his fraud in the

UAE.  There are operations for the Himalaya Exchange in the

UAE, another arm of his fraud.  There were two personnel, two

employees of G Club who spent months in the UAE and were able

to obtain visas in the UAE.  The defendant can go to the UAE.

He would be safe, effectively safe from the reach of the

government there, and he knows that because he's made

N44QkowC

statements about that.

So has the government established by a preponderance that the defendant is a risk of flight?  Yes.  And there really shouldn't be much of a serious dispute about that.  So then the question becomes what conditions -- are there conditions that the Court can impose to reasonably assure that there will not than a flight?  There aren't any.

So let's start with what the defense has put forth. They put forth a $25 million bond secured by $5 million cash. Now, if we take a step back for a moment, what is the purpose really of a bond?  The purpose of the bond, your Honor, is to change the incentive structure because the defense is incentivized to flee, he's incentivized to get away from possible prison, right?  So the thinking of a bond is if he flees, he loses money.  So that's supposed to flip the incentive.  But it doesn't here.  It can't here.

And why is that?  Because, as the defendant said in his pretrial services report, he claims not to have any money, and whatever money he does have is subject to the bankruptcy proceedings, which is to say all of his money is either forfeitable or encumbered by bankruptcy, so there is no money he could put up that will provide any moral suasion for him to remain.

And this, your Honor, it's also important to keep this in mind.  The defendant has an uncanny ability to convince

N44QkowC

victims to depart with hundreds of millions of dollars. In just weeks, he raised $400 plus million from thousands of victims. So if he were to lose $5 million, which is really all he's offering, $5 million cash, what cost for him? Really none. He can earn it again.

And that should raise another question. Where is this $5 million coming from? If he told pretrial services that his net worth is $10,000 comprised of the value of his clothing and two cellphones, where is this $5 million? $5 million that he hasn't told the bankruptcy trustee about. So there's no money. There's no PRB that could be offered here that flips the incentive for the defendant to remain.

What about cosigners? Your Honor, given the allegations in this case, the defendant's fraud is, quite frankly, sociopathic. He has taken money from thousands. Victims have cried in interviews that we have held with them explaining how their lives have been forever altered and damaged by the money that he has used to purchase Lamborghinis and Bugattis and $30,000 mattresses. He's not going to care if by leaving this country to avoid prison he saddles a couple of people, who he hasn't even named, with a $25 million judgment.

So, the defense, I would argue, your Honor, tacitly concedes all of this. They say that the PRB cosigners are really insufficient and so what they offer instead is or on top is this proposal of armed security. Now, the mere fact that

N44QkowC

1    this is proposed, I submit, this Court should swiftly reject

2    it.  Second Circuit, we pointed this out, disapproves of these

3    two-tiered approaches to American justice where the rich get to

4    provide their own private security; in this case, in a

5    defendant's palatial Connecticut estate, where as those without

6    access to his means are subject to the federal system.  That's

7    not fair.  That's not right.  And this Court shouldn't endorse

8    it.

9             But even putting that aside, even putting what the

10   Second Circuit said aside -- and we don't think this Court

11   should -- these security arrangements don't work.  They don't

12   work because of incentives.  Security personnel are, at least

13   according to the defense, will be answerable to the Court and

14   government.  But it doesn't really work that way because

15   they're going to be paid by him.  They're going to paid by the

16   defendant, and security is going to be incentivized to continue

17   to get paid.  And security is going to be incentivized not to

18   tell the Court when the defendant does something he shouldn't

19   do because it might risk him being remanded; it might risk

20   security being unable to continue getting paid by the

21   defendant.  Security does not work.  And if it is true, as the

22   defense claims, that the only way for the Court to be

23   reasonably assured that the defendant won't flee is for him to

24   be surveilled 24 hours a day, seven days a week by an armed

25   guard, there's a proper place for that.  And that's the MDC.

N44QkowC

1    But there's something else, your Honor, even putting

2    aside those conditions.  Ultimately, when a Court permits

3    pretrial release, it's about trust.  It's about trust that a

4    defendant will appear in court as required.  It's about trust

5    that a defendant will not endanger the community, which I'll

6    talk about.  There is no reason for this Court to trust the

7    defendant, simply based on what has happened since he was

8    arrested.  He lied about money that he had in his safe, nearly

9    $500,000 of it.  He didn't disclose his travel documents.  He

10    circumvented the rules of the MDC, as we've explained in our

11    papers.  There's no reason for this Court to trust him just on

12    those records.  And I'm not even talking about what has

13    happened in other cases, which I'll turn to.

14    In fact, let's talk about obstruction.  At least three

15    different judges, in both federal and state court, have found,

16    in effect, that the defendant obstructs justice.  Judge

17    Ostrager, New York State Supreme Court, said, I'm quoting, "The

18    defendant's efforts to avoid and deceive his creditors by

19    parking his substantial personal assets with a series of

20    corporations, trusted confidantes and family members," which is

21    to say, your Honor, a judge found he moves money around to hide

22    it from the judicial process.

23    Judge Ostrager is not alone.  Judge Manning, a

24    Bankruptcy Judge in the District of Connecticut, found similar

25    actions that Kwok has taken.  And even worse, Judge Manning

1    found the defendant fomented unrest, threatened a

2    court-appointed bankruptcy trustee, resulting in death threats,

3    resulting in harassment.  And this is on video.  This is what

4    the defendant said on video about that bankruptcy trustee.

5            On November 21, 2022, according to the bankruptcy

6    judge's findings, "To deal with this rogue" -- I'm quoting,

7    rogue being the trustee -- "we have our rogue's ways.  In a few

8    days you will see what would happen to him.  Calamities, I can

9    tell you guys.  They will suffer calamities!"

10           On top of that, he encouraged his followers to flood

11   the bankruptcy docket with false claims, to tie up the

12   bankruptcy, to cause the trustee to expend additional resources

13   to cause problems.  We talked in our papers about how he's

14   threatened victims, victims in this case; how he's threatened

15   them by saying he would post associations between him and the

16   victim, victims who have family in China, and thereby him

17   posting publicly that he was associated with those victims

18   would threaten the victims' families who happen to be in China.

19           This is all definitional obstruction.  It's not

20   theoretical.  It's not speculative.  It's not even isolated.

21   It's continuous.  It's ongoing.  It spans multiple years,

22   multiple courts, multiple judges, and the defendant is

23   exceptional in his willingness to continue to do this unabated.

24           So has the government demonstrated that there's a risk

25   of obstruction if he's released?  Yes, we certainly have.

N44QkowC

1          So, step two, what conditions can be imposed to

2     prevent obstruction?  The answer is there are none.  There

3     aren't any.  Pretty much all this Court could do is ask the

4     defendant not to obstruct.  But we know that doesn't work.

5     Because that was tried in the bankruptcy court in Connecticut.

6     That was tried in the New York State Supreme Court.  He doesn't

7     follow court orders.  To the defendant, a court's order isn't

8     worth the paper that it's printed on.  His low regard for the

9     judicial process and respect for due process is remarkable.

10    And it shows that there are no conditions that can change that

11    because if there were, it would have already happened.  So

12    again, this is straightforward.  He should be detained.

13          Let's turn to danger.  The defendant's willingness to

14    defraud for years thousands upon thousands of individuals is

15    quite something.  He's not stopped despite the many offramps

16    that have been the flag, the red flags he's seen, the

17    intervention of the SEC, the government's seizure of

18    $630 million, his embroilment in various litigations, the fact

19    that entities of his received grand jury subpoenas, the fact

20    that he knew the government was on his tail, he kept going.

21          And in February 2023, just essentially weeks before

22    his arrest, he announced a new offering, the A10 offering.

23    That's what he called it.  And he claimed that this offering

24    was a way for investors to invest 5 percent -- to purchase

25    5 percent of the Himalaya Exchange and 5 percent of a social

N44QkowC

media company called Gettr.  And like the other investments

that the defendant has proclaimed and promoted, this too had

all the hallmarks of fraud.  He claimed it was guaranteed and

that they would get their money back and everyone would make

all this great money.

But the difference about the A10 offering, your Honor,

this I think speaks to obstruction and also risk of flight, the

of point of it was that the money was going to be sent to the

UAE, away from -- and using Kwok's words -- the long-arm

jurisdiction of the United States.

So is he a continuing danger to the community?

Absolutely, because he hasn't stopped.  He hasn't stopped after

the SEC intervened in the GTV Private Placement, after his bank

accounts were closed, after many of his entities received

subpoenas, and after the government executed $630 million of

bank account seizures.

Indeed, your Honor, the money that the SEC was able to

intervene and save from being defrauded with respect to GTV

Private Placement, it's now being distributed.  It's in the

process of being distributed to the victims through a fair fund

distribution.  And what the defendant has done is encouraged

his victims to reinvest that money in other fraudulent

vehicles, which is to say he keeps going.  He keeps going.

So what conditions could the Court impose that would

stop all of this?  The defense basically offers one.  The

N44QkowC

1    defense offers the condition of if he wants to engage in a

2    financial transaction, he must get either the government's or

3    the Court's approval.  But this condition is meaningless.  It's

4    meaningless because he lies to pretrial services.  He

5    circumvents court orders.  It's something that can't possibly

6    work because the defendant can't be trusted.

7          But more than that, your Honor, as I've explained and

8    as our papers made clear, he works through intermediaries and

9    shell corporations.  He has the ability to conduct fraud

10   without himself, at least on paper, signing a financial

11   transaction.  He can work through others.  And that's how this

12   whole fraud worked, which is all to say, your Honor, there are

13   no conditions that can prevent the deep, ongoing danger that

14   the defendant presents to this community.

15         Your Honor, given all of this, the defendant's

16   incentive structure, he is highly incentivized to flee, his

17   deep resources, his connections, his network of supporters who

18   will harbor him, his documented unwillingness to follow court

19   orders, his threats against court-appointed officials,

20   including some of the people at this table, his sophistication,

21   his multitude of travel documents, his access to cash, his

22   willingness to lie to pretrial, his willingness to circumvent

23   rules in the MDC, his concealment of funds, there are no

24   conditions, your Honor.  There are none that can reasonably

25   assure the Court that he won't flee; that the community will be

N44QkowC

1  safe; and he will not obstruct these proceedings.

2          Pretrial services is correct:  The Court should follow

3  their recommendation and detain the defendant pending trial.

4          THE COURT:  I'll hear from counsel for Mr. Kwok.

5          MR. COOK:  Good morning, your Honor.  Stephen Cook on

6  behalf of Mr. Kwok.

7          Just as an initial matter, your Honor, we've seen no

8  evidence that Mr. Kwok threatened anyone at the table, at the

9  prosecution table.  I would certainly be interested in seeing

10  that because I'm aware of none of that.  He's been in custody

11  since March 15, and we've seen no evidence of any threats being

12  issued to any members of the prosecution team or anyone else,

13  for that matter.

14          Let me just address the very first question that

15  Mr. Finkel stated:  Why would he stay?  There are many reasons

16  why Mr. Kwok would stay, and there are even more reasons why he

17  would never leave.  I want to go through each of the arguments

18  made by the government, but I want to address first this idea

19  that the UAE is this ideal place for Mr. Kwok to abscond to.

20          And the government begins by saying that he has three

21  passports.  The government knows that's not true.  As they

22  state in their own paperwork, this passport to the country of

23  Vanuatu expired years ago, and it's in their possession in any

24  case.

25          The UAE passport that they don't have, but they claim

1    that he has, was returned to the UAE government years ago.  He

2    renounced his citizenship to the UAE years ago, and received a

3    letter from the UAE government, which I can present to the

4    Court and the prosecution.  I would have filed this, but we

5    just learned of this issue yesterday in government's filing.

6         April 11, 2018, he renounces his citizenship, and the

7    UAE confirmed that renunciation.  That passport was returned by

8    his immigration counsel to a representative of the UAW

9    government.  So he has no UAE passport.  He has no passport to

10   Vanuatu.  He has no citizenship with that nation.  The third

11   passport they reference is one to Hong Kong, the very nation

12   that he fled from, and that passport is in the government's

13   possession.  So of the three passports they claim are available

14   for him to use, there are zero, none.  And I don't think there

15   can be any dispute about that.

16        Now, Mr. Finkel says quote that "Mr. Kwok knew the

17   government was on his tail."  And that's absolutely correct.

18   Hundreds of millions of dollars seized, grand jury subpoenas

19   issued, SEC subpoenas issued; Mr. Kwok has known that he is a

20   target of a federal criminal investigation for the better of a

21   year.  And despite his alleged sophistication, despite being

22   essentially a criminal mastermind, an escape artist, what did

23   he do with that knowledge?  With all of the resources they

24   claim he has, with the passports he says -- they say he has

25   access to, with all the supporters worldwide, what did Mr. Kwok

N44QkowC

1  do in the face of that knowledge that the government was on his

2  tail?

3        He did nothing.  He didn't leave.  He went nowhere.

4  He continued to reside in the same residences he had been in

5  for years.  All of the evidence that they identify that was

6  found during the search that they point to as evidence of his

7  being a risk of flight:  The multiple cellphones, the cellphone

8  scrambler, Faraday bags, cash.  If he was this criminal

9  mastermind, knowing the government is on his tail, he left all

10  of those materials in the worst possible place, the place the

11  government knew that he resided.

12        Mr. Kwok was not unfamiliar with an FBI search.  Years

13  ago the FBI had searched the Sherry-Netherland residence where

14  he was arrested.  He knows how thorough they are.  He knows

15  what's involved and how many agents show up.  Yet, despite that

16  knowledge and despite the government being on his tail, he did

17  nothing to hide computer equipment or cellphones, with the

18  exception of putting one under his mattress, as if that was

19  going to remain unfound by the FBI.  This was not evidence of a

20  man seeking to flee.  It was evidence of a man who had decided

21  to stay in the face of the accusations that he knew were coming

22  any day.

23        Why didn't he leave?  Well, first of all, there's a

24  Red Notice against him issued by China.  We laid out in great

25  detail in our papers why he fled China, why he can never go

N44QkowC

back to China, and why they want him, and the enormous efforts
the Chinese government and the Chinese Communist Party in
particular, have taken to try and get him back in their
clutches.

This is documented.  You read about it, and it sounds
like it comes from a spy novel.  And then you start looking at
the sources and you realize this all really happened.
High-level DOJ officials being bribed to get our government to
extradite him to China.  There's a trial going on in Washington
D.C. right now in which an individual failed to register as a
Chinese foreign agent, who was lobbying our government
illegally to get this man extradited back to China.  Four
agents of the Chinese intelligent service accosted Mr. Kwok in
his home, threatened him, and tried to get him to return to
China.  They were arrested by the FBI, and because of
interjurisdictional squabbles between the State Department and
DOJ, they were not arrested, and they were allowed to return to
China.  But the Chinese Communist Party's interest in my client
is well documented, well-known and indisputable.

That's why you have cellphone scramblers.  The Chinese
government hacks at every opportunity every electronic device
that Mr. Kwok has.  As soon as it's hacked, he replaces it with
another one, over and over and over again.  That's why you have
so many phones and so many computers.  That's why there's a
cellphone scrambler which was recommended to him by the

N44QkowC

security service that he hired to help him prevent this

hacking.  The Faraday bags designed to prevent hacking.  Not by

the U.S. government.  They weren't hidden from the FBI.  But to

minimize or help reduce the risk that they would be hacked by

the Chinese Communist Party, as has been done over and over and

over again.

One of the things we didn't mention in our papers, but

we recently discovered was that back in 2019 and 2020 Twitter,

the social media platform, took down over 200,000 fake accounts

all created by the Chinese Communist Party to spew Chinese

propaganda.  And that propaganda fell into four categories.

This is all spelled out by in a report generated by Stanford

University.  Those four categories, not surprising, were

Taiwan, the pro democracy movement in Hong Kong, and the second

most prevalent topic, of Chinese propaganda, was Mr. Kwok

personally individually documented in the Stanford report.

The level of attention that Mr. Kwok generates from

the Chinese Communist Party is undeniable and extreme.  So he

has gone through extreme efforts to protect his ability to

broadcast his message to his followers with minimal or reduced

obstruction from the Chinese Communist Party.  That's why you

see all of these elements that you would typically find from a

spy novel, for example, present in his apartment.  Not because

he's hiding it from the U.S. Government.  He's trying to

protect his ability to get his message out to the millions of

N44QkowC

1    followers that he has worldwide.

2          I want to address the government's arguments

3    individually

4          THE COURT:  I would like you to go back to the issue

5    of the passports.  Is it your position that he has no valid

6    passport?

7          MR. COOK:  The only valid passport that we're aware

8    of -- and Mr. Kwok wasn't even aware of this until we saw it in

9    the government's filing -- is the Hong Kong passport that was

10   in his co-defendant's possession, that the government now has.

11   That was the only currently valid passport.  The other two he

12   previously had -- Vanuatu and UAE -- he renounced his

13   citizenship to both of those nations formally as part of his

14   asylum application years ago.  That's it.  There are no others.

15         THE COURT:  Go ahead.

16         MR. COOK:  Concerning Mr. Kwok's extensive

17   international travel, it's -- well, he did travel extensively

18   at one point in his life, but for the past six years, he hasn't

19   stepped foot outside this country.  There's many good reasons

20   for that:

21         (1)  His asylum application, which places restrictions

22   on that sort of travel.

23         (2)  The Chinese Red Notice out against him.

24         (3)  The four Chinese agents that accosted him in 2017

25   highlighted and elevated his level of concern as to his own

N44QkowC

safety were he to leave the United States to a level that

hadn't been seen before.

So he -- for example, his family had planned a couple

of years ago a vacation to Hawaii.  He was advised not to even

take that vacation because if there was a mechanical problem

with the plane, it could land at a foreign country, and he

could run into problems.  He faces almost certain death if he

is repatriated to China.  He will do nothing to jeopardize

that, even if it means spending time in a U.S. prison.

The government claims that, well, his asylum

application could be revoked if he's convicted.  That may be

true.  That's years down the road.  That's a hypothetical.  The

consequences if he were to leave are a certainty.  He would

also have opportunity to seek asylum or protection under the

Convention Against Torture.  Yes, that could mean deportation

to a third country, but far preferable to living life on the

run with a Red Notice from the Chinese superpower and another

Red Notice from the American superpower, there's literally

nowhere left in the world for him to reasonably go under those

circumstances.  He cannot flee.  There is nowhere he can go

where he would be safe.  He is here.  Whether he wants to or

not, he is here, and he has been here for the past six years,

and that is evidence alone of his desire to remain even in the

face of the government's investigation.

The foreign passports we've talked about, your Honor,

N44QkowC

1  and none of them have been used, in any case, for at least six

2  years.

3          We talked about the UAE.  In addition to the

4  renunciation of that citizenship, Mr. Finkel mentions that

5  there is no extradition treaty between the United States and

6  UAE were Mr. Kwok to flee there.  That's true.  However, the

7  UAE does have an extradition treaty with China.  China and the

8  UAE have extensive connections.  In fact, the UAE is China's

9  number one beneficiary of foreign investment of all the states

10  in the Gulf.  The relationship between the UAE and China is

11  well-documented and public.  The extradition treaty is public

12  as well.  That is probably the worst place he would go, second

13  to China itself.  So UAE is out.  It was never an option, even

14  were he to want to leave this country.

15          The currency found during the execution of the search

16  warrants, the hundreds of thousands of dollars.  First of all,

17  the three residences that were searched:  The Sherry-Netherland

18  penthouse, the Greenwich estate, and the property in Mahwah,

19  none of those properties are owned by Mr. Kwok.  They're owned

20  by other entities or other family members, not him.  They are

21  used by many family members, dozens of employees of many

22  different companies, not just Mr. Kwok.  None of that money was

23  his.  He didn't have access to the safes, and in at least two

24  of those cases didn't even know those safes existed.  They

25  weren't in his bedroom.  One of them belonged to his wife, and

N44QkowC

he didn't know the combination.  So he didn't lie to pretrial

services.  He didn't even know the money was there.  That's the

reality.

         And so the assumptions that are being made by the

government, as they've made assumptions in all these other

areas are skewed entirely in a way to portray Mr. Kwok in the

worst possible light.  The reality is the money wasn't his.  He

had no reason to disclose something he didn't know existed.

         Concerning the cellphones and the scrambling device

and Faraday bags, I mentioned that, your Honor.  These are

recommendations made by his security staff who made every

effort to try and minimize the hacking that took place.  And to

give you another example of just what he and anyone associated

with Mr. Kwok experienced from China.

         A law firm that was retained to assist him with his

immigration asylum paperwork was hacked.  Confidential

information stolen from the law firm and publicly disseminated.

Another law firm that was retained in connection with

bankruptcy proceedings was hosting a conference call with 30 or

40 people from all over the world, including the U.S. trustee.

On the day of that meeting, immediately prior to, that law

firm's entire security system electronically was hacked and

shut down.  The elevator system was shut down causing a delay

in the meeting.  It never happened before and hasn't happened

since.  These sorts of hacking efforts and attempts follow him

N44QkowC

wherever he goes simply because of who he is and the message that he espouses.

Concerning the civil lawsuits and the bankruptcy litigation and Mr. Kwok's alleged disregard for the law, first of all, it's important to keep in mind that much of the civil litigation, including the civil litigation that ultimately led to the bankruptcy filing was prompted by the CCP itself. That is not just a conspiracy theory. That is a documented fact. In fact, the *Wall Street Journal* in July of 2020 wrote an article, "China's New Tool to Chase Down Fugitives: America Courts. Beijing is turning to lawsuits to pressure expatriates to return home and face corruption charges as an end run around U.S. law." Their efforts to use the court system to leverage and exert pressure against people they don't like is documented and well-known and something that Mr. Kwok knows of firsthand. So Mr. Kwok has aggressively defended himself in all of that litigation and in the bankruptcy proceedings.

Now, concerning the source of the $5 million security for the bond. We never in our papers suggested Mr. Kwok would or even could himself put umm $5 million. However, what we proposed was that there would be two financially responsible adults who would sign onto that bond, and that the source of that money would be vetted with the government so they could assure themselves that the source had nothing to do with the fraud in this case, and that the two financially responsible

1    adults, one of whom would not be a family member, they could

2    also vet to assure not only that they are not purported

3    victims, but that they had moral suasion over the defendant.

4            The government also claims that Mr. Kwok -- they

5    allude to this in their paperwork -- that he fails to follow

6    Bureau of Prisons' procedure in connection with some family

7    members who wanted to make phone calls with Mr. Kwok, and they

8    used the legal pathway for legal calls instead of family calls.

9    We looked into that, your Honor, and, in fact, our ability to

10   communicate with our client via telephone was shut down because

11   of that.  We found out what happened.  It was a mistake.  We

12   wrote to the Bureau of Prisons explaining exactly what

13   happened.  In fact, the person who did this even wrote in the

14   application for calls "this is for family calls."  It was a

15   language issue and miscommunication on their part that we

16   corrected.  It hasn't happened again and won't happen again,

17   and our legal calls have been reinstated.  This has absolutely

18   nothing to do with anything Mr. Kwok did or even knew about at

19   this time, so it would be completely unfair to hold that

20   against him.

21           We also proposed this round-the-clock 24/7 security.

22   It's interesting Mr. Finkel says it's not fair and not right

23   when this exact procedure is something the government has

24   signed off on in other cases, but apparently in this case it's

25   not fair and not right.  Look, we don't think it's necessary.

N44QkowC

We don't think he is leaving.  We don't think he would ever leave this country.  However, we offered that as additional assurance and security that he would in fact remain here and can be monitored by professionals, and we said armed security not because we need them to be armed, but because armed security happened to be current or former law enforcement adding a level of professionalism.  And we can arrange that engagement in any way the Court deems acceptable so that they report directly to the marshals, to the FBI or to the Court, and not to us.  We can fashion that engagement in whatever way works.  The government has done this before and done it in an acceptable fashion.  There's no reason why it can't work in this case as well as an additional layer of protection against flight.

Concerning his purported efforts to contact victims or set up new businesses or perpetrate additional frauds, that can be dealt with as well.  The Southern District has dealt with something in the SBF, Sam Bankman-Fried, case where they restricted his access to any electronic communications to a single laptop that is restricted to allowing the defendant access to the discovery so they could review it and to communicate with lawyers, and nobody else.  If that is the government's legitimate concern that he is going to continue to communicate with the world and perpetrate frauds, we're amenable to that condition.  There are conditions to satisfy

1    each of these concerns, and we can fashion them.  To date the

2    government has simply been unwilling to even have a

3    conversation with us about it, but it's not impossible.

4            Finally, your Honor, I just want to note for the

5    record and for your Honor that the courtroom is full of many of

6    Mr. Kwok's supporters, many of whom have traveled from San

7    Francisco, North Carolina, around the country to be here in

8    support.  These are the purported victims?  No, they're

9    actually his supporters.  They are here because they care about

10   him.  They care about his message and his mission in connection

11   with bringing democracy to China.

12           Your Honor we remain open willing to employ any

13   reasonable condition as the Court may deem necessary to secure

14   Mr. Kwok's release.  We think what we've proposed is acceptable

15   and sufficient.  We will certainly entertain anything further,

16   and we're happy to work with the government if they're willing

17   to tailor or contour our proposal to work out any of the

18   legitimate issues that they might have

19           THE COURT:  I want to go back to the passports.

20   You're saying that your client wrote to the government of the

21   United Arab Emirates declaring that he had renounced

22   citizenship.  Is that correct?

23           MR. COOK:  Your Honor, I have the letter.  If I could

24   approach, I'm happy to provide the Court a copy.

25           THE COURT:  You may.  Thank you.  I assume you don't

1    have a certified version of this.

2              MR. COOK:  This is all I could get on such short

3    notice, your Honor.  I would note the picture of the passport

4    submitted in the government's letter yesterday has redacted the

5    passport number which is contained in this letter, so I have no

6    way to confirm that the numbers match up, but I presume that

7    they do.  In any case, I can represent to the Court that the

8    passport itself was hand-delivered to UAE, I believe it was the

9    consulate, by Mr. Kwok's immigration counsel.

10             THE COURT:  You're relying on your client's word on

11   that issue?

12             MR. COOK:  I'm relying on the word of my client's

13   lawyer, his immigration counsel, on that issue.  I can get a

14   declaration from him to that effect, your Honor.

15             THE COURT:  And the Vanuatu passport?

16             MS. McKINNEY:  The Vanuatu passport, you can see in

17   the picture submitted by the court, expired, and the government

18   noted in its letter that it had other evidence, which it didn't

19   talk about, suggesting that that citizenship had been

20   renounced.  I haven't seen any of that yet, but I know that to

21   be the case from my consultations with his immigration counsel.

22             THE COURT:  I'll allow rebuttal by the government.

23             MR. FINKEL:  Thank you, your Honor.

24             If I can, your Honor, I'd like to start with the

25   passport issue.

N44QkowC

1          First, the defendant has proclaimed to have eleven

2     passports, not just three.  What I would also ask is, your

3     Honor, how many defendants within a period of three or four

4     years were able to obtain citizenship in three different

5     countries and was on a pathway, or so he claims, to citizenship

6     in a fourth, which is to say, your Honor, the defendant

7     obtained citizenship in Vanuatu, obtained UAE citizenship, has

8     a Hong Kong citizenship, and was trying to obtain citizenship

9     here.  He knows how to get travel documents.  He was able to do

10    it at least two other times, while he was on the run, according

11    to the defense.  So can he do it again?  Of course he can.

12          And, your Honor, I just want to be clear about

13    something else.  Our burden is not to show that he will flee

14    internationally or go to a place where he can't be extradited.

15    The question is whether he will return to Court as required.

16    People flee within the United States, as your Honor knows.

17    And, your Honor, the defendant, as defense counsel has not

18    disputed, has a broad network of people who are sympathetic to

19    him, who, according to their social media posts, believe that

20    all of this is a political charge, which is to say they're

21    motivated to help him.  And it's not.  Those are meritless

22    claims, of course.  This is a fraud crime that is substantiated

23    by a significant amount of evidence which we have outlined in

24    our papers.

25          Your Honor, the defendant has been hiding.  To respond

N44QkowC

to defense counsel's arguments:  He hides behind his family, by

keeping entities and properties not in his name.  He hides

apparently by saying that the $394,000, just to be clear, was

in a safe that was attached to a dressing room in which his 31

suits that have his name hand-stitched into them were there.

It is simply not credible, it is not credible for him to be

unaware of $394,000 in United States currency that he didn't

disclose to pretrial services.

Your Honor, it's a big planet, and it's a big country.

There are places for him to go that would be beyond the reach

of China; that are beyond the reach of the United States.  But

the Court doesn't need to find that.  The question is whether

there's a risk of flight, the risk that he won't appear in

court, and the government has certainly met that burden.

Your Honor, the fact that defense counsel concedes

that the $5 million they're offering to put up is not from the

defendant means it has no moral suasion on him at all.  There

is no reason for him not to leave because he wouldn't be

concerned about giving up money that wasn't even his to begin

with.  Your Honor, if this money was clean and unencumbered by

both the fraud and the bankruptcy, I would have expected the

defense to explain where it's from.  I would have expected the

defense to explain who their cosigners could be, who would have

the unencumbered assets to support a $25 million bond for the

defendant and also moral suasion over him.

N44QkowC

1          Your Honor, with respect to armed security, the only

2    other case I'm aware of that happened in this district where it

3    was approved was before Judge Broderick.  It was over Southern

4    District's objection.  And in that case there were a host of

5    problems that occurred because the incentive structure doesn't

6    work.  Armed security took the defendant out to dinner.  Armed

7    security ate with the defendant, which is not really a good

8    idea if, you know, an armed security guard eats something and

9    then falls asleep and the defendant can flee.  Armed security

10   didn't report violations.  It doesn't work.  And, fundamentally

11   -- and the Second Circuit has been crystal clear about this --

12   fundamentally, it is wrong.

13         What I haven't heard also from the defense, your

14   Honor, is how their conditions can satisfy the very real

15   concerns about the danger to the community and the danger to

16   this judicial process.  There are no conditions that satisfy

17   that.

18         And, your Honor, as we've outlined, and as I've

19   explained earlier, this has been documented by three judges.

20   Three judges have found the defendant to essentially be

21   obstructing, including an extensive opinion that we attached

22   for your Honor to our March 15 submission, in which the

23   bankruptcy judge makes clear that the defendant is causing his

24   supporters to flood the docket or threatened with calamities

25   the court-appointed bankruptcy trustee.  None of the conditions

N44QkowC

1    proposed by the defense, none of them, none, can stop that.

2            Your Honor, the defendant has incredible means and

3    know-how, as the defense concedes.  He apparently has access to

4    friends who are willing to front $5 million -- $5 million in

5    cash.  He can go where he wants.  He has a network of people

6    who will harbor him.  He has international travel -- deep

7    international travel experience, the ability to obtain travel

8    documents from multiple different countries, apparently

9    citizenship in multiple different countries.  He has places to

10    go.  He has people who will help him.  He has a reason to flee.

11    And the asylum application, your Honor, the mere charges in

12    this case threaten that.  It's true.  The asylum application is

13    still pending, but the mere charges in this case threaten the

14    asylum application.

15            The point is, your Honor, on flight, he's motivated to

16    flee.  He has the means and know-how to do it, and there is no

17    condition that can stop that.

18            On danger, he continues to endanger the public, and

19    that hasn't stopped, and there are no conditions that can stop

20    that.

21            And on obstruction, your Honor, as three other courts

22    have made clear, the defendant continues to obstruct the

23    judicial process.  He will obstruct it in this criminal case

24    too.

25            There are no conditions, none, there are no conditions

N44QkowC

1   that can stop that.

2           At the end of the day, this is very straightforward.

3   This is very simple, we submit to the Court, the defendant

4   should be detained because he's a risk of flight, he presents a

5   danger, and he will obstruct.

6           THE COURT:  All right.  I'm going to reserve decision.

7           I'll issue a written decision.  The matter is

8   adjourned.

9           (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25