UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────┐
│ USDC SDNY                    │
│ DOCUMENT                     │
│ ELECTRONICALLY FILED         │
│ DOC #:_____        │
│ DATE FILED:  4/21/2023       │
└─────────────────────────────┘
```

UNITED STATES OF AMERICA

-against-

YANPING WANG, a/k/a "YVETTE",

Defendant.

S1 23 Cr. 118-3 (AT)

<u>**DECISION and ORDER**</u>

This matter comes before the Court on the motion of Defendant Yanping "Yvette" Wang ("Defendant" or "Wang") for an order directing that she has complied with the conditions previously imposed to obtain pre-trial release or, alternatively, modifying those conditions.  In opposition, the Government asks that Wang be detained because she has not complied with the conditions of release, lied about assets that she either owns or controls, and poses a serious risk of flight.  For the reasons that follow, the Court finds that Wang poses a serious risk of flight, that no conditions can reasonably assure her attendance at future proceedings in this case, and that Wang should continue to be detained.

**Background**

**A.     The Charges And Wang's Co-Conspirators**

On March 10, 2023, a sealed complaint issued charging Wang with (1) conspiracy to commit wire fraud and securities fraud; (2) wire fraud; (3) securities fraud; and (4) unlawful monetary transaction (the "Complaint").  (Dkt. 1.)  Essentially, Wang is alleged to have played a key role in a scheme to defraud thousands of investors, spearheaded by co-conspirators, Miles Kwok and William Je.[1]  (*See generally* Complaint; 23-CR-118-1

_____

[1] Both Kwok and Je are also known by other names; for simplicity, the Court uses the name

Dkt. 19 (superseding indictment).)   Specifically, the Complaint alleges that Wang participated in offering an unregistered private placement of securities and then misappropriating and transferring those funds, including one transfer in the amount of $100,000,000, to a high-risk hedge fund for the ultimate benefit of a close family relative of one of Wang's co-conspirators (i.e., Kwok).  (Complaint ¶ 9.a.)  More generally, the Government contends, Wang managed the day-to-day operations of numerous entities, including shell companies, that Kwok controlled and used to operate the scheme.  (*See* Complaint ¶ 10.e.)  In that role, Wang had access to, and signatory authority over, bank accounts allegedly used to obtain and launder fraud proceeds in the hundreds of millions of dollars.  (*See* Complaint ¶¶ 11-13.)  If found guilty, the Government estimates under the applicable Sentencing Guidelines, Wang will face 292 to 365 months in prison.  (Dkt. 10 at 2.[2])  Wang was arrested on a warrant on March 15, 2023.  Prior to being arrested, Wang was aware that the Government was investigating her but did not flee.  (March 15 Tr. at 17.[3])

A separate indictment was unsealed on March 15, 2023, charging Kwok and Je (the "Indictment").  (23-CR-118-1 Dkt. 2.)  The Indictment charges Kwok and Je with defrauding victims of more than $1 billion, allowing Kwok and Je to profit substantially from the alleged fraud and using investor for purchasing personal luxury items and services, such as a $26.5 million mansion and a $37 million yacht.  (Indictment ¶¶ 1, 4.)  A

---

for each that appears to be most generally used.  Kwok and Je are identified anonymously as co-conspirators in the complaint against Wong.

[2] Dkt. 10 is the Government's letter dated March 29, 2023 opposing the instant motion.

[3] "March 15 Tr." refers to the March 15, 2023 transcript of the presentment proceedings before Magistrate Judge Katharine H. Parker.  That Wang was aware she was being investigated was a representation by defense counsel; the Government did not challenge that assertion.

superseding indictment issued on March 29, 2023, adding Wang as a defendant ("SS Indictment").  (23-CR-118-1 Dkt. 19.)  Kwok has been charged and arrested and has been detained.   (23-CR-118-1 Dkt. 51)  Je, the alleged "financial architect and key money launderer" of the scheme (Indictment ¶ 7), is at large, lives in the United Kingdom, and, the Government believes, is currently hiding in the United Arab Emirates.  (Dkt. 10 at 2.) Kwok, and by extension his co-conspirators, are believed to have many devoted followers in the United States and throughout the world.  (*See* SS Indictment ¶¶ 2, 6.)

### B.    Wang's Characteristics And History

Wang is a Chinese citizen.   She emigrated from China in 2017 and filed an application for political asylum from the Chinese Communist Party ("CCP").   Wang considers herself a revolutionary against the CCP.  Wang's family remains in China, as does her ten-year old son, who resides with his father.  Since emigrating, however, Wang has not returned to China and is incentivized not to do so given her expectation that she would be arrested, detained, and possibly executed if she returned to China.  Wang has no family in the United States and no friends she can identify.  Her sole focus has been her involvement with Kwok, the Kwok businesses, and the purported anti-CCP cause. (*See* March 22 Tr. at 7-8.[4])

### C.    Wang's Known Financial Assets

Wang lives alone in a condominium, which she purchased for a little more than one million dollars, without any mortgage. (*See* March 15 Tr. at 18.)  She disclosed two personal bank accounts, one containing about $400,000, and the other about $500,000. (*See* Dkt. 9 at 5.)  In searching her residence, the FBI found a safe.  Among other items,

---

[4] "March 22 Tr." refers to the transcript of proceedings before Magistrate Judge Netburn on March 22, 2023.

the safe held a handbag containing $138,000 in U.S. currency, along with some relatively small amounts of British, Hong Kong, and Chinese currency.  (Dkt. 10 at 2.)

**D.    Other Items Found During Search of Wang's Residence**

Wang's safe also included expired passports for both Wang and Kwok from China and Vanuatu, a small island nation in the South Pacific.  Elsewhere in Wang's residence, the FBI recovered approximately 12 cellphones, two computers, and more than 25 USB flashdrives.  Some cellphones were out in the open; some were in a bag.  The Government asserts that one cellphone was found between the mattresses of defendant's bed, and that a laptop computer was found between sweaters on a shelf in Wang's closet.  (Dkt. 10 at 2-3.)  The inventory log of items seized from Wang's apartment identifies the room and general location from which each item was seized.  None of the entries refer to a phone having been found between mattresses, although there is an entry for an iPad found "on bed."  There is, however, an entry for a laptop computer found "in between clothes."[5]  (April 4 Tr. Ex. 1 at items 55 and 65.[6])

**E.    The First Bail Hearing**

Wang was presented before the Honorable Katharine H. Parker on March 15, 2023, where the Government and Wang agreed to terms of a bail package, except for two items.  Specifically, the agreed-upon terms included:  (1) a $5 million personal recognizance bond to be co-signed by two financially responsible persons approved by the Government; (2) security for the bond in the amount of $1 million in real property and/or cash; (3) GPS

---

[5] On April 17, 2023, the Government filed a letter stating that it had reinterviewed the relevant FBI agent, who said she does not recall any cellphone or documents found under Wang's mattress, but does recall finding the laptop between sweaters in a closet.  (Dkt. 47.)

[6] "April 4 Tr." refers to the transcript of proceedings before this Court on April 4, 2023.

location monitoring;[7] (4) restriction on travel to the Southern and Eastern Districts of New York; (5) the surrender of any travel documents and no new applications; (6) disclosure of any assets over which Wang has possession, custody, or control, including any joint or business accounts and any cash, cryptocurrency, or digital assets; (7) that Wang not open any new bank accounts or lines of credit without approval from Pretrial Services; (8) that Wang have no contact with Kwok, Je, or any alleged victims or witnesses outside the presence of counsel; and (9) any other conditions recommended by Pretrial Services. (March 15 Tr. at 7-8.)

The two disputed terms were the Government's demands that (1) Wang be subject to home detention; and (2) all conditions be satisfied before Wang's release.  (*Id.* at 8.) The Government sought those terms based on the risk that Wang would flee and not appear at future proceedings; the Government did not assert that Wang presented a danger to the community.

After listening to argument, Judge Parker imposed all the agreed-upon conditions, as well as the Government's demands that Wang be subject to home detention and that all conditions be met before Wang's release.[8]  (*Id.* at 22-23.)  Judge Parker found that the terms imposed "are the least restrictive I believe are necessary to achieve" Wang's return to court and the safety of the community.  (*Id.* at 22.)  Toward the end of the proceeding,

---

[7] The Government characterized one of the two disputed items as whether Wang would be subject to home detention, reinforced by GPS monitoring.  Wang, however, agreed to GPS monitoring; the only disputed aspect was whether she would also be subject to home detention.  (*Compare* March 15 Tr. at 8 *with id.* at 16-17 (The Court: "So you don't object to an ankle bracelet, you object to home detention?"  Defense counsel: "Correct.")).

[8] Both the Government's requests and the Court's ruling were consistent with the recommendation of Pretrial Services, which included, among other conditions, that Wang be detained until all conditions are satisfied.

Judge Parker commented, "Ms. Wang, I assume you're going to be able to meet these conditions at some point" and then issued warnings about the consequences if Wang were to violate the terms of her release.  (*Id.* at 24-25.)

## F.    The Government's Rejection Of Wang's Co-Signers And Sureties

Wang continues to be detained.  That is because the Government has not approved any of the individuals Wang put forward as financially responsible persons to co-sign the $5 million bond.

Since the bail proceeding before Judge Parker, Wang has identified eight persons who are ready and willing to sign the bond, and, in four instances, tender property as further security.  From the Government's perspective, each of the individuals identified by Wang are inadequate for three reasons: (1) they have insufficient finances; (2) they do not have any relationship with Wang and therefore hold no moral suasion over her; and (3) they are, according to the Government, either apparent victims of the fraud charged or otherwise involved in the fraudulent scheme.[9]  (*See generally* Dkt. 10 at 6-10.)

## G.    The Instant Motion

Wang contends that the Government's rejection of all her tendered co-signers and is arbitrary.  Accordingly, Wang has moved for a Court order either finding that Wang has satisfied the conditions of release, or, alternatively, modifying the conditions of release that

---

[9] The proposed sureties who are allegedly victims of the scheme charged are Yongbing Zhang ("Zhang"), Yue Zhou ("Zhou"), Chris Canada ("Canada"), Ping Liu ("Liu"), Yan "Michelle" Lou ("Lou"), and Qiang "Frank" Feng ("Feng").  The proposed co-signers who allegedly were involved in the fraudulent scheme are Chunguang "Hank" Han ("Han") and Defeng "Wayne" Cao ("Cao").  Han and Cao were the first two individuals Wang proposed as financially responsible persons.  Wang also identified Mei Guo – Wang's purported best friend and Kwok's adult daughter – as someone who could sign on to the bond and exercise moral suasion over Wang.  According to the Government, however, Guo is an alleged co-conspirator and received millions of dollars in fraud proceeds. (Dkt. 10 at 6-10.)

eliminates the requirement for two financially responsible persons but adds additional financial protection from Wang. Specifically, Wang has offered to secure the bond not only with her condominium residence, but also her $400,000 bank account and the $138,000 seized from the residence. Additionally, Wang proposes that she not be able to withdraw any funds from her other bank account, containing $500,000, without approval by Pretrial Services. Wang has not offered the $500,000 account as security, because she intends to use those funds for personal expenses and legal fees for her defense.

This Court first held a hearing on Wang's motion on March 31, 2023.[10] At that time, however, the Government came forward with what it characterized as new information warranting Wang's detention.[11] According to the Government, Wang had not fully disclosed her assets; had not fully disclosed the corporate entities and accounts over which she has control; and had misrepresented that she was not employed at the time of

---

[10] Wang initially made her application on March 22, 2023 before the Honorable Sarah Netburn, who was the duty Magistrate Judge that week. Judge Netburn determined that the motion was premature and that additional information needed to be submitted. Accordingly, she scheduled a hearing for the following week, which is when I was on duty. The Government characterizes the application to Judge Netburn as a motion for reconsideration of Judge Parker's ruling. (Dkt. 10 at 18.) The Court does not agree. Wang applied for an order determining that her conditions of release had been met, and, failing that, a modification of the terms. For similar reasons, the Court does not agree with the Government's characterization of the application made to me as a second motion for reconsideration (Dkt. 10 at 1); the hearing before me was simply the hearing that would have taken place before Judge Netburn but for being premature. In any event, the Government's argument overlooks the Act's provision that the Court "may at any time amend the order [of release] to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3).

[11] In correspondence first bringing the new information to the Court's attention, the Government seemed to be of two minds about the appropriate course of action. The Government opened its letter contending that the additional information "could justify more restrictive bail conditions" and ended the letter stating that Wang "should be detained pending trial." (*Compare* Dkt. 22 at 1 *with id.* at 2.) At the April 4, 2023 hearing and in subsequent correspondence, however, the Government maintained that Wang should be detained.

her arrest.  Specifically, the Government asserted that documents only recently reviewed show that: (1) as of November 1, 2021, Wang had been allocated approximately $6,999,800 worth of Himalaya Coin ("HCN"), which, in current dollars would be worth more than $13 million; (2) Wang personally owned a company registered in the British Virgins Islands and had applied for an account for that company at a bank located in St. Lucia; (3) as of March 13, 2023, two days before Wang's arrest, bank accounts for various companies allegedly managed and controlled by Wang had balances totaling tens of millions of dollars; and (4) Wang had just recently signed and dated a document reflecting February 2023 payroll for employees of various Kwok-controlled entities managed by Wang.  (Dkt. 22 at 2.)  The Government also noted that at the time of her initial interview by Pretrial Services, Wang did not disclose the $138,000 cash kept in her safe.  (*Id.*)

The Government argues that Wang's failure to disclose material information about her assets and employment demonstrates that she cannot be trusted to comply with the conditions of release and that the information itself further supports the availability of financial means for her to flee.  Additionally, the Government points to documentation dated from January 2023 demonstrating Wang's intent to travel abroad to the United Kingdom and the British Virgin Islands.  (Dkt. 42, Ex. G.)

Confronted with the new information relied upon by the Government, Wang requested, and the Court granted, an adjournment of the hearing to the following week. The hearing went forward on April 4, 2023.  The parties argued at length, each proffering evidence of the facts consistent with the above account.  Several individuals (apparently those Wang had already identified as proposed co-signers) appeared at the hearing in support of Wang and were willing to sign the bond.  Three of those individuals were prepared to offer their own real property to secure the bond in an amount that, collectively

with the assets posted by Wang, met the bond's full value of $5 million.  (April 4 Tr. at 35-37.)

At that time, however, defense counsel did not have in hand material information about the properties, including who actually owned them and to what extent they were encumbered.  The Court therefore adjourned the hearing and requested defense counsel to provide that information to both the Court and the Government for review.  On April 6, 2023, defense counsel provided that information.  (Dkt. 37.)   The material submitted indicates that there are four properties offered as security, each of which is a home owned by four different individuals.  (*Id.* Ex. E.)  Each of those individuals has been interviewed by the Government and determined inadequate at least because they did not possess moral suasion over Wang and were alleged victims of the fraudulent scheme. The value of their properties, based on internet real estate estimates, collectively total more than eight million dollars.  None are encumbered.

On April 10, 2023, the Court issued an order seeking more information from the Government, including documentation to which the Government cited demonstrating Wang's failure to fully disclose assets and other matters.  (Dkt. 39.)   On April 12, 2023, the Government submitted that information, along with its response to Wang's April 7, 2023 filing.  (Dkt. 42.)  The Government followed up with a letter of clarification on April 14, 2023.  (Dkt. 43.)  That same day, Wang filed a response to the Government's most recent submissions. (Dkt. 44.)

The Court must now determine if the conditions of Wang's release have been met, whether the conditions should be modified, or, as the Government contends, whether, in light of changed circumstances, there no longer are any conditions that can reasonably assure Wang's appearance at future proceedings.

**Legal Standards**

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 et seq (the "Act"), prescribes the statutory standards for determining whether a criminal defendant should be detained or released pending trial.  Pursuant to the Act, the Court "shall order the pretrial release of [a defendant] on personal recognizance, or upon execution of an unsecured appearance bond in an amount specified by the court . . . , unless the judicial officer determines that such release will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community."  18 U.S.C. § 3142(b).  Release may be denied only if, after a hearing, "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1); *see U.S. v. Baig*, 536 F. App'x 91, 92 (2d Cir. 2013) (quoting the Act).  With respect to risk of flight, "the Government must prove by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight, and that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court."[12]  *Baig*, 536 F. App'x at 92 (quoting *U.S. v. Sabhani*, 493 F.3d 63, 75 (2d Cir. 2007)) (internal quotation marks removed).

The Act identifies four factors for the Court to consider in "determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community": (1) the nature and circumstances of the offenses charged, (2) the weight of the evidence against the defendant, (3) the history and characteristics of the defendant, and (4) the nature and

---

[12] Although not relevant here, a finding of dangerousness must be supported by clear and convincing evidence. *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).

seriousness of the danger to any person or the community that would be posed by the defendant's release.   18 U.S.C. § 3142(g); *Baig*, 536 F. App'x at 92 (quoting the four factors).

If the Court finds that detention is not warranted, it must set conditions that are "the least restrictive" to reasonably assure the appearance of the defendant as required and the safety of the community.  18 U.S.C. § 3142(c)(1)(B); *see also* U.S. Const. amend. VIII. ("Excessive bail shall not be required").  The Court "may not impose a financial condition that results in the pretrial detention of the person." 18 U.S.C. § 3142(c)(2).  However, in considering what conditions to impose, the Court may "conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required."  18 U.S.C. § 3142(g)(4).

Bail conditions are not set in stone.  The Court thus "may at any time amend the order to impose additional or different conditions of release."   18 U.S.C. § 3142(c)(3). When considering an application to modify a defendant's bail conditions, the Court considers "the statutory standards applicable to the setting of bail."  *United States v. Zuccaro*, 645 F.2d 104, 106 (2d Cir. 1981).  "Courts have found that the authorization to amend a release order in Section 3142(c) is based on the possibility that a changed situation or new information may warrant altered release conditions."  *United States v. Dzhamgarova*, No. 21-CR-58, 2021 WL 3113036, at *1 (S.D.N.Y. July 21, 2021) (internal quotation marks and citation omitted); *accord United States v. Bankman Fried*, No. 22-CR-673, 2023 WL 1490417, at *2 (S.D.N.Y. Feb. 1, 2023).  "Accordingly, '[c]onditions of bail should properly be modified if a substantial change in circumstances as they existed

at the time bail was fixed is clearly shown.'"  *Id.* (quoting *United States v. Falcetti*, No. 02 CR 140, 2002 WL 31921179, at *1 (E.D.N.Y. Oct. 31, 2002)).

## Discussion

The Court first addresses whether the conditions of release previously imposed on Wang have been satisfied and finds that they have not.  The Court also finds that the modified conditions proposed by Wang will not reasonably assure Wang's presence at future proceedings. The Court then assesses whether under all the circumstances, including information learned since Wang's first bail hearing, there are conditions upon which Wang can be released that will reasonably assure her presence at future proceedings.  Because the answer to that question is no, the Court orders that Wang continue to be detained.

**A.      Conditions Of Wang's Release Have Not Been Met**

The conditions of Wang's release initially set by Judge Parker have not been met because Wang has not provided two financially responsible persons to co-sign the bonds that are acceptable to the Government.  As noted above, the Government rejected all eight individuals identified by Wang because none of them have a relationship with Wang that would provide the necessary moral suasion; they did not have sufficient net worth to be financially responsible; and each of them was either a victim of or participant in the alleged fraud.  The Government did not act arbitrarily in rejecting the proposed co-signers.

The primary point of contention is that of moral suasion.  The Act requires co-signers to be "solvent," and to "have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond."  18 U.S.C. § 3142(c)(1)(B)(xii).  "In addition to the requirement of financial responsibility," however, "a defendant must show that the proposed suretors exercise moral suasion to ensure the defendant's presence at trial."

*U.S. v. Batista*, 163 F. Supp.2d 222, 224 (S.D.N.Y. 2001).  The rationale for moral suasion

and what it means has been articulated as follows:

> [T]he Court is entitled to have a moral as well as a financial
> assurance . . . of the defendant's appearance in Court when required
> . . . .  [T]he function of bail is not to purchase freedom for the
> defendant but to provide assurance of his reappearance after
> release on bail. . . . The bail is not for the purpose of providing funds
> to the government to seek the defendant should he go underground
> or flee the jurisdiction.  Bail is intended as a catalyst to aid the
> appearance of the defendant when wanted.

*U.S. v. Melville*, 309 F. Supp. 824, 826-27 (S.D.N.Y. 1970); *accord Batista*, 163 F. Supp.

at 224 (favorably quoting *Melville*).  Factors relevant to considering whether a proposed

co-signer has moral suasion "vary from case to case, but may include the strength of the

tie between the suretor and defendant (i.e., family or close friend, close or estranged), the

defendant's roots in the community, and the regularity of contact between suretor and

defendant."  *Batista*, 163 F. Supp. at 224 (*citing U.S. v. Julio Rodriguez*, No. 84-CR-841,

1984 WL 1380, *2 (S.D.N.Y. Dec. 27, 1984); *Melville*, 309 F. Supp. at 828; and 18 U.S.C.

§ 3142(g)(3)(A)).

The Government is correct that none of the individuals put forward by Wang as co-

signers have any meaningful relationship with Wang that would incentivize Wang not to

flee.  Rather, they reported, variously, that they do not even know Wang (Liu), do not know

where she works or lives (Cao, Lou, Feng), only met Wang a handful or fewer times at

some unspecified event (Cao, Feng, Lou, Zhang, Zhou), or merely follow Wang on social

media (Feng).  Some have seen or spoken with her a few times but not often (Canada,

Lou, Zhang).  One purports to have spoken with Wang several times while being

interviewed by Wang for a job at a company for which Wang does not, according to the

Government, hold any formal position (Canada).  (Dkt. 10 at 6-14.)

While each of those individuals may be fully committed to Wang, none of them have

a relationship of any kind with Wang to provide a "catalyst to aid" Wang's appearance in the future. *Melville*, 309 F. Supp. at 827. Moreover, six of the individuals tendered are believed by the Government to be investors in the fraud of which Wang is accused. It is unlikely that Wang would be concerned with forestalling loss of security by the very people she is alleged to have defrauded. Just as dubious is the proposition that individuals alleged to have been involved in the fraud (Cao and Han) would hold moral suasion and qualify as financially "responsible" persons.

Wang argues that each individual co-signer is not required to have both sufficient financial net worth and moral suasion, so long as the co-signers as a group collectively have both requirements. In other words, Wang posits, it would be sufficient if one or more co-signers had the requisite financial resources while one or more other co-signers had moral suasion. There appears to be some disagreement about whether each co-signer must be both of sufficient financial means and also have moral suasion or whether the requirement can be satisfied with a mix of suretors who do not each have both those attributes.[13]   *See Batista*, 163 F. Supp. at 226 (recognizing that "[s]ome courts have required that each proposed suretor meet both financial and moral suasion requirements,"

---

[13] As support for the proposition that each surety must have both sufficient assets and moral suasion, the Government cites to *Baig*, 536 F. App'x at 93. In *Baig*, the Court affirmed detention where properties offered to secure bail were not owned by defendant's "close family members," and others were located out of state. The Court followed that finding with a cite to *U.S. v. Martinez*, 151 F.3d 68, 71 (2d Cir 1998) and described it as "noting that sureties are assessed for 'their ability to exercise moral suasion' over the defendant, 'should he decide to flee.'" The quoted language from *Martinez* is to a description of what the government did, not a statement of legal principle. *See Martinez*, 151 F.3d at 71 ("The government then interviewed the sureties individually to assess their financial qualifications and their ability to exercise moral suasion over Martinez. . . . After interviewing each surety individually, the government found all five sureties qualified, and all five sureties signed the bond."). That said, *Baig* appears to implicitly endorse the importance of reviewing sureties for moral suasion.

but requiring only "at least one" of three cosigners who "exerts moral suasion over the defendant").  Regardless of the answer to that question, Wang has not tendered sufficient co-signers, even if all eight are considered together.  That is because, as explained above, **none** are in a position, or have a relationship, likely to cause Wang any material reservation about forfeiting any funds or property pledged by the co-signer.[14]

Wang also contends that the putative co-signers do hold moral suasion over Wang because they support the anti-CCP cause to which she is devoted.  But, again, that connection may demonstrate the proposed co-signers devotion to Wang; it does not suggest that Wang would have any serious reservation about causing them financial loss to purchase her freedom.  As noted above, Wang is alleged to have defrauded these very individuals.  They may be loyal to her, but the reverse is by no means apparent.  As the Government aptly notes, the deep devotion shown by the prospective co-signers potentially makes them less responsible in that they would be more likely to help Wang to flee or go underground.  *See Melville*, 309 F. Supp. at 827 ("Certainly a source identified as a means to facilitate or one sympathetic to escape would be illegitimate – indeed, such sources would tend to assure against defendant's reappearance.").

Finally, Wang argues that detaining her under these circumstances – because she has no friends or family in the United States, and the Government will not accept alleged

---

[14] The fact that none of Wang's tendered co-signers possess the requisite moral suasion distinguishes the instant case from the out-of-circuit case relied on by Wang.  *See U.S. v. Hammond*, 204 F. Supp.2d 1157 (E.D. Wis. 2002) (stating that "not everyone posting property or money needs to have strong personal ties to the defendant, so long as there are adequate assurances of financial responsibility on the part of those putting up money and moral suasion over the defendant by one or more of those individuals").  Despite some similarities, *Hammond* also is materially distinguishable because, among other reasons, unlike Wang, the defendant there had "strong family ties and few personal resources."  *Id.* at 1166.

victims of the fraud charged as co-signers – would violate the Act's directive that the Court "may not impose a financial condition that results in the pretrial detention of the person." 18 U.S.C. § 3142(c)(2).  There is some appeal to that argument.  Insisting on financially responsible persons to sign on to a bond for which there are no suitable candidates could be construed as a "financial condition" resulting in detention.  Courts have addressed this issue, however, and concluded otherwise.  *U.S. v. Penaranda*, No. 00-CR-1251, 2001 WL 125621, *2 (S.D.N.Y. Feb. 13, 2001).

As explained in *Penaranda*, those courts that have considered the issue "have concluded that in light of the statutory scheme of which § 3142(c) is part, as well as the legislative history of the Bail Reform Act, this provision cannot mean that a defendant without means to meet the financial conditions of his bail must therefore be released." *Id*. (citing as examples *U.S. v. Mantecon-Zayas*, 942 F.2d 548, 549-50 (1st Cir. 1991); *U.S. v. McConnell*, 842 F.2d 105, 108 (5th Cir. 1988); and *U.S. v. Gotay*, 609 F. Supp. 156, 157 (S.D.N.Y. 1985)); *see also U.S. v. Stanton*, 91-CR-889, 1992 WL 27130, *2 (S.D.N.Y. Feb. 4, 1992) (following *Gotay* and acknowledging it had been cited favorably in two circuits).  Rather, "where a defendant cannot meet the financial conditions of his bail, then the court should consider whether that particular financial condition is a necessary part of the bail conditions to provide reasonable assurance of the defendant's appearance, and set forth written findings of fact and legal conclusions regarding the issue." *Penaranda*, 2001 WL at *2 (citing *Mantecon-Zayas*, 949 F.2d at 550 and *McConnell*, 842 F.2d at 110).

In the context of the conditions agreed to by the parties and imposed by Judge Parker, the Court finds that co-signing of the bond by two financially responsible persons is a necessary component.  After all, Judge Parker determined that the combined set of conditions was the "least restrictive" set of terms that would reasonably assure Wang's

presence at future proceedings.  This Court finds no reason to question that conclusion.

**B.**   **The Modified Conditions Proposed By Wang Are Not Sufficient**

As an alternative to the Court determining that the existing conditions of release have been met, Wang requests that the Court consider modifying the terms of release to remove the requirement for two financially responsible persons to co-sign the bond.  In place of that condition, Wang has offered to augment the security pledged in support of the $5 million bond to include not only her $1 million apartment but also the approximate $400,000 held in one of her personal bank accounts, and the $138,000 found in her safe, with the remainder to be secured by properties offered from four of the proposed co-signers.  But those terms suffer from the same flaw as set forth above.  $3.5 million of the bond would be secured by the property of persons who hold no moral suasion over Wang.  The additional security offered may put the Government in a better position of being able to recoup the totality of the bond in the event Wang were to abscond, but it does nothing to materially change the absence of any suretor who has sufficient moral suasion over Wang to incentivize her not to do so.  Accordingly, the Court finds the modified terms proposed insufficient to replace the condition for two financially responsible persons, and, as explained next, that there are no conditions that can be set to reasonably assure Wang's presence at future proceedings.

**C.**   **Detention Is Warranted**

The Government initially agreed that conditions could be set to reasonably assure that Wang would not flee.  In light of information learned since then, however, the Government asserts that there are no such conditions and that Wang should be detained. The Court agrees.

All the factors that pointed to risk of flight that existed before continue to exist.  The

charges alleged are of fraud on a mass scale and for which Wang played a significant role, even if she did not mastermind it, as Kwok and Je are alleged to have done.  The crimes charged do not give rise to a presumption that there are no suitable conditions for setting bail, but the potential sentence faced by Wang under the Sentencing Guidelines, as estimated by the Government, is between approximately 24 and 30 years – a lengthy sentence that could cause most anyone to consider alternative courses of action. According to the Government, the evidence of Wang's involvement in at least some aspects of the alleged criminal conduct is strong in that there are bank records, some with her signature, showing that she authorized various monetary transfers, including a single transfer of $100 million, and that she had reason to know the funds were being used for an improper purpose.  Both the nature and circumstances of the charges and the weight of the evidence thus counsel against release.

Wang's history and characteristics overwhelmingly demonstrate a serious risk of flight.  Wang has no family or friends in the U.S.  She has no ties to the community.  She denies being currently employed, and her previous employment was with the companies through which the alleged fraud operated.  She lives alone.  She is not a U.S. citizen. Although she has applied for asylum in the U.S. and has no incentive to return to China where she apparently is considered an enemy of the CCP, there presumably are other countries where she could seek haven.  And if her asylum application is denied, she will no longer be legally present in the U.S.  Wang has supporters across the globe, and if, like the proposed co-signers, they are so loyal as to risk being liable for millions of dollars without knowing her well, they could be a potential source of support and harbor for Wang if she were to flee.  One of Wang's alleged co-conspirators – Je – remains at large and could be of aid to Wang.

There also are strong indicia that Wang has considerable financial means at her disposal given the myriad accounts over which she has authority and her having kept on hand $138,000 in cash.  Wang also initially offered only her apartment as security, not her personal bank accounts holding between them approximately $900,000.  To be sure, Wang's access to known funds have been substantially reduced inasmuch as Wang has since pledged the $138,000 and one of her personal bank accounts as security and is amenable to Pretrial Services approval for any withdrawals.  The Court has no reasonable assurance, however, that there are not other substantial funds to which Wang has access, particularly, as explained further below, Wang denied having any cash in her apartment.

On the other hand, Wang has no prior criminal record and no prior history of failure to appear, although the former explains the latter thus diminishing its significance.  Wang reports no history of drug or alcohol abuse and no physical or mental health issues.  Such factors "augur in favor of setting bail."  *U.S. v. Hollender*, 162 F. Supp.2d 261, 267 (S.D.N.Y. 2001).  But those few factors pale in comparison to the many weighty factors demonstrating a serious risk of flight.

Finally, although there is no indication that Wang poses a physical danger to any person or community if released, she potentially could harm people if she were to reengage in fraudulent activity.  *See U.S. v. Gulkarov*, No. 22-CR-20, 2022 WL 205252, at *3 (S.D.N.Y. Jan. 24, 2022) (considering the risk of economic harm to the community); *U.S. v. Madoff*, 586 F. Supp.2d 240, 253 (S.D.N.Y. 2009) (same).

Information learned since Wang's initial bail hearing only heightens the Court's concern.  First, the fact that Wang has not been able to identify financially responsible persons with moral suasion is itself a substantial change in circumstances since conditions were set by Judge Parker.  Indeed, Judge Parker "assume[d]" Wang would be able to

meet the conditions set by the court. (March 15 Tr. at 24.) That assumption, however, has not been borne out.

Second, Wang has not been forthcoming in fully disclosing her assets. Documentation seized from Wang's residence, including as recently as November 2021, indicates that Wang was allocated and listed as a distributee of Himalayan Coin cryptocurrency redemption rights worth millions of dollars.[15] (Dkt. 42 at 2 and Exs. A, B.) At the April 4 hearing Wang's counsel asserted that Wang had no recollection of those cryptocurrency interests. As the Court noted at the time, however, it would be odd for someone not to at least be cognizant of the status of millions of dollars in cryptocurrency interests allotted to them. The Court recognizes that the documentation submitted is not proof that Wang actually received or currently owns any cryptocurrency. But the documentation certainly gives the Court concern that there may be unaccounted-for assets to which Wang could have access, notwithstanding limitations on Wang's current ability to effectuate as yet unexercised redemption rights.[16] (Dkt. 44 at 4.)

---

[15] Himalayan Coin ("HCN"), and its "stable coin" counterpart, the Himalaya Dollar ("HDO"), are digital currencies affiliated with the Himalaya Exchange, which the Government alleges was founded by Je and promoted by Kwok and used by them as one of the vehicles through which the fraudulent scheme operated. (*See* Dkt. 42 at 2; SS Indictment ¶¶ 12, 17.) The Government alleges that HCN and HDO are not actual cryptocurrencies but rather merely "credits" for redemption. (SS Indictment ¶ 22.)

[16] According to defense counsel, "as the government is undoubtedly well aware, the Himalayan Exchange has notified its customers that it is unable to redeem HDO for [US dollars] except in $5,000.00 increments and only once a month." (Dkt. 44 at 4 and Ex. A.) Also of note, the Government has already seized hundreds of millions of dollars of Himalaya Exchange's cash reserves. (SS Indictment ¶ 25(c).) The Indictment also implicitly recognizes current limitations on the Defendants' ability to monetize currently unredeemed HCN rights. (*See* SS Indictment ¶ 24(a) (alleging that Je "attempted" to effectuate a redemption of approximately $46 million of his own HCN rights but not alleging that he succeeded in doing so).)

Putting aside what Wang did or did not recall about the cryptocurrency rights apparently allocated to her, she did not disclose to Pretrial Services the $138,000 cash that was seized from her residence.  As set forth by the Government, the following exchange took place "in sum and substance" between the Pretrial Services Officer and Wang when she was interviewed on March 15, 2023, the day of her arrest:

> Q: At the time of your arrest, or within your residence, or on your person, did you have any cash to your name?
> A: No.
> ---
> Q:  Are there any business accounts under your name or that you oversee, or any additional cash anywhere else?
> A: No.

(Dkt. 42 at 5.)  As the $138,000 found in her residence demonstrates, Wang answered the questions about her assets untruthfully. That much of that cash may, as defense counsel urged, be money held to be given as gifts is beside the point.

Defense counsel disputes that the exchange recounted took place and contends that Pretrial Services merely asked Wang what cash she had "on her" at the time of the arrest.  (Dkt. 44 at 7.)  Defense counsel further notes that there was no recording of the interview, and that the questioning took place through a Mandarin interpreter.  True.  But it makes no sense that Pretrial Services, in seeking to learn what assets Wang has, would have asked only about cash "on her," or that Wang, in answering such questions, would have believed the question to be so limited.  Defense counsel counters that it would make no sense for Wang to lie about cash held in her apartment, given that she knew that there were agents searching there.  (*Id*. at 8.)  To the contrary, Wang may well have thought the agents would not be permitted or able to access her safe.[17]

---

[17] The Government points to additional documentation found in Wang's apartment allegedly

As indicia that Wang does not pose a risk of flight, her attorney proffered that Wang knew she was being investigated as much as a year ago yet did not flee.  He also noted that when Wang was considering going abroad – to the United Kingdom and the British Virgin Islands purportedly for business purposes – she applied to the immigration authorities for "parole" from the requirement that asylum applicants not leave the country. Far from surreptitiously traveling, Wang notified government authorities of her plans.

The Court agrees that staying put while known to be under investigation can be indicative of someone who is not likely to flee (although merely being under investigation and actually being charged are quite different).  Here, however, Wang applied to leave the country and not stay put.  Her being transparent with the immigration authorities allowed her to preserve her asylum application rights, which, in the event that she was not ultimately indicted, she would likely want to pursue.  But that provides no comfort that Wang actually

_____

demonstrating her dissembling and access to assets.  The Court does not find that conclusion persuasive with respect to the additional documents. Two of those documents relate to an application for a bank account in the name of a British Virgin Islands company owned by Wang and for which she is designated the beneficial owner.  (Dkt. 42, Exs. C, D.)  The Government has not proffered anything indicating that the account actually was approved and opened.  Other documents reflect transactions and balances for six bank accounts held in the name of various Kwok-related companies, including ones that Wang "effectively controls, as the 99.9999% shareholder."  (Dkt. 42 at 3 and Ex. E.)  On April 14, 2023, however, the Government advised the Court that three accounts for which Wang "appeared to be the controlling manager" were "in fact closed."  (Dkt. 43.)  Another document shows that as recently as March 2023 Wang signed off on payroll expenses for various Kwok-controlled entities.  (Dkt. 42, Ex. F.)  The Government contends that the document shows that Wang was employed at the time of her arrest despite denying being employed to Pretrial Services.  The Government implicitly concludes that by signing off on payroll expenses for others, Wang necessarily did so in an employed capacity. That is not an unreasonable inference.  Defense counsel has asserted that Wang was merely a "volunteer" and "authorized representative" at the time.  That seems a bit dubious given Wang's central role in the fraudulent scheme's financial transactions and her having no other source of employment.   And, as the Government notes, Wang has a motive not to admit employment with Kwok-related companies given the charges against her. Nonetheless, the Court does not conclude that Wang necessarily lied when she denied being employed at the time of her arrest.

planned to return.  If charged while abroad, Wang would have had no motivation to return and every incentive to remain abroad.  Indeed, as the Government asserts, Wang's statement of intended travel abroad shows that "she is willing to travel internationally, which undermines the defense's general claim that international travel would be unthinkable because of the defendant's concerns regarding the Chinese Communist Party."  (Dkt. 42 at 4.)

In short, the Government has shown that Wang actually poses a serious risk of flight and had the incentive and access to means to flee.  Conditions of home detention and electronic monitoring often can be enough, when combined with a secured bond signed by financially responsible persons and other standard pretrial release conditions.  The Government previously agreed that such conditions were sufficient for Wang's release.  Since then, however, circumstances have changed.  Despite Judge Parker's expectation that Wang would be able to find qualified co-signers, Wang has not been able to do so, instead tendering persons with no relationship to her and alleged to be either victims of or participants in the fraudulent scheme alleged.  Moreover, Wang has not been fully forthcoming about her assets.  The Court cannot have any confidence that Wang will abide by the terms of release or that she would not remove her electronic monitoring equipment.

For all of the above reasons, the Court finds that the Government has met its burden to show by a preponderance of the evidence that no condition or combination of conditions can reasonably assure the Defendant's appearance at future proceedings.

## Conclusion

For the foregoing reasons, the Court finds that Wang has not satisfied the conditions of pre-trial release previously imposed; that information learned since Wang's initial bail determination constitutes changed circumstances; and that there are no

conditions that can be reasonably assure Wang's attendance at future proceedings, and

that Wang should be, and hereby is ordered, detained.

**SO ORDERED:**

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  April 21, 2023
        New York, New York