# EXHIBIT A

```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                        Docket #23cr118/
 UNITED STATES OF AMERICA,         : 23m2007

                       Plaintiff,  :

   - against -                     :

 WANG, YANPING,                    : April 4, 2023
                                     New York, New York
                       Defendant.  :

----------------------------------- : BAIL HEARING

                    PROCEEDINGS BEFORE
             THE HONORABLE ROBERT W. LEHRBURGER,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:       UNITED STATES ATTORNEY'S OFFICE
                     BY:  JULIANA MURRAY, ESQ.
                          RYAN FINKEL, ESQ.
                     One Saint Andrew's Plaza
                     New York, New York 10007

For Defendant:       LIPMAN LAW PLLC
                     BY:  ALEX LIPMAN, ESQ.
                     45 West 29th Street, Suite 303
                     New York, New York 10001

                     CHAUDHRY LAW PLLC
                     BY:  PRIYA CHAUDHRY, ESQ.
                     147 West 25th Street
                     New York, New York 10001

INTERPRETER PRESENT


Transcription Service: Carole Ludwig, Transcription Services
                        155 East Fourth Street, #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

1

```
 1                    PROCEEDING              3
 2          THE CLERK:  We're here in the matter for a bail
 3   hearing, U.S. v. Yanping Wang, 23cr118.  Attorneys,
 4   please state your name for the record starting with the
 5   Government.
 6          MS. JULIANA MURRAY:  Good afternoon, Your
 7   Honor, Juliana Murray and Ryan Finkel on behalf of the
 8   United States.  We're joined by Paralegal Specialist
 9   Jeffrey Merns (phonetic).
10          MR. RYAN FINKEL:  Good afternoon.
11          MR. ALEX LIPMAN:  Good afternoon, Your Honor,
12   Alex Lipman, Lipman Law PLLC, and with me is my co-
13   counsel Priya Chaudhry, Chaudhry Law PLLC.  We're here
14   for the defendant Yanping Wang.  And she's here present
15   and she's being assisted by a Mandarin interpreter.
16          THE COURT:  All right, thank you.  Good
17   afternoon.  Ms. Wang, can you hear and understand
18   everything the interpreter is saying?
19          MS. YANPING WANG:  Yes, I do.
20          THE COURT:  All right, terrific.  So when we
21   law saw each other, you were going to see Judge Torres
22   in regard to Mr. Kwok and also seek possibly her say so
23   on this matter.  I understand she has left it in my
24   hands.  So I guess I will hear from the parties as to
25   where we are and what can be done, should be done in
```

```
1                            PROCEEDING                    4

2   respect to the financial suretors that the Government

3   says are not sufficient to meet the obligation under the

4   conditions set by Judge Parker that two financially

5   responsible people be able to sign on to the bond.

6           And this is really defendant's application in

7   that they raised this concern, and so I'll hear from

8   defense counsel first.  But why don't you also let me

9   know if there's been any developments during the last

10  week that make any difference and/or whether anything

11  that happened before Judge Torres influences what

12  happens here.

13          MS. MURRAY:  Just briefly, Your Honor, I just

14  wanted to confirm that this is being recorded, this

15  proceeding, because I don't see a court reporter.  So

16  just for the record.

17          THE COURT:  It is being recorded

18  electronically.

19          MS. MURRAY:  Thank you.

20          MR. LIPMAN:  May I begin, Your Honor?

21          THE COURT:  Yes, please.

22          MR. LIPMAN:  Your Honor, in our view, from the

23  beginning, the Government never actually established by

24  preponderance of the evidence that the defendant is a

25  flight risk.  And I want to go – we actually agreed to
```

PROCEEDING                5

the bond conditions, but we agreed to the bond
conditions based on conversation that we had with the
Government that in which the Government made certain
representations about what was found in Ms. Wang's
apartment.  And so we were told that, we didn't have a
lot of time to discuss things with our client, but we
thought, all right, it seems reasonable, and then we
agreed that we were going to propose names of two co-
signers for the bond and, frankly, didn't think that
this was going to be an issue.

        Then the Government made certain statements on
the record, and as we started having trouble having them
approve the people we proposed, we at some point asked
them for support for some of the things that they said
were the reasons that our client is a flight risk.  And
so then they eventually provided it to us, and what we
found is basically one of three things.  The Government
either made statements that are half true, and so we
need to actually fill in the blanks and realize that
what they said isn't really right.  They have made
statements that are contradicted by the evidence that
they gathered in Ms. Wang's apartment, and then they
made statements for which they're just conjectures.
They're not actually supported by any evidence.  So let

1                          PROCEEDING                    6

2   me back up and start at the beginning.

3          THE COURT:  Okay.

4          MR. LIPMAN:  So Ms. Wang and her co-defendant,

5   Mr. Kwok, knew that the Government was looking at them

6   for a very long time, so much so that in September, and

7   according to the indictment, in September and October of

8   last year the Government seized a bunch of assets,

9   according to the indictment it's something like on the

10  order of $700 million, and the Government seized those

11  assets.  It was a civil seizure, but it referenced, as

12  specified (indiscernible).  Right?  So $700 million

13  seized, I'm not sure that I can say for the Court that

14  my client understood the full scale of what was seized,

15  but she certainly understood that the Justice Department

16  has seized a bunch of money, right.

17         And then there was an SEC settlement for the

18  GTV case which is the one that's relevant to her, and

19  GTV paid back something in the order of I want to say

20  $500 million, which incidentally they didn't pay after

21  the – they first paid the money and then the SEC issued

22  a settlement order.  So it's in the reverse order from

23  the Government says happened.  Okay?  So she knew, she

24  knew that the Government was looking at her and that she

25  was potentially in severe legal jeopardy.

```
 1                        PROCEEDING                    7

 2              Despite that, she didn't go anywhere, but

 3   there's more.  The Government says she had the passport

 4   from, a Chinese passport that she could've traveled on,

 5   right, and that she, and she's an asylum applicant, and

 6   because she's an asylum applicant, they say this is one

 7   of the factors to consider in her not having ties to the

 8   United States is somehow she count against her.

 9              Well, because she's an asylum applicant and she

10   doesn't want to lose her asylum application, she did

11   want to go travel, and she applied to the United States

12   government for a furlough so that if she traveled, her

13   asylum application would not get denied.  So the

14   Government, and that happened, she received permission

15   to travel between December and January of last year, so

16   December '22 to January I want to say 27, I'm probably

17   wrong on the exact date, but something from mid-December

18   to the third week of January --

19              THE COURT:  And when was the seizure of the

20   money that you referred to?

21              MR. LIPMAN:  September and October according to

22   the indictment.  I think it's September 18 and October,

23   was it is, 24, 26.

24              So she put the government on notice that she

25   was going to go travel despite all of this going on.
```

```
 1                        PROCEEDING                  8
 2   She did not travel during that window.  It expired.  It
 3   expired for reasons that have nothing to do with
 4   anything other than she had a particular trip that she
 5   had in mind to make, she couldn't get, it didn't work
 6   out logistically.  She then applied for another
 7   application, and I believe that was, according to her
 8   immigration counsel, that was on February 8, 2023.  So a
 9   month before she was arrested.
10        So the idea that she is a flight risk is, given
11   all of that, is a little far-fetched, but there is a
12   reason for it, and the reason is this.  Ms. Wang is in
13   different times would be called a revolutionary.  She
14   has put herself, her family, everything she's done at
15   risk because she is opposing the communist party of
16   China, and whatever it is that they say in the
17   indictment, there is no dispute, none whatsoever, that
18   she has put herself in jeopardy.  Her son is in China,
19   her husband, the man, the one and only boyfriend she's
20   ever had, they're not allowed to have any communication
21   with her --
22        THE COURT:  Right, but as I understand the
23   Government, I don't know if they've pivoted or whether
24   they always asserted this, but their concern is with
25   fleeing to other jurisdictions, be it the United Arab
```

 1
 2  Emirates where supposedly Mr. Je, a co-conspirator, is
 3  or Vanuatu where she has an expired passport application
 4  or wherever.

 5          MR. LIPMAN:  So, Your Honor, let me take
 6  Vanuatu first because that's easiest.  Okay?  Together
 7  with the passport that's expired, they also found two
 8  documents both for her and Mr. Kwok in her apartment
 9  saying that she's renouncing Vanuatu citizenship.  So
10  that's not an issue.  The other thing is she got the
11  passport for Vanuatu I believe in 2016, if I have that
12  correctly, that was before she came to the United
13  States.  China and Vanuatu have since become good
14  friends, and it's a different situation now, and I don't
15  think it would be safe for her to go there.

16          As far as going to United Arab Emirates, the
17  United Arab Emirates does not, from what we heard this
18  morning from the Government in Mr. Kwok's hearing,
19  United Arab Emirates does not extradite its citizens to
20  the United States.  It does have an extradition treaty
21  with China.  She's not a citizen of United Arab
22  Emirates, nobody's suggesting that she is.  She's not,
23  she doesn't have a passport from there.  The only
24  passport that she had that was still live, they have
25  possession of that passport.  They found it in her

1
2  apartment.  So no, she cannot go somewhere else.

3            Now let's talk about whether she --

4            THE COURT:  Wait, wait, wait, I want to stop

5  you there, just on the issue of the extradition with

6  United, with the UAE.  What I heard you say was that

7  they don't have an extradition agreement with respect to

8  citizens of the UAE, and then I thought I heard you say

9  that they have an extradition treaty with China which,

10 of course, she's not going to go back to, and this isn't

11 a proceeding in China.  What is their status with

12 respect to extradition of a citizen of a third-party

13 country, if you will, and extraditing to the United

14 States?  I'm sure the Government can tell me but I'm

15 wondering if you have an understanding.

16           MR. LIPMAN:  As far as I know, there is no

17 extradition treaty with the United States, but it's an

18 irrelevant issue rather because, first of all, she can't

19 get there.  Okay?  And, second, she's not concerned

20 about being extradited to the United States; she's

21 concerned about being extradited to China --

22           THE COURT:  I understand.

23           MR. LIPMAN:  -- where she's going to get

24 arrested and shot.  I mean there's a difference.  You

25 know, as bad as the MDC is, it's not exactly a Chinese

1     prison.

2          THE COURT:  But is your point if she shows up

3     at the UAE, she's going to get exported or extradited to

4     China automatically?

5          MR. LIPMAN:  Well, I don't know about

6     automatically, but she certainly is in great danger of

7     that happening.  That's absolutely true.  And, look, in

8     the hearing that we had earlier this morning, the

9     Government actually, it was discussed, all the efforts

10    that the Chinese government has undertaken to get Mr.

11    Kwok back to China, including bribing American

12    officials, there's a case going on now, a criminal trial

13    I believe is going on right now in D.C. in which several

14    government officials who've been bribed by China in

15    order to facilitate Mr. Kwok's deportation from the

16    United States to China.

17         Well, the Government, this woman, according to

18    the Government, is Mr. Kwok's chief of staff, whatever

19    that means.  Well, I don't think that they seriously

20    will dispute that she is in danger.  So --

21         THE COURT:  I'm sorry, that she's what?

22         MR. LIPMAN:  In danger.

23         THE COURT:  In danger.

24         MR. LIPMAN:  Meaning I don't think they

1

2  seriously dispute that if she went to China, got into

3  China or that China wants her.

4           THE COURT:  Right.

5           MR. LIPMAN:  There can't be a serious dispute

6  about that.  So now let's talk about what would happen

7  if she were in the United States.  Basic reason, basic

8  reason, she is Mr. Kwok's, according to the Government,

9  chief of staff.  She's very recognizable.  Right?  She's

10 recognizable in the community of people who are here.

11 This is a community of thousands of people in the United

12 States.  So the Government says, oh, they will hide her.

13 Well, first of all, that's, forgive me, but that's just

14 an improper inference.  To think that thousands of

15 people who are on the U.S. soil will secret a fugitive,

16 is it because they're Chinese, is it because they speak

17 Mandarin --

18           THE COURT:  No, because they're, because they

19 potentially were victims of the fraud.

20           MR. LIPMAN:  Except for this.  If they are

21 victims of the fraud, they know what's going on, they're

22 adults, and so they could at any time become persuaded

23 that, in fact, she should be returned to the United

24 States government if she is a fugitive.

25           But there's more to this, and the more is this,

1

2  if the Chinese – we know from what I've read in the

3  paper, that the Chinese communist party has parking

4  Chinese communist officials from their police in their

5  United States consulate in New York.  For a second can

6  we think that they're not keeping tabs on her?  And that

7  if she showed up anywhere in any community where people

8  speak Mandarin as their primary language that she would

9  be spotted?  For a second can anybody conceive that the

10  Chinese communist party wouldn't find her and identify

11  her and tell the government exactly where she is?

12          Now let's take the alternative.  Let's assume

13  for a second that she decided to hide herself in, I

14  don't know, Utah among white people.  She speaks English

15  with a heavy accent, and her first language in Mandarin.

16  Would she not stick out like a sore thumb?  The idea

17  that this woman can hide is blatantly absurd.  It's

18  absurd.  And the idea that she could rely on people to

19  hide her in the United States.  So where are we?  She

20  can't leave and she can't hide.  That's not flight risk.

21          But there's more.  And the more is this.  The

22  Government said, and this is why we actually thought we

23  were okay with the bail package that they proposed.

24  They said we found stuff in her apartment that tells you

25  that she's a flight risk.  What is it?  We found twelve

1

2   phones.  Of these twelve phones, six of them were

3   secreted in boxes that were, that looked like brand new

4   boxes of iPhones and these were used – this is a

5   representation from the Government of the United States

6   to a court in the United States.  So we said, all right,

7   let's look at the pictures.  Send us the pictures.

8   Well.  May I approach, Your Honor?

9           THE COURT:  You may.

10           (pause in proceeding)

11           MR. LIPMAN:  This is the evidence log, Your

12   Honor, that was of collected items from her apartment.

13   This is what we got from the Government.  Okay?

14           THE COURT:  Uh huh.

15           MR. LIPMAN:  I'm going to assume that

16   everything on here is true and correct because it came

17   from the Government.  If it's not, they should tell Your

18   Honor.  Here's a list of phones and where they were

19   found.  On the first page.  Numbers 1, 2, 3, 4, 5, 6, 7.

20   These are all iPhones, and they were all found on the

21   kitchen table.  Now, Your Honor, if the Court would like

22   to see, I have pictures of them.

23           They were found on the counter in the kitchen,

24   three of them.  They were plugged in in plain view.

25   There was a phone that was on the side of the table,

```
 1                        PROCEEDING                    15
 2   there was another phone someplace on the side.  There's
 3   a description here.  On nightstand, right of bed.  On
 4   changing --
 5              THE COURT:  Right, well, those - all right, and
 6   they didn't say all of them were --
 7              MR. LIPMAN:  Your Honor --
 8              THE COURT:  -- secreted --
 9              (interposing)
10              MR. LIPMAN:  -- trust me, trust me --
11              THE COURT:  Let's just --
12              MR. LIPMAN:  I'm not bypassing --
13              THE COURT:  I didn't think you were, but we
14   don't need to go over the ones that are sort of obvious.
15              MR. LIPMAN:  Well, Your Honor --
16              THE COURT:  Okay.
17              MR. LIPMAN:  I wouldn't be talking to you if,
18   right?
19              THE COURT:  No.
20              MR. LIPMAN:  Okay.  So here we go.  On page 6
21   of 9 --
22              (pause in proceeding)
23              THE COURT:  Okay?
24              MR. LIPMAN:  Oh, I'm sorry.  I'm sorry, Your
25   Honor.  I apologize.
```

```
 1                           PROCEEDING                   16

 2              THE COURT:  Sure.

 3              MR. LIPMAN:  On page 7 of 9.

 4              THE COURT:  Okay.

 5              MR. LIPMAN:  Do you see where it says 56 --

 6              THE COURT:  Yes.

 7              MR. LIPMAN:  -- white phone, 57, white phone --

 8              THE COURT:  Yes.

 9              MR. LIPMAN:  -- 58, white phone --

10              THE COURT:  In bag in closet.

11              MR. LIPMAN:  In bag in closet.  Not in a box

12   pretending like it's new.  It's in a bag in closet.  I

13   have a picture of the closet.  I'm happy to show the

14   Court the bag that it was in.  There is, in fact, in

15   that picture one white box for an iPhone in that

16   picture.  One box.  And according to this none of these

17   phones came out of that bag, that box.  But even if one

18   did, that's one.

19              Now, also on this page you see, Your Honor,

20   where it says Mac book number 55 in between clothes?

21              THE COURT:  Uh huh.

22              MR. LIPMAN:  Okay, so one of the things that

23   they said is, oh, look, she's hiding stuff in between,

24   in her closet.  She's secreted a laptop in between her

25   clothes.  So a couple of things about that.  Number one,
```

```
 1                        PROCEEDING                17
 2   as the Government well knows, Ms. Wang is not unfamiliar
 3   with what happens when the FBI raids somebody.  They
 4   raided Mr. Kwok previously.  She knows what happens when
 5   that happens.  Okay?  So the idea that she could think
 6   that she could hide a laptop in between her sweaters is
 7   absurd.
 8            But there's more now, Your Honor.  Here is the
 9   - if I may - which is this?
10            ATTORNEY:  46.
11            MR. LIPMAN:  If I may approach, Your Honor.
12            THE COURT:  You may, and just, I want to
13   confirm something.  Are we looking at evidence and
14   material that was not available before the hearing
15   before Judge Parker?
16            MR. LIPMAN:  This was not available to us
17   before - we got this - so here's what happened.  We
18   asked them some of these questions about the phone,
19   right, we asked those questions I think it was on the
20   29th.  Do you have our letter?  But essentially, Your
21   Honor, we got these the night before we saw you.
22            THE COURT:  Okay, so that was well after Judge
23   Parker's ruling.
24            MR. LIPMAN:  If I may approach, Your Honor.
25            THE COURT:  Yes.
```

MR. LIPMAN:  Your Honor, this is the FBI
schematic of the apartment that Ms. Wang lives in.  By
the way, it's 740 square feet.  This is a woman who
apparently defrauded people up to, for something like a
billion dollars.  Anyway, so on this page, Your Honor, I
call the Court's attention on what is in the apartment
and what is not.  There is a bed in the bedroom, and
there's a side table.  There is a couch in the
livingroom, and there's something in front of the couch,
it's actually a (indiscernible).  There is nothing else
in this apartment.  There's no wardrobe, there's no
chest of drawers, there's no desk, there's nothing.  So
where does she keep her stuff?  In the closets.  All of
her stuff is in the closets.  Her old phones were in the
closet.  Right?  There's nothing nefarious about putting
stuff in the closet when you don't have any furniture.

So then, so then they say, okay, we found money
in her apartment.  We found money, we found $138,000.
Ms. Murray said in recent bills, she thought they were
recent bills.  Okay.  So then we thought, all right, can
we see the pictures of the money?  Why did we ask for
pictures of the money?  Because we had reason to think
that a bunch of that money was in red envelopes which
apparently in Chinese culture it is common on holidays

1

2    like Chinese New Year to give people gifts of money, and

3    they found red envelopes.  And so I wanted to see where

4    the money is, what it looks like, and how old it is.

5    Right?

6              So asked for the pictures.  That's actually,

7    truth be told, that's the thing that kind of prompted

8    this conversation to begin with.  (indiscernible) the

9    money.  Okay?

10             So what did we find?  (pause)  May I approach,

11   Your Honor?

12             THE COURT:  Yes, you may.

13             (pause in proceeding)

14             MR. LIPMAN:  This, Your Honor, is the pouch in

15   which the money was found.  Now, the Government says in

16   a letter to you, Your Honor, in their latest letter,

17   they said conveniently in a bag for easy retrieval.

18   Really?  Okay, let's look at it.  It's a bank bag.  This

19   is what money comes from when you get money from the

20   bank.  What else do we see here?  We see that there are

21   a bunch of this is in red envelopes.  Now there's other

22   cash in here, and, in fact, there's another picture.

23             THE COURT:  Look, you don't need to go in this

24   much detail on the cash.  And, you know, I agree with

25   you, I don't find the fact that it's in a bag

PROCEEDING                    20

1
2   particularly persuasive that means someone's necessarily
3   going to run because it's in a bag.  It's organized.
4   But one thing maybe you can tell me is, and I realize
5   this is shifting time a bit, but I thought that in their
6   filing that, their last filing that prompted putting
7   this over, that they had indicated and represented that
8   Ms. Wang did not disclose this $138,000 to Pretrial, but
9   I was under the impression this had already been seized
10  a couple of weeks before.
11          MR. LIPMAN:  No, it was seized on the day of
12  her arrest, okay, and the question that she was asked,
13  the relevant question was did you have any money cash on
14  you when you were arrested.  She was arrested at 6:15
15  a.m., she was in her pajamas.  The truthful answer to
16  that question is no.  We checked out notes, we don't see
17  any other questions that would have elicited a different
18  answer.  So did she disclose it voluntarily?  No.  I
19  don't know that she was asked about it.
20          THE COURT:  Okay.
21          MR. LIPMAN:  Okay?
22          THE COURT:  I get it.
23          MR. LIPMAN:  But, Your Honor, even if she had
24  been asked about it, there were a dozen FBI agents in
25  her apartment ripping it up.  Okay, I mean she was, she

1

2  was beyond stressed.  She's sitting and talking, in a

3  situation that she's never encountered, she's being

4  asked these questions.  Is it crazy that, you know, the

5  question is have you, do you have any cash on you, and

6  she says – did you have any cash on you when you

7  arrested and the answer is no and she doesn't say

8  anything else?  I mean really?

9        All right.  Now, by the way, before – because

10 they're going to bring up another picture for you, Your

11 Honor, and I don't want to be accused of giving you

12 something less than the full picture.  And the full

13 picture is that when they made another picture of the

14 money – I apologize, Your Honor.  I've gotten so

15 excited, I lost the other picture of the money.  Here it

16 is.  May I approach?

17        THE COURT:  Yes.

18        (pause in proceeding)

19        MR. LIPMAN:  This is the picture that makes it

20 look as if more of this money is more recent because you

21 can see there are some old bills, some new bills.

22 However, with that said, as I told the Government,

23 there's a good explanation for why some of that money is

24 recent.  Okay?  And the explanation, and I told the

25 Government this, is that she had some pounds that she

1

2   brought over from, with her herself at some point in her

3   previous travels, and that those pounds, you know,

4   however they got to her, but those pounds needed to be

5   replaced because apparently when the Queen died, they're

6   exchanging their money for money that looks, that has a

7   picture of the King.  Okay, so over time she had that

8   replaced, so there's got to be something like $30,000,

9   $40,000 in there that's recent that has to do with that.

10          I asked to see the bills yesterday when it was

11  too late for me to go do it, they said you can come see

12  it.  I'll see them at some point.  But my point though,

13  Your Honor, the idea that this is money secreted so that

14  she can get out of Dodge, no, no, that doesn't make any

15  sense.

16          THE COURT:  No, but it is suggestive that she

17  has access to significant funds even if that particular

18  one wasn't what she was intending to use.

19          MR. LIPMAN:  Let's address that.  Okay?  The

20  Government says she didn't disclose all of the bank

21  accounts over which she had control.  I had a specific

22  conversation with the Government in which I said if

23  you're asking about accounts for which she can actually

24  transact, meaning no third people, right, in other

25  words, but my bank account, I can go and do stuff.  My

1

2  firm's bank account, not necessarily.  Well, in my case

3  yes, but, you know, if you work for a firm, you may be

4  able to direct somebody to do whatever, that's firm

5  business, but you can't take it and put it in your

6  pocket.  Okay?  So what I said to the Government is we

7  are aware of two accounts, right, that are hers.  We're

8  aware of another business account where she could have,

9  she could transact.  We gave them the account and the

10  number.  Right?  We're not aware of any other accounts.

11  That is not, we did not hide from the Government that

12  she owns this BBI entity.  That's not – the question was

13  --

14          THE COURT:  I understand, that's, of the list

15  of four things, three of them were business entities,

16  two of them weren't even hers directly.  What about the

17  Himalayan cryptocurrency?

18          MR. LIPMAN:  Good question.  So I've been

19  trying to figure out what happened with the Himalayan

20  thing, and there are two things about that.  Number one,

21  the document that they're referring to, remember how I

22  said there are some things where there's evidence, there

23  are some things that are half-truths, there are some

24  things that are contradicted, and then there are some

25  things were it's just a leap?  Right?

So what are they looking at?  They're looking
at a schedule that says allocation, okay, allocation.
They're not looking at an account at H Coin.  They're
not looking - they're looking at an allocation.  I've
been trying to figure out what happened to that
allocation.  The best I can ascertain is that she has no
idea what happened.  I'm not saying that something
didn't happen with it.  I'm saying that she has no idea.
Okay?

           THE COURT:  But which is --

           (interposing)

           MR. LIPMAN:  But there's more --

           THE COURT:  The current value of that, right,
at least the Government says is something like $13
million.  I'm sure it was less than, well, maybe who
knows given the market.  But you would think that
someone - I'm going to assume it was a significant
amount of cyber currently at the time in that to her it
was significant, and you would think one would keep
track of that significant amount.

           MR. LIPMAN:  If one thought that it was theirs,
then one would.  But, Your Honor, here's - so the
Government seized hundreds of millions of dollars,
including from the Himalayan exchange.  The Government

2   is alleging that it's all a fraud.  Out of one side of

3   their mouth they say it's worthless, and people can't

4   actually turn it into cash.  The SEC said, in its

5   complaint the SEC says people tried to turn it into cash

6   but couldn't.  Well, is it or isn't it?  Because if it

7   is, then maybe it's worth $13 million, though we don't

8   know how to access it.  But if it isn't, if their

9   allegations are correct, then I don't know what the

10  mechanism is for turning this into cash.  Okay?

11          So this is all to say that the presumption is

12  that she would be released or released pursuant to

13  conditions that are least restrictive to assure her --

14          THE COURT:  Right, but are we arguing anew?  I

15  mean this comes back to the question, Judge Parker

16  implemented or ordered conditions.  The crux of the

17  problem is that one of her conditions is not being

18  fulfilled because the Government has taken the position

19  that none of the persons offered to be financially

20  responsible are going to be sufficient suretors either

21  because they don't exercise moral suasion, because they

22  aren't financially responsible, or they are a victim or

23  a participant in the alleged fraud.  And there's a

24  question of, okay, what happens if they keep on not

25  accepting these people.  So I just want to be careful

PROCEEDING                                          26

1
2   about thinking of this as brand new when Judge Parker
3   has already set conditions.
4           MR. LIPMAN:  So, Your Honor, if I may.
5           THE COURT:  Yeah.
6           MR. LIPMAN:  So, first of all, according to
7   3142, 18 U.S.C. 3142(e)(iv)(3), "The judicial officer
8   may at any time amend the order to impose additional or
9   different conditions of release."
10          THE COURT:  Yes.  Understood.
11          MR. LIPMAN:  So that's number one.  Number two,
12  as I explained to the Court, we agreed to $5 million –
13  I'm sorry, Your Honor, I used to be in, you know, for a
14  brief time at the U.S. Attorney's Office.  When the
15  prosecutor says we found recent cash, we found stuff,
16  they told us they found stuff, documents hidden in her
17  cushions of her, the only piece of furniture she has.
18  So they said they found in the cushions of her loveseat
19  or whatever it is, okay.  Well, somewhere here is my
20  other exhibit that I'm going to, sorry, Your Honor, I
21  get excited.
22          Anyway, somewhere here, I'll get it for the
23  Court, yeah, this is fantastic, thank you.  This is
24  important.  So, first, let me finish the first thing.
25  Okay?  So the photographs, the log of the photographs

that were taken.  I was looking to see if I can find a

photograph or a log of a document hidden in the

cushions.  That doesn't exist.  You know what else

doesn't exist?  They said in their – this is a

representation to a court, they said we found a phone

hidden between mattresses in her bedroom.  I want to see

this picture.  I want to find it on the log of pictures

that are taken.  Where is it?  It doesn't exist.  Or at

least it hasn't been given to us.

        Now, there is a picture like that that was

taken at Mr. Kwok's search, and – thank you.

        (pause in proceeding)

        MR. LIPMAN:  May I approach, Your Honor?

        THE COURT:  Yes.

        MR. LIPMAN:  So that's a picture of a phone

hidden between mattresses.  But it's not from her

apartment.  And I have yet to see the one from her

apartment.

        One other thing, they said she has stuff in

her, in the pouch for easy retrieval, right, the money

was in the pouch for easy retrieval.  Everything was in

a pouch for easy retrieval.  You know what else was in

the pouch for easy retrieval?  I think every credit card

she's ever had.  I mean a bunch of old expired credit

1
2  cards, easy retrieval.  It doesn't make sense.

3         Now let me, Your Honor, let me just now switch

4  over to the other piece of this which is the proposed

5  co-signers, the Government's refusal to approve any, and

6  what this is about.  And I want to start with something

7  that I actually did not plan on doing because it only

8  happened in the courtroom this morning.  You see these

9  people here, many of these people here are here to

10 support her.

11        She got emotional in the courtroom and started

12 crying because she realized that all these people are

13 here to support her, and let me explain what that means.

14 The Government probably doesn't know this, but surely it

15 is actually unlawful for the Government to disclose that

16 somebody's an asylum applicant.  There's a regulation

17 that says that.  I didn't know.  I found out recently.

18 I'm sure they don't know.  I'm sure they didn't do it

19 deliberately.

20        But the reason is obvious.  Right?  If you have

21 somebody coming from a country, you identify them as

22 somebody who's seeking asylum somewhere else, that

23 immediately puts them in danger.  All of these people

24 simply by coming here, do you think there's no one here

25 from the Chinese communist party in this room right now

monitoring this?  All these people simply by coming up

and standing up for her have exposed themselves, their

families --

THE COURT:  I don't think anyone questions

perhaps their intent.  The question does the --

MR. LIPMAN:  Does she care about them?

THE COURT:  -- does the defendant care enough

about these people that she's going to be concerned

enough about whatever monetary means they're putting on

the line versus taking flight, and one would paint the

picture, if you're the Government, saying she's alleged

to have committed fraud, you've got strong evidence.  So

why would she care about the people she defrauded?

MR. LIPMAN:  Fair amount, Your Honor, I was

about to address it.

THE COURT:  Okay.

MR. LIPMAN:  There are different ways to think

about moral suasion.  Right?  I think we all agree that

a brother can sign for a brother, and the first brother

is not going to care.  They're relatives, they're

brothers, but they're not going to care.  It's also true

that people can connect in some way, they could be

strangers, but they connected, right, and so somebody

can have moral suasion over somebody else who actually

1
2   they don't have all that much interaction.  They just

3   love each other.  Right?

4        But there's another kind, and the other kind is

5   this, if you are a member of a certain kind of community

6   and you're – and this community is important to you,

7   it's important to you what happens to the members of

8   this community.  Now, the Government's going to say, oh,

9   my God, a billion dollars, these people are victims.

10  Well, they're here, they don't think they're victims,

11  but that's another story.  Okay?

12       But here's the thing, look at the indictment,

13  Your Honor.  Mr. Kwok is alleged to have bought himself

14  a Lamborghini.  I would love one.  Okay?  But does she

15  have one?  No.  He apparently is living in a mansion and

16  has other mansions and boats and this and that and the

17  other thing.  Where in the indictment is there an

18  allegation that any of this money went to her?  The

19  closest they've come is this allocation of the coin

20  allocation.  Right?  And we don't know what happened to

21  that.  Okay.

22       So the question you have to ask yourself is why

23  is she doing this?  Why does she leave her family, her

24  son, her one true love, right, and moved to a foreign

25  country where she is basically exposing herself as a

1

2   revolutionary, why did she do this?  Okay.  There's an

3   answer, but that she's trying to enrich herself is not

4   the answer.  So then the question is would she, given

5   what the Government has alleged about her, not about her

6   co-defendants, but about her, because what happens to

7   the co-defendants is relevant but what matters really is

8   what happens to her.

9           And also the question, given the allegations

10  that the Government has made, right, is she the kind of

11  person who will stick one of these people with a $5

12  million debt?  And the answer to that is obviously no,

13  she lives in a 740 square foot apartment without

14  furniture, away from her family with whom she cannot

15  have anymore contact.  It's just beyond belief that we

16  have given them eight people, grownups, right, they

17  don't like all of them, that's fine.  They say we didn't

18  get enough documents with respect to certain people.

19  Really?  Somebody's willing to put up a $3 billion

20  house, what other documents do you want?  We couldn't

21  post that house unless we were able to prove to them

22  that that house existed and belongs to the person who's

23  posting it.  Right?  That person is an adult who

24  understands what's going on and thinks that she, that

25  that person has moral suasion over her and thinks that

1                                    PROCEEDING                        32

2   she's not – there are three people, the co-signers who

3   are in this room today.

4           So where does the Government, forgive me, Your

5   Honor, but where does the Government get off making

6   those judgments for these people?

7           THE COURT:  Well, that's part of what, I mean

8   they get to form that judgment, and if you don't agree

9   with it, that's why we're here, but they, the Government

10  needs to be assured or feel assured that the financial

11  security that's being posted is sufficient to reasonably

12  assure that the defendant will not flee, and there is a

13  valid concern I think in theory that if you have folks

14  that are allegedly victims of a fraud that's being

15  committed, that the fraudster or alleged fraudster may

16  not be so incented as one might normally be,

17  theoretically.

18          MR. LIPMAN:  Your Honor, one cannot paint

19  everything with a broad brush.

20          THE COURT:  I agree.

21          MR. LIPMAN:  One really needs to look at the

22  particular circumstances, and the particular

23  circumstances is that the Government is not alleging

24  that she stole money.  It's just that simple.  They're

25  alleging that the other two stole money.  They're not –

1

2   meaning for herself.  They're going to get up and say,

3   well, you know --

4         THE COURT:  Yeah, she was allegedly

5   instrumental and in the middle of it.

6         (interposing)

7         MR. LIPMAN:  -- this and that.  You know, and,

8   by the way, forget the presumption of innocence like

9   whatever.  Anyway, the point is that they're not

10  alleging she enriched herself at the expense of these

11  people.  So then the question is what is the reasonable

12  conclusion, I mean a reasonable basis for concluding

13  that she will do so with respect to this bond.

14        But, Your Honor, but I tell you this, everyone

15  she knows falls into one of two categories.  They're

16  either friends (indiscernible) or a family, okay, or

17  they're members of this community.  You know, it's -

18  sometimes people say, well, how is this possible?  She's

19  lived in the country for seven years and she doesn't

20  have any friends.  Well, she doesn't because she's a

21  revolutionary, Your Honor, because she has a mission in

22  life, and her mission is something different than making

23  friends.

24        So my point is this, these people can only come

25  from one of these two groups, okay, and if the

1

2  Government cannot approve cosigners who belong to one of

3  these two groups because as a category they

4  (indiscernible), then, Your Honor, you have the

5  authority to change this, and, in fact, as the Court is

6  well aware, one of the provisions in here is that you

7  cannot have a financial condition that makes it --

8          THE COURT:  "The judicial officer may not

9  impose a financial condition that results in the

10 pretrial detention of the person."  18 U.S.C.

11 3142(c)(2).  And yet the Government seems to have found

12 cases that say that in the context of the statute, that

13 does not trump but rather what trumps is whether the

14 conditions will reasonably assure the presence of the

15 defendant at future proceedings.  And even a case you

16 rely on, U.S. v. Panaronda, says that too, and they said

17 the ultimate question is the Court should consider

18 whether that particular financial condition is a

19 necessary part of the bail conditions to provide

20 reasonable assurance of the defendant's appearance.  I

21 mean that's really what we have to decide.

22         MR. LIPMAN:  And, Your Honor, that case, I'm

23 going to mispronounce names so I apologize --

24         THE COURT:  Panaronda.

25         MR. LIPMAN:  Okay, what happened in that case

is Judge Sweet, we'll change the conditions.  I mean and

he said, look, there's $250,000 bail here, this person

is never going to either meet it or get anybody who is

good for $250,000.  I'm going to reduce it to something

that people can meet and still satisfy the conditions.

We proposed, just so that we're clear, in

addition to posting, you know, property to secure the

bond that would be more than enough, right, because, you

know, it says two.  There are three people who together

have more property than $5 million.  They can post it

all.  They're prepared to do it.  But separately.  She

has access, as far as I know, and the Government doesn't

actually know anything different, she personally only

has access at this point to two accounts that belong to

her and that she has value in her apartment, we already

posted that.  So her apartment, one of her accounts

completely --

THE COURT:  With $400,000.

MR. LIPMAN:  Well, I'm not sure exactly.

THE COURT:  Well, that was the one that you

offered up --

MR. LIPMAN:  Yeah, yeah.  And then the second

one monitor it.  I mean we're happy to have - in other

words, she --

1                           PROCEEDING                    36

2              THE COURT:  I get it.

3              MR. LIPMAN:  -- would have no money --

4              THE COURT:  Right.

5              MR. LIPMAN:  Now, the Government says, well,

6  you know, supporters, this and that, they can – that's

7  true in every case.  Your Honor, I'm going to sit down

8  because I've been going on, you've indulged me and I

9  appreciate that.  But, Your Honor, there's no reason why

10 this woman should spend another night in prison.

11 There's no reason.  She's not a flight risk.  She has

12 already put up her apartment.  We're happy to have the

13 three co-signers that are here are happy to go down and

14 sign the bond today.  We can post the – in fact, I will

15 take personal responsibility for the two accounts.

16 Thank you.  My much wiser co-counsel reminded me that

17 what these people have on the hook is not $5 million.

18 It's their lives and their families' lives because of

19 what they're proposing to do for Ms. Wang.

20             If that is not an indication that they think

21 they have moral suasion --

22             THE COURT:  That's not, it's not, I don't

23 question their thought process on it.  And I just want

24 to confirm something.  In terms of what you did propose

25 in terms of possibly modifying the conditions is you

1

2  wanted the Court to approve two of the eight that you

3  had offered.  You have three here now.  You were going

4  to, in addition to the security for the apartment, you

5  were going to put up the $400,000 account and the

6  $130,000 cash that was seized.  You were going to put

7  additional security through others that you now say I

8  think that you could get to an amount in total of $5

9  million.  Do I have that right?

10         MR. LIPMAN:  Yeah, we could.  I mean we have

11  three people willing to post their property, and one of

12  those houses is I think $3 million, one is 1.7 if I

13  remember correctly, but yes.

14         THE COURT:  And then you proposed also that the

15  Government monitor and approve any expenditures from the

16  $500,000 account.

17         MR. LIPMAN:  I'd rather Pretrial did it and not

18  the U.S. Attorney's Office, but yes.

19         THE COURT:  Yeah, again, one of the driving

20  concerns here is – I'm just looking for where this was

21  said, that, and this is from U.S. v. Melville I think.

22  "Bail is not for the purpose of providing funds to the

23  Government to seek the defendant should he go

24  underground or flee the jurisdiction.  Bail is intended

25  as a catalyst to aid the appearance of the defendant

1

2   when warranted."  So, again, I just want to emphasize

3   that we're talking about what is the defendant going to

4   be motivated to do.

5           MR. LIPMAN:  I appreciate that, Your Honor,

6   but, Your Honor, and I don't want to annoy you --

7           THE COURT:  No, no, you're not annoying me.

8           MR. LIPMAN:  -- with I've already said, but the

9   fact of the matter is that --

10          THE COURT:  And I'm not saying I think

11  necessarily that she won't be motivated.  I just want to

12  make sure we're all on the same page about what's

13  important.

14          MR. LIPMAN:  Your Honor, you and I are on the

15  same page, absolutely, but, again, when a woman starts

16  getting emotional because people come here to support

17  her, when the Government does not allege that her

18  participation in the scheme, even if true, was for the

19  purpose of benefitting her, I mean, really, she did all

20  this so that somebody else can drive in a Ferrari?

21  Really?

22          Anyway, they're not alleging that she did this

23  for personal gain, and this is as good an indication as

24  there is that what she's not going to do is stiff

25  somebody for the 2 million.

```
1                      PROCEEDING                    39

2              THE COURT:  Okay.

3              MR. LIPMAN:  Okay.  So I already said that she

4    is a revolutionary.  She believes in the cause.  If she

5    didn't believe in the cause, if she didn't believe in

6    these people - thank you.

7              THE COURT:  The two are not mutually exclusive,

8    fraud and belief in a cause.

9              MR. LIPMAN:  Well, Your Honor, that's true,

10   but, again, you have to look at the individual and what

11   is it that they did --

12             THE COURT:  Of course.

13             MR. LIPMAN:  And so --

14             THE COURT:  I agree.

15             MR. LIPMAN:  -- they call each other, so I've

16   talked to a bunch of people --

17             THE COURT:  I think I get enough.

18             MR. LIPMAN:  You get it.  And they call each

19   other - just before I sit down, they call each other

20   brother and sister, okay, and I've talked to a bunch of

21   them, and I mean all I can say is that they're willing

22   to risk everything, and she has not done anything to

23   indicate that she would do, she would jeopardize them

24   at, jeopardize them personally for her own, for her own

25   personal gain.
```

1                              PROCEEDING                    40

2              THE COURT:  Understood.  Thank you.

3              MR. LIPMAN:  Thank you, Your Honor.

4              THE COURT:  All right, I will hear from the

5    Government.

6              MS. MURRAY:  Thank you, Your Honor.  Just one

7    brief point that Mr. Lipman just raised.  With respect

8    to the defendant's personal gain, the Government would

9    note that the defendant's living in a $1.1 million

10   apartment.  The defendant has nearly a million dollars -

11   -

12             THE COURT:  One might consider that poor in the

13   middle of New York, but, you know, nonetheless.

14             MS. MURRAY:  Has nearly a million dollars in

15   cash and her bank accounts, the two that were disclosed,

16   and I'll get to that point.  We have evidence that she

17   was allocated $7 million approximately of what was a

18   cryptocurrency or a purported cryptocurrency at the time

19   of the initial coin offering at a lower valuation.  So

20   that would be worth substantially more now.  And she had

21   over approximately $138,000 of cash in her safe.

22             But I would like to reset with respect today's

23   proceedings.

24             THE COURT:  Okay.

25             MS. MURRAY:  At the very outset, Your Honor

1

2  asked about the status of the bail proceedings, and no,

3  there have no further discussions between the defense

4  and the Government regarding proposed suretors.  The

5  Government has not received any documentation additional

6  to the documents that the defense submitted in

7  connection with their motion that support the various

8  purported financial situation of the suretors that they

9  proposed even though they were on notice from the

10 Government's submission that we believe the

11 documentation to be incomplete or inadequate to make an

12 accurate determination or assessment.  The Government

13 has not successfully reached the eighth co-signer that

14 the defense had proposed and, therefore, has been unable

15 to interview that person.  So that's where we are today.

16         Now, there are really three questions for the

17 Court today.  First, with respect to the defendant's

18 motion, whether the Court should direct that the

19 defendant has satisfied the conditions of her bond, the

20 conditions that Judge Parker imposed when she was

21 initially presented on March 15, several hours after her

22 arrest.  The answer is clearly no.

23         The second question is whether the Court should

24 modify the conditions of that bond that Judge Parker

25 imposed to remove the co-signers requirement, which is

1
2    one of the first modification requests the defense is

3    asking for, or potentially in connection with or an

4    alternative various different modifications, be it

5    posting additional property or cash in support of the

6    bond, adding co-signers, aggregating co-signers.  Again,

7    with respect to modification, the answer is plainly no,

8    the Court should not do that.

9           And, finally, the third question, which was

10   raised in the Government's submission last Friday,

11   whether the defendant should be detained pending trial

12   because there are no conditions or set of conditions

13   that will reasonably assure her presence at future court

14   proceedings.  And, Your Honor, the answer to that is

15   yes.

16          So I'll take each of those points in turn.

17          First, with respect to the proposed co-signers,

18   the defense submitted documentation and names and

19   information about those co-signers to the Court.  That

20   is because they are not approved by the Government.  So

21   under the statute the basis for the Court to approve

22   unapproved co-signers is to evaluate documentation,

23   information about those co-signers, and then determine

24   whether they have a net worth with sufficient

25   unencumbered value to pay the full amount of the bond,

1

2    here $5 million.  And I'm not going to go over each of

3    the individuals, Your Honor, because we laid this out in

4    great detail in our initial submission.  We went through

5    each of the seven proposed co-signers that the defense

6    has presented to the Court here with documentation,

7    again, setting aside the eighth whom we were not able to

8    interview.

9            For each of those seven, based on the documents

10   that the defense is providing to Your Honor for your

11   consideration of whether those individuals meet the

12   standard of the statute, first of all, Your Honor, none

13   of them has appropriate moral suasion over the

14   defendant.  And, again, we laid this out but I would

15   like to make that point a bit more finely because it's

16   extremely important where here the defense is saying

17   that these individuals exercise moral suasion.

18            And, Your Honor, is correct, it's not a

19   question of whether the proposed co-signers believe that

20   they have influence or moral suasion over the defendant.

21   It's a question of how the defendant feels, and while we

22   can't put ourself in our head or in her heart, what we

23   can do is we can look at the evidence that's in front of

24   us.

25            These seven proposed co-signers for Your

PROCEEDING                              44

Honor's consideration, some of them have never met Ms.
Wang, never spoken with her.  A handful of them have met
her at events, generally speaking.  Most do not know
where she works.  Most do not know where she lives.
They don't talk to her frequently.  They don't appear to
have a personal relationship.

          Interestingly, and I'll get to this point, one
of the individuals actually believes that Ms. Wang works
at Gettir, which is one of the alleged entities involved
in the fraud and a potential instrumentality.  And
believes that because that individual met Ms. Wang in
connection with interviewing for a position at Gettir.
I'll talk about why that's relevant.  Another individual
believes that she works at a company called HCHK
Properties.  Again, one of these shell companies that's
used in the course of this billion dollar fraud.

          And these proposed co-signers whom defense
argues exercise moral suasion, they don't know the
defendant well enough to even have personal relationship
with her, and, therefore, we have no comfort that Ms.
Wang would in any way be dissuaded by their signing a
bond from fleeing, from leaving them responsible for
paying the amount of the bond.

          THE COURT:  Well, even if they don't have what

we think of as a traditional personal relationship or

family relationship or a deep friend relationship, why

can't they be bonded over a cause?

MS. MURRAY:  They could be bonded over a cause,

Your Honor.  In this particular situation, and this is

why the Government's argument about these individuals

being potential victims of the fraud or apparent victims

of the fraud is important, this fraud has been largely

perpetuated targeting that community.  It is a fraud

that has focused on preying on and mobilizing people who

support Mr. Kwok's and Ms. Wang's and Mr. Je's movement

against the CCP.  Those are the exact individuals who

have been identified and targeted to send hundreds of

millions dollars, over a billion dollars, of money to

line Mr. Kwok's pockets, Mr. Je's pockets, their

families, to reinvest in the companies that are the

instrumentalities of the fraud, companies that Ms. Wang

manages and works for, some on paper and some functional

control.

So there's no comfort that the Government can

derive from the argument that because an individual is a

member of the allegedly community that Ms. Wang has

supporters, that that will influence Ms. Wang to not

flee.

PROCEEDING                        46

 1

 2           And, Your Honor, I just note, moral suasion

 3   factors vary, but some of the considerations include the

 4   strength of ties between the defendant and the proposed

 5   suretor.  Again, here, with respect to all of the

 6   proposed suretors in front of this Court which the

 7   defendant provided to Your Honor, that factor doesn't

 8   exist.

 9           Also, the defendant's roots in the community,

10   we understand from defense counsel that Ms. Wang

11   essentially works and then works within this community,

12   but I would just note during the second attempt at this

13   bail hearing for Ms. Wang Judge Netburn did note that

14   Ms. Wang has lived in the country for seven years and is

15   representing that she knows no one, no one who could

16   potentially come forward as a co-signer who either isn't

17   a potential victim within this community or a potential

18   subject or co-conspirator of the fraud.

19           And then also the regularity of contact.  And

20   here, again, we don't have regular contact between these

21   proposed suretors and Ms. Wang.

22           Now, turning to the second factor in evaluating

23   the proposed suretors that are before the Court is

24   financial responsibility.  And, again, here, I don't

25   want to belabor the point because we have gone through

1

2   each of the proposed suretors, but these individuals do

3   not have sufficient assets of an unencumbered value to

4   support the full amount of the bond.  That is the

5   statutory framework that we're working within at this

6   point where conditions have been imposed, where the

7   Government has unapproved suretors, and the defense has

8   now moved to bring them before the Court --

9            THE COURT:  Well, why I am hearing at least

10  from the defense that with an entire package and the

11  supposed three FRP's who are here, suretors, that they

12  do have $5 million.  Let me just verify something,

13  counsel for the defense, are you saying that that is

14  unencumbered, 5 million?

15           MR. LIPMAN:  Yeah, we have three people who

16  have unencumbered - well --

17           THE COURT:  Net unencumbered.

18           MR. LIPMAN:  Thank you.  Yes, net I think adds

19  up to - let's put it this way, together with the million

20  dollars that she has definitely, I know that one is $3

21  million.  I'm sorry, I'm spacing on one of them, but I'm

22  pretty sure that those three cover $5 million.  But that

23  they do including the --

24           THE COURT:  Right, she's got the million, she's

25  also got the 400, she's got the 138.  So we're good for

1                          PROCEEDING                    48

2  1.5 about.

3              MR. LIPMAN:  Right.

4              MS. MURRAY:  So a few responses to that, Your

5  Honor.

6              THE COURT:  Yeah.

7              MS. MURRAY:  First, this is the first kind of

8  question that I had mentioned that's before the Court

9  which is simply whether the Court should direct that she

10 has satisfied the conditions of her bond, the conditions

11 that were imposed.  And those are the conditions of two

12 co-signers.  And what defense has brought before Your

13 Honor in this motion are seven or eight specific names

14 with specific documentation they are purporting

15 justifies the Court directing that two of those co-

16 signers be approved.

17             Now, it's not clear which two the defense is

18 asking Your Honor to approve --

19             THE COURT:  No, but she has, look, there are

20 three here today that he's specifically proposing.  I

21 don't know who they are at the moment, but I think he

22 has one specifically in mind is my point, and one might

23 also take, might be offering to say, well, geez, we want

24 to but, you know what, the Government should pick the

25 ones they think are best.  Just saying there are ways to

1  deal with that.  But I understand.

2        MS. MURRAY:  Sure.  Yeah, and I understand,

3  Your Honor.  So then I guess I'll move to the second

4  question which is whether the Court should modify the

5  conditions of the defendant's bond, either to remove the

6  co-signer to alter in and adjust the bond so that

7  there's more cash or property securing the bond.  As I

8  said, the answer is plainly no to that as well.

9        And I just want to make a few points about the

10 representations that counsel has made --

11        THE COURT:  Before you do, let's assume for the

12 moment there are no financially responsible people in

13 your view because they don't know her personally except

14 for having maybe met her a couple of times, they're not

15 family, and the only thing they have in common is this

16 cause.  If I am to assess whether that particular

17 condition is necessary to reasonably assure the presence

18 of the defendant at future proceedings as opposed to

19 some other combination of provisions, putting aside, of

20 course, all the provisions that are already in place,

21 the home detention, electronic monitoring, etc., why

22 can't I then or why shouldn't I then consider other

23 things that are being offered insufficient to take that

24 place?  Why does it have to be two financially

PROCEEDING                          50

1

2  responsible people as opposed to, you know, another

3  combination of what's being offered?

4        MS. MURRAY:  Your Honor can consider modifying

5  the conditions of the bond certainly if you determine

6  that there is a set of conditions that would reasonably

7  assure the defendant's appearance at future court

8  proceedings.

9        THE COURT:  And to be clear, I'm not saying

10  what I have in mind is anything less than what Judge

11  Parker would think, and I'm not pretending to put myself

12  in her shoes.  But I could imagine that given that the

13  Government and the defendant came to essentially an

14  agreement on most of the terms of a package, that Judge

15  Parker no doubt was assuming at the point that there

16  would be two financially responsible people.  And if she

17  was presented with an argument that said, well, the

18  Government's willing to agree to this, but we don't have

19  anybody we're going to approve, she might take a

20  different tact.  She might not, she might say, you know

21  what, it's the Government's prerogative, the Government

22  offered this package, they can't satisfy it, t's not

23  going to do it, then I'm going to detain.

24        So I'm not saying it should necessarily come

25  out differently, but I think it's a little too pat in

1

2   some respects – well, again, why that condition as

3   opposed to what else is being offered?

4          MS. MURRAY:  Well, there are actually multiple

5   conditions, and, Your Honor, the reason is that when the

6   Government discussed a proposed bail package on consent

7   with defense, it was hours after the defendant was

8   arrested on March 15.  The Government had not had the

9   opportunity to go through the evidence that was then

10  being collected from the defendant's apartment in

11  connection with the FBI's premises search.  And,

12  frankly, the Government was not yet aware that the

13  defendant was going to lie to this Court, to Pretrial

14  Services --

15         THE COURT:  I don't understand what the lies

16  are.  I have to say I didn't, you know, in your letter

17  you accuse the defendant of dissembling on this.  The

18  only one that grabbed me as a possible dissembling would

19  be the cryptocurrency.  But it's certainly plausible

20  that you could have a cryptocurrency that was allocated

21  in 2016 I think the date was and, you know, it may have

22  never materialized into anything.  It certainly

23  suggests, you know, where did that go, can't someone

24  tell us, but right now she's saying she has no control

25  over access to it because she doesn't even know where it

PROCEEDING                    52

1

2    is or what it is.

3              MS. MURRAY:  So a few points there, Your Honor.

4    First, the defendant during her Pretrial Services

5    interview indicated she's been unemployed since

6    September of 2022.  Now, documents that the Government

7    reviewed late last week that had been seized from her

8    apartment and additional evidence that the Government

9    has, and, as you know, we can proceed by proffer in

10   detention hearings --

11             THE COURT:  Yes.

12             MS. MURRAY:  This is not a mini trial.  But the

13   Government's evidence is that the defendant was, in

14   fact, continuing to work in connection with her named

15   position with family offices of Mr. Kwok's family money

16   and also with some of the other entities that I

17   mentioned that are instrumentalities of the fraud up

18   until effectively the date that she was arrested.  We

19   have seen documents that lay out the financial position

20   of various of the different entities that are associated

21   with the fraud.  Those include Gettir which is, as I

22   mentioned, one of the proposed suretors believes Ms.

23   Wang formally works for.  They include HCHK Property

24   which another of the suretors believes Ms. Wang formally

25   works for, and the Government's evidence shows Ms. Wang,

2   in fact, is the 99.999 percent shareholder of HCHK

3   through her BBI entity.

4          They include G Clubs which is one of the arms

5   of the fraud that is outlined and alleged in the

6   Government's indictment.  They include the Rule of Law

7   Society and the Rule of Law Foundation which are

8   charities, purported charities that Mr. Kwok and others

9   founded in 2018 that laid the groundwork and the basis

10  for collecting all these monies through the different

11  arms of the fraud.

12         And, Your Honor, these are printouts of

13  balances of accounts, accounts raised through present

14  which, as reflected in the documents, was variously

15  February 2023 or March 13 of 2023, two days before the

16  defendant was arrested.

17         THE COURT:  But those are corporate funds,

18  right, but you're using it for the point about

19  employment.

20         MS. MURRAY:  I'm using it for the point about

21  employment, Your Honor, and also effective control.  Mr.

22  Lipman indicated he doesn't know what the Government

23  means when it uses the general phrase chief of staff.

24  What the Government is alleging by so characterizing Ms.

25  Wang is that she manages and controls these various

1

2   entities.  Now, like Mr. Kwok, she doesn't have her name

3   on each of the different companies that she is involved

4   with, but the Government has no question in light of the

5   evidence both found in Ms. Wang's apartment, the fact

6   that people associate Ms. Wang formally with these

7   companies because they interviewed with her for jobs at

8   some of these companies or they had contracts with her

9   in connection with their work with some of the

10  companies.

11          Ms. Wang runs the show with respect to these

12  instrumentalities.  She has done so up until the day of

13  her arrest contrary to what she told Pretrial Services.

14  And the Government would allege that part of the reason

15  that she lied to Pretrial Services was to disclaim

16  association with the various different instrumentalities

17  of the fraud.  To say that she took herself out of the

18  fraudulent entities, notably, Your Honor, right around

19  the time that the Government started to seize $630

20  million in fraud proceeds.

21          So in the Government's view, at the time of the

22  initial presentment and bail argument, we were not aware

23  that we were going to find concrete evidence in the

24  defendant's apartment that, in our view, proves what the

25  Government already alleged and believed to be true from

1

2   its investigation which is Ms. Wang has continued

3   working for these companies up until the time of her

4   arrest.  So that is one point, Your Honor.  It's a

5   change in circumstances.  The Government has a change in

6   circumstances from where it was at the time of the

7   initial presentment.

8           Now, with respect to accounts, the allocation

9   of H coin or one of the purported cryptocurrencies that

10  is traded on the Himalaya exchange, again, another arm

11  of the fraud, the allocation document was found in Ms.

12  Wang's apartment with various other documents that seem

13  to support the fraud.  Your Honor is correct, defense is

14  correct, there's no way for the Government to prove that

15  Ms. Wang holds that money, and, in fact, the

16  Government's allegation is that it's not cryptocurrency,

17  but we're not alleging it's valueless.  We're alleging

18  that certain people have it and the people who are

19  quickest to redeem can basically have an exit scam and

20  get out with their money.

21          I would note while, again, we don't have access

22  to an account that Ms. Wang has where the money is held,

23  Your Honor correctly identified approximately $7 million

24  worth of a cryptocurrency asset would be something you

25  would want to keep track of.  The allocation indicates

1                              PROCEEDING                    56

2   Yanping Wang, and then it has the allocation, it's in

3   her name.

4           I would note that some of the other individuals

5   or entities who are allocated HCN in the document that

6   the Government has include Ms. Wang's co-conspirator,

7   William Je.  It says Sue Ming Je and family, that's one

8   of his family members.  It includes Mr. Kwok's son, it

9   includes friends of Mr. Kwok's son, all named by their

10  names.  Ms. Wang is also named by her name.  Allocated 7

11  million.

12          Now, I don't know if she forgot or she just

13  didn't think it was relevant to disclose to Pretrial

14  Services, but this is a newly discovered fact the

15  Government found in the course of reviewing evidence

16  that was taken from Ms. Wang's apartment that gives us

17  serious pause, and it's something that's different from

18  when the Government first agreed to the conditions of

19  the proposed bond with defense counsel.

20          Another point I would like to note, with

21  respect to the accounts to which the defendant has

22  access, I understand that the way that the condition is

23  worded it could be read narrowly or broadly.  In the

24  Government's view it certainly imposes an obligation on

25  the defendant to be forthcoming.  And the condition

PROCEEDING                                    57

included the requirement that the defendant disclose

assets or accounts that she controls in her name or that

are in companies that she controls or is affiliated with

and, broadly speaking, cryptocurrency and other real

property.

         The Government has found evidence, again, dated

as recently as a few days before the defendant's arrest

from her apartment, as I said, that show bank account

information, account information, Ms. Wang signing off

on payroll for some of the instrumentalities that she

doesn't control, but that the Government certainly

alleges that she manages and works for in her role as

Mr. Kwok's chief of staff.  So to the Government that

indicates effective control over those finances.

         Even setting that aside though, Your Honor, Mr.

Lipman mentioned that there were credit cards and other

items in the safe.  The Government had indicated that

there was cash in one of the pouches, another pouch with

certain items that appeared to be and are ready to take

at the ready.

         THE COURT:  You mentioned a safe.  Was there a

safe?

         MS. MURRAY:  There was a safe.  Yes.  So the

bag with the cash and another bag that had credit cards

and other items, including the passports, those were all

concealed in a safe in defendant's apartment.

The credit cards notable that were taken from

one of those pouches in the safe, looking at the front

cover of those credit cards which were photographed and

we provided to defense counsel last week, there are

numerous cards that indicate accounts that are not yet

expired in the defendant's name that the defendant did

not disclose to the Government or to Pretrial Services.

And at this point, we have no way of determining what

assets are in those accounts, how the defendant

continues to control those accounts, but it's, again,

another layer, Your Honor, where we cannot derive

comfort that the defendant is being truthful with

Pretrial Services, with the U.S. Attorney's Office, or

with the Court.

And at a very high level, to talk through those

accounts, there is a Citibank account for one of the

Kwok family entities that the defendant controlled that

was active through last month when she was arrested.  So

it was active at the time.  There were two personal Bank

of America debit cards, different account numbers, both

in the defendant's name, in her name, personal accounts.

One which expired last month but, again, active when she

1  was arrested.  The next which expires next year.  There

2  is a Citibank personal account in the defendant's own

3  name which doesn't expire for another year.  There's a

4  DBS Treasures account at a Singapore Bank, and the

5  Government explicitly asked about foreign accounts as

6  well.  That card doesn't expire until January of 2025,

7  again, in the defendant's name.  And, finally, a China

8  Bank of Communications account, it's a Chinese bank.

9  That account, the card indicates it expires September of

10  2023, also in the defendant's name.

11          It's another example, Your Honor, of

12  indications to the Government that the defendant has

13  access to accounts, assets, funds that she could use in

14  order to flee.  And if they are funds that we needed to

15  rely on the defendant to disclose to satisfy another

16  condition of the bond that was imposed.  Separate and

17  apart from the question of co-signer, she was obligated

18  under the conditions imposed to disclose her assets, her

19  accounts, her cryptocurrency, her property to the

20  Government and to Pretrial Services.

21          She represented through counsel that she had

22  done that simply by disclosing two personal accounts,

23  one at Morgan Stanley Bank, one at TD Bank, and then

24  this account that was associated with one of the

PROCEEDING                              60

companies.  She did not disclose in the Government's

view by any stretch the corpus of money that she has

access to.

          These are examples of new circumstances that

gives the Government grave concerns.  Grave concerns

about the defendant's incentives to flee, about her

ability to flee, about the fact that we cannot trust

representations that the defendant is making.  And, Your

Honor, in those situations where we have so many red

flags and so many concerns that the Government would not

necessarily have identified if we hadn't found this new

information.  We simply do not have any assurances that

there are any conditions or set of conditions that will

assure the defendant's appearance at future court

appearances.

          So that goes to the third prong, Your Honor.

It's the fact that the Government is now coming to the

Court saying we agreed on these proposed bail conditions

at the time of her arrest based on what we knew then.

The world has changed since then, and it has only gotten

more concerning for the Government which already had a

significant concern about the defendant's risk of flight

but believed that there may be certain conditions that

could assure her appearance.  We no longer feel that

PROCEEDING                61

way.  We do not believe there are conditions or a set of

conditions that can reasonably assure her appearance.

THE COURT:  One clarification.  In regards to –

you referred to, I think you referred to, I don't know

if you were referring to the allegations of the

indictment or something else, but you referred to Mr.

Kwok and Mr. Je as being the ones who were sort of

lining their pocket and getting rich.  Are you in

agreement with defense counsel that the indictment

doesn't make allegations that the defendant here herself

was lining her pockets so to speak?

MS. MURRAY:  I guess to answer Your Honor's

question, the indictment does make allegations that the

defendant herself was personally responsible for a

hundred million dollar misappropriation of fraud

proceeds --

THE COURT:  I understand.

MS. MURRAY:  But that's to the point of

misappropriation.  Now, with respect to the indictment

which is a charging document that contains some

allegations, we haven't specifically outlined personal

money that the defendant herself misappropriated, but,

again, we don't believe that that is in any way germane

to her risk of flight and her access to money here and

1                           PROCEEDING                        62

2   to a network.

3           And another point that I would like to note is

4   with respect to travel documents and passports.  Mr.

5   Lipman said that the defendant had been seeking

6   permission to travel at the end of last year or

7   beginning of this year, and she was going to go I

8   believe to the U.K.  Travel internationally.

9           The Government recovered a Vanuatu passport and

10  a Hong Kong passport from her safe.  The Vanuatu

11  passport was expired, and we did see evidence which we

12  disclosed that that passport had been kind of not

13  revoked but that the defendant had removed her request

14  from the passport.  But she has the ability to obtain

15  travel documents as does her co-defendant Miles Kwok who

16  allegedly has had 11 passports at various points.

17          THE COURT:  Well, she's not Miles Kwok.

18          MS. MURRAY:  I understand --

19          THE COURT:  I understand she could be part of a

20  network where things like that can be made available is

21  what you're suggesting I think.

22          MS. MURRAY:  That's exactly right, Your Honor,

23  it's exactly right that she can both be part of the

24  network where things can be made available and she is

25  the one who is tasked with holding onto those travel

1

2  documents both for herself and Mr. Kwok.  She is a

3  trusted person who is entrusted with the responsibility

4  of having those travel documents --

5           THE COURT:  What do you make of the defense's

6  points that the defendant certainly would've been aware

7  in September or October of 2022 about the seizure of

8  phones and that something was afoot and then there was

9  the dealings with the SEC, together with the fact that,

10 again, as defense has represented, that she applied for

11 a furlough to be able to travel despite her asylum aps.

12 Aren't those, if true, sort of indicative of someone

13 who's not going to run?

14           MS. MURRAY:  Not necessarily, Your Honor, and I

15 would also note that while, you know, there may be a

16 question of whether those are at odds, and I'm happy to

17 address that in a moment, I would also note that the

18 defendant's willingness and, in fact, desire to travel

19 to the U.K. even though she has these serious concerns,

20 the CCP's persecution of repatriation, indicates that

21 those concerns are not so grave that she's not willing

22 to travel internationally.

23           But I don't know the circumstances of the

24 defendant's requested furlough.  I don't know what the

25 purpose was of her going on that trip.  I will say that

 1
 2  there's no reason - if we're speaking in hypotheticals
 3  in this instance, there's similarly no reason to believe
 4  that she didn't request furlough to go to the United
 5  Kingdom without any intention of returning after she was
 6  aware the funds had been seized.  And, again, I'm
 7  speaking in hypotheticals only because we were asked a
 8  question by the Court, but I think you can draw various
 9  different conclusions from these facts.  And at bottom,
10  her seeking to travel to the U.K., her willingness to
11  travel internationally, doesn't cut against the fact
12  that she poses a significant risk of flight.
13          And I'd also note, it's a risk of flight non-
14  appearance at future court appearances.  We don't need
15  to establish that she's going to go to a foreign
16  jurisdiction --
17          THE COURT:  No.
18          MS. MURRAY:  She could flee from the city, she
19  could flee from the several block radius.  She could cut
20  her bracelet.  And it could be that her vast network of
21  supporters enable and harbor her.  We don't know the
22  circumstances, but the bottom fundamental point is the
23  defendant poses a significant risk of flight.  The
24  Government sees no condition or set of conditions in
25  light of the strength of the evidence, the seriousness

1                              PROCEEDING                          65

2    of the charges here, the defendant's personal

3    circumstances, her access to substantial assets, foreign

4    connections including her co-defendant William Je who is

5    alleged to be in the UAE as a fugitive of where he has

6    charges, her network of supporters, and the new

7    information that we have found in the last two weeks,

8    indicating that the defendant has not been forthcoming

9    with the Court, Pretrial, or the Government.  We simply

10   don't believe there are any conditions that can ensure

11   her appearance at future court proceedings.

12              THE COURT:  All right.  I assume you want to

13   respond some.

14              MR. LIPMAN:  Oh, yes, Your Honor.  Thank you.

15              THE COURT:  Just let me say to my 3:30, sorry,

16   that we're going to be running late.  Just sit tight,

17   and we'll eventually get there.  Go ahead.

18              MR. LIPMAN:  I'll do this as quickly as I can,

19   Your Honor.  So I want to start with the following.

20   Everything I said about what they misrepresented in

21   their conversations with the Court and submissions

22   apparently is true because none of it did they take

23   issue with.  So all of that stuff about finding, you

24   know, a phone between mattresses, phones secreted in

25   whatever it that they were, a document hiding in between

1

2    the cushions, none of that apparently happened.  It is,

3    it was represented to the Court.

4            So now we get to the point of trust.  They said

5    trust.  You can't trust this defendant.  Really?  But

6    you can trust this Government?  Let's just see, let's

7    just parse through what Ms. Murray just said.  She said

8    that she found photographs of cards, some of those

9    showed that the card is not yet expired.  How do we go

10   from there to, oh, and there's an account that goes with

11   it?  What evidence does she have?  None.  None

12   whatsoever.

13           What she knows – by the way, Your Honor, I have

14   never, the words Great Britain never left my mouth.

15   Okay?  That means that they knew that she was about to

16   travel.  Why didn't they arrest her?  If they thought

17   that she was going to get out of Dodge and they were

18   concerned that she was a flight risk, well, when they

19   found out that she applied, well, arrest her.  What,

20   they didn't have a border watching her?  Really?

21   Because the Department of Justice has changed that much

22   since I was there?  I don't think so.

23           So now let's get to her employment.  Once

24   again, what was the question that was asked?  Are you

25   currently employed?  No.  No.  If the question were

PROCEEDING                    67

1    asked are you still a member of a revolutionary movement

2    that does whatever it is that they try to do to get rid

3    of the communist party of China, the answer to that is

4    yes.

5          THE COURT:  Well, wasn't she working for one or

6    more of the companies?

7          MR. LIPMAN:  She was working for the family

8    office.

9          THE COURT:  Yeah.

10         MR. LIPMAN:  There's no dispute that she had

11   input into various things that happened.  I'm not taking

12   issue with what they say that she interviewed people for

13   whatever it is and this and that.  The Government knows,

14   yeah, the Government knows that she was the 99.999

15   percent owner of this entity that owns these three other

16   companies.  None of that is a secret.  Okay?

17         THE COURT:  But was she --

18         MR. LIPMAN:  But was she --

19         THE COURT:  Was she employed?

20         MR. LIPMAN:  No, she got, she was not getting,

21   drawing a salary anymore.  She was not employed.  She

22   worked, she continued to do certain kind of work, but

23   she did not get paid.  She was volunteering.  And the

24   reason she's volunteering, Your Honor, this goes back to

PROCEEDING                                    68

1
2   what we talked about before.  The reason she is

3   volunteering is because this is a political movement

4   that she --

5           THE COURT:  What was she doing for a source of

6   funds then?

7           MR. LIPMAN:  Well, she's still, she has --

8           THE COURT:  I understand she has accounts.

9           MR. LIPMAN:  And, by the way, Your Honor, the

10  house that she bought, her apartment, she bought before

11  any of these fraud allegations --

12          THE COURT:  Yeah, I understand.

13          MR. LIPMAN:  And, Your Honor, look, I'm sorry,

14  but the few things that the Government says, they say

15  change in circumstances.  What's the change in

16  circumstances again?  That she's volunteering whereas

17  she used to - of course.  So what?  So what?  The day

18  before her arrest, did she know she was about to get

19  arrested?  Because if she did know that she was about to

20  get arrested and she didn't get out of Dodge, then she's

21  not a flight risk.  So she was going about her normal

22  life.  What is so, what's the new - what is new about

23  that?  Absolutely nothing.

24          Now, and then what is they say - she lied to

25  disclaim that she had nothing to do with any of these

1  companies?  When?  To whom?  And I had a specific

2  conversation with the Government when they say, well,

3  Ms. Murray says, she says that, broadly speaking, the

4  question could be that broadly construed or narrowly

5  construed.  Well, first of all, nobody's taken my

6  client's Fifth Amendment (indiscernible), not that I

7  have heard, and when she was asked the question, she

8  gave an answer, the answer was truthful.  If they wanted

9  to know more, they should've asked.  And I specifically

10  had a conversation with the Government, and I said

11  excluding anything that she may have control over by

12  virtue of corporate ownership or whatever, these are the

13  accounts.

14          She's not a flight risk, Your Honor.  There's a

15  question that I keep asking myself is this.  Why?  Why

16  is the Government misrepresenting evidence?  Why is the

17  Government stretching stuff, stretching stuff?  Even if

18  they believe that, you know, there's more to this.  Even

19  - I'm sorry, I'm sorry, I'm reminded that on her

20  employment question, we actually invoked, she invoked

21  her Fifth Amendment right.  Okay?  Thank you.

22          Even - I lost my train of thought.  I

23  apologize.  I think I was responding to this idea that

24  she controls stuff.  There's no - we never hid that.

The only question is is she a flight risk?  What is it about her that makes you think that she's not going to show up?  She will show up, Your Honor.  She's got nowhere to go.  Nowhere.  And the Government keeps – this is where I was, thank you.

Why are they stretching it?  Why?  What is the reason?  I mean, really, does she look dangerous?  What is it --

THE COURT:  They're not moving on dangerousness.

MR. LIPMAN:  I'm sorry, no --

THE COURT:  They're not moving on danger.

MR. LIPMAN:  There is a reason why they're doing it.  They want her to cook.  They want her to get a flavor of the MDC because she was the chief of staff, Your Honor, and that is not okay.  That is immoral.  And when the Government obtains that result by, among other things, misrepresenting, saying that she's a flight risk on the basis of things that they cannot support, that contradict the evidence that's collected, that is – is anybody other than me think that it's a little bit peculiar or ironic that the Government is alleging that she violated certain antifraud provisions that make it unlawful to make a statement that in light of all

1                           PROCEEDING                    71

2  circumstances is materially misleading and yet this is

3  what the Government is doing?  Why?

4        Your Honor, this woman needs to be released.

5  She's not a flight risk.  She's not going anywhere.

6  She's going to have an ankle bracelet, she'll have GPS

7  monitoring.  We can have all of her money tied up so

8  that she can't breathe without Pretrial or somebody

9  giving her approval.

10        And one last thing, if she's not released, her

11  defense is going to be severely prejudiced.

12        THE COURT:  It's true for anybody who doesn't

13  get released.

14        MR. LIPMAN:  Except, except when that person

15  also has Mandarin as her first language, when the

16  Government asks for a disk to put 2 terabytes of data on

17  it.  This is not a case that's going to be resolved

18  quickly, and it is a case in which it's going to be very

19  important to have your client's assistance.

20        THE COURT:  Okay, thank you.  Ms. Murray, do

21  you want to have the last word here?

22        MS. MURRAY:  Yes, Your Honor, briefly.  I want

23  to start by saying there is nothing that the Government

24  has misrepresented to the Court.  The Government has not

25  reached on facts.  The Government has provided evidence

1

2  substantiated information that it has presented to this

3  Court and to the defense.  With respect to the credit

4  cards Mr. Lipman mentioned, it's not a photo of the

5  cards.  It's a photo of the cards that we have before

6  the Court and the defense today.  They were the physical

7  cards.  But we resent the claim that we are in any way

8  acting other than --

9            THE COURT:  I know --

10           MS. MURRAY:  --fully forthcoming and in good

11 faith.

12           THE COURT:  -- I have no doubt you're operating

13 in good faith.  But he did point out some things that

14 were discrepancies it seemed between what was

15 represented in terms of where certain pieces of evidence

16 were found in her apartment versus what was inventoried

17 and how it was inventoried.  Can you speak to that?

18           MS. MURRAY:  Sure, Your Honor.  There aren't

19 discrepancies.  What Mr. Lipman has done is he's pointed

20 to an evidence log that has a column where there are

21 certain notations made when the FBI is collecting

22 evidence that indicates where the item was recovered.

23 Typically, it indicates the room by letter based on the

24 map that Mr. Lipman provided to the Court and a brief

25 description.  It does not indicate in a detailed

1

2  narrative where each and every item that is taken as

3  evidence was recovered from, what condition it was in,

4  how it was found.

5           So with respect the laptop between clothes,

6  that is consistent with the Government's representations

7  to Judge Parker at the initial presentment that the

8  laptop was found between sweaters in the closet.  It

9  doesn't say specifically what items of clothing --

10          THE COURT:  No.

11          MS. MURRAY:  -- or where, but it's consistent.

12 With respect to the iPhones that the Government had

13 indicated had been in boxes, yes, in a bag in the

14 closet, and you can see those are the items that Mr.

15 Lipman pointed Your Honor to in the 50's on the evidence

16 log.  And you'll note that nearly each of them has the

17 same PIN code or passcode.  So those are items that at

18 first the FBI thought might not have any content, and

19 then the FBI had technicians on site during the search

20 warrant, they plugged them in, and they determined they

21 had content.  There are no misrepresentations.

22          Mr. Lipman is now, again, Your Honor,

23 essentially trying to hold a trial on the merits of the

24 Government's case here at a point of a detention hearing

25 by, first of all, requesting information from the

Government which we happily provided and would have so

provided in the course of discovery in this case as

well, and then trying to hold it against the Government

by claiming that because there isn't a photo of each

stage of every step of the process that evidence was

collected, then the Government can't be trusted.  It is

simply not true, and it's disrespectful, Your Honor.

With respect to a couple of other points, I

would just like to note the defendant lied.  She lied

about the cash in her apartment.  I have now heard the

defense during the course of this argument split hairs

on several topics, and that is another example of what

gives the Government pause.

THE COURT:  Well, how do we know – it is

important what was asked.  Do you have any money on you?

Do you have any money in your apartment?  There's a

difference.

MS. MURRAY:  I understand, Your Honor, and the

Government obviously is not privy --

THE COURT:  And particularly for someone of a

different language and culture, it might be all the more

important that there's nuance to what's asked.  I don't

know what was asked.

MS. MURRAY:  Sure, and nor do we because the

1   Government is not part of Pretrial Services interview

2   with the defendant.  She was assisted by a Mandarin

3   speaking interpreter during that interview.  The

4   Government is also aware from its investigation that Ms.

5   Wang is quite fluent in English.  We know that from

6   various different pieces of evidence we've collected,

7   including statements that she's made and her voice

8   during conversations.  She doesn't appear to have an

9   issue understanding.

10          But with respect to the questions that were

11  asked, again, I don't know, I was not there.  The

12  defendant is very much so splitting hairs on several

13  topics.  I will note that the Pretrial Services report

14  indicates that the defendant was asked about assets,

15  assets, not specific accounts that she is the sole

16  signatory on, not specific accounts that are active that

17  she has control over and log-in information to.  We're

18  not splitting hairs.  Pretrial Services asked about

19  assets, and she did not disclose $138,000 worth of cash

20  that was sitting in a safe in her apartment.

21          With respect to her employment, the defense

22  just indicated that she had invoked – the Pretrial

23  Services report with respect to employment history

24  indicates that the defendant advised she has been

unemployed since September 2022.  Now, with respect to

the source of additional money that she has since then

or that she is living on, the defendant declined to

answer, and that is her right.  But she did provide this

statement in response to Pretrial Services report, she's

been unemployed since September of 2022.

Now, Mr. Lipman says that the defendant has

been volunteering in various organizations that she

previously might have worked in a more formal employment

capacity.  I just want to go back briefly to the

personal gain point that Your Honor has asked about.

Yes, I understand $1.1 million might not be an expensive

apartment in Manhattan, but it's a $1.1 million

apartment purchased in cash.  The defendant has nearly

another million dollars in her accounts.  The defendant

was up until her purported decision to terminate her

employment and start volunteering was earning a salary

of approximately $250,000 from the Kwok entities that

she worked for formally, in a formal capacity.  That is

personal gain in the Government's view.

It is also inconsistent with now the claims

that September 2022, right when the Government started

seizing funds, the defendant stopped working in a formal

capacity.  She can't be held responsible for any of

PROCEEDING                                77

1

2  these bank accounts that she's signing off on payroll

3  for, that she has access to the funds for.

4           Your Honor, at bottom the defendant is a risk

5  of flight.  There are no conditions that can reasonably

6  assure her appearance.  She has lied.  The Government

7  has not misrepresented itself to the Court.  And we have

8  no comfort that we can believe that she will make

9  accurate representations to the Court, that we will have

10  the ability to monitor her in any meaningful way that

11  would assure her appearance at future court proceedings.

12           THE COURT:  Thank you.  Mr. Lipman, I see you,

13  do you want to respond?  Go ahead.

14           MR. LIPMAN:  Your Honor, answering the question

15  that's posed truthfully is a complete answer.  It's not

16  splitting hairs --

17           THE COURT:  Look, the bottom line is we don't

18  know really what was asked and how it was asked --

19           MR. LIPMAN:  Well, we were there.

20           THE COURT:  Fine, but I'm saying we don't have

21  a record --

22           MR. LIPMAN:  But, Your Honor, there is no

23  record, and there is no proof of these things that the

24  Government says --

25           THE COURT:  I --

```
 1                          PROCEEDING                    78

 2          MR. LIPMAN:  -- which is what --

 3          (interposing)

 4          THE COURT:  I didn't say which way it cuts.

 5          MR. LIPMAN:  No, but, Your Honor, they said we

 6  found a credit card.  Well, that means she didn't

 7  disclose an account.  No, you found a credit card.

 8  Okay?  We found a statement that said that whatever,

 9  that she was allocated some coin.  Yes, that's what you

10  found, that's what you have.  You don't have anything

11  else.  So to tell me that she needs to be detained and

12  she cannot be trusted because they found something that

13  they don't fully understand, I'm sorry, but that's a

14  bridge too far.

15          And, yeah, a bunch of her accounts, by the way,

16  as the Government knows, were closed, and the

17  Government's investigation kind of followed that.  So

18  like the Citi accounts, for example, were closed.  Other

19  accounts at other banks were closed recently, they were

20  closed.  And the other thing, Your Honor, when they say

21  she controls this or she controls that or whatever,

22  okay, she worked somewhere, she no longer works there,

23  she doesn't draw a salary.  What she does with her time

24  is her business.  It's not cutting - it's not lying to

25  anybody, it's not any of that.  Okay?
```

1

2          And the Government essentially conceded – no,

3 not essentially.  The Government conceded the key point

4 that this was not, her participating, according to their

5 indictment, was not for the benefit for her personal

6 monetary gain.  It was for some other reason.  And the

7 apartment was bought before any of the allegations with

8 other money.  She did make money, but she didn't spend

9 it.  I already described to the Court how she lived.

10 And so the key question is why does she do this and, if

11 she did it, did she do it to benefit herself, and if

12 not, then is that sufficient reason to think that she's

13 now going to hurt these people because she did not put

14 any money that came out of their pockets and put it into

15 hers.  There's no reason to believe that having not done

16 that, being around all this money and not putting any of

17 it in your pocket.  For all of these years she didn't do

18 that.

19          So what is going to make her do it now?  And

20 the answer is that this is a revolutionary movement,

21 okay, these people are her brothers and sisters.  They

22 together want to see the CCP overthrown.  And so she's

23 not going to put them in financial jeopardy that she

24 dedicated her life, her life to this cause.

25          THE COURT:  All right.

PROCEEDING                    80

1

2           MS. MURRAY:  Your Honor, just a final point.  I

3    want to be clear the Government made no concession on

4    that point in any stretch, and a key question is whether

5    she poses a risk of flight, that is the question.

6           THE COURT:  All right, look, one thing that

7    I've been asked to do is to determine if the, or at

8    least order that some of the financial suretors that

9    have been offered are sufficient to meet the

10   requirements and conditions that were issued by Judge

11   Parker, and the defense has indicated here they have

12   three for which they believe that there's sufficient

13   property that can be offered as security along with the

14   enhanced package, if you will, of funds that were

15   offered on behalf of the defendant.

16           I don't have it in front of me information

17   about those three FRP's in terms of the property that's

18   being offered.  That is part of what I need to consider.

19   I realize I am also being asked by the Government for

20   detention anew in light of new material.  But it's

21   incumbent upon me to review whatever material the

22   defendant is going to provide to substantiate it's

23   offered financial suretors.

24           So I want a package of whatever it is that you

25   must or that you think is enough.  If there is

1                          PROCEEDING                    81

2   documentation you haven't provided the Government

3   already on others that you can provide, including the

4   so-called eighth or others, provide it.  And part of

5   what I'm going to do is assess that material.   It

6   doesn't mean I'm necessarily going to find obviously

7   that that is sufficient and that the conditions have

8   been met, but it is one of the things I am going to

9   consider in addition to considering whether a different

10  set of conditions should be imposed or whether the

11  defendant should be detained.

12          So she's going to continue to be detained

13  pursuant to Judge Parker's order of all conditions being

14  satisfied before she's released pending the submission

15  of this additional information and my review of it which

16  I will try to do as quickly as possible.

17          Let me ask Mr. Lipman, when can you get that

18  material to me and the Government?

19          MR. LIPMAN:  Your Honor, I will start working

20  on it as soon as I leave this courtroom.  I would ask

21  for 24 hours.

22          THE COURT:  Well, sure.

23          MR. LIPMAN:  Oh yes, yes.  Yes.  That's a good

24  point.  Your Honor has a lot of personal information,

25  rather than redacting it and filing it in various ways -

```
 1                    PROCEEDING                    82
 2  -
 3              THE COURT:  You can file it under seal.
 4              MR. LIPMAN:  Okay.  All right.
 5              THE COURT:  And you'll provide it to the
 6  Government obviously in unredacted form.
 7              MR. LIPMAN:  Of course.  You know what, Your
 8  Honor, I said 24 hours --
 9              THE COURT:  Give yourself more time.
10              MR. LIPMAN:  Yeah.
11              THE COURT:  It's your call sort of because your
12  client is going to remain detained.  So you obviously --
13              MR. LIPMAN:  I understand.  But how about this,
14  we will provide it no later than 48 hours from now, but
15  we will attempt to provide it as soon as humanly
16  possible.
17              THE COURT:  Okay.  All right, I mean it's
18  important I think also if you need a little more time,
19  to be able to put together something stronger that might
20  assure the Government.  Grant it that they're saying
21  there are changed conditions and they want detention.
22  But anything you can do to make stronger the financial
23  suretor application would be helpful to me in being able
24  to review and its significance.  Okay?
25              MR. LIPMAN:  Thank you, Your Honor.
```

```
 1                         PROCEEDING                    83

 2             THE COURT:  All right.  Anything else from the

 3   Government?

 4             MS. MURRAY:  No, Your Honor.  Thank you.

 5             THE COURT:  Anything else from the defense?

 6             MR. LIPMAN:  No, Your Honor, thank you.

 7             THE COURT:  All right, we're adjourned.  Thank

 8   you all.

 9             MS. MURRAY:  Your Honor, sorry.

10             THE COURT:  Oh, one administrative thing

11   actually.  I just want to note for the record that the

12   defense handed up exhibits marked 1, 45, 46, and 26, and

13   finally 27.

14             MS. MURRAY:  Your Honor, just briefly before we

15   adjourned.  To the extent the defense is going to submit

16   something to the Government and to the Court,  we would

17   ask for a response date.

18             THE COURT:  Fair.

19             MS. MURRAY:  We can figure out the timing once

20   the defense has actually submitted the materials, and we

21   can coordinate with Your Honor on that if that makes

22   sense.

23             THE COURT:  All right.  Should we set a defined

24   time now?  I think it would be appropriate.

25             MR. LIPMAN:  Yes, please.
```

PROCEEDING                           84

1

2          THE COURT:  So I would – I don't know about the

3   weekend.  So you're going to get to me and the

4   Government before the weekend it sounds like.

5          MR. LIPMAN:  Yes, I will get it to you as soon

6   as humanly possible.

7          THE COURT:  All right, well, I'm going to give

8   the Government, I was going to say five days --

9          MR. LIPMAN:  Your Honor.

10         THE COURT:  Too much?

11         MR. LIPMAN:  Five days at the MDC.

12         THE COURT:  Yeah, and the Government has

13  partial information on some of these already.  I'll give

14  the Government three days.  If for any reason something

15  turns out that is particularly complex that requires

16  more, let me know, but I'm giving the Government three

17  days --

18         MR. LIPMAN:  Your Honor, may I just for a

19  second, and I hear that, you know, I don't know why they

20  need three days.  I apologize --

21         THE COURT:  I don't know what's going to be in

22  the package.  Three days.

23         MR. LIPMAN:  Okay.  What I was going to say,

24  Your Honor, is this, what I would like to get to the

25  Court is evidence of real estate that is available.  It

1

2  is our position that if there's sufficient proof that

3  the person proposing to cosign actually owns this real

4  estate and the real estate has the value that they say

5  it does, that's really all that the Government needs.

6  In other words, right, because whether they make money

7  or not --

8          THE COURT:  I don't know what the Government

9  needs, but you need to assure the Court --

10          MR. LIPMAN:  I'm sorry?

11          THE COURT:  You need to assure the Court at the

12  very least.  I don't know exactly what that is you will

13  give to me.  Certainly, it'll be important to know who

14  is the owner, whether there are any other ownership

15  interests, what are the liens, what are the mortgages,

16  etc.  So I think you have an idea.

17          It's not going to necessarily take away from

18  whether someone is an alleged victim or has one of the

19  other faults, but at least I want a more complete

20  picture, and it's part of my obligation to make that

21  assessment.  And I don't want to make a sweeping

22  statement at the moment that just because anyone is an

23  alleged victim and is not a family tie in some way, that

24  necessarily makes them inadequate.  But that's why I

25  need to see it individually.

```
 1                          PROCEEDING                  86
 2              MR. LIPMAN:  Okay.
 3              MS. MURRAY:  Your Honor, with respect to the
 4   response date, assuming that the defense submits
 5   something on Thursday, that would make the Government's
 6   response due on Easter Sunday.  We would respectfully
 7   ask --
 8              THE COURT:  Monday.
 9              MS. MURRAY:  -- that we get until Monday.
10   Thank you.
11              THE COURT:  Yes, of course.  Okay, all right,
12   we are adjourned.  Thank you.
13              MS. MURRAY:  Thank you.
14              MR. LIPMAN:  Thank you, Your Honor.
15              (Whereupon the matter is adjourned.)
16
17
18
19
20
21
22
23
24
25
```

87

<u>C E R T I F I C A T E</u>

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, United States of America versus Wang, Docket #23cr118/23m2007, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.


Signature_____*Carole Ludwig*_____

Carole Ludwig

Date:  April 5, 2023