IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>                     Complainant<br><br>-v-<br><br>HO WAN KWOK,<br>    a/k/a "Miles Guo,"<br>    a/k/a "Miles Kwok,"<br>    a/k/a "Guo Wengui,"<br>    a/k/a "Brother Seven,"<br>    a/k/a "The Principal,"<br><br>KIN MING JE,<br>    a/k/a "William Je," and<br><br>YANPING WANG,<br>    a/k/a "Yvette,"<br><br>                     Defendants., | Criminal No.:   23 Cr. 118 (AT)<br><br>REPLY TO COLLATERAL ATTACK ON CUSTOMERS VICTIMIZED BY DOJ'S ERRONEOUS SEIZURE OF THE HIMALAYA EXCHANGE'S RESERVE FUNDS AND COUNSEL<br><br><br>Assigned to the Honorable<br>U.S. District Court Judge<br>Analisa Torres, Presiding Judge |

**I.       INTRODUCTION:   NEW COLLATERAL ATTACK RAISED**

As a tangential but serious matter, the U.S. Department of Justice ("DoJ") in a letter to the Honorable Presiding Judge filed in the Court on January 5, 2024 (ECF Dkt. # 223), attacks the right of the undersigned counsel to represent approximately (now) 5,242 Customers (Members) of the Himalaya Exchange and the right of the Customers whose investments – often life-savings – the DoJ has plundered to seek the opportunity to present their claim to the Court for the return of their investments.

The letter at ECF Dkt. # 223 primarily responds to the Customers' Replies, but then sideswipes the Customers and Counsel with unrelated attacks upon the character, honesty, and

1

legitimacy of the Customers. Undersigned counsel treats these attacks upon the Customers' right to seek the restoration of their investments as an entirely new matter or motion by the DoJ.

The DoJ's frequent use of letters to the Presiding Judge and a Chapter 11 Trustee's use of Notices obscures the procedural posture of their arguments. While neither has filed any actual, formal motions or oppositions to motions, it is clear that these unlabeled documents are intended to deprive the undersigned counsel's clients, Customers of the Himalaya Exchange, of their rights and their investments.

Technically, there are no motions before the Court but the Customers' motions for return of their money and to intervene. Technically, the Customers' motions are unopposed.

But in the absence of any formal motions by the DoJ, Counsel must treat the informal letters to the Honorable Judge as intended to affect his clients' rights.

## II.     CONFUSION FROM IMPROPER OR INADVISABLE JOINDER

1.     Initially, it should be recognized that the Government combined a fairly complex criminal prosecution (not actually involving the Himalaya Exchange, however, despite unfounded rhetoric) with an awkward attempt to seize funds and redistribute property to others in a manner taught by the Chinese Communist Party, as Soviet refugees fled a generation earlier.

2.     The funds that the DoJ seeks to redistribute involve a great many entities, but not the Himalaya Exchange. The only relevance of the Himalaya Exchange is that the Customers' investments represent a large pot of money tempting for the U.S. Treasury to smash and grab. Logically, there are many entities and funds for the Court to unravel, but the Himalaya Exchange reserve fund is not a proper part of that complex web.

3.     This combination of two very different but both complex matters was improper or at least inadvisable under Rule 8 of the Federal Rules of Criminal Procedure ("FRCP")

4.      Counsel has prepared a Motion to Sever the proceedings about funds seized from the criminal prosecution. Both are complex enough on their own. But counsel interprets the use of letters to the Judge as requiring a reply by today, and files this Reply first.

### III.     NO RIGHT TO BE HEARD?

5.      The Customers of the Himalaya Exchange are victims only of the seizure of their investments from the U.S. Government.

6.      Purporting to be protecting victims of vague and non-specific crimes by the Defendants in this criminal prosecution, only dim shapes in the shadows, the U.S. Government is turning those who were doing just fine into victims of the DoJ.

7.      And now the DoJ is very conspicuously following the old, half-joking adage: "If you have the facts, argue the facts. If you have the law, argue the law. If you have neither, attack your adversary [in personal terms]."

8.      It should not be overlooked that the Customers are prepared to present facts, including audit reports from two of the most respected international business auditors in the world. But the DoJ seeks to prevent the Customers from being heard. Why is the Government opposed to letting the Himalaya Exchange Members from presenting their case? (Again, these matters should be severed allowing the criminal prosecution to proceed in a more normal manner.)

9.      The forensic review will provide clear proper evidence that this money does not belong in the Chapter 11 estate and shows proper evidence of a financial trail existing for each customer. The random samples showed not a single inconsistency or discrepancy.

10.     Although most value their financial privacy, some are willing to stand publicly. Seven (7) declarations are attached from a few of the Customers, collectively Exhibit D.

11.     But the positions of the Government seem focused intently on not allowing the

Customers' whose funds it has taken to be allowed to have a voice.

12. To be charitable, one may speculate that any prosecutor might be concerned about the progress of the underlying criminal prosecution. And that is fair enough.

13. The issue of the seizure of funds should be severed from the criminal prosecution. Neither one of them would naturally proceed upon the same timetable or tracks. It is understandable to be concerned that one might interfere with the other. They should not be joined in the same case.

14. The Government's response to Counsel's filing, was unwarrantedly aggressive and somewhat defamatory. Such baseless criticism of legal professionals is unacceptable particularly when they are advocating on behalf of human rights, a core value the Department of Justice seems to have forgotten.

15. The sudden alterations to the indictment, including introducing R.I.C.O. provisions against what seems like a human rights movement, and so shortly after the customer motion's filing, raises legitimate concerns and begs this honorable court's oversight. The implication that the Exchange influences Counsel's actions particularly as now an alleged criminal entity further undermines the DoJ's position and objectivity.

16. The DoJ's recent filing merely reiterates previous claims without presenting any significant evidence. Their attempt to use the revised indictment to insinuate misconduct is unfounded.

17. The filing by Counsel updating the customer count was entirely appropriate.

18. Other than the Chinese Communist Party apparently viewing exiled Chinese businessman and political activist Ho Wan Kwok somewhat as the Union of Soviet Socialist Republics once viewed dissidents Alexander Solzenytsin and Lech Walesa in their day, the

Customers of the Himalaya Exchange were prospering before the tender mercies of the U.S. Department of Justice harmed the Customers' fortunes.

### IV. THE GOVERNMENT KNOWS THAT COUNSEL'S CLIENTS ARE LEGITIMATE, AND LIKELY WHO THEY ALL ARE

19. The Government somehow managed to seize funds, likely with imprecise and confusing demands, from a company organized and operating in the British Virgin Islands, which has no connection or interaction with the United States of America.

20. Certainly, the Exchange's possible use of vendors or banks fails to meet the requirement of sufficient contacts with the United States to justify personal jurisdiction over any aspect of the Exchange or its members.

21. However, whatever the DoJ did or said to badger the British Virgin Islands or confused international banks into handing over the Exchange's funds, it is hard to believe that the DoJ did not also obtain a full set of all banking records and evidence of transactions at the same time.

22. Counsel is a former Federal prosecutor, dealing especially with companies and financial institutions (as sources of evidence) at the Anti-Trust Division and it would be expected that if the DoJ was able to obtain at least $262 million in Exchange funds, that it much more easily obtained all of the transaction records of the Exchange.

23. Therefore, while the DoJ offers worries and speculations, most probably the DoJ actually knows the legitimacy of all of Counsel's customers and the investment of their funds as Members of the Exchange.

24. Furthermore, the Government has actual knowledge that before any investor could

become a Member of the Exchange, the Exchange would always conduct two levels of very intensive and demanding "Know Your Customer" reviews and would fully investigate each prospective Member.

25. Thus, the DoJ knows that none of the Member accounts are related to or are agents or proxies for the criminal Defendants.

26. The DoJ actually knows that no money has been deposited into the Exchange from Kwok, Je, or Wang or their agents, relatives, or proxies, but that the reserve funds are proceeds of investments by Members into the Exchange.

27. That is the DoJ must know where the money originated from, how it was transferred into the Exchange, and where it went if anywhere other than to the DoJ.

V.  **MISREPRESENTING CUSTOMER'S RIGHT TO LEGAL COUNSEL**

28. The DoJ also states in its February 5, 2024, letter: "Indeed, the Government has learned that the Himalaya Exchange appears to have notified all its registered customers (i.e. victims of the Himalaya Exchange) to file a claim with Petitioners' counsel. (See Ex. A.)"

29. Initially, if the DoJ is scrutinizing the Exchange's communications, then it knows that the correct legal name is: "Himalaya International Clearing Ltd. doing business as The Himalaya Exchange."

30. Elsewhere the Grand Jury finds fault in the Exchange not updating its website fast enough to the DoJ's liking when the DoJ began indictments and seizure of funds.

31. Surely the U.S. Attorney for the vaunted S.D.N.Y. well understands the serious obligations to properly disclose only appropriate matters and no more, lest an investment company become the cause of losses to investors rather than merely providing information.

32. Yet, ignoring the challenges of a financial institution determining what to disclose

and when, the Grand Jury accused the Exchange of not providing enough information.

33. Now the Government faults the Exchange for providing too much information, and letting Members know one of the options that might be available to them for legal help.

34. So it appears to be wrong either if the Exchange does or does not provide information to its Members.

35. Further, the Government provides to the Court as its Exhibit A only the middle of three emails to Exchange Members. Why did the Government conceal the first and the third emails on this topic, and include only the second email?

36. The first email to investors, attached hereto as Exhibit A, July 6, 2023, was a disclosure to investors required to give them the minimal information required about the U.S. Government's actions against the Exchange including the unsealing of an indictment, without doing harm to the financial positions of the investors. As the Court can see, the Exchange merely informed Members of their options and the bare facts. It's my understanding that the email was sent by the Exchange upon advice of its Crown counsel.

37. The second email to investors, attached hereto as Exhibit B, July 28, 2023, and addressed concerns about the scope of disclosures that had been raised by Members.

38. The third email to investors, attached hereto as Exhibit C, September 25, 2023, was sent for the benefit of customers whose disclosure concerns had been assuaged, but who were having trouble finding the undersigned counsel's contact information. Recall, that many of these customers do not speak English (imagine searching for an email from month prior written in Mandarin).

39. Viewing this progression of three communications to the Members presents a different picture and impression than the second email alone.

40. Yet the "General Investor Update" listed in the Government's Exhibit A (Exhibit B to this filing), states

**"The Exchange does not have any influence over this lawyer."**

41. The email also states: "*Should you wish* to protect and recover your assets *through this lawyer*, please register with him using the following link…." *(Emphasis added.)*

42. Thus, the Exchange has only kept investors informed, and has not "notified all its registered customers (*i.e.* victims of the Himalaya Exchange) to file a claim with Petitioners' counsel."

43. The Exchange let its Members know of a possibility, but did not tell Exchange Members "to file a claim with Petitioner's counsel."

44. Why is the Government giving this false impression to the Court?

45. One would assume that if or when any other lawyers become identified willing to do battle with the DoJ in service to the investors whose funds have been taken, the Exchange would provide equal prominence and notice.

46. It would appear that the DoJ does not want any attorneys defending these Customers, whether a single attorney or many attorneys.

47. Counsel will be submitting further documents on that topic.

48. The DoJ's stance lacks merit. The forthcoming motion will reveal the authenticity of this action. Counsel has substantiated the claim with evidence, including the Mazars report and live testimonies.

## VI. A LAWYER'S COMMON DUTY TO GATHER INFORMATION

49. Also, the DoJ's January 5, 2024, letter falsely claims that "Counsel then, apparently, "verifies" the client's ID number with the Himalaya Exchange, which makes it clear

that counsel is in consultation with the Himalaya Exchange…."

50. This is false. If a personal injury lawyer requests video recordings from the Department of Transportation's cameras viewing a highway, the lawyer is not in "consultation" with DOT.

51. It is a necessary part of a lawyer's tasks to gather information. That does not make the lawyer a partner of everyone he or she asks for information from.

52. Moreover, because consequences of inadvertent disclosures are so dire, undersigned counsel devised an authentication system that does not require further disclosures to be made until such time as they are deemed necessary and made under controlled conditions under court supervision.

### VII. KWOK'S CHAPTER 11 BANKRUPTCY PETITION DOES NOT AFFECT THE HIMALAYA EXCHANGE

53. The facts and the Customers reject any connection between "Himalaya International Clearing, Ltd., doing business as The Himalaya Exchange" and the Chapter 11 Estate of Kwok filed in the U.S. Bankruptcy Court for the District of Connecticut.

54. Only Kwok to the best of counsel's knowledge has filed a petition for protection in bankruptcy.

55. Therefore, any allegations concerning Je have no support in any bankruptcy proceeding.

56. The Grand Jury initially alleged twice that Kwok has no relationship to the Himalaya Exchange.

57. Meanwhile, Je has no bankruptcy proceeding pending.

58. But assuming for a moment that bankruptcy law might add something to the DoJ's

9

seizure of the Customer's investments, the purpose of a Chapter 11 bankruptcy petition – as opposed to a Chapter 7 petition – is to organize **_the continuation of one or more business enterprises_**.

59. If the Exchange did have any role in Kwok's Chapter 11 Estate, the DoJ and Trustee would still be wrong. The over-riding goals of a Chapter 11 (reorganization) are:

   a. **_continuation_** of businesses, not their destruction.

   b. orderly timing and scheduling of debt repayments to promote continuation.

   c. repayment of all debts over time, extending payment schedules, before the businesses emerge from Chapter 11 bankruptcy protection.

   d. often scrutiny of contracts and debts to ensure that they are fair, arms-lengths transactions and not fattened so as to hinder the goals above.

60. Therefore, the Government's deeply-held suspicions that Kwok is hiding funds from creditors of his businesses is hard to fathom when one of the over-riding purposes of a Chapter 11 is to try valiantly to pay off all creditors, but simply on a schedule that hopefully allows businesses to recover their misfortunes, be stabilized, and emerge from bankruptcy.

61. Thus when a Chapter 11 is aimed at paying off all creditors from rehabilitated businesses, it does not quite fit right to argue that Kwok filed for Chapter 11 but is hiding assets from creditors. Maybe he is. But the law has to run on a little something I call evidence.

62. The Chapter 11 Trustee Luc Despins' fiduciary duties are to preserve, continue operating, strengthen and release from bankruptcy any and all businesses that can be saved.

**VIII.    NO ALLEGATIONS OF FRAUD HAVE MERIT ABOUT EXCHANGE**

63. The Government repeatedly refers, in circular reasoning, to the Himalaya Exchange promising to buy back Himalaya crypto currency from Members / Customers as an example of

fraud.

64. But it is the U.S. Government and only the U.S. Government that has prevented the reserve funds it seized being used for their intended purpose of "cashing out" Customers.

65. The DoJ claims that the Himalaya Exchange "obtained more than approximately $262 million in victim funds through the Himalaya Exchange…"

66. But these "victims" are victims only of the U.S. Department of Justice grabbing their money. The DoJ has victimized Counsel's clients in order to designate them as victims in order to justify victimizing them because the Government victimized them and then concluded that they were victims because the U.S. DoJ stole their money.

67. An extra attempt at clarity might help:

   A. The reserve fund is dedicated and held in trust to allow Members of the Exchange to withdraw their funds by selling back their digital coins and cashing out their investment.

   B. The reserve fund is financed by Members depositing "hard" (national) currencies into their accounts, the same as E-Trade or the old ScotTrade or other cryptocurrencies, from which the Members then purchase digital coins. The hard currency remains on deposit as a reserve against future redemptions.

   C. The Exchange appropriately made that clear and promised to essentially buy back the crypto coins, apparently at a Member's purchase price.

   D. There appears to be no circumstances when the Exchange ever refused to honor the promise of redemption, unless perhaps on order of a court due to something improper regarding an individual Member (not the

    Exchange).

  E. The U.S. Government seized the funds being used, and intended to be used, and dedicated to, allowing Customers of the Exchange to withdraw their funds from investments in Himalaya digital coins.

  F. Because of the U.S. Government's destruction of the reserve fund, the Customers cannot get their investments out of the Exchange.

  G. The Himalaya Exchange at all times kept their promises and committed no fraud.

  H. But the U.S. Government took the Customers' money in the form of the reserve fund backing up their ownership of digital coins.

  I. Therefore, the U.S. Government is the source and cause of a problem.

## IX. MEANINGLESS TERMS CONFUSE, NOT ENLIGHTEN

68. The superseding indictment and latest correspondence reference the Himalaya Exchange as a "Kwok enterprise," even though the Grand Jury previously alleged twice that Kwok has no role or title with the Himalaya Exchange.

69. Thus, it appears that the Government is using an undefined phrase "Kwok Enterprise" to confuse rather than inform.

70. It appears that everything is "a Kwok Enterprise" without limitation or definition.

71. Such dramatics should be avoided.

## X. THE EXCHANGE'S MEMBERS NEVER WANTED TO BE DRAGGED INTO THIS CRIMINAL PROSECUTION

72. Customers and their undersigned counsel are not asking to be involved with the action against the criminal Defendants here, but to have their interests completely divorced from

the criminal prosecution. They want to be less involved in the criminal prosecution, not more.

73. The Government's and Chapter 11 Trustee's approach is the wrong way around. They have deeply-held feelings in their gut that maybe some of the Members of the Himalaya Exchange could be pseudonyms or agents of the criminal Defendants here.

74. But the Himalaya Exchange governing documents prohibit any U.S. citizen or U.S. resident or anyone acting on their behalf from being a Member / Customer of the Exchange. Therefore, if any of the accounts were proxies for the criminal Defendants, the Exchange would have to reject their Membership. If any of the Defendants are U.S. residents they would therefore ineligible to be Members of the Himalaya Exchange. Their application should have been denied at the time. If the ineligibility is discovered later the account would have to be closed.

75. Therefore, counsel does not represent the criminal Defendants or their hypothetical proxies, even if sympathy suggests there are problems with the prosecution. Any invalid accounts not eligible under the Exchange's prohibitions would not be among counsel's clients.

**76.** But, worse, the Government and Trustee are simply imagining. The mere hypothetical possibility that any of the funds of Customers in the Exchange are related in any way to these criminal Defendants requires proof, even at the forfeiture stage, not a "hail Mary pass" throwing the football with eyes closed.

### XI. COUNSEL AS FORMER U.S. DEPARTMENT OF JUSTICE PROSECUTOR IS WELL-SUITED TO REPRESENT THESE CLIENTS

77. Counsel's extensive experience makes him suitable for this case.

78. Counsel is a former attorney and prosecutor working in the U.S. Department of Justice.

79. Between 2015 to 2016, undersigned counsel came to the defense of ethnic Chinese

who had been accused of being money launderers by the US Department of Justice. While undersigned counsel obtained the return of what the DoJ had falsely claimed were counterfeit coins, the lingering aftermath resulted in one person almost being deported from the UK to a China prison by the Crown.

80. Through a related non-profit, undersigned counsel was able to intervene in the UK and catastrophe was averted. Here the China Freedom Movement were among early advocates for the urgency of early treatment solutions like hydroxychloroquine[1] and ivermectin[2] and advocated against the use of dangerous experimental vaccines, particularly on children. Undersigned counsel from March 2020, was sourcing hydroxychloroquine and ivermectin in Asia, while in May 2020, under blistering suppression on social media platforms we now know was sponsored by the US government, he worked tirelessly with volunteers to get word out to the American public to avert mass deaths. Sadly, due in large part to the government sponsored censorship efforts, his efforts and the efforts of thousands of volunteers from a variety of nations including the United States, they failed to reach enough Americans and thousands of these victims, having lost loved ones to hospital treatment protocols using deadly drugs like remdesivir, are now members of FormerFeds.Org, CHBMP.Org and FormerFedsGroup.Org.[3] In fact, our organization has documented over 1,000 hospital homicides and it has assisted victims and next of kin to recover hospital records for preservation for future enforcement agency action.

81. Many of Himalaya Exchange customers as members of the China Freedom

---

[1] https://x.com/miles20230315/status/1736233615816884500?s=20

[2] https://www.cnbc.com/2021/09/07/guo-wengui-pushes-ivermectin-misinformation-network.html

[3] See 1,100 recorded eyewitness accounts and recorded accounts of survivors of hospital treatment protocols, what we call the #fdadeathprotocol, at chbmp.org and formerfedsgroup.org/cases.

Movement were proponents for early treatment and against experimental vaccines and, being a tight knit community, it seems logical that they would have found undersigned counsel as we are all active participants in the movement to save human lives, liberty and freedom.

**82.** Counsel has adhered to proper procedures, with no financial ties to the exchange.

## XII.  CONCLUSION

Throughout this motion's process, the Court has maintained a fair approach, allowing the DoJ and the trustee ample opportunity to respond.  But the DoJ's insistence on unilateral control disregards due process and other parties' rights.

The instant Court is the rightful authority to determine these matters particularly when grave human rights issues are at stake that the government and the Trustee fails to acknowledge.

Exchange Customers, despite not being central to the main case, have pertinent third-party rights and can file a 41(g) motion for the court's consideration regarding their seized funds. The DoJ's objections appear baseless.

The DoJ's reluctance to acknowledge the growing number of customers suggests they fear its implications for their case, a reason unjustified by the facts.

Counsel's motion to update the court on the increased customer count was appropriate. The DoJ's aggressive response seems aimed at diverting attention from the case's merits.

Counsel's clients ask that the improper seizure of funds from the Himalaya Exchange be reversed.  This would restore the operating reserve fund to its function, purpose, and place and allow the Exchange to operate.

That means that the Customers would be protected and would have the rights established by the rules of the Exchange and their individual contracts as Members and the history of their

investments. There would not be any irregular distribution but the ability of Exchange members to operate according to their pre-existing individual rights.

This would be a return to "regular order" as the currently-popular phrase goes.

The Government, however, helpfully directs us to Title 21, United States Code, Section 853(n) as a mechanism for the Customers to restore the improperly seized funds more to the Government's liking. Customers, by counsel, are happy to amend their motion by adding Title 21, United States Code, Section 853(n) as an alternative mechanism for the return of their property.

However, the DoJ is incorrect in arguing from "Rule 41(g) [applies] only when (1) the movant has "no adequate remedy at law", and (2) "the equities favor the exercise of jurisdiction."

Without the reversal of the improper seizure, allowing the Himalaya Exchange to continue to operate, the Exchange will collapse and the Customers will completely lose their investments.

The Government argues that the market price of Himalaya cryptocurrency has not been affected, from which they appear to imply various things. This is false. The trading price collapsed from $21 per coin to as low as $12 per coin just a few days ago, now up to $13. The fact that the Exchange has continued to operate is remarkable but the DoJ's claim that there is no danger from the DoJ's interference is unwarranted.

Furthermore, it is obvious that the DoJ and Trustee are dissipating the assets in favor of themselves through exorbitant legal fees, expenses, and diverting the Customer's funds to other creditors. The Customers do not have an adequate remedy at law because once the Exchange collapses, their investments will lose all value and in a way that cannot be revived.

16

"The equities favor the exercise of jurisdiction."

Dated: January 12, 2024                 RESPECTFULLY SUBMITTED

/s/ Brad Geyer
Bradford L. Geyer, PHV
NJ 022751991
Suite 141 Route 130 S. 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2024, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the District of Columbia.

/s/ Brad Geyer
Bradford L. Geyer, PHV
NJ 022751991
Suite 141 Route 130 S. 303
Cinnaminson, NJ 08077
Brad@FormerFedsGroup.Com
(856) 607-5708