UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    v.<br><br>YANPING WANG<br>    a/k/a "Yvette,"<br>    a/k/a "Y,"<br><br>               Defendant. | **S2 23 Cr. 118 (AT)** |

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT YANPING WANG'S PRETRIAL MOTIONS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Justin Horton
Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
    *Of Counsel*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ....................................................................................................... 1

I. The Search of the Defendant's Apartment was Lawful ...................................................... 1

  A. Background ....................................................................................................................... 1

  B. Applicable Law ................................................................................................................ 4

    1. Deference to Judicial Findings of Probable Cause .................................................... 4

    2. Overbreadth in Complex Investigations .................................................................... 7

    3. Particularity in Complex Investigations..................................................................... 8

    4. Good-Faith Reliance on Judicially Authorized Warrants ........................................ 10

  C. Discussion ...................................................................................................................... 11

    1. The Judicially Authorized Search Warrant Was Supported by Probable Cause .......... 12

    2. The Search Warrant Was Neither Unparticularized nor Overbroad............................ 17

    3. In the Alternative, the Agents Relied in Good Faith on the Search Warrant................ 21

II. The Defendant's Post-Arrest Statement Should Not be Suppressed ................................... 22

  A. Applicable Law .............................................................................................................. 23

  B. Discussion ...................................................................................................................... 25

III. The Defendant's Motion for a Bill of Particulars Should Be Denied.................................. 29

  A. Applicable Law .............................................................................................................. 29

  B. Discussion ...................................................................................................................... 32

IV. A Severance Is Not Warranted ........................................................................................ 40

  A. Applicable Law .............................................................................................................. 40

  B. Discussion ...................................................................................................................... 43

CONCLUSION.................................................................................................................... 46

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motions to suppress, motion for a bill of particulars, and motion for severance filed by defendant Yanping Wang ("Wang Mot.").[1]  (Dkt. 196).  For the reasons set forth below, Wang's motions should be denied in their entirety.

## ARGUMENT

### I.  The Search of the Defendant's Apartment was Lawful

#### A.  Background

On March 6, 2023, a grand jury returned a sealed indictment (the "Original Indictment") charging Ho Wan Kwok ("Kwok") and Kin Ming Je ("Je") with crimes arising out of a wide-ranging conspiracy to defraud thousands of victims out of more than $1 billion "through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities."  (Dkt. 2 ¶ 1).  The Original Indictment charged Kwok, Je "and others known and unknown" with a conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering "from at least in or about 2018 through at least in or about March 2023." (*Id*. ¶ 1).  The Original Indictment went on to describe the first interrelated scheme of that conspiracy: the GTV Private Placement, an illegal private stock offering in a purported media venture that occurred between in or about April 2020 and in or about June 2020.  (*See id.* ¶ 12). The Original Indictment proceeded to describe other arms of the overarching fraud conspiracy from at least in or about June 2020 through at least in or about March 2023 that followed from, and related back to, the GTV Private Placement: the Farm Loan Program, (*see id.* ¶ 13), G|CLUBS,

---

[1] Wang joined in co-defendant Kwok's motion to dismiss the S1 Indictment, which the Court has denied as moot in light of the S2 Indictment.  (Dkt. 230 at 1 n.1).

(*see id.* ¶¶ 14-15), and the Himalaya Exchange, (*see id.* ¶¶ 16-22).  The Original Indictment charged Kwok and Je with, among other things, conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering, and repeatedly emphasized that Kwok and Je had acted with others to execute the sprawling and sophisticated fraud scheme.

Four days later, on March 10, 2023, Judge Gorenstein signed the Complaint charging Wang with the same wire fraud and securities fraud conspiracy, which spanned from "in or about 2018 up to and including at least in or about March 2023." (Compl. ¶ 1).  Wang was also charged with some of the same substantive offenses as Kwok and Je, including wire fraud and securities fraud offenses arising out of the GTV Private Placement.  (*See, e.g.*, Compl. ¶ 10).  The Complaint referred to Kwok as one of Wang's co-conspirators (under the name of "CC-1") and indicated that the Original Indictment charged Kwok "in connection with" the conduct for which Wang was being charged in the Complaint.  (*See id.* ¶ 10.a n.1).  The Complaint alleged, among other things, that Wang was identified as an Executive Director of, and "key personnel" for, GTV in promotional communications made and disseminated by, among others, Kwok.  (*See id.* ¶ 10.a-.d).  The Complaint also alleged "that WANG has had a close personal relationship with [Kwok]," "has worked for [Kwok] and [Kwok's] family for several years, since at least in or about 2018," and "is the President, Treasurer, and Secretary of an entity that manages [Kwok's] purportedly vast personal wealth."  (*Id.* ¶ 10.e).  While much of the Complaint focused on the GTV Private Placement and related events in 2020, the Complaint also alleged that Wang participated in a conspiracy that persisted through at least in or about March 2023.  (Compl. ¶ 1).  It also referenced a precursor to the Himalaya Exchange by alleging, among other things, that Wang opened bank accounts in 2018 held in the name of "Saraca Media Group DBA Himalaya Dollar."  (*See id.* ¶ 11.a, .b).  And the Complaint also alleged that "WANG well knew that the funds raised from the

2

GTV Private Placement could not be," but were, "invested in a high-risk hedge fund for the benefit of [Kwok's] close relative," (*id.* ¶ 13.h), who is identified as CC-1 in the Original Indictment.

Four days after signing the Complaint, Judge Gorenstein signed a search and seizure warrant for Wang's apartment (the "Wang Apartment") and certain items expected to be found therein, including electronic devices. (*See* Dkt. 199, Def. Ex. 8 (the "Wang Apartment and Devices Warrant" or the "Warrant")). Like the Complaint, the affidavit for the Wang Apartment and Devices Warrant (*see* Dkt. 199, Def. Ex. 1 (the "Wang Apartment and Devices Affidavit" or the "Affidavit")) was submitted and sworn by FBI Special Agent Nicholas DiMarino. The Affidavit set forth probable cause to believe that, from in or about 2018 to the present, Wang, Kwok, and Je executed a scheme to fraudulently obtain money from victims through false statements and misrepresentations and to launder and misappropriate victim funds, in violation of 18 U.S.C. §§ 1349 (conspiracy to commit bank and wire fraud); 1343 (wire fraud); 1344 (bank fraud); 1956 (money laundering and conspiracy to commit money laundering); 1957 (unlawful monetary transactions); 371 (conspiracy to commit wire, bank and securities fraud and money laundering), and 2 (aiding and abetting); and 15 U.S.C. §§ 78j(b) & 78ff, and 17 C.F.R. § 240.10b-5 (securities fraud) (the "Subject Offenses").

The Affidavit attached the Original Indictment and Complaint and incorporated them by reference, (*see* Aff. ¶¶ 7-8), but its section for probable cause to believe that Wang, Kwok, and Je committed the Subject Offenses consisted of 18 additional paragraphs and subparagraphs of evidence about the "Fraud Scheme" that "pertains to several companies that are owned or operated by, or otherwise affiliated with, KWOK, [Je], and other Target Subjects"—*i.e.*, the same 2018 through March 2023 wire fraud and securities fraud conspiracy in the Original Indictment and the Complaint. (*See id.* ¶ 9). This additional probable cause evidence, offered in addition to the

attached and incorporated charging instruments, included that "WANG is the New York-based functional head of the various KWOK-affiliated entities that have operated the Fraud Scheme," (*id.* ¶ 9), that Wang was identified as GTV's executive director in the fraudulent private placement offering document (*see id.* ¶ 11.a), that there were chat messages "among KWOK, JE, WANG, and others . . . regarding, among other things, business and other arrangements relating to various of the fraud-related ventures, including GTV and G|Fashion" (*see id.* ¶ 16.b), and that "KWOK, JE, WANG, and other Target Subjects primarily communicated" through a particular messaging application (*see id.*).

The Affidavit also set forth probable cause to believe that Wang resided in the Wang Apartment during the time of the Fraud Scheme, and that electronic devices and other specified items found there would constitute or contain evidence, fruits, and instrumentalities of the Subject Offenses.  (*See* Aff. ¶¶ 20-24).

## B.  <u>Applicable Law</u>

### 1.  **Deference to Judicial Findings of Probable Cause**

A judge's finding of probable cause is afforded significant deference. "A reviewing court must accord substantial deference to the finding of an issuing judicial officer that probable cause exists . . . . The reviewing court's determination should be limited to whether the issuing judicial officer had a substantial basis for the finding of probable cause." *United States v. Wagner*, 989 F.2d 69, 72 (2d Cir. 1993) (internal citations omitted) (reversing suppression order).[2]

Moreover, "[p]robable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)). "A judge's probable-

---

[2] Unless otherwise indicated, all quotations omit internal quotation marks, citations, alterations, and footnotes.

cause determination is not overly strict.  Presented with a warrant application, the judge must 'simply . . . make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "The quanta of proof necessary to establish probable cause is 'only the probability, and not a *prima facie* showing, of criminal activity.'" *Wagner*, 989 F.2d at 72 (quoting *Gates*, 462 U.S. at 235).  Neither is there any "bright-line rule for staleness." *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007) ("[A] magistrate is expected to consider the age of the facts in light of the conduct at issue with a view toward ensuring that probable cause exists at the time the warrant is to be executed, not simply at some past time."). And, "in circumstances of continuing or ongoing conduct, as contrasted with isolated illegal acts, 'the passage of time between the last described act and the presentation of the application becomes less significant.'" *Id.* (quoting *United States v. Martino*, 664 F.2d 860, 867 (2d Cir. 1981)).

Moreover, "[p]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Martin*, 426 F.3d at 74 (quoting *Gates*, 462 U.S. at 232). Thus, "[i]n assessing probabilities, a judicial officer must look to 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Walczyk*, 496 F.3d at 156 (quoting *Gates*, 462 U.S. at 231). "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *United States v. Ventresca*, 380 U.S. 102, 109 (1965)).

Such determinations must be approached in a practical way, because "probable cause is a flexible, common-sense standard." *Gates,* 462 U.S. at 231-32, *Texas v. Brown*, 460 U.S. 730, 742 (1983). Additionally, the training and experience of law enforcement agents bear significantly on probable cause determinations. *Gates*, 462 U.S. at 232. Inferences drawn by law enforcement agents based on facts known to them, the totality of the circumstances, and their training and experience can all support a probable cause finding. *Id*. at 231-32.

Once a warrant has been issued by a judge and executed, the duty of a court reviewing a magistrate judge's probable cause determination on a motion to suppress is far more limited: its task is "simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238-39 (quoting *Jones v. United States,* 362 U.S. 257, 271 (1960)). The issuing magistrate's decision is "entitled to substantial deference, and doubts should be resolved in favor of upholding the warrant." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993). Indeed, the magistrate's "finding of probable cause is itself a substantial factor tending to uphold the validity of [the] warrant." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). "Such deference derives not only from the law's recognition that probable cause is 'a fluid concept' that can vary with the facts of each case, but also from its 'strong preference' for searches conducted pursuant to a warrant." *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Gates*, 462 U.S. at 232, 236).  Thus, as described in *Clark*, the "task of a reviewing court is simply to ensure that the 'totality of the circumstances' afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *Clark*, 638 F.3d at 93 (quoting *Gates*, 462 U.S. at 238).

### 2.  Overbreadth in Complex Investigations

With respect to overbreadth specifically, "a warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'" *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2nd Cir. 2013)); *see also United States v. Hernandez*, No. 09 Cr. 625 (HB), 2010 WL 26544, at *8 (S.D.N.Y. Jan. 6, 2010) (framing the overbreadth inquiry as "whether the magistrate judge authorized search warrants that were constitutionally overbroad because they provided for the seizure of specific items for which there is no probable cause").

The more complex the crimes under investigation, the broader the categories of documents and records that may properly be seized.  *See, e.g.*, *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 304-05 (S.D.N.Y. 2018) ("The level of specificity required depends on the nature of the crime and its level of complexity."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 526 (E.D.N.Y. 2014) (concluding that breadth of warrant, which contained no timeframe limitation, was justified because "the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity"); *United States v. Levy*, No. S5 11 Cr. 62 (PAC), 2013 WL 664712, at *7-8 (S.D.N.Y. Feb. 25, 2013), aff'd, 803 F.3d 120 (2d Cir. 2015) (explaining that broad warrant with no time limitation was justified by scope and complexity of fraud described in affidavit); *United States v. Dupree*, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011) (describing how "[t]he nature of the crime . . . may require a broad search," including where "complex financial crimes are alleged")).

### 3.  Particularity in Complex Investigations

"Although somewhat similar in focus, particularity and overbreadth are two distinct legal issues." *Lustyik*, 57 F. Supp. 3d at 228 (quoting *United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013)). While "the overbreadth inquiry asks 'whether the warrant authorized the search and seizure of items as to which there is no probable cause,'" the particularity inquiry requires a court to assess "whether the warrant 'enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize.'" *Id.* A search warrant must be "sufficiently specific to permit the rational exercise of judgment by the executing officers in selecting what items to seize." *United States v. Shi Yan Liu*, 239 F.3d 138, 140 (2d Cir. 2000). "To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017). It must (i) "identify the specific offense for which the police have established probable cause," (ii) "describe the place to be searched," and (iii) "specify the items to be seized by their relation to designated crimes." *Id.* (quoting *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013)). "The Fourth Amendment does not require a perfect description of the data to be searched and seized . . . ." *Id.* at 100. Indeed, "[w]here, as here, complex financial crimes are alleged, a warrant properly provides more flexibility to the searching agents," *Dupree*, 781 F. Supp. 2d at 149, and "it may be appropriate to use more generic terms to describe what is to be seized," *United States v. Gotti*, 42 F. Supp. 2d 252, 274 (S.D.N.Y. 1999). "[A] search warrant does not necessarily lack particularity simply because it is broad." *Ulbricht*, 858 F.3d at 100. When a search warrant limits the scope of the search to evidence of particular federal crimes, and gives an "illustrative list of seizable items," the search warrant is sufficiently particular. *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990) (citing *United States v. Young*, 745 F.2d 733, 759-60 (2d Cir. 1984), *cert. denied*, 470 U.S.

1084 (1985)); *see also United States v. Ables*, 167 F.3d 1021, 1034 (6th Cir. 1999) (upholding warrant over overbreadth challenge when it "supplied sufficient examples of the items that the IRS was authorized to seize . . ."); *Lustyik*, 57 F. Supp. 3d at 227 ("The inclusion of an illustrative list of seizable items brings the Warrants within the Fourth Amendment's particularity parameters."); *United States v. Jacobson*, 4 F. Supp. 3d 515, 524 (E.D.N.Y. 2014) ("The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants."); *United States v. D'Amico*, 734 F. Supp. 2d 321, 363 (S.D.N.Y. 2010) ("Attachment A provides an exemplary list of records and other items falling within the scope of the Warrant, thereby enabling the executing agents to identify with reasonable certainty what they were authorized to seize.").

The requirement is satisfied if the warrant, including its attachments, enables the executing officer to ascertain and identify with reasonable certainty those items that the magistrate judge has authorized them to seize. *See Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004); *Rosa*, 626 F.3d at 58. This does not mean that the warrant must leave nothing to the discretion of the executing officer. To the contrary, "[o]nce a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." *Riley*, 906 F.2d at 845. "[A] warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'" *Id.*

9

Moreover, "[c]ourts tend to tolerate a greater degree of ambiguity where law enforcement agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant." *Young*, 745 F.2d 733 at 759 (2d Cir. 1984). Indeed, "where a particularly complex scheme is alleged to exist, it may be appropriate to use more generic terms to describe what is to be seized." *Gotti*, 42 F. Supp. 2d at 274 (citing *United States v. Regan*, 706 F. Supp. 1102, 1113 (S.D.N.Y. 1989) ("The degree to which a warrant must state its terms with particularity varies inversely with [the] complexity of the criminal activity investigated.")); *see also Pinto-Thomaz*, 352 F. Supp. 3d at 304-05 ("The level of specificity required depends on the nature of the crime and its level of complexity.").

### 4. Good-Faith Reliance on Judicially Authorized Warrants

Even if a warrant lacks probable cause, is insufficiently particular, or is overbroad, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144; *see also Rosa*, 626 F.3d at 64, 66. As a result, exclusion should be a "last resort" rather than a "first impulse." *Rosa*, 626 F.3d at 64 (quoting *Herring*, 555 U.S. at 140). Thus, suppression will generally not be warranted where the evidence at issue was "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *United States v. Leon*, 468 U.S. 897, 922 (1984). Although the burden is on the Government to establish good faith, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law

10

enforcement officer has acted in good faith in conducting the search." *Id.*; *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (noting that the "issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause"). Accordingly, considering this exception, "the Supreme Court [has] strongly signaled that most searches conducted pursuant to a warrant would likely fall within [the] protection" of the good faith exception. *Clark*, 638 F.3d at 100 (2d Cir. 2011) (citing *Leon*, 468 U.S. at 922).

Indeed, there are only four narrow circumstances in which the good-faith exception does not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable. *Id.*

### C. <u>Discussion</u>

Wang asserts that the judicially authorized Warrant was based on insufficient probable cause to search the Wang Apartment, was overbroad, and was insufficiently particularized. In support, Wang contends that the Affidavit furnished insufficient grounds to conclude that evidence of the Subject Offenses would be found at the Wang Apartment, that the Warrant's scope exceeded the probable cause on which it was issued, and that certain of its items to be seized gave the executing agents insufficient guidance. These arguments are meritless. The Affidavit set forth extensive probable cause that Wang conspired with Kwok, Je, and others to execute a sprawling fraud that included the GTV Private Placement and extended from there to three related arms of a single scheme. That evidence came not only in the form of the two incorporated charging instruments (through which a grand jury and a magistrate judge had found

probable cause to believe that Wang and her co-conspirators executed the Fraud Scheme), but from additional evidence that further explained Wang's role and the conspirators' means and methods.  The result of that Affidavit was a judicially authorized Warrant that identified the conduct and criminal offenses for which evidence was being sought, described the premises to be searched, and specified the items to be seized as evidence of the listed offenses.  Nothing more was required, and there is no basis to disturb the magistrate judge's finding of probable cause or to suppress the fruits of this lawful search.

### 1.   The Judicially Authorized Search Warrant Was Supported by Probable Cause

The Affidavit provided substantial evidence of Wang's participation in the Subject Offenses through means that made it reasonably likely that evidence of those crimes would be found at the apartment where she lived during the Fraud Scheme.  Under these circumstances, there is no basis to disturb the "substantial deference," *Rosa*, 11 F.3d at 326, owed to the issuing judge's probable cause determination.

The Affidavit began by describing and incorporating the two charging instruments through which a grand jury and a magistrate judge had found probable cause to believe that Wang, Kwok, Je, and their co-conspirators had executed the sprawling Fraud Scheme.  (*See* Aff. ¶¶ 7-8).  While neither Kwok's nor Wang's then-sealed charging documents referenced the other conspirator by name, reading the charging instruments together as they were presented to Judge Gorenstein makes clear the interrelation of their allegations and the presence of both co-conspirators in each charging instrument.  Indeed, the Affidavit made clear that Kwok, Je, and Wang all conspired together in the Fraud Scheme.  (Aff. ¶ 9 ("KWOK is the leader of, and directed, the Fraud Scheme. JE is the financial architect and key money launderer for the Fraud Scheme. WANG is the New York-based functional head of various of the KWOK-affiliated

12

entities that have operated the Fraud Scheme")).  The Original Indictment alleged that the Fraud Scheme was executed "through a series of complex fraudulent and fictitious businesses and investment opportunities that connected dozens of interrelated entities," (Dkt. 2 ¶ 1), and that it included the GTV Private Placement, (*see id.* ¶ 12), and three interrelated schemes, which were all part of the same conspiracy (*see id.* ¶¶ 13-15, 16-22).  The Original Indictment charged Kwok and Je with, among other things, conspiracy to commit wire fraud, securities fraud, bank fraud, and money laundering, and repeatedly emphasized that Kwok and Je had acted with others to execute the sprawling and sophisticated fraud scheme.  The Complaint referred to Kwok as one of Wang's co-conspirators (under the name of "CC-1") and indicated that the Original Indictment charged Kwok "in connection with" the conduct for which Wang was being charged in the Complaint.  (*See* Compl. ¶ 10.a n.1).  The Complaint then alleged, among other things, that Wang was identified as the Executive Director of, and "key personnel" for, GTV in promotional communications made and disseminated by Kwok.  (*See id.* ¶ 10.a-.d).  The Complaint also described how "WANG has had a close personal relationship with [Kwok]," "has worked for [Kwok] and [Kwok's] family for several years, since at least in or about 2018," and "is the President, Treasurer, and Secretary of an entity that manages [Kwok's] purportedly vast personal wealth."  (*Id.* ¶ 10.e).  And while much of the Complaint focused on the GTV Private Placement and related events in 2020, the Complaint also alleged that in 2018, Wang identified herself as the President of Saraca Media Group—a Kwok-controlled entity beneficially owned by Kwok's son—while opening two bank accounts that referenced a separate leg of Kwok's Fraud Scheme.  (*See id.* ¶ 11.a, .b (alleging, among other things, that Wang opened bank accounts held in the name of "Saraca Media Group DBA Himalaya Dollar")).  The Complaint also alleged that

13

"WANG well knew that the funds raised from the GTV Private Placement could not be," but were, "invested in a high-risk hedge fund for the benefit of [Kwok's] close relative." (*Id.* ¶ 13.h).

Wang's characterization that the Affidavit established probable cause "primarily" through these incorporated charging instruments, (Wang Mot. at 3), is misplaced. Establishing that there is probable cause to believe crimes were committed from 2018 through March 2023 through incorporated charging documents is itself sufficient. Nonetheless, the Affidavit did more. It included 18 paragraphs and subparagraphs of additional probable cause about the "Fraud Scheme" that "pertains to several companies that are owned or operated by, or otherwise affiliated with, KWOK, [Je], and other Target Subjects." (Aff. ¶ 9). That evidence included that "WANG is the New York-based functional head of the various KWOK-affiliated entities that have operated the Fraud Scheme," (*see id.*), and went on to allege that Wang was identified as GTV's executive director in the fraudulent private placement offering document (*see id.* ¶ 11.a), that there were chat messages "among KWOK, JE, WANG, and others . . . regarding, among other things, business and other arrangements relating to various of the fraud-related ventures, including GTV and G|Fashion" (*see id.* ¶ 16.b), and that "KWOK, JE, WANG, and other Target Subjects primarily communicated" through a particular messaging application (*see id.*).

The Affidavit set forth probable cause to believe that Wang lived at the Wang Apartment, including because Wang's name appeared on purchase records for the apartment in February 2020—that is, during the period of the Fraud Scheme and shortly before the GTV Private Placement—and because mail records indicated that Wang had received a package at the apartment at the other end of the period of the Fraud Scheme, in February 2023. (*See* Aff. ¶¶ 19.a-.b). The Affidavit also supplied probable cause to believe that electronic devices and other specified items likely to be found in the Wang Apartment would constitute or contain

evidence, fruits, and instrumentalities of the Subject Offenses, including by referring back to the evidence that Kwok, Wang, and others "primarily communicated" through a device-based messaging application, and that probable cause was supplemented with the agent's training and experience with the kinds of evidence that is found on electronic devices used in furtherance of criminal activity.  (*See id.* ¶¶ 20-24; *see also, e.g.*, *Ray*, 541 F. Supp. 3d at 406 (denying suppression motion where premises warrant's affidavit included evidence that defendant "used electronic devices in the commission of the Subject Offenses" and that agent's training and experience suggested that "individuals who engage in the Subject Offenses commonly use electronic devices to communicate with co-conspirators")).

"[A] sufficient nexus between the alleged criminal activities and the place to be searched 'does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience.'" *United States v. Gatto*, 313 F. Supp. 3d 551, 558 (S.D.N.Y. 2018) (quoting *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004)). The Affidavit's evidence that Wang "is the New York-based functional head of various of the KWOK-affiliated entities," that Wang resides at the Wang Apartment, that she and her co-conspirators "primarily communicated" about "business and other arrangements relating to various of the fraud-related ventures" through an electronic messaging application, (*see* Aff. ¶ 16.b), and that Wang personally participated in the receipt, transfer, and misappropriation of the Fraud Scheme's proceeds, (*see id.* ¶¶ 11-12), provided ample grounds for the issuing judge to "reasonably infer, based on common sense, that [Wang] has used electronic devices and encrypted applications to communicate with [her] coconspirators while at home." *United States v. Yu*, No. 22 Cr. 208 (CBA), 2023 WL 4687970, at *5 (E.D.N.Y. Jul. 21, 2023); *see also, e.g.*, *United States v. Brown*, 676 F. Supp. 2d 220, 228 (S.D.N.Y. 2009) (describing "common sense"

15

conclusion that "an individual engaged in a conspiracy may have evidence of that conspiracy, including telephone numbers and other contact information, located in his or her residence").

*Yu* illustrates the point that no more particularized nexus between specific devices and specific locations is necessary for a premises warrant to issue.  There, warrants were obtained in April and May 2022, *see id.* at *2, that sought evidence of a "conspiracy that spanned multiple months—from August 2018 to February 2019—and involved at least five coconspirators," *see id.* at *3.  *Yu*'s warrant affidavits, like the one at issue here, "describe[d] extensively the conspirators' use of various electronic devices . . . as well as their practice of hiding payments through corporate financial transfers."  *Id.* at *4.  Accordingly, the district judge rejected a challenge to the judicially authorized premises warrant over challenges similar to Wang's, because "[g]iven this context, the kind of evidence that would be relevant includes corporate documents, copies of communications between the conspirators on electronic devices, records contained within applications such as [a messaging application], or records of financial transactions between the conspirators, among others," which types of evidence are "those likely 'stored in secure locations, under the control of the owner, for long periods of time.'"  *Id.* at *4 (quoting *United States v. Russo*, 483 F. Supp. 2d 301, 307 (S.D.N.Y. 2007)); *see also, e.g.*, *Ray*, 541 F. Supp. 3d at 405 ("The magistrate judge can authorize law enforcement to seize an item of evidence that there is probable cause to believe would be at one of a number of different locations without establishing the existence of probable cause that it currently is present at any one of the locations.").

Wang also argues that the Affidavit provided "no basis to believe that evidence concerning the GTV Private Placement would still be at the [Wang Apartment], if it ever was there in the first place"—that is, that its probable cause was stale.  (Wang Mot. at 6).  The

16

argument ignores that the Complaint and Original Indictment charged a conspiracy that continued through March 2023.  It is common sense that the functional head of Kwok's entities would retain documents and electronics about those entities in her apartment.  And to the extent that Wang contends the *Complaint*, read in isolation, focused only on Wang's involvement with one facet of a broader conspiracy that occurred in 2020, the *Affidavit* provides clear probable cause that Wang conspired with Kwok to commit the broader Fraud Scheme "from in or about 2018 through the present," (Aff. ¶ 6).  What is more, the "factors relevant to a staleness inquiry"—in particular, "the nature of the alleged illegal activity" and "the nature of the evidence being sought"—undermine Wang's assertion.  *United States v. Salomon-Mendez*, 992 F. Supp. 2d 340, 347 (S.D.N.Y. 2014) (quoting *United States v. McGrath*, 622 F.2d 36, 41-42 (2d Cir. 1980)).  The items sought by the warrant—consisting largely of financial records and communications about prior commercial dealings—were "property of a more permanent nature that is likely to be maintained in one place for longer periods of time, such as business records." *Salomon-Mendez*, 992 F. Supp. 2d at 348; *see also, e.g.*, *Paul*, 692 F. Supp. at 193 ("[I]t is reasonable to infer that an individual like [the defendant] would keep bank statements, safe deposit box information or keys and other financial records or instruments in his house over an extended period of time…").  And even if "certain categories of items . . . were stale," "this staleness [need] not defeat the [Warrant's] probable cause to search the apartment."  *United States v. Disla Ramos*, No. 22 Cr. 431 (LJL), 2022 WL 17830637, at *14 (S.D.N.Y. Dec. 21, 2022).

### 2.  The Search Warrant Was Neither Unparticularized nor Overbroad

Wang's particularity argument relies almost exclusively on *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017), which concerned warrants fundamentally incomparable to the

Warrant at issue here. "[B]oth Warrants [in *Wey*] fail[ed] to set forth the crimes under investigation. . . . [T]hey neither cite[d] criminal statutes nor in any way describe[d] any criminal conduct." *Wey*, 256 F. Supp. 3d at 384. What is more, the *Wey* warrants effectively authorized the agents to seize *all items* related to the owner of the premises. *Id.* at 386.

But for warrants like the one at issue here—tied to specific crimes committed during a specific time period, and authorizing the seizure and search of specific categories of materials that relate to those time-bounded offenses—Wang's effort to import *Wey*'s language falls far short of the mark. First, Wang asserts that, after naming nine specific entities involved in the Fraud Scheme, the Warrant problematically permitted the seizure of documents relating to "other entities and/or individuals involved in the commission of the Subject Offenses." (Wang Mot. at 8-9). Notwithstanding that "[t]he nature of the crime . . . may require a broad search" where "complex financial crimes are alleged," *United States v. Dupree*, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011), the items complained of here are tightly connected to specific information about the articulated offenses. The purportedly broad language of "other entities and/or individuals" is cabined both by their "involve[ment] in the commission of the Subject Offenses," and by their implied relationship to the nine specific entities that preceded the broader language in this particular category. (Warrant at 7). Wang also seeks to borrow *Wey*'s concern that the warrants in that case "target[ed], in significant measure, the contents of electronic devices, such as computers, internal and external hard drives, and smartphones." (Wang Mot. at 9 (citing *Wey*, 256 F. Supp. 3d at 386-87)). That language in *Wey* is inseparable from its connection to warrants that cited *no* connection to *any* articulated crimes. But where, as here, a warrant's affidavit "supplied probable cause to believe that electronic devices and cellphones were used to communicate to cohorts, ensnare victims, and generally to prepare and orchestrate criminal

18

conduct" and "identified the [electronic-device] items to be searched and seized and linked them to the suspected criminal activity," the "case is easily distinguishable from [*Wey*]." *Ray*, 541 F. Supp. 3d at 391-92 (denying suppression motion for warrant with comparable language about electronic devices).

Wang's other particularity objection is to the Warrant's authorization to seize items that, by their nature, may have been purchased using funds originally sourced from proceeds derived from the Subject Offenses. (Wang Mot. at 9). Left out was that this item's breadth was cabined by its inclusion in a category of "evidence concerning the possession, receipt, use, transfer, or laundering of funds obtained in connection with the Subject Offenses"—a category with a substantial basis in the Complaint's detailed allegations, incorporated into the Affidavit, that Wang "received and transferred fraud proceeds" from at least the time she opened two bank accounts including the name of two different Kwok-related entities from at least in or about 2018, (*see* Compl. ¶¶ 11.a, .b), through a period after her critical role in 2020 in misappropriating $100 million of fraud proceeds into an investment vehicle whose ultimate beneficial owner was Kwok's son (*see id.* ¶¶ 12.a-.c).

Ignoring this clear connection to the Affidavit's probable cause, Wang relies instead on an inapposite First Circuit case. In *Application of Lafayette Academy, Inc.*, 610 F.2d 1 (1st Cir. 1979), an affidavit set forth probable cause to believe an organization had defrauded a specific federal student-loan program (the FISLP) before its warrant authorized "not just a search and seizure of FISLP-related records . . . but a general rummaging for evidence of any type of federal conspiracy or fraud." *Id.* at 3-4. The warrant at issue here, by contrast, did exactly what the *Lafayette Academy* court said was necessary: stating "the precise nature of the fraud and conspiracy offenses for evidence of which the search was authorized." *Id.*; 9*see also* Warrant,

Attachment-2, at II.A (linking "items to be seized" to "a scheme to fraudulently obtain money from victims through false pretenses and misrepresentations and to launder and misappropriate victim funds from in or about 2018 through the present")).

Tellingly, Wang's particularity argument fails to explain how any of the "three components of the particularity requirement" were not "satisfied on the face of the warrant" (or even engage with this clear case law). *See United States v. Margulies*, No. 17 Cr. 638 (JSR), 2019 WL 3080848, at *1 (S.D.N.Y. Jul. 15, 2019) (citing *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013)). The warrant satisfied all three: it identified the specific offenses for which agents had probable cause, it described the place to be searched, and it specified the items to be seized by their relation to the designated crimes. "Nothing more was required." *Margulies*, 2019 WL 3080848, at *1.

Wang's short overbreadth argument—which relies on no cases other than those that set out general standards—is that the Affidavit provided an insufficient basis to authorize the seizure of evidence relating to certain entities (namely, "G Club International Ltd.; G-CLUBS; G-Fashion, G News; G Music; Himalaya Exchange; or GETTR USA, Inc."). (Wang Mot. at 10). In fact, the Affidavit described the web of known and unknown entities connected to the Fraud Scheme and laid out for the issuing judge specifically why evidence relating to them should be seized: based on probable cause that Wang and her co-conspirators executed a Fraud Scheme "that pertains to several companies that are owned or operated by, or otherwise affiliated with," Kwok, Je, and others (Aff. ¶ 9), that Kwok and others "represented that G|CLUBS membership would be a mechanism to obtain stock in KWOK-affiliated companies, including GTV and a company called G|FASHION," (*id.* ¶ 11.c), and that "[Wang] is the New York-based functional head of various of the [Kwok]-affiliated entities that have operated the Fraud Scheme," (*see id.*;

20

*see also id.* ¶ 16.b (chat messages showing that Wang, Kwok, Je, and others discussed "business and other arrangements relating to various of the fraud-related ventures, including GTV and G|Fashion"). *See Andresen v. Maryland*, 427 U.S. 463, 480 n.10 (1976) (approving of warrant's breadth in investigation of "complex real estate scheme whose existence could be proved only by piecing together many bits of evidence" and where "[l]ike a jigsaw puzzle, the whole 'picture' of [the] scheme . . . could be shown only by placing in the proper place the many pieces of evidence that, taken singly, would show comparatively little").

The Warrant satisfied the three components of particularity, and each of its categories of authorized seizures were related back to the particular crimes for which the executing agents had probable cause that was amply laid out for the issuing judge.

### 3.   In the Alternative, the Agents Relied in Good Faith on the Search Warrant

Wang challenges a detailed warrant that incorporates and substantially builds on two related charging instruments that had been filed four and eight days before the Warrant was issued, laying out a long-running, wide-reaching, and interrelated set of schemes to defraud.  The Warrant was signed by the same magistrate judge who issued the related Complaint, and the two documents were sworn by the same agent.  Wang's motion makes no meaningful effort to overcome the good-faith exception that avoids suppression where the evidence at issue was "obtained in objectively reasonable reliance" on a warrant that may later be determined to have legal flaws.  *Leon*, 468 U.S. at 922.  That is not surprising.  Even if the Court accepted certain of Wang's arguments about the Warrant—and it should not—this case does not fit into any of the four narrow circumstances that void the good-faith exception: where the issuing judge was knowingly misled or where he wholly abandoned his judicial role, or where reliance is unreasonable because the application so lacks indicia of probable cause or the warrant is so facially deficient.  *See Clark*, 638 F.3d at 100 (citing

21

*Leon*, 468 U.S. at 922).  Wang does not allege that the Government "knowingly misled" the issuing judge, or that the issuing judge "wholly abandoned" his judicial role.  Her motion states breezily and in passing, with no citation to any purportedly analogous cases, that "other issues with the warrant . . . show why it was unreasonable for the agents to rely on the warrant," (Wang Mot. at 8), and that the warrant's purported overbreadth "provid[es] a further basis to show . . . that the agents' reliance on the warrant was unreasonable," (*id.* at 10).  While it is the Government's burden to establish good faith, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922.  Indeed, the "issuance of [the] warrant by a neutral magistrate . . . creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause." *Golino*, 950 F.2d at 870.

Moreover, there is no dispute that "[t]he agents complied with the terms of the warrant," whose "same terms were included in numerous cases in this Court approving search warrants for electronic devices and financial records." *Ray*, 541 F. Supp. 3d at 395.

The Court should deny Wang's motion to suppress evidence obtained by a warrant that was supported by two related charging instruments and substantial additional probable cause. While the Court need not reach the issue of good faith, there is no question that the executing agents had ample bases reasonably to rely on the Warrant's terms and that this good faith would suffice independently to deny suppression.

## II.  The Defendant's Post-Arrest Statement Should Not be Suppressed

Wang's next motion asks the Court to "[s]uppress [M]s. Wang's [p]ost-[a]rrest [s]tatement" that concerned only "the locations of, and passwords for, electronic devices in the

22

apartment" for which the agents had a judicially authorized warrant.  (Wang Mot. at 11).  In the motion's final sentence, citing no law, Wang broadens the request to suppress "the evidence obtained as a result of the violation—namely, the contents of the phones."  (*Id.* at 13).  To the extent Wang seeks to suppress her statements of her phones' locations and passcodes, the motion is moot, because the Government does not intend to offer those statements in its case-in-chief.  Wang's much broader, last-sentence request has no basis in law, and should be denied.  There is no controlling or persuasive authority (and Wang cites none) for the suppression of the contents of phones seized and searched pursuant to a warrant because an agent asked for their passcodes.

## A.  <u>Applicable Law</u>

In *Miranda*, the Supreme Court "adopted a set of prophylactic measures to protect a suspect's Fifth Amendment right from the inherently compelling pressures of custodial interrogation." *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010) (citation omitted) (internal quotation marks omitted). The Supreme Court has extended *Miranda* to provide that, "when an accused has invoked his right to have counsel present during custodial interrogation . . ., [he] is not subject to further interrogation by the authorities until counsel has been made available to him." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). This "second layer of prophylaxis," *McNeil v. Wisconsin*, 501 U.S. 171, 176–77 (1991), "is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights" and protects "a suspect's voluntary choice not to speak outside his lawyer's presence." *Montejo v. Louisiana*, 556 U.S. 778, 787 (2009) (citation omitted) (internal quotation marks omitted). If the police do subsequently initiate interrogation in the absence of counsel, "the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial." *McNeil*, 501 U.S. at 177. The U.S. Supreme Court

23

has "frequently emphasized that the *Edwards* rule is not a constitutional mandate, but judicially prescribed prophylaxis." *Id*. at 105.

While a violation of the *Edwards* rule will normally result in the suppression of *statements* made by the defendant, this prophylactic rule does not extend beyond the defendant's statements. The fruit-of-the-poisonous-tree analysis does not apply to statements taken in violation of the *Miranda* rules. *See Oregon v. Elstad*, 470 U.S. 298, 304–09 (1985) ("*Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made"). A violation of the prophylactic *Miranda* rule does not require "suppression of the [nontestimonial] physical fruits of the suspect's unwarned but voluntary statements." *United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion); *id*. at 645 (Kennedy, J., concurring) ("nontestimonial"). The same holds true for a violation of the prophylactic *Edwards* rule: when the evidence seized is "physical, nontestimonial evidence, an *Edwards* violation itself would not justify suppression." *United States v. Gonzalez-Garcia*, 708 F.3d 682, 687 (5th Cir. 2013). As the Supreme Court explained in *Patane*, 542 U.S. at 636, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self–Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context."

A defendant's statements are "not automatically involuntary merely because his *Miranda* rights were violated." *Gonzalez-Garcia*, 708 F.3d at 688. Thus, unless the agents, in violation of the Due Process Clause, coerced a defendant into making statements that led to the discovery of physical evidence, the physical evidence itself is admissible. *United States v. Hallford*, 816 F.3d 850 (D.C. Cir. 2016) (citing *Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (plurality opinion)).

"In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (factors include youth of accused, lack of education, low intelligence, lack of any advice of his constitutional rights, length of detention, repeated and prolonged nature of the questioning, and use of physical punishment such as deprivation of food or sleep); *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (evidence of coercion may include "an incapacitated and sedated suspect, sleep and food deprivation, and threats.").

### B. <u>Discussion</u>

The search of Wang's phone was conducted in good faith by FBI agents pursuant to a judicially authorized warrant. The issue raised by Wang, then, is merely whether using the passcode Wang provided, after invoking silence, to access certain phones requires suppression of the content of those phones. It does not. Wang cites no controlling or persuasive authority to the contrary in support of her request to suppress phone contents on *Miranda* grounds. Instead, the law is clear that a purported *Miranda* violation does not permit "suppression of the [nontestimonial] physical fruits of the suspect's unwarned but *voluntary* statements." *United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion) (emphasis added). Even if Wang's statement of her phones' passcodes was obtained inconsistently with *Miranda*'s guidance—and the Government does not concede the point, nor is it necessary to resolve in order to dispose of Wang's motion—her motion still fails because it does not establish that the statements regarding the passcode were involuntary, that the "contents of [her] phones" are their "fruits," or that the fruit-of-the-poisonous-tree doctrine even applies to purported *Miranda* violations (it does not).

First, Wang's affidavit does not even attempt to assert that her provision of her phones'

passcodes was involuntary. *United States v. Taylor*, 745 F.3d 15, 23-24 (2d Cir. 2014) ("voluntariness inquiry should examine 'the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials.')); *cf. Gonzalez-Garcia*, 708 F.3d at 688 (5th Cir. 2013) (defendant's statements "not automatically involuntary merely because his *Miranda* rights were violated"). It alleges nothing about Wang's characteristics or the agents' conduct to suggest that Wang's "will was overborne," *Schneckloth*, 412 U.S. at 226, nor presents any evidence of coercion above and beyond the fact that she was in custody (a threshold requirement necessary for any *Miranda* claim), *Berghuis*, 560 U.S. at 387. Indeed, Wang's affidavit points in the *opposite* direction: by clarifying that she knew how to invoke her rights and remain silent (in response to invitations to make more general statements) and when, instead, to provide certain limited information about items that the agents had warrants to search and seize, Wang's characterization only underscores the voluntariness of her statements about the phones' passcodes. *Cf. United States v. Pinto-Thomaz*, 357 F. Supp. 2d 324, 340 (S.D.N.Y. 2019) (denying suppression, including because defendant "exhibited awareness that he could refuse to answer questions or provide information when he repeatedly refused to provide the passcode to his phone, while answering other questions"). Wang does not allege that she was forced to answer questions, incarcerated for days, subjected to torture, mentally incapable or offered promises such that her will was overborne. *Taylor*, 745 F.3d at 24 (noting that *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998), "rejected a claim that a statement was involuntary, even though the accused claimed that prior to being taken into U.S. custody, he had been incarcerated in Egypt and tortured for ten days."). Wang alleges nothing close to involuntary coercion—just that "agents asked me multiple questions . . . about the locations of, and passwords for, electronic devices, in the apartment," and that she answered. (*See*

26

Dkt. 199, Def. Ex. 4 ¶ 6). This should end the inquiry, because without a finding that the passcode statements were involuntary, there can be no suppression. *Patane*, 542 at 634.

Second, Wang assembles language from a different opinion in *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287 (S.D.N.Y. 2018), for the purported rule that "if, as here, a person in custody 'invoked his right to counsel prior to being questioned concerning his iPhone passcode,' it 'is an *Edwards* violation requiring suppression of the contents of the phone.'" (Wang Mot. at 13 (citing *Pinto-Thomaz*, 352 F. Supp. 3d at 310-11)). But Judge Rakoff's opinion *declined to decide* the question. Instead, the court simply noted that one judge in the Northern District of New York, and one panel of the Court of Appeals for the Armed Forces ("relying in part on the Military Rules of Evidence"), had so held. *See Pinto-Thomaz*, 352 F. Supp. 3d at 311. Contrary to those decisions, and as explained above, the law is clear that the fruit-of-the-poisonous-tree analysis does not apply to voluntary statements taken in violation of the *Miranda* rules. *See Elstad*, 470 U.S. at 304–09. And in fact, more recently, Judge Rakoff—*Pinto-Thomaz*'s author—has stated the law in a manner fatal to Wang's motion: "*Miranda* does not require the exclusion of physical evidence based on a suspect's unwarned but voluntary statements. Further still, even if one assumes that [the defendant's] divulging his password was not just unwarned but also coerced, that would still likely not require suppression. . . . [T]he Court holds the view that being made to produce a phone password—at least, where, as here, there is no real dispute that the person in fact owns the phone and knows its password—does not violate the Fifth Amendment's guarantee against self-incriminating testimony." *United States v. Smith*, No. 22 Cr. 352 (JSR), 2023 WL 3358357, at *2 n.3 (S.D.N.Y. May 11, 2023) (citing *Patane*, 542 U.S. at 637-42 (plurality opinion); *id.* at 644-45 (Kennedy, J., concurring in the judgment); *Fisher v. United States*, 425 U.S. 391, 411 (1976)); *see also, e.g.*, Yale Kamisar, *Postscript: Another Look at* Patane *and* Seibert*, the 2004*

27

Miranda *"Poisoned Fruit" Cases*, 2 Ohio St. J. Crim. L. 97, 113 (2004) ("[T]he most plausible reading" of *Miranda*'s progeny is that "the physical fruits of a *Miranda*-deficient statement are always admissible.").

Finally, Wang's motion simply assumes its predicate that the contents of her phones were the "fruits" of her providing their passcodes to the agents.  But even if this were the relevant inquiry—and, as explained above, it is not—Wang's motion would fail for reasons she neglects to mention or take issue with.  The Court can conclude, based on the Warrant already in the record and without need for an evidentiary hearing, that the Government would inevitably have discovered the phones in the confined space of her Manhattan condominium and likewise would have gained access to the contents of those phones because, as the issuing Magistrate approved, the Warrant authorized the agents to compel Wang's use of the phones' biometrics, *see* Warrant at 9. Indeed, the Government could compel Wang to "press the fingers, including thumbs, of: . . . WANG to the Touch ID sensor of any device(s) found in [the Wang Apartment], or to instruct WANG to remain still, with eyes looking forward at the Face ID sensor of the device(s), . . . for the purpose of attempted to unlock the device(s) via biometric features in order to search the contents as authorized by the warrants."  (Aff. at 22 ¶ 35; *see also id.* at 22 n.5 (citing *United States v. Adams*, No. 15 Cr. 410 (ECF No. 56) (S.D.N.Y. Dec. 22, 2015) (Kaplan, J.) (denying motion to quash grand jury subpoena commanding defendant to appear so that a phone seized from his person and equipped with a facial recognition lock may be unlocked by placing the phone next to his face and activating the facial recognition function))).  *See United States v. Eldarir*, No. 20 Cr. 243 (LDH), 2023 WL 4373551, at *9 (E.D.N.Y. Jul. 6, 2023) (collecting cases and denying suppression on alternatively sufficient ground that "the evidence Defendant seeks to suppress would have been discovered even if, as Defendant argues, he had not been compelled to

unlock the phone"). So too do tools employed by the FBI, which are sometimes able to access cellphones without passcodes.

Wang does not allege that her provision of her phones' passcodes was involuntary, and she cites no authority for the proposition that *Miranda*'s progeny provides a basis to suppress the contents of phones seized and searched pursuant to a warrant. Her motion to suppress her statement of the passcodes is moot as described above, and her motion to suppress the contents of the phones should be denied.

## III. The Defendant's Motion for a Bill of Particulars Should Be Denied

The defendant moves for a number of particulars. Consistent with established law, the Indictment and discovery materials provide the defendant with more than enough factual information to adequately defend against the charges. The motion, which constitutes an improper demand for a preview of the Government's trial evidence and a method to cabin the Government's trial presentation, should be summarily rejected.

### A. <u>Applicable Law</u>

The proper scope and function of a bill of particulars is to provide sufficient information about the nature of the charge to enable a defendant to prepare for trial, to avoid unfair surprise, and to preclude a second prosecution for the same offense. Fed. R. Crim. P. 7(f); *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990), abrogated on other grounds by *United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010); *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam). "A bill of particulars should be required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *Torres*, 901 F.2d at 234.

If the information the defendant seeks "is provided in the indictment or in some acceptable alternate form," no bill of particulars is required. *Bortnovsky*, 820 F.2d at 574. In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also the discovery and other filings by the Government. *See, e.g.*, *United States v. Kazarian,* No. 10 Cr. 895 (PGG), 2012 WL 1810214, at *25 (S.D.N.Y. May 18, 2012) (noting the "enormous amount of discovery material" which "provide [the defendant] with much of the information sought in the request for a bill of particulars"); *United States v. Monserrate*, No. 10 Cr. 965 (CM), 2011 WL 3480957, at *4 (S.D.N.Y. Aug. 4, 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States v. Samsonov*, No. 07 Cr. 1198 (CM), 2009 WL 176721, at *4 (S.D.N.Y. Jan. 23, 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial).

In other words, the defense cannot use a bill of particulars as a general investigative tool, *United States v. Morales*, 280 F. Supp. 2d 262, 274 (S.D.N.Y. 2003), or as a device to compel disclosure of the Government's evidence prior to trial. *United States v. Triana-Mateus*, No. 98 Cr. 958 (SWK), 2002 WL 562649, at *5 (S.D.N.Y. Apr. 15, 2002) (citing *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir. 1974)); *see also United States v. Strawberry*, 892 F. Supp. 519, 526 (S.D.N.Y. 1995). Supplying evidentiary detail is not the function of the bill of particulars. *Torres*, 901 F.2d at 234. Accordingly, the Government is not required to: (a) "particularize all of its evidence," *United States v. Cephas*, 937 F.2d 816, 823 (2d Cir. 1991); (b) disclose the precise manner in which the crimes charged in the indictment were committed, *see Torres*, 901 F.2d at 233-34; or (c) provide the defendant with a preview of the Government's case or legal theory, *see*

*United States v. Muyet*, 945 F. Supp. 586, 598-599 (S.D.N.Y. 1996). The ultimate test is whether the information sought is *necessary*, not whether it is helpful. *See United States v. Conley*, No. 00 Cr. 0816 (DAB), 2002 WL 252766, at *4 (S.D.N.Y. Feb. 21, 2002); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001); *United States v. Taylor*, 707 F. Supp. 696, 699 (S.D.N.Y. 1989); *United States v. Persico*, 621 F. Supp. 842, 868 (S.D.N.Y. 1985).

There are good reasons why bills of particulars are warranted only where the allegations in an indictment, as supplemented by discovery and otherwise, are so general as to render it impossible to prepare a defense. Because a bill of particulars "confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *United States v. Feola*, 651 F. Supp. 1068, 1132 (S.D.N.Y. 1987). "The [G]overnment's presentation of evidence at trial is limited to the particulars contained in the bill, so care must be taken not to overly restrict the government's proof while still protecting the defendant from unfair surprise." *United States v. Mahabub*, No. 13 Cr. 908, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014); *see also Samsonov*, 2009 WL 176721, at *3 (bill of particulars "must not be misused . . . to foreclose the Government from using proof it may develop as the trial approaches").

Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197 (citing *United States v. Cimino*, 31 F.R.D. 277, 279 (S.D.N.Y. 1962)); *United States v. Sindone*, 01 Cr. 517, 2002 WL 48604, at *1 (S.D.N.Y. Jan. 14, 2002) ("The stakes in a criminal case are high, and temptations of perjury, subornation and intimidation are ever present. Accordingly, the government is not required to turn over information that will permit a defendant to preview the government's case and tempt him to tailor proof to explain it away, or see to it that the government's proof is not presented.").

31

Applying these principles, courts in this district routinely deny motions for bills of particulars that are, at bottom, demands for additional details of the manner in which the offense was committed or how the Government intends to prove its case at trial. *See, e.g.*, *United States v. Mitlof*, 165 F. Supp. 2d 558, 569 (S.D.N.Y. 2001) (denying request for bill of particulars identifying "each act of 'fraud, neglect, connivance, misconduct, and violation of law' upon which the Government will base its case," and noting that Government may not be compelled to disclose manner in which it will prove charges, manner in which defendant committed the crime charged, or a preview of Government's evidence or legal theories); *United States v. Leonelli*, 428 F. Supp. 880, 882 (S.D.N.Y. 1977) (rejecting request for bill of particulars regarding the names, dates and places for the entire case as "an attempt to discover the minutia of the Government's case").

B. **Discussion**

The defendant does not need a bill of particulars to defend this case and is not entitled to one as a matter of law. Indeed, much of what the defendant seeks amounts to a request for a presentation of the Government's proof, and much of it is already contained in the Government's disclosures, which the defendant has ample time to review. Rather, it appears the defendant is seeking particulars concerning four topics to improperly "lock the government into its proof," *United States v. Rigas*, 258 F. Supp. 2d 299, 304 (S.D.N.Y. 2003). That is not a proper purpose and, in short, the defendant's requests do not represent an appropriate use of Rule 7(f), and should therefore be denied.

*First*, several of the defendant's requests for particulars are meritless in light of the operative S2 Indictment (the "Indictment"). For instance:

- Wang seeks particulars regarding the fraudulent and fictitious businesses that were interrelated and instrumentalities of the fraud. (Wang Mot. 13-14 (seeking particulars for "[t]he businesses [the S1 Indictment] allege[d] were 'fraudulent [or] fictitious'"; "the entities [the S1 Indictment] allege[d] were 'interrelated'"; "the

32

entities [the S1 Indictment] contend[ed] were 'instrumentalities of the fraud." The
operative Indictment specifically names over 40 entities and organizations that
were part of the Kwok Enterprise. (Indictment ¶ 3.a; *see also id.* ¶ 1).

- Wang also seeks particulars regarding how she enriched herself. (Wang Mot. 13).
  The operative Indictment alleges that Wang "was paid at least approximately
  $500,000 per year, was gifted an approximately $1.1 million-dollar Manhattan
  condominium, and was promised millions of dollars' worth of a purported
  cryptocurrency."[3] (Indictment ¶ 5).[4]

The 49-page, thirteen-count speaking Indictment describes the charged fraud schemes in great
detail. It explains how Kwok led a criminal organization (the "Enterprise") that defrauded
thousands of victims of more than $1 billion from at least in or about 2018 through at least in or
about March 2023, through acts of racketeering activity that include wire fraud, bank fraud, money
laundering, and securities fraud offenses. (Indictment, Dkt. 215 at ¶ 1). The Indictment describes
that the Enterprise perpetrated the fraud using a series of complex fraudulent businesses and
fictitious investment opportunities associated with dozens of interrelated entities controlled by
Kwok, 44 of which are specifically named in the Indictment. (Indictment ¶ 3.a). The Indictment
alleges that Wang operated as the "chief of staff" for the Enterprise. (Indictment ¶ 11). It further
alleges that Kwok, Wang, and their co-conspirators laundered their fraud proceeds through foreign
and domestic bank accounts and entities, layering the fraud proceeds to conceal their source, as
well as using the fraud proceeds to further promote the ongoing fraud, (Indictment ¶¶ 4, 20), and
that they also misappropriated victim funds for their own personal use and for the use of family
members, including for personal investments and the purchase of luxury residences, vehicles, and
goods. (Indictment ¶¶ 5, 16.h, 17.f, 18.h). Wang's requests should be denied based on the

---

[3] Wang's allocation of cryptocurrency was, furthermore, the subject of bail submissions. (*See* Dkt.
42 at 2-3 (discussing evidence indicating Wang was allocated HCN)).

[4] The Complaint charging Wang also described how Wang wired herself over $30,000 of GTV
Private Placement fraud proceeds as a "Director Fee." (Compl. ¶ 13.d).

Indictment (not to mention the extensive discovery and other filings in this case).

*Second*, the requests for particulars relating to the GTV Private Placement are likewise meritless. The requested evidentiary detail includes: (1) how the defendant "conducted the GTV Private Placement," (2) the "purchase[s] and sale[s]" the defendant was involved in or solicited in connection with the GTV Private Placement, (3) which proceeds of the GTV Private Placement were "not used to develop and grow the GTV business," and (4) how the specific $100 million wire transfer cited in the Indictment "was contrary to the PPM representations to prospective GTV investors about how investments in GTV would be used." (Wang Mot. at 20). Wang does not need—and is certainly not legally entitled to—a bill of particular for any of this information. As described in the Indictment, Wang was Kwok's chief of staff, exercising control over entities within the Enterprise, including GTV, of which Wang was named as an Executive Director. (Indictment ¶¶ 11, 13, 16.c). As detailed in the Indictment and Complaint, Wang controlled the bank accounts (held in the name of Saraca) into which GTV investor funds were deposited. (Indictment ¶ 16.f (noting deposits to Saraca, which is beneficially owned by Kwok's family member, Relative-1); Compl. ¶ 11 (describing Wang's control of Saraca bank accounts that received incoming wires referencing the GTV Private Placement from victim investors)). As further described in the Indictment and Complaint, Wang and her co-conspirators misappropriated $100 million of those GTV investor funds. (Indictment ¶ 16.h); Compl. ¶ 12). The Indictment explains that, contrary to representations in the GTV Private Placement memorandum regarding how funds raised through the offering would be spent, the $100 million investment of GTV funds into Fund-1 "was not made 'to strengthen and grow' GTV's business or to benefit GTV, but rather was made for the benefit of Saraca and Relative-1." (Indictment ¶ 16.h). The Indictment's specific allegations—further detailed through the Complaint (and other filings) and discovery—

need not be supplemented by a bill of particulars.

To the extent Wang seeks a line-by-line specification of bank transfers (*i.e.*, stock purchases) involving thousands of victims and hundreds of millions of dollars, such "evidentiary minutiae" is not a proper basis for a bill of particulars—and, in any event, is contained in the bank and financial records produced in discovery and already in the defendant's possession.[5] *United States v. Levy*, 11 Cr. 62 (PAC), 2013 WL 664712, at *4, 13 (S.D.N.Y. Feb. 25, 2013) (in case charging stock manipulation through false representations by corrupt brokers, request for bill of particulars recounting "each specific misrepresentation and omission alleged" denied as "simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars") (citation and quotation marks omitted); *see also, e.g.*, *Bonventre*, 2013 WL 2303726, at *5-*7 (in case involving largest Ponzi scheme in U.S. history, which spanned decades, denying request for bill of particulars identifying, among other things, all "allegedly false records upon which the Government intends to rely to prove its case," "the specific entries [in specific books and records] that the Government alleges [the defendants] knew were false," "the specific arbitrage trades in which [a defendant] was involved that the Government alleges are fraudulent," the "dates and stock names for all alleged backdated transactions," and "all unnamed clients and allegedly fake trades referred to in" a particular count).  Wang's suggestion that such particulars are justified due to extraterritoriality concerns (*see* Wang Mot. 19-20) is baseless; the conduct and financial transactions took place in the United States.  (*See, e.g.*, Compl. ¶ 11 (detailing receipt

---

[5] Relatedly, Wang seeks particulars regarding "the transfers" the Indictment "contends were illegal," citing the S1 Indictment's paragraph 3, which is (in substance) now the S2 Indictment's paragraph 4.  (Wang Mot. 14 & n.15).  That paragraph of the Indictment refers to the laundering of over a billion dollars through over "500 accounts held in the names of at least 80 different entities or individuals."  (Indictment ¶ 4).  As noted above, a bill of particulars for such voluminous financial record evidence is plainly unwarranted.

and transfer of fraud proceeds via bank headquartered in Manhattan)). To the extent Wang seeks

merely to try to restrict the Government's presentation of evidence at trial, that likewise is not a

proper basis for a bill of particulars. *See, e.g.*, *Mitlof*, 165 F. Supp. 2d at 569; *Mahabub*, 2014 WL

4243657, at *2; *Samsonov*, 2009 WL 176721, at *3.

As numerous courts have found, where specific examples are offered, as here, the

Government need not produce a bill of particulars containing an inventory of every act it plans to

prove that constituted part of the fraud.

*Third*, the defendant's request for particulars regarding the identities and locations of

victims, *including whether those victims will be trial witnesses*, is plainly improper. (*See* Wang

Mot. 14). Details regarding victims are not properly within the scope of a bill of particulars,

particularly where, as here, the discovery materials already contain that information. *See, e.g.,*

*United States v. Russo*, 483 F. Supp. 2d 301, 311 (S.D.N.Y. 2007) (identification of particular

"investors" referenced in the indictment was beyond the scope of a bill of particulars); *United*

*States v. Fea*, No. 10 CR. 708 (PKC), 2011 WL 2119708, at *2 (S.D.N.Y. May 24, 2011) (denying

bill of particulars request seeking identities of victims in loansharking case, where discovery

materials already contained victim information); *United States v. Gall*, No. 95 Cr. 98 (AHN), 1996

WL 684404, at *7 (D. Conn. Aug. 12, 1996) (denying bill of particulars request demanding

identities of insurance fraud victims and "the manner in which the financial statements [the

defendant] submitted to insurance companies and state agencies were false"). Further, a bill of

particulars is clearly not a mechanism to obtain early disclosure of the Government's witness list,

regarding victims or any other potential witnesses. This request is improper and should be rejected.

*Finally*, the defendant's argument that the volume of discovery favors a bill of particulars

is without merit. In fact, the opposite is true. As an initial matter, comprehensive discovery has

36

often been cited by courts in denying motions for a bill of particulars because the discovery

provides defendants with more than sufficient information to prepare for trial. *See Kazarian,* 2012

WL 1810214, at \*25; *Monserrate*, 2011 WL 3480957, at \*4; *Samsonov*, 2009 WL 176721, at \*4;

*United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (the "mere existence of a

'mountain of documents' does not entitle" a defendant to a bill of particulars).

      While the Government has produced a significant amount of material to the defendants, it

is not an unusual quantity of discovery in a fraud case such as this one and, as noted above, the

defendant has ample time to review it. Indeed, while the defendant points out that the Government

produced the contents of approximately 100 or more electronic devices, she omits the fact that

approximately 50 of those devices are her own electronic devices. Courts in this Circuit have

routinely denied motions for a bill of particulars premised on the fact that discovery is voluminous,

especially in situations where the defendants have had (or will have) many months to review it.

*See, e.g.*, *United States v. Wey*, No. 15 Cr. 611 (AJN), 2017 WL 237651, at \*21 (S.D.N.Y. Jan. 18,

2017) ("[T]he discovery volume alone simply does not necessitate a bill of particulars."); *Levy*,

2013 WL 664712, at \*13 (denying request for bill of particulars based on amount of discovery and

noting that "[w]hile the Court may sympathize with counsel's task of reviewing a large quantity

of materials that continue to be produced by the Government, the applicable Indictment was filed

almost eight months ago, and counsel has had the opportunity to review discovery materials as the

Government has produced them"). This case is no different.

      The authorities relied upon by the defendants compelling the Government to identify

particular transactions or false representations contained in voluminous discovery are inapposite.

For example, the defendant relies on *Bortnovsky*, 820 F.2d at 575, a RICO insurance fraud case in

which the Government did not identify before trial which of the fifteen burglaries and four

thousand documents were alleged to have been fabricated. At trial the Government ultimately alleged that only four burglaries and only three of four thousand documents were false. The Second Circuit found that, under these circumstances, the burden had impermissibly shifted to the defendants, who were "forced to explain the events surrounding eight actual burglaries and to confront numerous documents unrelated to the charges pending." *Id.* at 574-75. Not so here. This is not a case where the Government intends to prove that only certain discrete transactions were fraudulent but fails to identify such transactions, creating a needle-in-a-haystack problem for the defendant. In addition to conspiracy charges, for which bills of particular are routinely denied,[6] the Government has charged four related fraud schemes (relating to GTV, the Farm Loan Program,

---

[6] "[D]emands for particular information with respect to where, when, and with whom the Government will charge the defendant with conspiring are routinely denied." *Trippe*, 171 F. Supp. 2d at 240 (collecting cases); *see, e.g., United States v. Barrera*, 950 F. Supp. 2d 461, 478 (E.D.N.Y. 2013) ("As a general rule, a defendant is not entitled to receive details of the government's conspiracy allegations in a bill of particulars."); *United States v. Wilson*, 493 F. Supp. 2d 364, 372 (E.D.N.Y. 2006) (same, denying motion for a bill of particulars as to the dates on which the defendant and his co-conspirators joined the charged conspiracy); *Rivera*, 2017 WL 1843302, at *3 (citing *Torres*, 901 F.2d at 233-34 (affirming denial of bill of particulars about when defendant was "alleged to have joined" the conspiracy, the identities of co-conspirators and the "precise dates and locations" of overt acts)); *United States v. Nachamie*, 91 F. Supp. 2d 565, 575 (S.D.N.Y. 2000) (defendant not entitled to particulars regarding his participation in submission of false Medicare claims, including manner in which he caused such claims to be submitted); *United States v. Mittal*, No. 98 Cr. 1302, 1999 WL 461293, at *9 (S.D.N.Y. July 7, 1999) ("[C]ourts have consistently rejected demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant or confederate.") (citing cases); *United States v. Johnson-Guzman*, No. 98 CR. 350 (RWS), 1998 WL 730327, at *7 (S.D.N.Y. Oct. 16, 1998) ("With respect to conspiracy charges in particular, since the Government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme, and as the circumstantial proof on which the government usually relies to prove the existence of a scheme often does not reveal such details, the courts have consistently rejected demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant or confederate."); *United States v. Perez*, 940 F. Supp. 540, 552 (S.D.N.Y. 1996) (government not required to specify particular acts in which defendants alleged to have "participated in, had knowledge of, or are being held responsible for") (citations omitted).

G|CLUBS, and the Himalaya Exchange) in a lengthy speaking Indictment and produced detailed discovery regarding those schemes.

Equally unhelpful to the defendant is *United States v. Savin*, No. 00 Cr. 45 (RWS), 2001 WL 243533 (S.D.N.Y. 2001), which is also cited by the defendant. In *Savin*, the indictment alleged that an investment advisor had misappropriated client funds over a six-year period through "an unspecified series of 'intercompany transfers' without identifying the amounts, dates, means, corporate entities, or co-conspirators involved." *Id.* at *3. Because the Government had produced voluminous documents evidencing fund transfers without specifying which transfers were alleged to be improper, the court granted in part a bill of particulars request. *Id.* at *2. By contrast, here the Government has identified specific fund transfers that it alleges constitute misappropriation, including by date, entity involved, beneficiary, and items purchased with the funds. (*See, e.g.*, Indictment ¶¶ 4, 5, 16.h, 17.f, 18.h, 24, 25). Other authorities cited by the defendants are of the same ilk, and thus not on point here. *See, e.g.*, *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (bill of particulars should have been ordered to identify the companies defendant was alleged to have extorted as part of a RICO scheme, when he was indicted for extortionate schemes directed at one company but confronted at trial with evidence of extortions aimed at entirely different companies).

Simply put, the defendant has before her extensive information about the alleged fraud scheme and how it will be proven. Courts routinely find such information and discovery is sufficient for defendants to prepare for trial, and the defendant has a substantial amount of time to review it. In these circumstances, a burdensome bill of particulars effectively seeking disclosure of the Government's trial evidence is neither necessary nor appropriate.

**IV.  A Severance Is Not Warranted**

Far from rebutting the strong and well-settled presumption that defendants indicted together should be tried together, Wang's motion to sever rests on a misapprehension of the evidence and the Government's allegations concerning her conduct.  It is not correct that "the overwhelming majority of [discovery] has nothing at all to do with the allegations against Ms. Wang."  (Wang Mot. at 22).  To the contrary, the Government's investigation, the produced discovery, and as the Government will prove at trial, Wang was intimately involved in every aspect of the charged offenses.  (*See* Indictment ¶ 11 ("WANG has held titles in, and exercised control over, a variety of entities that were part of the Kwok Enterprise and instrumentalities of the fraud described herein."); *id*. ("WANG has worked for KWOK . . . and has operated as a "chief of staff" for KWOK and the Kwok Enterprise")).  Indeed, the trial evidence and witnesses against Kwok and Wang are virtually identical.  It was Wang who implemented Kwok's directions and ensured the Kwok Enterprise operated for Kwok's, and her own, benefit.  Wang was a part of all aspects of the Kwok Enterprise—severing trial would severely undermine judicial economy, require witnesses and victims to testify twice, and provide one defendant an unjust advantage of going second.  Because the defendant has not overcome the presumption in favor of joinder—a presumption that is especially strong here because "the defendants are alleged to have participated in a common plan or scheme"—her motion for severance should be denied.  *United States v. Fazio*, 770 F.2d 160 (2d Cir. 2014) (quoting *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998)).

**A.  Applicable Law**

Rule 8 of the Federal Rules of Criminal Procedure provides, in pertinent part:

> (a) Joinder of Offenses.  The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or

> transaction, or are connected with or constitute parts of a common scheme or plan.
>
> (b) Joinder of Defendants.  The indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses.  The defendants may be charged in one or more counts together or separately.  All defendants need not be charged in each count.

Rule 14 of the Federal Rules of Criminal Procedure permits severance of properly joined charges or defendants, at the discretion of the trial court, to avoid prejudice to a defendant or the Government.

Under Rule 8, "[t]here is a preference . . . for joint trials of defendants who are indicted together."  *Salameh*, 152 F.3d at 115 (quoting *Zafiro v. United States*, 506 U.S. 534, 537 (1993)); *see United States v. Miller*, 116 F.3d 641, 679 (2d Cir. 1997).  "This preference is particularly strong where . . . the defendants are alleged to have participated in a common plan or scheme." *See Salameh*, 152 F.3d at 115; *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991); *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).  As the Supreme Court has explained:

> Many joint trials—for example, those involving large conspiracies to import and distribute illegal drugs—involve a dozen or more co-defendants. . . . It would impair both the efficiency and the fairness of the criminal justice system to require . . . that prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendants who have the advantage of knowing the prosecution's case beforehand. . . .  Even apart from these tactical considerations, joint trials generally serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.

*Richardson v. Marsh*, 481 U.S. 200, 210 (1987); *see also United States v. Zafiro*, 945 F.2d 881, 886 (7th Cir. 1991) (joint trials reduce not only litigation costs but also "error costs," *i.e.*, the costs associated from depriving the jury of making its determinations based on "the full picture"), *aff'd*, 506 U.S. 534 (1993).

41

Simply put, there is a strong and well-settled presumption that defendants who are indicted together will be tried together. *See, e.g.*, *Zafiro*, 506 U.S. at 537; *United States v. Blount*, 291 F.3d 201, 209 (2d Cir. 2002); *United States v. Diaz*, 176 F.3d 52, 102 (2d Cir. 1999). Given this presumption, the "prejudice" standard is difficult to satisfy. Indeed, if a particular defendant is somehow prejudiced by joinder, that prejudice must be "sufficiently severe [as] to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *United States v. Lanza*, 790 F.2d 1015, 1019 (2d Cir. 1986) (quoting *United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir. 1984)). Thus, under the Supreme Court's decision in *Zafiro*, a discretionary severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539.

In conspiracy cases, the Court's evaluation of the potential for substantial prejudice must take into account that once a defendant is a member of a conspiracy, "all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by co-defendants, is admissible against the defendant." *Salameh*, 152 F.3d at 111. As such, the mere fact that evidence may be admitted concerning acts, even violent acts, committed by joined defendants is not, standing alone, sufficient to warrant severance. "The fact that one of several codefendants is tried for a crime not committed by another codefendant does not, without more, create the sort of miscarriage of justice that would require [severance]." *United States v. Hernandez*, 85 F.3d 1023, 1029 (2d Cir. 1996); *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008) ("[T]he fact that evidence may be admissible against one defendant but not another does not necessarily require a severance.") (quoting *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)). Further, even when the "risk of prejudice is high . . . less drastic measures—such as limiting instructions—often suffice as an

alternative to granting a Rule 14 severance motion." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003); *see also Zafiro*, 506 U.S. at 538-39 ("Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion.").

Because of the preference for joint trials of defendants indicted together, and the discretion afforded to district courts in addressing any potential prejudice, a defendant seeking review of denial of severance under Rule 14 bears an "extremely difficult burden," *United States v. Casamento*, 887 F.2d 1141, 1149-50 (2d Cir. 1989) (quotation omitted), of showing that he was so prejudiced by the joinder that he suffered a "miscarriage of justice" or was denied a constitutionally fair trial. *See United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993) ("A motion for severance is committed to the sound discretion of the district court, and its disposition is virtually unreviewable on appeal.").

## B. **Discussion**

Wang and Kwok are charged in the same eleven counts of the same indictment for participating in the same racketeering enterprise—the Kwok Enterprise—and committing the same massive fraud against the same victims and concealing the same proceeds through the same money laundering conspiracy.[7] At trial, the Government intends to prove their guilt by relying on much of the same evidence introduced through many of the same witnesses. It follows that a single trial preserves judicial resources, avoids the expense and inconvenience to witnesses who would otherwise have to testify twice, avoids the inequity of allowing one defendant to preview the

---

[7] The S2 Indictment contains thirteen counts. Wang is charged in Counts One through Ten and Twelve. Kwok is charged in Counts One through Twelve. The only counts that Wang is not charged in are Count Eleven (relating to the Himalaya Exchange wire fraud) and Count Thirteen (charging Je with obstruction of justice).

Government's case, and "serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." *Richardson*, 481 U.S. at 210; *see also Zafiro*, 945 F.2d at 886.

To the extent that Wang's motion suggests otherwise, her arguments either rely on a now-outdated indictment or misapprehend the evidence. But even under the prior superseding indictment, and certainly under the now-operative Indictment, Wang was involved in every aspect of the Kwok Enterprise including, for example, the GTV Private Placement, the Farm Loan Program, G|CLUBS, and the Himalaya Exchange. Indeed, even though not charged with the substantive wire fraud charge pertaining to the Himalaya Exchange, the Government will show at trial that Wang's involvement in the conspiracy included interviewing personnel for the Himalaya Exchange, among other acts in furtherance of the Kwok Enterprise. Simply put, Wang is an integral part of the Kwok operation and to prove that is so, the Government will introduce much of the same witnesses and the same evidence against both Kwok and Wang. If Wang and Kwok were to be tried separately, much of this evidence establishing the existence and operations of the Kwok Enterprise would be presented twice, to two different juries, resulting in needless duplication and inefficiencies—a wasting of resources that would be especially acute given that trial is anticipated to last approximately two months.

Wang contends a severance is appropriate because she received fewer personal benefits than Kwok. The Indictment does allege that Wang financially benefited from the Kwok Enterprise, (Indictment ¶ 5), but even if Wang had received no financial benefits, that discrepancy would still fall far short of carrying the heavy burden of establishing that Wang "will be so severely prejudiced by a joint trial that it would in effect deny h[er] a fair trial." *United States v. An-Lo,* 851 F.2d 547, 556 (2d Cir. 1988) (quoting *United States v. Rucker,* 586 F.2d 899, 902 (2d Cir. 1978)).

44

Next, Wang contends that she may suffer "spill over prejudice" because of Kwok's "prolific online presence." (Wang Mot. at 26). This claim misses the mark. Kwok's statements (and Wang's) are evidence that is properly introduced against both Kwok and Wang as co-conspirator statements.[8] Moreover, there is no spillover prejudice. Both Kwok and Wang are changed with the same basic conduct: perpetrating a massive fraud against the same victims. This is not a situation where Kwok's conduct is any more sensational than Wang's—they both committed the same financial fraud. There is no risk of spill over prejudice.

Finally, Wang posits that she "may" have conflicting defenses from Kwok at trial, but Wang does not state what the conflicting defenses are. Thus, this argument is nothing more than speculative. Even if it were not, a defendant is "not entitled to severance [under Rule 14] merely because [he] may have a better chance of acquittal in [a] separate trial[]." *Zafiro*, 506 U.S. at 540.[9] Nor is a defendant entitled to severance simply because the evidence against a co-defendants is more damaging or voluminous than the evidence against them. *See, e.g.*, *Spinelli*, 352 F.3d at 55. Indeed, "joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *Locascio*, 6 F.3d at 947. In any event, under well-established precedent, the fact that the trial will involve evidence of Kwok statements that

---

[8] Wang's assertion that all such statements must be specified "well before trial" is a backdoor attempt at a bill of particulars—which, as discussed above, is meritless. Moreover, a great many of Kwok's statements are cited in the Indictment, and other legal process provided to the defendants. And all such statements have been produced in discovery.

[9] The premise that a joint trial is more prejudicial to a less culpable defendant is not a universal truth. *See Marsh*, 481 U.S. at 210 (1987) ("Joint trials generally serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability – advantages which sometimes operate to the defendant's benefit.").

were in furtherance of the conspiracy in which Wang actively participated with a leadership role

does not even approach the level of potential prejudice that would support severance.[10]

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Wang's motions.


Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
Justin Horton
Juliana N. Murray
Ryan B. Finkel
Micah F. Fergenson
Assistant United States Attorneys
212-637-2276/-2314/-6612/-2190

---

[10] Wang's attempt to use the Government's motion to disqualify her former counsel as evidence of conflicting defenses fails. That conflict was about the former counsel's possession of confidential Government information. That is of no moment, as that lawyer is no longer Wang's counsel and her current counsel has no such conflict.