**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA,

     v.

YANPING WANG,

          Defendant.

23 Cr. 118-3 (AT)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**<u>DEFENDANT YANPING WANG'S PRE-TRIAL MOTIONS</u>**

Brendan F. Quigley
Sarah Reeves
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, N.Y. 10112
212 408 2520
brendan.quigley@bakerbotts.com

*Attorneys for Yanping Wang*

## **<u>TABLE OF CONTENTS</u>**

I.  The Court Should Grant the Motion to Suppress Evidence Seized from Ms. Wang's Apartment ................................................................................................................ 1

    A.  The Warrant Application Failed to Provide Probable Cause That Evidence of a Crime Would Be Found in Ms. Wang's Apartment ................................................ 2

    B.  The Warrant's Overbreadth and Lack of Particularity Compounded the Lack of Probable Cause; the Fourth Amendment Does Not Have a Special "Complex Investigations" Exception or Doctrine ................................................................... 8

    C.  The Good Faith Exception Does Not Apply ........................................................ 13

II.  The Court Should Grant Ms. Wang's Motion to Suppress Statements ........................... 16

III.  The Court Should Grant Ms. Wang's Motion for a Bill of Particulars............................ 20

IV.  The Court Should Grant Ms. Wang's Motion for Severance .......................................... 25

    A.  Severance is Appropriate ..................................................................................... 26

    B.  The Opposition's Arguments Simply Highlight the Need for Severance............. 28

CONCLUSION....................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<span style="font-variant: small-caps;">CASES</span>

*Edwards v. Arizona*,
    451 U.S. 477 (1981)......................................................................................................17, 18, 19

*In re 650 Fifth Ave. & Related Properties*,
    934 F.3d 147 (2d Cir. 2019).....................................................................................19, 20

*Michigan v. Mosley*,
    423 U.S. 96 (1975)..............................................................................................................18

*Miranda v. Arizona*,
    384 U.S. 436 (1966)......................................................................................................17, 19

*Payton v. New York*,
    445 U.S. 573 (1980)..............................................................................................................1

*Riley v. California*,
    573 U.S. 373 (2014)...............................................................................................7, 9, 18, 19

*S.E.C. v. Zandford*,
    535 U.S. 813 (2002)............................................................................................................24

*Silverman v. United States*,
    365 U.S. 505 (1961)..............................................................................................................9

*United States v. Alexander*,
    888 F.3d 628 (2d Cir. 2018)..............................................................................................9

*United States v. Bertini*,
    No. 23 Cr. 61 (PGG), 2023 WL 8258334 (S.D.N.Y. Nov. 29, 2023) ....................1, 2, 5, 6, 13

*United States v. Boles*,
    914 F.3d 95 (2d Cir. 2019)................................................................................................6

*United States v. Bortnovsky*,
    820 F.2d 572 (2d Cir. 1987).............................................................................................21

*United States v. Buck*,
    813 F.2d 588 (2d Cir. 1987).............................................................................................11

*United States v. Clark*,
    638 F.3d 89 (2d Cir. 2011)................................................................................................6

*United States v. Davidoff,*
    845 F.2d 1151 (2d Cir. 1988) .......................................................................21, 23, 24

*United States v. Dupree,*
    781 F. Supp. 2d 115 (E.D.N.Y. 2011) ........................................................................10

*United States v. Eiland,*
    No. 18-Cr. 3154, 2019 WL 2724077 (D. Neb. July 1, 2019) ...................................19

*United States v. Galpin,*
    720 F.3d 436 (2d Cir. 2013) .................................................................................1, 11

*United States v. Garcia,*
    No. 3:20-CR-00058 (KAD), 2023 WL 4850553 (D. Conn. July 28, 2023) ...............6, 8, 9, 14

*United States v. Gatto,*
    313 F. Supp. 3d 551 (S.D.N.Y. 2018) ..........................................................................8

*United States v. Gilkeson,*
    431 F. Supp. 2d 270 (N.D.N.Y. 2006) ........................................................................19

*United States v. Gomez,*
    652 F. Supp. 461 (E.D.N.Y. 1987) ...............................................................................5

*United States v. Griffith,*
    867 F.3d 1265 (D.C. Cir. 2017) ..........................................................................14, 15

*United States v. Gupta,*
    747 F.3d 111 (2d Cir. 2014) ........................................................................................29

*United States v. Key,*
    No. 12 Cr. 712 (SHS), 2013 WL 12204221 (S.D.N.Y. Aug. 28, 2013) ....................26

*United States v. Leon,*
    468 U.S. 897 (1984) .......................................................................................................2

*United States v. Mitchell,*
    76 M.J. 413 (C.A.A.F. 2017) ......................................................................................19

*United States v. Moran,*
    349 F. Supp. 2d 425 (N.D.N.Y. 2005) ..........................................................................6

*United States v. Patane,*
    542 U.S. 630 (2004) .....................................................................................................17

*United States v. Pinto-Thomaz,*
    352 F. Supp. 3d 287 (S.D.N.Y. 2018) ........................................................................19

*United States v. Raymonda*,
    780 F.3d 105 (2d Cir. 2015).............................................................................13

*United States v. Regan*,
    706 F. Supp. 1102 (S.D.N.Y. 1989).................................................................10

*United States v. Reilly*,
    76 F.3d 1271, 1280 (2d Cir. 1996)..................................................................13

*United States v. Rosa*,
    626 F.3d 56 (2d Cir. 2010)..............................................................................16

*United States v. Smith*,
    No. 22-CR-352 (JSR), 2023 WL 3358357 (S.D.N.Y. May 11, 2023) ...................19

*United States v. Tournant*,
    No. 22 Cr. 276 (LTS), 2023 WL 8649893 (S.D.N.Y. Dec. 13, 2023).........................21, 22, 23

*United States v. Ukhuebor*,
    No. 20 Mag. 1155 (LDH), 2021 WL 1062535 (E.D.N.Y. Mar. 19, 2021)...............8

*United States v. West*,
    520 F.3d 604 (6th Cir. 2008) ............................................................................6

*United States v. Wey*,
    256 F. Supp. 3d 355 (S.D.N.Y. 2017)...........................................................9, 13, 14

*United States v. Williams*,
    592 F.3d 511 (4th Cir. 2010) ..........................................................................11

*United States v. Yu*,
    No. 22 Cr. 208 (CBA), 2023 WL 4687970 (E.D.N.Y. July 21, 2023) ...............7, 8

*United States v. Zemlyansky*,
    945 F. Supp. 2d 438 (S.D.N.Y. 2013)..............................................................12

*Ybarra v. Illinois*,
    444 U.S. 85 (1979)............................................................................................1

*Zafiro v. United States*,
    506 U.S. 534 (1993)........................................................................................26

*Zurcher v. Stanford Daily*,
    436 U.S. 547 (1978).........................................................................................6

OTHER AUTHORITIES

Yale Kamisar, *Postscript: Another Look at* Patane *and* Seibert*, the 2004* Miranda *"Poisoned Fruit" Cases*, 2 Ohio St. J. Crim. L. 97, 105 n.42 (2004) ........................................18

Defendant Yanping Wang respectfully submits this memorandum in further support of her pre-trial motions and in reply to the government's opposition ("Opposition" or "Opp'n").

## I.   <u>The Court Should Grant the Motion to Suppress Evidence Seized from Ms. Wang's Apartment</u>

The Court should suppress the evidence seized from Ms. Wang's apartment (the "Apartment").

"The chief evil that prompted the framing and adoption of the Fourth Amendment was the 'indiscriminate searches and seizures' conducted by the British 'under the authority of general warrants.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Payton v. New York*, 445 U.S. 573, 583 (1980)). "To prevent such general, exploratory rummaging in a person's belongings and the attendant privacy violations, the Fourth Amendment provides that a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Id.* (quotations and citations omitted). Further, that probable cause showing must be based on "particularized facts," *United States v. Bertini*, No. 23 Cr. 61 (PGG), 2023 WL 8258334, at *9 (S.D.N.Y. Nov. 29, 2023) (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)) (internal quotations omitted)), not generalized conclusions or speculation.

Tellingly, and disappointingly, in arguing that the warrant to search Ms. Wang's Apartment complied with these well-settled principles, the Opposition *repeatedly* mischaracterizes and misstates the evidence that was put before the magistrate judge. For example, the Opposition, incredibly, ***misrepresents*** the contents of one of few sentences in the entire 77-page search warrant affidavit (the "Affidavit") that actually does reference the Apartment, getting confused between a ███████████████████████████████████████." And, as discussed in more detail below, the contents of other portions of the Opposition mischaracterize and materially overstate what the Affidavit actually said.

1

Further, while the magistrate judge's finding is entitled to "deference," that "deference . . . does not, of course, preclude this Court from 'properly conclud[ing] that . . . [a] warrant was invalid because the magistrate's probable-cause determination reflected an improper analysis of the totality of circumstances.'" *Bertini*, 2023 WL 8258334, at *4 (S.D.N.Y. Nov. 29, 2023) (quoting *United States v. Leon*, 468 U.S. 897, 915 (1984)). This Court can and should reach that conclusion here: the "totality of circumstances" show that the Affidavit failed to establish probable cause that evidence of a crime would be found at Ms. Wang's Apartment and the resulting search warrant ("the Warrant") was both insufficiently particularized and overbroad. As such, the Court should suppress the evidence seized from the Apartment.

### A. The Warrant Application Failed to Provide Probable Cause That Evidence of a Crime Would Be Found in Ms. Wang's Apartment

Here, the Affidavit failed to provide probable cause that evidence of a crime would be found in the Apartment, and the Magistrate Judge respectfully had no substantial basis to conclude otherwise. Nothing in the Affidavit suggested that criminal activity was afoot in the Apartment, the Opposition confuses the "distinct" inquiries of probable cause to arrest a person and probable cause to search their home, and the conclusory allegations in the Affidavit regarding the use of cellphones did not provide probable cause for the broad, sweeping search authorized by the Warrant.

### 1. The Warrant Application Contained No Particularized Facts Regarding Criminal Activity in the Apartment

Here, there can be no dispute that the Affidavit—which was used to support searches of both Mr. Kwok's apartment and Ms. Wang's apartment—failed to contain any "particularized facts" concerning criminal activity (or really *any* activity) in Ms. Wang's Apartment. None. While the government's opposition goes on for pages about the *allegations* in the Indictment (in which

Ms. Wang was not charged), the Complaint, and "18 paragraphs and subparagraphs" in the Affidavit, Opp'n at 14, those documents say nothing about potential criminal activity in Ms. Wang's Apartment, much less tie Ms. Wang to any specific event occurring after mid-2020, almost three years before the warrant application.

Indeed, the "paragraphs and subparagraphs" in the Affidavit that the Opposition is apparently relying on do not even mention the Apartment and barely mention Ms. Wang. Indeed, the Opposition **_misstates_** what these paragraphs say, citing paragraphs 11 and 12 of the Affidavit as providing evidence that "Wang personally participated in the receipt, transfer, and misappropriation of the Fraud Scheme's proceeds." Opp'n at 15.

Wrong. While █████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████████

Similarly, the other "paragraphs and subparagraphs" the government is apparently relying on barely mention Ms. Wang at all, much less the Apartment. ███████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████

Finally, in discussing Affidavit paragraph 19, which contains the only three sentences in the 77-page Affidavit that deal in any substantive way with the Apartment,[1] the Opposition gets it wrong. The Opposition asserts that paragraph 18 states that "Wang's name appeared on purchase records for the apartment in February 2020," i.e., over three years before the Affidavit, and "mail records indicated Wang *had received a package at the apartment . . . in February 2023*." Opp'n at 14 (emphasis added). That is not what the Affidavit said. ███████████████████████████

---

[1] ████████████████████████████████████████████████████████
██████████████████████   Affidavit ¶¶ 4-5.

4

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████

In short, notwithstanding the Opposition's repeatedly misstating the contents of the "paragraphs and subparagraphs" of the Affidavit it cites, it cannot be seriously disputed that the Affidavit contained no facts indicating that criminal activity, much less recent criminal activity, had been afoot at the Apartment.

> **2. Probable Cause to Arrest is "Distinct" from Probable Cause to Search a Premises, and the Allegations Concerning Ms. Wang's Involvement in a Crime Were Dated and Non-Particularized**

Further, even though the Affidavit incorporated the criminal complaint charging Ms. Wang and the Indictment charging Mr. Kwok and Mr. Je (but not Ms. Wang), these materials do not provide probable cause to search the Apartment.

*First,* the Indictment is completely irrelevant to the probable cause analysis concerning both Ms. Wang and the Apartment. The Indictment says nothing about the Apartment and does not reference Ms. Wang by name. Moreover, in returning an indictment against Mr. Kwok and Mr. Je, the grand jury obviously did not make *any* probable cause finding as to Ms. Wang. And even if the Indictment alleges a conspiracy that occurred "through 2023," it contains no particularized facts as to anyone in 2023.

*Second*, as to the Complaint, the government relies heavily on the idea that there was probable cause to believe Ms. Wang had committed a *crime.* But this is a "distinct" inquiry from whether there was probable cause to believe evidence of that crime would be found in her home, and "the existence of probable cause to arrest will not necessarily establish probable cause to search." *Bertini*, 2023 WL 8258334, at *5 (S.D.N.Y. Nov. 29, 2023) (citing *United States v.*

*Gomez*, 652 F. Supp. 461, 462 (E.D.N.Y. 1987)). The "required nexus" between the items sought

and the place to be searched "protects against the issuance of general warrants." *Id.* (quoting *United*

*States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011)) (suppressing evidence seized pursuant to a

warrant); *see also United States v. Garcia*, No. 3:20-CR-00058 (KAD), 2023 WL 4850553, at *7

(D. Conn. July 28, 2023) ("[T]he relevant inquiry to the issuing judge in determining whether

probable cause existed was not whether there was a fair probability that [the suspect] committed a

crime, but whether 'there [was] a fair probability that contraband or evidence of a crime will be

found *in a particular place*.'") (citing *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019))

(emphasis added in original) (suppressing evidence seized pursuant to warrant).[2]

And here, that distinction is critical because the only particularized facts concerning Ms.

Wang's involvement in any criminal activity date to 2020, almost three years before the Affidavit

and are completely untethered to the Apartment. Indeed, while the Complaint contains a single

reference to a conspiracy occurring "up to and including at least in or about March 2023,"

Complaint ¶ 1, it contains no *facts* concerning *any* events that occurred after mid-2020.[3] The mere

conclusory reference to "in or about March 2023" is insufficient.[4]

---

[2] *Accord Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."); *United States v. Moran*, 349 F. Supp. 2d 425, 476 (N.D.N.Y. 2005) ("merely connecting [the defendant] to the . . . conspiracy is an insufficient basis for finding probable cause to search [her] residence").

[3] The Opposition admits that the Complaint "focused on . . . events in 2020." Opp'n at 13.

[4] *See, e.g.*, *United States v. West*, 520 F.3d 604, 609 (6th Cir. 2008) ("In order to be able to properly determine whether probable cause exists sufficient to issue a warrant, the magistrate must be presented with an affidavit containing adequate supporting facts about the underlying circumstances, either from the direct knowledge of the affiant or from reliable hearsay information; bare conclusions are not enough.").

In short, to the extent they concern Ms. Wang at all, the charging instruments attached to the Affidavit contain no particularized facts tying Ms. Wang to any recent criminal activity and no facts at all concerning the Apartment.

### 3. Generalized Allegations Regarding the Use of Cellphones—on Unspecified Dates—Are Insufficient

Finally, to support the existence of probable cause, the government relies on general allegations concerning the use of cellphones. Taken to its logical end, and given the ubiquity of smart phones in modern society,[5] the government's argument here would destroy the distinction between probable cause to believe a person committed a crime and probable cause to search. Moreover, here, the government relies on this argument not just in support of an application to search a particular cellphone it could link to particular calls, chats, or messages, but to execute what was essentially a general rummaging through Ms. Wang's Apartment, authorizing it to seize all electronic devices in the Apartment (not just cellphones) plus numerous other facially innocuous items such as "jewelry" and "furnishings," among others.

While FBI agent stated in the ███████████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████ Affidavit ¶ 16, he provided no particularized facts about when these messages were sent or received or their contents. In this way, the Affidavit differed from two of the opposition's primary authorities.

*First*, in *United States v. Yu*, No. 22 Cr. 208 (CBA), 2023 WL 4687970 (E.D.N.Y. July 21, 2023), the "warrant affidavits describe[d] extensively the [] use of electronic devices" in the

---

[5] *Riley v. California*, 573 U.S. 373, 385 (2014) ("These cases require us to decide how [Fourth Amendment law] applies to modern cell phones, which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy.").

murder-for-hire conspiracy charged in that case, including by citing specific messages, sent on specific dates, among certain co-conspirators. *Id.* at *4 & n.5. Moreover, in *Yu*, the court found sufficient probable cause existed to certain defendants' homes, *citing* evidence that one of the individuals whose home was to be searched "sometimes worked from his home and reviewed electronic documents [there]" and kept cash at his home that he would use "for certain payments." *Id.* at *5-*6. There is, of course, no such comparable evidence in the Affidavit concerning the Apartment here.[6]

*Second*, in *United States v. Gatto*, 313 F. Supp. 3d 551 (S.D.N.Y. 2018), the Court found warrant applications for multiple cellphones (not a premises search) to be supported by probable cause where, for instance, one of the cellphones had allegedly been subject to a wiretap and government recordings, and the second cellphone had been seized from the defendant on his way to a meeting concerning the alleged scheme. *See id.* at 555, 559 & n.44. There is, of course, no similarly direct allegation concerning cellphone use in the Affidavit here.

### B. The Warrant's Overbreadth and Lack of Particularity Compounded the Lack of Probable Cause; the Fourth Amendment Does Not Have a Special "Complex Investigations" Exception or Doctrine

As Ms. Wang discussed in her moving brief, the lack of probable cause in the Affidavit concerning the Apartment was bad enough, but it was compounded because the warrant itself (the "Warrant") was also lacking in particularity and was overbroad. *Garcia*, 2023 WL 4850553, at *12 (D. Conn. July 28, 2023) ("[E]ven if the warrant had been supported by probable cause—

---

[6] Further, to the extent the government relies on the agent's "training and experience" concerning the use of electronic devices, "the officer's opinion, standing alone, is generally not 'sufficient to establish a link between the item to be searched and the alleged criminal activity[.]'" *United States v. Garcia*, No. 20 Cr. 58 (KAD), 2023 WL 4850553, at *7 (D. Conn. July 28, 2023) (quoting *United States v. Ukhuebor*, No. 20 Mag. 1155 (LDH), 2021 WL 1062535, at *3 (E.D.N.Y. Mar. 19, 2021)).

which it was not—it nevertheless violated the Fourth Amendment because it was unjustifiably overbroad.").

### 1. The Warrant Lacked Particularity Because It Gave the Agents' Unfettered Discretion to Determine What Categories of Evidence to Seize

The government's opposition responds to these arguments largely by insinuating that there are different rules for particularity and overbreadth in "complex" cases. Opp'n at 7-8, 17-19.

But if anything concerns about particularity and overbreadth, and the Fourth Amendment generally, are *higher* here given that: (1) the search was of a home, where Fourth Amendment protections are highest, *United States v. Alexander*, 888 F.3d 628, 631 (2d Cir. 2018) ("At the 'very core' of the Fourth Amendment 'stands the right of a man to retreat into his home and there be free from unreasonable governmental intrusion.'") (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)) (holding that even an area a few steps from the back door of the defendant's residence was protected from warrantless search, due to the intense Fourth Amendment protection the home enjoys, and therefore reversing denial of a suppression motion, and vacating a conviction); (2) ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████—which are not "by [their] particular character, contraband." *United States v. Wey*, 256 F. Supp. 3d 355, 385 (S.D.N.Y. 2017) (internal citation and quotation omitted).

---

[7] *Cf. Garcia*, 2023 WL 4850553, at *11 (D. Conn. July 28, 2023) ("[A]n all-encompassing search of a modern cell phone—which has the capacity to contain vast troves of information about all aspects of a person's life from the mundane to the intimate—without almost no indicia of probable cause to support the scope of the search cannot be countenanced."); *see also Riley*, 573 U.S. at 393-97 (detailing the ways in which "[c]ell phones differ in both a quantitative and a qualitative sense" from other objects that might be found on a person subject to a search because of their immense storage capacity).

While the Fourth Amendment's particularity requirement may allow a comparatively longer list of items to be seized in complex cases, it does not allow the agents the unbridled discretion they had here. In this regard, one of the opposition's primary authorities, *United States v. Dupree*, 781 F. Supp. 2d 115 (E.D.N.Y. 2011) is actually instructive. *Dupree* upheld a warrant authorizing the search of a business (not a home), noting that the warrant was "sufficiently particular" when the "items to be seized" related to transactions between specific companies listed in the warrant application; financial records relating to the *specific* company whose office was being searched; mailbox records; communications between specified individuals; and calendar, contact, and personal planners. *Id.* at 150-50. In short, while the list of "items to be seized" in *Dupree* was long, the *Dupree* warrant still cabined the agents' discretion by listing specific companies and items that could be searched and seized.

Moreover, unlike the Warrant here, the *Dupree* warrant did not contain "catch all," vague phrases, but rather was "'sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize.'" *Id.* at 150 (citing *United States v. Regan*, 706 F. Supp. 1102, 1110 (S.D.N.Y. 1989)).

In contrast, the Warrant here had such broad, catch-all phrases that gave the agents' unfettered discretion as to what to seize. The Warrant, for example, authorized the seizure of records relating to ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████[.]" Affidavit, Attachment A-2 at 7. Unlike *Dupree*, the officers themselves had to figure out, unguided by the Warrant, which unnamed ██████████████████████████████████████████████

10

███████████████████████████████████████████████████████████████

██████████████████████████████████████████ In other words, the

Warrant improperly allowed the agents to conduct a "general rummaging" through Ms. Wang's

home.[8]

### 2. Overbreadth

Similarly, the Warrant was overbroad. The Opposition points out that the overbreadth

argument in Ms. Wang's moving brief, was "short," Opp'n at 20, but this is only because the

Warrant was so plainly overbroad in multiple ways that there was no need for extended discussion.

First, the Warrant explicitly authorized the seizure of records relating to *specified* entities—

including ██████████████████████████████████████████████

████████████████████████—which were not connected to Ms. Wang, much less the

Apartment, by any particularized facts in the Affidavit. Second, even worse, the Warrant

authorized the agents to search for ██████████████████████████████████

███████████████████████████████████████████████████████████████

████████ In addition, while the Affidavit contained thin, generalized allegations regarding Ms.

Wang's use of cellphones, it contained *no particularized facts* concerning her use of computers or

---

[8] While the opposition contends that Ms. Wang "fails to explain how any of the 'three components of the particularity requirement' [identified in *United States v. Galpin*, 720 F.3d 436 (2d Cir. 2013)] were not 'satisfied on the face of the warrant,'" Opp'n at 20, that argument is misplaced. *Galpin*'s third component— "that the warrant must specify the 'items to be seized by their relation to designated crimes,'" applies where, as here, a warrant fails to properly limit the kind of evidence sought, and is not satisfied merely because the Warrant talismanically mentions words like "fraud" or "laundering," leaving it to the discretion of the agents on the scene to determine what kinds of otherwise innocuous items are evidence of "fraud" or "laundering." *See United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (citing *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010) and *United States v. Buck*, 813 F.2d 588, 590–92 (2d Cir. 1987)).

other kinds of electronic media, ███████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████ Affidavit, Attachment A-2 at 8. *Cf. United*

*States v. Zemlyansky*, 945 F. Supp. 2d 438, 465 (S.D.N.Y. 2013) (finding warrant overbroad and

ordering suppression because, while the affidavit "provide[d] probable cause for the search and

seizure of materials from [a business] relating to [certain specified companies], the "Affidavit did

not justify a search of the sweeping list of items enumerated in the [subject] warrant.").

Finally, it bears noting that the Opposition again, to put it charitably, materially overstates

the evidence before the magistrate judge, suggesting the Affidavit actually contained "██

██████████████████████████████████████████████████████████████

███████████████████████████████████████ "'" Opp'n at 21. Of course,

in reality, the Affidavit contains no actual chat messages, just the agent's say-so that he was

████████ of such messages, without providing any facts of when they occurred or their contents.

And of course, that paragraph of the Affidavit, like the rest of the Affidavit, contains no

information linking Ms. Wang or the Apartment to "█████████████████████████

████████████████████████████████████ " even though the Warrant

authorized a search for those and other entities.

*** 

In short, the Warrant's broad, catch-all provisions violated the particularity requirement

and, notwithstanding the lack of probable cause concerning the Apartment described above, the

scope of items to be seized was far broader than anything linked to Ms. Wang in the Affidavit,

rendering the Warrant overbroad.

### C.  The Good Faith Exception Does Not Apply

#### 1. By Authorizing a General Rummaging through Ms. Wang's Apartment Based on Scant Evidence, the Warrant Affidavit Violated Clearly Established Law in Multiple Ways

The Opposition asserts that the good-faith exception saves the Warrant. It does not. "Good faith is not a magic lamp for [law enforcement agents] to rub whenever they find themselves in trouble*." United States v. Reilly*, 76 F.3d 1271, 1280 (2d Cir. 1996). "[T]he good faith exception 'cannot shield even an officer who relies on a duly issued warrant in *at least* four circumstances: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.'" *Wey*, 256 F. Supp. 3d at 395 (quoting *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015)) (additional internal citation and quotation omitted) (emphasis added).

In addition, courts in this circuit have also considered the deterrent value of suppression before deciding whether to suppress evidence. *See Wey*, 256 F. Supp. 3d at 396-97.

Here, first, the Warrant lacked probable cause concerning the Apartment as to render reliance on it unreasonable. "[C]ourts suppress evidence obtained from search warrants issued on the basis of bare bones affidavits that do not allege facts sufficient to draw a plausible nexus between a suspect's alleged criminal conduct and the electronic device, material, or location to be searched." *Bertini*, 2023 WL 8258334, at *1. The Affidavit was essentially a "bare-bones" affidavit as to *Wang's Apartment* (the critical issue here), failing to establish probable cause that evidence of a crime would be found in the Apartment; indeed, the 77-page Affidavit barely mentioned the Apartment at all. Moreover, the government's counterarguments eliminate the well-

13

settled, clearly established distinction between probable cause to arrest and probable cause to search, a distinction that is crucial when, as here, agents seek to conduct a wide-ranging search of *both* a person's residence, that most protected of spaces, and electronic devices.

These errors are compounded by the particularity and overbreadth issues in the Warrant itself, discussed above. *United States v. Garcia*, No. 3:20-CR-00058 (KAD), 2023 WL 4850553, at *12 (D. Conn. July 28, 2023) (holding the good-faith exception did not apply where warrant was "facially defective because it was unsupported by sufficient indicia of probable cause, insufficiently particularized, and unconstitutionally overbroad—a trifecta of constitutional infirmities").

These particularity and overbreadth issues also violated clearly established law at the time, making it objectively unreasonable for the agents to rely on the warrant. As to particularity, as discussed above, the Warrant "authorize[d] the seizure of multiple expansive categories to records"—here including, for example, "furnishings," "jewelry," and "watches"—"without any meaningful linkage to the suspected criminal conduct [described in the Affidavit] and limited only, at the outer boundaries, to some relationship to the owner/occupant of the premises being searched." *Cf. Wey*, 256 F. Supp. 3d at 398. In *Wey*, then-District Judge Nathan noted this type of deficiency "r[a]n[] afoul of principles that had already been clearly established in binding precedents when the Warrants were issued and Searches conducted" in that case—i.e., in 2012, over a decade before the search here. *Id.*

As to overbreadth, as discussed above, "courts have denied reliance on the good-faith exception when a warrant sweeps too broadly in describing the items subject to seizure." *United States v. Griffith*, 867 F.3d 1265, 1279 (D.C. Cir. 2017). Here, the Warrant explicitly authorized the seizure of (i) records relating to specified entities not connected to Ms. Wang or the Apartment;

(ii) unnamed "other individuals or entities" and (iii) numerous categories of electronic devices, including "storage media," "servers," "computer devices," and "routers," based on a threadbare, conclusory assertion regarding Ms. Wang's use of cellphones. *Cf. Griffith*, 867 F.3d at 1278 (finding good-faith exception did not apply, noting "it was no solution to rely on a catch all provision authorizing seizure of every device they might happen to find in the house. Nothing in the Affidavit or warrant supported—or could have supported—probable cause to seize any and all phones, tablets, computers, and other electronic devices in the apartment").

In short, given the level and number of constitutional infirmities here, it was objectively unreasonable for officers to rely on the Warrant.

### 2.  The Conduct of the Search and Arrest Reinforces the Need for Suppression

Further, the conduct of the search and other events at the Apartment on March 15, 2023 reinforce the need for suppression.

*First,* while the government continues to produce information concerning the materials seized as recently as last week, the information produced so far shows repeated overreach by the agents. For one, as discussed below, the government does not dispute that the agents violated Ms. Wang's rights by questioning her after she invoked her right to counsel (which it shrugs off by saying it doesn't matter because "we won't offer in our case-in-chief" and (wrongly) that the fruit of the poisonous tree does not apply).

Further, the government has already had to make a public corrective disclosure regarding the FBI search team leader's description of the conduct of the search. ECF No. 47.

Finally, and, again, although material related to the search continues to be produced, there is already clear evidence of the seizure of highly personal items, including a notebook in which

Ms. Wang tracked highly personal health information, including ███████████████ ████.[9]

*Second,* there is no indication the officers were under any sort of time pressures, which courts have relied on to deny suppression in the past. *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010). To the contrary, the Affidavit itself states ███████████████████████ █████████████████████████████████████ As to the search itself, over 12 FBI agents spent *almost six hours* at Ms. Wang's single-bedroom apartment conducting the search. 2/1/24 Declaration of Sarah Reeves ("Reeves Decl.), Exhibit B (USAO_00110296).

***

In short, the search of Ms. Wang's Apartment was based on a warrant that suffered from numerous constitutional deficiencies, and it was objectively unreasonable for the agents to rely on that Warrant. The Court should grant her suppression motion.

## II.   The Court Should Grant Ms. Wang's Motion to Suppress Statements

The Court should grant Ms. Wang's motion to suppress her post-arrest statements.

*First*, the opposition again plays word games, this time with Ms. Wang's affidavit, which she submitted in support of her motion. The government claims her affidavit "concerned only 'the locations of, and passwords for, electronic devices in the apartment.'" Opp'n at 22-23 (citing Wang Aff. ¶ 6). That's not what her affidavit said. Instead, it said that, after she invoked her right to counsel, the agents asked questions "including"—not "only"—"about the locations of, and

---

[9] Reeves Decl., Exhibit A (USAO_00065009). Further, the government also seized numerous calendars and date books of Ms. Wang's. While some of the information in these calendars could fall within the (deficient) Warrant, the calendars also detailed highly personal matters, ███████████████████████ ██████████████████

passwords for, electronic devices in the apartment." Wang Aff. ¶ 6.[10] The FBI 302 Report attached

to Ms. Wang's motion makes clear that, following her invocation, the FBI continued to ask her

other questions, ███████████████████████████████████████████. 12/15/23

Declaration of Brendan F. Quigley (ECF No. 199), Exhibit 2 (USAO_00110620); Reeves Decl.,

Exhibit C (USAO_00110621).

*Second,* in any event, the government apparently concedes that Ms. Wang invoked her right

to counsel almost immediately upon the agents' arrival at the Apartment, and thus, these statements

were obtained in violation of her rights, because it does not dispute that the agents continued

questioning her after she invoked her right to counsel. *See* Opp'n at 23 ("[T]he Government does

not intend to offer those statements in its case-in-chief.").

*Third*, in arguing that the fruits of the (apparently admittedly) unlawfully obtained

statements should not be suppressed, the Opposition conflates the situation here—a violation of

the right to counsel under *Edwards v. Arizona*, 451 U.S. 477 (1981)—with a violation of the right

to silence under *Miranda v. Arizona*, 384 U.S. 436 (1966). The government argues that, because

under *United States v. Patane*, 542 U.S. 630 (2004), the fruit of the poisonous tree doctrine does

not apply to *Miranda* violations, i.e., admission of the fruits of unwarned statements is allowed,

the fruit of the poisonous tree doctrine does not apply to *Edwards* violations.

But *Miranda* and *Edwards* violations are treated differently, and courts place greater

restrictions on agents' conduct after an *Edwards* violation than after a *Miranda* violation. For

example, if a suspect invokes her right to silence, agents may resume questioning if they cut off

---

[10] Later on in the opposition, the government literally elides the "including" in Ms. Wang's affidavit, omitting it via ellipses. Opp'n at 26 ("Wang alleges nothing close to involuntary coercion—just that 'agents asked me multiple questions . . . about the locations of, and passwords for, electronic devices in the apartment[.]'").

questioning, wait a reasonable time, and then re-administer Miranda warnings. *See Michigan v. Mosley*, 423 U.S. 96, 106-07 (1975). In contrast, under *Edwards*, if a suspect invokes her right to counsel, she cannot be re-interrogated without counsel present. *Edwards v. Arizona*, 451 U.S. at 484 (if a suspect invokes the right to counsel, questioning must immediately cease and may not resume "until counsel has been made available to [the suspect]").

And while the government claims there is no "persuasive authority" supporting the idea that the Court should suppress evidence obtained following a suspect's invocation of her right to counsel under *Edwards*, Opp'n at 23, the very law review article the Opposition cites makes this argument. As Professor Kamisar notes, "rejecting a suspect's request for counsel is a more serious failure to comply with Miranda—and more likely to be a deliberate failure—than not giving a custodial suspect a full set of warnings." Yale Kamisar, *Postscript: Another Look at* Patane *and* Seibert*, the 2004* Miranda *"Poisoned Fruit" Cases*, 2 Ohio St. J. Crim. L. 97, 105 n.42 (2004). "Moreover," Professor Kamisar goes on, "excluding only the statement obtained by questioning someone who has asked for a lawyer, but not the physical evidence the statement produced, is a woefully weak sanction in a situation where the police have nothing to lose by continuing to question the suspect, but something to gain (the physical evidence)." *Id.*

This is particularly true in a case where information is needed to obtain and access cellphones, which, as the Supreme Court noted, "differ in both a quantitative and a qualitative sense from other" kinds of evidence and are, often, "in fact minicomputers" which "typically expose to the government far *more* than the most exhaustive search of a house." *Riley v. California*, 573 U.S. 373, 393, 396 (2014) (emphasis in original). Thus, not surprisingly, as Judge Rakoff noted, "[s]everal courts to consider the issue have specifically held that asking a suspect to enter his phone passcode after the suspect has requested an attorney is an *Edwards* violation requiring

suppression of the contents of the phone." *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 311 (S.D.N.Y. 2018) (citing *United States v. Gilkeson*, 431 F. Supp. 2d 270 (N.D.N.Y. 2006) and *United States v. Mitchell*, 76 M.J. 413 (C.A.A.F. 2017)); *accord United States v. Eiland*, No. 18-Cr. 3154, 2019 WL 2724077, at *5 (D. Neb. July 1, 2019) ("To suppress his statement alone, but not the evidence derived from the search and seizure of his cellphone, would create an incentive for law enforcement to ignore the law. Specifically, this would create a disincentive for law enforcement to stop questioning a detainee if he or she could possibly be induced to reveal information leading to incriminating physical evidence that could be admitted in a subsequent criminal trial.").[11]

This Court should reach the same conclusion. The agents should not be allowed to run roughshod over Ms. Wang's apparently indisputable invocation of her right to counsel and then *benefit* by obtaining evidence that "typically expose to the government far *more* than the most exhaustive search of a house," *Riley*, 573 U.S. at 396, without suffering any consequences.

*Finally*, the inevitable discovery doctrine does not excuse the agents' conduct. To begin with, the basis for inevitable discovery here is the Warrant, which as discussed above, was invalid. *In re 650 Fifth Ave. & Related Properties*, 934 F.3d 147, 165 (2d Cir. 2019) (explaining that when evaluating the inevitable discovery doctrine, the court must establish that a valid underlying investigation would have led to the search).

---

[11] The opposition claims that Judge Rakoff's subsequent opinion in *United States v. Smith*, No. 22-CR-352 (JSR), 2023 WL 3358357, at *2 (S.D.N.Y. May 11, 2023) is "fatal to Wang's motion." Opp'n at 27. In reality, *Smith* is inapposite, given the defendant there did not even make a *Miranda* argument, much less an *Edwards* one. *Id.* at *2 n.3 ("Smith has not argued that the Government, in holding him at the airport until he turned over his phone password, subjected him to a custodial interrogation under *Miranda v. Arizona*[.]").

Relatedly, this argument further shows why it would be perverse to allow the Warrant to stand based on an application of the good-faith exception. The government would have the Court hold the good-faith exception excuses not only a violation of Ms. Wang's Fourth Amendment rights, but also the agents' deliberate violation of her Fifth Amendment right to counsel.  !

Moreover, the government bears the burden of showing that inevitable discovery would have occurred and must "prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered." *In re 650 Fifth Ave. & Related Props.*, 934 F.3d at 164 (internal citation and quotation omitted). Here, the government provides no factual support to meet its burden and instead, simply speculates, for each of the phones and other electronic devices seized, the "phones' biometrics" or unspecified "tools employed by the FBI" (like a hammer?), Opp'n at 28-29, would have enabled the agents to in fact unlock the contents of the phones and other devices found in the Apartment. That falls short of making the necessary showing. *In re 650 Fifth Ave. & Related Props.*, 934 F.3d at 165 (requiring the Court, "*for each particular piece of evidence*, specifically analyze and explain how, if at all, discovery of that piece of evidence would have been more likely than not inevitable absent the unlawful search") (emphasis in original)). !!

\*\*\*

Accordingly, the Court should grant Ms. Wang's suppression motions.

### III.   <u>The Court Should Grant Ms. Wang's Motion for a Bill of Particulars</u>

The S2 Indictment, in particular the addition of a RICO conspiracy charge, simply reinforces, rather than undermines the need for a bill of particulars. As the Second Circuit stated in reversing a RICO conspiracy conviction based on a denial of a defendant's motion for a bill of

particulars, "[w]ith the wide latitude accorded the prosecution to frame a charge that a defendant has 'conspired' to promote the affairs of an 'enterprise' through a 'pattern of racketeering activity' comes an obligation to particularize the nature of the charge to a degree that might not be necessary in the prosecution of crimes of more limited scope." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988); *accord United States v. Bortnovsky*, 820 F.2d 572, 574-75 (2d Cir. 1987) (reversing, *inter alia*, RICO conspiracy conviction based on failure to provide bill of particulars).

And despite the Opposition's repeated citations to the government's massive (and still on-going) discovery productions, the Second Circuit and courts in this district have stated that providing "mountains" of discovery, in an indisputably "complex" case like this one, counsels in *favor* of a bill of particulars. *Bortnovsky*, 820 F.2d at 574-75 ("The Government did not fulfill its obligation merely by providing mountains of documents to defense counsel . . . ."); *accord United States v. Tournant*, No. 22 Cr. 276 (LTS), 2023 WL 8649893, at *2 (S.D.N.Y. Dec. 13, 2023) ("Courts in this Circuit have, however, recognized that, in some instances, 'mountains' of discovery without more will not be sufficient to render an indictment constitutionally sound.").[12]

As to Ms. Wang's specific requests,

*First*, the Court should order the government to provide particulars concerning "the identity and any location of any purported victims of the scheme, and whether the government intends to

---

[12] In response to Ms. Wang's arguments concerning the voluminous nature of discovery, the Opposition asserts that it has produced "approximately 50" electronic devices belonging to Ms. Wang and at least another 50 belonging to Mr. Kwok and others. Opp'n at 37. To be clear, most of these "devices" allegedly belong to Ms. Wang have been hard drives and thumb drives and the government's production of data and translations from these materials were produced as recently as last week. In any event, the government's statements simply highlight the voluminous nature of discovery (which supports a bill of particulars). Moreover, the fact that the government seized over four dozen devices from Ms. Wang's Apartment, based on, at best, generalized, undated allegations about Ms. Wang's use of a cellphone simply highlights the general and overbroad nature of the Warrant and why the evidence seized pursuant to it should be suppressed.

call those individuals as trial witnesses." Moving Brief (ECF No. 197) at 14. While the government

contends this request is "plainly improper," Opp'n at 36, just weeks ago, Judge Swain granted a

similar request in a complex fraud prosecution in this District. In *United States v. Tournant*, No.

22 Cr. 276 (LTS), 2023 WL 8649893 (S.D.N.Y. Dec. 13, 2023), the defendant, who was charged

with, among other things, securities and wire fraud, sought particulars identification of the specific

investors and consultants that were alleged victims of the charged offenses. Judge Swain ordered

the government to "particularize the institutional and individual investors and prospective

investors . . . as well as any consultants, that it will or may attempt to provide were victims" of the

alleged scheme. *Id.* at *4.

Notably, Judge Swain rejected the very argument the government makes here, recognizing

that the "the lengthy," 48-page "Indictment and voluminous discovery produced thus far also cut

against the Government's position that a particularized list of victims is unnecessary." *Id.* *4.

Judge Swain noted that given that the scheme allegedly "span[ed] six years" and,

implicated more than "100 institutional and individual investors," *id.* at *4, the "at least seven

million pages of discovery," along with information that provided "further direction to help

navigate the discovery," "d[id] not provide sufficient particularity to apprise [the defendant] of the

parameters of the scheme with which he is charged." *Id.* at *3-*4. Judge Swain further observed

that it would be a "a daunting and potentially impossible undertaking" to require the defendant "to

sufficiently identify the scope of the alleged scheme and prepare accordingly" within that

voluminous discovery (even with the additional detail provided by the government, which it has

not provided here). Judge Swain further noted that "[c]ourts in this Circuit have shown an

inclination to grant particulars in similarly complex cases with markedly less discovery." *Id.* at *4

(collecting cases).

This case is "similarly complex," and indeed analogous to *Tournant*. The length of the indictment almost identical (48 versus 49 pages) as is the time frame of the alleged scheme (five years versus six years). The discovery is similarly voluminous. The Indictment here claims there are "thousands of victims." S2 Indictment ¶ 1.

As is *Tournant*, "particulars as to the" individuals or entities the government will or may attempt to provide were victims, "are necessary to allow defense counsel to conduct a reasonably focused investigation, such that [Ms. Wang] will be adequately prepared for trial." *Tournant*, 2023 WL 8649893 at *4.[13]

*Second*, the Court should order the government to provide particulars regarding the businesses it alleges were "fraudulent [or] fictitious"; the entities it claims were "interrelated," and the "entities it contends were "instrumentalities of the fraud," which Ms. Wang allegedly held titles in.[14] The government's new list of 44 different entities that it alleges were part of the RICO enterprise, does not resolve this issue. *Cf.* Opp'n at 33-34. That list begins with an "include" and ends with an "among others," S2 Indictment ¶ 3(a), leaving the government ample wiggle room. Indeed, this is analogous to the situation in *Davidoff* where the Second Circuit reversed a RICO conspiracy conviction based on the government's failure to provide particulars concerning "unspecified violations indicated [in the RICO conspiracy count] by the phrase 'but were not limited to,'" and the government then introduced at trial evidence concerning companies that had

---

[13] Further, the fact that at least some of the government's apparent victims now claim they are not really victims of Ms. Wang or Mr. Kwok, *see* ECF No. 229 ¶ 5 (asserting "the Customers of the Himalaya Exchange are victims only of the seizure of their investments from the U.S. government"), heightens the need for defense counsel to be able to conduct a "reasonably focused investigation" via particulars.

[14] Each of these phrases appears both in the S1 Indictment and the S2 Indictment. S1 Indictment ¶¶ 1, 8; S2 Indictment ¶¶ 1, 11.

not been identified in the Indictment. *See* 845 F.2d at 1153-54. The Court should not allow that error to be repeated here. Finally, it is unclear what the government means by "fraudulent and fictitious" entities (did the entity really not exist at all?), highlighting the need for particulars here.[15]

*Third*, the Court should order the government to particularize "how Ms. Wang 'conducted the GTV Private Placement'" and the securities "purchase[s] and sale[s]" it contends she was involved in or solicited. The opposition can conclusorily describe this as a request for "evidentiary detail" as many times as it wants, but it cannot avoid the fact that a "purchase and sale" of a security is the actus reus of a securities fraud charge, *see S.E.C. v. Zandford*, 535 U.S. 813, 819 (2002), and while the S2 Indictment alleges Ms. Wang took a certain actions with the *proceeds* of the GTV Private Placement, it does not allege she participated in the *offering*, *purchase, or sale* of those alleged securities in any way.

*Fourth,* while the S2 Indictment does add allegations on how Ms. Wang allegedly enriched herself as part of the scheme, Ms. Wang is still left to guess about much of the government's theory here. As discussed below in connection with Ms. Wang's severance motion, on the one hand the government alleges Ms. Wang was enriched by a promise of cryptocurrency but elsewhere in the S2 Indictment alleges that cryptocurrency was essentially worthless.[16] In addition, paragraph 18.h. makes a conclusory claim that Ms. Wang "misappropriated a substantial portion of the funds

---

[15] As just one example, GETTR USA Inc. is a clearly non-"fictitious" entity listed as a member of the alleged enterprise. S2 Indictment ¶ 3.

[16] The opposition—again—misquotes the government's own prior filings. The government claims that "[t]he Complaint charging Wang also described how Wang *wired herself* over $30,000 of GTV Private Placement fraud proceeds as a 'Director Fee.'" Opp'n at 33 (Compl. ¶ 13.d)) (emphasis added). However, the Complaint actually contains no allegation that Ms. Wang "wired herself" the money, only that the money "was wired."

victims had paid G|CLUBS for 'memberships' using, among other things, a complex web of entities and bank accounts to do so." It then describes how Kwok and Je misappropriated the funds, but Ms. Wang is left to guess about the government's theory about how she allegedly misappropriated the funds.

*Finally*, the Court should order the government to provide particulars regarding the wire transfers it claims were illegal. In response, the Opposition contends that the government has identified specific fund transfers that "it alleges constitute misappropriation, including the date, entity involved, beneficiary, and items purchased with the funds. (See, e.g., Indictment ¶¶ 4, 5, 16.h, 17.f, 18.h, 24, 25)." Opp'n at 39. But the cited paragraphs do not actually identify "specific fund transfers" with the detail the government suggests they contain. Paragraph 4, for example, generally alleges the defendants "laundered hundreds of millions of dollars of fraud proceeds," that money was transferred between "more than approximately 500 accounts held in the names of at least 80 different entities or individuals," and that proceeds were transferred into accounts held domestically and internationally "in the name of entities owned or otherwise controlled by JE." Similarly, Paragraph 24 lists out the statutory allegations but contains no specific discussion of misappropriated funds. Paragraph 25 alleges that it was "part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise." None of this provides the detail the Opposition suggests it does, and the Court should order the government to provide the requested particulars.

## IV.   **The Court Should Grant Ms. Wang's Motion for Severance**

The Court should also grant Ms. Wang's motion for severance. If anything, the S2 Indictment and the government's argument in the Opposition make the need for severance even clearer.

### A. Severance is Appropriate

Severance is appropriate when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Key*, No. 12 Cr. 712 (SHS), 2013 WL 12204221, at *1 (S.D.N.Y. Aug. 28, 2013) (*quoting Zafiro v. United States*, 506 U.S. 534, 539 (1993)). The risk of prejudice is heightened when "'many defendants are tried together in a complex case and they have markedly different degrees of culpability.'" *Id.* (*quoting Zafiro*, 506 U.S. at 539)).

Here, the S2 Indictment does not cure, and indeed, heightens, the risk that the jury will be unable to make a reliable judgment about guilt or innocence in a joint trial, given the different roles of culpability between Ms. Wang and her co-defendants.

*First*, the new allegations concerning the Himalaya Exchange highlight these issues. In a weak attempt to show that Ms. Wang received some benefit (beyond having a job) from her association with her alleged co-conspirators, the S2 Indictment alleges Ms. Wang "benefit[ted]" from the alleged scheme because she "was promised millions of dollars' worth of a purported cryptocurrency." S2 Indictment ¶ 5. Later on, however, the S2 Indictment alleges that the same cryptocurrency was essentially worthless and illiquid, S2 Indictment ¶¶ 19(e)-(f), and notably, does not charge Ms. Wang in the wire fraud count related to the Himalaya Exchange (although it does allege the Himalaya Exchange is part of the RICO Enterprise). This fact alone creates serious tension between Ms. Wang and her co-defendants, and requires Ms. Wang to choose between (i) arguing that the Indictment overstates (or misstates) one of the personal benefits she received and (ii) not undercutting her co-defendant's defense on the Himalaya Exchange wire fraud count.

*Second*, despite the S2 Indictment adding charges against Ms. Wang, there are still exponential differences in alleged culpability. The government's new personal benefit allegations

against Ms. Wang allege that she received a job that paid her $500,000 a year,[17] a condominium,[18] and an (apparently worthless) cryptocurrency. Indictment ¶ 5.

These purported benefits pale in comparison the benefits the government claims her co-defendants received. As to the Farm Loan Program alone, the government alleges Mr. Kwok and his relatives misappropriated at least $27.5 million and that Mr. Je and his relatives misappropriated another $10 million. S2 Indictment ¶ 17(f). Similarly, with respect to the alleged misappropriation of "G-Clubs" funds, the S2 Indictment alleges that Mr. Kwok and his relatives received approximately $35 million of these funds for their benefit, that Mr. Je received at least $1.1 million, but does not allege that Ms. Wang personally benefitted in any way. As to the Himalaya Exchange, the S2 Indictment alleges that Mr. Kwok misappropriated nearly $37 million in Himalaya Exchange funds to cover the purchase of a luxury yacht for the benefit of himself and his relatives. S2 Indictment ¶19(g). The Indictment alleges no such benefit for Ms. Wang. Indeed, the government's new indictment does not assert that Ms. Wang misappropriated any funds for her own benefit.

The S2 Indictment also still has marked differences in the roles of Ms. Wang and her co-defendants. Mr. Kwok is alleged to have had a "prolific online presence", S2 Indictment ¶ 2, and both he and Mr. Je are alleged to have solicited investors central to the fraud. With respect to GTV, the S2 Indictment cites two videos including statements by Mr. Kwok and none by Ms. Wang. S2 Indictment ¶¶ 16(a), 17(d), 40(a), 40(e). As to G|Clubs, the S2 Indictment cites three videos including statements by Mr. Kwok and none by Ms. Wang. S2 Indictment ¶¶ 18(a), 18(d), 18(f),

---

[17] Documentary evidence in discovery shows that Ms. Wang's salary was actually significantly less than this for a large portion of time-frame the alleged conspiracy.

[18] Ms. Wang does not concede that the condominium purchase was financed by any member of the alleged conspiracy.

40(f). As to the Farm Loan Program, the S2 Indictment cites one video including statements by Mr. Kwok and none by Ms. Wang. S2 Indictment ¶¶ 17(c), 40(d). As to the Himalaya Exchange, the S2 Indictment cites two online statements by Mr. Kwok, and statement by Mr. Je concerning a Ferrari allegedly purchased with Himalaya Exchange coin, and no statements by Ms. Wang. S2 Indictment ¶¶ 19(a)-(d).

### B.  The Opposition's Arguments Simply Highlight the Need for Severance

Against all this, the opposition simply highlights the need for severance, confirming that, it seeks to convict Ms. Wang mainly based on her association with her alleged co-conspirators and thereby prevent the jury from making a reliable determination about each defendant's guilt or innocence. *See* Opp'n at 43 ("At trial, the Government intends to prove their guilt by relying on much of the same evidence introduced through many of the same witnesses."). No matter how many times the opposition conclusorily asserts that Ms. Wang was "involved in every aspect of the [alleged] Kwok Enterprise" or was "integral" to the Kwok operation, it cannot avoid the fact that the S2 Indictment plainly alleges different roles, benefits, and degrees of culpability.

Indeed, the Opposition remarkably claims that "[t]his is not a situation where Kwok's conduct is any more sensational than Wang's—they both committed the same financial fraud," Opp'n at 45, but the S2 Indictment contains no allegation that Ms. *Wang* purchased $8 million of luxury vehicles, a $37 million yacht, a $140,000 piano, and $72,000 worth of mattresses, as it alleges against Mr. Kwok. S2 Indictment ¶ 5.[19]

Further, the government's conclusory assertion that "Kwok's statements . . . are evidence that is properly introduced against . . . Wang," Opp'n at 45, simply makes plain the government's

---

[19] Moreover, if the government believed the case was simply a "financial fraud," it begs the question why it chose to seek a superseding indictment charging a RICO conspiracy

intention to obtain massive unfair and improper spillover prejudice. Under the Federal Rules of Evidence, however, one alleged co-conspirator's statements are not automatically admissible against another based on the government's say-so. Instead, *for each statement*, the government must meet the requirements of Rule 801(d)(2)(E). *See, e.g.*, *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014).

Finally, the Opposition's attempt, in a footnote, to back away from its prior position regarding Ms. Wang's former counsel should be rejected. As noted in Ms. Wang's moving brief, the government noted in trying to disqualify Ms. Wang's former counsel that Mr. Bove's involvement in a separate investigation of Kwok "might restrict Bove's ability to defend his client . . ." because he could not use information he learned during his time as an AUSA to help Ms. Wang." ECF No. 128 at 3 (arguing that the Court would have to "wrestle with thorny issues during trial"). The Opposition's footnote amazingly claims "[t]hat conflict was about former counsel's possession of confidential Government information." Opp'n at 46 n.10. But that information— which the government contended could "help Ms. Wang"—was clearly *about Mr. Kwok*, Ms. Wang's co-defendant. As such, the government's own prior position, despite its newfound attempt to back away from it, highlights the risk of prejudice and the need for severance here.

## **CONCLUSION**

The Court should grant Ms. Wang's motions.

Dated: February 1, 2024

Respectfully submitted,

BAKER BOTTS LLP

By: */s/ Brendan F. Quigley*
Brendan F. Quigley
Sarah Reeves
30 Rockefeller Plaza
New York, N.Y. 10112
(212 ) 408-2500
brendan.quigley@bakerbotts.com

*Attorneys for Yanping Wang*