## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>           **Complainant**<br><br>           **-v-**<br><br>**HO WAN KWOK, a/k/a  "Miles Guo,"  "Miles Kwok,"  "Guo Wengui,"  "Brother Seven," or  "The Principal,"**<br><br>           **and**<br><br>**KIN MING JE, a/k/a "William Je,"**<br><br>           **and**<br><br>**YANPING WANG, a/k/a "Yvette,"**<br><br>           **Defendants.** | Criminal No.:  23-cr-118 (AT)<br><br><br>**MOTION OF HIMALAYA EXCHANGE CUSTOMERS FOR EXPEDITED HEARINGS AND MOTIONS FOR COURT ORDER ON THEIR MOTIONS TO INTERVENE AND FOR RETURN OF THEIR  PROPERTY AND FOR LIMITED DISCOVERY**<br><br><br>Assigned to the Honorable<br>U.S. District Court Judge Analisa<br>Torres, Presiding Judge |

**MOTION FOR RECONSIDERATION OF JUDGE'S ORDER OF MARCH 7, 2024**

By counsel Bradford L. Geyer, Esq., Customers (technically "Members") of Himalaya International Clearing, Ltd., doing business as The Himalaya Exchange, whose investments in the Exchange have been seized as actions ancillary to the core criminal prosecution in this case, hereby file these motions in support of their Motion for the Return of Property Seized by the Complainant, United States of America.

"Members" or Customers, totaling 5,242, have now engaged the undersigned counsel to assist them in recovering their investments (that is returning the reserve funds which allow the Exchange to "cash out" Customers' investments by selling their crypto-currency coins back to the Exchange).

Counsel repeats the objection that the United States of America lacks jurisdiction over

the Customers none of whom are U.S. citizens or U.S. residents nor their agents in a company that exists entirely outside of the United States. The sometimes fine balance of jurisdiction cannot flow only one way. Even if the Defendants were found guilty of actions within the United States referencing the Exchange, that would not mean that the Exchange itself committed any acts under U.S. jurisdiction. However, the Customers first have to be allowed in a case not of their making to be able to state their case in all of its details and claims. If the proceeds of crime idea had any merit, the Government would have shown us by now large transactions unrelated to the activity of individual Customers. But they are persistently silent in the face of these concerns. If all finances of the Exchange correspond to the investments of individual Customers, then that theory falls by the wayside and we should all be concerned about the rough handling these innocents have received from the American system.

## I. INTRODUCTION

The Court is asked to re-consider the Customer's motion as innocent third parties under Rule 41(g) as there is a serious risk of irreparable harm and substantial losses to the Customers assets if the seizures are not returned urgently. The Customers' motion was considered under the assumption that there would be no irreparable harm, that is money later is the same as money today other than interest.

However, this point has been addressed in the previous submissions and – notably – to date the DOJ has failed to respond or provide any compelling reason or justification to retain the Customers' money. They have simply ignored this and other points and ignored that the continued retention of the Customers' funds has already caused a substantial devaluation of their HCN holding and this continues each day.

The Court has cited to principles of law and precedent most of which the Customer's agree with but disagree that there has been any factual showing to support assuming no irreparable harm. And the Customers disagree that that can merely be assumed without adequate evidence or a framework of allegations. The Customers suggest it is significant that the DOJ has been silent on the potential for loss of the Customer's investments and possible collapse of the Exchange. In the bail hearings for Ms. Wang it was pointed out (Dkt. #44) that the Government is both trying to claim that Himalaya Exchange digital coins defrauded investors – none of whom are in the United States – but also valuable enough that the Government speculated that Defendant Wang might have access to some Himalaya coins (unclear when or if that might be some future plan based on success of the project) to be able to flee. So the Government understands that whether the Himalaya Exchange coins are up to its standards might make the Himalaya coins so depressed in value as to constitute fraud upon the non-U.S. investors over whom the U.S. Government has no jurisdiction. The Customers believe that it would be the prosecutor's burden to show that there is no irreparable harm versus risk of de-valuation of the Exchange investments.

Should the Himalaya Coin (HCN) valuation drop to zero the customers will lose millions of dollars' worth of assets with no way of recouping their lost value. The now increased number of 5242 foreign innocent bystanders bringing their case is substantial (updated to the Count in filing Dkt. #212). This is separate from their Himalaya Dollar (HDO) holding of which the DoJ hold their equivalent dollar reserve for which they are the beneficiaries. The restoration of the customers HDO reserve is therefore essential not only so customers can redeem but also to preserve their HCN asset and prevent substantial losses. The Exchange will fail and crash and cannot function without the stable coin reserve as it is an integral part of it functioning. At

present even if customers can buy and sell using their HDO and HCN the inability to redeem will cause a reduction in trading and devalue the coin which can be already seen from the decline since seizure. The coin price approximately at seizure was $24 for one HCN and at present is it averaging around $11 for one HCN. There is already a deprecation loss of millions to the customers HCN asset. This value of the loss for the initial customers that signed up was $136 million detailed in the initial filling. This has now increased with the additional customers that have joined this action.

## II. BACKGROUND

The Himalaya Exchange ("the Exchange") has two types of digital assets, namely the HDO, which is a "stable coin" pegged to the U.S. dollar and backed by cash reserves 1:1 in the bank.  These are the reserve funds seized by the DoJ.  The second is the HCN, which is a trading coin and is valued by supply and demand. This is not a stable coin and is a trading coin.  As the world is learning a digital coin can be used either as an investment hoping that the value on the open market will rise, as some cryptocurrencies have seen extraordinary increases in price, or as a medium of payment among those who are willing to engage in transactions in digital coins. Services like PayPal or Venmo in very simplistic versions allow transfer of money equivalent quickly and securely over the internet with password protection.  Ownership of digital coins can similarly be transferred (in far more sophisticated mechanisms) without the involvement of the sponsoring Himalaya Exchange.  Therefore, if one were to pay for a week's rental property in Ft. Lauderdale with Himalaya Coin, the Himalaya Exchange would not be part of that transaction nor even aware of it except to the extent that the parties asked the Exchange to note the new owner of coins on its books.  The minimal involvement of the Exchange is not unlike parties privately selling and buying shares of stock in Microsoft without the permission or participation

of the Microsoft company.

Once Customers open an account with the Exchange and passes the relevant Know "know your Customer" ("KYC") checks, the customer deposits money in USD and obtains the equivalent number of HDOs in their Himalaya Exchange Account. In other words, an originally empty account becomes funded by the customer's investment into his or her account.

They can then utilize their full or partial HDO to buy HCN, which they can trade on the platform. Each customer has HDO or HCN balances or both depending on their trading activity. If any sale of their HCN is made, they will receive HDO as proceeds of that sale and if any HCN is purchased then the customer will utilize their HDO to purchase.   That is, the dollar balance of their account in Himalaya Dollars is either spent on the purchase of digital coins or increased from the sale of Himalaya Coin.

Examples of this would be customers depositing USD and receiving the equivalent HDO in their Himalaya exchange account. They then use their entire HDO holding to purchase HCN coins. At that point some customers have held onto all of their HCN coins as an asset and not traded. Presumably they would sell at a later date when there is an increased price in order to make profit.  These customers would only have HCN balances. This would be similar to buying shares and then holding them for as long as wanted in order to retain them as an asset or selling them later when the price of those shares increases. Others have held some and traded some HCN coins making a profit. Some customers have partially used their HDO to purchase HCN leaving them with balances of HDO and the HCN they purchased. Those customers who have bought and then subsequently sold HCN would have the profits of those sales in HDO, which will also be reflected in their balance.  Therefore, at any given time different customers will have different balances of HDO and HCN depending on their trading activities and or holding their

HCN as an asset of value.

In order to redeem their HDO back to USD, a customer makes a redemption request on their account. (This is identical to all or nearly all website-based investment platforms like E-Trade or Scotttrade, and not intended to suggest anything unusual.) The amount of redemption a customer can request has to be in line with the monthly limits, which are put in place to comply with Anti-Money Laundering ("AML") Rules. Customers prior to the seizures have received numerous redemptions from the Exchange.

Therefore, preservation of the HCN and its value is of substantial importance because if the exchange fails which it will without it stable coin reserve, the customers holding HCN would lose their asset and or as in the current circumstance experience a substantial devaluation of the HCN. They will only recoup their HDO equivalent in USD from the DoJ and have no recourse to any HCN losses.

If there is no urgent resolution in the restoration of the HDO reserve, innocent parties will be subjected to serious irreparable harm. It is likely to be months if not longer before any kind of restoration process is started and longer before any customers obtain their funds back. By then it will be too late.

For reasons above, it is submitted that this is an exceptional case which justifies departing from the normal process and considering this application under U.S.C. Section 853(n), which permits an "innocent third party claim[ing] a legal interest in the forfeitable property" to "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." Accordingly we implore the Court to  allow this motion to be heard before it is too late and irreversible substantial irreparable harm occurs to innocent victims of these seizures.

### III. IRREPARABLE HARM

The Government has elected to seize the entire reserve of the Himalaya Exchange. They have concluded their investigations and no doubt are in a position to identify which Funds they believe are attributable to the defendants. It would be proper and justified to ring fence these portions to remain seized until forfeiture. However instead the DoJ has seized the entire HDO reserve and held onto innocent customer money which has no bearing on the trial.

The release of innocent customer funds where there are high risks of asset loss and where there is clearly substantial devaluation of their assets as a result of the seizures cannot be seen as an unreasonable balance to strike in the circumstances. This point has been ignored by the DoJ in all the filed responses. The Court is asked not to ignore these genuine compelling reasons and to list the case urgently for a motion to be heard.

In the government filing docket 233 they indicate the following:

> "the government wishes to note that it does not believe the assets that the government has seized and seeks to forfeit should be transferred to the bankruptcy estate. Rather the government intends to forfeit the criminal proceeds of the Kwok enterprise, which the government has seized, and return those assets to the victims of Kwok's crimes provided it is granted approval from the Department of Justices remission or restoration process, and of dictating an order of forfeiture from this court. To the extent there is a dispute with the trustee, or any third party, concerning forfeiture of seized assets, the time to adjudicate those disputes will arise after the criminal trial."

### IV. NO COMMITMENT TO RETURN THE FUNDS

The aforementioned assurance by the government does not give a full and final assurance that these victims will receive their funds back. The indication by the DOJ given in this filing is not an absolute position but a qualified position that carries a caveat that they will return the money to *as yet unidentified* "victims" – not necessarily these Customers – provided they are granted approval from the Department of Justice in its remission or restoration process. The DOJ do not indicate in the event that approval is not granted what the position would be for these innocent customers. By implication it appears that if no such grant is made then the government intends to keep innocent customers' money for itself. Further the reference to the trustee and his unjustified and meritless claims should not form part of the assessment for the DOJ who are responsible for seizing these funds and should take responsibility and accountability for creating a situation of substantial loss of the customer's assets and or a substantial devaluation. Moreover, it is extremely farfetched to suggest that 5242 customers around the world are all in coercion and one large conspiracy to deposit their own money on behalf of any of the defendants.

The Government will have complete control over whether the victims receive restitution and how much they receive.

At no stage has the Government confirmed that it will unequivocally return the money and compensate all customers as per their HDO balance. Further of concern is that the DoJ will use money belonging to customers bringing this action and spread it across all victims in other alleged frauds. Although the bankruptcy proceedings seem to be stayed and the government blessedly seems to agree that customer funds should not be considered part of the bankruptcy estate, there is also the issue of substantial administrative fees which would be taken off in undertaking this task.

### V.  NO NEED FOR THE GOVERNMENT TO HOLD THE FUNDS FOR TRIAL

The Court made note of the principle that sometimes property needs to be retained even from innocent third parties to the extent it is necessary to prosecute defendants at trial.  However, Customers' argue that there is no need or value to a trial to simply a pile of money held in a bank. The Court is not going to allow the prosecutors to build a mountain of cash in the courtroom before the jury, nor would that have any meaning.  If there is any basis for referring to the funds as evidence at trial, which does not seem likely, the bank financial records would suffice.

### VI. LAW CALLS FOR RETURN OF THE FUNDS

The seizure of property belonging to a party not indicted and pending the outcome of a third party's criminal proceedings is in breach of the United States Constitution.  The fundamental principle of due process enshrined in the Fifth Amendment of the United States Constitution requires that individuals not be deprived of their property without the opportunity to be heard and contest the deprivation. The fact that these victims are not afforded those rights as they are not US citizens but yet are subject to the jurisdiction's process due to seizure is wholly unjust and a situation created by the DoJ seizures.  These foreign speaking innocent bystanders already seeking refuge from one totalitarian government was expected to see statutory posted notice, in English, and then understand complicated procedure much of it sealed.  It is hard to imagine a more prejudicial and unjust predicament that has been thrust upon these innocent bystanders.

The following cases are relevant to the issues to consider in this case and provide not only helpful guidance but can be applied to the customers case by analogy and the principles

followed in particular to the issue of irreparable harm. Further these rulings relate to charged defendants and, therefore, these being innocent bystander customers, they should be afforded elevated application of these principles to these customers, none of whom are charged or even suspected of being involved with criminal offences charged under this indictment.

The Customers submit that in this matter, due process was not followed. None of the customers were given notice or the opportunity to be heard. Depriving the customers of contesting the seizure defies the General rules for civil forfeiture proceeding and principles set out in *United States v. One Hundred Forty Thousand Dollars in U.S. Currency, 2007 WL 2261650* which provide that the government cannot restrain property, without notice and the opportunity to be heard, prior to the filing of a forfeiture complaint.

*De Almeida v. United States, 459 F.3d*, sets forth a standard whereby the government's seizure of property must be scrutinized to ensure compliance with constitutional protections. The court in De Almeida recognized the inherent tension between the government's interest in preserving evidence and an individual's right to possess and utilize their property. It emphasized the necessity for balancing these interests, particularly when a criminal case is pending.

The court also addressed the concept of irreparable harm in the context of property seizure during a criminal investigation. While the case primarily dealt with issues related to civil forfeiture, the court's discussion of irreparable harm is pertinent to the broader question of property seizure and its impact on victims in particular. The court recognized that the deprivation of property pending the outcome of a criminal case can cause irreparable harm to the individual whose property is seized. This harm stems from various factors, including the potential loss of livelihood, financial hardship, and reputational damage. The customers have experienced substantial hardship already from a lack of redemption for over a year now in addition to the

substantial devaluation of their asset.

The court's acknowledgment of irreparable harm underscores the importance of balancing the government's interest in preserving evidence with the individual's right to due process and property rights. As such, this Court is invited to carefully consider the potential consequences of property seizure and should only order such measures when they are absolutely necessary and no less intrusive alternatives exist. The customers submit that the Government's continued seizure of the HDO reserve is not absolutely necessary.  Repatriation will cause no prejudice to the pending criminal trial, but retention will cause substantial irreparable harm to the customers. The Government has been unreasonable and failed to consider alternatives. Indeed, even when engaging war in foreign lands, the US military has a strong credo against inflicting collateral damage.  Certainly, in a civil enforcement context involving an extremely unusual situation where the vast bulk of over 5,000 innocent bystanders have engaged in no wrongdoing, in a civil enforcement context surely collateral damage is something that we all have a common interest in preventing.

The inability to redeem as a result of the seizures is not only affecting those with HDO but also HCN that has been dropping in price as a result of the seizures. Innocent individuals are losing their investments. They cannot wait for the criminal proceedings to conclude. By then the Exchange will collapse and the irreparable harm will be done. In *United States v. James Daniel Good Real Property, 510 U.S. 43 (1993)*, the Supreme Court held that a defendant faced with the forfeiture of property must have an opportunity to contest the government's seizure before trial. This decision recognizes the irreparable harm that can occur if property is forfeited prior to a full adjudication of the underlying criminal charges.  The Supreme Court further emphasized the importance of procedural safeguards to protect against the irreparable harm caused by the seizure

of assets before trial in *Kaley v. United States, 571 U.S. 320 (2014)*. It held that defendants facing criminal charges have a right to challenge the legality of the seizure of their assets in a pretrial hearing so that irreparable harm can be avoided. If a defendant has this right then the rights of an innocent customer should no doubt rank in a higher category without the scrutiny that may be levied at a defendant facing an indictment.

To date, the Government has failed to demonstrate a compelling need to seize **all** the accounts. In *United States v. $8,850 in U.S. Currency, 461 U.S. 555 (1983)* the Supreme Court rejected the government's claims that it was entitled to retain seized property for as long as it saw fit.  It held that a pending Administrative Petition for Remission or mitigation of forfeiture cannot justify prolonged seizure of property without a meaningful judicial hearing.  As a result of this case, Congress passed the *Civil Asset Forfeiture Reform Act of 2000* (CAFRA). This case underscores the principle that the government must demonstrate a compelling need to seize property prior to trial and that the potential harm to the defendant must be carefully considered by the court. In this case, the Government has seized the funds for over a year and a half without a 'meaningful judicial hearing' and without due regard to harm. Therefore the DoJ remission suggestion holds little weight or justification for not releasing the funds now to the customers without other compelling reasons.

It is submitted that the Government's continued possession is overboard and that the innocent customers should not be deprived of their investments. *In re Application of Madison,687 F. Supp. 2d 103, 117 (E.D.N.Y. 2009)* the courts were required to balance "the government's interest in the continued retention of the property and the owner's right to its use." Factors that the court must consider include "whether the Government showed a 'callous disregard' for a movant's constitutional rights"; "whether the movant has an individual interest

in and need for the seized property"; and "whether the movant would be irreparably injured if the property is not returned."(in *Patel v. United States, No. 9:19-MC-81181- WM, 2019 WL 4251269, at \*2 (S.D. Fla. Sept. 9, 2019)*)).

For many customers the seizure of property has had devastating financial consequences. The Court is accordingly asked to re-consider the ruling and list the case for an urgent hearing so that the issues can be fully considered.

## VII.    OTHER GROUNDS FOR RECONSIDERATION

**A.** The Government argues that the technical details of 21 U.S.C. 853(n) govern.

However, Title 21 of the U.S. Code applies to the manufacture or sale of controlled substances, including psychotropic drugs, or other actions with controlled substances.

> The Attorney General shall apply the provisions of this subchapter to the controlled substances listed in the schedules established by section 812 of this title and to any other drug or other substance added to such schedules under this subchapter.

Therefore, perhaps we should not parse 21 U.S.C. 853(n) to narrowly when the Subchapter applies to the trade in illegal drugs. 18 U.S.C. 983 applies more generally to civil forfeiture and applies rules. But 18 U.S.C. 983 contains an entirely different set of requirements, which here the Government did not comply with.

**B.** The Court may not have been fully aware with the busy-ness of preparing for a criminal trial that the Government has never provided, and it seems there is an incomplete set in the public record of seizure proceedings, documents, and other filings. We respectfully request that the Court should reconsider any assumption that the Customers were ever included in this process or made aware of it when it was happening. This is important as to the timetable of methods that the Court analyzes

as to when actions must take place.

## VIII.  CONCLUSION

Customers of the Exchange, the clients of the undersigned, ask the Court to reconsider their respectful demand for the return of their property, by way of this special appearance by members/customers who have no interest in the criminal case, the bankruptcy or any connection to the United States.

Dated:  March 14, 2024                    RESPECTFULLY SUBMITTED

<u>/s/ Brad Geyer</u>
Bradford L. Geyer, PHV
NJ 022751991
Suite 141 Route 130 S.  303
Cinnaminson, NJ 08077
Brad@formerfedsgroup.com
(856) 607-5708

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 14, 2024, a true and accurate copy of the forgoing was electronically filed and served through the ECF system of the U.S. District Court for the Southern District of New York.

<u>/s/ Brad Geyer</u>
Bradford L. Geyer, PHV
NJ 022751991
Suite 141 Route 130 S.  303
Cinnaminson, NJ 08077
<u>Brad@FormerFedsGroup.Com</u>
(856) 607-5708