UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| USDC SDNY | |
| DOCUMENT | |
| ELECTRONICALLY FILED | |
| DOC #: _____ | |
| DATE FILED: _03/22/2024_ | |

UNITED STATES OF AMERICA,

-against-

YANPING WANG,

                                        Defendant.

23 Cr. 118-3 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

On January 3, 2024, a Manhattan grand jury returned a superseding indictment ("S2")

charging Defendant, Yanping Wang, with eleven counts of wire fraud, securities fraud, and

unlawful monetary transactions, as well as conspiring to commit racketeering offenses, wire and

bank fraud, money laundering, and securities fraud.  S2, ECF No. 215.  Wang moves for an order

(1) directing the Government to provide a bill of particulars, (2) severing her trial from that of

co-defendant Ho Wan Kwok, (3) suppressing evidence seized from her Manhattan apartment

pursuant to a search warrant, and (4) suppressing post-arrest statements that she made to

investigators.[1]  Def. Mot., ECF No. 196; *see* Def. Mem., ECF No. 197; ECF No. 231.  For the

reasons stated below, (1) Wang's motion for a bill of particulars is GRANTED IN PART, (2) her

motion to sever her trial is DENIED, (3) her motion to suppress evidence from her apartment is

DENIED, and (4) the Court shall hold a suppression hearing regarding her post-arrest statements.

**BACKGROUND**

I.     <u>The Indictments</u>

Wang and two co-defendants, Ho Wan Kwok and Kin Ming Je, are charged with

operating a scheme to defraud thousands of investors out of more than $1 billion, laundering the

---

[1] Wang joined Kwok's motion to dismiss the first superseding indictment.  Def. Mem. at 26.  The Court denied
Kwok's motion as moot following the grand jury's return of S2, *see* ECF No. 230, and, in due course, shall rule on
Kwok and Wang's motion to dismiss S2, *see* ECF Nos. 238, 241.

proceeds through foreign and domestic entities, and misappropriating the funds for their own use.  The indictment alleges that four "opportunities" comprise the alleged fraud scheme: (1) the "GTV Private Placement," an unregistered stock offering in Kwok's "citizen journalism" company; (2) the "Farm Loans Program," which solicited funds that Defendants promised would be convertible to GTV stock; (3) "G|CLUBS," a "high-end membership program"; and (4) the "Himalaya Exchange," a cryptocurrency offering.  S2 ¶¶ 16–19.  It also alleges that Kwok, Je, and Wang transferred money through "more than approximately 500 accounts held in the names of at least 80 different entities or individuals."  *Id.* ¶ 4.

On March 6, 2023, Kwok and Je were initially indicted for wire fraud, securities fraud, money laundering, and unlawful monetary transactions, as well as conspiracy to commit wire fraud, securities and bank fraud, and money laundering.  ECF No. 2.  On March 10, 2023, the Government filed a complaint (the "Complaint") charging Wang with wire fraud, securities fraud, unlawful monetary transactions, and conspiracy to commit wire fraud and securities fraud.  Compl., ECF No. 1.  The same day, the Honorable Gabriel W. Gorenstein issued an arrest warrant for Wang.  ECF No. 2, Dkt. Entry 3/10/2023.

Wang was first indicted on four counts on March 29, 2023: (1) wire fraud and (2) securities fraud arising from the GTV Private Placement, (3) unlawful monetary transactions, and (4) conspiracy to commit wire and bank fraud, money laundering, and securities fraud.  S1 ¶¶ 1–36, 51–52, ECF No. 19.  S2—filed on January 3, 2024—charges Wang with eleven counts.[2] In addition to separating the conspiracy charge into three separate counts, S2 ¶¶ 27–40, the superseding indictment adds Wang to the wire fraud and securities fraud charges for both the

---

[2] Wang filed her omnibus motion papers that are the subject of this order on December 15, 2023, before S2 was issued.  Def. Mot.  By letter dated January 18, 2024, she informed the Court that she did not seek to file new papers in light of S2, *see* ECF No. 231, and the parties addressed the impact of S2 on her motions in their opposition and reply papers.  *See* Gov. Opp., ECF No. 232; Def. Reply, ECF No. 236.

Farm Loans Program and G|CLUBS, S2 ¶¶ 45–52, and charges all Defendants with one count of conspiring to commit racketeering offenses ("RICO"), *id.* ¶¶ 1–26.  Je alone is charged with obstruction of justice, *id.* ¶¶ 57–58, and Je and Kwok are charged with wire fraud arising from the Himalaya Exchange, *id.* ¶¶ 53–54.

## II.   The Warrant

On March 14, 2023, Judge Gorenstein issued a search and seizure warrant (the "Warrant") for the apartment located at 188 East 64th Street, Apt. 1601, New York, NY 10065 (the "Apartment").  Warrant, ECF No. 199-8. Wang resided at the Apartment.  Wang Aff. ¶ 1, ECF No. 199-4.  The Warrant specified the crimes under investigation (the "Subject Offenses"). Warrant at 4.  It was supported by an affidavit submitted and sworn to by Nicholas DiMarino, a special agent with the Federal Bureau of Investigation (the "FBI").  DiMarino Aff., ECF No. 199-1.  The March 6, 2023 indictment of Kwok and Je as well as the Complaint are attached as exhibits to the affidavit.  *Id.* ¶¶ 7–8.

## III.   Wang's Arrest

At approximately 6:00 a.m. on March 15, 2023, FBI agents arrested Wang and executed the Warrant at the Apartment.  Wang Aff. ¶ 2; *see* ECF No. 199-2 at USAO_00110620; ECF No. 199-3 at USAO_00111198.  When Wang opened the door, the agents asked her to enter the hallway, handcuffed her, and told her that she was under arrest.  Wang Aff. ¶ 4.  At approximately 6:05 a.m., Wang was read her *Miranda* rights.  ECF No. 199-3 at USAO_00111199.  Wang claims that she invoked her right to counsel while still handcuffed in the hallway.  Wang Aff. ¶ 5.  By contrast, the Government's records do not state that Wang invoked her right to counsel in the hallway.  ECF No. 199-2 at USAO_00110620.

The agents "cleared the residence pursuant to the [Warrant]." *Id*.  They then took Wang

to a bedroom area, and Wang "advised [that] the cellular phone by her bed was one she used

often." *Id*.  Wang was then asked if she would like to provide a statement, and she said that "she

would like to have her lawyer present." *Id.*; *see* ECF No. 199-3 at USAO_00111199 ("Wang

would later invoke her right to counsel at approximately 6[:]15am.").  Wang agrees that she

invoked her right to counsel in the bedroom, but claims that she had also invoked it earlier while

in the hallway.  *See* Wang Aff. ¶¶ 4–6.

The agents also found multiple phones on the kitchen counter; Wang stated "she used

them all."  ECF No. 199-2 at USAO_00110620.  "When asked, Wang provided the phones'

passcodes, (where applicable) prior to Wang leaving the residence to be transported." *Id*.  The

agents' report does not state the time or place of this questioning, but Wang says that it also

occurred in the bedroom.  Wang Aff. ¶ 6.  At approximately 7:00 a.m., the agents transported

Wang to an FBI office.  ECF No. 199-3 at USAO_00111199.

## DISCUSSION

I.    <u>Motion for a Bill of Particulars</u>

A.  Legal Standard

Federal Rule of Criminal Procedure 7(f) gives the Court the authority to order a bill of

particulars "to permit a defendant 'to identify with sufficient particularity the nature of the

charge pending against [her], thereby enabling [a] defendant to prepare for trial, to prevent

surprise, and to interpose a plea of double jeopardy should [s]he be prosecuted a second time for

the same offense.'" *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988) (quoting

*United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (per curiam)).  The decision to

grant or deny a bill of particulars "rests within the sound discretion of the district court." *Bortnovsky*, 820 F.2d at 574.

"In determining whether a bill of particulars is warranted, the important question is whether the information sought is necessary, not whether it is helpful."  *United States v. Tournant*, No. 22 Cr. 276, 2023 WL 8649893, at *2 (S.D.N.Y. Dec. 13, 2023) (internal quotation marks and citation omitted).  The defendant cannot use the bill of particulars to "obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant[;] or disclose its legal theory."  *United States v. Carroll*, No. 19 Cr. 545, 2020 WL 1862446, at *6 (S.D.N.Y. Apr. 14, 2020).

Particulars are necessary "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which [s]he is accused."  *United States v. Chen*, 378 F.3d 151, 163 (2d Cir. 2004) (citation omitted).  Although "'mountains' of discovery without more" will not render an indictment constitutionally sound if the defendant is not "apprise[d] . . . of the parameters of the scheme with which [s]he is charged," *Tournant*, 2023 WL 8649893, at *2, *4 (citation omitted), "the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars."  *Carroll*, 2020 WL 1862446, at *6.

Factors considered in determining whether to order a bill of particulars include "the clarity of the indictment; the duration and breadth of the alleged conspiracy, i.e., the complexity of the crime charged; whether the government has provided adequate notice of the particulars; the potential danger to co-conspirators, witnesses, or victims; and the nature of the alleged criminal conduct."  *Tournant*, 2023 WL 8649893, at *2.  The length of the indictment is not

dispositive if the defendant is still left with an insufficient understanding of the parameters of the scheme with which she is charged. *See id.* at *4. On the other hand, the Government is not required to "set forth the precise details of a charged criminal conspiracy." *United States v. Cave*, No. 18 Cr. 689-1, 2019 WL 2764081, at *2 (S.D.N.Y. July 1, 2019) (citation omitted).

B. Analysis

S2, which is forty-nine pages, describes the four interrelated schemes in detail and is not "so general that [it does] not advise the defendant of the specific acts of which [s]he is accused." *Id.* at *2 (citation omitted). However, Wang requests five categories of additional information with respect to the allegations: (1) the identities of victims of the fraud, (2) how she conducted the GTV Private Placement, (3) how she enriched herself as a result of the fraud, (4) which businesses are instrumentalities of the fraud, and (5) which wire transfers are illegal. *See* Def. Reply at 21–25, ECF No. 236.

Wang's first three requests are meritless. First, Wang seeks the identity and location of purported victims, and asks whether the Government will call those victims at trial. The prosecution states that "the discovery materials already contain" the information about the victims. Gov. Opp. at 36, ECF No. 232. Wang does not dispute this, *see* Def. Reply at 21–23, which is alone sufficient to deny her request. *Bortnovsky*, 820 F.2d at 574 ("[I]f the information sought by the defendant is provided in . . . some acceptable alternate form, no bill of particulars is required."). Wang's latter request, which seeks disclosure of trial witnesses, is premature. *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001) ("A bill of particulars is not . . . a means to compel the government to disclose evidence or witnesses to be offered prior to trial.").

Wang relies on the recent decision in *United States v. Tournant*, which required the Government to particularize the alleged fraud victims. *Tournant* similarly featured a lengthy indictment that provided a detailed overview of the complex fraud scheme, including examples of alleged misrepresentations, and discovery that listed investors in the defendant's funds. 2023 WL 8649893, at *3–4. But, in that case, the defendant was charged with fraud based on individual misrepresentations made to particular investors, and had to identify the victims out of over 100 sophisticated institutional and individual investors spread across seventeen different funds. *Id.* at *1, 3–4. The defendant contended that the scheme charged was "highly individualized," as the investors all had "different investment objectives, risk strategies, and disclosures." *Id.* at *3–4. The court agreed, finding that it "would be a daunting and potentially impossible undertaking" to "extrapolate" the full list of victims from the "limited set of examples" in the indictment. *Id.* at *4; *see also United States v. Vaid*, No. 16 Cr. 763, 2017 WL 3891695, at *11 (S.D.N.Y. Sept. 5, 2017) (requiring the Government in an insurance-fraud case to specify which claims were fraudulent because it had to show at trial that each fraudulent claim was medically unnecessary or not provided).

By contrast, the frauds alleged by the Government in S2 are not "highly individualized," and their details are not so "obscure." *Tournant*, 2023 WL 8649893, at *3–4 (citing *Bortnovsky*, 820 F.2d 572). For example, the Government alleges that the GTV Private Placement raised $452 million from 5,500 investors—based on a social media video by Kwok and written materials distributed en masse—and misappropriated "the vast majority of the proceeds." S2 ¶ 16(a), (e)–(f). The Government similarly alleges that the Farm Loan Program and the G|CLUBS programs were rife with fraud and points to particular mass statements distributed by the Defendants in support of these claims. *Id.* ¶¶ 17(e)–(f), 18(d), (e), (h). Wang, therefore, has

a sufficient description of the frauds of which she is accused, as well as the purported victims of

the schemes—who are, in the Government's account, nearly all of the investors in the three

schemes.[3]  Wang's request is an impermissible attempt to use the bill of particulars as "a general

investigative tool."  *United States v. Rivera*, No. 16 Cr. 175, 2017 WL 1843302, at *3 (S.D.N.Y.

May 8, 2017).

Second, Wang seeks particulars regarding how the Government alleges that she

"conducted the GTV Private Placement," including which securities purchases and sales were

involved.  Def. Reply at 24.  But, the indictment has already provided this information, detailing

Wang's involvement in controlling bank accounts in which investor funds were deposited and

misappropriating the funds in those accounts.  S2 ¶ 16(f), (h).  Wang's request "impermissibly

seeks evidentiary detail."  *Vaid*, 2017 WL 3891695, at *12.

Third, Wang calls for the Government to specify how she allegedly enriched herself as

part of the schemes.  Def. Reply at 24–25.  Again, the indictment provides this information,

stating that Wang was "paid at least approximately $500,000 per year, was gifted an

approximately $1.1 million-dollar Manhattan condominium, and was promised millions of

dollars' worth of a purported cryptocurrency."  S2 ¶ 5.  Further specification is not necessary.

*See United States v. Savin*, No. 00 Cr. 45, 2001 WL 243533, at *5 (S.D.N.Y. Mar. 7, 2001)

(denying a request for evidentiary detail regarding defendant's "alleged role" in the offense).

---

[3] Wang speculates that the investors in the GTV Private Placement "may have had a variety of motivations, expectations, and beliefs about why they were investing."  Def. Mem. at 18.  But unlike the defendant in *Tournant*, who was alleged to have made "different misrepresentations to different investors who were invested in different [f]unds . . . at different times," Defendants are not alleged to have personalized their outreach to any specific victims.  2023 WL 8649893, at *3.  Whether Defendants conceived of and carried out any "scheme to defraud" investors by their misrepresentations, therefore, will be a question common to most (if not all) of the investors.  *See United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (noting that, in order to prove the "scheme to defraud" element of a wire fraud claim, a defendant must have "contemplated actual harm that would befall victims due to his deception").

Wang's final two requests are justified.  Wang seeks a list of the businesses that the Government alleges to be fraudulent or fictitious, interrelated, and instrumentalities of the fraud. Def. Reply at 23–24.  She also asks which wire transfers the Government alleges are illegal.  *Id.* at 25.  Courts regularly require the Government to provide information about wire transfers through particulars when the defendant is faced with wire-fraud charges and voluminous discovery.  *See United States v. Silver*, 117 F. Supp. 3d 461, 471 (S.D.N.Y. 2015); *United States v. Rajaratnam*, No. 09 Cr. 1184, 2010 WL 2788168, at *2 (S.D.N.Y. July 13, 2010) (citations omitted); *United States v. Reale*, No. 96 Cr. 1069, 1997 WL 580778, at *14 (S.D.N.Y. Sept. 17, 1997).

The Government states that such information is "contained in the bank and financial records produced in discovery and already in the defendant's possession."  Gov. Opp. at 35 & n.5.  It is true that the Government has done more than provide an "unspecified series of intercompany transfers without identifying the amounts, dates, means, corporate entities, or co-conspirators involved."  *Savin*, 2001 WL 243533, at *3 (quotation marks omitted).  The indictment names forty-four entities that it alleges were part of the RICO enterprise.  S2 ¶ 3(a); *see* Gov. Opp. at 33–34.  The prosecution further alleges that Kwok and Je transferred money to purchase a New Jersey mansion, at least two luxury vehicles, and a luxury yacht; invested $100 million in a high-risk hedge fund; transferred $10 million into Je's accounts; and paid Wang and bought her a Manhattan condominium.  S2 ¶ 5; *see also id.* ¶¶ 16(h), 17(f), 18(h).  In the securities fraud conspiracy count, it also alleges that Wang "opened a particular bank account in the name of GTV" and transferred approximately $200 million into it around May 20, 2020, and "authorized a wire transfer of $100 million from Saraca to Fund-1" around June 5, 2020.  *Id.* ¶ 40(b), (c).  Each of these examples has specified dollar amounts and beneficiaries.  *See United*

*States v. Kozel*, No. 19 Cr. 460, 2020 WL 4751498, at *3 (S.D.N.Y. Aug. 17, 2020) (suggesting that these were necessary particulars).

But, the indictment makes clear that these transfers are only examples of Wang and her co-defendants' money transfers "through more than 500 accounts held in the names of at least 80 entities or individuals, including entities that are part of the Kwok Enterprise." *Id.* ¶ 4; *see id.* ¶¶ 4, 17(f), 18(h) (stating that these transactions were examples). The indictment does not specify these accounts or entities, beyond naming forty-four entities as part of the RICO enterprise and stating that some proceeds were transferred to "bank accounts in the United States, the Bahamas, Switzerland, and the United Arab Emirates" and "held in the name of entities owned or otherwise controlled by Je, including ACA Capital, Hamilton Investment Management Ltd., and Hamilton Opportunity Fund SPC." *Id.* ¶ 4.

Specifying four countries and forty-seven entities—when a "complex web" of over 500 accounts and eighty entities are allegedly implicated by the scheme—does not provide Wang with enough information about the accounts and entities at issue. S2 ¶ 18(h); *see Silver*, 117 F. Supp. 3d at 470–71 (requiring a bill of particulars where the indictment could implicate "hundreds of thousands" of wire transmissions and lacked "specific information regarding the dates of the allegedly offending mailings and wire transmissions"). And, the Government cannot rely on discovery where, as here, the "large volume of material disclosed" forces the defendant to "attempt to guess at which transactions, during a [five]-year period, were allegedly improper." *Rajaratnam*, 2010 WL 2788168, at *2 (citations omitted); *accord Tournant*, 2023 WL 8649893, at *4 (requiring particulars to provide the defendant with knowledge of the "parameters of the scheme").

In "complex conspiracy cases like this one, the potential for unfair surprise and the difficulty of preparing a defense are amplified." *United States v. Bonventre*, No. 10 Cr. 228, 2013 WL 2303726, at *7 (S.D.N.Y. May 28, 2013); *see Reale*, 1997 WL 580778, at *14 ("[E]ach use of the mail or wires in furtherance of a scheme to defraud constitutes a separate crime."). Still, the Government need not "disclose in advance of trial every act it will prove that may violate some criminal statute," *Davidoff*, 845 F.2d at 1154, or "itemize all the overt acts committed in furtherance of the conspiracy," *Rajaratnam*, 2010 WL 2788168, at *3. The Court shall not require the Government to point to every transfer that it contends is illegal in light of the detail and guidance provided in S2. However, the Government is directed to provide to Wang a list of the specific accounts and entities at issue so that she can understand the parameters of the scheme and prepare for trial.[4]

Accordingly, Wang's motion for a bill of particulars is GRANTED IN PART. By **April 2, 2024**, the Government shall indicate to Wang the entities and bank accounts that it contends were involved in the scheme and the dates for any transfers alleged in S2.

II.     <u>Motion to Sever Trial</u>

A.  Legal Standard

"There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). However, under Rule 14 of the Federal Rules of Criminal Procedure, "[i]f the joinder of offenses or defendants in an indictment . . . for trial appears to prejudice a defendant . . . , the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P.

---

[4] The prejudice to the Government's investigation from this disclosure is limited, as trial is set to begin in less than 60 days. *See Bonventre*, 2013 WL 2303726, at *7 (requiring disclosure of exhibits and copies of the exhibits no later than 60 days before trial, in lieu of a bill of particulars); *United States v. Wey*, No. 15 Cr. 611, 2017 WL 237651, at *22 (S.D.N.Y. Jan. 18, 2017) (same).

14(a).  Severance is "an extreme remedy."  *United States v. Lopez*, No. 18 Cr. 736, 2019 WL
4733603, at *4 (S.D.N.Y. Sept. 27, 2019).  "The burden is on the defendant to demonstrate that
severance is proper," *id.*, and this burden can be satisfied only by a showing that "a joint trial
would subject [her] to 'legally cognizable prejudice,'" *United States v. Pirro*, 76 F. Supp. 2d
478, 481 (S.D.N.Y. 1999) (quoting *Zafiro*, 506 U.S. at 541).

The preference for joint trials reflects the idea that "[t]hey promote efficiency and serve
the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  *Zafiro*, 506
U.S. at 537 (quotation marks omitted); *see also Richardson v. Marsh*, 481 U.S. 200, 210 (1987)
(explaining that joint trials "enabl[e] [a] more accurate assessment of relative culpability—
advantages which sometimes operate to the defendant's benefit").  The Supreme Court has,
therefore, instructed that "a district court should grant a Rule 14 severance motion only when
'there is a serious risk that a joint trial would compromise a specific trial right of one of the
defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'"
*United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003) (quoting *Zafiro*, 506 U.S. at 539).
Even in situations "where the risk of prejudice is high," the court should consider "less drastic
measures—such as limiting instructions—[which] often suffice as an alternative to granting a
Rule 14 severance motion."  *Id.*  The preference for joint trials "is particularly strong where . . .
the defendants are alleged to have participated in a common plan or scheme."  *United States v.
Salameh*, 152 F.3d 88, 115 (2d Cir. 1998); *see also Pirro*, 76 F. Supp. 2d at 483.

B.  Analysis

The cases against Wang and Kwok are overlapping, and judicial efficiency and the
interests of justice weigh in favor of trying the two together.  The indictment charges Wang and
Kwok with the same eleven counts and only charges Kwok with one additional count for the

alleged Himalaya Exchange fraud.  *See generally* S2.  The Government alleges that Wang "was intimately involved in every aspect of the charged offenses."  Gov. Opp. at 40.  And, the Government intends to introduce "virtually identical" trial evidence against her and Kwok through "many of the same witnesses."  *Id.* at 40, 43–44.

Wang contends that severance is nonetheless warranted because of marked differences in evidence and "alleged culpability" between her and Kwok, pointing to the fact that, according to the indictment, she received far fewer financial benefits and made fewer allegedly fraudulent statements than Kwok.  Def. Mem. at 23–25.  As the Second Circuit has recognized, "disparity in the quantity of evidence and of proof of culpability are inevitable in any multidefendant trial, and by themselves do not warrant a severance," particularly when the unrelated evidence does not "reflect[] activities of a violent nature."  *United States v. Cardascia*, 951 F.2d 474, 483 (2d Cir. 1991); *see also United States v. Spinelli*, 352 F.3d 48, 56 (2d Cir. 2003) ("[E]ven the fact that evidence may be admissible against one defendant but not another does not necessarily require a severance." (internal quotation marks omitted)).  "[I]t is well established that defendants who played a minor role in a conspiracy may be tried with those who played a larger or dominant role."  *United States v. Hameedi*, No. 17 Cr. 137, 2017 WL 5152991, at *5 (S.D.N.Y. Nov. 3, 2017) (citation omitted) (alteration in original); *see also Richardson*, 481 U.S. at 210.

Although prejudice may occur when "proof inadmissible against a defendant becomes a part of [her] trial solely due to the presence of co-defendants as to whom its admission is proper," "[t]his is an unlikely occurrence when [both] defendants are charged under the same conspiracy count."  *Salameh*, 152 F.3d at 115.  Evidence of criminal acts by co-conspirators are often admissible to prove the existence of the criminal racketeering enterprise in which the defendant participated.  *United States v. Matera*, 489 F.3d 115, 120–21 (2d Cir. 2007).  Kwok's

allegedly fraudulent statements may be admissible against Wang at a separate trial, and their admission during a joint trial is "neither spillover nor prejudicial." *United States v. Ramos*, 346 F. Supp. 2d 567, 572–73 (S.D.N.Y. 2004).[5]

Accordingly, Wang has not made the weighty showing which would warrant severance of her trial from Kwok's, and her motion is DENIED.

III.     Motion to Suppress Apartment Evidence

A.  Legal Standard

Pursuant to the Fourth Amendment's guarantee of the right to be free from "unreasonable searches and seizures," "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

When reviewing a challenged warrant, the Court "accord[s] considerable deference to the probable cause determination of the issuing magistrate" and ensures only that "the totality of the circumstances afforded the magistrate 'a substantial basis' for making the requisite probable cause determination." *United States v. Thomas*, 788 F.3d 345, 350 (2d Cir. 2015) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).  Probable cause is a "fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003) (citation omitted).

The Fourth Amendment's particularity requirement seeks "to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).  To satisfy the requirement, a warrant must (1)

---

[5] Wang claims that she "may have conflicting defenses with Kwok." Def. Mem. at 25; Def. Reply at 29.  But, she does not specify what these defenses may be, why they could not be presented with Kwok as a co-defendant, or why measures such as limiting instructions—"commonly used in multi-defendant, racketeering conspiracy cases such as this"—are insufficient. *United States v. Eley*, No. 20 Cr. 78-3, 2022 WL 1608068, at *3 (S.D.N.Y. May 20, 2022).

"identify the specific offense for which the police have established probable cause," (2) "describe the place to be searched," and (3) "specify the items to be seized by their relation to designated crimes." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020) (citation omitted).  A warrant is facially unconstitutional if it fails to comply with any of these requirements—for example, if the warrant does not tell the officer what crime is at issue in the search, or if it provides no limitation on the "kind of evidence sought." *Id.* (collecting cases).

A warrant that satisfies particularity may still be defective if the "description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based." *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013).  The Circuit has cautioned that, "[n]evertheless, in many cases, the volume of records properly subject to seizure because of their evidentiary value may be vast." *Purcell*, 967 F.3d at 179 (citation omitted); *accord United States v. Johnson*, 93 F.4th 605, 615 (2d Cir. 2024).

"[E]vidence seized pursuant to a defective warrant will not be suppressed if it was 'obtained in objectively reasonable reliance' on the invalid warrant." *Purcell*, 967 F.3d at 179 (quoting *United States v. Leon*, 468 U.S. 897, 922 (1984)).  The good-faith exception does not apply "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992) (citation omitted).  Warrants without a reference to alleged crimes or a temporal scope fall into the fourth category. *In re 650 Fifth Ave. & Related Props.*, 934 F.3d 147, 163 (2d Cir. 2019).

B.  Analysis

Wang challenges Judge Gorenstein's determination of probable cause and argues that the Warrant was insufficiently particular and overbroad.  Def. Mem. at 5–10.

1.  Probable Cause

Wang argues that the Warrant lacks probable cause because DiMarino's affidavit ties her only to the GTV Private Placement in 2020 and fails to establish that evidence of a crime would still be found at the Apartment.  *Id.* at 5–7.  The Court disagrees with Wang's cramped reading of the affidavit.

First, the affidavit ties Wang to the Apartment.  Wang's name appears on purchase records for the Apartment.  DiMarino Aff. ¶ 19(a).  Second, contrary to Wang's assertion that she was only linked to the GTV Private Placement, the affidavit provides sufficient facts to infer Wang's extensive involvement with Kwok's alleged schemes.  The affidavit identifies Wang as the "New York-based functional head of various of the KWOK-affiliated entities that have operated the [f]raud [s]cheme," *id.* ¶ 9, and states that she exchanged messages with Kwok and Je about "various of the fraud-related ventures, including GTV and G|Fashion," *id.* ¶ 16(b).  The Complaint—incorporated into the affidavit, *id.* ¶ 8—states that Wang "has had a close personal relationship with" Kwok, and "is the [p]resident, [t]reasurer, and [s]ecretary of an entity that manages [Kwok]'s purportedly vast personal wealth."  Compl. ¶ 10(e).

Third, and finally, the affidavit makes clear that these schemes extended from 2018 through March 2023, defeating Wang's contention of staleness.  *See* DiMarino Aff. ¶ 6.  In addition, the warrant application primarily sought cell phone communications and business records, which constitute "property of a more permanent nature that is likely to be maintained in one place for longer periods of time."  *United States v. Salomon-Mendez*, 992 F. Supp. 2d 340,

347–48 (S.D.N.Y. 2014); *see United States v. Yu*, No. 22 Cr. 208, 2023 WL 4687970, at *5 (E.D.N.Y. July 21, 2023). Therefore, Wang has not made a sufficient showing for the Court to second-guess Judge Gorenstein's considered determination of probable cause.

>   2. Particularity

On particularity, Wang does not contest that the Warrant facially meets the three criteria set forth by the Second Circuit in *Purcell*: it sets forth the Subject Offenses and explicitly incorporates Attachment A-2, which specifies the relevant time period and lists twelve categories of information to be seized. *See* Warrant at USAO_00110309, USAO_00110311 to USAO_00110315; *Purcell*, 967 F.3d at 179 (permitting a court to examine supporting documents in a particularity determination only if those documents are "incorporated by reference in the warrant itself and attached to it").

Wang argues—relying on *United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017)— that the Warrant defined two categories of information vaguely and, therefore, gave the FBI agents unbounded discretion to search the Apartment. The Warrant is a far cry from the warrant examined in *Wey*, which not only failed to specify the crimes or time period at issue but also, when setting forth "expansive categories of often generic items subject to seizure," omitted "any linkage to the suspected criminal activity." 256 F. Supp. 3d at 385. By contrast, the first category that Wang objects to is the authorized seizure of evidence concerning entities allegedly involved in the Subject Offenses. *See* Def. Mem. at 8–9. But, the Warrant names nine specific entities involved in the fraud scheme and, although it includes broad language about "other entities and/or individuals," this language is cabined by the nine named entities and the requirement that the entities be tied to the Subject Offenses. *See* Warrant at USAO_00110311 to USAO_00110312. The next objected-to category is items "that may have been purchased using

funds originally sourced from proceeds derived from the Subject Offenses." Def. Mem. at 9.
Again, this broad language is cabined by the category in which it is contained, namely
"[e]vidence concerning the possession, receipt, use, transfer, or laundering of funds obtained in
connection with the Subject Offenses." Warrant at USAO_00110312. The limitations imposed
by the Warrant's references to the Subject Offenses and by DiMarino's affidavit, which is also
incorporated into the Warrant, prevent the "seizure of sweeping categories of materials,
regardless of their potential connection (or lack thereof) to any suspected criminal activities."
*Wey*, 256 F. Supp. 3d at 387. It may be that this category is vast, given the nature of the Subject
Offenses, but vastness alone does not make a warrant defective. *Purcell*, 967 F.3d at 179.
Accordingly, the Warrant is not insufficiently particular.

   3.   Overbreadth

Finally, Wang contends that the Warrant authorizes seizure of materials related to entities
that the affidavit does not sufficiently tie her to and, therefore, is overbroad. But, as the Court
has already found, the affidavit permits a probable-cause inference that Wang was an integral
member of Kwok's alleged fraud schemes. The affidavit also offers factual content in support of
the inference that Wang used electronic devices to communicate and make transfers in service of
those schemes. Therefore, the Warrant authorizing seizure of items related to those schemes—
including electronic information—is not overbroad.[6]

Accordingly, Wang's motion to suppress the evidence from the Apartment is DENIED.

---

[6] Even if the Warrant were defective, which it is not, suppression is unwarranted because Wang has not shown that it
was objectively unreasonable for the FBI agents to rely on the Warrant. *See United States v. Rosenfeld*, No. 23 Cr.
65, 2023 WL 8471947, at *10 (S.D.N.Y. Dec. 7, 2023).

IV.   Motion to Suppress Post-Arrest Statement

A.  Legal Standard

The Fifth Amendment's prohibition against compelled self-incrimination guarantees that custodial interrogation "must cease until an attorney is present" if the defendant requests counsel. *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).  "[W]hen an accused has invoked [her] right to have counsel present during custodial interrogation, . . . [she] is not subject to further interrogation by the authorities until counsel has been made available to [her], unless the accused [herself] initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981).  The invocation of the right "requires a *clear* assertion of the right to counsel," not an ambiguous reference such as, "Maybe I should talk to a lawyer." *United States v. Medunjanin*, 752 F.3d 576, 586–87 (2d Cir. 2014) (cleaned up and emphasis in original).  Interrogation includes both express questioning and "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).  But, "routine booking questions do not constitute interrogation protected by *Miranda*." *United States v. Haygood*, 157 F. App'x 448, 449 (2d Cir. 2005) (summary order).

Under the Supreme Court's decision in *United States v. Patane*, 542 U.S. 630 (2004), a failure to give *Miranda* warnings does not require suppression of nontestimonial "physical evidence discovered as a consequence of unwarned statements that are voluntary and uncoerced." *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010) (summary order); *accord United States v. Sharma*, No. 18 Cr. 340, 2019 WL 3802223, at *8 (S.D.N.Y. Aug. 13, 2019).  This is because *Miranda* is a prophylactic rule that safeguards the Fifth Amendment's "prohibition on compelling a criminal defendant to testify against himself at trial." *Patane*, 542

U.S. at 637.  "The exclusion of unwarned statements is a complete and sufficient remedy for any perceived *Miranda* violation."  *United States v. Tirado*, No. 17 Cr. 668, 2018 WL 3432040, at *21 (S.D.N.Y. July 16, 2018) (quoting *Patane*, 542 U.S. at 641–42) (cleaned up); *see United States v. Wilson*, 914 F. Supp. 2d 550, 562 (S.D.N.Y. 2012).

Under the "inevitable-discovery exception," to the Fourth Amendment's exclusionary rule, moreover, the Government may "rely on unlawfully seized evidence if it can prove that it would have inevitably obtained the evidence absent the constitutional violation."  *In re 650 Fifth Ave.*, 934 F.3d at 164 (citation omitted).  But, to do so, the Government must "prove that each event leading to the discovery of the evidence would have occurred with a sufficiently high degree of confidence for the district judge to conclude, by a preponderance of the evidence, that the evidence would inevitably have been discovered."  *Id.* (citation omitted).

B.  Analysis

The *Patane* rule may not neatly apply in this case for two reasons.  First, although the Second Circuit has noted that "failure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of . . . voluntary statements," *McCoy*, 407 F. App'x at 516, the Circuit has not yet determined whether the same standards of voluntariness apply for statements obtained in violation of *Edwards*.[7]

---

[7] It is true that, like *Miranda*, the *Edwards* rule is "judicially prescribed prophylaxis," *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010).  But, the Third Circuit has explicitly reserved judgment on whether *Patane* applies equally to physical evidence obtained pursuant to an *Edwards* violation.  *United States v. Caesar*, 2 F.4th 160, 168 n.4 (3d Cir. 2021); *see also United States v. McCluskey*, Cr. No. 10-2734, 2013 WL 12330211, at *3–4 (D.N.M. June 14, 2013).  There is reason to believe that the answer may be different.  "The merit of the *Edwards* decision lies in the clarity of its command and the certainty of its application."  *Minnick v. Mississippi*, 498 U.S. 146, 151 (1990).  When a defendant invokes their right to silence under *Miranda*, the police must cut off questioning but can resume questioning after the passage of a significant period of time and the provision of a fresh set of warnings.  *Michigan v. Mosley*, 423 U.S. 96, 105 (1975).  By contrast, *Edwards* demands that questioning cease until an attorney is present or unless there is a break in custody lasting at least fourteen days.  *Shatzer*, 559 U.S. at 104, 110.  Moreover, one district court has found:

As a practical matter, once an arrestee has invoked the right to counsel, the police know that the interview is the last opportunity they will have to interrogate the arrestee without counsel.  There is

Second, it is unresolved whether the provision of a password or code in this manner is indeed nontestimonial.  The Government cites a Fifth Circuit case holding that when the evidence seized is "physical, nontestimonial evidence, an *Edwards* violation itself would not justify suppression."  Gov. Opp. at 24 (citing *United States v. Gonzalez-Garcia*, 708 F.3d 682, 687 (5th Cir. 2013)).  But, that same case—although permitting guns discovered in violation of *Edwards* to be admitted—held that the defendant's act of "unlocking the combination locks" on the gun cases was "testimonial and communicative in nature."  *Id.*  "Several courts to consider the issue have specifically held that asking a suspect to enter his phone passcode after the suspect has requested an attorney is an *Edwards* violation requiring suppression of the contents of the phone."  *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 311 (S.D.N.Y. 2018) (citing *United States v. Gilkeson*, 431 F. Supp. 2d 270 (N.D.N.Y. 2006) and *United States v. Mitchell*, 76 M.J. 413 (C.A.A.F. 2017));[8] *see Seo v. State*, 148 N.E.3d 952, 957–58 (Ind. 2020) ("[A] suspect surrendering an unlocked smartphone implicitly communicates, at a minimum, three things: (1) the suspect knows the password; (2) the files on the device exist; and (3) the suspect possessed those files.  And, unless the State can show it already knows this information, the communicative aspects of the production fall within the Fifth Amendment's protection.").

The Court shall not wade into these novel constitutional waters when there are factual disputes that may obviate the need for such a decision.  First, Wang claims that she invoked her

---

no incentive to cease questioning if the arrestee can be induced to make incriminating statements or to reveal information which leads to physical evidence that can be admitted in a subsequent criminal case.  The fact that the statements themselves would not be admissible is not a sufficient remedy to protect the individual's right to be free from compelled self-incrimination.

*United States v. Gilkeson*, 431 F. Supp. 2d 270, 294 (N.D.N.Y. 2006).

[8] On the other hand, the *Pinto-Thomaz* court later stated that "being made to produce a phone password—at least, where, as here, there is no real dispute that the person in fact owns the phone and knows its password—does not violate the Fifth Amendment's guarantee against self-incriminating testimony."  *United States v. Smith*, 673 F. Supp. 3d 381, 388 n.3 (S.D.N.Y. 2023).

right to counsel prior to being asked about the phones or providing her passwords.  Wang Aff. ¶¶ 4–6.  But, the warrant reports created by the FBI agents indicate that Wang first invoked her right to counsel only after being taken to the bedroom.  *See* ECF No. 199-2 at USAO_00110620. Moreover, neither Wang's affidavit nor the reports are clear as to whether Wang re-initiated contact with the agents after invoking the right to counsel.  If Wang provided the passwords before invoking her right to counsel or re-initiated contact with the agents after her invocation, then there was no *Edwards* violation, and the issue is moot.

Second, the Government claims that it would have inevitably accessed the phones because the Warrant permitted them to compel Wang's use of the phones' biometrics and because "tools employed by the FBI . . . are sometimes able to access cellphones without passcodes."  Gov. Opp. at 28–29.  But, the Government has not submitted an affidavit demonstrating that each of the phones had biometrics that could be so accessed or establishing the FBI's ability to access the phones.  Therefore, the Government has not made the necessary showing to demonstrate inevitable discovery.

Accordingly, the Court finds that a suppression hearing is necessary to determine (1) whether Wang invoked her right to counsel prior to being questioned regarding her phone passwords, and (2) whether the Government would have inevitably accessed the phones.  The hearing shall be held on **April 9, 2024**, at **11:00 a.m.**

## CONCLUSION

For the foregoing reasons, Wang's motion for a bill of particulars is GRANTED IN PART, her motion to sever her trial is DENIED, and her motion to suppress the Apartment evidence is DENIED.  The Court shall hold a suppression hearing regarding the post-arrest statements on **April 9, 2024**, at **11:00 a.m.**  The Government is directed to provide to Wang a list

of the entities and bank accounts that it contends were involved in the schemes and the dates for

any transfers alleged in S2 by **April 2, 2024**.

        SO ORDERED.

Dated: March 22, 2024
       New York, New York

                                 _____
                                    ANALISA TORRES
                            United States District Judge