```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
UNITED STATES OF AMERICA,

                    -against-

HO WAN KWOK and
YANPING WANG,

                                         Defendants.
```

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _04/02/2024_
```

23 Cr. 118 (AT)

**ORDER**

ANALISA TORRES, District Judge:

On January 3, 2024, a Manhattan grand jury returned a superseding indictment ("S2") charging Defendant, Ho Wan Kwok, with twelve counts of wire fraud, securities fraud, and unlawful monetary transactions, as well as conspiring to commit racketeering offenses, wire and bank fraud, money laundering, and securities fraud. S2, ECF No. 215. Kwok now moves to dismiss S2 in its entirety.[1] ECF No. 238; *see* Def. Mem., ECF No. 240. For the reasons stated below, the motion is DENIED.

## BACKGROUND

I.  Factual Allegations[2]

Kwok and two co-defendants, Kin Ming Je and Yanping Wang, are charged with operating a scheme from 2018 to March 2023 to defraud thousands of investors of more than $1 billion, laundering the proceeds through foreign and domestic entities, and misappropriating the funds for their own use. S2 ¶ 1. S2, the operative indictment, describes Kwok as an "exiled

---

[1] Kwok's co-defendant, Yanping Wang, joins Kwok's motion "as it pertains to the counts in the S2 Indictment in which [she] is also charged"—Counts One through Ten and Count Twelve. ECF No. 241. For the sake of clarity, and because Wang does not make any standalone arguments, the Court will attribute Defendants' arguments to Kwok.

[2] The following allegations are taken from S2, which the Court must accept as true for the purposes of a motion to dismiss the indictment. *See United States v. Skyfield*, No. 23 Cr. 569, 2023 WL 8879291, at *5 (S.D.N.Y. Dec. 22, 2023). The Court has not held an evidentiary hearing and makes no findings of fact or credibility determinations.

Chinese businessman who fled to the United States in or about 2015" and "garnered a substantial online following" by "claiming to advance a movement against the Chinese Communist Party." *Id.* ¶ 9(a). Je "served as the financial architect and key money launderer" to Kwok, and Wang "operated as a 'chief of staff' for Kwok." *Id.* ¶¶ 10, 11. S2 alleges that Defendants "took advantage of Kwok's prolific online presence and hundreds of thousands of online followers to solicit investments in various entities and programs by promising outsized financial returns and other benefits." *Id.* ¶ 2. In reality, it alleges, "the scheme allowed Kwok, Je, and Wang to enrich themselves, their family members, and their co-conspirators, and to fund Kwok's extravagant lifestyle." *Id.*

S2 names more than 40 "interrelated and overlapping entities that form the Kwok Enterprise." *Id.* ¶ 3(a). The Kwok Enterprise "engaged in criminal activity, [] includ[ing] wire fraud, bank fraud, money laundering, and securities fraud," in service of "the objectives of the enterprise." *Id.* ¶ 3(b). One such objective was to "[e]nrich[] the members and associates of the enterprise": the indictment alleges that with "fraudulently obtained victim money," Kwok purchased "a $26.5 million . . . mansion in New Jersey," at least two luxury vehicles and a $37 million yacht, and "two approximately $36,000 mattresses," among other things. *Id.* ¶¶ 5, 7. Another objective was to "[c]onceal[] and launder[] fraud proceeds": S2 alleges that the Defendants transferred "money into and through more than approximately 500 accounts held in the names of at least 80 different entities or individuals," including accounts in the Bahamas, Switzerland, and the United Arab Emirates. *Id.* ¶¶ 4, 7.

      A. The GTV Private Placement

The indictment describes four alleged fraud schemes. First, between April and June 2020, Defendants "obtained more than $400 million in victim funds through an illegal private

2

stock offering related to" GTV Media Group, Inc. ("GTV"), Kwok's "news-focused social media platform" for which Wang was an executive director. *Id.* ¶¶ 13, 16. On April 21, 2020, Kwok posted a video on social media announcing an offering of GTV common stock via a private placement (the "GTV Private Placement"). *Id.* ¶ 16(a). A memorandum describing the terms of the GTV Private Placement stated that GTV planned to use the proceeds "to expand and strengthen the business," and included a chart detailing how the funds would be spent. *Id.* ¶ 16(d).

The GTV Private Placement raised approximately $452 million from more than 5,500 investors located in the United States. *Id.* ¶ 16(e). The "vast majority of the proceeds" were used not to grow GTV, but were "deposited directly into bank accounts held in the name of Saraca, GTV's parent company, which is beneficially owned by" one of Kwok's "close family members." *Id.* ¶¶ 5, 16(f). Defendants also "misappropriated approximately $100 million raised from investors," placing those funds into a high-risk hedge fund ("Fund-1") for the benefit of Saraca and Kwok's family member. *Id.* ¶ 16(h). The GTV Private Placement "was not made pursuant to a registration statement filed with the U.S. Securities and Exchange Commission." *Id.* ¶ 16(g).

B.  The Farm Loan Program

Around June 2020, domestic banks "began to freeze and close GTV-associated bank accounts," in part because transfers to the accounts "referenced an unregistered stock offering." *Id.* ¶ 17(a). Defendants continued to solicit funds from the GTV Private Placement investors. Around July 22, 2020, Kwok posted a video on social media announcing the "Farm Loan Program," through which investors could loan money to informal "Farms" in the "Himalaya Farm Alliance." *Id.* ¶ 17. Kwok promised that the loans "would be convertible into GTV

3

common stock at a conversion rate of one share per dollar loaned." *Id.* ¶ 17, 17(c). Kwok also stated, in an August 2, 2020 social media video, that GTV had "a market value of 2 billion US dollars," even though it was in fact "a new business that generated no revenue." *Id.* ¶ 17(d).

Thousands of people sent money to the Farms. *Id.* ¶ 17(e). And, although the loan agreements stated that the funds were to be used for a Farm's "general working capital purposes," Kwok transferred millions of dollars to his family members, including to pay for a flight crew on a private jet and maintenance expenses on a yacht. *Id.* ¶ 17(f).

### C. G|CLUBS

On June 20, 2020, Kwok posted a video on social media encouraging viewers to purchase a "G Club . . . membership card." *Id.* ¶ 18(a). A few months later, in October 2020, Kwok launched G|CLUBS, an "exclusive, high-end membership program offering a full spectrum of services." *Id.* ¶ 18(b). G|CLUBS memberships began at $10,000, with top-tier memberships running up to $50,000. *Id.* ¶ 18(c). By August 2021, G|CLUBS documents "reflected approximately 5,900 active members." *Id.* ¶ 18(d).

G|CLUBS "provided its members few to no discernable membership benefits." *Id.* ¶ 18(e). Instead, Kwok told his online followers that "their purchase of G|CLUBS memberships would entitle them to stock in Kwok-affiliated entities, such as GTV and G|Fashion." *Id.* ¶ 18(f). On July 30, 2021, for example, Kwok stated that he "ha[d] to promise that anyone who buys G-Club membership before September 17 must be allotted shares, which is exactly the same." *Id.*

Defendants used G|CLUBS money to purchase luxury automobiles (including a "custom-build Bugatti sports car") and the New Jersey mansion (including "extravagant renovations" and assorted expensive decorations). *Id.* ¶ 18(h).

D. Himalaya Exchange

From April 2021 to March 2023, Kwok and Je operated the "Himalaya Exchange," a "purported cryptocurrency 'ecosystem.'" *Id.* ¶ 19. The Himalaya Exchange hosted both a "purported stablecoin called the Himalaya Dollar" ("H Dollar"), which Defendants claimed had a "fixed 1-to-$1 value backed by reserves," and a "trading coin called Himalaya Coin" ("H Coin"), valued based on supply and demand. *Id.*

Kwok "trumpeted the prosects and valuation" of H Dollar and H Coin online. *Id.* ¶ 19(a). In a video posted on October 20, 2021, for example, Kwok stated that "[i]f anyone loses money, I can say that I will compensate 100%," and that he could "sell the H Coin in the market in one minute and get it back to my H Dollar, and back to your fiat money unit." *Id.* The initial coin offering of both H Coin and H Dollar occurred around November 1, 2021. *Id.* ¶ 19(b).

In fact, H Coin and H Dollar were not "real cryptocurrencies": they were "recorded in an internal database," not on a publicly accessible blockchain, and could not be traded anywhere other than the Himalaya Exchange. *Id.* ¶ 19(e), (f). White papers on the Himalaya Exchange website provided, "in fine print," that H Coin and H Dollar "were merely 'Credits'" that could only be used on the Himalaya Exchange and did "not carry any right to require their exchange for fiat currency or crypto-assets." *Id.* ¶ 19(f).

In April 2022, Kwok and Je arranged for the transfer of approximately $37 million in Himalaya Exchange funds to an escrow account, which was used to guarantee the cost of a yacht that Kwok had purchased. *Id.* ¶ 19(g).

II. Charges

S2 contains thirteen counts. Count One charges all Defendants with Racketeer Influenced and Corrupt Organizations ("RICO") Act conspiracy in violation of 18 U.S.C.

§ 1962(c) and (d), predicated on acts indictable under several federal statutes[3] and spanning from 2018 to March 2023. *Id.* ¶¶ 1–26. Count One does not specify who agreed to commit which acts, or when each act was committed, but does state that each Defendant agreed that a conspirator would commit at least two predicate acts. *Id.* ¶ 25.

Kwok refers to Counts Two and Four as the "Bank Fraud Counts." Count Two charges all Defendants with conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. § 1349. S2 ¶¶ 27–30. Count Four charges all Defendants with conspiracy to commit securities fraud and to provide false statements to a financial institution, in violation of 18 U.S.C. § 371. *Id.* ¶¶ 36–40. Specifically, Count Four alleges that the Defendants "agreed to fraudulently induce investors to participate in the GTV Private Placement, the Farm Loan Program, and G|CLUBS by providing materially false and misleading information and representations in connection with purported shares of GTV common stock and purported companies affiliated with GTV." S2 ¶ 38. The count cites several of Kwok's statements as overt acts, including his representations that the Farm Loan Program "is a loan, and then you can ask for stocks"; that GTV had "a market value of $2 billion US dollars"; and that "anyone who buys G-Clubs membership before September 17 must be allotted shares." *Id.* ¶ 40(d), (e), (f).

Counts Three and Twelve, which Kwok calls the "Money Laundering Counts," charge all Defendants with conspiring to launder money and committing unlawful monetary transactions. Count Three alleges that the Defendants conspired to launder the proceeds of the GTV Private Placement, Farm Loan Program, G|CLUBS, and Himalaya Exchange schemes, in violation of 18 U.S.C. § 1956(h). *Id.* ¶¶ 31–35. And, Count Twelve alleges that the Defendants made and

---

[3] Namely, 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344 (financial institution fraud); 18 U.S.C. § 1956 (laundering of monetary instruments); 18 U.S.C. § 1957 (monetary transactions in property derived from specified unlawful activity); and 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b–5 (securities fraud). S2 ¶ 24.

directed others to make "a wire transfer of approximately $100 million derived from" the GTV Private Placement to Fund-1, in violation of 18 U.S.C. § 1957. *Id.* ¶¶ 55–56.

Counts Five through Eleven, which Kwok calls the "Alleged Fraud Counts," charge Defendants with wire fraud and securities fraud in connection with the GTV Private Placement, Farm Loan, G|CLUBS, and Himalaya Exchange schemes.[4] *Id.* ¶¶ 41–54. The counts allege that Defendants conducted the schemes to "fraudulently obtain money from victims through false statements and misrepresentations" (wire fraud) and "used and employed . . . a manipulative and deceptive device and contrivance" (securities fraud). *Id.*

Kwok moves to dismiss S2 in full pursuant to Federal Rule of Criminal Procedure 12(b).

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 7(c)(1), an indictment must contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged." An indictment satisfies Rule 7(c) if it "first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). To satisfy this pleading standard, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Benjamin*, 95 F.4th 60, 66–67 (2d Cir. 2024) (citation omitted). A defendant, therefore, "faces a high standard in seeking to dismiss an indictment." *United States v. Taveras*, 504 F. Supp. 3d 272, 277 (S.D.N.Y. 2020).

---

[4] Count Eleven charges only Kwok and Je—not Wang—with wire fraud in connection with the Himalaya Exchange scheme. And, S2 does not include a corresponding securities fraud charge for the Himalaya Exchange scheme. *Id.* ¶¶ 53–54.

In addition, "the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment" unless "the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial." *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998).

## DISCUSSION

I.   RICO Conspiracy (Count One)

Kwok moves to dismiss Count One, arguing that it fails to allege a pattern of racketeering activity or a "RICO enterprise." Def. Mem. at 10–19. The Court disagrees.

A.  Predicate Acts

First, Kwok contends that S2 fails to allege "valid predicate acts" to support Count One. *Id.* at 12. He argues that the predicate acts related to GTV, the Farm Loan Program, and G|CLUBS only involve "false promise[s]" to "fulfill contractual obligations," which do not constitute predicate criminal acts in the RICO context, and that these predicate acts are inadequately pleaded in any case. *Id.* at 13.

Kwok's arguments are premature. "[A] RICO conspiracy charge need not specify the predicate or racketeering acts that the defendants agreed would be committed." *United States v. Applins*, 637 F.3d 59, 81 (2d Cir. 2011). Instead, it is sufficient if the indictment "tracks the applicable language of the RICO statute," "states the approximate time and place" of the alleged conspiracy, "lists the state and federal statutory offenses that allegedly comprise the pattern of racketeering," and describes "the nature and structure of the charged enterprise, its purposes, [and its] methods and means."[5] *United States v. D'Amico*, 734 F. Supp. 2d 321, 332 (S.D.N.Y. 2010); *see Alfonso*, 143 F.3d at 776.

---

[5] Kwok largely cites civil authority in support of his request to dismiss the RICO conspiracy count. *See* Def. Mem. at 13–18; Def. Reply at 4–7, ECF No. 245. But, while the Government "must prove the same elements *at trial* as a

S2's allegations fulfill these requirements. Count One tracks the applicable language of the RICO statute, alleging that Defendants and others "willfully and knowingly combined, conspired, confederated, and agreed together and with each other to violate the racketeering laws of the United States . . . , that is, to conduct and participate in the affairs of the Kwok Enterprise through a pattern of racketeering activity." S2 ¶ 24. It states the approximate time and place of the alleged conspiracy: from 2018 to March 2023, "in the Southern District of New York and elsewhere." *Id.* And, it lists the statutory offenses allegedly comprising the pattern of racketeering activity. *Id.* ¶ 24(a)–(e). This is sufficient to apprise Kwok of the "types of predicate crimes allegedly committed." *United States v. Raniere*, 384 F. Supp. 3d 282, 300 (E.D.N.Y. 2019). The twenty-six pages of Count One also provide substantial detail about the nature and structure of the Kwok Enterprise, including details about the four alleged fraud schemes, the relevant persons and entities, and the "purposes" and "means and methods" of the conspiracy. *Id.* ¶¶ 1–26. The Court, therefore, shall not dismiss Count One for failure to allege specific predicate acts.

B. Continuity

Kwok also argues that S2 fails to allege "continuity," as required to establish the "pattern" element of a RICO conspiracy charge at trial. Def. Mem. at 14–18; *see United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012). As numerous courts have held, however, "the Government does not have to plead" continuity in the indictment "with the particularity that [Kwok] suggest[s]." *Raniere*, 384 F. Supp. 3d at 301 (collecting cases). Rather, the indictment need only "specify at least two racketeering acts within a 10-year period . . . that evidence

---

civil plaintiff," the "criminal and civil *pleading standards* are different, even in RICO cases." *Raniere*, 384 F. Supp. 3d at 302 (emphasis in original); *see also United States v. Marchese*, No. 89 Cr. 229, 1991 WL 60338, at *2 (S.D.N.Y. Apr. 11, 1991) (noting that cases involving motions to dismiss civil RICO complaints "are inapposite" when examining a criminal indictment).

continuity." *United States v. Giovannelli*, No. 01 Cr. 749, 2004 WL 48869, at *3 (S.D.N.Y. Jan. 9, 2004) (citing 18 U.S.C. § 1961(5)). In *Giovanelli*, for example, the court found that an indictment adequately alleged continuity where "the relevant counts allege four timely predicate acts—obstruction of justice, illegal trafficking in motor vehicle parts, extortion, and operation of an illegal gambling business—that are alleged to have been performed in furtherance of an ongoing enterprise." *Id.*

Count One's allegations meet this low bar, alleging at least five types of predicate acts—wire fraud, financial institution fraud, money laundering, unlawful monetary transactions, and securities fraud—in furtherance of an ongoing enterprise within a ten-year period. S2 ¶ 24. Kwok cites no criminal RICO cases dismissing an indictment for failure to allege a pattern of racketeering, and the Court is aware of none in this District. Whether the Government can ultimately prove continuity, as required to establish a pattern of racketeering, is a matter for trial. *See United States v. Messina*, No. 11 Cr. 31, 2012 WL 463973, at *4 (E.D.N.Y. Feb. 13, 2012) (rejecting similar challenge as premature).

C. RICO Enterprise

Kwok also contends that Count One should be dismissed "because it fails to allege a RICO enterprise"—specifically, that it fails to "allege relationships among those [entities] associated with the Kwok Enterprise or that it existed for any period of time." Def. Mem. at 18–19. Again, however, Kwok's argument goes to the Government's evidentiary burden at trial, not its pleading burden in an indictment. Kwok identifies no caselaw requiring the Government to

10

allege the "relationships" or duration of the entities within a criminal enterprise with particularity.[6]

Accordingly, Kwok's motion to dismiss Count One is DENIED.

II.    Alleged Fraud (Counts Five through Eleven)

A. Wire Fraud

Kwok contends that Counts Five, Seven, Nine, and Eleven—the wire fraud charges for the GTV Private Placement, the Farm Loan Program, G|CLUBS, and Himalaya Exchange schemes, respectively—must be dismissed for failure to allege a material misrepresentation. Def. Mem. at 33–54.

The wire fraud statute, 18 U.S.C. § 1343, proscribes the use of wire communications in interstate and foreign commerce in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004). The Circuit has summarized the "essential elements" of the wire fraud offense as: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the [] wires to further the scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (citation omitted), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023). "Courts generally find that indictments sufficiently allege wire fraud where they track the language of the wire fraud statute, and where they set forth approximate details about the alleged scheme to defraud." *United States v. Cornelson*, 609 F. Supp. 3d 258, 267 (S.D.N.Y. 2022).

---

[6] By order dated March 22, 2024, the Court ordered the Government to provide "a list of the entities and bank accounts that it contends were involved in the schemes and the dates for any transfers alleged in S2," which will provide further detail on the entities involved in the alleged Kwok Enterprise. ECF No. 251 at 22–23.

11

Kwok argues that S2 does not allege a scheme to defraud because it does not allege a "material misrepresentation" in connection with any of the four fraudulent schemes. At trial, the Government will be required to prove that the Defendants "employed a falsehood that was 'material.'" *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022) (quoting *Neder v. United States*, 527 U.S. 1, 20 (1999)) (emphasis omitted). "To be material, the information withheld either must be of some independent value or must bear on the ultimate value of the transaction." *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994). At the motion-to-dismiss stage, however, Kwok does not cite any caselaw suggesting a heightened pleading requirement that would require the wire fraud counts to do more than track the language of § 1343 and set forth "approximate details" of the alleged schemes. *Cornelson*, 609 F. Supp. 3d at 267; *cf. United States v. Wey*, No. 15 Cr. 611, 2017 WL 237651, at *10–11 (S.D.N.Y. Jan. 18, 2017) (rejecting defendant's argument that wire fraud count should be dismissed for failure to "identify any allegedly fraudulent wires"). An inquiry into the materiality of the Defendants' alleged falsehoods would entail a premature "challenge to the sufficiency of the Government's anticipated evidence." *Wey*, 2017 WL 237651, at *13.

The Court is satisfied that Counts Five, Seven, Nine, and Eleven adequately track the statutory language, "apprise[] [Kwok] of the nature of the accusations against him, and—when read in conjunction with the [rest] of the [i]ndictment, which [the counts] incorporate[] by reference—provide[] notice generally of where and when the crime occurred." *United States v. Avenatti*, 432 F. Supp. 3d 354, 361 (S.D.N.Y. 2020). For the GTV Private Placement, Farm Loan Program, and G|CLUBS charges, S2 alleges (among other things) that Defendants told potential investors that their funds would be used to support the businesses, while Defendants in fact misappropriated much of the money for themselves. *See* S2 ¶¶ 16(d) and (f), 17(e) and (f),

18(f) and (h).  For the Himalaya Exchange count, S2 alleges that Kwok and Je promoted H Coin and H Dollar as "real cryptocurrencies," when in fact they were not recorded on a blockchain and could not be traded anywhere other than the Himalaya Exchange.  *Id.* ¶ 19(e), (f).  And, S2 alleges that Kwok misappropriated the Himalaya Exchange funds, too.  *Id.* ¶ 19(g).

Relying entirely on posttrial and/or civil caselaw, Kwok raises a battery of challenges to the Government's case on these counts.[7]  Although his rebuttals to the indictment's allegations will be tested at trial, "[s]uch factual disputes are simply not matters that the Court may consider at this stage."  *Wey*, 2017 WL 237651, at *10.

For these reasons, Kwok's motion to dismiss Counts Five, Seven, Nine, and Eleven is DENIED.

    B.  Securities Fraud

Kwok next argues that Counts Six, Eight, and Ten—the securities fraud charges for the GTV Private Placement, the Farm Loan Program, and G|CLUBS, respectively—should be dismissed.  The charging language in each of these counts specifies that Defendants "willfully and knowingly, . . . used and employed, in connection with a purchase and sale of a security . . . , a manipulative and deceptive device and contrivance," in violation of 17 C.F.R. § 240.10b–5.  S2 ¶¶ 44, 48, 52.  The counts track the language of Rule 10b–5, *id.*, and incorporate the detailed factual allegations of paragraphs 1–23 by reference, *id.* ¶¶ 43, 47, 51.  No more is needed to satisfy the indictment pleading standards.  *See, e.g.*, *Wey*, 2017 WL 237651, at *9–10; *United States v. Greebel*, No. 15 Cr. 637, 2017 WL 3610570, at *4 (E.D.N.Y. Aug. 4, 2017); *United States v. Zaslavskiy*, No. 17 Cr. 647, 2018 WL 4346339, at *3 (E.D.N.Y. Sept. 11, 2018).

---

[7] *See, e.g.*, Def. Mem. at 36 (arguing that the GTV Private Placement materials did not commit Defendants to use the funds in a particular way); *id.* at 41 (arguing that "no reasonable investor would rely" on Kwok's statement that the Farm Loan investments would be convertible to stock); *id.* at 46 (arguing that Defendants did not promise to use G|CLUBS membership dues for any specific purpose).

13

Kwok nevertheless contends that the counts are deficient because they (1) fail to allege a material misrepresentation or omission; (2) for the Farm Loan or G|CLUBS schemes, do not allege a securities transaction; and (3) do not allege scheme liability.

1. Material Misrepresentation or Omission

First, mirroring his wire-fraud arguments, Kwok argues that Counts Six, Eight, and Ten must be dismissed for failure to allege a material misrepresentation or omission. Def. Mem. at 33–54. To prove securities fraud at trial, the Government will have to establish that Defendants willfully "made a material misrepresentation (or a material omission if [they] had a duty to speak) or used a fraudulent device." *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (quoting *VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011)). In this context, "materiality" means that "there is a substantial likelihood that a reasonable investor would find the omission or misrepresentation important in making an investment decision." *Id.* (cleaned up).

But again, the ultimate truth or falsity of Defendants' alleged misrepresentations—and the materiality of those misrepresentations—are factual questions for trial. *See United States v. Brooks*, No. 08 Civ. 35, 2008 WL 2092433, at *3 (S.D.N.Y. May 16, 2008) (in case involving false statements made to the government, holding that materiality and "truth and falsity" are "issue[s] of fact to be determined at trial"). Kwok argues, for example, that his statements about the GTV Private Placement funds were "too general to cause a reasonable investor to rely upon them," and that "no reasonable investor would rely on [Kwok's statements] in loaning money to the Farms." Def. Mem. at 38, 41 (cleaned up); *see also* Def. Reply at 23–25, ECF No. 245. But, "[d]etermination of materiality under the securities laws is a mixed question of law and fact that the Supreme Court has identified as especially well suited for jury determination." *United States*

14

*v. Gramins*, 939 F.3d 429, 446 (2d Cir. 2019) (citation omitted).  These arguments are not properly considered on a Rule 12(b) motion.

        2.   Securities Transaction

Kwok also argues that Counts Eight (Farm Loans) and Ten (G|CLUBS) should be dismissed because they did not involve a securities transaction.  "The Supreme Court has repeatedly held that Rule 10b–5's requirement that a fraud be 'in connection with' the purchase or sale of a security is easily satisfied," covering "deceptive devices 'touching' a sale or purchase of a security."  *United States v. Nouri*, 711 F.3d 129, 143 (2d Cir. 2013) (citations omitted).  The indictment's allegations here suffice.

First, Kwok contends that S2 equivocates about what securities are at issue in the Farm Loans and G|CLUBS schemes, rendering the counts "impermissibly vague" and violative of due process.  Def. Mem. at 21, 25; *see* Def. Reply at 14–16.  The Court disagrees.  The indictment alleges that investors in the Farm Loan Program were "promis[ed] that such loans would be convertible into GTV common stock at a conversion rate of one share per dollar loaned."  S2 ¶ 17.  S2 also alleges that Kwok told his "online followers that their purchase of G|CLUBS memberships would entitle them to stock in Kwok-related entities, such as GTV and G|Fashion."  *Id.* ¶ 18.  Far from being "hopelessly confused" on the issue, Def. Reply at 16, the indictment is sufficiently clear as to which alleged securities are at issue.

Kwok then argues that if GTV equity is the security underlying Counts Eight and Ten, S2 does not allege that the Farm Loan Program or G|CLUBS involved the "sale or purchase" of the stock—only a promise that the Farm Loans and G|CLUBS memberships would be convertible to stock at some unspecified future date.  Def. Mem. at 22–23, 26–27.  But, "the question of whether the conspirators *in fact* offered a security, currency, or another financial instrument

15

altogether, is best left to the finder of fact." *Zaslavskiy*, 2018 WL 4346339, at *4 (emphasis in original). A reasonable jury could find that the Farm Loans and G|CLUBS memberships were stock transactions by another name—or, it could agree with Kwok that the membership and loan agreements were too vague to violate Rule 10b–5. The Court, however, will not "evaluate documents and evidence outside of the four corners of the [i]ndictment" to make that determination at this stage. *Id.*

### 3. Scheme Liability

Kwok argues that Counts Six, Eight, and Ten should be dismissed "[t]o the extent they purport to assert 'scheme liability'" under subsections (a) and (c) of Rule 10b–5, "as distinct from liability for a misrepresentation under [subsection] (b)." Def. Mem. at 55 (citation omitted). Kwok cites *SEC v. Rio Tinto PLC*, 41 F.4th 47 (2d Cir. 2022), in which the Circuit held (in a civil enforcement action) that "a scheme liability claim [] requires something beyond misstatements and omissions, such as dissemination" of false information. *Id.* at 49 (emphasis omitted). Even assuming that *Rio Tinto* applies in the criminal context and affects the pleading standards for indictments, S2 adequately alleges that Kwok participated in the dissemination of the misstatements by posting videos to his large following on social media. *See, e.g.*, S2 ¶¶ 16(a), 17(c)–(d), 18(a), (d), and (f), 19(a).

Accordingly, Kwok's motion to dismiss Counts Six, Eight, and Ten is DENIED.

### III. Bank Fraud and Money Laundering (Counts Two, Three, Four, and Twelve)

Kwok's requests to dismiss the remaining Bank Fraud and Money Laundering Counts are largely derivative of his challenges to the substantive Alleged Fraud Counts. He argues that "the securities fraud portion of Count Four (alleging a conspiracy to commit securities and bank fraud)" must be dismissed because S2 does not allege any material misrepresentation made in

16

connection with the GTV Private Placement, the Farm Loan Program, or G|CLUBS. Def. Mem. at 29. The Court has rejected that argument, *see supra* Part II.B.1, so this challenge to Count Four fails for the same reasons. Kwok also argues that all of the Bank Fraud and Money Laundering Counts should be dismissed because the "predicate acts"—the Alleged Fraud Counts—are "deficient as a matter of law." Def. Mem. at 58. Because they are not, *see supra* Part II, the related conspiracy and unlawful transactions counts will not be dismissed on this basis.

Kwok's two other challenges merit slightly more discussion. First, he contends that the Bank Fraud Counts must be dismissed because S2 only alleges that Defendants "deposit[ed] funds allegedly procured by fraud into a federally-insured bank," which (he argues) "is not sufficient to allege violation of 18 U.S.C. §§ 1344 and 1014." Def. Mem. at 57.

Count Two charges Defendants with conspiracy to commit bank fraud under 18 U.S.C § 1349, with the object of violating the substantive bank fraud statute, 18 U.S.C § 1344. S2 ¶¶ 27–30. Section 1344, in turn, criminalizes schemes to knowingly "defraud a financial institution," 18 U.S.C § 1344(1), or "to obtain any of the moneys, funds, credits, assets, securities, or other property owned by . . . a financial institution, by means of false or fraudulent pretenses, representations, or promises," *id.* § 1344(2). The two subsections "defin[e] different ways in which a defendant may commit the offense of bank fraud," and violation of either is sufficient to support a conviction. *United States v. Crisci*, 273 F.3d 235, 239 (2d Cir. 2001).

Count Two tracks the language of the statute, alleging that Defendants "made false representations . . . to financial institutions to . . . open and maintain bank accounts used in furtherance of their fraud and obtain funds under the custody and control of those financial institutions." S2 ¶ 30. Although Kwok argues that Defendants did not expose the financial

17

institutions to "actual or potential loss," Def. Mem. at 57, "[t]here is no requirement under the bank fraud statute that a scheme to obtain money or property must 'create[] a risk of financial loss to the bank.'" *United States v. Bankman-Fried*, No. 22 Cr. 673, 2023 WL 4194773, at *8 (S.D.N.Y. June 27, 2023) (quoting *Loughrin v. United States*, 573 U.S. 351, 366 n.9 (2014)). Instead, an indictment sufficiently states a bank fraud conspiracy offense where it alleges that the defendant "conspired to send false information to a financial institution to disguise the true nature of an account and to obtain funds from that account that were in the custody and control of the financial institution." *Id.* (citing *United States v. Lebedev*, 932 F.3d 40, 49 (2d Cir. 2019), *abrogated on other grounds by Ciminelli v. United States*, 598 U.S. 306 (2023)). Count Two does so and is, therefore, legally sufficient.

      Count Four, similarly, charges Defendants with conspiring to provide false statements to a financial institution, in underlying violation of 18 U.S.C. § 1014. S2 ¶¶ 36–40. Section 1014 provides that "[w]hoever knowingly makes any false statement or report . . . for the purpose of influencing in any way the action of . . . any institution the accounts of which are insured by the Federal Deposit Insurance Corporation . . . upon any application" is guilty of a crime. 18 U.S.C. § 1014. The charging language in S2 tracks the language of the statute and specifies, "to wit," that Defendants "lied, and caused others to lie, to financial institutions in connection with applications for bank accounts, including concerning the source and ownership of funds to be deposited and the intended purpose of the accounts." S2 ¶ 39. Kwok notes that the indictment does not allege that Defendants lied to any financial institution "in connection with procuring a loan or any related transaction." Def. Mem. at 57. But that is not a required element of the offense, which, by its plain language, covers any "application." *See United States v. Wade*, 266 F.3d 574, 581 (6th Cir. 2001) (holding that § 1014 extends to an "application to open a checking

account"); *United States v. UBS Sec. LLC*, No. 18 Civ. 6369, 2019 WL 6721718, at *20 (E.D.N.Y. Dec. 10, 2019) ("Persuasive appellate authority favors the Government's position that § 1014 liability extends beyond lending." (citation omitted)).[8] Accordingly, Count Four is also legally sufficient, and Kwok's motion to dismiss the Bank Fraud Counts is DENIED.

Finally, Kwok argues that Count Twelve, unlawful monetary transactions in violation of 18 U.S.C. § 1957, "should be dismissed for the independent reason that it impermissibly merges with its predicate offenses." Def. Mem. at 59. Section 1957 subjects to criminal penalties "[w]hoever . . . knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. § 1957(a). To be considered "criminally derived property," the funds must have been "obtained from a prior, separate criminal act" other than the unlawful transaction itself. *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 372 (S.D.N.Y. 2008) (citing *United States v. McCarthy*, 271 F.3d 387, 395 (2d Cir. 2001), *abrogated on other grounds by Eberhart v. United States*, 546 U.S. 12 (2005)). That is, "when the underlying crime is completed, a transaction conducted with the proceeds from that crime may provide the basis for a money laundering conviction." *McCarthy*, 271 F.3d at 395.

Count Twelve alleges that Defendants "made, and directed others to make, a wire transfer of approximately $100 million derived from the offenses charged in Counts Five and Six"—the

---

[8] In his reply brief, Kwok contends that the Second Circuit's decision in *United States v. Krown*, 675 F.2d 46 (2d Cir. 1982), limits § 1014 to statements made in connection with "an advance or loan or other credit transaction listed in the statute." Def. Reply at 32 (citing *Krown*, 675 F.2d at 51). In that case, the Circuit held that merely depositing worthless checks at an FDIC-insured bank did not violate § 1014 where there was no evidence that the defendant "had the purpose of influencing the bank to use the [] checks in connection with an advance, loan, application or commitment." *Krown*, 675 F.2d at 50. *Krown*'s holding is "narrow"—turning on the defendant's intent, not the meaning of "application"—and does not foreclose the Court's conclusion here. *UBS Sec. LLC*, 2019 WL 6721718, at *19; *cf. id.* at *18–20 (holding that *Krown* "has no bearing on whether a securities offering can be considered an 'advance' or 'purchase' under section 1014").

GTV Private Placement—to Fund-1. S2 ¶ 56. Kwok claims that this transfer "is at the heart of the alleged fraud in Counts Five and Six," so it "cannot also serve as the basis for a separate money laundering offense." Def. Mem. at 60. Not so. In *McCarthy*, the Second Circuit explained that funds derived from a crime become "proceeds" within § 1957 when they are either "derived from an already completed offense, or a completed phase of an ongoing offense." 71 F.3d at 395 (citations omitted). The next year, in *United States v. Szur*, the Circuit held that funds obtained from a wire fraud scheme "comprised 'proceeds' at the moment they were in 'the control of the perpetrators'"—that is, "as soon as [the defendant] received them." 289 F.3d 200, 214 (2d Cir. 2002) (citation omitted). The Circuit found, therefore, that the wire fraud was "sufficiently distinct" from the subsequent money laundering. *Id.*

*Szur* applies here, where the Government alleges that Defendants conducted a wire and securities fraud scheme and then unlawfully transferred the funds they received from it. At a minimum, S2 alleges that "a discrete phase" of the GTV Private Placement "ha[d] been completed so as to generate 'proceeds'" under § 1957. *Id.* The indictment's allegations about the GTV Private Placement are not, as Kwok argues, limited to the impropriety of the alleged $100 million transfer. *See* Def. Reply at 33–34; *see also* S2 ¶ 16(b)–(c), (f). Kwok's motion to dismiss Count Twelve is, therefore, DENIED.

## CONCLUSION

For the foregoing reasons, Kwok's motion to dismiss S2 is DENIED. The Clerk of Court is directed to terminate the motions at ECF Nos. 238 and 241.

SO ORDERED.

Dated: April 2, 2024
      New York, New York

_____
ANALISA TORRES
United States District Judge