# Exhibit C

1                    UNITED STATES DISTRICT COURT

2
                    FOR THE DISTRICT OF CONNECTICUT

3

4

5      - - - - - - - - - - - - - - - x
                                     :
6      UNITED STATES OF AMERICA       :   No.  3:15CR155(RNC)
                                     :
7               vs.                   :
                                     :
8      ROSS SHAPIRO, ET AL,           :
                                     :   HARTFORD, CONNECTICUT
9                    Defendants.      :   April 24, 2017
                                     :
10     - - - - - - - - - - - - - - - x

11

12
                         TELEPHONE CONFERENCE
13

14          BEFORE:

15               HON. ROBERT N. CHATIGNY, U.S.D.J.

16

17

18

19

20

21                                    Darlene A. Warner, RDR-CRR
                                      Official Court Reporter
22

23

24

25

1    APPEARANCES:

2

3            FOR THE GOVERNMENT:

4                 U.S. ATTORNEY'S OFFICE-NH
                  157 Church Street
                  P.O. Box 1824; 23rd Floor
5                 New Haven, Connecticut 06510
                  BY:  LIAM BRENNAN, AUSA
6                       HEATHER L. CHERRY, AUSA
                        DAVID NOVICK, AUSA

7

8            FOR ROSS SHAPIRO:

9                 PETRILLO, KLEIN & BOXER LLP
                  665 Third Avenue
                  22nd Floor
10                New York, New York 10017
                  BY:  GUY PETRILLO, ESQ.
11                      JOSHUA KLEIN, ESQ.
                        AMY LESTER, ESQ.

12

13                REID & RIEGE, P.C.
                  One Financial Plaza
                  Hartford, Connecticut 06103
14                BY:  THOMAS V. DAILY, ESQ.

15

16           FOR MICHAEL GRAMINS:

17                BRACEWELL & GIULIANI, LLP
                  1251 Avenue of the Americas
                  49th Floor
18                New York, New York 10020-1100
                  BY:  MARC L. MUKASEY, ESQ.
19                      Kedar S. Bhatia, Esq.

20

21

22

23

24

25

```
 1    APPEARANCES (CONTINUED):

 2

 3         FOR TYLER PETERS:

 4              ALSTON & BIRD, LLP-NY
                90 Park Avenue
 5              12th Floor
                New York, New York 10016
 6              BY:  BRETT D. JAFFEE, ESQ.
                     MICHAEL L. BROWN, ESQ.
 7
                BRAFMAN & ASSOCIATES, PC
 8              767 Third Avenue
                26th Floor
 9              New York, New York 10016
                BY:  ALEX SPIRO, ESQ.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                           9:30 A.M.

2

3               COURT REPORTER:  Good morning, Judge Chatigny

4    has joined the conference.  Please state your appearances.

5               MR. NOVICK:  For the government, David Novick.

6    Also present with me is Liam Brennan and Heather Cherry.

7    Good morning, Your Honor.

8               THE COURT:  Good morning.

9               MR. PETRILLO:  Good morning, Your Honor, Guy

10   Petrillo, Josh Klein, Amy Lester and Tom Daily; and

11   Mr. Shapiro is on the line as well.

12              MR. MUKASEY:  Good morning, Judge, Marc Mukasey

13   from Greenberg Traurig.  I'm with me colleague, Kedar S.

14   Bhatia, a few others here for the defendant, Michael

15   Gramins, who is here with us.

16              MR. BROWN:  Good morning, Your Honor, Mike

17   Brown, Alex Spiro and Brett Jaffee on behalf of Mr. Peters

18   who is also on the line.

19              THE COURT:  Good morning.  This is a telephone

20   conference to talk about the jury questionnaires and also

21   the motions that remain to be resolved.  We're getting

22   feedback on this line unfortunately.  I don't know why

23   that is; but, can everybody hear me all right?

24              MR. NOVICK:  From the government, yes, Your

25   Honor.

1          SPEAKER:  Yes, Your Honor, we can.

2          THE COURT:  Not hearing differently, I assume

3    everybody can hear me.

4          With regard to the jury questionnaires, you have

5    received copies of the questionnaires.  You've had an

6    opportunity to review them and discuss them, and it's my

7    understanding that as of this morning you have agreed that

8    20 people should be excused for cause.  In addition, there

9    are 12 jurors with respect to whom for cause challenges

10   have been raised by the defense but as to whom the

11   government does not agree that the person should be

12   excused.  Then I gather we have quite a few people who

13   have indicated that they would have great difficulty being

14   available for one reason or another, and that group

15   numbers, according to my chart, 61 people.  So that's the

16   status.

17         With regard to the stipulations that you have

18   reached, I adopt your agreement as to those 20 and they

19   will be excused accordingly.

20         With regard to the 12 people as to whom the

21   defense has raised objection, does the government have

22   anything to say as to any of those 12?

23         MR. NOVICK:  Sure, Your Honor.  I could go

24   through them individually, but I think what would probably

25   make most sense as a broad kind of global matter.

1    I think the government's position on those 12 is

2    not necessarily that we wouldn't ultimately agree in some

3    cases to a cause challenge, but that in reviewing the

4    answers, it seems to us that additional questions would be

5    appropriate, and if we were -- if we were in court, as we

6    normally are when we go through this process, and those

7    answers -- those questions were asked and those answers

8    were given, that the Court or the Court either on its own

9    or with the parties' suggestion, would likely follow up

10   and ask additional questions to determine either about a

11   conflict or an inability to sit medically or a view that

12   may suggest a lack of impartiality.

13        Oftentimes we find out on further pressing that

14   the issue that what the juror thought was an issue for

15   them really isn't as a matter of fairness.

16        For example, someone who has seen the Big Short

17   and thinks this case is all about the origination of RMBS

18   and finds out it's really not, you know, that may change

19   both the juror's and the parties' and the Court's view of

20   whether there's a real conflict.

21        So that was kind of our analysis in driving

22   these were were there follow-up questions that we thought

23   were appropriate, and it's only fair to the remaining

24   members of the jury pool that these jurors come in and be

25   considered in terms of whether they're capable of being

1  fair and impartial.

2        THE COURT:  Okay, that's fine.  Then there's no

3  need for you to comment as to any of these individually.

4        MR. NOVICK:  Okay.

5        THE COURT:  If we bring those folks in for voir

6  dire, then we can ask the follow-up questions that you

7  think are necessary rather than try to do it in the

8  abstract based on the questionnaire responses alone.

9        At that rate, it's my understanding that

10  removing the 20 by agreement would leave us with 102

11  people; and as to that group, we would have the 12 with

12  regard to whom objections have already been made.

13        Am I right that the government has an objection?

14        MR. NOVICK:  Yes, Your Honor.  We had an

15  objection to one juror who I think answered that their

16  religion prevented them from passing judgment on people.

17        THE COURT:  That's juror 234, is that correct?

18        MR. NOVICK:  That's right, Your Honor, yes.

19        THE COURT:  Ordinarily when we have somebody who

20  tells us that or something very much like that, the juror

21  is excused from further service.  Is there some reason why

22  the defense wants me to hold on to this juror

23  notwithstanding the juror's statement?

24        MR. BHATIA:  Your Honor, Kedar Bhatia.  We think

25  that juror falls into the same category as some of the

1   others where additional questions would be appropriate.

2   But ultimately we agree that this might be a cause

3   challenge, but we thought it was better to ask at least to

4   bring them in to talk to them.

5          THE COURT:  Okay.  Moving on from there, looking

6   at the total situation, let's suppose that we have a

7   hundred people who come into court to participate in voir

8   dire, of that hundred, we have 61 who have already told us

9   that for one reason or another they can't be available --

10  is that correct?

11         Hang on please.

12             (Pause)

13         THE COURT:  Okay.  So we have a hundred people

14  potentially coming to court and 40 of those people have

15  indicated to us that for one reason or another they don't

16  think they can be available.  Are you comfortable going

17  forward on that basis?  Or do you think that we need to do

18  something in addition in order to get a jury?  Bearing in

19  mind that you've had an opportunity to review the

20  responses to the questionnaires and given that we're going

21  to need a jury of 12 plus an appropriate number of

22  alternates and given the number of peremptories that you

23  are entitled to under the rule, not to mention the

24  defense's suggestion that an additional number might be

25  fair for the defense.

1          Given all those factors, are you comfortable

2     going ahead with a hundred people, approximately 40 of

3     whom have indicated that they don't think they should be

4     here?

5          Mr. Novick?

6          MR. NOVICK:  Your Honor, just so that I

7     understand the sort of playing field here, the potential

8     additional challenges that the defense has asked for

9     which, you know, as a matter of fairness depending on the

10    number the defense has asked for, the government may also

11    request additional strikes, do we have an idea of, in

12    doing our calculation in the potential for issues here,

13    how many we're talking about of additional peremptories

14    that the defense is asking for.  I don't think we ever had

15    discussions about actual numbers.

16          THE COURT:  We have not.

17          MR. NOVICK:  Because ordinarily, if we were

18    talking about just a standard number of peremptories, I

19    think the government would be fine with the number of

20    jurors that we're looking at here.  It's more than we

21    normally have for a criminal case.

22          I understand that the case is longer than we

23    normally have, so we're going to have more issues, but I

24    think the numbers of people are appropriate here.

25          And I also would say that a lot of the 20 that

1    we've agreed to strike, those were, it seemed to us, in

2    many cases, the sort of immovable conflicts, you know, for

3    example, I have a plane ticket bought on such and such a

4    date as opposed to a jury who says, you know, my job is

5    really important, which perhaps we look less favorably

6    upon as an excuse.

7              So I think a lot of the immovable conflicts will

8    have been taken care of.

9              I just hesitate -- so ordinarily I would say the

10   government thinks that we're fine with the number we have

11   I guess with the caveat that I don't know, you know, how

12   many peremptories we're really talking about here.

13             THE COURT:  Does anybody want to speak on the

14   defense side?

15             MR. MUKASEY:  Judge, Marc Mukasey.

16             I think that an additional peremptory for each

17   defendant, so three for the sort of three combined teams

18   would be appropriate given the length and complexity of

19   this case and are certainly permitted under the rules in

20   Your Honor's discretion.

21             And I'll just offer a comment with respect to

22   Mr. Novick's request for additional strikes for the

23   government.

24             I don't think respectfully that this is an issue

25   that should be treated proportionally.  The reason we're

1    asking for extra strikes is because we have three defense

2    teams here with three different defendants who operated at

3    three different hierarchal levels at Nomura who come from

4    three different law firms that are going to offer three

5    different perspectives.  I think we're largely on the same

6    page, but we have individual clients to worry about, and

7    offering each defendant one extra chance for the combines

8    three teams.  Three extra chances to ensure a fair and

9    impartial jury in a case of this complexity I respectfully

10   submit is important.

11          The government is the government.  They don't

12   have extra teams, they don't have extra clients, they're

13   presenting the same case regardless.  They're not meshing

14   with other U.S. Attorney's Offices and they're not

15   protecting the rights of three different people at the

16   same time.

17          So at least as far as Mr. Gramins goes and to

18   the extent that I speak for the three teams at this point,

19   I think three additional defense peremptory challenges

20   would be appropriate.

21          MR. PETRILLO:  Your Honor, Guy Petrillo for

22   Mr. Shapiro.  We join in that application.  We think that

23   makes eminent sense.

24          MR. BROWN:  As does Mr. Peters.

25          THE COURT:  Mr. Novick?

1          MR. NOVICK:  Sure, Your Honor.  Respectfully I

2    certainly understand the fact that there are three

3    different defense teams here.

4          The government's request is a matter of

5    fairness.  We're all involved in a case which the defense

6    has characterized just now as complex and lengthy, and

7    that's true for all sides.  And I understand that they

8    each have clients to represent and the government though

9    at the same time is prosecuting three distinct individuals

10   at the same time.

11         And I am not suggesting that we need move

12   proportionally.  The rules as it is give the defense more

13   strikes than the government as a general matter, and those

14   are the rules; and so I'm not necessarily suggesting that

15   we need receive three additional peremptories, but some

16   number of additional peremptories I think would be fair.

17         The government has an interest, just like the

18   defendant, to have a fair trial with a panel of jurors who

19   are going to be fair and impartial as to both sides.

20         This is not just a question of protecting the

21   defendants' rights, which I understand frankly is in the

22   interest of all parties, but also the government's

23   interest in having this case tried fairly.

24         THE COURT:  Okay.  How many alternates do you

25   think we should seat given the experience in the Litvak

1    trial?

2                MR. NOVICK:  From the government, Your Honor, I

3    would say at least four, if not more.

4                I mean, I think, God willing, the issues that we

5    had in the Litvak case will not repeat themselves,

6    however -- and that was a much shorter trial in the end,

7    which I hope this will be true for this one, but obviously

8    they were planning for a longer trial, so I would say at

9    least four, if not five.

10               THE COURT:  How about on the defense side?

11               MR. BHATIA:  Your Honor, we thought that four

12   was an appropriate number for the alternates.

13               MR. PETRILLO:  Agreed for Mr. Shapiro.

14               THE COURT:  At that rate, let's suppose that we

15   were to have four alternates.  That would entitle each

16   side to two additional peremptories.  On that basis --

17   gosh, I wish we didn't have that feedback on our system

18   this morning, but be that as it may -- we have -- this is

19   the arithmetic:

20               We have 12 regular jurors, and under the

21   applicable rule, Rule 24 of the Federal Rules of Criminal

22   Procedure, the parties would be entitled to 16

23   peremptories in choosing the regular jurors, six for the

24   government, ten for the defendants, so that would be 28;

25   and if we add four alternates, that's 32 plus two

1    additional peremptories per side for the alternates.  That

2    brings us to 36.  That is the number of regular jurors and

3    peremptories as to regular jurors plus four alternates

4    with peremptories as to the alternates.

5         That brings us to a total of 36, such that if we

6    had 36 people qualified to serve, you could exercise your

7    peremptories as against the regular jurors and we could

8    seat 12, you could exercise your peremptories as against

9    the alternates and we could seat four and we would be

10   ready to go with our jury.  That's what the law provides

11   by rule.

12        I gather from what you said before, Mr. Novick,

13   it's your view that if that's the number we need, you

14   would be comfortable going ahead with the pool that we

15   have at the moment, is that right?

16        MR. NOVICK:  Yes, Your Honor.

17        THE COURT:  And let me ask the defendants that

18   question.

19        Putting aside for the moment your understandable

20   interest in having as many peremptories as humanly

21   possible, what do you say about going ahead with this pool

22   if our minimal requirement is 36?

23        MR. PETRILLO:  Your Honor, may I ask, to the

24   extent that we thought it would be prudent to summon more

25   juror candidates, is that feasible for the Court?

1    THE COURT:  I don't think so.  You will recall

2  that we tailored our communications with prospective

3  jurors in an attempt to make it absolutely clear that if

4  anybody had any concern about the schedule, they had to

5  opt out at the first step and not come here and fill out a

6  questionnaire.

7    It's frustrating, to say the least, to be in a

8  position where notwithstanding that, we see so many people

9  coming in to tell us, belatedly, that they have a problem

10  with the schedule.

11    But we cannot summon additional people in

12  advance of our next court date, the first week of May.

13    MR. PETRILLO:  Thank you.

14    I think it's our position for Mr. Shapiro, that

15  we will endeavor to go forward with this group and we

16  believe it will work out given the numbers and the

17  questionnaire responses as we've seen them to date.

18    THE COURT:  Other counsel on the defense side?

19    MR. SPIRO:  Judge, this is Alex Spiro.  I think

20  that makes sense what Mr. Petrillo said.

21    MR. NOVICK:  Your Honor, for defendant Gramins,

22  we agree that the pool is fine as is.

23    THE COURT:  Okay.  Then I think the best way for

24  us to proceed is to go ahead, bring the people in, hope

25  that we'll have a group that is large enough to enable me

1   to give you additional peremptories.  If I can I will, but

2   I may not be able to.

3           I don't think that additional peremptories are

4   strictly necessary in the interest of justice.  I think

5   that in this case given the defense that is common to the

6   three defendants, i.e., that the misrepresentations were

7   not material, the number of peremptories provided by the

8   rule is adequate.  At the same time, if I can give you

9   additional ones, I'd be happy to do so.  So we'll proceed

10  accordingly.

11          With regard to the procedure, I outlined for you

12  a procedure whereby we would arrange to speak with each

13  person individually in the courtroom, if only briefly.

14          Is that something that appeals to you,

15  Mr. Novick?

16          MR. NOVICK:  Yes, Your Honor.

17          THE COURT:  Okay.  How about on the defense

18  side?

19          MR. PETRILLO:  For Mr. Shapiro that appeals to

20  us.

21          MR. MUKASEY:  For defendant Gramins, that

22  appeals to us.

23          MR. BROWN:  And the same for defendant Peters.

24          THE COURT:  We'll proceed on that basis.  In

25  other words, we will endeavor to have a number of jurors

1    brought from the jury assembly room to the vicinity of the

2    courtroom where they can conveniently await coming in and

3    seeing us individually for a few minutes, and we'll

4    structure this so that we minimize the waiting time for

5    people in the pool.

6         I'm joined this morning here in chambers by

7    Terri Glynn.  And, Terri, I think we're going to need to

8    prepare to do what we did last time.  In other words, we

9    can in effect release people so they can go get a cup of

10   coffee, take a walk in the park, do whatever it is they

11   want to do on the understanding that they're not going to

12   be needed for some period of time, and in due course we'll

13   work our way through the group of 100, if that's how many

14   actually show up.

15        Once we complete that process, we can proceed

16   with everybody who remains in the pool in the courtroom

17   and do as I discussed, that is, bring a certain number

18   forward to fill up seats.

19        There needs to be room to respond to

20   contingencies as they arise.  It may be that after we see

21   people individually, the group will be reduced in size to

22   the point where it really doesn't make sense to bring

23   people forward to the jury box and we should instead treat

24   the gallery as the jury box, if you will.  We'll see.

25        But unless there's something further with regard

1    to that, I'll turn to the motions in limine.

2              Anything further on the jury selection?

3              MR. NOVICK:  Not from the government, Your

4    Honor.

5              MR. PETRILLO:  Not from Mr. Shapiro, Your Honor.

6              MR. MUKASEY:  Not for Mr. Gramins.

7              MR. BROWN:  Or Mr. Peters.

8              THE COURT:  Okay, thank you.

9              With regard to the motions, let me tell you what

10   I have in mind.

11             The first one that I want to address is the

12   motion concerning the defendants' total compensation.

13   This requires me to apply Rule 403.  Looking at the

14   probative value of the spreadsheet that is attached to the

15   government's memo, the government says that this

16   spreadsheet is important evidence of the defendants'

17   financial motive to engage in fraud, the hierarchy that

18   existed on the desk and the conspiratorial agreement

19   alleged in the indictment.

20             The spreadsheet shows the defendants' actual

21   compensation on an annual basis for each of the years 2010

22   through 2015.  The highest annual compensation was in

23   2013.  For that year Mr. Shapiro's total compensation was

24   ███████████.  Mr. Peters, ████████████, and Mr. Gramins

25   ████████████.

1          The government says that it will offer the

2    testimony of Mr. Raiff, the head of Securitized Trading

3    Products as of mid-2012.  The government says that

4    Mr. Raiff will testify that Mr. Shapiro was mainly

5    responsible for compensation decisions with regard to

6    traders on the desk.  Mr. Raiff is expected to testify

7    that Nomura allocated bonus money to the desk based on,

8    among other factors, the profitability of the desk.

9    Mr. Raiff is expected to testify that in determining the

10   size of the bonus pool, he reviewed the profit and loss

11   figures for the desk.  Finally, he is expected to testify

12   that Mr. Shapiro disbursed the bonus pool as he saw fit.

13          In addition, the government says that it will

14   offer the testimony of junior traders who will say that

15   they knew the profitability of the desk had an impact on

16   their compensation; that they were incentivized to squeeze

17   every tick out of every trade, and they understood that

18   this was important because it was tied to how well the

19   desk performed which in turn impacted on their

20   compensation.

21          The question I ask at the outset is:  What

22   probative value do the total compensation numbers have

23   with regard to motive?  The government says that the total

24   compensation numbers show that the profitability of the

25   desk directly impacted the defendants' compensation.

1    It's undisputed, as far as I know, that the

2    defendants' compensation was affected to some extent by

3    the profits produced by the desk.  The question is to what

4    extent was the profit based on the alleged misconduct?

5    The total compensation numbers themselves don't

6    tell us to what extent the defendants' compensation was

7    based on profits derived from fraudulent activities.

8    There is no indication that a witness is prepared to say

9    that profits from fraudulent trades increased the

10   defendant's compensation by "X" amount or even "X"

11   percent.  There is no indication that the government will

12   offer evidence of what the defendants' total compensation

13   would have been without the fraudulent trades.

14   So the probative value of the total compensation

15   numbers as proof of motive appears to me to be indirect,

16   at best, and limited; and I think that if I allowed the

17   total compensation numbers on that spreadsheet, I would

18   need to have a stronger basis than that.

19   I say that because I think that the probative

20   value of the actual compensation numbers with regard to

21   motive on the record in front of me right now is

22   substantially outweighed by the danger of unfair

23   prejudice.  Courts recognize that evidence of wealth can

24   unduly prejudice a defendant during jury deliberations,

25   and in this day and age, I think that remains true.  I

1    think that concerns about inequality in wealth are very

2    much on the minds of many, if not most, people these days

3    and I'm sure the jurors would be struck by these numbers.

4           Can a jury instruction cure that?  Well, I don't

5    think you reach that question unless you have a stronger

6    basis for putting the numbers in.

7           With regard to the probative value of the total

8    compensation numbers as proof of hierarchy or

9    conspiratorial agreement, I think the probative value is

10    substantially outweighed by the same concern.

11           There is another danger that troubles me, and

12    that is the risk of misleading the jury.  If the

13    government proposes to persuade the jury that these

14    defendants were motivated to engage in fraud because it

15    enabled them to pocket ████████████████ and the

16    government can prove that, then the total compensation

17    numbers in the spreadsheet could come in.  That would not

18    mislead the jury.  But if the government is less

19    ambitious, if the government proposes to prove that it had

20    some effect on the defendants' compensation, I think

21    offering the numbers in the spreadsheet carries a danger

22    of misleading the jury into believing that this was a

23    ████████████████ fraud when in fact it wasn't, and

24    again a curative instruction may be helpful to deal with

25    that danger, but I don't see a need to think in terms of

1    what such an instruction might look like in the absence of

2    a stronger basis in probative value for submitting these

3    numbers in the first place.

4         So the numbers aren't going to be mentioned in

5    opening argument, we had already agreed to that, and

6    they're not coming into evidence unless and until the

7    government can persuade me that there's something new,

8    something different.  Maybe the calculus could change.  It

9    could be that not allowing the government to present these

10   numbers would be misleading.  It could be that the way the

11   trial unfolds, the jury will be getting the impression

12   that this was nickels and dimes and it really wasn't

13   nickels and dimes, it was quite a bit more, and it may be

14   that the calculus could change, but right now, I don't see

15   a need for these numbers and I see that any need is

16   substantially outweighed by these dangers that I've

17   mentioned.

18        I would note that I've considered the

19   government's other arguments, for instance, the argument

20   that the numbers are necessary to rebut a suggestion that

21   the defendants are being treated unfairly because the

22   junior traders haven't been criminally charged.  Again, I

23   mean, I don't see that as a basis for allowing the

24   government to offer these numbers up front.  If it should

25   turn out that the defendants are beating that drum, then

1    the calculus might change.

2         With regard to passive investors, the government

3    wants to present evidence that the victim institutions

4    managed money for sophisticated investors, sophisticated

5    institutional investors, hedge funds, pension funds,

6    endowments, mutual funds, sovereign wealth funds,

7    insurance companies and the PPIP program.  It's my

8    understanding that there's no particular objection to

9    evidence along this line, that is, there's no objection to

10   the government offering that kind of general testimony,

11   what might be thought of as generic testimony with regard

12   to the identities of the passive investors.

13        Let me pause and ask:  Is that correct?

14        MR. PETRILLO:  Your Honor, Guy Petrillo for

15   Mr. Shapiro.

16        We had objected on the defense side to the

17   identification of pension funds and charitable

18   institutions because of the potential that the jury would

19   infer from the mention of those types of institutions that

20   they're personally affected by the conduct.

21        And the government's objection regarding PPIP,

22   for the same reason we objected because we think it

23   implicates for the jury whether this conduct in some way

24   affected them personally by the Treasury.

25        THE COURT:  Okay.  Well, I want to be careful to

 1   avoid that problem.  I have to recuse myself if I own a

 2   share of stock in IBM and IBM is implicated in a case

 3   before me, so I'm sensitive to what you're talking about,

 4   and I want to avoid that problem for the jurors who for

 5   all intents and purposes are going to be our judges for

 6   this trial.

 7            But even so, I think that the government is in a

 8   position where it needs to offer this typed of evidence

 9   for the reason it states.  It goes to materiality with

10   regard to whether the victim witness who is testifying

11   should be viewed as a reasonable investor, and I gather it

12   also does affect the behavior of the person in the

13   position of the victim witness as the government explains.

14            I understand the defendants do not agree.  They

15   think that the resumes of these witnesses are in

16   themselves sufficiently impressive to remove any doubt,

17   and they assert that the individual in the position of the

18   victim witness owes the same fiduciary duty to everybody,

19   but that's not something that I can take from the jury.

20   So I ask whether there is any danger of unfair prejudice

21   or confusing the issues or misleading the jury or

22   otherwise by allowing this kind of evidence that

23   substantially outweighs the probative value with regard to

24   materiality, and I don't see that, generally speaking.

25            The concern I have is what this motion really

1    addresses is the government's desire to offer the

2    testimony of Mr. Canter concerning his reaction to

3    discovering similar fraudulent behavior by Mr. Litvak.

4    That seems to be what this is really all about.

5              From my perspective based on your submissions,

6    it appears to me that the government wants very much to be

7    able to tell that story.  It wants to have Mr. Canter tell

8    the jury about his interaction with Mr. Litvak and his

9    shock and outrage on learning about Mr. Litvak's lie.

10             Based on your submissions it's my understanding

11   that the government would like to continue in that vein by

12   offering evidence that Mr. Litvak was indicted, and the

13   government would like to offer evidence of the fallout of

14   that indictment.  It seems that what the government has in

15   mind is a case in which we could find ourselves with a

16   jury verdict that acquits on the pre-Litvak indictment

17   trades but convicts on the post-Litvak indictment trade.

18             So in that framework, let me ask:  Of the 20

19   trades that the jury is going to be asked to consider, how

20   many took place after the Litvak indictment?

21             MR. NOVICK:  Two, Your Honor, of the trades were

22   after the Litvak indictment; however, there were others

23   that were after news of Mr. Litvak's firing became public

24   and the reasons for that firing.  I think we address that

25   issue in reporting it to Treasury, and I think we

```
1    addressed that issue in the most recent filing.

2              The only thing I would ask, Your Honor, is --

3    and I think Your Honor has hit the nail on the head with

4    regard to that possibility -- with the Canter narrative,

5    that really is driven by the issue of materiality, to some

6    degree intent, but largely materiality, his reaction.  And

7    a lot of the other bases for our offering would really

8    have to deal with intent and wrongfulness.

9              I think in the most recent filing by Mr. Shapiro

10   raises the issue that, you know, Litvak doesn't go to the

11   core issue in this trial, which is materiality.  And what

12   struck me was all along the defense has been raising to

13   the Court that this case is unlike Litvak in that it's

14   both about intent as well as materiality.

15             And I think within intent -- it's both about

16   intent to defraud and harm as well as about wrongfulness.

17   And I suspect there will be arguments about that with

18   regards to the jury instructions.

19             But at any rate of course the reaction of the

20   defendants to this similar conduct is critical evidence of

21   their knowledge, of their intent.

22             So that's the basis the government proceeds on,

23   Your Honor.

24             THE COURT:  Okay.  With regard to Mr. Canter's

25   interaction with Mr. Litvak, do we have, among our 20
```

1    trades, any trade involving a misrepresentation about the

2    price of an RMBS within the PPIP program?

3              MR. NOVICK:  Yes, Your Honor.

4              THE COURT:  And can you tell me which one?

5              MR. NOVICK:  There are two of them.

6              Just one moment please, Your Honor?

7              THE COURT:  Okay.

8                   (Pause)

9              MR. NOVICK:  Your Honor, sorry.  So there is a

10   trade in 2012.

11             Sorry, one in 2011, one in 2012, both of them

12   with AllianceBernstein.

13             THE COURT:  Was Mr. Canter involved in those

14   trades?

15             MR. NOVICK:  Yes.  Mr. Canter and Mr. Schiff.

16             The narrative as to the 2012 trade I think Your

17   Honor has spelled out in our most recent filing involving

18   Mr. Canter's discovery that he was lied to in the course

19   of that trade and then raises that within Nomura and then

20   says something to the effect of -- and I'm going to be

21   paraphrasing here -- don't you know that I was the person

22   who just got Jesse Litvak or somebody else fired for doing

23   something similar for lying to me and reported it to

24   Treasury?

25             THE COURT:  Something similar.  Let me clarify.

```
 1            My question is whether we have a trade in which
 2   a misrepresentation was made with regard to the price.
 3            MR. NOVICK:  That would have been the one the
 4   year before, Your Honor, I believe.
 5            THE COURT:  In other words, Mr. Canter would
 6   testify that he was a victim of the very same type of
 7   misrepresentation made by Mr. Litvak when in 2011 he
 8   transacted with Nomura.  In other words, a
 9   misrepresentation with regard to a price of the bond in
10   the context of the PPIP program.
11            MR. NOVICK:  Your Honor, I'm going to have
12   Mr. Brennan, since this is his witness, jump in here.
13            MR. BRENNAN:  Good morning, Your Honor, Liam
14   Brennan.
15            Mr. Canter, the evidence we intend to present at
16   trial would be that Mr. Canter was lied to in 2011 about a
17   trade purely about price in the PPIP program.
18            Then in 2012, the one that blows up that he
19   catches Nomura on, he was lied to both about ownership,
20   which he was also lied to about Litvak, and he caught
21   Litvak in that lie as well, and about the price.
22            So what happens is on February 7, Nomura is
23   supposedly trying to transact between third-party
24   counterparty and Mr. Canter, but then they end up buying
25   the bond, then the next day they continued to represent
```

1    that the bond is being offered at 73 and 16 ticks when in

2    fact they've already bought it at 72.

3            So it was a lie both about price and about

4    ownership at that time.

5            THE COURT:  Did Mr. Canter call the Treasury

6    Department with regard to these instances at Nomura?

7            MR. BRENNAN:  He did not, Your Honor.  And we

8    expect the explanation would be they caught it before --

9    so the deal had not settled, even though they had issued

10   the trade tickets, there's a three day settlement date,

11   and it was only one where he caught Litvak with multiple,

12   so he did not report this one.

13           THE COURT:  With regard to the post-Litvak

14   indictment trades, the government says that it's necessary

15   that the jury be informed of the Litvak indictment because

16   it provides the context for those trades.  It's not only

17   evidence of materiality and intent, but it provides

18   context.  Is that right?

19           MR. NOVICK:  I think, Your Honor, it provides

20   context in the sense that it eliminates the defendant's

21   intent or knowledge of wrongfulness, I think is our core

22   argument there.

23           THE COURT:  So let me see if I can tease out the

24   probative value.

25           Let's suppose that I didn't allow Mr. Canter to

1    testify about his interaction with Mr. Litvak and I didn't

2    allow evidence of the Litvak indictment, what does the

3    government's case look like then?

4            MR. NOVICK:  It would look differently, Your

5    Honor.

6            I think that obviously the question of

7    wrongfulness would be something we would get into with

8    just the company policies, the rules and regulations from

9    FINRA.  But obviously my suspicion is the defendants are

10   going to try to advance arguments that say that those

11   policies and those rules do not cover the specific conduct

12   that the defendants engaged in that they didn't have

13   reason to know that this was wrongful.  In fact, I'm quite

14   certain that that would be an argument the defense would

15   advance, and that's something the government has to prove.

16           So that's why, Your Honor, I think it's so

17   critically probative both in assessing at the time how the

18   defendants -- well, in explaining what the defendants

19   knew.  In other words, that now you have an instance not

20   just where this kind of conduct could by argument be said

21   to fall within these prohibitions both via compliance as

22   well as via, you know, SEC rules and regulations.  But now

23   you have an actual example of where this kind of conduct

24   has A:  Gotten somebody fired for having lied to a

25   counterparty, and it shows intent and materiality; and B,

1      it shows after he gets indicted, that they had reason to

2      believe that this implicates criminal law.

3           Now, look, the defense could very well argue

4      that at that time the defendants believed, oh, you know,

5      yes, the government said it's criminal but we don't think

6      it is, we continued to believe it wasn't, which is an

7      argument they could make.  But to the extent the

8      government -- and even -- I mean, particularly on the

9      defendants' view of the jury instructions, to the extent

10     the government needs to prove that they knew that it was

11     in violation of the law or had reason to believe that it

12     was in violation of the law, there's no better evidence,

13     Your Honor.  And I think that the probative value is

14     incredibly high here and it outweighs any prejudicial

15     value, particularly in the sense, as we've argued, that

16     the fact of another indictment, not a conviction, the fact

17     of another indictment was something the courts regularly

18     instruct on, the fact of an indictment at all in this case

19     is something the courts regularly instruct jurors to

20     ignore in making a judgment.

21          THE COURT:  Well, do you see the problem there,

22     Mr. Novick?  You maintain that the probative value is

23     critical, unique, very, very important and yet you want me

24     to instruct the jury that the indictment is irrelevant and

25     should be ignored.

1    MR. NOVICK:  I don't necessarily want you to

2    instruct, Your Honor, that it should be ignored.  I would

3    limit the -- I think you could craft an instruction with

4    the parties' assistance that it can be used for a limited

5    purpose.  I shouldn't have said "ignored", Your Honor,

6    that it comes in for the limited purpose of its affect on

7    knowledge, affect on the defendants' state of mind, and

8    that's the limited purpose, at least in that context, that

9    we're -- or materiality, that we're asking for it to be

10   considered.

11   You know, the other thing, Your Honor, and I'm

12   just ticking down the list of things that it bears on, is

13   also a conversation that Mr. Jones, the head of sales in

14   New York, has after that 2012 fraudulent trade in which

15   Mr. Canter said to him that, you know, this is exactly the

16   kind of conduct I just called out Jesse Litvak on or

17   called out this other individual on.  And then they had

18   the discussion with Mr. Shapiro who promises, but we have

19   no evidence that he actually followed through on that, to

20   go talk to the desk.  And that's in 2012, a year before

21   the indictment.

22   So if we again preclude all evidence relating to

23   Litvak, we lose another piece of probative information.

24   And then, you know, the junior traders wouldn't

25   be able to talk about the fallout from that trade; they

1   wouldn't be able to explain what "don't Litvak me" means.

2   And it doesn't just mean don't lie to me, it means don't

3   lie to me in the context of there's a guy out there who

4   did this in violation of -- at least as perceived by the

5   indictment and within the defendants' state of mind -- in

6   violation of the law.

7          And we have to prove wrongfulness here.

8          THE COURT:  So without references to Litvak,

9   you'd have the various policies and manuals and so forth

10  and you would have the witnesses saying don't lie, do not

11  lie, we do not lie, you have to agree not to lie.  You

12  would have all of that, but you think that the Litvak

13  related evidence is necessary to rebut any suggestion that

14  those policies, manuals, statements, et cetera, were

15  ambiguous and didn't apply to this conduct?

16         MR. NOVICK:  I think that's very true, Your

17  Honor.  I think that's very true, based on particularly

18  the arguments that I've seen already in briefing which

19  relate to the compliance policies, I think that's true.

20         THE COURT:  Okay, thank you.

21         Let me hear from defense counsel.

22         Is it indeed your intention to advance that

23  argument?  Namely, that the manuals and policies and so on

24  were ambiguous and did not cover this conduct?

25         MR. KLEIN:  Judge, Josh Klein on behalf of

1    Mr. Shapiro.

2            I think we do intend to advance that argument

3    with respect to the conduct that preceded the Litvak

4    indictment.  I think there is ample evidence that the

5    compliance policies and compliance trainings did not apply

6    the directive in those compliance policies to this

7    specific conduct.

8            I think the circumstance surrounding the

9    termination of Mr. Litvak is a big distraction and I think

10   it shows nothing more than that there was some

11   business-related fallout within jeopardy following that

12   incident.

13           I think all the witnesses in trial are going to

14   testify that they always perceived potential

15   misrepresentations in the negotiations as a potential

16   business issue and that if people were caught, that could

17   lead to some discussion with counterparties, as occurred

18   in the AllianceBernstein February 2012 incident.  But I

19   think that the objection with respect to the indictment is

20   that it injects an enormous degree of prejudice.

21           This is a case, unlike many criminal cases in

22   which the defense believes there's a genuine issue as to

23   whether or not the alleged misrepresentations were

24   material, and once you inject the fact that an unrelated

25   party at a different firm was indicted for similar

1    conduct, you are in effect telling the jury that these
2    alleged misrepresentations are material because the jury
3    is wondering, well, why is somebody being indicted for
4    this?  How can they be indicted in this other case as
5    well?  And if it's coming in with an instruction that goes
6    to wrongfulness, how can it get to wrongfulness if it's
7    not material?

8            And so it injects this degree of undue prejudice
9    into the case that impairs the defense's ability to not
10   only advance intent defense -- put that aside -- it
11   impairs our ability to advance the materiality defense,
12   and we think for that reason it should not come in.  It's
13   unduly prejudicial and it does not in any respect, in any
14   respect, it does not advance the government's argument
15   that the pre-2013 policies at Nomura related to the
16   alleged conduct.

17           THE COURT:  What about the post-indictment
18   trades?  Isn't the indictment part of the story there.

19           MR. KLEIN:  We believe that with respect to the
20   post-indictment trades, we don't believe that there's
21   going to be an argument that -- certainly not on behalf of
22   Mr. Shapiro -- we don't believe that there's going to be
23   an argument that there was a view held that engaging in
24   the alleged conduct was something that was condoned by the
25   firm.

1          I think that, you know, everyone acknowledges

2     that post-Litvak indictment there was an understanding

3     that, at least in the government's view, this was wrongful

4     conduct, the government has brought an indictment with

5     respect to conduct.  But I don't think you need to get

6     into any of that because internally there were directives

7     that traders should not engage in this conduct.

8          And I think what we're saying is that there's --

9     there are methods by which the government could admit the

10    fundamental evidence that there was a change of view

11    within Nomura or within the industry, however they want to

12    introduce that element, but there's a way of doing that

13    that doesn't inject the undue prejudice that an indictment

14    would inject into the case.

15         And I would reiterate that as to Mr. Shapiro we

16    have an application to strike reference to him in the

17    overt acts.  We don't believe there is any evidence that

18    he was involved in any such conduct in 2015.

19         THE COURT:  Suppose that was denied, do you

20    still maintain that the post indictment trades can be

21    properly litigated by the government without evidence of

22    the Litvak indictment?

23         In other words, I understand that from

24    Mr. Shapiro's point of view, the post-Litvak trades are

25    trades in which he did not participate and thus they

1    really had no bearing on him.  But let's suppose your

2    motion fails and the government is permitted to argue that

3    he was complicit in those post-indictment communications,

4    would your position remain the same?

5            MR. KLEIN:  To the extent that Your Honor is --

6    I mean, I think our position is that if the government

7    wants to make those arguments, they can do so without the

8    introduction of the Litvak indictment.  In other words,

9    they can -- you know, we have proposed that there can be

10   reference to a litigation development or something along

11   those lines.  They could, to the extent the Court denies

12   our application, you know, they can make reference to the

13   compliance directive that occurred following the Litvak

14   indictment in which the RMBS desk was directed not to make

15   misrepresentations relating to price in trade negotiations

16   and, you know, that evidence can come in without reference

17   to the prejudicial fact that an unrelated party at a

18   different firm was indicted.

19           THE COURT:  All right.

20           Let me hear from counsel for the other

21   defendants.  In light of what has just been said on behalf

22   of Mr. Shapiro, I'd be interested to get your thoughts.

23           It would be simple enough, I suppose, if

24   everybody said, yeah, we understood as of January 1, 2013

25   that you couldn't do this anymore and we never did it

1     again, and while the government suggests that we in fact

2     engaged in this conduct in 2013, they're wrong, we didn't.

3     That would be simple enough.

4              Is that your position or are you intending to

5     argue that, yeah, we did continue to do it but it wasn't

6     material notwithstanding whatever Nomura said to us in any

7     training or otherwise?

8              MR. MUKASEY:  Judge, it's Marc Mukasey.  May I

9     have one moment, please?

10              THE COURT:  Yes.

11              (Pause)

12              MR. MUKASEY:  Judge, on behalf of Mr. Gramins,

13     it's going to be our position that post-Litvak or post

14     January 1, 2013, we did not violate any laws because we

15     did not engage in the what was then possibly considered

16     illegal conduct.

17              So our view is we didn't do anything wrong after

18     January 1, 2013.

19              THE COURT:  Okay.  Are you saying that you would

20     take the position that there were no misrepresentations as

21     to the price of bonds after January 1, 2013 as alleged?

22              MR. MUKASEY:  Did you say "material

23     misrepresentations" or "misrepresentations"?

24              THE COURT:  I said "misrepresentations."

25              So I take it that Mr. Gramins's position would

```
1    be the same with regard to the pre-indictment trades as
2    well as the post-indictment trades.  There was no material
3    misrepresentation, in other words?
4              MR. MUKASEY:  That's correct.
5              MR. SPIRO:  Judge, Alex Spiro on behalf of
6    Mr. Peters, just a couple of threshold things that I
7    wanted to address before I get to the ultimate question
8    the Court is posing.
9              Normally we're not in a position when the
10   government proffers testimony to sort of reject it or give
11   the Court another position, but because Mr. Canter's
12   testified under oath about these incidents, I wanted to
13   point out two quick things for the Court so the Court is
14   aware.
15             One thing just to note is obviously his reaction
16   in Litvak was important because he went to the Treasury.
17   Here he doesn't.  So it would seem to me to support just
18   the opposite notion, which would make it even less
19   probative or, if anything, cut the other way.
20             And the other thing that the Court should know,
21   just in terms of the PPIP stuff, is that, you know,
22   Mr. Canter testifies that he treats all investors' money
23   with the same degree of importance, and most investor
24   decisions, and looks at the same way.
25             So again with respect to those issues, I wanted
```

1    the Court to be aware of that.

2           Just another point regarding what Mr. Novick

3    said in terms of that the courts instruct juries all the

4    time that indictments are not evidence or indictments

5    don't prove a case. I actually think that proves just the

6    opposite point here, and I'm sure it's Your Honor's

7    practice as it is almost all judges, if not all, that when

8    a jury comes in, you say the evidence will be the evidence

9    and the indictment is proof of nothing. This becomes an

10   indictment on top of an indictment, and in my view it

11   violates the due process clause. There's no way to

12   cross-examine it, impeach it or do anything with it. It

13   just exists and you can't fight it. And I think that

14   becomes particularly meaningful in a case like this.

15          You know, you have both in the Litvak cases and

16   here all these debates and discussions and legal motions

17   about, you know, where the line of the law is and it

18   strikes me that in such a case the introduction of some

19   other finding of law is wholly prejudicial and improper.

20          And I point to things that are just even in

21   Litvak -- in Litvak 2/Litvak 1, in the way the Second

22   Circuit dealt with it, just the fact that they're looking

23   at the supervisor's direction as being something that's

24   relevant, that again we've litigated here, and looking at

25   expert testimony about where lines are, as we litigated

1    here, sort of proves that point, that it's not, you

2    know -- it doesn't matter what a supervisor says in a

3    murder case because a murder as we all know is wrong.  But

4    it becomes complicated here, which just bolsters the

5    improprieties introduced in the indictment.

6              As to the way Mr. Klein and Mr. Mukasey phrased

7    what we believe the evidence will be and what our response

8    is post learning of the Litvak indictment, which again to

9    me the legal development is just as good and doesn't have

10   any of these same issues, practicalities and everything

11   else that I've already spoken to the Court about, but we

12   expect our response to be exactly as Mr. Klein and

13   Mr. Mukasey related.

14             THE COURT:  Okay.  Just to be clear in an effort

15   to avoid any possible misunderstanding, the defense

16   intends to take the position that no material

17   misrepresentation was made in any of the subject trades,

18   whether they occurred prior to Litvak's indictment or

19   after the indictment?  This is not a case, in other words,

20   where the defense is going to say post-indictment they

21   understood that these misrepresentations were material and

22   could not be made and none were made; instead, the defense

23   intends to take the position that there was no material

24   misrepresentation in any of these trades regardless of the

25   date of the trade?

```
1              MR. BROWN:  Judge, Mike Brown on behalf of

2    Mr. Peters.

3              Our position on the post-Litvak issue is that it

4    became -- that the fact of the indictment or what the rule

5    was following the indictment, guidance was provided to the

6    traders by the Nomura compliance department, so any

7    uncertainty or ambiguity that existed prior to the Litvak

8    indictments was clearly stated to the traders after the

9    Litvak indictment.

10             We will be arguing more in line with the way

11   Mr. Klein described it than the way that Mr. Mukasey

12   described it.

13             In other words, our position is that after the

14   Litvak indictment, Mr. Peters followed the advice and the

15   guidance that he received from the compliance department.

16   And in order to prove that, the government, in order to

17   raise -- the government need not get into the fact of an

18   indictment because there was a compliance meeting that was

19   held and guidance that was provided after that, which I

20   think is the way that Mr. Klein has described it in that

21   the -- and I think it was the way that the Court went back

22   to on it -- which is that any ambiguity was cleared up by

23   compliance as to what is material and what is not

24   material, and that at least insofar as Mr. Peters is

25   concerned, he received that additional guidance.
```

1          MR. MUKASEY:  Judge, Marc Mukasey on behalf of

2     Mr. Gramins.  Just in case there's any misunderstanding,

3     we're going to defend post-Litvak exactly the same way as

4     Mr. Brown just described, so I think we're all on the same

5     page.

6          THE COURT:  All right, thank you.

7          Mr. Novick, Mr. Brennan, where does that leave

8     us?

9          MR. NOVICK:  Your Honor --

10          MR. KLEIN:  Judge, just to complete the picture,

11     to make sure that we're all clear, it's Josh Klein.

12          With respect to Mr. Shapiro, we are going to

13     advance the defense that in 2013, Mr. Shapiro did not

14     engage in any misrepresentations -- trade-related

15     misrepresentations; and, moreover, that there is no

16     evidence that he was aware of any trade-related -- alleged

17     trade-related misrepresentations.

18          THE COURT:  Okay, thank you.

19          Where does that leave us then?  The government

20     has been concerned that without the evidence of the Litvak

21     indictment, it would not be able to rebut the defense that

22     the internal compliance manual was vague and actually

23     allowed for this conduct.

24          MR. NOVICK:  Your Honor, I think that the way

25     the defendants are framing what happened here kind of

1    makes the government's points for it.

2              The defendants want to frame this that in lieu

3    of Litvak they can just put on the evidence of the

4    compliance presentation because that is a proxy for some

5    change in policy on the part of the company.

6              So two things on that.

7              First of all, as we have explained all through,

8    and as I think the witnesses will explain, there was no

9    change in policy.  Lying has always been wrong and within

10   the company, within the market.  And the presentation that

11   Nadine Cancell gave to the traders, the senior traders and

12   the sales people, reflected that.  It was inspired by or,

13   I don't know what the correct word here is, it was

14   suggested by the Litvak -- the fact of the Litvak

15   indictment, that they ought to have something to remind

16   people of that.  But it was not, if you look at the one

17   page PowerPoint slide that was given out, it was not a

18   Litvak specific presentation, it was a compliance

19   presentation that said do not lie and it had a number of

20   other things that had absolutely nothing to do with

21   Litvak.

22             The do not lie was the top line of the

23   presentation, but then there are other things on the

24   presentation as well as.

25             It didn't go through and say Jesse Litvak lied

1     therefore you should not lie.  It was a reiteration of

2     prior compliance policy.

3            The fact of the Litvak indictment is entirely

4     different because it doesn't just reiterate policy, it has

5     a completely independent basis not just about materiality,

6     because I understand the defense wants to keep coming back

7     to that this implies essentially something about

8     materiality and that they are going to say that there were

9     no material lies, I suppose, either before or after, which

10    I understand always, all along, to be their position; but

11    the government has to affirmatively prove intent, we have

12    to affirmatively disprove good faith.

13           I don't think that the defendants are going to

14    get up there and concede that they knew that this

15    particular kind of conduct was wrongful, was unlawful.

16    Whether or not they argue that these things were material

17    or immaterial.

18           I mean, I look, Your Honor, at the defense

19    exhibits and there are defense exhibits in there which go

20    to the issue, I believe, if I understand correctly, of

21    wrongfulness; and this indictment is another piece, a

22    critical piece, of information in the minds of the

23    defendants after the Litvak indictment.  And then if you

24    go backwards in time, their knowledge of Litvak's issues,

25    the fact that he'd been fired for similar conduct for

1    lying about price or about ownership of the bonds, then

2    you get into an entirely larger range of trades that this

3    implicates.

4           You know, I'm looking at the indictment now,

5    Your Honor.  Several other trades that occurred between

6    the time -- or other trades that occurred between the time

7    of the now discovery and Mr. Canter's phone call, not in

8    the Litvak issue but with Mr. Jones and Mr. Jones'

9    subsequent conversation with Mr. Shapiro, and that, you

10   know, one of the reasons we offered that 21st trade, Your

11   Honor, was to reiterate the fact that this was occurring

12   all along; that the defense implication, which seems to be

13   throughout all of these motions, that these 20 are the

14   only 20 trades out there, is just not true, and that there

15   was another misrepresented trade, at least another one

16   that we offered showing that Mr. Shapiro lied in the

17   context of a trade after he had had that conversation with

18   Mr. Canter, after he had that conversation with Mr. Jones.

19          And so, you know, again, Your Honor, this all

20   comes back to the government's affirmative need to prove

21   intent, and also to talk about why they moved from the

22   typing in the Bloomberg chat to the phone, and why the

23   jury may not see as much conduct post-Litvak as

24   pre-Litvak.  We're going to have witnesses on that.  We're

25   going to have exhibits in which somebody says that guy was

1    the first one to move to the phone after the Litvak

2    indictment.  He's shady.

3           I mean, that kind of encapsulates the whole

4    point, Your Honor, and saying that there was some sort of

5    legal development, Your Honor, particularly in a world

6    where we need to prove either wrongfulness -- not just a

7    legal development, but wrongfulness -- or unlawfulness, if

8    you believe the defendants, the fact of the indictments

9    has real probity.

10          And I would add, Your Honor, it's not as if we

11   are going to be putting in a copy of the Litvak indictment

12   laying bare all the things that Mr. Litvak did.  It's

13   going to be extremely limited testimony about the fact of

14   the indictment and the impact it had on various people, on

15   the things that it begot.  And we believe that that has

16   significant probative value here.

17          THE COURT:  What is the probative value,

18   Mr. Novick?  Are you going to argue that before the

19   indictment maybe an ethical, responsible person could

20   think the lie wasn't material, but after the indictment

21   obviously it was material, the indictment establishing as

22   a matter of law the materiality of the lie?  Is that what

23   you're going to argue?  What is the probative value of an

24   indictment?

25          Under standard evidence treatises, indictments

1     are typically inadmissible.  They're hearsay reflecting

2     somebody's opinion about what somebody did.

3                MR. NOVICK:  Yes, I understand, Your Honor.

4                THE COURT:  And normally we spend time educating

5     the jury that they are to ignore allegations in

6     indictments because they're just that, they're just

7     somebody's opinion.

8                MR. NOVICK:  Understood, Your Honor.  And again

9     I go back to the idea that we're not asking to put in a

10    copy of the indictment, because the indictment in and of

11    itself, Your Honor, I 100 percent agree with you is not

12    proof of the contents of it.  It is something that serves

13    a number of purposes here.

14               It serves a purpose of telling the defendants to

15    the extent that it's in their minds of linking this kind

16    of conduct to the securities laws, they can no longer

17    claim ignorance that these two things are unrelated.

18               Your Honor, the government's going to argue, and

19    I concede we thought long and hard about this issue, to be

20    completely candid, because we don't view a sea change in

21    what the defendants should have known and did know because

22    of the clarity in our view of the compliance policies;

23    however, we do think that it is another thing.

24               Like, Your Honor, asked at the very beginning of

25    this colloquy whether it's possible the jury would acquit

1    as to the pre-Litvak conduct and convict as to the

2    post-Litvak conduct.  That is a possibility, Your Honor.

3    That is a reaction the jury could have.

4           We don't think that would be the right one, but

5    we think a jury could decide if there was ambiguity

6    previously and that there wasn't afterwards because again

7    it made that connection.  The defendants now understood in

8    all the context of all of this, goes to the context of

9    intent and materiality.  Intent because now they

10   understood the connection of the laws with the conduct and

11   also because materiality, they hear people saying things

12   like "don't Litvak me" and "that guy moved to the phone."

13          They also know, Your Honor, that the government

14   was in possession of Litvak's chats and that's why they

15   moved to the phone.  They know that what got Mr. Litvak

16   indicted was the fact that he's chatting with people about

17   this stuff, and that provides motive to move to the phone.

18   And that's another thing that happens.  You're going to

19   hear testimony about that.  You're going to hear some of

20   the phone calls that Mr. Gramins had with one of the

21   victims, a phone call Mr. Gramins had with Mr. Romanelli

22   in which they're talking about how they're going to get

23   more money out of one of the victims.  Why did they have

24   that phone call?  Why is his chat or communication with

25   Mr. Choi, the victim in that case on the other side of the

1    chat over the phone?  Why is his conversation with

2    Mr. Romanelli over the phone?

3             The government is within its right to argue that

4    that's because they knew that the chats are what got them

5    in trouble in the first place.  We certainly can make that

6    argument, Your Honor.

7             THE COURT:  Okay.  Let me follow up, Mr. Novick,

8    and then we're going to have to get off the phone.  The

9    reporter needs a break and I need a break.

10            Obviously the Litvak piece of this case is very

11   important to both sides.  It's evident from the amount of

12   time and energy you've given to litigate the Litvak piece.

13            Why is that?  Well, the government feels

14   strongly that it helps its case and the defense feels

15   strongly that it helps the government's case, and it

16   presents a unique problem.

17            The government wants to argue to this jury that

18   it can find these defendants guilty under this indictment

19   because somebody else got indicted.  That's a very unusual

20   argument, one I've not heard before; and how do you

21   respond to Mr. Brown's point that there's no way for a

22   defendant to come to grips with such a pitch by the

23   government?  How does somebody defend against that pitch?

24            You can convict these people under this

25   indictment because somebody else got indicted in a

1    different case?  How do you deal with that?

2          MR. NOVICK:  Your Honor, first of all, that

3    is -- I mean, that is not what the government is saying.

4    Again, the government is arguing that this goes to

5    discrete pieces of the case that are things the government

6    has to prove.

7          We're not saying at all, I think, that the jury

8    should convict these three defendants because someone else

9    was charged with the crime hard stop.  What we're saying

10   is that that is a critical piece of knowledge evidence of

11   what was in the defendants' minds at the time they acted,

12   critical times they acted; not just the fact of the

13   indictment, but the fact that they become aware that

14   Mr. Litvak had the issue; why we know they went to the

15   phone and why they went to the phone after the indictment.

16         All of these things that I just described, we're

17   not again -- and that I think is a critical distinction

18   between what the government is arguing and the way the

19   defense is defending this -- is we are we are not saying

20   that -- and I don't think we would ever say that they

21   should convict Mr. Shapiro and Mr. Gramins or Mr. Peters

22   simply because someone else was charged with this crime.

23   We are simply saying that the knowledge of that charge,

24   the knowledge of the fact that someone else was indicted

25   for securities fraud because of similar conduct is

1    obviously a critical piece in terms of showing the state

2    of mind of the defendants at the time they acted.

3                THE COURT:  Let me ask you to stop right there,

4    Mr. Novick, and explain to me why that's true.  Take the

5    last statement that you made and please explain to me why

6    that's true.

7                MR. NOVICK:  Absolutely, Your Honor.

8                Because all of the compliance policies,

9    everything else in the rules and regulations, everything

10   else, says -- obviously, we think we've raised this with

11   the Court -- that lying, material misrepresentations are

12   wrong, et cetera.  And I understand the defendants to be

13   arguing that they didn't have the intent, they didn't

14   believe these were material misrepresentations, they

15   didn't have the intent, and they did not believe that this

16   was wrongful.

17               I understand the defendants to be defending this

18   case on the idea that this was not unlawful conduct, not

19   wrongful conduct, and that they had no way to connect in

20   their minds the conduct that they were taking with

21   violation of the law.

22               And what we're saying is that this is a piece of

23   information, the fact of the indictment, which directly

24   ties those two things together.

25               It also impacts, Your Honor -- again showing how

1    it impacted, how it changed their behavior -- impacts the

2    way they worked by moving onto the phones, showing that it

3    did have an impact on their behavior, showing that it had

4    an impact on their state of mind.

5            And again so a critical piece of information, a

6    critical piece of the government's case.

7            We will argue this at that they should have

8    known or did know all along that this was wrongful, that

9    these were material misrepresentations, but we can't be,

10   Your Honor, respectfully, can't be cabined in proving a

11   case in the various ways that we have available to us.

12   And this is obviously, as Your Honor pointed out, the

13   reason why the government feels so strongly about this.

14   There's no more salient piece of evidence, probative piece

15   of evidence, that these were potentially implicated -- its

16   conduct potentially indicates a securities law in the

17   minds of defendants.

18           And again, not an absolute, right?  We're not

19   saying that the indictment is evidence of the commission

20   of a crime.  It is evidence of the tying of, in the

21   defendants' minds, their conduct to the securities laws

22   and it implicates or provides context which describes why

23   the defendants did what they did afterwards.

24           Just as we use evidence of flight at trial to

25   explain the state of mind of a defendant.  We do things

1    like that all the time, Your Honor, to show why the
2    defendants did what they did to reflect some guilty
3    knowledge.  And we believe that this is evidence of the
4    defendants' guilty knowledge.  It's evidence of the
5    defendants' knowledge that what they were doing implicated
6    material misrepresentations, that it was wrongful.
7              And that's why we continue to press this issue,
8    Your Honor.
9              THE COURT:  Okay.  If we put aside that piece of
10   it, which maybe that surfaced earlier in the case and I
11   missed it, it could be, but it seems to me to be
12   relatively new to the discussion, but put that aside for
13   the moment, as I listen to you, it sounded to me like the
14   probative value of the indictment lies in the fact that
15   the defendants learned that the government regarded this
16   type of misrepresentation as material and would bring an
17   indictment on that basis if they had the opportunity to do
18   so.  That was the probative value that I heard you
19   articulate.  Is that right?
20             MR. NOVICK:  I think I would nuance it a little
21   bit differently, Your Honor.  The probative value is the
22   tying together of the conduct, in other words, lying to
23   counterparties with the securities regulations.  That I
24   think is the probative value.
25             THE COURT:  So let's suppose the government

1   through the SEC had issued a release saying that, you

2   would say that that would be admissible for proof of

3   intent with regard to any subsequent activity, right?

4           MR. NOVICK:  If that were the case, Your Honor,

5   yeah, I think that's right; it would be probative evidence

6   if the SEC issued a release.

7           But again, it's different because we're talking

8   about laws of the United States versus rules and

9   regulations of the SEC.  And to the extent that we need to

10  prove wrongfulness, either it's just wrongfulness or

11  unlawfulness, and again I don't know where the Court is

12  going to go with this.  There is a distinction,

13  particularly when it's reflective of the defendants' mind.

14          Because again we don't need to prove

15  wrongfulness in absolute terms, we need to prove the

16  knowledge and the state of mind of the defendants.

17          THE COURT:  If you step back, and I am going to

18  have to conclude here, if you step back and look at this

19  in the broadest terms, we have a party here, the U.S.

20  government, vying for an opportunity to bring to the

21  attention of this jury the fact that it indicted somebody

22  else for very similar conduct, and the government views

23  that as very important, it views it as a critical part of

24  the case.

25          In this very case the defendants are saying that

1    they don't agree with the government notwithstanding their

2    own indictment in this case, they're saying the government

3    is wrong.

4              How is the defendant facing this rather unusual

5    case theory?  How is the defendant supposed to deal with

6    the indictment of the other person?  How is the defendant

7    supposed to respond?

8              MR. NOVICK:  Your Honor, here's -- I mean, the

9    problem here with that issue is just like in many other

10   cases, these are the facts of the case.  The fact that the

11   defendants reacted to the indictment and the implications

12   that had for their conduct subsequently.  Those are just

13   the facts.

14             The fact that the indictment became a thing in

15   the market, became a thing within the RMBS trading desk,

16   became a thing that motivated other people to say things,

17   that caused the defendants to act in a different way, all

18   those things are just facts of this case.  And what the

19   defendants are suggesting is to, I believe, Your Honor, is

20   to artificially take a critical piece of information out

21   of this trial.

22             To the extent that I hope that this trial is a

23   search for the truth of what happened here, what was in

24   the defendants' minds at the time all this was going on.

25   What they're essentially suggesting is to take one of the

1    most significant pieces of information that could bear on

2    the defendants' intent out of the trial.

3            So we're going to be left with this kind of

4    artificial construct, and which now the defendants are

5    going to come and they're going to say, well, there was

6    this do not lie conference in, you know, January or

7    February of 2013, and that Mr. Shapiro came and he said,

8    you know, to the desk, you know, do not lie, with having

9    no idea where that came from, what that was, that there's

10   going to be evidence that they moved to the phone after

11   February of 2013 and stopped chatting as much with these

12   kinds of issues, and we're going to have no idea why that

13   occurred.

14           We're going to be taking out of the trial a

15   critical piece of information that was in the minds of the

16   defendants, was in the minds of some of the victims, was

17   in the minds of the testifying co-conspirator witnesses,

18   artificially and creating essentially a trial that is not

19   going to be, at least in the government's view, now a

20   search for the truth but an effort to manipulate sort of

21   the facts now for the benefit of, you know, an argument

22   the defendants want to make.

23           And we just view this evidence as important in

24   that respect, Your Honor, is to complete the picture, to

25   understand what was in the defendants' minds, why

1    everybody did what they did.

2            And it just, again, it is for all the reasons

3    I've said before.  I understand Your Honor is under time

4    pressure here.  We believe it was a critical piece of

5    evidence that was present.  It was there and it was of

6    what everybody was thinking about and it drove how they

7    reacted.

8            THE COURT:  Help me understand this part of it,

9    if you would, please, Mr. Novick:  As I understand it,

10   most of the trades that the jury will be asked to consider

11   in this case occurred before Mr. Litvak was indicted.

12           MR. NOVICK:  Yes.

13           THE COURT:  So how could the fact of the Litvak

14   indictment and its impact on the market and these

15   individuals have any bearing object the majority of the

16   trades at issue?

17           MR. NOVICK:  Well, a couple of things, Your

18   Honor.

19           First of all, they're obviously critical

20   evidence that related to the trades that occurred after

21   the indictment.  And as Your Honor said at the very

22   beginning, we don't think, and I said this a couple of

23   minutes ago, while we don't think it would be a right

24   result, a jury could theoretically decide that that was a

25   significant moment in the market and that any lies after

1    that should be treated differently than lies before that.

2    That's a thing the jury can do.  And to the extent we are

3    seeking the truth and seeking a just result here, I don't

4    want to deprive the jury of the ability to make a decision

5    if they think it's fit.  We're going to argue against that

6    distinction.  And so, you know, that's the for instance.

7            The second thing, Your Honor, is we know that

8    they -- because of the Litvak indictment -- and by the

9    way, Your Honor, the defendants -- well, withdraw that.

10            We know because of the Litvak indictment that

11    everybody moved to the phone -- not everybody -- a lot of

12    the traders moved to the phone more frequently, knew that

13    chats were going to be a problem, and did that more and

14    chatted -- excuse me -- used the phone more and chatted on

15    Bloomberg less.

16            So that's a thing that would explain why there's

17    fewer fraudulent trades after.  It's also just simply more

18    time before the Litvak indictment than there is after.

19    When the government's investigations began, the defendants

20    were put on suspension.  So we're really talking about a

21    year timeframe versus a -- you know, post indictment

22    versus a three-year, four-year timeframe beforehand.

23            You know, in addition to that, Mr. Shapiro had

24    been promoted and so he at that point is trading less and

25    supervising more.  And just in terms of volume, you know,

1       it's different.

2               And so I think that answers the question Your

3       Honor asked.

4               THE COURT:  I don't want to prolong this, but in

5       all fairness, Mr. Novick, you really didn't.  The question

6       related to the trades before the indictment.

7               How can the fact of the indictment have any

8       bearing on those trades which comprised the majority of

9       the trades at issue?

10              MR. NOVICK:  Sure.  So two things, Your Honor.

11              I think that the fact that they moved to the

12      phones after the indictments and did more work on the

13      phones after the indictment is reflective of the idea that

14      they had intended to do wrong the entire time.

15              THE COURT:  That's what I was wondering.  That's

16      something I need to think about because it strikes me that

17      that's what may be in store for us, that you would wind up

18      arguing to the jury that no matter what they might make of

19      the pre-Litvak indictment trades, without the benefit of

20      the Litvak indictment, once that indictment came down, we

21      see people behaving in a way that shows they were bad news

22      all along.

23              MR. NOVICK:  Yes, Your Honor.

24              THE COURT:  Their post-Litvak indictment

25      behavior allows the jury to find that they had a guilty

1    state of mind prior to the Litvak indictment.

2              MR. NOVICK:  Precisely, Your Honor.

3              THE COURT:  Okay.  Well, last question on this.

4    If Mr. Litvak had never been indicted, would we be dealing

5    with this case?  If Mr. Litvak had never been charged and

6    everything else remained the same, would we have this

7    case?

8              MR. NOVICK:  Your Honor, that's a tricky

9    question, because I think if the way this all played out,

10   which I think we described in one of our filings, the fact

11   that Mr. Canter had found what Mr. Litvak had done, begot

12   that case and opened our eyes to this issue in the

13   marketplace and then begot all the inquiries that we made

14   to the various, SEC and then DOJ, to the various other

15   banks trading in this marketplace, who then did their own

16   internal investigations and found the evidence that they

17   found.

18             So I think the answer is no.  Well, maybe we

19   would have eventually found it, I don't know, but facts on

20   the ground are such that the way the Litvak case unfolded

21   and the way the government proceeded from there, the

22   Litvak case was the beginning of that narrative.

23             THE COURT:  Can you point to any precedent for

24   in effect clarifying legal standards that apply in the

25   securities industry through the process of an indictment

1    rather than agency regulation or some other means?  I'm

2    thinking about this in the broadest terms.

3            I have a case in which people apparently can say

4    that at the time they engaged in most of these trades,

5    they believed in good faith that what they were doing was

6    not illegal.  No one had ever been charged with doing

7    this, even though everybody did it, and certainly nobody

8    had ever been convicted of doing it.  They thought that it

9    was okay, and the government has decided to use the

10   criminal law as a means of educating the people in this

11   industry about where the line is.

12           Do we have a precedent for that?  Is there any

13   other area of securities regulation where the government

14   proceeded by way of indictment rather than some lesser

15   means?

16           MR. NOVICK:  I guess I'm not completely

17   following.  Are you saying, Your Honor, precedent to show

18   that -- I mean, there are many white collar cases where

19   the -- I have white collar cases where the defense is

20   "here's what I did, I didn't think it was wrong," and the

21   government has to prove that it was wrong, that it was

22   illegal.

23           You know, I think that's pretty common, and

24   certainly, you know --

25           THE COURT:  Do you have any case where the

1    government was allowed to offer evidence of an indictment

2    of someone else in a previous case in order to prove guilt

3    in the charges under an indictment on trial?  Any other

4    case where an indictment was used for the purpose for

5    which it's being sought to be used here?

6              MR. NOVICK:  I don't have a case either way,

7    Your Honor, either allowing it or disallowing it.

8              THE COURT:  Okay, all right.

9              With regard to other things, very, very quickly,

10   I'm going to go through this list that I have.

11             I've talked about the motion to exclude evidence

12   and argument regarding the defendants' compensation.

13   That's ECF-160, and that's granted in line with what I

14   said before today.  If the government wants to offer the

15   spreadsheet, it's going to need to persuade me that it

16   should be allowed to do so.  Based on the analysis to

17   date, I don't see that it should come in.

18             With regard to the motion to preclude evidence

19   and references to the PPIP program and the identities of

20   passive investors and the funds managed by counterparty

21   institutions, ECF-162, that's granted in part.  I am not

22   persuaded that Mr. Canter should be allowed to discuss his

23   reaction to his discovery of Mr. Litvak's

24   misrepresentation.  It's something that I need to think

25   about some more in light of our conversation today, but I

1    want the government to realize that it's in doubt.

2           I think that the government should be able to

3    offer evidence of the identities of the passive investors

4    in these funds, and that includes charities, college

5    endowments, et cetera.  I think that any danger of unfair

6    prejudice or anything else arising from that evidence can

7    be adequately dealt with through a jury instruction, and I

8    think it's important to educating the jury about what

9    these people are doing when they trade on behalf of these

10   passive investors.

11          With regard to the PPIP program in particular,

12   if we're going to be hearing from Mr. Canter about his

13   interactions with the defendants in the context of the

14   PPIP program, then that answers itself.  If that's going

15   to be evidence here, then there's nothing for me to say,

16   that trade or trades is part of the case and I'm not going

17   to conceal the PPIP program if we have PPIP trades.

18          With regard to the motion to preclude admission

19   of the FINRA study guides absent proper foundation, we

20   discussed this at a court session awhile ago and I said by

21   its terms this motion should be granted.  It's

22   self-evident that in the absence of a proper foundation

23   the guides can't come in.  That's the last I know we

24   touched on this, and so I'm granting that motion on the

25   same basis.  If the government proposes to use the FINRA

1    guides, I presume it proposes to lay a proper foundation.

2              That was ECF-163 for the benefit of the clerk.

3              The motion to exclude evidence that the

4    defendants acted as agents or brokers or owed any agency

5    duties to counterparties, ECF-164, I believe we resolved

6    that at that court session.  There isn't going to be any

7    suggestion by the government that the defendants owed

8    fiduciary duties to the counterparties, and so that motion

9    can be granted.

10             MR. NOVICK:  I'm sorry, Your Honor, from the

11   government's perspective there was another part of that, I

12   think.

13             We obviously concede that we're not going to

14   suggest that there's an agency relationship as a matter of

15   law, but I think the defendants were also looking to

16   preclude the testimony of the witnesses that they

17   perceived one and that they were made believed by the

18   defendants that there was one.  And I believe my

19   recollection, it's been a long time, Your Honor, that the

20   Court was inclined to permit the witnesses to testify in

21   that manner.

22             THE COURT:  Yes, yes.  I see that Judge Hall

23   dealt with that in her recent ruling on the motion for

24   judgment of acquittal of a new trial.  She described that

25   testimony in great detail.  I think that if we have a

1    witness who wants to say that he thought that the

2    defendant was acting as his agent, he could be

3    cross-examined on that.

4            MR. NOVICK:  Thank you, Your Honor.

5            THE COURT:  With regard to the motion to exclude

6    evidence of the absence of criminal activity, ECF-159, I

7    don't know where that stands.  Is that still something

8    that you are disputing?  Or is that moot?

9            MR. NOVICK:  Yes, Your Honor, I think -- I don't

10   know to what degree the -- one moment, please, Your Honor,

11   I'm sorry.

12           (Pause)

13           MR. BRENNAN:  Your Honor, Liam Brennan here, we

14   are -- our motion was to preclude the actions to criminal

15   activity in all there are like thousands of other trades,

16   and that is something persisted in.  I think the question

17   is whether the defense intends to bring in the non-charged

18   trades, the ones that aren't the 21 trades we've given

19   notice we're going to introduce.

20           MR. MUKASEY:  Your Honor, if I may address Liam

21   briefly.

22           I think we've tried to meet and confer on this,

23   and I thought we had.  I thought we've sort of reached an

24   agreement that there could be reference to many, many

25   other trades both by you and by us, but you would not

1    characterize them as criminal or wrongful and we would not

2    characterize them as all innocent.  So simply as part of

3    the universe of what these guys did over four years.

4           I thought we had agreed on that, or at least we

5    had agreed to try to agree on that.  And that would be at

6    least a proposal from Mr. Gramins, if not all three

7    groups.

8           MR. NOVICK:  Your Honor, Mr. Novick.

9           Why don't we just continue to confer with

10   counsel on that and we can reraise it with the Court if

11   necessary.

12          THE COURT:  Okay, then, I'll deny that without

13   prejudice to renewal.  That's ECF Number 159.

14          The next one, the government's motion to

15   preclude evidence or argument blaming victims.  We talked

16   about this at a court session, and the upshot of it is

17   that the motion is denied.  The defendants are entitled to

18   offer evidence that the victim witnesses did not conduct

19   themselves in the manner of a reasonable investor.

20          The next motion, ECF-166, to preclude evidence

21   or argument regarding fair market value, again I ruled on

22   that in essence at a previous court session.  That motion

23   is granted.

24          The next motion relatedly, ECF-167, to preclude

25   evidence regarding profitability, I'm not exactly sure

1    what the defendants have in mind in that regard, but it

2    would be helpful if you could educate me, we can't do it

3    now, but to the extent that remains open, to the extent

4    the defendants intend to offer evidence that these trades

5    were in fact profitable, I would ask you to discuss that

6    with the government and see if you can work that out.  If

7    you can't, fine, I'll deal with it, but I'm going to deny

8    that without prejudice to renewal pending that discussion.

9         Next one, motion to preclude evidence regarding

10   other broker/dealers, ECF-187, again, I don't know where

11   that stands today, so I think I'm going to treat it the

12   same way.  I'm denying it without prejudice to renewal on

13   the understanding that if the defendants seek to offer

14   evidence in that vein, they will confer with counsel for

15   the government and in that way give the government fair

16   notice of exactly what they have in mind, and then the

17   government can renew its motion if it wants to.

18        There's a motion regarding expert witnesses,

19   which I think we've addressed.

20        This leads me to the latest motions.

21        I've got Mr. Shapiro's motion to strike

22   surplusage.  That motion is denied for substantially the

23   reasons stated by the government, and the alternative

24   request to admit evidence relating to Nomura's internal

25   review is denied for substantially the reasons stated by

1    the government.

2              With regard to the Litvak indictment and

3    references to the Litvak indictment, as you can tell from

4    today's discussion, I'm still thinking about that.  You've

5    submitted papers as recently as last week which I've read,

6    but I need to think more about it and I'll get back to you

7    on that.

8              Let me see if there's anything else that I need

9    to talk about.

10                  (Pause)

11             THE COURT:  The Scadden report and Mr. Harrison,

12   I think we've sorted that out in court.  The defendants

13   are not going to be offering that report, at least not as

14   far as they know at the moment, but they want to be able

15   to cross-examine Mr. Harrison about the conduct, and I

16   think that's fair game for cross-examination.

17             Whether we will get into what happened to

18   Mr. Harrison's employment is something that I'm not in a

19   position to say at the moment.  It may well be that

20   cross-examination will naturally wind up getting there

21   even though there's no intent to go there right off the

22   bat.

23             In general, I agree with the government that

24   personnel decisions made by these employers should not be

25   a part of this case.

1          We talked about the summary charts.  You were

2     going to have a follow-up on that.  As I said, I think

3     summary charts are useful, probably unavoidable, and it's

4     just a question of whether the charts themselves are

5     somehow or other inaccurate or otherwise unfairly

6     prejudicial.

7          I think that takes care of everything that I

8     needed to deal with today, and in any event, we need to

9     adjourn, so please continue to talk and get back to me if

10    you need anything further from me.  In the meantime, I'll

11    continue to think about the Litvak part of this and I will

12    be in touch with you.

13          There is one last point.

14          With regard to jury instructions, in your recent

15    submissions reference is made to your competing requests

16    for instructions on the elements of the offenses.  My

17    question for you would be:  Why shouldn't I use Judge

18    Hall's instructions as a starting point?  She devoted

19    substantial time and attention to these matters in the

20    course of those two trials and heard extensive argument

21    and wound up with a set of jury instructions that I

22    believe went to the jury without objection, or if there

23    was objections, there weren't too many.  My sense is that

24    they were able to come up with a set of instructions that

25    made everybody reasonably happy.

1          So my question for you would be:  Why shouldn't

2     we use her instructions as a starting point recognizing

3     that they would need to be tailored to our case, but on

4     such things as a general statement of the elements of the

5     offenses, why couldn't we use the instructions that were

6     used there.  I'd be interested to hear back from you on

7     that.  You could email Katie and let her know your

8     thoughts.

9          Thank you all, I need to run.

10          MR. MUKASEY:  Judge, can you just really quickly

11     seal the portion of the transcript in which you referred

12     to the defendants' compensation today, Judge?

13          MR. BROWN:  We join in that, Your Honor.

14          THE COURT:  Yes, that will be sealed.

15          SPEAKER:  Thank you, Your Honor.

16          MR. NOVICK:  Thanks, Your Honor.

17          THE COURT:  All right, thank you.

18          (Proceedings adjourned at 11:45 a.m.)

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3                  In Re: U.S. vs. SHAPIRO

4

5

6           I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                     /s/_____
16
                     DARLENE A. WARNER, RDR-CRR
17                     Official Court Reporter
                     450 Main Street, Room #223
18                   Hartford, Connecticut 06103
                         (860) 547-0580
19

20

21

22

23

24

25
```