

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 12, 2024

**VIA ECF AND EMAIL**
The Honorable Analisa Torres
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl St.
New York, NY 10007-1312

    Re:    *United States v. Yanping Wang*, S2 23 Cr. 118 (AT)

Dear Judge Torres:

    The Government respectfully writes in response to the Court's request for post-hearing submissions following the April 9, 2024 hearing on defendant Yanping Wang's motion to suppress her statements and the contents of her lawfully seized devices. For the reasons that follow, the Court should deny Wang's motion to suppress.

## PRELIMINARY STATEMENT

    On March 15, 2023, FBI agents arrested defendant Yanping Wang in the hallway outside of her apartment and searched her home for electronic devices pursuant to judicially authorized warrants. Wang identified her phones and their passcodes. In an affidavit submitted in connection with her suppression motion, Wang acknowledges that, once inside her apartment, she provided her passcodes *before* invoking her right to counsel.

    At the hearing, the Court heard live testimony from Special Agent Melissa Baccari who explained that she read Wang her *Miranda* rights in the hallway but planned to wait until they were both inside in a quieter space to begin to question her. Special Agent Baccari testified that Wang eventually asked for a lawyer, but only *after* discussing her phones—cutting off the discussion when Agent Baccari raised the topic of Wang's co-defendant, Miles Guo. Agent Baccari's testimony and Wang's affidavit are therefore consistent that Wang's indoor invocation occurred only after she identified her phones and their passcodes. The sole factual dispute is about what happened in the hallway, where live testimony from an experienced law enforcement agent contradicts the self-serving affidavit of the defendant—which should be disregarded.

    On this record, the Court should find by at least a preponderance of the evidence that "Wang provided the passwords before invoking her right to counsel . . . and the issue is moot." (Dkt. 251, March 22 Order at 22). The record also provides ample support for additional bases to deny Wang's motion. The same 777777 passcode was separately provided to the FBI by Wang's

co-defendant—Miles Guo, also known as "Brother Seven"—and his personal assistant. It was listed multiple times in a notebook recovered at one of Guo's homes in Mahwah, New Jersey. As a result, it was placed at the top of a list of case-wide passcodes for digital forensic examiners to attempt when they encountered locked devices. Beyond that, at least certain of the disputed devices were susceptible to established tools that the FBI has frequently and successfully used to access locked devices. In other words, the Court can find by at least a preponderance of the evidence that the FBI ultimately would have successfully accessed the locked devices even without Wang providing the passcodes.

Wang's motion should be denied.

## THE RECORD

The following facts were established through the testimony and exhibits offered at the April 9, 2024, suppression hearing.

### I. Wang is Arrested, and Her Home is Searched, Pursuant to Warrants

Early on the morning of March 15, 2023, FBI agents arrived at Wang's apartment to execute arrest and search warrants. (Tr. 6:4-5, 6:21-23; GX 26). One of the search warrants authorized the seizure of "cellphones" and other "electronic devices" that "may contain" evidence of the criminal scheme giving rise to Wang's later indictment (GX 26 at 3, 5) (the "Wang Premises Warrant"). Agents were further authorized to use "the biometric sensor of any electronic devices recovered from WANG's person" to "unlock the device." (*Id.* at 6).

Wang came to the door after a group of FBI agents knocked and announced themselves. (Tr. 5:21-6:11). She was placed into custody and walked into the hallway outside of her apartment, where she was received by Special Agent Melissa Baccari and another female agent. (*Id.* 6:9-19, 7:3-4). Agent Baccari, a five-year veteran of the FBI, informed Wang of the arrest and search warrants and read Wang her *Miranda* rights. (*Id.* 6:18-7:4).

### II. Wang Acknowledges Her Rights and Does Not Invoke

After Agent Baccari read Wang her rights, Wang acted "as if she understood" and was "compliant[]." (Tr. 7:8-9). Wang did not ask for a lawyer in the hallway. (*Id.* 7:10-11). She did not say she wished to remain silent. (*Id.* 7:12-14). She did not say anything of substance at all in the hallway. (*Id.* 15-16).

The hallway interaction was brief—just "a couple of minutes"—while agents cleared Wang's small apartment. (*Id.* 7:5-7, 8:5-7). During this short initial exchange in the hallway, Agent Baccari did not ask Wang to make a statement. Instead, she "wanted to bring her inside to the bedroom, inside the apartment." (*Id.* 7:17-22). Agent Baccari acted purposefully in declining to ask Wang substantive questions in the hallway: the experienced agent "wanted to make [Wang] feel a little bit more comfortable instead of asking her questions in the hallway outside . . . in the hopes that she'd like to speak with me" inside. (*Id.* 7:23-8:4). Wang acted "compliantly and as if she understood." (*Id.* 7:8-9).

After the quick period in the hallway, Special Agent Baccari and another female agent walked Wang inside to her bedroom, passing "a line of phones on the kitchen counter." (Tr. 8:5-17).

### III. Wang Provides Her Passcodes

Immediately after they entered Wang's bedroom, Special Agent Baccari "noted a cell phone near Ms. Wang's bed on the night table" and "asked her if this was her phone and the phone that she used every day." (Tr. 9:5-11). Wang said "yes," and nothing else, and Special Agent Baccari asked Wang for the phone's passcode. (*Id.* 9:7-13). Wang provided it—"777777"—right away, without any additional comment. (*Id.* 9:16-10:6). At that time, Wang had neither asked for a lawyer nor said she wished to remain silent before identifying her phone and its passcode to Special Agent Baccari. (*Id.* 10:7-12).

The conversation continued: Special Agent Baccari asked Wang about the phones that they had both walked by moments before on the way to Wang's bedroom, and Wang "said that they were all her phones." (*Id.* 10:13-23). Without prompting by Special Agent Baccari and without having asked for a lawyer, Wang elaborated and provided an explanation for why she kept so many phones. (*See id.* 10:19-23 (Wang told Agent Baccari "that she was a refugee of the CCP, and her phones were constantly getting hacked, and that's why she had so many phones")).

### IV. Wang Asks for a Lawyer Only After Providing Her Passcodes

Agent Baccari "just acknowledged" Wang's unsolicited explanation for why she owned so many phones, and then asked Wang a question on a different topic: if she "knew where Mr. Miles Guo was that morning." (Tr. 10:25-11:4). After declining to ask Wang substantive questions in the hallway until the two female agents could make her more comfortable inside, Agent Baccari "thought I could attempt to interview her at that time" because "she had been very compliant, and she was speaking." (*Id.* 11:15-24). Wang "just said no or shook her head no" to Agent Baccari's question about whether Wang knew Guo's whereabouts, and so Agent Baccari "asked Ms. Wang if she'd like to speak with us, give me a statement." (*Id.* 11:15-21). In response to that question—after responding to at least four other questions about her phones, her passcode, and her co-defendant—Wang mentioned for the first time that she would like to have an attorney. (*Id.* 11:19-12:4). At that point, Agent Baccari declined to ask any additional substantive questions, "because it's not our process to continue to have substantive conversation after someone invokes." (*Id.* 12:5-19).

Wang's pre-hearing affidavit—uncorroborated in view of her decision not to testify at the hearing, *see supra* 7-8 & n.3—stated that Wang asked for a lawyer outside "in the hallway," but that once "back into the apartment bedroom," Wang "provided . . . the locations of, and passwords for, electronic devices, in the apartment," *before* Wang "said [she] wanted to speak to a lawyer" inside. (Dkt. 199-4).

### V. Wang's Mobile Devices Are Seized Pursuant to the Wang Premises Warrant

Agents finished executing the search and ultimately seized various items and devices pursuant to the Wang Premises Warrant. (*See* DX 2 (search 302)[1]). In relevant part, the FBI seized 13 mobile devices—12 iPhones and 1 iPad (the "Wang Mobile Devices"). (*See* GX-S1). Eight of these devices had the same 777777 passcode; the remaining five either had a different passcode or none at all. (*See id.*)

### VI. The 777777 Passcode is Also Provided by Miles Guo and His Assistant, and Found in a Notebook in Mahwah, the Same Day

That same morning, co-defendant Miles Guo was arrested at his penthouse apartment in Midtown Manhattan. (Tr. 47:13-25). Special Agent Jessica Cardenas collected multiple cellphones from a table in the room where Guo and his assistant, Jason Hu, were detained following their arrest. (*Id.* 48:16-24). Agent Cardenas asked "everyone that was in the foyer area" for the passcodes to these phones, and "the first one to answer was Miles Guo," who provided the passcode 777777. (*Id.* 49:12-23). Agent Cardenas then asked for the passcode to another of these phones, and Jason Hu—Guo's assistant—gave the same 777777 passcode for another device. (*Id.* 49:24-50:8). In all, Guo and his assistant gave the 777777 passcode for three devices. (*Id.* 50:9-11).

The same 777777 passcode was also listed several times in a notebook recovered from a search of Guo's home in Mahwah, New Jersey. The Mahwah search occurred the same day that Wang, Guo, and Hu provided the 777777 passcode for at least 11 mobile devices. (*See* Tr. 16:7-9 (Mahwah search on same day); *id.* 50:9-11 (three Guo and Hu devices with 777777 passcode); GX-S1 (eight Wang mobile devices with 777777 passcode)). A notebook seized in Mahwah included at least two references to the same passcode, as shown below. (*See* GX-2A (list of passcodes emailed by case agents to digital forensic examiners citing 777777 passcode as derived from 1B196, a notebook seized in Mahwah); USAO_00064116, USAO_00064120 (photos of pages cited in GX-2A)).[2]




| USAO_00064116 | USAO_00064120 |

---

[1] Defense counsel offered 3501-05 as Defense Exhibit 2, and it was admitted. (*See* Tr. 33:22-34:2). Because 3501-05 is only the first page of a document that spans from 3501-05 to 3501-15, the Government refers to the entire document as DX-2.

[2] USAO_00064116 and USAO_00064120 were not introduced as evidence at the hearing and come from a notebook that was seized from the Mahwah Mansion. They were produced to the defendants on or about May 12, 2023.

### VII. The FBI Creates a Passcode List to Share with the Digital Forensic Examiners Analyzing the "GTV" Devices

The FBI section that processes and analyzes mobile devices is called the Computer Analysis Response Team, or "CART." (Tr. 46:19-47:7). CART examiners sometimes need passcodes to access mobile devices. (*Id.* 64:17-22). When a device's passcode is unknown, CART often consults a "passcode list," which is a series of "potential [passcodes] that can be compiled by investigators either from other digital evidence items, just observing them from search warrants, and they can compile a list of [passcodes] to test on the devices" for which a passcode is unknown. (*Id.* 64:23-65:12).

CART referred to a single case called "GTV" that encompassed all of the mobile devices seized from at least four locations and belonging to, among others, Guo, Hu, and Wang. (*See* Tr. 47:21-23; 50:15-18; 55:6-8). The FBI case agents for the related investigation created a passcode list and sent it to the CART examiners on the GTV case on May 3, 2023, with the subject line "GTV – Last Warrant and Potential Passwords/Pins" (the "Passcode List") (GX-2 (email); GX-2A (Passcode List)).

777777 was at the top of the Passcode List's tab labeled "Pins," (*see* GX-2A), and the case agent in the accompanying email asked the CART examiners to "please try all 7s to start with" in the event they had to process devices for which a passcode was unknown (*see* GX-2). As described above, the Passcode List's Pins tab identified the source of the 777777 passcode at the top of its list of potential codes sourced from casewide materials as a notebook recovered in the search of Guo's home in Mahwah, New Jersey. (*See* GX-2A, "Pins" tab, top row). The Passcode List also followed the provision of the same 777777 passcode by Miles Guo—identified in the then-operative indictment as, among other things, "Brother Seven" and "the leader of the scheme," (Dkt. 2 ¶¶ 1, 6)—and his assistant. (*See* Tr. 48:16-24 (SA Cardenas)).

### VIII. The Overlapping Alternative Ways the FBI Would Likely Have Accessed the Relevant Wang Mobile Devices

#### A. The Relevant Wang Mobile Devices

Eight of the Wang Mobile Devices used the 777777 passcode (the "Wang 777777 Devices"). The remaining five Wang Mobile Devices either used another passcode or did not have a passcode enabled (the "Other Wang Devices"). Accordingly, those five Wang Mobile Devices are not subject to Wang's motion. (*See* GX-S1).

#### B. The Passcode List and the Widespread Repetition of 777777 Across Devices From Multiple People at Multiple Locations

As noted above, CART examiners received the Passcode List on at least May 3, 2023. (*See* GX-2; Tr. 65:23-66:16 (Digital Forensics Examiner ("DFE") Volchko identifying GX-2 as "a password list of potential passwords and Pins" she and others received in the GTV case)). Two weeks later, DFE Volchko emailed the case agents to note that two of the Wang Mobile Devices

required passcodes to be manually entered because they were not susceptible to the FBI's "brute force" technique for bypassing devices' passcode protection. (*See* GX-4 at 2). DFE Volchko, who was not at the search of Wang's apartment, (*see* DX-2 at 1 (listing search participants)), asked the case agents in an email she titled "GTV- PINs for iPhones" if she should try 777777 for these two Wang Mobile Devices. (*Id.*)

Special Agent Cardenas did not participate in the search of Wang's apartment; she was only present at the search of Guo's apartment at the Sherry Netherland. (*See* Tr. 47:24-25, 50:12-14). Agent Cardenas testified that, as is typical, CART examiners discussed potential passcodes with each other around their office when they encountered locked devices from a particular case. (*Id.* 50:15-24). When a colleague asked Agent Cardenas for advice on how to attempt to manually access a pair of locked devices, Agent Cardenas suggested she try 777777—and it worked. (*Id.* 50:25-51:14).

### C. Brute Force

Two of the Wang 777777 Devices—1B70 (an iPhone 11) and 1B71 (an iPhone XR)—were of a make, model, and operating system that "would be brute forceable." (Tr. 76:12-78:12). In other words, these Wang Mobile Devices had features that would have enabled use of FBI software "that allows the guessing of passcodes against the device" and "will try all 1 million attempts until it finds the correct passcode." (*Id.* 76:16-20).

### D. Biometrics

One of the Wang 777777 Devices—1B15, the iPhone that Wang identified in her bedroom (*see* DX-2 at 3501-12 (identified as "Item 1"); GX-5 at 9-10 (identified as "1B15" and received "already powered on")—had its biometrics function enabled. (Tr. 79:4-14). "Biometrics is a way to unlock phones" either by putting the powered-on device in front of its owner's face or pressings its owner's fingerprint to the device. (*Id.* 79:15-19). The Wang Premises Warrant authorized the seizure of her electronic devices and the compelled use of biometrics for any devices seized from her person. (*See* GX-26 at 5-6).

## APPLICABLE LAW

### I. The *Miranda/Edwards* Right to Counsel

"[W]hen an accused has invoked [her] right to have counsel present during custodial interrogation, . . . [she] is not subject to further interrogation by the authorities until counsel has been made available to [her], unless the accused [herself] initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). The invocation of the right "requires a *clear* assertion of the right to counsel," not an ambiguous statement such as, "Maybe I should talk to a lawyer." *United States v. Medunjanin*, 752 F.3d 576, 586–87 (2d Cir. 2014) (cleaned up and emphasis in original).[3]

---

[3] The Government respectfully maintains its position that *Miranda*'s exclusionary rule is limited to *statements* obtained in violation of a defendant's rights to silence or counsel, and that no

## II.     Inevitable Discovery

The doctrine of inevitable discovery caveats the exclusionary rule to permit the admission of unlawfully obtained evidence where the Government can "establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). A two-step process determines whether contested evidence avoids suppression on this ground. *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 103 (2d Cir. 2016). First, "the court must evaluate the progress of the investigation at the time of the government misconduct to determine whether an active and ongoing investigation . . . was in progress." *Id.* Second, "the court must, for each particular piece of evidence, specifically analyze and explain how, if at all, discovery of that piece of evidence would have been more likely than not inevitable absent the unlawful search." *Id.*

## III.     Evidentiary Standards at Suppression Hearings

The Court is free to consider hearsay or any other nonprivileged evidence to decide a suppression motion. *See* Fed. R. Evid. 104(a) (court "is not bound by evidence rules, except those on privilege," when deciding whether "evidence is admissible"); Fed. R. Evid. 1101(d)(1) (evidentiary rules other than privilege do not apply to "[t]he determination of questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under rule 104"); *see also United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."); *accord United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003).

A defendant's affidavit should be disregarded if she chooses not to testify. See *United States v. Deleston*, No. 15 Cr. 113 (PKC), 2015 WL 4745252, at *5 (S.D.N.Y. July 24, 2015); *United States v. James*, No. 10 Cr. 1293 (RPP), 2011 WL 6306721, at *7 (S.D.N.Y. Dec. 16, 2011); *United States v. Al-Marri*, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002); United States v.

---

controlling authority provides for suppression of *derivative evidence* as a remedy for purported violations of a defendant's *Edwards* right to counsel. (*See* Dkt. 232). A violation of *Miranda*'s prophylactic rules does not require "suppression of the [nontestimonial] physical fruits of the suspect's unwarned but voluntary statements." *United States v. Patane*, 542 U.S. 630, 634 (2004) (plurality opinion); *United States v. Gonzalez-Garcia*, 708 F.3d 682, 687 (5th Cir. 2013) (when evidence seized is "physical, nontestimonial evidence, an *Edwards* violation itself would not justify suppression"). As three Justices explained in *Patane*, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. The Self-Incrimination Clause, however, is not implicated by the admission into evidence of the physical fruit of a voluntary statement. Accordingly, there is no justification for extending the *Miranda* rule to this context." 542 U.S. at 636. Nonetheless, the Court need not reach this issue because the testimony during the suppression hearing established, by at least a preponderance of the evidence, that Wang had *not* invoked before she provided the 777777 passcode.

Polanco, 37 F. Supp. 2d 262, 264 & n.4 (S.D.N.Y. 1999) ("[T]he self-serving affidavit of the moving defendant is usually disregarded if [she] declines to testify at the hearing.").

## DISCUSSION

### I. Wang Provided Her 777777 Passcode Before Invoking Her Right to Counsel

"If Wang provided the passwords before invoking her right to counsel . . . then there was no *Edwards* violation, and the issue is moot." March 22 Order at 22. Agent Baccari appeared before the Court to testify under oath that Wang did *not* invoke her right to counsel in the hallway. Instead, Wang provided the 777777 passcode after she was provided Miranda warnings but *before* she invoked. (Tr. 45:2-13). Accordingly, there is no *Miranda/Edwards* violation and that should end the inquiry.

Wang's own affidavit is the only source substantiating her claim to have invoked her right to counsel immediately upon her arrest in the hallway. (*See* Dkt. 199-4). But, as his her right, Wang declined to testify and allow the Court to assess her credibility, and so her self-serving affidavit should be disregarded.[4] *See United States v. Deleston*, No. 15 Cr. 113 (PKC), 2015 WL 4745252, at *5 (S.D.N.Y. July 24, 2015); *United States v. James*, No. 10 Cr. 1293 (RPP), 2011 WL 6306721, at *7 (S.D.N.Y. Dec. 16, 2011); *United States v. Al-Marri*, 230 F. Supp. 2d 535, 539 (S.D.N.Y. 2002); *United States v. Polanco*, 37 F. Supp. 2d 262, 264 & n.4 (S.D.N.Y. 1999) ("[T]he self-serving affidavit of the moving defendant is usually disregarded if [she] declines to testify at the hearing."). And if the Court *were* to credit Wang's written statement, it presents no factual dispute about the events that transpired once Agent Baccari and Wang were back in her bedroom—where the disputed passcode statements were made. By Wang's own account, she invoked her right to counsel inside her bedroom only *after* providing "the location of, and passwords for, electronic devices, in the apartment." (Dkt. 199-4).

Weighing Agent Baccari's live testimony against Wang's uncorroborated litigation submission points to the conclusion that Wang did not invoke her right to counsel in the brief initial hallway encounter where Agent Baccari did not ask her any substantive questions she could have refused to answer. *See, e.g.*, *United States v. Cherry*, 541 F. Supp. 3d 407, 422-23 (collecting cases for proposition that courts "give greater weight" to witness testimony "even where an adversary has submitted an affidavit or declaration"); *United States v. Thompson*, No. 10 Cr. 94 (JSR), 2010 WL 3069668, at *5 (S.D.N.Y. July 29, 2010) (denying motion to suppress where search agent's testimony contradicted non-testifying defendant's affidavit); *United States v. Juliano*, No. 99 Cr. 1197 (AGS), 2000 WL 1206745, at *3 n.1 (S.D.N.Y. Aug. 24, 2000) (rejecting non-testifying defendant's "conclusory" sworn statement concerning sole material fact in face of agent's "forthright and truthful" testimony).

---

[4] Had Wang chosen to testify at the suppression hearing, the Government would have been prohibited from introducing any of her testimony at trial as evidence of her guilt. *See United States v. Warren*, 453 F.2d 738, 742-43 (2d Cir. 1973).

## II. Alternatively, the FBI Would Inevitably Have Discovered the Contents of the Relevant Wang Devices

Assuming the Court declines to make a finding regarding the timing of Wang's invocation, or finds that Wang timely invoked, the record more than adequately supports a finding by a preponderance of the evidence that each of the Wang 777777 Devices "would have more likely than not" been discovered absent Wang's disputed provision of that passcode. *See Nix*, 467 U.S. at 444 (preponderance standard for inevitable-discovery exception to suppression); *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 103 (2d Cir. 2016) (application of "more likely than not" standard to each piece of relevant evidence).

First, the case agents created and disseminated the Passcode List drawn from a number of independent and overlapping sources beyond Wang's apartment. (*See* GX-2, GX-2A). That document identified 777777 at the top of its list of potential passcodes that CART examiners should try on devices seized across the entire investigation, and cited not Wang's provision of the code but its appearance in a notebook seized at Guo's residence in Mahwah, New Jersey. (*See* GX-2A; USAO_00064116, USAO_00064120). This combination of numbers was ubiquitous and it was not random: Guo refers to himself as "Brother Seven," (*see* Dkt. 2 ¶¶ 1, 6), and he identified the same passcode as belonging to his personal phone on the day of his arrest, when his assistant identified the same passcode for two additional devices. (Tr. 48:16-50:11). This record provides more than an adequate basis for the Court to find, by a preponderance of the evidence, that the FBI would "more likely than not" have attempted 777777 on the Wang 777777 Devices in the event that Wang had not provided the passcode herself.

Second, certain of the Wang 777777 Devices would more likely than not have been accessed not only by application of the Passcode List but through additional technological means. DFE Isolda described his personal examination of three of the physical Wang 777777 Devices, and testified that two of them were susceptible to the FBI's "brute force" technology that bypasses passcode protections to gain entry to a locked device, and that a third had biometrics engaged that would have permitted agents to exercise their authority to unlock the device by holding it up to Wang's face or pressing her finger against it. (Tr. 75:3-79:14). Courts have consistently denied suppression motions on inevitable-discovery grounds where, as here, law enforcement would more likely than not have been able to access a device's contents through established technological methods that obviated the need for a passcode. *See, e.g.*, *United States v. Eldarir*, No. 20 Cr. 243 (LDH), 2023 WL 4373551, at *9 (E.D.N.Y. July 6, 2023) (publication forthcoming) (denying motion to suppress where law enforcement "could have performed an extraction of Defendant's phone for the forensic review even without a passcode, though it may have taken additional time"); *see also, e.g.*, *United States v. Will*, No. 15 Cr. 6, 2015 WL 3822599, *16 (N.D. W. Va. June 19, 2015) (denying suppression motion where "the preponderance of the evidence supports that the Government's forensic analysis would uncover the same content even if Will did not provide his cell phone password"); *United States v. Todd*, No. 16 Cr. 305, 2017 WL 1197849, *13 (S.D. Ga. Feb. 10, 2017) ("as [the agent] testified, [the] FBI offices ... had the technological capabilities to bypass the swipe pattern and access the contents of [d]efendant's cell phone[;] [t]hus, regardless of whether officers violated [d]efendant's Miranda rights in obtaining [d]efendant's swipe pattern, the inevitable discovery doctrine prevents suppression of the evidence attained from the cell phone search"), *report and recommendation adopted*, 2017 WL 1172113 (S.D. Ga. March 29, 2017);

*United States v. Ashmore*, No. 16 Cr. 20016, Dkt. 36 at 12 (W.D. Ark. Dec. 7, 2016) (denying suppression of contents of device where Government "would have been able to access the information on [the defendant's] computer and cell phone without the passwords provided by [the defendant] at his residence").

## **CONCLUSION**

For the reasons set forth above, the Court should deny Wang's motion to suppress the contents of mobile devices seized from her apartment pursuant to a search warrant.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/
Micah F. Fergenson
Ryan B. Finkel
Justin Horton
Juliana N. Murray
Assistant United States Attorneys
(212) 637-2190 / 6612 / 2276 / 2314