O49FwanH

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                              23 Cr. 118 (AT)

5    YANPING WANG,

6                                             Hearing
               Defendant.
7    ------------------------------x

8                                             New York, N.Y.
9                                             April 9, 2024
                                              11:00 a.m.

10

11   Before:

12                     HON. ANALISA TORRES,

13                                             District Judge

14                          APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  JUSTIN HORTON
17        JULIANA MURRAY
          MICAH FERGENSON
18        RYAN FINKEL
          Assistant United States Attorneys
19
     BRENDAN QUIGLEY
20   RACHEL SEBBAG
          Attorneys for Defendant
21
     Also Present:   Isabel Loftus, Paralegal Specialist USAO
22

23

24

25

O49FwanH

1          (Case called)

2          MR. QUIGLEY:  Good morning.  We are here in the matter

3     of The United States v. Yanping Wang.

4          Would you make your appearances, please.

5          MR. HORTON:  Good morning, your Honor.

6          Justin Horton for the government.  I'm joined at

7     counsels' table by Assistant U.S. Attorneys Juliana Murray,

8     Micah Fergenson, Ryan Finkel, and paralegal specialist, Isabel

9     Loftus.

10         MR. QUIGLEY:  Good morning, your Honor.

11         For Ms. Wang, Brendan Quigley.  Ms. Wang is to my

12    right, and I'm also joined by my colleague Rachel Sebbag from

13    Baker Botts.  Good morning.

14         THE COURT:  And I'd like the interpreters to identify

15    themselves.

16         INTERPRETER HUANG:  Good morning, your Honor.

17         Mandarin interpreter Tor Huang, and with me is my

18    colleague.

19         INTERPRETER WILKINSON:  Una Wiklinson, Mandarin

20    interpreter.

21         THE COURT:  Ms. Wang, are you able to understand what

22    the interpreters are saying?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Please be seated.

25         The matter is on for a suppression hearing.

O49FwanH                         Direct - Baccari

1          On March 15, 2023, the government arrested Ms. Wang at

2     her apartment and seized her cell phones.  On December 15,

3     Ms. Wang moved to suppress the contents of the phones, claiming

4     that the government elicited the phone passcodes from her after

5     she had invoked her right to counsel.  She argues that this is

6     a violation of Edwards v. Arizona, 451 U.S. 477 (1981).

7          By order dated March 22, 2024, I ordered that a

8     suppression hearing is necessary to determine whether Ms. Wang

9     invoked her right to counsel prior to being questioned

10    regarding her phone passcodes and whether the government would

11    have inevitably accessed the phones.

12          The government may call its first witness.

13          MR. HORTON:  The government calls Special Agent

14    Melissa Baccari.

15    MELISSA BACCARI,

16         called as a witness by the GOVERNMENT,

17         having been duly sworn, testified as follows:

18          THE COURT:  Please state your name and spell it.

19          THE WITNESS:  Melissa Baccari.

20          THE COURT:  You may inquire.

21          MR. HORTON:  Thank you, your Honor.

22    DIRECT EXAMINATION

23    BY MR. HORTON:

24    Q.  Good morning, Agent Baccari.

25    A.  Good morning.

O49FwanH                        Direct - Baccari

1   Q.  Where do you work?

2   A.  For the Federal Bureau of Investigation.

3   Q.  And what's your title at the FBI?

4   A.  Special Agent.

5   Q.  How long have you been a special agent at the FBI?

6   A.  Just about five years.

7   Q.  And what are your job responsibilits as a special agent?

8   A.  I'm assigned to a squad that investigates financial crimes.

9   Q.  Do you participate in arrests?

10  A.  Yes.

11  Q.  Do you participate in the execution of search warrants?

12  A.  Yes.

13  Q.  Did there come a time, Agent Baccari, when you participated

14  in the arrest of Ms. Wang?

15  A.  Yes.

16  Q.  Do you see Ms. Wang in the courtroom today?

17  A.  Yes.

18  Q.  And where do you see her?

19  A.  At the second table, the defense table.

20          MR. QUIGLEY:  We'll stipulate that that's Ms. Wang.

21  Q.  When was Ms. Wang arrested?

22  A.  In March of 2023.

23  Q.  What was the date of her arrest?

24  A.  The 15th.

25  Q.  And where was Ms. Wang arrested?

O49FwanH                          Direct - Baccari

1    A.   In her apartment in New York City.

2    Q.   And what kind of building was her apartment in?

3    A.   It was a multi-floor residential building.

4    Q.   What time of day was Ms. Wang arrested?

5    A.   Approximately 6 a.m.

6    Q.   Were you there?

7    A.   Yes.

8    Q.   And where were you in the moment before she was arrested?

9    A.   I was in the hallway, outside of her apartment door.

10   Q.   Were you alone there?

11   A.   No.

12   Q.   Who else were you with?

13   A.   The rest of the arrest team.

14   Q.   And about how many people was that?

15   A.   About ten other agents.

16   Q.   Agent Baccari, what's a knock-and-announce?

17   A.   The knock-and-announce is the term that we use to identify

18   ourselves as agents, advise that we have a warrant, and tell

19   the individual what we'd like them to do, which is, come to the

20   door.

21   Q.   And how does a knock-and-announce work?

22   A.   Agents will knock on the front door of the location where

23   we believe the individual to be located and identify themselves

24   as FBI and ask them to come to the front door, that we have a

25   warrant.

O49FwanH                         Direct - Baccari

1    Q.  Was there a knock-and-announce at Ms. Wang's that morning?

2    A.  Yes.

3    Q.  And where were you during the knock-and-announce?

4    A.  In the hallway, behind the agents knocking and announcing.

5    Q.  And where in the hallway in relation to the doorway to her

6    apartment?

7    A.  I believe I would have been against the wall on the same

8    side as her door.

9    Q.  Can you describe to the Court what happened after the

10   knock-and-announce?

11   A.  Shortly after, Ms. Wang came to the front door.

12   Q.  And what did you do next?

13   A.  She was placed into custody.

14   Q.  And how was she placed into custody?

15   A.  I believe she was handcuffed by the agents at the front

16   door.

17   Q.  And what did you do in that moment?

18   A.  Ms. Wang was passed to me, and I began to interact with

19   Ms. Wang.

20   Q.  And how did you begin to interact with Ms. Wang?

21   A.  I advised her that we had an arrest warrant, an arrest

22   warrant for her and a search warrant for the residence,

23   including electronics, and then I read her her rights.

24   Q.  And how did you read her her rights?

25   A.  I read them from a card, standing in the hallway.

O49FwanH                      Direct - Baccari

1   Q.  And were you alone in this moment with Ms. Wang?

2   A.  No.

3   Q.  Who else were you with?

4   A.  Another female agent.

5   Q.  Where had the rest of the agents you mentioned a moment

6   ago, where had they gone?

7   A.  To clear the residence, inside the apartment.

8   Q.  How did Ms. Wang respond after you read her her rights?

9   A.  Compliantly and as if she understood.

10  Q.  And did Ms. Wang ask you for a lawyer at that time?

11  A.  No.

12  Q.  Did Ms. Wang tell you she did not want to speak to you at

13  that time?

14  A.  No.

15  Q.  Did Ms. Wang say anything to you at all?

16  A.  No.  Not in the hallway.

17  Q.  After you read Ms. Wang her rights in the hallway, did you

18  ask her to make a statement out there?

19  A.  No.  Not in the hallway.

20  Q.  And why not?

21  A.  I wanted to bring her inside to the bedroom, inside the

22  apartment.

23  Q.  And why do you want to bring her inside the bedroom in her

24  apartment?

25  A.  I just wanted to make her feel a little bit more

1    comfortable instead of asking her questions in the hallway

2    outside.

3    Q.  And why did you want to make her more comfortable?

4    A.  Just in the hopes that she'd like to speak with me.

5    Q.  How long did you spend in the hallway with Ms. Wang and the

6    other female agent?

7    A.  A couple of minutes.

8    Q.  And then where did you go next?

9    A.  We went into the apartment and back to her bedroom.

10   Q.  And how did you get from the hallway back to Ms. Wang's

11   bedroom in the apartment?

12   A.  We walked through the front door and passed the kitchen on

13   the left-hand side and then went directly to the bedroom.

14   Q.  And what did you see while you were walking from the

15   hallway to the bedroom?

16   A.  There was a line of phones on the kitchen counter in the

17   kitchen to the left.

18   Q.  When you got to Ms. Wang's bedroom, who besides you was in

19   that room?

20   A.  Ms. Wang and the other female agent.

21   Q.  Did you have a weapon on that day, Agent Baccari?

22   A.  Yes, I did.

23   Q.  Where was it when you were in the hallway reading Ms. Wang

24   her rights?

25   A.  In my holster.

O49FwanH                         Direct - Baccari

1   Q.  And where was it when you took her to the bedroom?

2   A.  In my holster.

3   Q.  Did you ever take it out of your holster that morning?

4   A.  I don't believe I did.

5   Q.  When you got to Ms. Wang's bedroom with her and the other

6   female agent, what, if anything, did you see?

7   A.  I noted a cell phone near Ms. Wang's bed on the night

8   table.

9   Q.  And what happened next?

10  A.  I asked her if this was her phone and the phone that she

11  used every day.

12  Q.  How did she respond to you?

13  A.  She said yes.

14  Q.  Why did you ask Ms. Wang if that was her phone?

15  A.  Because we had a search warrant for electronics.

16  Q.  After Ms. Wang said that that phone was hers, what did you

17  do next?

18  A.  I asked her for the passcode.

19  Q.  Did she give it to you?

20  A.  Yes.

21  Q.  What passcode did she give to you?

22  A.  All seven, six 7s.

23  Q.  And what do you mean by all sevens?

24  A.  777 --

25          THE COURT:  One moment, please.

O49FwanH                    Direct - Baccari

1          You may proceed.

2          MR. HORTON:  Thank you, your Honor.

3   Q.  Agent Baccari, you testified that the passcode she gave was

4   all sevens.

5          Can you explain what you mean by that?

6   A.  777777.

7   Q.  Before Ms. Wang told you the 777777 passcode, had she asked

8   for a lawyer?

9   A.  No.

10  Q.  And before Ms. Wang gave you the 777777 passcode, had she

11  told you that she wished to remain silent?

12  A.  No.

13  Q.  After she give gave you the 777777 passcode, what happened

14  next?

15  A.  I asked her about the phones in the kitchen and if they

16  were all hers as well.

17  Q.  And where were you when you asked her that?

18  A.  In the bedroom.

19  Q.  How did she respond to your question about the phones in

20  the kitchen?

21  A.  She said that they were all her phones and that she was a

22  refugee of the CCP, and her phones were constantly getting

23  hacked, and that's why she had that many phones.

24  Q.  And what did you say -- how did you respond to her

25  discussing all the phones in the kitchen?

O49FwanH                    Direct - Baccari

1    A.  I just acknowledged it.

2    Q.  And what did you do next?

3    A.  I asked if Ms. Wang knew where Mr. Miles Guo was that

4    morning.

5    Q.  And why did you ask that question next?

6    A.  I believe, at that time, we were still unsure where Mr. Guo

7    was with the other operations that were happening that day,

8    simultaneously.

9    Q.  Was that the first time you asked her a question other than

10   about her phones?

11   A.  I'm sorry.  Can you repeat that?

12   Q.  Was that the first time you asked her a substantive

13   question other than about her phones?

14   A.  I believe so.

15   Q.  Did Ms. Wang respond to your question about Miles Guo?

16   A.  Yes.

17   Q.  How did she respond?

18   A.  I believe she just said no or shook her head no.

19   Q.  And what did you do next?

20   A.  I asked Ms. Wang if she'd like to speak with us, give me a

21   statement.

22   Q.  And why did you ask that question then?

23   A.  She had been very compliant, and she was speaking, so I

24   thought I could attempt to interview her at that time.

25   Q.  And did she respond to you asking if she'd like to speak

O49FwanH                     Direct - Baccari

1   with you then?

2   A.  Yes.

3   Q.  How did she respond?

4   A.  She said, I think I'd like to have my attorney.

5   Q.  After Ms. Wang said she thinks she'd like to have her

6   attorney. did you have any further substantive conversation

7   with her?

8   A.  No.

9   Q.  And why not?

10  A.  She had invoked at that point, and our focus would have

11  transitioned to processing her, taking her down to transport

12  and process her.

13  Q.  And why would your focus change when she had invoked?

14  A.  Because she had asked for an attorney at that point.

15  Q.  And why would your process change then?

16  A.  Because it's not our process to continue to have

17  substantive conversation after someone invokes.

18  Q.  Why not?

19  A.  Because that's the law of the Miranda rights.

20  Q.  Agent Baccari, when you were speaking about the phones with

21  Ms. Wang in her bedroom, what language were you speaking?

22  A.  English.

23  Q.  And what language was Ms. Wang responding to you in?

24  A.  English.

25  Q.  Did there come a time that morning, at Ms. Wang's

O49FwanH                        Direct - Baccari

1    apartment, when you Ms. Wang provide another passcode, other

2    than the one you mentioned earlier?

3    A.  Yes.

4    Q.  And what was that second passcode?

5    A.  I don't recall the exact passcode.

6    Q.  Was it all sevens?

7    A.  No.

8    Q.  And when did Ms. Wang provide this other passcode?

9    A.  I don't recall exactly when the non-sevens passcode was

10   given.

11   Q.  To whom did she provide that second passcode?

12   A.  Another agent, part of the team that morning.

13   Q.  And was that other agent in the room when Ms. Wang had

14   asked you, in her bedroom, for her lawyer?

15   A.  I don't believe so; no.

16   Q.  When Ms. Wang told you the 777777 passcode, had she already

17   asked you for a lawyer?

18   A.  No.

19   Q.  When she gave you the 777777s passcode, had she told you

20   she wished to remain silent?

21   A.  No.

22   Q.  And when you were with Ms. Wang in the hallway at the

23   beginning of that morning, did she ask you for a lawyer there?

24   A.  No.

25   Q.  And when you were with her in the hallway at the beginning

1  of that morning, did she tell you that she wished to remain

2  silent?

3  A.  No.

4         MR. HORTON:  Thank you, your Honor.

5         No further questions.

6         THE COURT:  Cross-examination.

7         MR. QUIGLEY:  Yes, your Honor.  Thank you.

8  CROSS-EXAMINATION

9  BY MR. QUIGLEY:

10  Q.  Good morning Agent Baccari.

11  A.  Good morning.

12  Q.  How are you?

13  A.  I'm well.  How are you?

14  Q.  Good.

15         No question that Ms. Wang asked to speak to an

16  attorney on March 15, 2023?

17  A.  That's correct.

18  Q.  No question that you asked for her cell phone passcodes on

19  that day; correct?

20  A.  That's correct.

21  Q.  I want to back up a second to the day before the search, so

22  that would be March 14, 2023?

23  A.  Yes.

24  Q.  You met with other agents who would be conducting a law

25  enforcement operation that day; correct?

1    A.  Yes, I believe so.

2    Q.  And these were other FBI agents; correct?

3    A.  Yes.

4    Q.  Was Agent Effting there?

5    A.  I believe so, but I can't be sure exactly who gave the

6    briefing.

7    Q.  What was his role in the investigation?

8    A.  Agent Effting is one of the case agents.

9    Q.  And was Agent DiMarino there?

10   A.  I believe so; yes.

11   Q.  What was Agent DiMarino's role in the investigation?

12   A.  Agent DiMarino is also a case agent.

13   Q.  What's your role in the investigation?

14   A.  I am a squad member of the squad in which Agent Effting and

15   Agent DiMarino are a part of.

16   Q.  And in fact, Agent DiMarino was the affiant on the search

17   warrant for Ms. Wang's apartment; correct?

18   A.  I don't know that offhand.

19   Q.  Okay.  We can come back to that.

20        Focusing back on this planning meeting on March 14,

21   there was an arrest warrant for Ms. Wang; correct?

22   A.  Yes.

23   Q.  There was also an arrest warrant for Mr. Kwok; correct?

24   A.  Yes.

25   Q.  And this was going to, kind of, going to be a complex

o49FwanH                         Baccari - Cross

1    operation; correct?

2            MR. HORTON:  Objection.

3            MR. QUIGLEY:  Okay.  I can rephrase, your Honor.

4    Q.  You had agents, including yourself, planning to go to

5    Ms. Wang's apartment; correct?

6    A.  Yes.

7    Q.  You had agents planning to go to a property in Mahwah, New

8    Jersey, to look for Mr. Kwok; correct?

9    A.  That's correct.

10   Q.  You had agents planning to go to Sherry-Netherland in

11   Manhattan to go look for Mr. Kwok; correct?

12   A.  Correct.

13   Q.  You had agents going to a residence in Greenwich,

14   Connecticut, to look for Mr. Kwok; correct?

15   A.  There were agents going to Connecticut as well.  Yes.

16   Q.  To look for Mr. Kwok; correct?

17   A.  I believe so.  Yes.

18   Q.  There was a search warrant that was going to be executed in

19   Florida; correct?

20   A.  I don't recall that offhand.

21   Q.  There was a search warrant that was going to be executed in

22   Staten Island; correct?

23           MR. HORTON:  Objection, your Honor.

24           THE COURT:  Please step up.

25           (At sidebar; discussion off the record)

o49FwanH                    Baccari - Cross

1          THE COURT:  Are you objecting because all of this

2    questioning concerning that which proceeded the arrest is not

3    relevant?

4          MR. HORTON:  I don't think it's not relevant because

5    it proceed the arrest.  My understanding is that it's beyond

6    the scope of the understanding of her knowledge, and I don't

7    think he's established that she had a reason to know what he's

8    talking about.

9          THE COURT:  The last question concerned Staten Island.

10         Is that what you're objecting to?

11         MR. HORTON:  The line of questioning seemed to be

12   going away from the briefing he was asking her about and into

13   an area she would not be able to answer.

14         MR. QUIGLEY:  Your Honor, if she doesn't know, she

15   doesn't know.  The point is that there was a lot going on that

16   day and we want to discover her direct knowledge of the search

17   of Ms. Wang's apartment.

18         They're also going to argue inevitable discovery based

19   on materials that were discovered from the apartment, at

20   Mr. Kwok's apartment, so I think it's relevant.

21         I don't have any more questions on this line of

22   evidence.  I'm just going to ask about the planning for the

23   actual discovery.  I'm about to move on to some more about her

24   intentions in interacting with Ms. Wang and the actual

25   execution of the search of Ms. Wang's apartment.

1          THE COURT:  The objection, on that ground, is

2     overruled, and I'm going to ask the reporter to read the

3     question back to the witness.

4               (In open court)

5          THE COURT:  The objection is overruled.

6          Mr. Quigley, would you repeat the question?

7          MR. QUIGLEY:  Sure.

8     BY MR. QUIGLEY:

9     Q.   There was a search warrant that was planned to be executed

10    in Staten Island also, in connection with this investigation on

11    the morning of March 15; correct?

12    A.   I don't recall that.

13    Q.   Okay.  And the reason that there were teams going to three

14    locations to look for Mr. Kwok was that you weren't sure where

15    he was going to be; correct?

16    A.   That's my recollection.  Yes.

17    Q.   Okay.  You were pretty sure where Ms. Wang was going to be;

18    correct?

19    A.   Yes.

20    Q.   At her apartment in Manhattan.

21    A.   Yes.

22    Q.   And Mr. Kwok was charged in the indictment at that time?

23    A.   I believe so.  Yes.

24    Q.   And Ms. Wang was charged in a criminal complaint, separate

25    from Mr. Kwok.  Are you aware of that?

1   A.  I don't recall the details of their charging documents at

2   this time.

3   Q.  Part of the reason somebody would be charged in a complaint

4   as opposed to an indictment with their coconspirators --

5           MR. HORTON:  Objection, your Honor.  Question.

6           THE COURT:  Don't testify.

7   Q.  Do you have an understanding of why somebody would be

8   charged in a complaint as opposed to an indictment with their

9   coconspirators?

10  A.  I imagine there are multiple reasons why a team would

11  choose to either indict or charge by complaint.

12  Q.  Could one reason a person was charged --

13          THE COURT:  Don't ask her hypothetical questions.

14          MR. QUIGLEY:  Okay.

15  Q.  Were you supposed to try to talk to Ms. Wang on the day of

16  her arrest?  Was that part of your role?

17  A.  Yes.

18  Q.  Did you know that she had counsel at that time?

19  A.  I don't recall.  I don't recall at this time.

20  Q.  Okay.  This investigation had been going on for time before

21  March 15, 2023; correct?

22  A.  Yes.

23  Q.  So on the 15th, you go to Ms. Wang's apartment early in the

24  morning; correct?

25  A.  Yes.

o49FwanH                          Baccari - Cross

1    Q.   You couldn't go in before 6 o'clock; correct?

2    A.   Correct.  Correct.

3    Q.   Under Rule 41, you can only go in in the daytime, which

4    starts at 6 o'clock; correct?

5    A.   Yes.

6    Q.   Fair to say your team didn't begin knocking on the door

7    until 6 a.m.; correct?

8    A.   Approximately 6 a.m.

9    Q.   And that was the same time that teams were going to the

10   other locations in Connecticut, at the Sherry-Netherland, and

11   in Mahwah; correct?

12   A.   I don't recall their times, because I wasn't at those

13   locations.

14   Q.   Are you aware that they had any authorization to enter

15   those buildings before 6 a.m.?

16   A.   I'm not aware of a nighttime exception.

17   Q.   Okay.  And that would be an exception; right?  A nighttime

18   exception.

19   A.   Correct.

20   Q.   After you knocked on the door at about 6 a.m., it took

21   Ms. Wang a few minutes to come to the door; correct?

22   A.   Yes.

23   Q.   In fact, you called or your team called a phone number

24   ending in 7455; right?

25   A.   I don't recall the number at this time.

o49FwanH                    Baccari - Cross

1   Q.  In fact, you called four different phone numbers; right?
2   To try to get her?
3   A.  I don't recall how many numbers, but that there was more
4   than one.
5   Q.  Can you take a look at 3501-18, page 1.
6           Do you have 3500 up there?
7   A.  Not yet.
8   Q.  Do you have it?
9   A.  Not yet.  Oh, I'm sorry.  Is it coming on my screen?
10          MR. QUIGLEY:  You guys have it?  Okay.
11          I know we don't have a jury, but just for the witness
12  and the lawyers.
13          Your Honor, may I approach?  Sorry.
14          THE COURT:  You may.
15          MR. QUIGLEY:  Thanks.
16  Q.  Take a look at the bottom paragraph on page 1, and let me
17  know if that refreshes your recollection about how many phone
18  numbers you called before Ms. Wang came to the door.
19  A.  Okay.
20  Q.  Does that refresh your recollection?
21  A.  I see four numbers there.  Yes.
22  Q.  So you called four numbers before Ms. Wang came to the
23  door?
24  A.  I believe that that's what it says there.  Yes.
25  Q.  Okay.  So some time after those numbers are called,

o49FwanH                    Baccari - Cross

1   Ms. Wang comes to the door; correct?

2   A.  I don't recall the exact timeline of it and whether she

3   came to the door during one of those calls or not, but it was

4   approximately a few minutes after.

5   Q.  Well, you didn't call the numbers after she came to the

6   door; correct?

7   A.  Not after.

8   Q.  Okay.  And she was asked to step into the hallway?

9   A.  She was taken into custody, yes, and from her apartment

10  door.

11  Q.  Okay.  So she was brought out into the hallway.

12  A.  Yes.

13  Q.  And handcuffed.

14  A.  I believe she was handcuffed.

15  Q.  And she was -- no question she was under arrest at that

16  point; correct?

17  A.  Correct.

18  Q.  You almost immediately read Ms. Wang her Miranda rights;

19  correct?

20  A.  Yes.

21  Q.  From a rights card that you had with you?

22  A.  Yes.

23  Q.  And you indicated her right to have an attorney present for

24  all questions by the authorities; correct?

25  A.  Correct.

o49FwanH                    Baccari - Cross

1  Q.  All right.  You told the government a couple of days ago it

2  was "your practice" to do that.

3          Do you recall that?

4  A.  Yes.

5  Q.  And is that because you weren't -- strike that.

6          And, this was at 6:05 when you Mirandized her;

7  correct?

8  A.  Approximately.

9  Q.  And at this point, you were definitely taking Ms. Wang into

10  custody, right?

11  A.  She was in FBI custody at this point.  Yes.

12  Q.  This wasn't just an interview; correct?

13  A.  No, sir.

14  Q.  She was going to go to 26 Federal Plaza to be processed;

15  correct?

16  A.  Yes.

17  Q.  And then to court; correct?

18  A.  Correct.

19  Q.  What was she wearing when she first stepped out into the

20  hallway?

21  A.  I don't recall exactly what she was wearing.

22  Q.  Did she have a bathrobe?

23  A.  I don't recall.

24  Q.  You intended to take her back into her apartment to help

25  her get dressed; correct?

o49FwanH                        Baccari - Cross

1   A.  Initially, it was to attempt to speak with Ms. Wang.

2   Q.  Well, you couldn't take her to court in her pajamas;

3   correct?

4   A.  No.

5   Q.  So if she was in her pajamas, she would need to get

6   dressed; correct?

7   A.  It would be our practice to make sure that she was dressed

8   for the day.

9   Q.  And in fact, that's one of the things that happened after

10   you went inside the bedroom of her apartment; she got dressed;

11   correct?

12   A.  At some point; right.

13   Q.  Because she wasn't dressed when she came out into the

14   hallway; right?

15   A.  I don't recall Ms. Wang being naked when she came to the

16   front door.

17   Q.  She was not dressed.  She was not dressed in clothes to go

18   to court in; correct?

19   A.  I believe that's correct.  Yes.

20   Q.  Before you could take her back into the apartment, the

21   other agents have to clear the apartment; correct?

22   A.  Correct.

23   Q.  And that's to make sure there's nothing dangerous in the

24   apartment before you go back in there with Ms. Wang; correct?

25   A.  Yes.

o49FwanH                    Baccari - Cross

1   Q.  And no weapons; correct?

2   A.  Correct.

3   Q.  No pets; right?

4   A.  Not necessarily to ensure that there are no pets, but a law

5   enforcement clear is inclusive of agents just making sure it's

6   clear for individuals to come back in.

7   Q.  Okay.  And in fact, you would have asked -- after you had

8   arrested Ms. Wang, you would have asked her, are there other

9   people in the apartment; correct?

10  A.  I don't recall asking her that.

11  Q.  Is that your practice before the agents go in to clear?

12  A.  Not always.

13  Q.  But you've done it before?

14  A.  I may have asked those questions.  I think it's very

15  dependent on a number of factors in the situations.

16  Q.  But she was being compliant; right?

17  A.  Yes.  She was compliant.

18  Q.  Wouldn't you have wanted to know before the agents went

19  into the apartment if there were pets or other people in the

20  apartment?

21          MR. HORTON:  Objection, your Honor.

22          THE COURT:  Overruled.  You may answer.

23  A.  Would we have wanted to know?  Yes, but that doesn't

24  necessarily mean we would have asked it.  The agents went in as

25  soon as she came out of the apartment.

o49FwanH                         Baccari - Cross

1   Q.  But you might have asked those questions before the --

2           MR. HORTON:  Objection, your Honor.

3           THE COURT:  All right.

4           Don't ask all these hypotheticals.

5           MR. QUIGLEY:  All right.  I'll move on, your Honor.

6   Q.  So then the agents went in to do their clearing of the

7   apartment; correct?

8   A.  Yes.

9   Q.  And they didn't find any other people; right?

10  A.  No.

11  Q.  They didn't find any weapons; correct?

12  A.  I don't recall any weapons.  No.

13  Q.  No pets, right?

14  A.  I don't recall any pets.

15  Q.  Okay.  They did knock over a vase though.

16          Do you recall that?

17  A.  I do not.

18  Q.  Do you recall the agents coming back out to ask for a

19  towel, because they had spilled water on the floor?

20  A.  I don't recall that right now, as I sit here.

21  Q.  It might have happened.

22          MR. HORTON:  Objection.

23          THE COURT:  Please with the hypotheticals.  It's not

24  necessary.

25          MR. QUIGLEY:  All right.

o49FwanH                    Baccari - Cross

1    Q.  You testified, on direct, that you didn't ask Ms. Wang to

2    make a statement in the hallway; right?

3    A.  Yeah; correct.  I don't recall that.

4    Q.  Fair to say that you weren't that positive of that a couple

5    of days ago when you spoke to the AUSAs?

6    A.  I'm sorry.  Can you ask that again?

7    Q.  Isn't it true that you said to the AUSAs a couple of days

8    ago, "don't think I would have asked her in the hallway to make

9    a statement."  Correct?

10   A.  If that's what I said.  I don't recall exactly what I said

11   a couple of days ago.

12   Q.  And the reason you said you didn't think you asked her to

13   make a statement is because you weren't 100 percent sure;

14   right?

15   A.  No.  I believe it's a result of me knowing that my

16   intention was to bring her back inside to attempt to try and

17   speak with her, so there would be no real reason for me to do

18   that outside in the hallway.

19   Q.  Okay.  Well, one of the -- well, we'll get to that in a

20   second.

21         But she invoked her right to counsel no later than

22   6:15 a.m.; correct?

23   A.  Approximately.

24   Q.  Within ten minutes of your first interaction with her at

25   about 6:05; correct?

o49FwanH                         Baccari - Cross

1   A.   Approximately.

2   Q.   If we could take a look at 3501-17, it's in the binder

3             MR. HORTON:  Objection, your Honor, to showing the

4   witness's exhibit without stating the purpose of showing it to

5   her.

6             THE COURT:  If you'll step up, please.

7             (At sidebar; discussion off the record)

8             THE COURT:  All righty.  What is this?

9             MR. HORTON:  So this is a piece of 3500 material from

10  the witness, and my understanding is that it's not been

11  established that there's failure to recall that could justify

12  putting the interview notes that she did it right in front of

13  her.  So that's why I objected.

14            THE COURT:  These are prepared by whom?

15            MR. HORTON:  These are prepared by the witness.

16            MS. SEBBAG:  This is not her, is it?  Oh, yeah.

17            THE COURT:  These notes were prepared by her and you

18  want to show her her notes.

19            Is it that you are claiming that she doesn't recall

20  some of it?

21            MR. QUIGLEY:  No, your Honor.

22            I think it shows a record of a temporaneous record of

23  a timeline.  This is a preliminary hearing; the Federal Rules

24  of Evidence don't apply.  Even still, I'm still just going to

25  through the present-sense impressions of when Ms. Wang invoked.

o49FwanH                     Baccari - Cross

1          We can always also attach it to the post-hearing

2     briefing as an exhibit, but it's pretty clear in here that she

3     was Mirandized at 6:05 and that she invoked at 6:15, and I

4     think that timeline is critical.

5          THE COURT:  So what's the problem?

6          MR. HORTON:  Counsel just said that he was introducing

7     it for the purpose of establishing a present-sense impression.

8     There's no foundation of when this document was created, so I

9     just wanted --

10         MR. QUIGLEY:  It's a preliminary hearing on

11    admissibility.  The rules of evidence don't apply.  We can

12    attach it to the post-hearing brief as an exhibit, but I think

13    it should be in the record, because it establishes that less

14    than -- no more than ten minutes after her first interaction,

15    she invoked her right to counsel.

16         THE COURT:  I don't have a problem with her testifying

17    about this document.

18         MR. QUIGLEY:  Thank you, your Honor.

19         (In open court)

20         THE COURT:  Overruled.

21         You may continue.

22         MR. QUIGLEY:  Thank you, your Honor.

23    BY MR. QUIGLEY:

24    Q.  Agent Baccari, are you on 3501-17?

25    A.  Yes.

o49FwanH                    Baccari - Cross

1    Q.  I offer this as Defense Exhibit 1.

2          THE COURT:  She needs to authenticate the document.

3    Q.  Agent Baccari, have you seen this document?

4    A.  Yes.

5    Q.  What is it?

6    A.  My notes from the day, the morning.

7    Q.  And these were notes you took on March 15, 2023?

8    A.  Yes.

9          MR. QUIGLEY:  I'd offer that as Defense Exhibit 1,

10   your Honor.

11         THE COURT:  Admitted.

12         (Defendant's Exhibit 1 received in evidence)

13         MR. QUIGLEY:  Thank you, your Honor.

14   BY MR. QUIGLEY:

15   Q.  Agent Baccari, these notes reflect -- the top line says

16   Yvette Wang; correct?

17   A.  Yes.

18   Q.  And on the next line below that, it says rights read;

19   correct?

20   A.  Yes.

21   Q.  And to the left of that, it says, est. 6:05; correct?

22   A.  Yes.

23   Q.  And that means the estimated time you read her rights was

24   about 6:05 a.m.; correct?

25   A.  Correct.

o49FwanH                        Baccari - Cross

1    Q.  And if you look to the right of that, it says, invoked

2    estimated -- est. 6:15 a.m.; correct?

3    A.  Correct.

4    Q.  And so that means she invoked her right to counsel at about

5    6:15 a.m.; correct?

6    A.  Approximately; yes.

7    Q.  And so no more than 10 minutes passed from when you read

8    her her rights to when she invoked her rights to counsel;

9    correct?

10   A.  Correct.

11   Q.  And once she invoked her right to counsel, all questioning

12   was to cease; correct?

13   A.  Well, there are certain things you do have to ask

14   throughout the rest of the morning.

15   Q.  Is --

16   A.  Substantive questioning.

17   Q.  Is the question about her cell phones a substantive

18   question?

19   A.  No.

20   Q.  It's not.  Okay.

21   A.  I'm sorry.  Can you just repeat the question?

22   Q.  Is a question about her cell phones a substantive question,

23   in your view?

24   A.  Yes.

25   Q.  By the way, it doesn't say on here where she invoked her

1    right to counsel; correct?

2    A.  No.

3    Q.  You also told the AUSAs that even if Ms. Wang had invoked

4    her right to counsel, I may still have asked whether the phone

5    was hers because we had a warrant for it.

6         Do you recall telling the AUSAs that?

7    A.  Yes.

8    Q.  So you might have asked her some questions about the cell

9    phone even after she invoked her right to counsel.

10        MR. HORTON:  Objection.

11        THE COURT:  I'm going to overrule this.

12        Go ahead.  You may answer.

13   A.  We had a search warrant for cell phones that belonged to

14   Ms. Wang, so if that took place by myself or other agents, I

15   imagine it would be to clear up if it was her cell phone.

16   Q.  So I don't think that was in response to my question.

17        Was that a yes to my question?

18   A.  Can you repeat your question again?

19        MR. QUIGLEY:  I ask the court reporter to read it

20   back.

21        (Record read)

22   A.  I don't recall asking any questions.

23   Q.  But you might have.

24        MR. HORTON:  Objection.

25        THE COURT:  Overruled.

o49FwanH                    Baccari – Cross

1          But counsel, you're basing this "might have" on notes.

2          MR. QUIGLEY:  Yes, your Honor, of her 3500 material.

3          THE COURT:  Fair game.

4   BY MR. QUIGLEY:

5   Q.  Agent Baccari, isn't it true you told the agents even if

6   Ms. Wang had invoked her right to counsel, they may still have

7   asked whether the phone was hers?

8          MR. HORTON:  Objection, your Honor.

9          THE COURT:  Overruled.

10  A.  I'm sorry.  I told the agent.

11  Q.  The AUSAs that?

12  A.  Yes.  I guess I said that.

13  Q.  Okay.  The search itself actually began at about 6:18;

14  correct?

15  A.  I believe that would have just been when entry photos

16  began.

17  Q.  Okay.  We can come back to that.

18          Take a look at 3501-05.

19          Do you recognize this, Agent Baccari?

20  A.  Yes.

21  Q.  What is it?

22  A.  The Search 302.

23  Q.  I'd offer 3501-05 as Defense Exhibit 2?

24          THE COURT:  No objection.

25          MR. HORTON:  Can I have one moment, your Honor.

o49FwanH                      Baccari - Cross

1              (Counsel conferred)

2              MR. HORTON:  No objection, your Honor.

3              THE COURT:  It is admitted.

4              (Defendant's Exhibit 2 received in evidence)

5    Q.  Agent Baccari, do you see where it says FBI CART Examiner

6    Stepan Shkropak?  I hope I'm pronouncing that RIGHT.

7    A.  Yes.

8    Q.  Can you read the line below that?

9    A.  Entry photos were taken at approximately 6:18 and the

10   search commenced thereafter.

11   Q.  So the search commenced after 6:18; correct?

12   A.  That's what that says.  Yes.

13   Q.  Okay.

14              Ms. Wang remained at the apartment over 40 minutes

15   after the search began; is that correct?

16   A.  I don't recall exactly how long she was there.

17   Q.  Take a look at 3501-18.

18              And does that refresh your recollection at what time

19   the agents began to transport Ms. Wang to 26 Federal Plaza?

20   A.  Can you go to the second page, please.

21   Q.  I'm sorry.  Yes.  First full paragraph on the second page.

22   A.  Okay.

23   Q.  What time do you begin transporting Ms. Wang to Federal

24   Plaza?

25   A.  It says approximately 7 a.m.

o49FwanH                      Baccari - Cross

1    Q.  So approximately 40 minutes after the search began?

2    A.  That's what it says there.

3    Q.  And agents were continuing to search the apartment that

4    whole time, between 6:18 and 7 a.m.; correct?

5    A.  I don't recall the exact sequence of events.  I know there

6    were people in the apartment.

7    Q.  Nobody decided to say, let's take a break for breakfast.

8    They were continuing to search; correct?

9            MR. HORTON:  Objection, your Honor.

10           THE COURT:  Overruled.

11   A.  I don't recall exactly when entry photos were completed and

12   the search actually began.

13   Q.  But we just saw a document that said, entry photos were

14   taken at 6:18 and the search commenced thereafter; right?

15   A.  Yes.

16   Q.  So the search commenced at around 6:18; right?

17           MR. HORTON:  Objection, your Honor.  The document's

18   not in evidence.

19           THE COURT:  Overruled.  You may answer.

20   A.  The entry photos began at 6:18, and some time after that,

21   the search team would have begun officially searching.

22   Q.  They found a number of cell phones during the search?

23   A.  Yes.

24   Q.  And they were asking Ms. Wang questions; correct?

25   A.  Who was asking?

o49FwanH                          Baccari - Cross

1   Q.  The agents, the searching agents.

2   A.  I don't recall that.

3   Q.  Wouldn't they periodically come into the bedroom to ask

4   Ms. Wang questions?

5   A.  I don't know I'd say "periodically."

6   Q.  Would they come into the bedroom to ask Ms. Wang questions?

7   A.  I recall an instance.

8   Q.  Did you tell anyone she'd invoked her right to counsel; we

9   can't talk to her?

10  A.  I don't recall when that happened, if it happened before or

11  after Ms. Wang invoked.

12         THE COURT:  I'm sorry.  Are you saying you don't

13  recall -- what is it that you're saying you don't recall

14  happened?

15  A.  An agent asking Ms. Wang a question.

16  Q.  Well, we've established that the search didn't begin until

17  at least 6:18; correct?

18  A.  The entry photos began then.

19  Q.  And the search, if anything began after; right?

20  A.  Correct.

21  Q.  And Ms. Wang invoked at 6:15, correct?

22  A.  Approximately.

23  Q.  When you were in the bedroom with Ms. Wang, you were with

24  her the whole time; correct?

25         Let me rephrase that.

o49FwanH                    Baccari - Cross

1              When Ms. Wang was in the bedroom of her apartment, you

2      were not with her the whole time; correct?

3      A.   The entire time she was in the apartment?

4      Q.   The entire 40 minutes plus that she was in the apartment,

5      you were not in the bedroom with her the whole time; correct?

6      A.   No.  I don't believe I was.

7      Q.   Because you were going in and out to check the status of

8      these other operations; correct?

9      A.   I could have been, yes.

10     Q.   In fact, at some point, you went to the Sherry-Netherland

11     that morning; right?

12     A.   I did go that day, not that morning.

13     Q.   Fair enough.

14              And you wrote an FBI Form 302 relating to this search;

15     correct?

16     A.   Related to the search?

17     Q.   Yeah, related to the operation at Ms. Wang's apartment.

18     A.   Yes.

19     Q.   So, I'd like to show the witness 3501-16.

20              THE COURT:  Okay.

21     Q.   Do you recognize this, Agent Baccari?

22     A.   Yes.

23     Q.   And what is it?

24     A.   A 302 regarding Ms. Wang.

25     Q.   I'd offer this as Defense Exhibit 3.

1          THE COURT:  No objection?

2          MR. HORTON:  No objection.

3          THE COURT:  It is admitted.

4   Q.  First focus on the first paragraph of this document?  The

5   first two sentences of this document occur in chronological

6   order; correct?

7   A.  Yes.

8   Q.  Right, the first sentence talks about how she was arrested

9   and located; right?

10  A.  Correct.

11  Q.  And the second sentence says after the arrest, agents

12  cleared the residence; right?

13  A.  It says that, yes.

14  Q.  Correct.  So the second sentence came after the first

15  sentence in time; correct?

16  A.  Yes.

17  Q.  And then the third sentence talks about how after the

18  residence was cleared, Ms. Wang was taken to a bedroom area;

19  correct?

20  A.  Correct.

21  Q.  And so the third sentence comes after the second sentence;

22  correct?

23  A.  Yes.

24          THE COURT:  So, Mr. Quigley, are you asking whether

25  the third sentence follows in sequence after the second

o49FwanH                    Baccari - Cross

1  sentence?

2            MR. QUIGLEY:  I'm sorry.  I will rephrase.

3            THE COURT:  Yes.

4  BY MR. QUIGLEY:

5  Q.  In terms of the time these events occurred, the first three

6  sentences of this document all follow the order in which the

7  time these events occurred; right?

8  A.  Yes.

9  Q.  The first sentence happened first, right?  The second

10 sentence happened second; right?  Correct?

11           MR. HORTON:  Objection, your Honor.

12           THE COURT:  Overruled.  You may answer.

13 A.  Wait a minute.  To say things happened one, two, three, I

14 just want to be clear in -- that happened relatively in

15 chronological order to what you're saying.

16           THE COURT:  So he is asking you whether this document

17 states the exact sequence of events.  At least that's my

18 question.  You may answer my question.

19           THE WITNESS:  The entire document or --

20           THE COURT:  Whether the first three sentences that he

21 has been discussing, does that state the exact sequence of

22 events as it occurred in chronological order or does it not.

23           THE WITNESS:  It is in relatively chronological order,

24 yes.

25           THE COURT:  I don't understand what "relatively"

o49FwanH                    Baccari - Cross

1    means.

2              THE WITNESS:  I don't recall if there were other

3    things that were happening in addition to those three sentences

4    but those three sentences are in chronological order.

5    BY MR. QUIGLEY:

6    Q.  In the fourth sentence beginning:  Wang advised the

7    cellular phone..., that happened after you were back in the

8    apartment; right?  According to this?

9    A.  Yes.

10   Q.  And then the fifth sentence, the fifth sentence reflects,

11   with a semi colon in the middle, that she was asked, in

12   substance, whether she would like to provide a statement and it

13   says:  Wang advised at that point she would like to have her

14   lawyer present.  Correct?

15   A.  That's what it says, yes.

16   Q.  And then below that in the next paragraph, second sentence,

17   it says:  Wang provided the phone's passcodes; right?

18   A.  That's what it says, yes.

19   Q.  And then below that it includes other information that

20   Ms. Wang relayed to you that morning; correct?

21   A.  Correct.

22   Q.  OK.  You can take that down.

23             You mentioned on direct you thought another agent --

24   you asked her about, what you described as sevens passcodes.

25   Do you recall that?

o49FwanH                          Baccari - Cross

1    A.  I'm sorry.  Can you rephrase that question?

2    Q.  Sorry.

3         You testified when Mr. Horton was examining you that

4    she provided you with some sevens passcodes as you described;

5    right?

6    A.  A passcode that includes sevens.

7    Q.  Right.  And then you testified that another agent later on

8    asked her about another phone that had a different passcode;

9    right?

10   A.  I recall that, yes.

11   Q.  OK.  And do you remember telling the AUSAs last week that

12   you think that you're not as confident that she provided the

13   non-sevens passcode before invocation?

14   A.  I'm sorry.  Can you say that again?

15   Q.  Do you remember telling the prosecutors last week that you

16   were, quote, not as confident that she provided that non-sevens

17   passcode before invocation?

18   A.  Yes, I recall saying that.

19   Q.  And do you recall also telling the AUSAs last week that you

20   think more than likely she invoked Agent Cayman with the phone

21   and I left to go make calls or talked to search TL?

22        Do you recall telling the AUSAs that last week?

23   A.  I don't recall saying it like that, no.

24   Q.  Take a look at 3501-1 and look at the bottom paragraph and

25   the very last sentence.  Does that refresh your recollection

o49FwanH                          Baccari - Cross

1    that you told the AUSAs that?

2    A.  I don't recall saying it exactly like that but that's what

3    it says there.

4    Q.  OK.  It says:  Think more than likely she invoked Agent

5    Cayman with phone and I left to go make calls.  Right?

6    A.  That's what it says, yes.

7    Q.  And you didn't say to any other agent --

8             MR. HORTON:  Objection.

9    Q.  -- government, she revoked her right to counsel, we can't

10   question her?

11            THE COURT:  Please step up.

12            (Continued next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

o49FwanH                        Baccari - Cross

1              (At sidebar; discussion off the record)

2              THE COURT:  For my edification, the document that

3    we're looking at is one authored by the witness.

4              MR. QUIGLEY:  Those are notes of her prep with the

5    prosecutors.  Those are the prosecutor's notes of her prep.

6              THE COURT:  Those are the prosecutor's notes.  Okay.

7              And the objection?

8              MR. HORTON:  The objection is that he's reading from a

9    document that's not in evidence.  It's refreshing a witness's

10   recollection, and that's one thing.  And after that, he is

11   reading from the document.  It is not evidence.  The witness

12   didn't offer and she did not adopt it.

13             THE COURT:  All right.  The objection is sustained.

14             (In open court)

15   BY MR. QUIGLEY:

16   Q.  Did you review these notes before testifying today?

17   A.  No.

18   Q.  When the other agent asked her for the non-sevens password,

19   did you say to him or her that Ms. Wang had already invoked her

20   right to counsel?

21   A.  I don't recall that.

22   Q.  Do you recall telling any other agents on the scene on

23   March 15, 2023, that Ms. Wang had invoked her right to counsel?

24   A.  I don't recall specifically how that information was

25   relayed to other individuals there.

o49FwanH                      Baccari - Cross

1    Q.  You don't recall relaying it, though?

2    A.  I didn't say that.  I just don't recall exactly how that

3    information would have been relayed to the other agents that

4    were there that day.

5    Q.  Do you recall relaying it?

6    A.  I believe so, because the next step was to begin the

7    process for transport and that was as a result of her invoking.

8    Q.  Even though she stayed at the scene for 45 minutes after

9    she invoked her right to counsel?

10   A.  Yes.

11   Q.  OK.  You said you were the squad leader for the search?

12   A.  The squad leader?

13   Q.  Were you the squad leader for this search?  Was that

14   your --

15   A.  I was a member of the squad on this search.

16   Q.  There was a lot going on that day; right?

17   A.  There were a lot of operations happening that day.

18   Q.  And are you aware that this search has already required the

19   government to make one corrective disclosure to the Court about

20   where items were found in Ms. Wang's apartment?

21           MR. HORTON:  Objection, your Honor.

22           THE COURT:  Sustained.

23           MR. QUIGLEY:  I have no further questions, your Honor.

24           THE COURT:  Redirect.

25   REDIRECT EXAMINATION

O49FwanH                    Baccari - Redirect

1   BY MR. HORTON:

2   Q.  Agent Baccari, I want to discuss the 777777 password.

3   A.  OK.

4   Q.  Before Ms. Wang gave you that 777777 passcode, had she

5   asked you for a lawyer?

6   A.  No.

7   Q.  Where did you read Ms. Wang her rights?

8   A.  In the hallway outside her apartment door.

9   Q.  Did she ask you for a lawyer in the hallway?

10  A.  No.

11  Q.  Did she say that she wished to remain silent in the

12  hallway?

13  A.  She did not.

14          MR. HORTON:  May I have a moment, your Honor?

15          THE COURT:  OK.

16          (Counsel conferring)

17          MR. HORTON:  Thank you, Agent.  We have no further

18  questions.

19          THE COURT:  Recross?

20          MR. QUIGLEY:  No recross, your Honor.  Thank you.

21          THE COURT:  Thank you, Ms. Baccari.

22          THE WITNESS:  Thank you, your Honor.

23          THE COURT:  You may call your next witness.

24          MR. HORTON:  Government calls Special Agent Jessica

25  Cardenas.

O49FwanH                    Cardenas - Direct

1   JESSICA CARDENAS,

2         called as a witness by the GOVERNMENT,

3         having been duly sworn, testified as follows:

4               THE COURT:  State your name and spell it.

5               THE WITNESS:  Jessica Cardenas.  J-E-S-S-I-C-A,

6   C-A-R-D-E-N-A-S.

7               THE COURT:  You may inquire.

8               MR. HORTON:  Thank you, your Honor.

9   DIRECT EXAMINATION

10  BY MR. HORTON:

11  Q.  Good afternoon, Agent Cardenas.

12  A.  Good afternoon, sir.

13  Q.  Where do you work?

14  A.  The Federal Bureau of Investigation, New York office.

15  Q.  And what is your title at the FBI?

16  A.  Special agent.

17  Q.  How long have you been a special agent?

18  A.  18 years.

19  Q.  And are you currently assigned to any particular part of

20  the FBI?

21  A.  Yes.

22  Q.  Which part is that?

23  A.  The Computer Analysis Response Team.

24  Q.  Is that also called CART?

25  A.  Yes.

O49FwanH                        Cardenas - Direct

1    Q.  What is the Computer Analysis Response Team?

2    A.  We provide technical support to the New York office,

3    specifically digital forensics for investigations.

4    Q.  Can you describe the scope of your job responsibilities

5    there?

6    A.  I provide assistance in identifying, collecting, and

7    preserving digital evidence.

8    Q.  Do you help execute search warrants?

9    A.  Yes.

10   Q.  And what is your role at the execution of a search warrant?

11   A.  Again, identifying, assisting with the collection, and the

12   preservation of digital items.

13   Q.  Did there come a time that you participated in a search of

14   a premises belonging to Miles Guo?

15   A.  Yes.

16   Q.  And when was that search?

17   A.  March 15, 2023.

18   Q.  What name, if any, did CART use to refer to the CART case

19   relating to that search?

20   A.  I don't understand your question.

21   Q.  Was there a name that was used at CART to refer to the

22   investigation that that search was a part of?

23   A.  Yes, I'm sorry:  GTV.

24   Q.  Where did the search you participated in take place?

25   A.  781 Fifth Avenue, 18th floor.

O49FwanH                         Cardenas - Direct

1    Q.   What kind of building is 781 Fifth Avenue?

2    A.   Hotel and residential.

3    Q.   Where inside that building did the search take place?

4    A.   18th floor penthouse.

5    Q.   And how did you first arrive at that penthouse that day?

6    A.   My government vehicle.

7    Q.   And where did you go when you arrived?

8    A.   Initially after parking the vehicle, I was stationed in the

9    lobby.

10   Q.   Where did you go from there?

11   A.   There was -- approximately 15 minutes after the execution

12   of the operation, there was a radio call for additional agents

13   to come up to the penthouse and that's when I went up.

14   Q.   How did you get up there from the lobby?

15   A.   The elevator.

16   Q.   And what did you see when the elevator opened?

17   A.   When the elevator doors opened I noticed that there was two

18   individuals that were in custody, being held in custody by FBI

19   agents, and there was a table with cell phones on them.

20   Q.   Was this all in one room?

21   A.   Yes.   It was the foyer area before you enter the penthouse.

22   Q.   And who were the two individuals you testified you saw in

23   custody?

24   A.   Miles Guo and his assistant Jason.

25   Q.   What did you do after you came out of the elevator?

1    A.  I went to the table and I picked up the cell phones.

2    Q.  And what did you do next?

3    A.  I placed the cell phones in airplane mode; ensured that

4    wi-fi was disabled and bluetooth was disabled.

5    Q.  And who else was in that room with you then?

6    A.  I remember Special Agent Nicholas DeMarino and there was

7    several other agents but I don't recall their names.

8    Q.  After you placed the cell phones in airplane mode, what did

9    you do next?

10   A.  I waited until the penthouse was cleared and entered the

11   penthouse and assisted with the search.

12   Q.  What, if anything, did you ask anybody about the cell

13   phones?

14   A.  I asked for the passcode.

15   Q.  And who did you ask?

16   A.  I just directed the question to the room to everyone that

17   was in the foyer area.

18   Q.  Did anybody answer your question?

19   A.  Yes.

20   Q.  Who answered your question?

21   A.  The first one to answer was Miles Guo.

22   Q.  And what did he say the passcode was?

23   A.  777777.

24   Q.  And did anybody else answer your question?

25   A.  After I placed the first cell phone in airplane mode I

O49FwanH                        Cardenas - Direct

1   went -- I picked up the second phone and, again, I directed the

2   question to the room:  What is the passcode?

3   Q.  And did anybody respond?

4   A.  Yes.

5   Q.  And who responded?

6   A.  Jason.

7   Q.  How did he respond?

8   A.  Provided the passcode; 777777.

9   Q.  And how many phones did those passcodes pertain to, as far

10  as you knew in that moment?

11  A.  Three.

12  Q.  Did you participate in any other premises searches that

13  day?

14  A.  Just the penthouse on the 18th floor.

15  Q.  Agent Cardenas, what other work, if any, did you do on the

16  GTV case?

17  A.  I processed some of the evidence from the other search

18  locations.

19  Q.  And how, if at all, did CART examiners share information

20  with each others during a review?

21  A.  At times via electronic communication or conversation --

22  verbal conversation.

23  Q.  And what sorts of things are discussed?

24  A.  Passcodes, passwords for devices.

25  Q.  Did there come a time that another examiner asked you about

O49FwanH                           Cardenas - Cross

1   passcodes in the GTV case?

2   A.  Yes.

3   Q.  Can you describe that situation for the Court?

4   A.  I was just walking in the squad area and I observed two I

5   Mac computers that I recognized what I thought were from the

6   penthouse, so I went into a cubicle area -- my co-worker's

7   cubicle area and I asked how things were going with the

8   devices.  And she said she was unable to access them because

9   she didn't have the password.

10  Q.  And how did you respond?

11  A.  I said I believed that those were computers from the GTV

12  search at the penthouse and she should try the passcode.

13  Q.  And which passcode did you suggest she try?

14  A.  777777.

15  Q.  Based on your participation in the GTV device review, was

16  that the only password you were aware of in that case?

17  A.  Yes.

18          MR. HORTON:  If I can have one moment, your Honor?

19          (Counsel conferring)

20          MR. HORTON:  Thank you.  We have no further questions.

21          THE COURT:  Cross-examination.

22          MR. QUIGLEY:  Yes, your Honor.

23  CROSS-EXAMINATION

24  BY MR. QUIGLEY:

25  Q.  Good morning, Agent Cardenas.

O49FwanH                         Cardenas - Cross

1    A.  Good afternoon, sir.

2    Q.  It is good afternoon.

3              Just to be clear, Ms. Wang wasn't at the

4    Sherry-Netherlands that day; correct?

5    A.  Ms. Wang?  I don't know Ms. Wang.

6    Q.  The only people you saw were Mr. Kwok and his assistant

7    Jason; correct?

8    A.  That were non-FBI personnel; correct.

9    Q.  And you testified that you asked about the passwords for

10   their cell phones; correct?

11   A.  Passcodes?

12   Q.  Did you ask anyone whether they'd invoked their right to

13   counsel before you asked them those questions?

14   A.  No.

15   Q.  You also testified about a meeting with another examiner.

16   Was that at 26 Federal Plaza?

17   A.  Yes.

18   Q.  When was that?

19   A.  I couldn't tell you.  It was several days after the search.

20             MR. QUIGLEY:  No further questions, your Honor.  Thank

21   you.

22             THE COURT:  What is the difference between password

23   and passcode?

24             THE WITNESS:  Passcode, your Honor, is usually

25   indicative of all digits; a password can be alphanumeric, in my

O49FwanH                          Volchko - Direct

1  experience.

2            THE COURT:  Redirect?

3            MR. HORTON:  Nothing further from us, your Honor.

4            THE COURT:  Thank you.  You may step out.

5            (Witness excused)

6            THE COURT:  The government may call its next witness.

7            MR. HORTON:  Government calls Digital Forensic

8  Examiner Jessica Volchko.

9  JESSICA VOLCHKO,

10       called as a witness by the Government,

11       having been duly sworn, testified as follows:

12            THE COURT:  Please state your name and spell it.

13            THE WITNESS:  Jessica Volchko.  J-E-S-S-I-C-A,

14  V-O-L-C-H-K-O.

15            THE COURT:  You may inquire.

16            MR. HORTON:  Thank you, your Honor.

17  DIRECT EXAMINATION

18  BY MR. HORTON:

19  Q.  Good afternoon, Ms. Volchko.

20  A.  Good afternoon.

21  Q.  Where do you work?

22  A.  I work for the Federal Bureau of Investigation, which is

23  also known as the FBI.

24  Q.  Do you work for any particular part of the FBI?

25  A.  The Computer Analysis Response Team, which is also known as

O49FwanH                         Volchko - Direct

```
 1    CART.
 2    Q.  And how long have you worked with CART?
 3    A.  Approximately eight years.
 4    Q.  What were you doing before you were doing CART?
 5    A.  I was an intern for the FBI.
 6    Q.  And what were you doing before that?
 7    A.  I was in college.
 8    Q.  And did you graduate with a degree?
 9    A.  I did.
10    Q.  What was your degree in?
11    A.  I have a bachelor of science in digital forensics.
12    Q.  What is your current title at CART?
13    A.  I am a digital forensic examiner.
14    Q.  Was that your title when you joined?
15    A.  When I joined I was a digital forensic examiner trainee.
16    Q.  And what kind of training have you received at CART?
17    A.  Part of the CART certification process, we have a variety
18    of training in computers and cell phones to essentially
19    complete the certification process, and then once we are
20    complete with our training, we become a certified digital
21    forensic examiner.
22    Q.  And are you certified?
23    A.  I am.
24    Q.  Do you supervise any other personnel at CART?
25    A.  I wouldn't say supervise, but I am a coach to a trainee
```

O49FwanH                          Volchko - Direct

 1  currently.

 2  Q.  Do you ever oversee the work of anybody else at CART?

 3  A.  I oversee my trainee's work.

 4  Q.  Do you ever review anybody else's work?

 5  A.  I have.

 6  Q.  Did there come a time that you participated in a device

 7  review for a case that was referred to in CART as GTV?

 8  A.  Yes.

 9  Q.  And what role, if any, did you have in that case?

10  A.  I had an administrative role and also an examination role.

11  Q.  And taking you to those, what did the administrative role

12  entail?

13  A.  That was just coordination back and forth with the case

14  agents; kind of discussing deadlines, receiving some of the

15  CART requests, and assigning those to other examiners.

16  Q.  And what sorts of things did you communicate with the

17  agents about?

18  A.  Just the volume of data, if there were any deadlines in

19  producing extractions and reports, and potential PINs and

20  passwords.

21  Q.  Is that a typical communication with agents in a CART case?

22  A.  Yes.

23  Q.  Are you familiar with something called CART examination

24  notes?

25  A.  I am.

O49FwanH                    Volchko - Direct

1    Q.  And how are you familiar with them?

2    A.  They are notes that I take, as well as other examiners,

3    during the course of our examination.

4    Q.  And, generally speaking, what do CART examination notes

5    say?

6    A.  Examination notes document the items that the case agent is

7    requesting be examined, and then the steps that are taken to

8    examine those devices.

9    Q.  And how does a CART examiner fill out examination notes?

10   A.  During the exam they will document what they are doing as

11   they're working on the devices.

12   Q.  Are examination notes shared within CART?

13   A.  They can be.

14   Q.  And for what purposes can they be shared?

15   A.  Just for review, for if a question comes up and another

16   examiner needs to answer the question and someone is out of the

17   office, we can reference notes.

18   Q.  Is there a part of CART called a Mobile Device Unlock

19   Service?

20   A.  Yes.

21   Q.  Is that also called MDUS or MBUS?

22   A.  Yes.

23   Q.  And what does MDUS do?

24   A.  MDUS is a request for either an unlock of a mobile device

25   or an advanced extraction of a mobile device.

1          MR. HORTON:  Ms. Loftus, can you please show the

2     witness what has been marked for identification as Government

3     Exhibit 5?

4     Q.  Ms. Volchko, can you see that?

5     A.  Yes.

6     Q.  Do you recognize Government Exhibit 5?

7     A.  I do.

8     Q.  And what is it?

9     A.  These are my examination notes for a request.

10    Q.  Do these notes concern some of the devices that were seized

11    from Yangpin Wang's apartment in March 2023?

12    A.  These are devices that were received from an apartment on

13    68th Street.

14         MR. HORTON:  Your Honor, the government offers

15    Government Exhibit 5.

16         MR. QUIGLEY:  No objection, your Honor.

17         THE COURT:  It is admitted.

18         (Government's Exhibit 5 received in evidence)

19    BY MR. HORTON:

20    Q.  Do CART examination notes say anything about how a device

21    was accessed by an examiner?

22         MR. HORTON:  Ms. Loftus, if you can navigate to page 3

23    of this document, please?  Thank you.

24    Q.  Ms. Volchko, looking at the gray bar with text that starts

25    with 1B17 in the top middle of the page, what does this section

O49FwanH                          Volchko - Direct

1    of the document describe?

2    A.  The section is the steps that I took to examine evidence

3    item 1B17.

4    Q.  And in the cell it is titled Mobile Device Examination,

5    just looking down sort of three paragraphs:  It says device not

6    locked with a PIN.

7           What does that mean?

8    A.  That means that when I received the device and powered it

9    on, there wasn't a user lock enabled so I was able to unlock

10   the phone without the use of a user's PIN and access the

11   settings and see the content of the device.

12          MR. HORTON:  And looking now at the bottom of this

13   page 3, going into the top of page 4, Ms. Loftus, if you could

14   navigate the document, please?  Thank you.

15   Q.  Directing you to where it says, just above the page cut:

16   MDUS results, and then at the top of the next page:  Full file

17   system extraction.  What is a full file system extraction?

18   A.  That's a complete extraction of a mobile device.  It is

19   essentially the best extraction we can get from an iPhone.

20   Q.  And what does this box here indicate about this particular

21   device?

22   A.  This indicates that a full extraction was completed.

23          THE COURT:  What does an MDUS stand for?

24   A.  Mobile Device Unlock Service.

25          MR. HORTON:  Ms. Loftus, if you could please display

O49FwanH                    Volchko - Direct

1    the first page again of GX- 5?  Thank you.

2    Q.  Ms. Volchko, directing you now to the text box that is

3    titled:  Legal Authority Review.  Do you see that?

4    A.  Yes.

5    Q.  What does this box indicate?

6    A.  This indicates that the legal authority for this request

7    was a search warrant, and this is the information that was

8    reviewed in the search warrant.

9         MR. HORTON:  Ms. Loftus, can you please show the

10   witness what's been marked as Government Exhibit 26?

11   Q.  Can you see this document, Ms. Volchko?

12   A.  Yes.

13   Q.  Do you recognize it?

14   A.  I do.

15   Q.  And what is it?

16   A.  This is the search warrant that I reviewed for this CART

17   request.

18   Q.  Is there an address on the search warrant?

19   A.  Yes.

20   Q.  Does it correspond with the address on your examination

21   notes?

22   A.  It does.

23         MR. HORTON:  Ms. Loftus, could you please go to page 6

24   of Government Exhibit 26?

25   Q.  Ms. Volchko, directing your attention to the paragraph

1  that's titled:  C.  Unlocking electronic devices.  What does

2  this paragraph mean?

3  A.   This enables using biometrics, so that could be a face ID

4  or a fingerprint to unlock mobile devices.

5  Q.   Generally speaking, what are biometrics?

6  A.   They are features that the user has that they can use to

7  unlock the phone, so some of the most common are fingerprints

8  or their face.

9  Q.   And what does this paragraph on the warrant allow law

10  enforcement to do?

11              MR. QUIGLEY:  Objection.  Calls for legal conclusion.

12              THE COURT:  If you will step up?

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

O49FwanH                    Volchko - Direct

1            (At sidebar; discussion off the record)

2            THE COURT:  Mr. Quigley, I did not catch what you

3    said.

4            MR. QUIGLEY:  Sorry.  I just said it calls for a legal

5    conclusion.  He's asking her to interpret a document that she

6    didn't write, but he hasn't offered it in evidence.

7            MR. HORTON:  She testified that she read that as part

8    of the mobile device review.  I'm happy to ask her what she

9    understood it to be.

10           THE COURT:  What portion are we talking about?

11           MR. HORTON:  There's a portion of the warrant that

12   authorizes law enforcement to use biometrics.  She reviewed

13   that warrant and she reviewed that paragraph, and I'd just like

14   to ask her what she understands it means.

15           MR. QUIGLEY:  Biometrics, your Honor, it's like

16   opening up --

17           THE COURT:  I'm proud to say I do understand.

18           MR. QUIGLEY:  I think "what's your understanding"

19   would be objectionable.  What does that mean is --

20           MR. HORTON:  We're happy to rephrase.

21           THE COURT:  Okay.

22           MR. HORTON:  Thank you, your Honor.

23           MR. QUIGLEY:  Thank you, your Honor.

24

25

1              (In open court)

2              THE COURT:  You will rephrase the question.

3    BY MR. HORTON:

4    Q.  Ms. Volchko, did you read this warrant before you began the

5    device review?

6    A.  I did.

7    Q.  And what is your understanding of what this paragraph

8    means?

9    A.  It allows law enforcement to use search biometric features

10   to unlock a device in lieu of using a PIN.

11   Q.  Ms. Volchko, have you previously reviewed the documents

12   that have been premarked as Government's Exhibits 6, 7, 8, 21

13   and 27?

14   A.  I have.

15   Q.  And are those documents CART examination notes and MDUS

16   report for devices seized at the same address you have been

17   testifying about this morning?

18   A.  Yes.

19             MR. HORTON:  Your Honor, the Court would offer

20   Government's Exhibits 6 through 8, 21, and 27.

21             MR. QUIGLEY:  No objection.

22             THE COURT:  They are admitted.

23             (Government's Exhibits 6, 7, 8, 21 and 27 received in

24   evidence)

25   BY MR. HORTON:

O49FwanH                    Volchko - Direct

1    Q.  Ms. Volchko, did you review a summary chart of devices that

2    were obtained in connection with the GTV case prior to your

3    testimony today?

4    A.  I have.

5            MR. HORTON:  Ms. Loftus, can you please show the

6    witness what has been marked Government Exhibit S-1.

7    Q.  Can you see that document, Ms. Volchko?

8    A.  I can.

9    Q.  Did you compare the information in the summary chart with

10   the information that's contained in Government's Exhibits 5

11   through 8, 21, and 27?

12   A.  I did.

13   Q.  And does this chart accurately summarize information from

14   those exhibits?

15   A.  Yes.

16           MR. HORTON:  The government offers Government Exhibit

17   S-1, your Honor.

18           MR. QUIGLEY:  No objection.

19           THE COURT:  It is admitted.

20           (Government's Exhibit S-1 received in evidence)

21   BY MR. HORTON:

22   Q.  Ms. Volchko, the column on the far right, the FBI's means

23   of access.  What information does that provide about the

24   devices on this chart?

25   A.  That information is how the PIN was obtained or used to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O49FwanH                    Volchko – Direct

1   unlock the device.

2   Q.  And were the first five devices on this list accessed with

3   a PIN?

4   A.  The second one was.

5   Q.  Was it accessed by entering the PIN?

6   A.  No, it was accessed by brute forcing the pin.

7           THE COURT:  What does that mean?

8           THE WITNESS:  That means that a series of PINs can be

9   used to test against the device until one is successful in

10  unlocking the device.

11  BY MR. HORTON:

12  Q.  Ms. Volchko, what is a passcode?

13  A.  A passcode is -- it can be digits, it can be alphanumeric,

14  and it is used to unlock or protect a device.

15  Q.  Can that also be referred to as a PIN?

16  A.  It can.

17  Q.  And how, if at all, are PINs relevant to the FBI's analysis

18  of electronic devices?

19  A.  Depending on the state of the device, if it's received

20  powered on or powered off and depending on the type of

21  encryption on the device, we may need to use the PIN to access

22  the data.

23  Q.  And based on your training and experience at CART, are you

24  familiar with the concept of a passcode list?

25  A.  Yes.

O49FwanH                    Volchko - Direct

1  Q.  And what is your understanding of a passcode list?

2  A.  These are potential PINs that can be compiled by

3  investigators either from other digital evidence items, just

4  observing them from search warrants, and they can compile a

5  list of PINs or passwords to test on the devices.

6  Q.  And then who uses those passcode lists?

7  A.  CART can use those to upload to one of our tools -- one of

8  our advanced extraction tools to attempt those PINs first.

9  Q.  In your eight years of experience at CART, approximately

10  how common -- well, how commonly are passcode lists used in

11  device reviews?

12  A.  They're often used.

13        MR. HORTON:  Ms. Loftus, can you please show the

14  witness what is marked as Government Exhibit 2?

15  Q.  Ms. Volchko, do you recognize this document?

16  A.  I do.

17  Q.  And what is it?

18  A.  This is an e-mail I received from one of the case agents.

19        MR. HORTON:  The government would offer Government

20  Exhibit 2.

21        MR. QUIGLEY:  No objection.

22        THE COURT:  It is admitted.

23        (Government's Exhibit 2 received in evidence)

24  BY MR. HORTON:

25  Q.  Ms. Volchko, what is the subject line of this e-mail?

1    A.  GTV – Last warrant and potential passwords/PINs.

2    Q.  Can you please look down at list of the last bulleted items

3    in the e-mail, it says for PINs, please try all 7s to start

4    with?

5    A.  Yes.

6    Q.  What, if anything, was your understanding at the time you

7    received this e-mail of what that meant?

8    A.  If a device was locked with a PIN and we were unable to

9    extract the data without the PIN, to attempt that PIN to unlock

10   the device.

11   Q.  Up on the attachments line, the first one is:  GTV Summary

12   of Potential Passwords and PINs.  It is an Excel file.  Have

13   you seen that document?

14   A.  I have.

15   Q.  What is it?

16   A.  That was a password list of potential passwords and PINs.

17           MR. HORTON:  Ms. Loftus, can you please show the

18   document market Government Exhibit 2A?

19   Q.  Ms. Volchko, is this the document that was attached to the

20   e-mail we were just looking at?

21   A.  Yes.

22           MR. HORTON:  The government would move to offer

23   Government Exhibit 2A.

24           MR. QUIGLEY:  No objection.

25           THE COURT:  It is admitted.

O49FwanH                    Volchko - Direct

1            (Government's Exhibit 2A received in evidence)

2            MR. HORTON:  Ms. Loftus, can you please navigate to

3    the middle tab that is marked:  PINs.

4    BY MR. HORTON:

5    Q.  Ms. Volchko, what is this table?

6    A.  This is a table of potential PINs.

7            MR. HORTON:  Ms. Loftus, can you please show the

8    witness what is marked as Government Exhibit 4?

9    Q.  Ms. Volchko, do you recognize this document?

10   A.  I do.

11   Q.  And what is it?

12   A.  This is an e-mail communication between myself and the case

13   agent.

14           MR. HORTON:  The government offers Government

15   Exhibit 4.

16           MR. QUIGLEY:  No objection.

17           THE COURT:  It is admitted.

18           (Government's Exhibit 4 received in evidence)

19   BY MR. HORTON:

20   Q.  Generally speaking, what information does this e-mail

21   reflect?

22   A.  This is a communication discussing whether to attempt

23   potential PINs on the devices.

24           MR. HORTON:  Ms. Loftus, can you navigate to the

25   second page?  Thank you.

1  Q.  And looking at your e-mail here at the bottom, you write:

2  We currently don't have brute force support for 1B16 and 1B18.

3  What do those two alphanumeric phrases refer to?

4  A.  1B16 and 1B18 are evidence item numbers.

5  Q.  Are they phones?

6  A.  Yes.

7  Q.  The next sentence says:  Both devices were seized from 188

8  East 64th Street, apartment 1601.  Please advise if you would

9  like me to attempt 777777 for both devices.

10        Ms. Volchko, why did you suggest that PIN?

11  A.  Because it was in the potential PINs and there were also

12  conversations about attempting that PIN first.

13  Q.  And who were those conversations with, the case agents?

14        MR. HORTON:  If I can have one moment, your Honor?

15        (Counsel conferring)

16        INTERPRETER:  I'm sorry.  This is the interpreter

17  speaking, counsel, and your Honor.  If you could slow it down

18  for the interpretation, please, a little bit?  Thank you.

19        MR. HORTON:  Ms. Loftus, can you please pull up

20  Government Exhibit S-1 one more time?

21  BY MR. HORTON:

22  Q.  Ms. Volchko, for the devices from 1B15 to the bottom of the

23  summary chart, was the PIN 777777 used to gain access to those

24  phones?

25  A.  That's correct.

O49FwanH                    Volchko – Cross

1           MR. HORTON:  No further questions.

2           THE COURT:  Cross-examination.

3           MR. QUIGLEY:  Sure.  Thank you, your Honor.

4           Can we leave that exhibit up?

5    CROSS-EXAMINATION

6    BY MR. QUIGLEY:

7    Q.  Good afternoon, Ms. Volchko.

8    A.  Good afternoon.

9    Q.  Just referring to Government Exhibit S-1, directing your

10   attention to the right-hand column:  FBI's means of access.

11   You testified about biometrics on direct.  Do you recall that?

12   A.  I do.

13   Q.  None of these devices were accessed via biometrics,

14   correct?

15   A.  I don't believe so.

16   Q.  It certainly doesn't reflect that on this summary chart;

17   correct?

18   A.  That's correct.

19   Q.  And you don't know whether the FBI even attempted to use

20   biometrics to access any of these devices; correct?

21   A.  Possibly one of the items that I reviewed.

22   Q.  But you don't know?

23   A.  Just based on the state of the device when I received some

24   of the items.

25   Q.  It hadn't been extracted.  That item had not been

O49FwanH                    Volchko - Cross

1    extracted, yet, correct, when you received it?

2    A.  I'm sorry.  Can you -- I'm not understanding the question.

3    Q.  You received a device that you believed the FBI attempted

4    to access biometrically; correct?

5    A.  That, I can't state yes or no if it was accessed.

6    Q.  OK.  Fair enough.

7         I want to take a look at GX- 4, Government's

8    Exhibit 4.  If you can go to the second page?

9         You tell Agent Effting that we don't have currently

10   have brute force to support for 1B16 and 1B18; correct?

11   A.  That's correct.

12   Q.  And those were items seized from the 64th Street apartment;

13   correct?

14   A.  That's correct.

15   Q.  These were not seized from Mahwah; correct?

16   A.  That's correct.

17   Q.  They were not seized from the Sherry-Netherland; correct?

18   A.  That's correct.

19   Q.  They were not seized from Connecticut; right?

20   A.  That's correct.

21   Q.  And you relay, it's important, if you are going to enter a

22   PIN, to try to get the PIN right the first time; correct?

23   A.  I would say for attempting a PIN, we should have a pretty

24   good idea that that may be the right PIN.  We shouldn't just

25   randomly attempt PINs.

1   Q.  Right, because you say in the third sentence:  It is

2   important to note that unsuccessful PIN attempts always run the

3   risk of permanently disabling or wiping the device.  Correct?

4   A.  That's correct.

5   Q.  And you asked Agent Effting how he would like to proceed,

6   correct?

7   A.  That's correct.

8   Q.  And by the way, Agent DeMarino is on this e-mail as well;

9   correct?

10  A.  That's correct.

11  Q.  And he is one of the other case agents?

12  A.  Yes.

13  Q.  And if we can scroll up to the next e-mail on the chain?

14          He said, Agent Effting says:  Hi, Jess.  Please try

15  those PINs.  If that does not work, please let me know and I

16  will provide another option for us to try.

17          Do you see that?

18  A.  I do.

19  Q.  You don't know what information Agent Effting had about the

20  search on East 64th Street when you gave you that information;

21  correct?

22  A.  That's correct.

23  Q.  You have no way of knowing whether information from that

24  search impacted his division to tell you to proceed, correct?

25  A.  That's correct.

O49FwanH                        Volchko - Cross

1              MR. QUIGLEY:  We can take that down.

2              THE COURT:  When you use the word "support" what do

3     you mean?

4              THE WITNESS:  Depending on if you are referring to

5     brute force support.

6              THE COURT:  Correct.

7              THE WITNESS:  Depending on the model and the operating

8     system of the device we may not have a tool that can unlock the

9     devices or attempt to brute force the devices.  So, as Apple

10    and other mobile devices are updating their software, we can

11    have support and then lose support with a new operating system

12    version.

13    BY MR. QUIGLEY:

14    Q.  You are aware that brute force does not -- there is no

15    current brute force capability for iPhone 12 or later; correct?

16    A.  That's correct.

17    Q.  By the way, you did the extraction for 1B16 through 1B21?

18    A.  That's correct.

19    Q.  Is it right that it took over six months to extract those

20    devices?

21    A.  I don't recall the exact time frame.

22    Q.  Can we take a look at 3503-06 and scroll down to the second

23    page?

24              Could it have been six months?

25    A.  It is possible.

1              MR. QUIGLEY:  One moment, your Honor?

2              THE COURT:  So, it doesn't help me if you say that

3    something is possible, I need something firmer than that.

4              THE WITNESS:  I would have to refer to my examination

5    notes to determine when I submitted the unlock request and when

6    the extraction was completed.

7              THE COURT:  Is that something that you have?

8              THE WITNESS:  Yes.  That's Government Exhibit 5, I

9    believe.

10             THE COURT:  OK.  You can refer to that.  Do you have

11   that?

12             THE WITNESS:  I don't have it with me.

13             MR. QUIGLEY:  I think it is up there.

14             THE COURT:  Is it on the screen now?

15             THE WITNESS:  Yes.

16             THE COURT:  Go ahead.

17             THE WITNESS:  Are you referring to a specific evidence

18   item?

19   BY MR. QUIGLEY:

20   Q.  I believe you wrote a message that on December 12, 2023,

21   all mobile device extractions, mobile device reports, forensic

22   images, work product files and reports, were copied to a

23   forensically-prepared hard drive.

24             Do you recall writing that?

25   A.  I don't recall.

O49FwanH                    Volchko - Redirect

1    Q.  Would that have meant the extraction was complete on

2    December 12, 2023?

3            MR. HORTON:  Objection, your Honor.  She just said she

4    didn't recall the statement.  He is asking her to explain.

5            MR. QUIGLEY:  I think I was asking her to explain what

6    that statement would have meant.

7            MR. HORTON:  She said she didn't say it.

8            THE COURT:  Sustained.

9            MR. QUIGLEY:  Your Honor, I have no further questions

10   for the witness.

11           THE COURT:  Redirect.

12   REDIRECT EXAMINATION

13   BY MR. HORTON:

14   Q.  Ms. Volchko, generally speaking, how many PIN attempts can

15   you try on a locked device?

16   A.  It depends on the security settings and if we have brute

17   force capabilities.  There is a security setting on an iPhone

18   that could potentially wipe a phone after 10 incorrect

19   attempts, but to my knowledge that is not enabled by default so

20   it really depends on the security settings of the phone and if

21   we are able to unlock it with one of our advanced tools.

22           MR. HORTON:  No further questions, your Honor.

23           THE COURT:  Recross.

24           MR. QUIGLEY:  No, your Honor.  Thank you.

25           THE COURT:  Thank you.  You may step out.

O49FwanH                    Isolda – Direct

1              (Witness excused)

2              THE COURT:  The government may call its next witness.

3              MR. HORTON:  The government calls Christian Isolda.

4              THE COURT:  How many more witnesses does the

5    government have?

6              MR. HORTON:  This is our final witness, your Honor.

7    CHRISTIAN ISOLDA,

8         called as a witness by the Government,

9         having been duly sworn, testified as follows:

10             THE COURT:  Please state your name and spell it.

11             THE WITNESS:  My name is Christian Isolda.

12   C-H-R-I-S-T-I-A-N.  My last name is Isolda.  I-S-O-L-D-A.

13             THE COURT:  You may inquire.

14             MR. HORTON:  Thank you, your Honor.

15   DIRECT EXAMINATION

16   BY MR. HORTON:

17   Q.  Good afternoon.  Mr. Isolda.

18   A.  Good afternoon.

19   Q.  Where do you work?

20   A.  I work at the Federal Bureau of Investigation.

21   Q.  And do you work at a particular part of the FBI?

22   A.  I do.

23   Q.  And what part is that?

24   A.  I work on a squad called CART.

25   Q.  And how long have you worked at CART?

O49FwanH                    Isolda – Direct

1  A.  I have been with CART for approximately four and a half

2  years.

3  Q.  Do you work on any particular section at CART?

4  A.  I do.  I work on a separate team as well called the Mobile

5  Device Unlock Team.

6  Q.  Is that also called MDUS?

7  A.  Correct.

8  Q.  What are your duties at MDUS?

9  A.  MDUS duties entail unlocking phones, performing extractions

10  on cell phones, as well as preparing broken devices or doing a

11  more advanced level of extraction on cell phones.

12  Q.  What does the term "brute force" mean?

13  A.  Brute force is a capability that comes in forensic tools,

14  some of our software that allows the guessing of passcodes

15  against the device or a file.

16  Q.  And generally speaking, how does that work?

17  A.  The tool -- the brute force tool goes and tries every

18  single passcode possible.  For example, a six-digit passcode

19  has 1 million possible attempts so it will try all 1 million

20  attempts until it finds the correct passcode.

21  Q.  And without the brute force tool, what would happen?

22          MR. QUIGLEY:  Objection.  Vague.

23          THE COURT:  One moment, please.  (Pause)  I'm sorry.

24  The objection was?

25          MR. QUIGLEY:  I'm going to withdraw the question.

O49FwanH                    Isolda - Direct

1              THE COURT:  All righty.

2    BY MR. HORTON:

3    Q.  Can all phones be brute forced?

4    A.  No.

5    Q.  What determines whether the FBI is capable of accessing a

6    device on brute force?

7    A.  Very dependent on the model of the phone as well as the

8    software that is running on the phone.

9    Q.  Do you have experience using brute force techniques?

10   A.  I do.

11   Q.  In preparing to testify today, Mr. Isolda, did you review

12   any physical devices?

13   A.  I did.

14   Q.  Did those include phones that were labeled 1B70 and 1B71?

15   A.  Correct.

16   Q.  And what information, if any, did you review on those

17   devices?

18   A.  I was able to verify the model of the device, as well as

19   the IOS version that was running on the device.

20   Q.  And based on your training and experience what, if

21   anything, were you able to determine about the FBI's ability to

22   access phone 1B70 by brute force?

23   A.  1B70 would be brute forceable with the combination of the

24   model and the IOS version.

25              THE COURT:  I'm sorry.  The current combination of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

O49FwanH                          Isolda - Direct

1    model?  What do you mean by that?

2              THE WITNESS:  The combination of the model, combined

3    with the software that's on that specific device.

4    BY MR. HORTON:

5    Q.  Did you access the same information about 1B71?

6    A.  I did.

7    Q.  And based on your training and experience what, if

8    anything, were you able to determine about the FBI's ability to

9    access phone 1B71 by brute force?

10   A.  1B71 also has the ability to be brute forced.

11   Q.  And why is that?

12   A.  The model and the IOS version.

13   Q.  What are biometrics?

14   A.  Specific to?

15   Q.  In the context of mobile devices, what are biometrics?

16   A.  Biometrics is a way to unlock phones.  For example, some of

17   the newer app devices have something called face ID where you

18   can unlock your phone with your face.  Other phones have touch

19   ID which you can unlock your phone with your fingerprint.

20   Q.  And can you determine whether a particular device has

21   biometrics enabled?

22   A.  Yes.

23   Q.  And how would you determine that?

24   A.  There is a few different ways.  Some of the wording on the

25   lock screen can indicate if biometrics is enabled.  Another way

O49FwanH                    Isolda – Cross

1   you can quickly tell is if you go into the settings of the

2   device, you can check the biometrics settings to see if it is

3   enabled or not.

4   Q.  In preparing to testify today, did you review a device that

5   is labeled 1B15?

6   A.  I did.

7   Q.  Is that an iPhone?

8   A.  Correct.

9   Q.  What information about that device did you review?

10  A.  I confirmed that the biometrics was enabled on that device.

11  Q.  How did you determine that?

12  A.  I went into the settings of the phone and I verified that

13  biometrics, specifically a face ID, was enabled on that device.

14          MR. HORTON:  If I can have one moment, your Honor?

15          (Counsel conferring)

16          MR. HORTON:  Thank you, Mr. Isolda, we have no further

17  questions, your Honor.

18          THE COURT:  Cross-examination.

19          MR. QUIGLEY:  Thank you, your Honor.

20  CROSS-EXAMINATION

21  BY MR. QUIGLEY:

22  Q.  Good afternoon, Mr. Isolda.

23  A.  Good afternoon.

24  Q.  You were asked some questions about 1B70.  Do you recall

25  that?

O49FwanH                       Isolda - Cross

1   A.  I do.

2   Q.  And you were asked whether you reviewed whether that phone

3   could be brute forced; right?

4   A.  Correct.

5   Q.  You didn't conduct that analysis until you were preparing

6   to testify today; correct?

7   A.  Correct.

8   Q.  That was in the last couple of weeks?

9   A.  Correct.

10  Q.  Do you know when, approximately?

11  A.  That was this morning.

12  Q.  And 1B71, you didn't conduct any analysis on that phone

13  until after you knew you were going to testify today; correct?

14  A.  Correct.

15  Q.  When did you conduct that analysis?

16  A.  That was also this morning.

17  Q.  And 1B15, you didn't conduct any analysis on the biometrics

18  on that phone until you knew you were going to testify today;

19  correct?

20  A.  Correct.

21  Q.  When was that?

22  A.  That was yesterday.

23  Q.  These phones were seized over a year ago now?

24  A.  I'm not sure when they were seized.

25          MR. QUIGLEY:  One moment, your Honor?

1           (Pause)

2    Q.  By the way you testified a little bit about brute force

3    capable; correct?

4    A.  Correct.

5    Q.  Even if a phone has the ability to be unlocked via using

6    brute force, there are variables that play into how long it

7    takes for that to happen; correct?

8    A.  Correct.

9    Q.  What is the longest you have seen a phone take to get

10   unlocked?

11   A.  Personally?

12   Q.  What is the longest you have heard of a phone getting

13   unlocked?

14   A.  The longest I have heard of a phone to take to get unlocked

15   took, if I recall correctly, three years to get in.

16   Q.  Do you know whether anyone did any analysis of whether it

17   would be reasonable to hold on to a phone for three years while

18   you were waiting for it to unlock?

19           MR. HORTON:  Objection, your Honor.

20           THE COURT:  Sustained.

21           MR. QUIGLEY:  No further questions, your Honor.

22           THE COURT:  Any redirect?

23           MR. HORTON:  No questions from us, your Honor.

24           THE COURT:  All righty, sir.  Thank you.  You may step

25   out.

O49FwanH                    Isolda – Cross

1              THE WITNESS:  Thank you.

2              (Witness excused)

3              THE COURT:  One moment.

4              (Pause)

5              THE COURT:  Mr. Quigley, are you going to put on any

6    witnesses?

7              MR. QUIGLEY:  We are not, your Honor.  Thank you.

8              THE COURT:  I am not going to take argument at this

9    time.  I am going to order a briefing schedule.  I am advised

10   by our reporter that the transcript will be ready by tomorrow

11   morning, and so you are going to be filing your briefs

12   simultaneously, both parties at the same time.  So, the opening

13   brief is due on April 12; and your opposition papers, both

14   sides, April 16.

15             Is there anything further?

16             MR. HORTON:  No, your Honor.

17             MR. QUIGLEY:  No, your Honor.  Thank you.

18             THE COURT:  Just a reminder, the final pretrial

19   conference is on May 14, and of course, trial is set for May

20   20.  Thank you.

21             (Adjourned)

22

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2  Examination  of:                        Page

 3  MELISSA BACCARI

 4  Direct By Mr. Horton . . . . . . . . . . . . . 3

 5  Cross By Mr. Quigley . . . . . . . . . . . . .14

 6  Redirect By Mr. Horton . . . . . . . . . . . .45

 7  JESSICA CARDENAS

 8  Direct By Mr. Horton . . . . . . . . . . . . .46

 9  Cross By Mr. Quigley . . . . . . . . . . . . .51

10  JESSICA VOLCHKO

11  Direct By Mr. Horton . . . . . . . . . . . . .53

12  Cross By Mr. Quigley . . . . . . . . . . . . .69

13  Redirect By Mr. Horton . . . . . . . . . . . .74

14  CHRISTIAN ISOLDA

15  Direct By Mr. Horton . . . . . . . . . . . . .75

16  Cross By Mr. Quigley . . . . . . . . . . . . .79

17                    GOVERNMENT EXHIBITS

18  Exhibit No.                           Received

19  5    . . . . . . . . . . . . . . . . . . . .57

20  6, 7, 8, 21 and 27  . . . . . . . . . . . . .62

21  S-1   . . . . . . . . . . . . . . . . . . . .63

22  2    . . . . . . . . . . . . . . . . . . . .65

23  2A    . . . . . . . . . . . . . . . . . . . .67

24  4    . . . . . . . . . . . . . . . . . . . .67

25                    DEFENDANT EXHIBITS
</pre>

Exhibit No.                                          Received

1    . . . . . . . . . . . . . . . . . . .30

2    . . . . . . . . . . . . . . . . . . .34