**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA,

     v.

YVETTE WANG,

         Defendant.

23 Cr. 118-3 (AT)

---

**SENTENCING MEMORANDUM ON BEHALF OF YVETTE WANG**

Brendan F. Quigley
Sarah Reeves
BAKER BOTTS LLP
30 Rockefeller Plaza
New York, N.Y. 10112
212 408 2520
brendan.quigley@bakerbotts.com

*Attorneys for Yvette Wang*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

MS. WANG's BACKGROUND ............................................................................. 2

   I.   Ms. Wang's Upbringing in Communist China .................................................. 2

   II.   Ms. Wang Comes to America, and Soon Thereafter ███████████████ ███████ ................................................................................................ 5

   III.   The Impact of this Case on Ms. Wang ......................................................... 10

APPLICABLE LAW ........................................................................................... 11

A SIGNIFICANTLY BELOW GUIDELINES SENTENCE IS APPROPRIATE ..................... 12

   I.   Ms. Wang Did Not Significantly Financially Benefit from the Offense, and Indeed the Offense Came at a Significant Cost ....................................................................... 12

   II.   Other Characteristics of the Offense Do Not Support a Guidelines Sentence ................. 14

   III.   A Below Guidelines Sentence Would Be Consistent with Sentences Imposed on Similarly Situated Defendants ................................................................................ 16

   IV.   Ms. Wang Has Already Faced Significant Consequences from Her Involvement in the Conspiracy ....................................................................................................... 21

     A.   ███████████████████████████ ............................................ 22

     B.   Ms. Wang's Pre-Trial Detention at MDC ................................................. 23

   V.   Ms. Wang Will Continue to Face Significant Consequences from Her Involvement in the Conspiracy ........................................................................................... 27

     A.   Simply Because She is a Foreign National, Ms. Wang Faces More Severe Restrictions in BOP Custody than Similarly Situated U.S.-Citizen Inmates. .......................... 27

     B.   Ms. Wang Faces Significant Financial Penalties, Which Will Likely Last Well Beyond Any Time of Incarceration, But Which Far Outweigh any Personal Gain from the Offense 31

   VI.   Ms. Wang Has a Low Risk of Recidivism .................................................. 33

CONCLUSION .................................................................................................. 34

## PRELIMINARY STATEMENT

For almost four decades, Yvette Wang lived a productive, law-abiding life. She excelled in school in China, completed two master's degrees in France, started a family with her college sweetheart, and got a job at one of China's leading real estate firms.

So, why is Ms. Wang here? She was not motivated by greed. The monetary benefits she gained from her involvement with the Guo organization pale in comparison to those received by others, both charged and uncharged in this case. Indeed, the costs—mental, emotional, and physical—of her involvement with the organization, even absent a potentially lengthy prison sentence, have far outweighed the benefits.

The reality is that, in the year the charged conspiracy began, 2018, Ms. Wang was in the midst of a series of deep personal crises.



. She was cut off from any contact with her husband and son, who remained in China. Her father had died at the relatively young age of 61, and she could not attend his funeral.

These events left Ms. Wang in constant fear for her safety and that of her family.

. They left her deeply distrustful of security services and law enforcement. They left her increasingly dependent on, and loyal to, her employer. And they clouded her judgment.

Ms. Wang profoundly regrets her actions. But considering that she did not materially benefit from the offense other than by having a job (which pre-dated the conspiracy), and she did not solicit investors, she has already been punished significantly, and she will continue to face punishments and a highly uncertain future. Under these circumstances, and particularly when

considered against the sentences imposed on similarly situated defendants in this District, a below-Guidelines sentence of less than 48 months would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

## MS. WANG's BACKGROUND

### I.    Ms. Wang's Upbringing in Communist China

Ms. Wang is 45-years old and was born on September 1, 1979 in Shuozhou, Shanxi Province, China. *See* PSR ¶ 92.

In many ways, Ms. Wang's early childhood was relatively good. Her parents were married, and both were professionals who provided the family's basic necessities and promoted values of hard work, loyalty, and adherence to rules. *Id.* ¶¶ 92, 94. She also had a close relationship with her maternal grandparents and spent much of her childhood with them. Exhibit A (filed under seal), Report of Dr. Adeyinka Akinsulure-Smith ("Akinsulure-Smith Report") at 3.

However, even as a child, Ms. Wang had experiences that left her with lasting questions about the authoritarian Chinese government. In particular, the year Ms. Wang was born, 1979, China adopted a policy restricting couples from having more than one child. This policy was strictly and dangerously enforced.[1] Shortly after the policy's enactment, in the early 1980s, Ms. Wang's mother became pregnant with a second baby girl. PSR ¶ 93. Having another child, particularly a girl, would have exposed Ms. Wang's family to significant sanctions under the one-child policy, and Ms. Wang has a vivid memory of her grandparents visiting her home close to the due date. During this visit she remembers her uncle holding her down and her paternal grandmother

---

[1] China's One-Child Policy: The Government's Massive Crime Against Women and Unborn Babies Before the Subcomm. On Africa, Global Health, and Human Rights, 112th Cong. 105 (2011) (noting "there [were] 16 million forced and coerced abortions a year in China, but when counting on the numbers of abortion pills sold, possibly close to 23 million").

with an OBGYN doctor holding her mother down, hearing a baby cry, seeing her paternal grandmother put the pill in the baby's mouth, followed by deafening silence.

By the mid-1980s, the restrictions had eased somewhat, and the policy was relaxed if the family's second child was a boy. In 1986, Ms. Wang's mother gave birth to Ms. Wang's brother, ▮▮▮▮▮▮▮, her only sibling. PSR ¶ 93. Ms. Wang and her brother have always had a close relationship, and she has often cited him as one of the protective and motivational factors in her life. Akinsulure-Smith Report at 3, 7; PSR ¶ 94.

In addition, Shuozhou was a coal mining town and was a highly toxic environment. As discussed further below, both of Ms. Wang's parents died of cancer at relatively young ages. PSR ¶ 92. Ms. Wang herself has developed a tumor. *Id.* ¶ 103. She believes the frequency of cancer in her family results from the toxins that filled the air in Shouzhou in the 1980s and 1990s. *See id.* ¶ 92; Exhibit B (Y. Wang Letter) ("Wang Letter") at 1.

Still, driven by her parents, Ms. Wang developed a strong work ethic and got excellent grades in primary school. At the age of 15, she was accepted to Huai Ren, a prestigious, elite, and demanding boarding school. Akinsulure-Smith Report at 3. Ms. Wang found Huai Ren's schedule emotionally and physically grueling and saw one fellow student commit suicide. *Id.*[2]

The education she received at Huai Ren gave her an intense work ethic and paved the way for her admission to the prestigious Shanxi University, where she majored in international culture, civilization, and logistics. Akinsulure-Smith Report at 3. At Shanxi, she met her future husband, ▮▮▮▮▮▮▮. They majored in the same subject and met in their overlapping classes. Their

---

[2] Some 30 years later, Huai Ren apparently retains its reputation as a demanding institution. Just weeks ago, *China Daily* reported that a student who used the bathroom after curfew was required to "to self-fund the printing of 1,000 copies of a self-criticizing document for distribution throughout the school." Quan Zhanfu, *Shanxi school faces backlash over harsh punishment*, CHINA DAILY (Sept. 24, 2024), https://www.chinadaily.com.cn/a/202409/24/WS66f29b51a310f1265a1c4946.html

friendship grew through their intellectual interests and evolved into a romantic partnership. They found out that they grew up in the same area of China which made their bond only stronger. *Id.* at 4.

After graduating in 2002, ███████ moved to France where he taught Chinese at a French school, while Ms. Wang returned home to care for her dying maternal grandfather. After her grandfather passed away in 2003, Ms. Wang herself moved to France with ███████ and began studying for a master's degree at the University of Charles de Gaulle Lille. Akinsulure-Smith Report at 3-4; PSR ¶ 109.

In the spring of 2005, however, Ms. Wang learned her mother had contracted lung cancer while still only in her late 40s. *See* PSR ¶ 92; Akinsulure-Smith Report at 4. Ms. Wang believes this cancer was caused by her mother's exposure to toxins from the underground coal mine in Shuozhou. *Id.* The cancer spread quickly, and her mother died in 2005 at 49 years old. PSR ¶ 92. Ms. Wang returned to China for the funeral, and both ███████ and his family helped with funeral expenses and were very present for Ms. Wang during her grief. Her family, however, insisted she return to France to complete her education. Akinsulure-Smith Report at 4. After returning to France, she finished her master's degree at Charles de Gaulle Lille and then completed a second master's degree at the University of March Bloch in Strasbourg. *Id.* Ultimately, Ms. Wang and her husband decided to return to China to be near family. *Id.* Ms. Wang and her husband had their only child in 2013. *Id.* at 5.

Ms. Wang began working in 2009 for Beijing Pangu Investment Limited ("Pangu"), which was owned by the Guo family. Akinsulure-Smith Report at 4; Wang Letter at 2. She started her tenure as an interpreter, and then became a secretary. PSR ¶ 114. She continued to move up at the company, taking on the role of Director of International Affairs and working in the chairman's

office. *Id.* Her position involved regular travel and overseeing various vendors, contractors and suppliers, as well as overseeing communications and logistics. *Id.* She also managed the assets of the owner. *Id.* Through her time working for the Guo family, continuing to her arrest, Ms. Wang was seen as someone who was caring for her co-workers. ▮▮▮▮ described her as "very motivated and caring, and she could always bring sunshine and happiness to the people around her. Wherever she was, there was always full of warmth. At work, she helped her colleagues to improve together, and in daily life she cared for the people around her like an elder sister." Exhibit D (Letter from ▮▮▮▮) at 1. A junior staff member who worked for Ms. Wang described her as "embod[ying] the perfect elder sister figure" for many at the company. She further said that "[s]he warms everyone's heart, making us feel like a family, united in our battles." Exhibit Q (Letter from ▮▮▮▮).

## II. **Ms. Wang Comes to America, and Soon Thereafter** ▮▮▮▮▮▮▮▮▮▮

In 2015, Pangu sent her and several colleagues to New York, for what was originally supposed to be a three-to-six-month trip. Wang Letter at 2; PSR ¶ 97. However, soon thereafter, the Guo companies began to be targeted by Chinese intelligence agencies. *See* PSR ¶ 97. One of Ms. Wang's colleagues was kidnapped in Hong Kong, secretly transported to mainland China, and disappeared. Akinsulure-Smith Report at 4.

Although Ms. Wang returned to Hong Kong with the hopes of being able to reunite with her husband and son in mainland China, she was not able to do so. *See* Wang Letter at 2. In 2016, Ms. Wang's husband was detained by Chinese security agents for 12 hours and forced to sign documents without reading them. *Id.* at 1. The security agents told Ms. Wang's husband to report any attempt she made to contact him. *Id.* Ultimately, Ms. Wang's husband was compelled to

divorce her. *Id.* Ms. Wang has had no contact with her former husband or her son—no photos, no Facetimes, no Zooms—since 2018. *See* PSR ¶ 95; Akinsulure-Smith Report at 5.

Recognizing that she faced likely detention and possible execution if she returned to China, Ms. Wang settled in New York permanently in 2017. PSR ¶¶ 97-98. Almost simultaneously, "[i]n May 2017, the PRC government sent four undeclared agents from the PRC's Ministry of State Security (MSS) to the United States to attempt to cause Mr. Guo's coerced repatriation to the PRC as part of the Fox Hunt initiative," a plot that was foiled by the FBI. Transcript of Trial, *United States v. Guo*, 23 Cr. 00118 (2024) at 5132:14-22 ("Guo Trial Tr.").



The stress of being ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was compounded by Ms. Wang's father's cancer, which eventually killed him; as well as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮; estrangement from her husband and son; and Ms. Wang's own hospitalization as a result of a stomach tumor and severe bleeding. Ms. Wang's electronic devices were frequently hacked, manipulated photos of her and her family were placed on the

internet, and she lost access to her Chinese and Hong Kong bank accounts. Wang Letter at 2. Ms.

Wang, in a classic understatement, describes these events as "some of the toughest times in my

life." *Id.*

These stresses continued through her detention in this case. ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████.[3]

In addition, an individual (presumably at the direction of, or encouraged by, Chinese

intelligence) began making online and in-person accusations against Ms. Wang beginning in

approximately 2017, including previously posting a purported recording of Mr. Guo and Ms. Wang

having sex. *See Wang v. Xiong*, NY County Index No. 157786/2019, NYSCEF No. 1 ¶ 33; *see

also id.* at NYSCEF No. 47 (entering order of protection) ("Order"). In April 2020, this individual

took photos of Ms. Wang through the first-floor window of her office and posted them on Twitter.

Order at 1. A few days later, he showed up outside Ms. Wang's office, began taking pictures of

her and threatening to kill her. Ms. Wang called the police who told her they were "conducting an

ongoing investigation of defendant." *Id.* at 2. After she called the police, another individual showed

_____

████████████████████████████████████████████████████
████████████████████████████████████████████████████

up and engaged in the same conduct. Afterward, the first individual posted a video of himself outside Ms. Wang's office on Twitter and encouraged others to join in threatening Ms. Wang. *Id.*

The harassment and false rumors have continued to the present. Notably, despite the order of protection, this individual appeared at the suppression hearing in this case and at Ms. Wang's guilty plea proceeding (before being removed by FBI agents and court security officers).



[4]

---

[4] We would be happy to provide the government or the Court with the relevant Twitter posts.

With no family support, and rendered essentially stateless, Ms. Wang received critical emotional support from her employer, Mr. Guo, and his family, including personal security protection and transportation. Mr. Guo's family business, Pangu, also helped pay burial costs for Ms. Wang's father, when he died of cancer at age 61. PSR ¶¶ 92, 95. Mr. Guo and his family treated Ms. Wang, who had no family of her own in the United States and could not return to China, "like family." Wang Letter at 3. As Ms. Wang states, "in addition to working as hard as" she could for the Guo family, Ms. Wang "developed a great amount of loyalty to them." *Id.*

Ms. Wang's work became her world. Her colleagues have described her as "a kind-hearted, generous, strong, and courageous person" Exhibit E (Letter from ████████) at 1; as someone who "consistently goes out of her way to support those around her, whether they are friends, family, colleagues, or even strangers," whose "compassion and selflessness are well-known in [her] community, and . . . has earned the respect and admiration of many," Exhibit S (Letter from ████) at 1; as a person whose "care for everyone is genuine and heartfelt," Exhibit F (Letter from ████); and as "kind and compassionate." Exhibit N (Letter from ████) at 1. ████ describes how, when ████ was sick, Ms. Wang helped her get better and "constantly checked on my recovery." Exhibit O (Letter from ████) at 1.

Still, these constant threats took a physical, mental, and emotional toll on Ms. Wang. Soon after her father's death in March 2018, Ms. Wang herself began suffering from dizziness and fainting and was diagnosed with a stomach tumor. *Id.* ¶ 103. As noted above, when Ms. Wang was hospitalized, Mr. Guo's daughter managed her personal affairs and was by her side daily.

Threats against Ms. Wang's family in China also continued though. After Ms. Wang's divorce and her father's death, the authorities turned their attention to her brother, her only other surviving relative, repeatedly contacting him over several years to ask about Ms. Wang's

whereabouts and her dealings with Mr. Guo. ████████████████████████████
████████████████████████████████████████████████████. Later that year,
Ms. Wang's brother was arrested and his home was raided. Wang Letter at 1. Over the next several
months, he gradually reduced contact with her, and she has had no contact with him at all since
her arrest.

The constant fear for herself and her family has taken a toll on Ms. Wang, even before her
arrest, leaving her diagnosed with post-traumatic stress disorder and chronic trauma. Akinsulure-
Smith Report at 3, 14.

### III. The Impact of this Case on Ms. Wang

In the 19 months since her arrest in this case, Ms. Wang has been detained in the MDC,
which has compounded her mental and emotional health issues. *See* Akinsulure-Smith Report at
13. A federal district judge recently and aptly described the MDC during those 19 months as a
place where "[c]haos reigns, along with uncontrolled violence," which can be attributed to "a
woeful lack of supervision over the facility, a breakdown of order and an environment of
lawlessness within its confines that constitute unacceptable, reprehensible and deadly
mismanagement." *United States v. Colucci*, No. 23 Cr. 417 (GRB), 2024 WL 3643857, at *4, 6
(E.D.N.Y. Aug. 5, 2024). Since March 2024, while Ms. Wang was nearing trial, there have been
a number of occurrences of "catastrophic violence" at MDC, including at least two homicides,
numerous stabbings, and an assault that resulted in a fractured eye socket. *Id.* at *5. In June 2024,
an inmate was fatally stabbed in the neck during an altercation over drugs. Six weeks later, another
inmate was killed in a physical altercation, resulting in an extensive lockdown at the facility. *Id.*
at *5-6. Despite the frequent lockdowns and absence of visits from close family members, Ms.

Wang has incurred no disciplinary infractions, PSR ¶ 8, and has maintained generally positive relationships with MDC staff.[5]

## APPLICABLE LAW

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220, 245 (2005), the Sentencing Guidelines are advisory. Although "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," the Guidelines are merely the "starting point and the initial benchmark . . . ." *Gall v. United States*, 552 U.S. 38, 49 (2007) (internal citations and quotations omitted). The Court must "consider all of the [18 U.S.C.] § 3553(a) factors" and "make an individualized assessment based on the facts presented." *Id.* at 49–50; *see also United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (reasonableness of a sentence is driven by "the district court's individualized application of the statutory sentencing factors," not "the amount by which a sentence deviates from the applicable Guidelines range").

---

[5] The government has previously contended that, in the weeks immediately after her arrest, Ms. Wang used her prior attorney to "ferry her request" to obtain "fraud proceeds" from a G Clubs mailbox. Gov't Mar. 31, 2024 Ltr. to Court, ECF No. 255 at 11. That theory is largely based on a confused, hearsay-filled series of recordings with third parties (i.e., not Ms. Wang or her prior attorney) made by a G Clubs employee who (i) apparently refused to return the only key to a G Clubs mailbox (which apparently contained two checks worth $7 million that came not from investors but from banks that had shut down G Clubs' accounts in the preceding weeks) while simultaneously (ii) trying *very* hard to get third parties to make recorded, incriminating statements as part of an effort to curry favor with the government. Ultimately, based on discovery produced by the government, it appears a third party told the employee he did not need to return the key.

To be sure, Ms. Wang, does not deny that, last year, in the weeks immediately following her sudden arrest and detention, she agreed to take steps to assist certain entities in continuing to carry out their obligations to remaining employees and others. *See, e.g.*, GXVI101 (email subject "Written Consent Sighed [sic] by Yvette"). At the time, however, Ms. Wang was not charged with any substantive crime relating to G Clubs, or any entity other than GTV, and the government had not yet alleged the existence of the "Guo Enterprise." If anything the presence of multiple attorneys—including multiple distinguished members of the white-collar bar and former AUSAs—on relevant communications that openly referenced Ms. Wang signing consents, *see, e.g.,* GXVI101—further shows that is, at best, an overstatement to contend these actions were part of a deliberate effort "to operate [a] racketeering enterprise, even while inside the MDC," Gov't Mar. 31, 2024 Ltr. to Court, ECF No. 255 at 11, even if, in hindsight, a more self-interested and prudent course of action might have been to fully step back from any role in the entities with which she was involved.

These statutory sentencing factors include: the nature and circumstances of the offense and the history and characteristics of the defendant; the seriousness of the offense; the need to promote respect for the law and provide just punishment; considerations of general deterrence; protection of the public from further crimes of the defendant; the provision of educational or vocational training, medical care, or other correctional treatment; the types of sentences available; and the avoidance of unwarranted disparities. 18 U.S.C. § 3553(a). The Court must "impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing. *Id.* (emphasis added).

### A SIGNIFICANTLY BELOW GUIDELINES SENTENCE IS APPROPRIATE

### I.  Ms. Wang Did Not Significantly Financially Benefit from the Offense, and Indeed the Offense Came at a Significant Cost

In considering the nature and circumstances of the offense, it is significant that, in a case involving the alleged massive misappropriation and conversion of investor funds, Ms. Wang received no material financial benefit from the offense, other than a salary from her pre-existing job. PSR ¶ 14.[6] Ms. Wang's salary ranged from approximately $231,900 in 2019 to $313,961 in 2021.[7] Significantly, Ms. Wang's work for the Guo family had gone on for almost a decade prior to the start of the conspiracy, in roles that are not alleged to be criminal. Even during the time of the charged conspiracy, the companies she was involved with actually existed and had employees and normal operations, notwithstanding the alleged misappropriation of investor funds. *See, e.g.*, Guo Trial Tr. 2987 (testimony of government witness Linmarie Reyes that, while working at G

---

[6] While the government has previously cited to the Himalaya Exchange cryptocurrency Ms. Wang was supposedly allocated, the government has also alleged that cryptocurrency was worthless, not real, and illiquid, extinguishing any claim the allocation was somehow a benefit to Ms. Wang.

[7] *See* GXBR0156 at 5699 (W2 for 2019); GXBR0147 at 428 (W2 for 2020); GXBR0115 at 671 & GXBR0150 at 469 (W2s for 2021).

Clubs, she believed it was "a legitimate business," received health insurance, was paid via direct deposit, and worked with 14 other employees); *id.* 3664:7-12 (testimony of Jesse Brown that he believed Himalaya Exchange was a "legitimate business"); GXBR0156 (2019 W-2's showing Golden Spring New York had approximately 40 employees); GXBR0014 (2020 W-2s showing GTV had approximately 40 employees). Nor has the government apparently viewed these employees' salaries as ill-gotten gains, as evidenced by the fact that it has not sought forfeiture of the salaries paid to Mr. Khaled, Ms. Reyes, or other witnesses with whom it entered non-prosecution agreements.

Even accounting for the $30,906 "Director's Fee" she also received from the GTV offering, PSR ¶ 57,[8] that salary is a fraction of the benefits her charged co-conspirators and other uncharged individuals received from the scheme. The government has alleged Guo used money obtained from victims to purchase a $26.5 million mansion, a $3.5 million Ferrari, $4.4 million Bugatti, and a $37 million yacht, among other things. PSR ¶ 14. William Je transferred approximately $10 million into personal bank accounts, *id.*, and the government's summary expert at Guo's trial testified that Je and his entities received over *$500 million* in net income from the scheme, GX Z-26 at 34.

Ms. Wang's financial benefits from the scheme were also less than numerous other *uncharged* individuals. Uncharged Mercantile Bank retained $5 million of investor funds, which it used to hire lawyers, while also bankrolling a racecar sponsorship. *See* Guo Trial Tr. 2887:10-11, 2888:20-2889:17, 2890:16-23. Uncharged Mileson Guo received more than $100 million in loans from G Clubs, among other benefits. *Id.* 2991:2-20. Uncharged Hayman Capital Management retained a $2 million management fee. *Id.* 891:2-7. Uncharged Haitham Khaled also

---

[8] At least three other uncharged individuals, ███████████████████████████████████████████, received the same director's fee, *see* GXSM – 073; GXSM – 178; GXSM - 187, which the government has apparently not sought to forfeit.

retained $2.7 million of investor funds, which he transferred to a personal account and then used to buy seven luxury properties. Trial Tr. 2035:15-2036:1, 2319:11-2320:24. Notably, Ms. Wang's salary prior to 2022 was less than the $350,000 salary paid to Khaled, *see id.* 1923:10-15. In short, Ms. Wang did not receive any material financial benefits from the offense, beyond a salary for a job she actually performed, which pre-dated the start of the conspiracy.

## II.  Other Characteristics of the Offense Do Not Support a Guidelines Sentence

In addition to the fact that she did not materially benefit from the offense—and indeed benefitted less than other *uncharged* individuals—the other circumstances of the offense do not support a Guidelines sentence.

First, Ms. Wang was not involved in soliciting investors, the core activity of any fraud scheme. The government acknowledges as much in responding to the defense's objections to the PSR on this point, falling back on the idea that a co-conspirator is "responsible for all of the conspiracy's activities." *See* PSR ¶ 42; *see also id.* at 41. While that may be true as a matter of evidentiary law or substantive criminal law, it proves too much in the context of sentencing. Otherwise, every defendant in every conspiracy should receive the same sentence, which is obviously not the case and would be contrary to the individualized determination that Section 3553 requires. *See generally* Transcript, *United States v. Crupi*, No. 10 Cr. 228 (LTS) (S.D.N.Y. Dec. 15, 2014) ECF. No 1478 at 80 (Judge Swain emphasizing, in sentencing a defendant who participated in the "world's most extensive Ponzi scheme," "I am sentencing a single individual," not the institution that perpetrated the scheme or other co-conspirators).

Second, while Ms. Wang agreed to a three-point enhancement for being a "manager or supervisor (but not an organizer or leader) [of] criminal activity [that] involved five or more

participants or was otherwise extensive,"[9] as a condition of her plea agreement, it is important to note what that enhancement means and what it does not mean. It applies so long as the criminal activity involved "five or more participants" in total; in other words, it does not require that Ms. Wang supervised five or more participants. To the contrary, "a defendant does not need to even know of the other participants or be an organizer or leader of more than one participant for purposes of applying"[10] that enhancement, and the defendant herself is considered a participant, *see United States v. Paccione*, 202 F.3d 622, 625 (2d Cir. 2000) (holding, consistent with the "apparent consensus among our sister circuits," that "a defendant may be included when determining whether there were five or more participants in the criminal activity in question"). Here, indeed, as evidenced by the government's apparent decision not to charge anyone in the conspiracy subordinate to Ms. Wang, Ms. Wang was, at most, a supervisor of other low-level "participants" or non-participants.

Indeed—again, while not disputing the application of the enhancement stipulated to in the plea agreement—the Guo trial record also shows Ms. Wang was subordinate to, and overruled by others in the conspiracy. The government began its summation at the Guo trial by playing a recorded conversation from April 28, 2021, GX-417/417-T, in which Ms. Wang, in the government's words, "pleaded," Guo Trial Tr. 5884, against Mr. Guo's instructions to transfer $100 million of G Clubs funds abroad, but was overruled, in a conversation that ended with screaming in Mandarin, and Ms. Wang throwing a remote control at the television Mr. Guo was speaking on. GX 417; Guo Trial Tr. 2047:4-12. Notably, Ms. Wang was excluded from subsequent

---

[9] US.S.G. § 3B1.1

[10] U.S. SENTENCING COMMISSION, PRIMER ON AGGRAVATING AND MITIGATING ROLE ADJUSTMENTS at 5 (2023), *https://www.ussc.gov/sites/default/files/pdf/training/primers/2023_Primer_Role.pdf*

meetings that Mr. Khaled recorded. *Cf., e.g.*, GX 404, 405, 408, 408, 411, 412, 413; Guo Trial Tr. 2047-2069.

Third, in considering the obstruction enhancement agreed to in the plea agreement, the Court should consider Dr. Akinsulure-Smith's observations ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████

### III. A Below Guidelines Sentence Would Be Consistent with Sentences Imposed on Similarly Situated Defendants

Considering all of the above, a decade-long sentence would be inconsistent with sentences of similarly situated defendants sentenced in recent years, even defendants convicted of more substantial frauds.

For example, just months ago, Judge Ramos imposed a 48-month sentence on Irina Dilkinska. *See* Judgment, *United States v. Dilkinska*, 17 Cr. 630 (ER) (S.D.N.Y. May 2, 2024), ECF No. 653. Ms. Dilkinska, an attorney, had served as the head of legal and compliance at a company that marketed and sold a fraudulent cryptocurrency, that took in over "$4 billion from at least 3.5 million victims," i.e., a significantly bigger fraud than alleged here. *See* Gov't Sentencing Submission, *United States v. Irina Dilkinska*, 17 Cr. 630 (ER) (S.D.N.Y. Mar. 27, 2024), ECF No. 640 at 6. The government described Ms. Dilkinska as "an integral member of" the "inner circle" of the fraud "who was involved in the . . . scheme nearly from its inception . . . ." *Id.* at 2. Similar

to the government's allegations against Ms. Wang, the government alleged that Ms. Dilkinska "creat[ed] and manag[ed] shell companies that were used to hold properties in [another co-conspirator's] name, open[ed] bank accounts, and launder[ed] proceeds from the" scheme. *Id.* Like Ms. Wang, Ms. Dilkinska did not "appear to have profited personally, beyond salary, for her role in the . . . scheme." *Id.* at 5.

Like Ms. Wang, Ms. Dilkinska pled guilty before trial, pursuant to a plea agreement, to a superseding information charging her with conspiracy to commit wire fraud and money laundering, which capped her statutory sentencing exposure and resulted in a Guidelines range of 120 months. *See id.* at 3-4. Further, like Ms. Wang, Ms. Dilkinska agreed to several enhancements under Chapter 3 of the Guidelines, including the three-point manager or supervisor enhancement, and the Guidelines offense level absent the 120-month statutory maximum was 43. *See id.* at 4. Further like Ms. Wang, Ms. Dilkinska was detained before trial in the horrid conditions of the MDC. *See id.* at 3.

However, unlike Ms. Wang, Ms. Dilkinska was a licensed attorney and compliance professional, who had ethical and legal obligations as a "gatekeeper." *Id.* at 5 (arguing that "Dilkinska abused her position as an attorney and violated her ethical obligations in assisting in laundering hundreds of millions of dollars."). Further, as Judge Ramos observed in imposing sentence, "I honestly do not understand what prevented [Dilkinska] from leaving the scheme prior to the time it was brought down." *United States v. Dilkinska*, 17 Cr. 630 (ER) (S.D.N.Y. May 2, 2024), ECF No. 654 at 21:7-8. In contrast, Ms. Wang's options for "leaving the scheme," were, at best, severely limited. She had no permanent legal status in the U.S. and a lack of social connections and professional here, and she faced immediate detention should she return to China (and potential rendition by Chinese security services anywhere else in the world).

17

Under the circumstances, Judge Ramos sentenced Ms. Dilkinska to 48 months. Indeed, despite the multi-billion dollar nature of the scheme at issue in *Dilkinska*, only one the six defendants, a co-founder of the scheme, in that case was sentenced to above 120 months. *See id.* at 304.

And even in the "largest known fraud in history,"[11] the Bernard Madoff scheme, Judge Swain sentenced a key participant, who *went to trial* and whose involvement in that scheme spanned decades, to 72 months' imprisonment, or 60 percent of the 120 months' Guidelines "range" here.[12] The losses in the scheme were estimated at $17.5 billion, and the defendant Joanne Crupi, for *decades*, "constructed fake convertible arbitrage trades," "backdated trades," "fabricat[ed] . . . documents and other misleading responses for the SEC and KPMG audits," "fabricated losses . . . [on] her own . . . account," and "received extraordinary returns in her own or family accounts that were the product of backdated, fake trades." *See* Sentencing Transcript, *United States v. Crupi*, No. 10 Cr. 228 (LTS) (S.D.N.Y. Dec. 15, 2014) ECF No 1478 at 29, 80-82. Ms. Crupi also personally received millions of dollars from the scheme, including $2.7 million for a beach house. *See id.* at 82-83.

Again, unlike Ms. Wang, Ms. Crupi went to trial, her involvement in the scheme spanned decades, she interacted directly with retail investors;[13] and she personally received "extraordinary

---

[11] *See* Gov't Supplemental Mem. of Law in connection with Sentencing, *United States v. Bonventre, et al.*, No. 10 Cr. 228 (LTS) (S.D.N.Y. Aug 20, 2014), ECF No. 1124.

[12] *See* USAO SDNY, *Four Employees Of Bernard L. Madoff's Fraudulent Investment Advisory Business Sentenced In Manhattan Federal Court For Their Roles In The Massive Fraud* (Dec. 15, 2014), https://www.justice.gov/usao-sdny/pr/four-employees-bernard-l-madoff-s-fraudulent-investment-advisory-business-sentenced#:~:text=Madoff%20Investment%20Securities%20LLC%2C%20JOANN,sentenced%20in%20Manhattan%20federal%20court.

[13] Judge Swain did find it significant that (like Ms. Wang) Ms. Crupi "did not affirmatively solicit investments personally . . . ." *Id.* at 86.

return[s]," as a result of the scheme. And unlike Ms. Wang she did not undertake her actions while being targeted by a foreign government, she did not face the collateral consequences of deportation (and potential political imprisonment or execution), she did not serve over 19 months in the horrid conditions of the MDC while awaiting sentencing, and she *was* eligible, as a U.S. citizen, for placement at a BOP camp. *See infra*.

Finally, in 2020 Judge Abrams imposed a 15-month sentence on Michelle Morton, who like Ms. Wang, pled guilty shortly before trial to two Section 371 conspiracies, after being originally charged in a wide-ranging fraud scheme. *See* Judgment, *United States v. Morton*, No. 16 Cr. 371 (RA) (S.D.N.Y. Dec. 4, 2020), ECF No. 945. Ms. Morton took over two SEC-registered investment advisers that managed the pensions for "transit workers, longshoremen, housing authority workers and city employees, among others." *See* Transcript, *United States v. Morton*, No. 16 Cr. 371 (RA) (S.D.N.Y. Nov. 18, 2020), ECF No. 946 at 32. She then used $40 million of client assets to purchase illiquid tribal bonds offered by her co-conspirators—despite the protests of employees of the investment advisers[14]— which the conspirators then used to further their fraudulent scheme. Unlike Ms. Wang, who has accepted responsibility, Ms. Morton twice moved unsuccessfully to withdraw her guilty plea in litigation that went on for years. *Id.* at 34 (the Court noting "[a]t this point I think it's clear she's not willing to accept responsibility for her actions, although she may well be remorseful that people were harmed in the way that they were").[15]

In short, a sentence of less than 48 months would be well within the range of other sentences imposed on defendants convicted of similar conduct in this District.

---

[14] *Id.* at 16, 42.

[15] In the interests of full disclosure, Mr. Quigley represented the government in the *Morton* case between late 2017 and the fall of 2019, but left government service over a year prior to Ms. Morton's eventual sentencing.

Indeed, even defendants who have personally profited and themselves made misrepresentations to investors in significant frauds have received sentences far less than 120 months. For example, Trevor Milton, the former CEO of an electric vehicle company, who was convicted after trial, received a sentence of 48 months late last year, despite an applicable Guidelines range of 60 *years* imprisonment. *See* Gov't Sentencing Submission, *United States v. Trevor Milton*, 21 Cr. 478 (ER) (S.D.N.Y. Dec. 12, 2023) ECF No. 315. Unlike, Ms. Wang, Mr. Milton made false and misleading statements "directly to the investing public through social media and television, print, and podcast interviews," about the company's technical and engineering progress. *Id.* at 2. By way of example, "[i]n order to make it appear that the [prototype hydrogen powered vehicle] was driving, when it was not in fact functioning at all," Milton staged a video shoot in which "the vehicle was brought to the top of an incline and rolled down a hill," which was then doctored to make it appear it was traveling under its own power. *See id.* at 5-6. At the same time, Milton engaged in a parallel scheme to get an individual to accept the company's stock to allow Milton to purchase a ranch. *See id.* at 8. These schemes "followed a long history of dishonesty and accusation by others of false and fraudulent business practices undertaken by Milton," dating back decades. *See id.* at 2-3.

By contrast, a 120-month sentence would be only slightly less in absolute terms—and arguably more in real terms given Ms. Wang's conditions of confinement at MDC, the fact that (as discussed below) she is ineligible to serve her sentence in a camp, and the near-certainty that she will spend additional post-sentence jail time in ICE custody and in China—than the 135-month sentence recently imposed in the Northern District of California on Elizabeth Holmes. Ms. Holmes was convicted *after trial*, personally made false statements that jeopardized her victims' health, falsely claiming a blood-testing kit her company marketed could obtain accurate results and that

20

major pharmaceutical companies had comprehensively evaluated her company's technology and that her company she was working with the Department of Defense.[16] These statements resulted in widespread use of her company's testing kits, which resulted in inaccurate results sent to patients being screened for cancer, to women monitoring their pregnancies, and to one victim who was led to believe she had the precursor virus to AIDS, among many other examples. *See id.* Further, these statements induced investors to invest hundreds of millions of dollars, resulting in Ms. Holmes' own company stock being valued at more than $4 billion. *Id.* Unlike Ms. Wang, who spent the time of the fraud living alone and toiling in relative obscurity, Ms. Holmes "enjoyed a lavish life while carrying out her fraudulent scheme," living in a $15 million mansion and traveling in a Theranos-paid private jet. *Id.* She gained a national profile, adorning the cover of Fortune, Forbes, Inc., Glamour, and T: The New York Times Style Magazine. *Id.* In short, Ms. Wang is not remotely comparable Elizabeth Holmes, and a comparable sentence of 120 months here would be far greater than necessary.

In sum, a sentence of less than 48 months would be consistent with other sentences on defendants with similar records convicted of similar conduct, *see* 18 U.S.C. § 3553(a)(6).

## IV. Ms. Wang Has Already Faced Significant Consequences from Her Involvement in the Conspiracy

Further, in considering "just punishment" for the offense, the Court must consider the significant consequences Ms. Wang has already faced, and will face, as a result of involvement with Mr. Guo and his organization. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("The district court is specifically required by section 3553(a) to consider the 'just punishment for

---

[16] USAO SDNY, *Elizabeth Holmes Sentenced to More than 11 Years for Defrauding Theranos Investors of Hundreds of Millions* (Nov. 18, 2022), https://www.justice.gov/usao-ndca/pr/elizabeth-holmes-sentenced-more-11-years-defrauding-theranos-investors-hundreds

the offense.' 18 U.S.C. § 3553(a)(2)(A). It is difficult to see how a court can properly calibrate a 'just punishment if it does not consider the collateral effects of a particular sentence.").

**A.** █████████████████████████████████

First, Ms. Wang's association with Mr. Guo caused ████████████████████ ████, leaving her in constant fear for her safety and the safety of her family, and left lasting mental and physical wounds.

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████.

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████

████████████████████████████████████████ ████████████████

████████████████████████████████████████ ████████

███████████████████████████████.

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████.

These tactics worked, at least to a degree, against Ms. Wang, ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████.

**B. Ms. Wang's Pre-Trial Detention at MDC**

Ms. Wang's ████████████████████████████████████

████████████████████████████████████████████

████████████████.

---

[17] Guo Trial Tr. 5091:7-16.

[18] *See id.* 5090:3-15.

Over a year-and-a-half would be a significant amount of time in pre-sentence detention by any measure, regardless of the facility. Over a year-and-a-half in the MDC, a facility a judge in this District described as having "visible mold on the walls and ceilings, contaminated drinking water, vermin infestation, mouse droppings falling through HVAC vents, and roaches and flies in showers," *United States v. Chavez*, 710 F. Supp. 3d 227, 235 (S.D.N.Y. 2024), is brutal.[19]

In addition to the harsh physical conditions, MDC is subject to perpetual violence, which results in near-constant lockdowns. Earlier this week, the U.S. Attorney's Office for the Eastern District of New York filed charges against nine MDC inmates, in five separate cases, for multiple murders and assaults that occurred inside the MDC earlier this year, i.e., while Ms. Wang was detained there.[20] These charges came only after EDNY Judge Gary Brown, in a judicial opinion, described how, through his review of sealed documents, official government statements, judicial opinions and news media reports, he had "identified shocking instances of brutal violence within the facility." *Colucci*, 2024 WL 3643857 at *4 (highlighting the "chaotic, unremedied lawlessness" at MDC); *United States v. Griffin*, No. 22 Cr. 408 (EK), 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024) ("[I]t has been well documented that the MDC has an ongoing issue with frequent lockdowns due to violence and the threat of violence, among other concerns . . . ."). And, illustrating the scope of the problems at the facility, the same day EDNY charged nine inmates

---

[19] By way of more recent example, last month, when the undersigned was visiting Ms. Wang to discuss early drafts of this submission, the visiting room and surrounding area reeked of feces during the entire time of the visit. The odor was so pungent that the guards were wearing masks and asked the undersigned to "report" the abhorrent "working conditions." The undersigned contacted a member of the Federal Defenders, involved in the ongoing litigation with the MDC. When this attorney spoke to MDC legal counsel about this issue, MDC legal counsel reportedly responded that her office smelled, too.

[20] *See* USAO EDNY, *Federal Charges Announced Against Inmates for Violent Crimes Committed in the Metropolitan Detention Center in Brooklyn* (Sept. 30, 2024), https://www.justice.gov/usao-edny/pr/federal-charges-announced-against-inmates-violent-crimes-committed-metropolitan

with murders and assaults, it also charged an MDC guard with civil rights violations, for chasing a vehicle through the MDC parking lot, before shooting at the car without justification.[21]

Further, court intervention is often required for inmates to get timely medical care, and even then, court orders often go ignored such that denials and delays for basic medical care have become "commonplace" at MDC. *Chavez*, 710 F. Supp. 3d at 234. These problems are often attributed to overcrowding and understaffing and have only gotten worse given that, as of January 2024, the MDC inmate population was the largest it has been in three years, except for a period of time following the closure of MCC and the subsequent transfer of hundreds of new prisoners to MDC. *Id.* at 236. ███████████████████████████████

███████████████████████████████████████████

███████ .

        ███████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████ .

In short, 19 months of MDC time is hard time—very hard time—and is a significant punishment standing alone, and weighs in favor of a substantial variance. Judge Ramos recognized as much in imposing a 48-month sentence in *United States v. Dilkinska*. As discussed in more detail above, Ms. Dilkinska, an attorney involved in an over four billion dollar fraud scheme, pled

---

[21] *See* USAO EDNY, *MDC Correctional Officer Charged with Federal Civil Rights Violation* (Sept. 30, 2024), https://www.justice.gov/usao-edny/pr/mdc-correctional-officer-charged-federal-civil-rights-violation

guilty to conspiracy to commit wire fraud and money laundering to cap her statutory sentencing exposure (and Guidelines range) at 120 months (like Ms. Wang) and, like Ms. Wang, was a foreign national who was incarcerated in the MDC for 14 months between her March 2023 arrest and May 2024 sentencing. *See supra.* Judge Ramos determined that "a substantial variance . . . is appropriate because of the conditions under which she and her fellow detainees were being held at the Metropolitan Detention Center. A lot has been spoken in courts in this building and in reports in the press about the conditions of the MDC, the constant lockdowns, the inability to meet with attorneys or family. And like many of my colleagues, I believe that some level of leniency, some measure of leniency is appropriate, given that we are not able to detain individuals in a manner in which we know they ought to be held." Sentencing Transcript, *United States v. Dilkinska,* 17 Cr. 630 (ER) (S.D.N.Y. Apr. 3, 2024), ECF No. 654 at 21:22-22:6. Many other judges in the Southern and Eastern Districts have granted similar variances or other appropriate relief. *Colucci*, 2024 WL 3643857, at *2 (Since the COVID pandemic, "it has become routine for judges in both the Southern District and the Eastern District to give reduced sentences to defendants based on the conditions of confinement in the MDC." (internal quotations omitted)); *see, e.g. id.* at *7 (sentencing defendant to a term of imprisonment of nine months, unless BOP designates MDC as the relevant facility, in which case the term of incarceration is to be converted to a term of home confinement.); *Chavez*, 710 F. Supp. 3d at 236 (holding that "the conditions at the MDC constitute 'exceptional reasons' why detention of most defendants who do not pose a risk of flight or danger to the community, including [this defendant], 'would not be appropriate.'"); *Griffin*, 2024 WL 2891686 at *3 (granting compassionate release based on the violence and subsequent delay in receiving medical care the defendant experienced while incarcerated at MDC); *United States v. Santana*, No. 22 Cr. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) (adjusting sentence

downward by six months to account for defendant's incarceration at MDC and the severe conditions there that "amount to imposing harsher punishment on prisoners").

In sum, Ms. Wang's 19 months at the MDC (five months greater than the time Ms. Dilkinska spent awaiting sentencing) were particularly punitive and justify a "substantial variance" here.

## V. Ms. Wang Will Continue to Face Significant Consequences from Her Involvement in the Conspiracy

In addition to the punishments she has *already* faced because of her involvement with Mr. Guo and his entities, Ms. Wang will continue to suffer significant consequences, beyond the ordinary consequences of a felony conviction, likely for the rest of her life.

### A. Simply Because She is a Foreign National, Ms. Wang Faces More Severe Restrictions in BOP Custody than Similarly Situated U.S.-Citizen Inmates.

First, simply because she is a foreign national, and even though she was legally within the U.S., Ms. Wang will face significantly more onerous conditions of confinement than a similarly situated U.S. citizen. BOP regulations prohibit non-citizens like Ms. Wang from serving any portion of their sentence in a minimum-security prison camp (an FPC), a typical designation for "while collar" offenders.[22] Instead those regulations require she be assigned to at least a low security Federal Correctional Institution (an FCI). *See* BOP Program Statement 5100.08 at 50 (describing as a "deportable alien" as "a male or female inmate who is not a citizen of the United States," and requiring that such "inmate or long-term detainee shall be housed in at least a Low security level institution.").

---

[22] *See e.g.,* Madeline Halpert, *Elizabeth Holmes: Inside the routine at the Federal Prison Camp in Bryan, Texas*, BBC (May 30, 2023), https://www.bbc.com/news/world-us-canada-65625526 (describing conditions at FCP Bryan, Texas, where Elizabeth Holmes is incarcerated along with other inmates, "most of whom are serving time for non-violent offences and white-collar crime")

The conditions at a low security FCI are considerably more difficult and dangerous than an FCP. FCPs house inmates serving shorter sentences, who are generally well-behaved and have a much lower risk profile.[23] By contrast, FCIs often house inmates whose sentences are greater than 10 years and are the result of violent offenses such as gang-related activity, drugs or gun charges, or sex trafficking.[24] Additionally, FCIs are usually larger and suffer from problems of overcrowding.[25]

Judges in this district, and others, have long recognized the sentencing disparity that is created for non-citizens. Transcript, *United States v. Connolly*, No. 16 Cr. 370 (CM) (S.D.N.Y. Oct. 24, 2019) ECF No. 451 at 91:4-12 ("[B]ecause he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve. And that's not right."); Transcript, *United States v. Cohen*, No. 19 Cr. 741 (WHP) (S.D.N.Y. June 9, 2020) ECF No. 48 at 42:7-9 (acknowledging that "foreign nationals, unlike similarly situated U.S. citizens are unable to serve terms of imprisonment in a camp or minimum security facility," and imposing sentence of time served and home confinement).

Second, unlike a U.S. citizen, after her sentence Ms. Wang will go into ICE custody without bail until her immigration status is resolved. *See* 8 U.S.C. § 1226 (requiring detention of criminal

---

[23] A 2022 report from the Department of Justice showed that of 73,459 "prohibited acts" committed by inmates in 2021, 1.5% of those took place at a minimum security facility, while 16.9% occurred at a low security facility. U.S. DEP'T OF JUSTICE, FEDERAL PRISONER STATISTICS COLLECTED UNDER THE FIRST STEP ACT, 2022, at 7 (2022), https://bjs.ojp.gov/sites/g/files/xyckuh236/files/media/document/fpscfsa22.pdf

[24] See U.S. Gov't Accountability Off., GAO-12-743, *Bureau of Prisons: Growing Inmate Crowding Negatively Affects Inmates, Staff, and Infrastructure* 27, 51 (2012) (noting possibility of violence at low security facilities due to high gang presence).

[25] In 2011, low security institutions were at 37% over capacity, while minimum security camps were at just 14%. *Id.* at 52. Severe overcrowding has "negatively affected inmates housed in BOP institutions" and "contributed to inmate misconduct, which affects staff and inmate security and safety." *Id.* at 18.

aliens upon completion of their prison term). While ICE detention is technically "civil," it is also undoubtedly punitive, since Ms. Wang's placement there will result from her conviction, not from being in the U.S. unlawfully. Judges in this District have also recognized that disparate, punitive effect ICE detention has on foreign nationals as compared to U.S. citizens. Transcript, *United States v. Lewis*, 23 Cr. 370 (JGLC) (S.D.N.Y. Apr. 4, 2024), ECF No. 76 at 30:10-17 (imposing time-served sentence on billionaire who pled guilty to insider trading and noting that, "because Mr. Lewis is a noncitizen, he could not simply leave the country at the end of any prison term even though he is committed to leaving the country voluntarily. Instead, he would be released in the custody of ICE, and be placed in an ICE detention facility, which would not only increase his time in custody, it would almost certainly affect his ongoing medical treatment and medical care. In light of this, a variance is warranted.").

Moreover, ICE detention, much like the MDC, will be "hard time" for Ms. Wang. The Inspector General of ICE's parent agency, the Department of Homeland Security, described in 2019 how his team's inspection of ICE detention facilities revealed "immediate risks or egregious violations of detention standards," including "nooses in detainee cells, overly restrictive segregation, inadequate medical care, unreported security incidents, and significant food safety issues," including for example, "open packages of raw chicken" with "leaked blood all over refrigeration." *See* OFFICE OF THE INSPECTOR GENERAL, DEPARTMENT OF HOMELAND SECURITY, CONCERNS ABOUT ICE DETAINEE TREATMENT AND CARE AT FOUR DETENTION FACILITIES, at iii, 4 (June 3, 2019), https://www.oig.dhs.gov/sites/default/files/assets/2019-06/OIG-19-47-Jun19.pdf. The IG also observed "dilapidated and moldy" bathrooms in certain facilities. *Id.* at iii.

Third, if Ms. Wang is not able to stay in the United States, she will likely be deported to China, where she will likely face further imprisonment, and, potentially, execution. Given the

undisputed evidence at Mr. Guo's trial that the Chinese government sought to forcibly render Mr. Guo from the United States back to China, it is difficult to contemplate the fate that would befall Ms. Wang if she were returned to that country. The Court itself acknowledged at sidebar during the Guo trial that it was well-known that the Chinese government was "horrific, oppressive, authoritarian, totalitarian, [and] awful." Guo Trial Tr. 5045. Conditions in Chinese prison camps are incredibly harsh as prisoners, particularly political prisoners subject to torture and other inhumane treatment are often "subjected to punishments which amount to torture or cruel, inhuman or degrading treatment or punishment." *China: Heavy prison sentences for human rights activists 'disgraceful'*, AMNESTY INTERNATIONAL (Apr. 10, 2023) https://www.amnesty.org/en/latest/news/2023/04/china-heavy-prison-sentences-for-human-rights-activists-disgraceful/ (describing 12 and 14 year sentences imposed on human rights activists, who were "subjected to torture and other ill-treatment during detention, including long hours of interrogation and being bound to an iron 'tiger-chair' with their limbs contorted for more than 10 hours per day for many days"). As someone who ██████████████████████ ████, Ms. Wang is likely to face harsh consequences, as torture is "often used as an instrument of political repression against people considered to be a threat to the established order." *People's Republic of Fina Torture and ill-treatment*, AMNESTY INTERNATIONAL at 3(Apr. 1996), https://www.amnesty.org/en/wp-content/uploads/2021/06/asa170511996en.pdf. Sometimes these instances of torture end in death. One newspaper, the Henan Legal Daily, reported that during a two-year period, 41 prisoners had died from torture during interrogation in Henan province, citing instances where "victims were tied and hung up, had boiling water poured over them, were hit with bottles, burned with cigarettes, whipped with leather or plastic belts, or had electric prods placed on their genitals." *Id.* at 12.

*****

In short, even in a best-case scenario in which Ms. Wang is able to remain in the United States after her release, her conditions of confinement will be materially worse, and (given her transfer to ICE custody) her time in jail more lengthy, than a similarly situated U.S. citizen. And, in a worst-case scenario, in which she is deported to China, she potentially faces a "sentence" that has not been imposed on *any* defendant, for *any* crime, in this District in 70 years.[26]

### B. Ms. Wang Faces Significant Financial Penalties, Which Will Likely Last Well Beyond Any Time of Incarceration, But Which Far Outweigh any Personal Gain from the Offense

The financial penalties Ms. Wang faces as a result of her conviction—which far outweigh her non-existent personal gain—will also have a continuing, punitive effect on her going forward. Ms. Wang agreed to a forfeiture amount equal to "a sum of money equal to approximately $1.4 billion in United States currency." Plea Agreement at 2.

First, it is no question that the "approximately $1.4 billion" criminal forfeiture amount is punitive. *See United States v. Viloski*, 814 F.3d 104, 109 (2d Cir. 2016) (describing a forfeiture "linked to specific offenses," "imposed at the culmination of a criminal proceeding that required a conviction of the underlying felony," and it could not have been imposed upon an innocent party" as "fit[ting] easily within the definition of punitive forfeitures." (quotation omitted)). The punitive nature of the forfeiture here is made all the more clear because, after Ms. Wang's guilty plea, the government's trial expert accounted for only $1.3 billion in total funds that went into GTV, the Farm Loans program, G Clubs, and the Himalaya Exchange. *See* GX Z-26 at 1; Trial Tr. 4320:25-

---

[26] Benjamin Weiser and Lola Fadulu, *Terror Trial Could Yield Manhattan's First Death Penalty in 60 Years*, N.Y. TIMES (Feb. 12, 2023), https://www.nytimes.com/2023/02/12/nyregion/saipove-manhattan-death-penalty-trial.html (noting that the last federal execution in New York state, involving a defendant convicted in this District of killing an FBI agent, occurred in 1954).

32:7.[27] While a $100 million difference may not seem like much in the context of $1.4 billion, that amount (or even a portion of it) will have a real effect on Ms. Wang going forward, as discussed below.

Second, relatedly, if there is a shortfall between the specific property seized and the $1.4 (or $1.3) billion forfeiture amount, Ms. Wang is likely to be the only co-conspirator to be potentially available to satisfy a money judgment. Mr. Je, whose companies had *net* inflows $550 million—or ***over forty percent***—of the $1.3 billion, is believed to be comfortably in the Middle East, without any prospect of seeing the inside of a U.S. courtroom, much less being required to pay any forfeiture judgment. Mr. Guo, whose family offices and family members received net inflows of $100 million,[28] declared bankruptcy and faces numerous other creditors, in addition to a potentially lengthy sentence. Ms. Wang, who received a salary in the low- to mid-hundreds of thousands, is thus likely to be the one left holding the bag to satisfy a judgment of potentially hundreds of millions of dollars of substitute assets.

***

In short, regardless of the additional time she has to serve in jail, Ms. Wang will continue to be punished for this offense for the rest of her life. It is certain that her conditions of confinement will be worse, and longer, than similarly situated U.S. citizens. Her life post-confinement is less clear. But even in a best-case scenario, she is likely to be followed by a significant money judgment (and potentially the CCP) until the day she dies and isolated from her brother and son, who remain in China. In a worst-case scenario, she faces torture and potential execution in a Chinese prison.

---

[27] Further, as the trial evidence stated (i) much of the inflows to GTV were ultimately repaid to the Securities and Exchange Commission and (ii) approximately $150 million of the inflows to GTV came from Saraca's sale of is pre-existing GTV shares, *see* Guo Trial Tr. 5308-09 (denying government motion to strike).

[28] GX Z-26 at 34.

**VI.** <u>**Ms. Wang Has a Low Risk of Recidivism**</u>

Finally, a Guidelines sentence, or even a sentence approaching a Guidelines sentence, is not necessary for specific deterrence or to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B)-(C).

First, Ms. Wang carries a "████████████████████████████"[29] for her conduct and the events which have decimated the movement she was so devoted to. Her choices were made against the backdrop of persistent trauma, during a time where she relied entirely on her job and Mr. Guo's family for protection, support, and camaraderie. Wang Letter at 2-3.

Now, Ms. Wang is someone who has a growing sense of self-awareness, is remorseful and motivated to improve. Akinsulure-Smith Report at 15. As noted by Dr. Akinsulure-Smith, she has "███████████████████████████████████████████████████████████████." *Id.* at 2. Ms. Wang herself has expressed "███████████████████████████████" of the scheme and understands that the missed opportunities and losses they have suffered are "irreplaceable." Wang Letter at 3. Despite her past struggles, Ms. Wang is "resolute in [her] commitment to making amends and addressing [her] errors." *Id.*

Second, Ms. Wang spent four decades of her life as a productive, law-abiding member of society, which should give the Court confidence about the low risk of recidivism going forward. She became involved in this offense only in the context of ███████████████████████████████, the death of her father, a divorce by her husband, and a personal health crisis.

Third, to the extent anyone is concerned that her prior loyalty to Mr. Guo and his organization portends some risk of future misconduct, the reality is that Guo organization has been effectively decimated by a trifecta of Chinese government persecution, U.S. government

---

[29] Akinsulure-Smith Report at 2.

prosecution, and a sprawling bankruptcy case in which the trustee has spent literally tens of millions of dollars in fees hunting down its alleged assets. ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. A sentence substantially below the Guidelines range is sufficient to ensure any remaining necessary change.

**CONCLUSION**

For the reasons set forth above,  in particular Ms. Wang's history and characteristics around the time of the offense and the sentences imposed on defendants convicted of similar conduct, we respectfully submit that a sentence of less than 48 months is sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Dated: October 4, 2024                    Respectfully submitted,

                                          BAKER BOTTS LLP

                                          By: /s/ Brendan F. Quigley

                                          Brendan F. Quigley
                                          Sarah Reeves
                                          30 Rockefeller Plaza
                                          New York, N.Y. 10112
                                          (212 ) 408-2500
                                          brendan.quigley@bakerbotts.com

                                          *Attorneys for Yvette Wang*