UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

YANPING WANG,
   a/k/a "Yvette,"

               Defendant.

S4 23 Cr. 118 (AT)

## SENTENCING MEMORANDUM OF THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Micah F. Fergenson
Ryan B. Finkel
Justin R. Horton
Juliana N. Murray
Assistant United States Attorneys
   *Of Counsel*

**TABLE OF CONTENTS**

BACKGROUND ....................................................................................................... 1

   I. Offense Conduct .............................................................................................. 1

   II. Procedural History ......................................................................................... 7

      A. The Charges and Arrest............................................................................ 7

      B. The Plea Agreement ................................................................................ 8

      C. Probation's Sentencing Recommendation................................................ 10

A GUIDELINES SENTENCE OF 120 MONTHS IS NECESSARY AND APPROPRIATE .... 10

      A. Applicable Law ..................................................................................... 10

      B. The Nature, Circumstances, and Seriousness of the Offenses Warrant a Guidelines ...... 11

      Sentence ................................................................................................. 11

         *1. Wang's Offenses Caused Thousands of Innocent Victims to Lose More Than $1 Billion* ................................................................................................. 12

         *2. Wang Harmed the Chinese Pro-Democracy Movement* .............................. 13

         *3. Wang's Criminal Acts Occurred over a Period of Years* ........................... 14

         *4. Wang's Offenses Evolved and Adapted to Evade Law Enforcement* ........................... 14

         *5. Wang Was a Leader of the G|Enterprise and Obstructed Justice* ............................... 17

         *6. Wang Personally Controlled Millions That She Stole from Victims*............................ 18

      C. A Guidelines Sentence Is Necessary to Serve the Goals of Specific Deterrence and to Protect the Public ....................................................................................... 20

      D. A Guidelines Sentence Serves the Interests of General Deterrence ............................... 22

      E. The Defendant's History and Characterizes Do Not Warrant a Variance........................ 24

         *1. The Actions of the CCP Are Not a Mitigating Factor* .................................... 25

         *2. A Guidelines Sentence Would Not Create Unwarranted Sentencing Disparities* ........ 27

         *3. Any Immigration Consequences Are of Wang's Own Making*..................................... 29

CONCLUSION ...................................................................................................... 31

## PRELIMINARY STATEMENT

Yanping "Yvette" Wang, the defendant, was instrumental in carrying out a billion-dollar fraud scheme that injured thousands, obstructed justice, spurned regulatory enforcement, lasted for years, and harmed the so-called pro-democracy movement to which Wang claims to have devoted her life. The truth, which Wang seems unwilling to fully accept responsibility for, is that her actions took money from thousands of individuals who cared about democracy in China—and used that money to line Miles Guo's pockets as well as her own. Contrary to Wang's sentencing submission, Wang did benefit significantly from her crimes, which were not a momentary lapse of judgment or the result of life challenges. Every step of the way, over the course of at least five years, Wang was keenly aware she was not fighting against the Chinese Communist Party ("CCP")—she was causing deep pain for thousands. And even after she was criminally charged and arrested, Wang obstructed justice, exemplifying an utter disregard for the law and for the victims she harmed. This serious conduct is worthy of *at least* a Guidelines sentence. The substantial variance the defense seeks overlooks the harm Wang imposed on others, does not sufficiently deter her from future criminal conduct, sends an inappropriate message to others contemplating similar actions, and fails to protect the public from future harm at the hands of this defendant. For those reasons, and those that follow, this Court should impose a sentence of 120 months imprisonment.

## BACKGROUND

### I. Offense Conduct

In this pervasive, malicious conspiracy, Yvette Wang was Miles Guo's right hand. For at least five years, Miles Guo led—and Yvette Wang operated with managerial authority—a massive, global racketeering conspiracy to harness Guo's image as an democratic activist billionaire and

used it to steal more than a billion dollars from dedicated, trusting supporters around the world. (Presentence Investigation Report, dated August 8, 2024 (Dkt. 461) ("PSR") ¶ 10, 12). While Guo sat at the top of this criminal enterprise (the "G|Enterprise"), Wang maintained an important leadership role. In that capacity, Wang did the critical, and essential, work of ensuring that the G|Enterprise's wheels turned; that its dozens of "complex and largely fraudulent and fictitious businesses and investment opportunities" ran smoothly; and that its bank accounts stayed open and flush with fraud proceeds. (PSR ¶¶ 10-13). As Guo's lawyers told the jury on the opening day of his trial, Wang was his "head of operations" who "ran the day-to-day" of each of Guo's purported businesses. (Trial Tr. 42). Wang's formal titles underscored, but also understated, the breadth and centrality of her role in the G|Enterprise. She "operated as a 'chief of staff' for GUO's family's companies in the United States, as well as in various entities that were instrumentalities of the fraud." (PSR ¶ 18). But in other instances, she "exercised control over . . . other entities within the [G|] Enterprise, even where she had no formal position or title." (*Id.*). Indeed, conducting the criminal affairs of the vast G|Enterprise was Wang's full-time job, for which she received a salary funded by fraud proceeds and an allocation of millions of dollars of a purported cryptocurrency "funded by victim money" (PSR ¶ 14)—millions of dollars she was destined to collect if not for the intervention of the FBI and her arrest.

Wang's guilty plea allocution was focused mainly on one component of her criminal conduct: Wang's conduct relating to the GTV Private Placement: specifically, the June 2020 misappropriation and laundering of $100 million of victims' money into a risky hedge-fund investment for the benefit of Miles Guo's son (the "Hedge Fund Misappropriation"). (PSR ¶¶ 1-5, 73). But the scope of Wang's conduct far exceeds the Hedge Fund Misappropriation scheme. Her key role in the G|Enterprise began long before the Hedge Fund Misappropriation. Indeed,

2

Wang played an important role in the various schemes of the G|Enterprise: the Rule of Law Charities, GTV Private Placement, Farm Loan Program, G|CLUBS, and the Himalaya Exchange.

A.    The Rule of Law Charities

In the years before June 2020, Wang's operational duties extended to supporting Miles Guo's use of his phony philanthropic Rule of Law charitable organizations that were used to deceive their donors and misappropriate their funds.  As former close Guo aide Karin Maistrello testified, Wang directed a scheme to transfer funds from various Guo business accounts to the Rule of Law organizations' accounts in order to create the false appearance of more and larger donations to Rule of Law.  (*See* Trial Tr. 473-74).  Later, Wang directed Maistrello to write a letter to the New York City Police Department ("NYPD") through which Guo himself would be given credit for an NYPD donation made with Rule of Law donors' funds.  (*See id.* 481).  Wang exacted her leadership and quieted the aide's objections by telling her that she "was being paid to execute orders and not to think."  (*Id.*).

B.    The GTV Private Placement

Wang's June 2020 misconduct at the center of the GTV Private Placement scheme and Hedge Fund Misappropriation reflected the critical services she provided to the G|Enterprise more generally.  In July 2018—nearly two years before the Hedge Fund Misappropriation in June 2020—Wang opened and served as the signatory for two bank accounts held for Saraca, (PSR ¶¶ 47-49), the Guo Enterprise entity that was ultimately owned by Miles Guo's son, Mileson Guo (P*Id.* ¶ 47-49).  In April and May of 2020, those accounts—with Wang as the sole authorized signatory—received more than $300 million in defrauded victims' purported investments in GTV. (*Id.* ¶¶ 48-41).  The fraudulent GTV stock offering's Private Placement Memorandum ("PPM")— issued just earlier in April 2020—identified Wang to investors as GTV's executive director.  (*Id.*

¶ 25).  On June 3, 2020—just after the Saraca accounts under Wang's control received more than $300 million in victims' money—Wang executed the subscription agreement by which $100 million of those victims' funds were to be invested in a high-risk hedge fund, (*id.* ¶¶ 52), for the benefit of Saraca's sole beneficial owner, Miles Guo's son.  That same day, Wang personally used her online banking account to transfer the same $100 million from one Saraca bank account (where it had been received for the purported purpose of investment in GTV) to another Saraca bank account (which, prior to that transfer, had a $0 balance).  (*Id.* ¶ 53).  And two days later, Wang transferred the $100 million of victims' investment funds over to the hedge fund.  (*Id.* ¶ 54).  As Wang allocuted, she "knew these funds had been received from investors in the GTV offering," and "had concerns based on what I knew about representations [to] GTV investors, that this use of funds was improper," but she "made the wire transfer anyway."  (*Id.* ¶ 73).  Indeed, Wang not only knew that the GTV PPM promised investors that their funds would be used solely "to develop and grow that business," (*id.* ¶¶ 26-27), but she made a personal representation about the same limited purpose of GTV investor funds when transferring GTV private placement proceeds into a fresh set of bank accounts in July 2020.  (*See id.* ¶¶ 59-61 (Wang's representation to a bank that "[t]he funds in the account are funds of GTV Media Group and are strictly for operational purposes and acquisitions")).  Wang's own false representation about the limited use of GTV investors' funds came in the course of her efforts, in June and July 2020, to move the GTV private placement's proceeds into accounts to avoid bank-account closures and facilitate future criminal transfers—including nearly $31,000 that she caused to be wired to a personal bank account as a purported "director fee."  (*Id.* ¶¶ 55-61).

C.  <u>The Farm Loan Program</u>

As the G|Enterprise's fraud schemes continued, Wang continued to play a critical operational role at their center.  After "domestic banks that held accounts used to process the funds raised through the GTV Private Placement began to freeze and close GTV associated bank accounts," (PSR ¶ 31), Guo—with Wang's operational support—promoted a scheme through which "individuals seeking to invest (or reinvest) in GTV could participate in the Farm Loan Program" (*id.*). "Thousands of victims 'loaned' money to the Farms by sending money to bank accounts controlled by the Farms (and not GTV)." (*Id.* ¶ 32). When "Guo and Je misappropriated funds that were raised through the Farm Loan Program," (*id.* ¶ 33), it was with Wang's operational and executive support.  "Mulan"—a former Guo supporter and Farm leader—funneled millions of supporter dollars to an Abu Dhabi bank account under Guo's control at Wang's direction. (*See* Trial Tr. 1389 ("Q: Did you coordinate with Guo directly? A: No, is through Yvette Wang. Q: And why did you coordinate with Yvette Wang on that? A: Miles Guo say Yvette Wang will tell me how to do it.")).

D.  <u>G|CLUBS</u>

Around the same time, "GUO, JE, and WANG" began to "use[] G CLUBS"—the "purported online membership club"—"as a mechanism to continue fraudulent stock offerings." (PSR ¶ 34-37).  Wang's role was, once again, critical.  She hired and supervised G|CLUBS's figurehead CEO, Limarie Reyes.  (Trial Tr. 2976, 2983).  Indeed, in her leadership role, Wang ordered that the advice of a G|CLUBS's lawyer be disregarded and directed the entity's figurehead CEO to transfer $5 million, telling the CEO that it would be the CEO's "fault if something went wrong." (*Id.* 2994).  It was also Wang who gave the command to G|CLUBS's nominal CEO and in-house counsel to set up multiple memberships—that is, to solicit additional money from

G|Enterprise victims under the premise that holders of multiple G|CLUBS memberships would be entitled to additional GTV stock. (*See, e.g.*, Trial Tr. 5920). And in connection with the G|CLUBS scheme, Wang—working with a banker whom she had hired to serve the G|Enterprise—created a shell company whose original purpose was to create a U.S. financial institution to serve the G|Enterprise, but whose ultimate purpose was to receive and launder defrauded investors' funds. (*See* Trial Tr. 1999-2001).

    E.  Himalaya Exchange

When the locus of the G|Enterprise fraud schemes broadened to include the Himalaya Exchange and its purported cryptocurrencies, Wang continued to be instrumental. She hired the Exchange's nominal CEO, Jesse Brown, (*see* Trial Tr. 3638), who testified that Wang later called him "to push along our development," and to convey that "they"—that is, the G|Enterprise, as voiced by Wang—"were getting very frustrated that we weren't delivering on time" (*id.* 3727). One metric of Wang's contribution to the Himalaya Exchange fraud was her personal allocation of Himalaya Coin: as a document found in her apartment reflected, Wang was allocated nearly 7 million Himalaya Coins at a price of $0.10, a value that was later dwarfed by the purported $27-per-coin price that the Exchange quoted potential investors after its launch. (*See* GXWA68; Trial Tr. 3679-80 (Exchange CEO's testimony that Himalaya Coin's price "popped . . . from 10 cents to a dollar . . . and it later went to $20 in 14 days")).

    F.  Obstruction of Justice

Wang's offense conduct also includes efforts to obstruct justice in further service of the G|Enterprise. (*See* PSR ¶ 5(g) (stipulation to application of obstruction enhancement)). Chats from Wang's devices showed evidence that she suborned perjury in Miles Guo's bankruptcy proceedings. (*See* Dkt. 255 at 11 and Exs. D-G). In Signal chats to Guo's daughter, Mei, Wang

coached Mei Guo on how to falsely claim to both her attorneys and later in perjurious testimony that Miles Guo's yacht in fact belonged to her. (*See id.*). And after her arrest and while in custody in this case, Wang used prior counsel to ferry her requests to retrieve bank checks consisting of millions of dollars of G|CLUBS funds—that is, fraud proceeds. (*See id.* at 11).

## II. Procedural History

### A. The Charges and Arrest

On March 15, 2023, Wang was arrested at her Manhattan apartment on Criminal Complaint 23 Mag. 2007 (GWG), charging her with conspiracy to commit wire and securities fraud, in violation of 18 U.S.C. § 371; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; securities fraud, in violation of 15 U.S.C. §§ 78j(b) & 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2; and money laundering, in violation of 18 U.S.C. §§ 1957 and 2. On March 29, 2023, Superseding Indictment S1 23 Cr. 118 (AT), was filed, charging Kwok, Je, and Wang in various counts for their alleged participation in the fraud and money laundering conduct described therein. (Dkt. 19.)

The same day of her arrest, the FBI conducted a judicially authorized search of Wang's apartment. During that search, the FBI recovered bulk U.S. and foreign currency from inside a safe; specifically, more than approximately $138,000 in U.S. currency, approximately £3,000, approximately 1180 Hong Kong dollars, and approximately 600 Chinese Yuan. Additional items inside the safe included expired foreign passports for both Wang and Kwok from Vanuatu[1] and

---

[1] Vanuatu is a small island nation in the South Pacific. It has been publicly reported that Vanuatu permits foreign nationals to acquire Vanuatu citizenship in exchange for investments in the country. *See* "Citizenship for sale: fugitives, politicians and disgraced businesspeople buying Vanuatu passports," The Guardian, dated July 14, 2021 (available at https://www.theguardian.com/world/2021/jul/15/citizenship-for-sale-fugitives-politicians-and-disgraced-businesspeople-buying-vanuatu-passports). Wang obtained this passport after fleeing China. (*See* Dkt. 22.)

China.  (Dkt. 56, Lehr. Op. 3-4).  The FBI recovered approximately 12 cellphones, two computers, and more than 25 USB flash drives from Wang's apartment.  The FBI also recovered a variety of Hermes fashion items.

Also on March 15, 2023, the FBI arrested Miles Guo, and the FBI conducted judicially authorized searches of three of his residences—his Manhattan penthouse apartment, his Greenwich, Connecticut residence, and his Mahwah, New Jersey mansion.  During those searches, the FBI recovered, among other things, dozens of electronic devices, more than approximately $394,000 in U.S. currency, evidence of Kwok's foreign travel documents, and luxury vehicles that had been purchased with fraud proceeds.  On the same day Wang and Kwok were arrested, U.K. law enforcement attempted to arrest William Je in London and executed a judicially authorized search of Je's London residence.  Je was not home nor was he in the United Kingdom at the time. Since March 15, 2023, Je has not returned to the United Kingdom and remains a fugitive abroad.

On January 3, 2024, a second superseding indictment was filed, charging Wang, Guo and Je with, *inter alia*, engaging in a racketeering conspiracy named in that Indictment as the "Kwok Enterprise" (*i.e.*, the G|Enterprise).

The foregoing charges were the product of a years-long investigation by the FBI that included, among other things, subpoenas sent to entities for which Wang "worked."  This is to say that Wang was long aware of the U.S. Government's investigation (as well investigatory efforts by the Securities and Exchange Commission) but nonetheless continued to participate in criminal conduct until the FBI arrested her.

B.  The Plea Agreement

On May 3, 2024, Wang pleaded guilty, pursuant to a plea agreement, to Superseding Information S4 23 Cr. 118 (AT) (the "Superseding Information"), which charged her in two counts

with participating in a wire fraud conspiracy and a money laundering conspiracy, each in violation of 18 U.S.C. § 371. Count One of the Superseding Information, to which Wang pleaded, charged her with participating in a fraud scheme to raise money through entities including GTV Media Group, Inc., the Himalaya Farm Alliance, G CLUBS, and the Himalaya Exchange from 2018 through May 2023.

Under the terms of the plea agreement, Wang agreed to forfeit $1.4 billion dollars, which represents proceeds traceable to the offenses. The plea agreement further contains a Guidelines stipulation pursuant to which Wang agreed that, for Guidelines purposes, the applicable loss amount exceeds $550,000,000, the defendant purported to act on behalf of a charitable or political organization, the defendant relocated fraud proceeds to another jurisdiction to avoid detection, the offense involved sophisticated means, the defendant was a "manager or supervisor" of the criminal activity, and the defendant obstructed justice with respect to the investigation or prosecution of the offenses of conviction.

Wang further agreed that the applicable Guidelines offense level is 43, which with a criminal history category of I, equates to a sentencing range of life; however, pursuant to U.S.S.G. § 5G1.1(a), because the statutory maximum is 120 months, which is less than life, the applicable Guidelines range is 120 months.

On May 3, 2024, during her plea allocution, Wang stated that in June 2020 she wired $100 million dollars raised through the GTV stock offering to a hedge fund. Wang stated that she knew that using the money for that purpose was improper based on representations made to investors. Notably, during Wang's guilty plea proceeding, Wang interacted with the Court without the assistance of a Mandarin language interpreter, and stated affirmatively and repeatedly that she understood her rights as explained by the Court.

9

C. Probation's Sentencing Recommendation

The PSR similarly calculates an applicable offense level of 43 and a criminal history category of I. After reviewing Wang's personal circumstances, interviewing Wang, and considering the offense conduct, the Probation department recommended that Wang be sentenced to 120 months imprisonment. (PSR at 46). Probation noted that the criminal conduct "resulted in astronomical losses totaling more than $1 billion to thousands of victims" and that Wang "played a pivotal role" in that conduct. (*Id.* at 48). The Probation department further assessed that absent her plea agreement, Wang would be facing "a life sentence under the guidelines due to the extraordinary losses caused by the offense." (*Id.*). Probation also was mindful of Wang's personal circumstances, including her claims of suffering "at the hands of the CCP [Chinese Communist Party]." (*Id.*). On balance, however, Probation "do[es] not believe that these personal history and characteristics of the defendant outweigh the need for punishment and deterrence in this case." (*Id.*).

**A GUIDELINES SENTENCE OF 120 MONTHS IS NECESSARY AND APPROPRIATE**

A. Applicable Law

While advisory following *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines remain "the starting point and the initial benchmark" for sentencing. *Gall v. United States*, 552 U.S. 38, 49 (2007). That is because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id.* at 46. For that reason, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances." *United States v. Fernandez*, 443 F.3d 19, 27 (2d Cir. 2006).

In imposing a sentence, the Court must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims."   18 U.S.C. § 3553(a)(l)–(7).  *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)     to afford adequate deterrence to criminal conduct;
(C)     to protect the public from further crimes of the defendant;
(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

B.   The Nature, Circumstances, and Seriousness of the Offenses Warrant a Guidelines Sentence

As to the offense conduct, as the Court well knows, the G|Enterprise operated an egregious, escalating fraud that stole over a billion dollars from thousands of victims worldwide.  Wang helped manage and run the companies that were created and operated for the express purpose of perpetrating the fraud, and she played a critical role in the laundering of hundreds of millions of dollars in fraud proceeds through a complicated web of hundreds of bank accounts held in the names of dozens of entities.  Wang was Guo's trusted associate and an essential member of Guo's inner circle who was involved in the G|Enterprise from its inception.

It is difficult to capture the scope and magnitude of Wang's offenses. Indeed, there are few fraud crimes as serious as the ones that Wang has committed. Wang was involved in a scheme of astounding scale—playing a managerial role, and serving as a member of the inner-circle of a literal enterprise of fraud. The nature and seriousness of her conduct itself warrants the imposition of a Guidelines sentence.

The severity of the conduct is best explained by the magnitude of the financial loss incurred, the staggering number of victims harmed, the geographic reach of the offense, the fact that Wang intentionally hurt the democratic movement she claimed to support, the length of Wang's involvement, the sophisticated nature in which these offenses were committed, Wang's leadership in the conspiracy, Wang's obstruction, and her personal financial benefit. Wang, through her submission, fails to address and accept responsibility for the immense magnitude of harm she caused, the thousands of victims who suffered because of her conduct, and the unparalleled breadth of her crimes.

1. _Wang's Offenses Caused Thousands of Innocent Victims to Lose More Than $1 Billion_

The level of financial loss Wang helped cause is staggering. It is rare for a fraud case to cause harm exceeding a billion dollars. And when that has occurred, the loss often stems from corporate malfeasance, such as accounting fraud that causes the collapse of a stock price. The astronomical loss here was caused by theft. Guo told lies to take a billion dollars from victims, and Wang helped him every step of the way.

While the billion-dollar loss figure is enormous on a macrolevel, it is important to appreciate the harm inflicted on an individual level as well. As victims recounted during Guo's trial, they lost retirement savings, incurred debt, and suffered deeply because of this fraud. Indeed,

the FBI interviewed dozens upon dozens of victims who recounted the sometimes-excruciating losses they suffered—but many were afraid to speak publicly, for fear of retribution by Guo, Wang, and their remaining supporters.  The victims in this case were individuals who saw Guo and Wang's schemes in the way they were marketed—as a grand opportunity to become rich.  That, as Wang well knew, was a colossal lie (or, more precisely, a torrent of lies).  Wang is responsible for this harm to thousands of individuals and families who suffered because of her actions.

The seriousness of Wang's offenses also is exemplified by the geographic reach of the scheme.  The scheme, and Wang's involvement in it, literally spanned the globe.  Victims could be found in nearly every corner of the earth, and throughout the United States.  The operations of the fraud were also global in scale, with companies, entities, and bank accounts in an array of jurisdictions including the British Virgin Islands, Australia, Switzerland, the United Arab Emirates, and Kyrgyzstan.

### 2. *Wang Harmed the Chinese Pro-Democracy Movement*

Beyond the financial harm she inflicted, Wang was a critical part of something even more malicious.  The G|Enterprise targeted a specific group of victims—typically members of the Chinese diaspora who sought to promote democracy in China.  Guo, with Wang's help, promoted himself as a "freedom fighter" who would eradicate the Chinese Communist Party.  But Guo's actions did nothing to promote the ideals he espoused.  Rather, and as Wang well understood, Guo drew his victims in by professing to fight on their behalf for these lofty goals of democracy, but all he did was collect, and spend, their money on himself and his family.  The disturbing reality is that Guo and Wang did not strengthen a pro-democracy movement—they kneecapped it.  Guo, with Wang's remarkable management skills, erected an empire of fraud that sucked money from those who actually desired a democratic China.  Far from supporting a fight against the Chinese

13

Communist Party, Guo and Wang extracted their followers' finances, drained the movement's resources, and violated their victims' trust. In so doing, Guo and Wang actually hurt the pro-democracy movement and, therefore, advanced the goals of who they claimed was their biggest threat: the CCP. That is the sinister reality of this fraud.

### 3. Wang's Criminal Acts Occurred over a Period of Years

Wang was involved in the G|Enterprise enterprise from its inception in 2018 through her March 2023 arrest—and for months after that. She participated in, and helped manage, the fluid nature of the G|Enterprise's operations, all of which were designed to evade regulatory and law enforcement detection. Wang's involvement to that degree and for such a prolonged length of time further underscores the seriousness of her offenses. Her involvement was not due to a moment of poor judgement, an innocent mistake, or a bad choice due to momentary financial stress—it was the result of a series of decisions that took place over five years. In her sentencing submission, Wang contends that her involvement was caused, in part, by "a series of deep personal crises." (Def. Mem. at 1). Even if that is true, there can be no excuse for continuing to engage in deliberate criminal acts for *five* years—indeed, even after Wang was arrested and incarcerated in this case. Thus, the length of Wang's involvement is very much an aggregating factor when fashioning an appropriate sentence.

### 4. Wang's Offenses Evolved and Adapted to Evade Law Enforcement

The Court should consider not only the length of Wang's involvement and the insidious nature of her crimes themselves, but also the manner in which Wang and her co-conspirators continually adapted and evolved the scheme to keep it alive—and beyond the reach of law enforcement and regulators. After establishing the fraudulent purported dual charities (the Rule of Law Society and the Rule of Law Foundation) in April 2020, the G|Enterprise raised money in

14

connection with the fraudulent offering of GTV stock.  Given that this offering was not registered with the Securities and Exchange Commission, investors were required to meet a series of requirements to ensure they were qualified to participate.  Guo, Wang, and others flouted those requirements and pooled victim money from unqualified investors, through vehicles such as Voice of Guo (*i.e.*, VOG, the company that former Phoenix Farm leader Sara Wei ran at Guo's direction, as described during trial).  The SEC investigated the offering, put a stop to it, and ultimately entered into an agreement in which the money raised (to the extent it was not unlawfully spent) would be redistributed to investors.  Of course, the money the G|Enterprise raised in the GTV Private Placement was not for GTV—it was for Guo and his family.  Wang knew this, as she was responsible for moving $100 million of investor money to Hayman Capital Management, a hedge fund, which money was invested in a high-risk investment in the name of Guo's son.  Like she often did, Wang handled the logistics of that investment and was responsible for first conducting a transfer of that $100 million to conceal its true source.  There can be no doubt that, at the time, Wang was well aware of the wrongness of her actions; indeed, she confessed as much during her allocution.[2]

But Wang's involvement did not end in 2020.  Indeed, after the GTV component of the conspiracy lost $30 million of victim funds, and after it drew regulatory attention, the conspiracy adapted.  This time, it used "Farm Loans"—as opposed to direct sales of stock—to sell shares in GTV.  That money was routed through a complex web of sophisticated monetary transactions before being funneled back to the Guo family.  Then the G|Enterprise changed tactics again.  This

---

[2] Wang Plea Tr. at 25-26 ("In about June 2020, I was directed by others to wire approximately 100 million U.S. dollars from a bank account in New York to Hayman Capital Management, a hedge fund in Texas.  I knew these funds had been received from investors in the GTV offering. . . .   I knew what I was doing was wrong.")

time it sold GTV (and other Guo-linked entities') shares through the guise of memberships in G|CLUBS. But G|CLUBS money was not used to fund a media company, or even to fund any real member benefits. Rather, G|CLUBS money was used to purchase luxury assets, fancy sports cars, and a literal mansion for the Guo family. Wang was deeply involved in G|CLUBS and acted as its *de facto* CEO. She directed million-dollar money transfers, million-dollar luxury purchases, and all the time knew this membership club was no more than a smoke screen to conceal the same fraud tricks as the GTV private placement and the Farm Loan Program—an offering of GTV stock. But when G|CLUBS and the G|Enterprise ran into banking difficulties, the G|Enterprise engineered yet another solution: a fake cryptocurrency called H-Coin and H-Dollar. In service of those phony cryptocurrencies, Wang helped set up the Himalaya Exchange, which operated both as a fraud scheme and a money laundering operation to draw victim money into "cryptocurrency" that Guo and the G|Enterprise fully controlled.

In September and October 2022, after the U.S. Government seized $630 million from the G|Enterprise, including hundreds of millions from accounts linked to the Himalaya Exchange, the conspiracy adapted yet *again*; this time, with the launch of "A10" and "A15," schemes that collected money by claiming to sell stock in Gettr, G|CLUBS, and other Guo-linked entities. Except this money, this time, was to be sent to the Middle East to place it beyond the reach of the U.S. Government. Wang played a key role in transitioning the G|Enterprise's operations to the United Arab Emirates, including by designating which New York G|CLUBS and other G|Enterprise "employees" should travel to Abu Dhabi to help establish operations of a Middle East-based G|CLUBS and the Himalaya Exchange.

In March 2023, Wang was arrested, but her involvement in the G|Enterprise continued. She attempted to engineer, through her then-attorneys, to have a G|CLUBS employee collected

approximately $7 million of G|CLUBS proceeds from a P.O. Box in midtown Manhattan. The sophisticated tactics that Wang and her co-conspirators employed over the course of this five-year racketeering conspiracy highlight the severity of Wang's criminal acts. All of which are collectively worthy of a Guidelines sentence.

5.  *Wang Was a Leader of the G|Enterprise and Obstructed Justice*

Wang—as she has stipulated—played a managerial role in this sweeping conspiracy. She was not a foot solider or a messenger. Wang was instrumental in organizing the scheme, hiring its personnel, making financial decisions, and directing some of its attorneys and financial experts. Of course, Wang was a subordinate to Miles Guo, but aside from Guo, Wang often had absolute authority. Take, for example, G|CLUBS. Wang directed the figurehead CEO Limarie Reyes on a near-daily basis. Reyes took direction from Wang or from others reporting to Wang. Indeed, it was Wang who informed G|CLUBS that it needed to offer "multiple" memberships (a way to increase the amount of money it could collect from each member-victim). It was Wang who hired those in the G|Enterprise's New York City offices, and controlled entities such as HCHK to carry out the fraud. It was Wang who kept meticulous notes on the directions she gave others, serving as the organizer and manager of dozens of participants. Indeed, returns from the search warrant executed on Wang's apartment include dozens of daily planners from each year of the conspiracy containing extensive notes covering all corners of the G|Enterprise.

Wang's obstruction also deserves reflection. Not only did Wang help lead the conspiracy's evolution to avoid intervention of law enforcement, she personally took steps to obstruct. To start, and as documented by a series of text and voice messages, Wang directed Guo's daughter to lie in a deposition to Guo's Bankruptcy trustee. This was part of an effort to conceal G|Enterprise assets from the Bankruptcy trustee, and it demonstrates a contempt on Wang's part for the American

17

judicial system and due process.  Moreover, after she was arrested in this case, Wang attempted to obtain millions of G|CLUBS member fees (*i.e.*, victim proceeds) by asking her then-attorneys to ask G|CLUBS "employees" to arrange to pick up a check from a P.O. box.  Despite stipulating to the obstruction enhancement, Wang's sentencing submission contends that these conversations— which are recorded—are "confused."  They are not.  G|CLUBS employees whom Wang directed (both prior and after her arrest) were clear in the recorded conversations  that *Wang* had asked her attorneys to contact them to retrieve the checks.  Wang's sentencing submission tries to excuse this criminal conduct, arguing that "Wang was not charged with any substantive crime relating to G Clubs" at that time, which is both a surprising statement and belied by the clear facts.  (Def. Mem. at 11.)  At the time, G|CLUBS was described as part of the conspiracy in Indictment S1, in which Wang was a charged defendant.  More to the point, Wang knew by the time of her arrest (and long before it) that G|CLUBS was not providing members with stock, nor was it providing any tangible member benefits.  Indeed, Wang was the *de facto* CEO of G|CLUBS.  That she sought to obtain G|CLUBS funds, after her arrest, constitutes obstruction of justice and establishes that she continued to try to convert victim money to the benefit of the G|Enterprise even after she was arrested.  Wang's obstructive conduct underscores her lack of remorse and complete disregard for the law and for the victims she harmed.

### 6. *Wang Personally Controlled Millions That She Stole from Victims*

Wang argues that she did not significantly financially benefit from the offense, and a lower sentence is therefore warranted.  (Def. Mem. at 12-14).  Wang is factually incorrect.  First, a document recovered from Wang's apartment during the investigation reflects that 6,999,800 Himalaya Coins (HCN) were allocated to Wang at the initial coin offering price of $.10 per HCN. (Dkt. 42.)  A separate document recovered from Wang's apartment, which was entitled "Himalaya

Coin Distribution Table at launch on 1 November 2021," reflects the distribution of certain of the "HCN (in US dollar terms)," including $700,000 to Wang. (*Id.*). Wang was set to receive this cash, and most likely cash out the HCN allocated to her for millions more. It is true, as the defense now argues, that HCN is a worthless crypto but the fraud scheme was designed to lure victims into sending money to purchase HCN. Once real dollars entered Himalaya Exchange accounts, those that the conspiracy wanted to benefit—*i.e.* Wang, Guo and Je—could them "redeem" their allocated HCN and obtain victim-provided fiat currency. Indeed, Guo did as much when he obtained a $37 million dollar loan to avoid criminal contempt in New York State Court, and Je attempted to do as much when the Government seized Himalaya Exchange bank accounts. Wang would have certainly followed that path, and personally collected millions from victims if not for the intervention of U.S. law enforcement. Thus, Wang stood to collect several million dollars of victim money for her work in the G|Enterprise.

In addition, at least approximately $34 million in victim funds were maintained in bank accounts held in the name of entities under *Wang's* management or control. Wang also had approximately $138,000 in U.S. currency and additional foreign currency secured in a safe in her apartment at the time of her arrest—a fact she concealed from Pretrial Services. (Dkt. 42).

Wang contends that her annual salary of approximately $231,900 to $313,961 was the only benefit she received from her participation in the fraud scheme, and that she validly earned that salary "for a job she actually performed." (Def. Mem. at 14). This argument is entirely misguided, because the sole purpose of her "job" for the various G|Enterprise entities—companies that are all members of a racketeering enterprise—was to raise, launder, and misappropriate hundreds of millions of dollars in fraud scheme proceeds. Wang cannot credibly argue that she did not

19

materially benefit from the fraud because she "only" took home a salary of a quarter of a million dollars for her years-long criminal activity. The Court should dismiss that argument out of hand.

C.    A Guidelines Sentence Is Necessary to Serve the Goals of Specific Deterrence and to Protect the Public

Under Section 3553(a), the need for the sentence to "protect the public from further crimes of the defendant" and "afford adequate deterrence to criminal conduct" must be considered. 18 U.S.C. § 3553(a)(2)(B), (C). Here, a Guidelines sentence of 120 months is necessary to serve these purposes.

The risk of recidivism here is substantial.  First, as the defense concedes, the personal circumstances that Wang cites as the reasons she engaged in the offense conduct in the first place and then continued to commit crimes—the CCP's targeting of Wang, her forced separation from her family, her personal trauma, and her lack of permanent status in the U.S. and lack of social connections here—will be unchanged after she serves her term of imprisonment, or even exacerbated.  (*See generally* Def. Mem. at 1-10, 17).  The Government can derive no comfort that Wang will not return to fraud when she is released from prison.

Second, Wang's extensive and long-running participation in the G|Enterprise fraud scheme demonstrates that she is undeterred from committing crimes.  Indeed, neither the immense pain she caused to thousands of victims, nor the  possibility of prison deterred her from committing crimes.  As Wang's allocution makes plain, she understood she was in a criminal conspiracy as early as June 2020.  *She still maintained her commitment to the criminal enterprise for the next five years.*  And in or around the spring of 2020, as executive director of GTV, Wang also knew the SEC was investigating the stock offering and ultimately disgorged the proceeds GTV raised. The intervention of civil regulatory authorities did not cause Wang to seek lawful work elsewhere. Indeed, and critically, Wang continued to perpetrate the fraud and steal money from victims for at

least more than a year *after* she became aware of the Government's *criminal* investigation. Wang personally received the Government's subpoenas to G|CLUBS and other G|Enterprise entities; she sent text messages referencing several of the undersigned prosecutors in this case; she directed an employee not to assist in the Government's investigation; and she did so all while continuing to operate the G|Enterprise entities that took in victim funds, launder fraud proceeds, and assist in the misappropriation of those funds.

Third, and perhaps most troubling, even after she was arrested and incarcerated in this case, she still engaged in obstructive conduct and took active steps to frustrate the Government's investigation and shield fraud proceeds from the Government. (*See* Dkt. 255 at 11; Def. Mem. at 11 n.5). Wang's effort to explain away this defiant behavior and blatant disrespect for the law is entirely unavailing. Regardless of whether the checks were from closed bank accounts or directly from individual victim-investors, the *source* of the $7 million in  was the G|CLUBS fraud scheme that Wang operated. And Wang's minimization of her obstructive conduct as a purportedly innocent attempt to "take steps to assist certain entities in continuing to carry out their obligations to remaining employees and others" entirely ignores that the express purpose of those entities and their operations was to continue the fraud scheme. As the *de facto* CEO Wang plainly understood that. The Court should approach Wang's excuse for her conduct with skepticism and recognize her actions for exactly what they were: a disrespect for the law and an indication that Wang has not been deterred.

Also, the fact that a past fraud does not necessarily deter a future one is evidenced by the number of first-time fraudsters in this district who have become recidivists. *See, e.g., United States v. Jonathan Ghertler*, No. 23 Cr. 100 (ER) (investment fraud scheme following over a dozen prior convictions); *United States v. Franklin Ray*, No. 22 Cr. 228 (AT) (orchestrating a Ponzi scheme

after having served a prior two-year sentence for bank and wire fraud); *United States v. Vitaly Borker*, No. 22 Cr. 273 (JSR) (defendant convicted of wire fraud for operation of fraudulent eyeglasses website after two prior federal convictions for the same conduct); *United States v. Joseph Meli*, No. 19 Cr. 480 (RA) (defendant convicted of participating in a Broadway ticket resale investment fraud scheme after previously serving a 78 month sentence for the same scheme); *United States v. Edward Durante*, No. 15 Cr. 171 (ALC) (beginning a new investment fraud scheme while serving a 121 month sentence for fraud); *United States v. John Galanis*, No. 15 Cr. 643 (PKC) (defendant convicted of securities fraud after 1973 and 1988 convictions for mail fraud and securities fraud).

That Wang was unwilling to stop her criminal conduct despite her years-long involvement in it, as well as knowledge of civil and criminal investigations, raises another important consideration for the Court: protection of the public. While some of Guo's supporters have realized the criminal scheme for what it is, others continue to move forward and, in some cases, raise money in similar ways. If not incapacitated, Wang is likely to return to that work and continue to commit crimes upon her release. Indeed, letters submitted by Wang in support of a sentencing variance come from individuals who were, and likely still are, close to Guo and remain devoted followers. Given Wang's willingness to continue criminal conduct unabated for years, a significant sentence is necessary to protect the public and the vulnerable victim population that Wang targeted and exploited from future harm.

D.  A Guidelines Sentence Serves the Interests of General Deterrence

A Guidelines Sentence is also necessary in this case to afford adequate general deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2)(B). "Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and

22

punish, since both attributes go to increase the expedited benefits of a crime and hence the punishment required to deter it." *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994); *see also United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." (quotation marks and citation omitted)); *United States v. Mueffelman*, 470 F.3d 33, 40 (1st Cir. 2006) (deterrence of white-collar crime is "of central concern to Congress").

General deterrence is critically important in this case given the magnitude of the fraud and in order to send an appropriate message to those who obstruct regulatory authorities and the judicial process. Hiding behind corporate forms, shell entities, and foreign accounts, and concealing criminal conduct demand a sentence that signals clearly that those who take steps to violate the laws, hide their crimes, and hurt others over a period of years will face significant and serious penalties. A sentence for Wang that is below the Guidelines would not sufficiently discourage others similarly situated committing similar crimes.

The need for general deterrence is heightened here where, to this day, individuals are still acting in Guo's name and raising money purportedly to fight the CCP. The Court must send a message to Guo's supporters and associates that continuing these types of crimes will result in significant consequences. Those who contemplate doing what Wang has done—promoting this grand criminal conspiracy under the guise of democratic activism—should understand that doing so will come with serious penalties. A Guidelines sentence of 120-months' imprisonment is necessary to serve that purpose.

E.   <u>The Defendant's History and Characterizes Do Not Warrant a Variance</u>

The extensive scale of the G|Enterprise, and Wang's critical role in that scheme, warrant a 120-month sentence.  The defense's request for a substantial downward variance that is less than half of the recommendation of the Probation Department, the Government, and the Guidelines is inadequate and will not satisfy the important purposes of sentencing.  That is especially true here, where the Guidelines range without a statutory cap would have been life imprisonment.

The Probation Department carefully assessed both the mitigating and aggravating circumstances that are present.  Wang has no criminal history, and she reportedly had legitimate employment before her participation in the offense conduct (although the Government notes that her prior employment was for Guo).  Her apparent personal profit for her participation in the G|Enterprise appears to be largely comprised of a substantial annual income, along with the grant of approximately 7 million worth of in Himalaya Exchange credits—which, as proved at Guo's trial, were not legitimate cryptocurrency holdings, but which represented victim-investor funds that Wang could have cashed out in the form of fiat, as her co-defendant William Je attempted to do in his exit scheme.  She was also a target of the CCP online harassment.  That said, Wang perpetrated the subject offense over a period of years.  She played a pivotal role in the offense and worked tirelessly, day in and day out, to carry out the criminal conduct.  The G|Enterprise preyed on vulnerable victims throughout the world; victims who are unlikely to be made whole for the substantial financial hardships they suffered.

Simply put, a 120-month sentence is sufficient, but not greater than necessary, to account for the offense conduct, afford adequate deterrence, and promote respect for the law and provide just punishment for the offense.  Wang's role in the scheme was critical and deliberate, and calls

24

for such a term of imprisonment. The defendant's arguments for a substantial variance are unavailing.

   1.  *The Actions of the CCP Are Not a Mitigating Factor*

The defendant's sentencing submission spends several pages recounting CCP targeting aimed at Wang. (Def. Mem. 7-10.) However, any actions by the CCP toward Wang underscore the malicious nature of *Wang's offenses* and are not sufficiently mitigating to warrant a variance.

To start, even if the Court were to credit all of Wang's accusations about CCP targeting, they do not excuse a five-year course of criminal conduct aimed at victimizing third parties. There is no legal defense—let alone a moral one—that permits Wang (or anyone else) to harm innocent victims, merely because someone else has harmed Wang. Accepting Wang's contentions otherwise would sanction a bizarre vigilante system of justice that would enable a victim of one crime to harm others—even others who have no connection to the former crime. During the Guo trial, Guo's own purported FoxHunt expert recognized the absurdity of the mitigation argument Wang now makes. (Trial Tr. at 5190 ("Q: [FoxHunt] has nothing to do with the business opportunities that Miles Guo promoted, correct? A. Correct.").)

Next, if Wang's targeting at the hands of the CCP were as pernicious as her submission suggests, her response to that targeting is puzzling. After being targeted, Wang responded by playing an instrumental and essential role in a global criminal organization that stole money from thousands of democratic activists who wanted to displace the CCP. That is, in response to CCP targeting, *Wang hurt the CCP's enemies* all the while claiming she was supporting a movement to dismantle the CCP. Properly understood, Wang—and Miles Guo alongside her—did far more to help the CCP than to combat it.

25

Wang also reports a disturbing stalking situation.[3]    But even accepting Wang's description as true, a disturbing and upsetting situation does not justify inflicting significant pain and harm on others, as Wang did in this case.  Wang, moreover, inflicted largely similar harm in G|Enterprise's targeting, stalking, and protesting against the Bankruptcy trustee and his family—the G|Enterprise even went as far as to protest outside a public elementary school where the Bankruptcy trustee's daughter worked.  That Wang supported the G|Enterprise's targeting of others, despite her own reportedly harmful stalking experience, raises two possibilities:  either the actions of Wang's alleged stalker never truly impacted Wang in the way she claims, or Wang plainly understood that she was deeply hurting, smearing, and emotionally injuring many individuals when she helped the G|Enterprise target its critics.[4]

In addition, in response to the stalker, Wang sought the help of law enforcement.  She contacted the police and obtained, through the judicial process, a court order of protection.  This demonstrates that, first, Wang was capable of rational action and could have withdrawn from the

---

[3] To be clear, there is no evidence (and Wang cites none) that this stalker's conduct is related to the CCP's targeting of Wang.

[4] Dr. Askinsulure's report thus presents, at best, an incomplete picture of Wang that is based on a curated set of slanted facts.  It does not, for example, consider the any of Wang's conduct, including materials that were readily available to the defense, such as:  Wang's emails about offense conduct, text messages directing others, or even the Indictment.  Rather, Dr. Askinsulure's opinion is based on a document written by Wang, unspecified social media posts, an article about the MDC, and temporary restraining orders.  These materials are not appropriately characterized as a "███████████," as Dr. Askinsulure claims. (Def. Ex. A at 2). Indeed, Dr. Askinsulure has ignored five years of Wang's personal history and conduct toward others.  Further, Dr. Askinsulure's assessment that Wang has ███████████████████ is entirely belied by evidence uncovered by the Government, dozens of witness interviews the Government conducted, and the Court's own observations of Wang.  If anything, Wang has above-average intellect, superior managerial and organizational skills, and a remarkable ability to manipulate others.  Wang managed the work of a global organization with dozens, if not hundreds, of employees.  She tracked hundreds of millions of dollars, kept straight the assignments of her underlings, and was an essential leader in this massive fraud enterprise.  Dr. Askinsulure's report should be afforded little weight.

conspiracy and left Guo and the G|Enterprise.  Second, it demonstrates that Wang well understood the importance of the judicial system, which she nonetheless abused and obstructed when it suited her criminal ends.

### 2.  A Guidelines Sentence Would Not Create Unwarranted Sentencing Disparities

Wang cites the sentences of several defendants who she claims are similarly situated, in an effort to persuade the Court to significantly vary downward from the Guidelines.  Contrary to Wang's assertions, those defendants are not similarly situated, and a 120-month sentence would not be inconsistent with those cases.

Irina Dilkinska, cited by Wang, was head of legal for OneCoin, a company that marketed and sold a fraudulent cryptocurrency and raised approximately $4 billion through its multi-level marketing scheme.  *See United States v. Dilkinska*, 17 Cr. 630 (ER) (S.D.N.Y).  (*See* Def. Mem. at 16-18).  Judge Ramos sentenced Dilkinska to 48 months' imprisonment.  While it is true that Dilkinska was a licensed attorney who violated her ethical obligations through her crimes, there are substantial—and relevant—differences between Dilkinska and Wang.  First, Dilkinska was only approximately 32 years old, and relatively inexperienced, when she began her participation in the OneCoin fraud.  By contrast, Wang was approximately 40 years old, and both highly educated and business-savvy when she began her participation with the G|Enterprise.  Second, while OneCoin was another billion-dollar fraud, Dilkinska's conduct in the OneCoin scheme was substantially less active than Wang's conduct in the G|Enterprise.  Wang cites the Government's allegations that Dilkinska "creat[ed] and manag[ed] shell companies" in an effort to equate Dilkinska to Wang.  (Def. Mem. at 17.)  Dilkinska's role, however, was to work entirely at the direction of OneCoin founder Ruja Ignatova and others, and the shell companies that she "managed" were mere corporate vehicles for fund movements.  Wang, by stark contrast, was the

*de facto* chief-of-staff for G|Enterprise companies like G|CLUBS, G|Fashion, and the Himalaya Exchange—companies that were intentionally and painstakingly constructed and operated to appear to offer legitimate goods and services. Wang worked tirelessly to further and expand the operations of the G|Enterprise. The daily planners recovered from her apartment reflect meetings relating to all aspects of the fraud scheme, and her communications with employees of the various G|Enterprise entities—which are corroborated by witness testimony—indisputably establish that Wang was the day-to-day boss. She was calling the shots. Guo was the mastermind of the fraud, but Wang was the conductor, and it was through her substantial efforts to defraud victims that the G|Enterprise was able to raise more than $1 billion. Moreover, despite her control over every aspect of the operations of the various entities, Wang very deliberately removed herself from titled positions, and bank accounts, and formally disclaimed her involvement with the G|Enterprise entities. These deliberate efforts to conceal her involvement and to insulate herself from potential criminal liability should be heavily weighed as aggravating factors, and they certainly distinguish her from Dilkinska.

Other cases Wang cites are similarly distinguishable. Most notably, aside from Elizabeth Holmes, the conduct of defendants cited by the defense was not as unilaterally critical to their respective schemes as Wang's was to the G|Enterprise. Joanne Crupi played a role in the Madoff scheme as an investment adviser, including moving client funds, transferring funds among accounts, and submitting false information to banks. *United States v. Crupi*, No. 10 Cr. 228 (LTS) (S.D.N.Y.). (Def. Mem. at 18). Yet Crupi was one of many engaging in similar conduct to successfully operate the Madoff scheme, while Wang was the sole chief-of-staff, and the essential manager of the G|Enterprise fraud. Wang emphasizes that Crupi went to trial, apparently as an aggravating factor that reflects a lack of acceptance of responsibility by Crupi. Indeed, in

28

discussing the Crupi case, Wang suggests that Crupi is more culpable because, "unlike Ms. Wang she did not undertake her actions while being targeted by a foreign government." (Def. Mem. at 19). Wang's attempt to justify her criminal conduct and her essential role in operating the G|Enterprise fraud scheme and defrauding thousands of victims—and thus to deny complete responsibility for her actions—is familiar to this Court from the trial against Miles Guo, where Guo advanced that defense. As with Guo, it is of no moment to Wang's culpability for her offense conduct that she was targeted by the CCP. That fact certainly does not make her less culpable than Crupi and should not be any basis for a downward departure. And Michelle Morton was involved in a fraud valued at tens of millions of dollars, not over a billion dollars. *See United States v. Morton*, No. 16 Cr. 371 (RA) (S.D.N.Y.). (Def. Mem. at 19). Simply put, there are distinguishing factors between Wang's aggravated conduct and the conduct of the defendants she cites in arguing for a sentence of less than 48 months, and a Guidelines sentence of 120 months would not create any unwarranted disparities particularly given the many aggravating factors described above.

   3. *Any Immigration Consequences Are of Wang's Own Making*

Wang immigrated to the United States claiming she was being subjected to persecution at the hands of the CCP. As an educated, intelligent, immigrant with fluency in English, the United States presented her an opportunity to live a law-abiding peaceful life free from any claimed CCP threats. She chose a different path and decided to abuse the opportunities provided to her in this country. Wang spurned the promise the United States offered and used it, with Miles Guo, as the base of operations for a global criminal enterprise. While in the United States as an asylee she targeted U.S. citizens and stole from them, she abused and thwarted the judicial system here. She did these things for five years and any time could have left and tried to make amends and live a law-abiding life. She did not. Now, as a convicted felon, she unsurprisingly, may be subject to

immigration consequences—but those consequences are a result of the choices Wang made over a period of years.[5]  If anything, Wang's immigration status should have incentivized her to act within the bounds of the law while in the United States.  She knowingly chose a different path.

Wang also complains that as a result of her citizenship-status she is ineligible for designation to a minimum-security prison camp.  At this time, the Government understands that the Bureau of Prisons does not strictly forbid the designation of a non-citizen to a minimum security prison camp, and the Court may make such a recommendation.  That said, the Bureau of Prisons does not ordinarily designate noncitizens to such facilities, and any designation decision, were the defendant to be sentenced to a term of incarceration, would be left to the discretion of the Bureau of Prisons.  Regardless of the designation made by BOP, in view of all the factors, the seriousness of Wang's conduct outweighs any mitigation that may be warranted to the extent that Wang is ineligible for a prison camp as opposed to a minimum-security facility.

---

[5] In contrast to the defendant's assertions now, when Wang sought pretrial release, she argued to this Court that, even if she were convicted, she would not be deported to China and thus had no motive to flee the United States.  (Dkt. 81 at 20 n. 14 ("Even if she were convicted, she would likely not be deported after serving her sentence because of the U.S.'s participation in the Convention Against Torture").)

## **CONCLUSION**

Wang's multiyear commitment to criminal conduct, the astounding level of harm she caused others, her repeated obstruction of justice, and her important leadership role in a complex, pernicious, and grand enterprise of criminal activity demand a serious sanction. The Government respectfully requests that for the reasons described herein, the Court impose a Guidelines sentence of 120 months imprisonment.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
    Micah F. Fergenson
    Ryan B. Finkel
    Justin R. Horton
    Juliana N. Murray
    Assistant United States Attorneys
    212-637-2190/-6612 /-2314