In the matter of *United States v Kwok, et al* 23 CR 118 (SDNY) with respect to 41(g) Customer Action for the return of their Himalaya Exchange Funds

---

## Independent forensic review
## of Mazars LLP

## 21 December 2023

---



**In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds**

**mazars**                                    Independent forensic review of Mazars LLP

# Contents

|  |  | Page |
|---|---|---|
| **1** | **Introduction** | **5** |
| 1.1 | This matter | 5 |
| 1.2 | Our experience | 5 |
| 1.3 | Our instructions | 6 |
| 1.4 | Access to the relevant information | 7 |
| 1.5 | Structure of this report | 7 |
| 1.6 | Scope of this report | 8 |
| **2** | **Executive Summary** | **10** |
| 2.1 | Introduction | 10 |
| 2.2 | Our instructions | 10 |
| 2.3 | Summary of our work and findings | 11 |
| **3** | **The HEX Customer Database** | **15** |
| 3.1 | Introduction | 15 |
| 3.2 | Our understanding of the information available on the HEX Customer Database that is relevant to our instructions | 15 |
| **4** | **Instruction 1: Our understanding of the processes and procedures in place relating to customer onboarding at the Exchange** | **22** |
| 4.1 | Introduction | 22 |
| 4.2 | Key stages in the customer onboarding process | 22 |
| **5** | **Instruction 2: Our review of the Relevant Customers' accounts on the HEX Customer Database** | **29** |
| 5.1 | Introduction | 29 |
| 5.2 | The HEX Customer Database Download | 29 |
| 5.3 | The results of our work | 32 |
| **6** | **Instruction 3: Our detailed review of the customer onboarding information and the financial data in respect of a sample of the Relevant Customers** | **33** |
| 6.1 | Introduction | 33 |
| 6.2 | Sample selection methodology | 33 |
| 6.3 | The procedures we performed in respect of the sample of the Relevant Customers | 34 |
| **7** | **Instruction 4: Illustrative customer onboarding** | **38** |

**mazars**

| | | |
|---|---|---|
| 7.1 | Introduction | 38 |
| 7.2 | First illustrative customer onboarding test | 38 |
| 7.3 | Second illustrative customer onboarding test | 39 |

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**

Independent forensic review of Mazars LLP

## Appendices

| | |
|---|---|
| Summary of our meetings with personnel of the service company of the Exchange | Appendix 1.1 |
| Documents used in the preparation of this report | Appendix 1.2 |
| The testing undertaken on the HEX Customer Database (Customer Account Sample 1) | Appendix 5.1a |
| The testing undertaken on the HEX Customer Database Download (Customer Account Sample 2) | Appendix 5.1b |
| Our review of the Relevant Customers' accounts on the HEX Customer Database | Appendix 5.2 |
| The testing undertaken on the customer onboarding information and the financial data in respect of a sample of the Relevant Customers | Appendix 6.1 |

## Exhibits

| | |
|---|---|
| Example excerpts from the HEX Customer Database | Exhibit 3.1 |
| Onboarding Process Document | Exhibit 4.1 |
| Excerpts of the "Risk Scoring" tab on the HID Database | Exhibit 6.1 |
| Extracts of bank statements of the Exchange | Exhibit 6.2 |
| Mercantile Bank Custody Agreement | Exhibit 6.3 |
| FV Bank Custody Agreement | Exhibit 6.4 |
| FV Bank Business Account Application | Exhibit 6.5 |

**mazars**

# 1 Introduction

## 1.1 This matter

1.1.1 We, Mazars LLP ("**Mazars**"), have been instructed by Candey Limited ("**CANDEY**"), the legal counsel for Himalaya International Clearing Limited (the "**Exchange**" or "**HEX**"). The Exchange is a British Virgin Islands registered company that operates a user-to-user, centralised cryptocurrency exchange platform for clients to trade, store and manage the Himalaya cryptocurrencies, namely the Himalaya Coin ("**HCN**") and the Himalaya Dollar ("**HDO**").

1.1.2 The ultimate beneficial owner of the Exchange and its affiliated companies is Mr William Je ("**Mr Je**") against whom (along with two other defendants) criminal charges have been brought by the United States Department of Justice ("**DoJ**"), in the Southern District of New York. It is alleged in those proceedings, *inter alia*, that Mr Je perpetrated a fraudulent scheme through the Exchange. We understand that those charges are denied by Mr Je.

1.1.3 As a consequence of those charges, we understand that certain assets of the Exchange have been seized by the DoJ, in particular the Exchange's HDO stable coin[1] reserve[2].

1.1.4 We are instructed that:

(a) on 6 December 2023, 3,539 customers of the Exchange filed a motion pursuant to Federal Rule of Criminal Procedure 41(g) for the return of their property seized by the United States (the "**Relevant Customers**" and the "**Customer Action**")[3]; and

(b) on 7 December 2023, the DoJ made representations asking the United States District Court to deny the relief sought by the Relevant Customers in the Customer Action. We are instructed that one of the reasons for this is that the customers in the Customer Action (who are described as "purported customers") are not genuine, with the implication that the Customer Action is, itself, a fiction.

## 1.2 Our experience

1.2.1 The Mazars Group is an international, integrated, and independent organisation specialising in audit, advisory, accounting and tax services, with a direct presence in more than 95

---

[1] We understand that a "stable coin" is a type of cryptocurrency whose value is pegged to another asset class
[2] Which is held in USD
[3] The original number of the Relevant Customers was 3,345 at the time the Customer Action was filed. I am instructed that this number has since increased to 3,539

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**

Independent forensic review of Mazars LLP

countries and territories drawing on the expertise of over 47,000 professionals. In the UK, Mazars has approximately 150 Partners and more than 2,500 employees.

1.2.2     This report has been prepared by the Crisis & Disputes team in London. We are routinely instructed in the context of allegations of fraud, accounting irregularities, money laundering and misrepresentation, regulatory investigations and cash and asset tracing assignments. We have acted on behalf of regulators and prosecuting agencies (both in the UK and overseas) as well as on behalf of defendants. Our recent cases include instructions by the Financial Conduct Authority, relating to (i) its investigation into the collapse of a major authorised collective investment fund; and (ii) its decision to discontinue the shares of a UK publicly listed company.

## 1.3     Our instructions

1.3.1     We have been provided with a schedule setting out information in respect of the each of the Relevant Customers (the "**Customer Action Schedule**")[4]. We understand that the Relevant Customers created their accounts on the Exchange between 23 April 2021 and 22 August 2023 (the "**Relevant Period**").

1.3.2     Using the Customer Action Schedule, we have been instructed to undertake the following:

(a)     conduct a live and independent review of the customer database (the "**HEX Customer Database**") in order to confirm and document the processes and procedures in place relating to customer onboarding at the Exchange ("**Instruction 1**");

(b)     verify that each of the Relevant Customers included in the Customer Action Schedule has an Exchange account on the HEX Customer Database ("**Instruction 2**");

(c)     identify and isolate a sample of the Relevant Customers from the Customer Action Schedule in order to:

(i)     verify the existence of "*know your client*" ("**KYC**") onboarding information;

(ii)     verify the financial data contained in the Customer Action Schedule against the live data on the HEX Customer Database for this sample; and

---

[4] Which we understand was provided to the legal representative of the Relevant Customers by the Exchange on 10 November 2023

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                          Independent forensic review of Mazars LLP

       (iii)    verify the redemptions made by the Relevant Customers (described as "redemptions balance" in the Customer Action Schedule) to the bank statements of the Exchange for this sample ("**Instruction 3**"); and

   (d)    carry out an illustrative onboarding application to any jurisdiction of choice, including but not limited to the United States ("**US**") ("**Instruction 4**").

## 1.4 Access to the relevant information

1.4.1    Other than the write-up of our findings in this report, we carried out the majority of our work at the premises of the service company of the Exchange[5], which we visited on 14 and 15 December 2023[6]. Our instructing solicitors from CANDEY were also present at the same time. We set out a summary of our meetings with the Exchange and CANDEY in **Appendix 1.1**.

1.4.2    The Customer Action Schedule does not contain the names of the Relevant Customers. Rather, customers are identified by unique Himalaya account numbers ("**HIDs**"). We are instructed that both the customer information that we have reviewed and the underlying KYC documents against which we have verified them are confidential and subject to data protection considerations. Therefore, whilst we reviewed unredacted information on the HEX Customer Database, we are instructed that it must be presented in redacted form for the purposes of this report.

## 1.5 Structure of this report

1.5.1    The remainder of this report is structured as follows:

   (a)    in **Section 2**, we set out an Executive Summary of our work and findings;

   (b)    in **Section 3**, we set out an overview of our understanding of the information available on the HEX Customer Database;

   (c)    in **Section 4**, we address Instruction 1 by setting out our understanding of the processes and procedures in place relating to customer onboarding at the Exchange;

---

[5] Hamilion Capital Holding. We have been instructed not to disclose the address of the service company of the Exchange for the purposes of this report or until a protective order is in place by the Court

[6] During the course of our work, we undertook discussions with personnel of the service company of the Exchange's IT, Legal and Compliance teams. We are instructed to not disclose the names of these individuals for the purpose of this report for data protection and safeguarding the identity of staff

Case 1:23-cr-00118-AT Document 402-5 Filed 04/04/25 Page 9 of 40

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**

(d)    in **Section 5**, we address Instruction 2 by describing the work we have undertaken to
identify whether an account exists on the HEX Customer Database for each of the
Relevant Customers;

(e)    in **Section 6**, we address Instruction 3 by describing the work we have undertaken to
confirm the customer onboarding information and the financial data held by the
Exchange in respect of a sample of the Relevant Customers; and

(f)    in **Section 7**, we address Instruction 4 by describing the illustrative customer
onboarding application we have undertaken.

## 1.6    Scope of this report

1.6.1    We set out at **Appendix 1.2** a list of the information and documents that we have used in the
preparation of this report.

1.6.2    It should be noted that the work we have completed does not constitute an audit and, other
than as expressly set out in this report, we have not verified or in any other way checked the
information set out in the documents we have reviewed.  This is our standard approach in
matters of this nature, unless expressly instructed to give an opinion on the authenticity of
underlying documents.

1.6.3    We have prepared this report in connection with the Customer Action filed in the US District
Court.  It is confidential in all respects other than to be made available to CANDEY, the
Exchange, the legal representative of the Relevant Customers, the DoJ and the United States
District Court.  This report should not be used, reproduced or circulated for any other purpose
without our prior written consent.  Mazars accepts no responsibility to third parties in relation
to the matters in this report and / or for any breaches of this obligation.

1.6.4    This report reflects our understanding of matters of law but expresses no opinion on them as
they are not for us to determine.

1.6.1    We have not been instructed to prepare this report in accordance with the English Civil
Procedure Rules (and in particular Part 35), the U.S. Federal Rules of Civil Procedure and
the U.S. Federal Rules of Criminal Procedure, which would apply to expert reports adduced
in proceedings in England and Wales and the United States respectively.  Nevertheless, we
have adopted protocols applicable to an expert preparing a report for such purposes.  In this
regard:

**mazars**

(a)   the opinions set out in this report reflect our independent opinions based on the evidence provided to us;

(b)   we have exercised reasonable care and skill in order to be accurate and complete in preparing this report; and

(c)   we confirm that we have not entered into any arrangement where the amount or payment of our fees is in any way dependent on the outcome of the case.

**mazars**

## 2    Executive Summary

### 2.1    Introduction

2.1.1    We, Mazars, have been instructed by CANDEY, the legal counsel for the Exchange.  The ultimate beneficial owner of the Exchange and its affiliated companies is Mr Je against whom (along with two other defendants) criminal charges have been brought by the DoJ in the Southern District of New York.  It is alleged in those proceedings, *inter alia*, that Mr Je perpetrated a fraudulent scheme through the Exchange.  We understand that those charges are denied by Mr Je.

2.1.2    As a consequence of those charges, we understand that certain assets of the Exchange have been seized by the DoJ, including the Exchange's stable coin reserves.

2.1.3    We are instructed that:

(a)    on 6 December 2023, the Relevant Customers filed the Customer Action (a motion pursuant to Federal Rule of Criminal Procedure 41(g) for the return of their property seized by the United States; and

(b)    on 7 December 2023, the DoJ made representations asking the United States District Court to deny the relief sought by the Relevant Customers in the Customer Action.  We are instructed that the basis of this is, *inter alia*, that the customers in the Customer Action are not genuine, with the implication that the Customer Action is, itself, a fiction.

### 2.2    Our instructions

2.2.1    Using the Customer Action Schedule, we have been instructed to undertake the following:

(a)    conduct a live and independent review of the HEX Customer Database in order to confirm and document the processes and procedures in place relating to customer onboarding at the Exchange ("Instruction 1");

(b)    verify that each of the Relevant Customers included in the Customer Action Schedule has an Exchange account on the HEX Customer Database ("Instruction 2");

(c)    identify and isolate a sample of the Relevant Customers from the Customer Action Schedule in order to:

(i)    verify the existence of KYC onboarding information;

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                            Independent forensic review of Mazars LLP

(ii)   verify the financial data contained in the Customer Action Schedule against the live data on the HEX Customer Database for this sample; and

(iii)   verify the redemptions made by the Relevant Customers (described as "redemptions balance" in the Customer Action Schedule) to the bank statements of the Exchange for this sample ("Instruction 3"); and

(d)   carry out an illustrative onboarding application to any jurisdiction of choice, including but not limited to the US ("Instruction 4").

## 2.3   Summary of our work and findings

2.3.1   Other than the write up of our findings in this report, we carried out the majority of our work at the premises of the service company of the Exchange, which we visited on 14 and 15 December 2023. Our instructing solicitors from CANDEY were also present at the same time. During this time, we conducted a live review of the HEX Customer Database, which was undertaken by personnel of the service company of the Exchange who have the relevant system access at our and CANDEY's direction.

2.3.2   A summary of our work and findings is set out below:

*Instruction 1: Our understanding of the processes and procedures in place relating to customer onboarding at the Exchange*

2.3.3   We understand that customer onboarding at the Exchange comprises four key stages:

(a)   "**Stage 1**": Customer registration, whereby the customer provides personal details including name, date of birth, citizenship and country of residence. We understand that it is the Exchange's policy that individuals resident in certain countries are not permitted to open accounts on the Exchange. These "Restricted Countries" include the United States[7];

(b)   "**Stage 2**": Customer identification, verification and screening, which requires the customer to:

(i)   provide and verify their email address and phone number;

---

[7] In this regard, we are instructed (i) that the list of Restricted Countries is reviewed on a regular basis to ensure the Exchange is compliant with global regulatory requirements; and (ii) that the US has been included in the list of Restricted Countries since the inception of the Exchange

**mazars**

      (ii)    complete a "KYC Questionnaire", which consists of numerous[8] multiple-choice questions relating to, *inter alia*, the customer's personal details, the source of their funds and their level of experience with cryptocurrency trading; and

      (iii)   submit an identification document and complete certain identity verification checks. In this regard, the Exchange outsources the collection and verification of customer ID documents to a third party, Jumio Corporation ("**Jumio**")[9]. Jumio services include (i) verifying that the ID document is "*authentic and valid*"; and (ii) verifying the customer's identity by comparing the ID Document provided with a live photo taken by the customer, using artificial intelligence powered facial recognition.

      In addition to this, the Exchange undertakes screening of prospective customers, to identify any individuals that are Politically Exposed Persons, subject to sanctions or subject to adverse media. We understand that the Exchange utilises a third party software provider, "ComplyAdvantage" to undertake this screening process;

(c)    "**Stage 3**": Customer risk assessment, where the Exchange will assess the information provided and assign a "Risk Rating" to each customer which reflects the Exchange's assessment of the risk associated with onboarding that customer and is derived from the responses provided by the customer in the KYC Questionnaire; and

(d)    "**Stage 4**": Customer acceptance approval or escalation, where the involvement of the Exchange's compliance team in the onboarding process for each customer is triggered by the Risk Rating assigned to that customer.

*Instruction 2: Our review of the Relevant Customers' accounts on the HEX Customer Database*

2.3.4    We are instructed to verify that each of the Relevant Customers has an Exchange account on the HEX Customer Database. Based on our review of the information contained in the HEX Customer Database, we identified that:

(a)    for each of the Relevant Customers, an account exists in the HEX Customer Database;

(b)    the Relevant Customers:

      (i)    comprise 3,521 personal accounts and 18 corporate accounts; and

---

[8] Between 8 and 16 questions.

[9] Which is an "*AI-driven identity verification platform*". https://www.jumio.com/

**mazars**

       (ii)    are all "Tier 1" customers[10]; and

   (c)    all of the Relevant Customers' accounts were created between 23 April 2021 and 22 August 2023.

*Instruction 3: Our detailed review of the customer onboarding information and the financial data in respect of a sample of the Relevant Customers*

2.3.5    We are instructed to identify a sample of our choosing of the Relevant Customers from the Customer Action Schedule and, for that sample, to (i) verify the existence of KYC onboarding information; (ii) verify the financial data contained in the Customer Action Schedule against the live data on the HEX Customer Database; and (iii) verify the redemptions made by the Relevant Customers (according to the Customer Action Schedule) to the bank statements of the Exchange.

2.3.6    For each HID that forms part of our sample, we identified:

   (a)    in respect of the KYC information obtained by the Exchange:

       (i)    an account exists in the HEX Customer Database;

       (ii)    the Exchange holds copies[11] of an ID document, which have been verified by Jumio as being "authentic"; and

       (iii)    a facial recognition test was undertaken by Jumio, the purpose of which is, as noted in paragraph 4.2.11 below, to confirm that the person holding the ID is (i) the same person shown in the ID photo; and (ii) physically present during the onboarding process; and

   (b)    in respect of the financial information in respect of these customers:

       (i)    the HCN balance and HDO balance in the HEX Customer Database agreed to the amounts noted in the Customer Action Schedule[12];

---

[10] Which, based on our understanding of the Exchange's policy reflects customers who have been onboarded as customers of the Exchange, meaning (i) the customer has created an account with the Exchange; (ii) the customer has verified their contact details; (iii) the Exchange has verified their identity in accordance with its client acceptance procedures; and (iv) the customer has either been auto-approved based on the information they provided or, following escalation to compliance personnel, has been manually approved

[11] Via Jumio

[12] As at the date the Customer Action Schedule was complied. As explained further in Section 6 below, our work in agreeing the financial data in the Customer Action Schedule was to a "live" database. Given there was ongoing trading activity of HCN and HDO balances between the date of the Customer Action (which we are instructed was 10 November 2023) and the date of our work (which was 15 December 2023), for certain customer accounts, there were reconciling items. This is explained further in Section 6 below

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds
Independent forensic review of Mazars LLP

mazars

    (ii)    the total deposits and total redemptions in the HEX Customer Database agreed to the amounts noted in the Customer Action Schedule; and

    (iii)    the total redemptions in the HEX Customer Database (and the Customer Action Schedule) agreed to the Exchange's bank statements that were provided to us.

**Instruction 4: Illustrative customer onboarding**

2.3.7    We are instructed to carry out an illustrative onboarding application to any jurisdiction of choice, including but not limited to the United States.  Our findings in relation to the two illustrative customer registrations and onboardings we undertook is in line with our understanding of the Exchange's customer registration policy.  In particular:

    (a)    one illustrative customer onboarding test would not permit the creation of an account on the Exchange or progression to the next stage of the onboarding process due to the customer's citizenship and / or country of residence being the United States; and

    (b)    one illustrative customer onboarding test permitted the creation of an account on the Exchange, but did not permit progression to the next stage of the onboarding process due to the name on the customer registration forms not matching the identification document provided.

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**

Independent forensic review of Mazars LLP

# 3    The HEX Customer Database

## 3.1    Introduction

3.1.1    The HEX Customer Database is the "back-end"[13] collection of data in respect of customers of the Exchange. It contains records of, *inter alia*:

   (a)    the virtual assets held by each customer;

   (b)    the deposits, redemptions and trading activity of each customer; and

   (c)    the customer's personal information, including records of KYC procedures undertaken in respect of each customer.

3.1.2    As noted in Section 1.4 above, in order to address our instructions, we visited the premises of the service company of the Exchange on 14 and 15 December 2023, along with representatives from CANDEY. During this time, we conducted a live review of the HEX Customer Database in order to provide the necessary context for us to address our instructions. This was undertaken by personnel of the service company of the Exchange who have the relevant system access, at our and CANDEY's direction. The information set out in this Section is based on that live review.

3.1.3    In this Section, we set out an overview of our understanding of the information available on the HEX Customer Database[14].

## 3.2    Our understanding of the information available on the HEX Customer Database that is relevant to our instructions

### The HEX Customer Database Dashboard

3.2.1    We set out in Figure 3.1 below an excerpt of the "Dashboard" of the HEX Customer Database (the "**HEX Customer Database Dashboard**")[15]. We understand that this is often referred to by the personnel of the service company of the Exchange as the "admin panel".

---

[13] Meaning the information that is not directly accessible by the customer, but rather specific individuals within the Exchange who have been granted access to this information

[14] Importantly, we have not been instructed (and therefore have not sought) to consider the integrity or operational effectiveness of the HEX Customer Database. Any reference to how the HEX Customer Database operates is therefore based on the information we observed during the course of our work

[15] All excerpts from the HEX Customer Database are provided in Exhibit 3.1

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**

Independent forensic review of Mazars LLP

Figure 3.1: The HEX Customer Database Dashboard[16]



3.2.2    As shown in Figure 3.1, there are a number of functionalities in the HEX Customer Database
Dashboard (including the ability to view, *inter alia*, "*Transactions*", "*Markets*" and "*Coins*").  Of
particular relevance to our instructions is the functionality "*Users*" which, as described on the
HEX Customer Database Dashboard, "*will allow you to see the number of users on your
exchange and their details from username, to email address to exploit attempts. User - >
Balances will allow you to see what cryptocurrency each user is holding and the quantity*"[17].

3.2.3    We refer to this as the "**User Page**".

The User Page

3.2.4    We set out in Figure 3.2 below an excerpt of the User Page.

Figure 3.2: The User Page[18]

3.2.5    From Figure 3.2 above it can be seen that the User Page provides a number of criteria by
which one can search the HEX Customer Database (including, *inter alia*, the HID, name of
the customer, date of creation of the account).

3.2.6    We set out in Figure 3.3 below an example of the type of information available on the User
Page for each HID.

---

[16] Exhibit 3.1
[17] Exhibit 3.1
[18] Exhibit 3.1

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**

Independent forensic review of Mazars LLP

Figure 3.3: Example of the type of information available on the User Page for each HID[19]



3.2.7    As demonstrated in Figure 3.3 above, when a HID is input into the User Page, it provides a summary overview of the customer. In particular, it sets out:

(a)    the "*Type*" of account related to that HID. We understand that an account can be either:

(i)    "*personal*", meaning the customer is an individual, and using the account for personal purposes; or

(ii)    "*corporate*", meaning the account is being used on behalf of a corporate entity.

We understand that the key difference between these types of accounts, for the purposes of our instructions, is the onboarding procedures that the Exchange undertakes in respect of these customers;

(b)    the name of the customer;

(c)    the date the account was created (as indicated in the column "*Created*"). We understand that the Exchange website began accepting customers from April 2021;

(d)    information as to the status of the account, for example if it is "*Enabled*", "*Approved*", "*Locked*" or "*Deleted*";

(e)    high-level information as to the activity of the account, for example if the customer has deposited funds, traded HCN or HDO or withdrawn funds (as indicated in the columns "*Deposit*", "*Trade*" and "*Withdraw*" respectively);

(f)    the communication preferences of the customer (for example if they have agreed to be communicated with "*Online*", via "*Newsletter*" or via "*SMS*");

---

[19] Exhibit 3.1

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                                    Independent forensic review of Mazars LLP

(g)   the permissions on the account in respect of the Exchange's payment application
      "**Hpay**"[20]; and

(h)   the results of the client acceptance procedures undertaken by the Exchange, including:

      (i)    the "**Risk Rating**" of the customer:  We understand that the Risk Rating reflects
             the Exchange's assessment of the risk associated with onboarding that customer
             and is classified as "*low*", "*medium*", "*high*" or "*ultra-high*".  The Risk Rating is
             derived from a "**Risk Score**", which is computed based on the customer's
             responses to a questionnaire (the "**KYC Questionnaire**"[21]).  We provide a more
             detailed explanation of the Exchange's risk assessment process in Section 4
             below; and

      (ii)   the "**Tier**" of the customer: We understand that there are three different "Tiers"
             of customer classification[22], which reflect the status of the client acceptance
             procedures.  These include:

             •   customers who are not yet allocated to a Tier.  These are customers who
                 have signed up to create an account with the Exchange, but have not yet
                 verified their contact details;

             •   Tier 0 customers:  These are customers who have signed up to create an
                 account with the Exchange and have verified their contact details
                 (including an email address and a phone number), but client acceptance
                 procedures have not yet been completed.  These are not "active"
                 accounts[23] at this stage; and

             •   Tier 1 customers:  These are customers who have been onboarded as
                 customers of the Exchange, meaning (i) the customer has created an
                 account with the Exchange; (ii) the customer has verified their contact
                 details; (iii) the Exchange has verified their identity in accordance with its
                 client acceptance procedures (further details of which are set out in
                 Section 4 below); and (iv) the customer has either been auto-approved

---

[20] I am instructed that Hpay allows customers to, *inter alia*: (i) undertake peer to peer transfers to other Exchange customers;
and (ii) purchase HDO/HCN gift cards for merchants that have been approved by the Exchange
[21] Further details of the KYC Questionnaire is provided at paragraph 4.2.8 *et seq.* below
[22] We understand the Exchange is considering implementing an additional Tier, "Tier 2", in the future
[23] Meaning customers cannot deposit or redeem funds or trade HCN or HDO

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                                    Independent forensic review of Mazars LLP

based on the information they provided or, following escalation to compliance personnel, has been manually approved.

We understand that the Relevant Customers comprise only Tier 1 customers.

### The HID Dashboard

3.2.8   Further information in respect of the customer can be found by clicking on the HID in the column "*User Name / HID*", which produces a dashboard for each customer (the "**HID Dashboard**").

3.2.9   The HID Dashboard contains a number of tabs which categorise the information available in respect of each customer.  Of particular relevance to our instructions are the following tabs:

(a)   "*Profile*": This includes further information in respect of the customer including, *inter alia*, their name, date of birth, contact details, citizenship, country of residence, ID document number;

(b)   "*Deposits*": This sets out details of deposits made by the customer including, *inter alia*, (i) the date and time of the deposit; (ii) the amount of the deposit; (iii) the individuals at the Exchange who authorised the deposit[24]; and (iv) any fees payable to the Exchange in respect of the deposit;

(c)   "*Withdrawals*": This sets out details of withdrawals[25] made by the customer including, *inter alia*, (i) the date and time of the withdrawal requested by the customer; (ii) the amount of the withdrawal; and (iii) any fees payable to the Exchange in respect of the withdrawal; and

(d)   "*Risk Scoring*": This sets out the Risk Score of the customer (as explained in paragraph 3.2.7(h) above), the customer's completed KYC Questionnaire and comments from the Exchange's compliance team relating to client acceptance decisions in respect of the customer.

3.2.10   We set out in Figure 3.4 to Figure 3.7 below an excerpt of each of these four tabs for an example HID[26].

---

[24] We understand that every deposit made to the Exchange is subject to a two-step authorisation process, where the deposit is required to be authorised by two individuals in order for the funds to be accepted
[25] "Withdrawals" is synonymous with redemptions
[26] As noted in Section 1.4 above, we are instructed that the customer information that we have reviewed is confidential. Therefore, whilst we reviewed unredacted information on the HEX Customer Database, we are instructed that it must be redacted for the purposes of the report.  The information in Figure 3.4 to Figure 3.7 is therefore redacted

**In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)**
**Customer Action for the return of their Himalaya Exchange Funds**

**mazars**                                        Independent forensic review of Mazars LLP

Figure 3.4: Example of the information contained on the "Profile" tab of the HID Dashboard[27]



Figure 3.5: Example of the information contained on the "Deposits" tab of the HID Dashboard[28]



Figure 3.6: Example of the information contained on the "Withdrawals" tab of the HID Dashboard[29, 30]



---

[27] Exhibit 3.1

[28] Exhibit 3.1

[29] The customer selected for this example had not made any withdrawals at the date we completed our work

[30] Exhibit 3.1

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**

Independent forensic review of Mazars LLP

Figure 3.7: Example of the information contained on the "Risk Scoring" tab of the HID Dashboard[31]



---
[31] Exhibit 3.1

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

Independent forensic review of Mazars LLP

**mazars**

# 4    Instruction 1: Our understanding of the processes and procedures in place relating to customer onboarding at the Exchange

## 4.1    Introduction

4.1.1    In addition to conducting a review of the HEX Customer Database, we sought to confirm the processes in place at the Exchange in respect of customer onboarding by reference to the Exchange's written documents that relate to the Relevant Period. In this regard, we have been provided with a presentation titled "*Demonstration of the Client Onboarding and Compliance Process*", dated June 2022 (the "**Onboarding Process Document**")[32, 33].

4.1.2    Based on the Onboarding Process Document[34], we understand that customer onboarding at the Exchange comprises four key stages:

    (a)    "**Stage 1**": Customer registration;

    (b)    "**Stage 2**": Customer identification, verification and screening;

    (c)    "**Stage 3**": Customer risk assessment; and

    (d)    "**Stage 4**": Customer acceptance approval or escalation.

We set out further details of each these key stages in **Section 4.2**.

## 4.2    Key stages in the customer onboarding process

### Stage 1: Customer registration

4.2.1    In order to register with the Exchange, a new customer must first access the Exchange's website[35] and select the "*Register*" tab. We set out in Figure 4.1 below an excerpt of information that a customer has to provide as part of this registration process (the "**Key Registration Information**"):

---

[32] Exhibit 4.1

[33] We are instructed that the Exchange's compliance policies are formally documented in a "Compliance Manual". This has not been provided to us for the purposes of this report due to the scope of our instructions

[34] We are instructed that the Onboarding Process Document was prepared for the purpose of regulatory licence application and is based on the "Compliance Manual" and the Exchange's policies and procedures that were in place during the Relevant Period

[35] At https://himalaya.exchange/



In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                        Independent forensic review of Mazars LLP

Figure 4.1: Customer registration page on the Exchange's website[36]



4.2.2   Importantly, the questions relating to citizenship and country of residence are multiple choice
(and completed by the customer by reference to a dropdown list). We understand that a
customer's country of residence is of particular relevance to customer acceptance decisions
made by the Exchange and the Exchange's policy is not to accept customers resident in
certain countries (including, for example, the United States) (the "**Restricted Countries**")[37].
The Restricted Countries are not included within this dropdown list, meaning that individuals
whose country of residence is a Restricted Country will not be able to register for an account
with the Exchange.

4.2.3   Once the customer has provided their Key Registration Information, they are requested to
provide answers to three personal questions on the Exchange's secure online portal. The
purpose of these security questions is to "*add an extra layer of customer protection to the
authentication process*"[38].

---

[36] As demonstrated in Figure 4.1, there are separate registration pages for "*Individuals*" (which are also referred to as "*personal*"
accounts) and "*Corporates*". Based on our work on this matter, we understand that over 99% of the Relevant Customers are
individuals and we have therefore not considered the customer onboarding process in respect of corporates

[37] In this regard, we are instructed (i) that the list of Restricted Countries is reviewed on a regular basis to ensure the Exchange
is compliant with global regulatory requirements; and (ii) that the US has been included in the list of Restricted Countries since
the inception of the Exchange

[38] Exhibit 4.1, slide 3

Case 1:23-cr-00118-AT Document 207-5   Filed 12/04/25   Page 24 of 40

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                    Independent forensic review of Mazars LLP

## Stage 2: Customer identification, verification and screening

4.2.4    The second key stage in the customer onboarding process is described in the Exchange's Onboarding Process Document as "*Identification, Verification and Screening*".  It requires the customer to:

(a)    provide and verify their email address and phone number;

(b)    complete the KYC Questionnaire, which consists of numerous multiple-choice questions relating to, *inter alia*, the customer's personal details, the source of their funds and their level of experience with cryptocurrency trading; and

(c)    submit an identification document ("**ID Document**") and complete certain identity verification checks.

4.2.5    We provide further details on each of these requirements in turn below.

### Obtaining and verifying the customer's email address and phone number

4.2.6    In order to progress the client onboarding process, the customer is required to provide and verify their email address and phone number, via the Exchange's secure online portal.  The verification in respect of:

(a)    their email address is completed once the customer activates a verification link that is sent to their email address; and

(b)    their phone number is completed once the customer enters a 6-digit verification code that is sent to them by text message.

4.2.7    In addition, the customer is required to provide confirmation that they are not a resident of the US, Japan, citizen or resident of Canada or any other jurisdiction where the laws of such jurisdiction prohibits the holding or use of cryptocurrencies

### The KYC Questionnaire

4.2.8    We set out in Figure 4.2 below an example of the questions included in the KYC Questionnaire:

**mazars**

Figure 4.2: KYC Questionnaire[39]

| |
|---|
| Place of birth |
| Citizenship on the document |
| Please tell us about your current employment status. |
| Please tell us about your occupation or business activity. |
| Please tell us about business you may conduct in other country(s) besides where you are registered for tax purposes? |
| Is your individual activity or business registered or conducted in preferential tax zone (for instance, free economic zone, offshore jurisdiction)? |
| Please tell us about your annual turnover, in individual or business activity, which is handled in cash. |
| Please tell us about your annual turnover, in individual or business activity, which is handled in cryptocurrency. |
| Please tell us about your source(s) of income funds. Select more than one box if necessary. |
| Please tell us about your source(s) of wealth? Select more than one box if necessary. |
| Please select the service(s) you plan to use. Select more than one box if necessary. |
| How much do you plan to deposit per year (USD and crypto combined)? |
| Please tell us which countries the funds will be received and/or transferred from. |
| Let us know what your level of experience is with cryptocurrency trading? Please select one: |
| How many years of experience do you have in crypto trading? |
| Are you, an immediate family member or a close associate, entrusted, or have been entrusted, with prominent public functions in any country or international institution? This could be a public office, a government role, a regulatory role or a senior military position, at home or overseas. |

4.2.9     In order to complete the KYC Questionnaire, the customer must answer all questions. Based on the customer's responses to the KYC Questionnaire, the Exchange computes the Risk Score for each customer, which is described in further detail in paragraph 4.2.13 *et seq.* below.

### Obtaining documentation evidencing customer identification

4.2.10     We understand that the Exchange outsources the collection and verification of customer ID Documents to Jumio. Jumio is an "*AI-driven identity verification platform*"[40] that "*uses artificial intelligence, machine learning and biometrics to automate the verification process and help companies improve conversion rates, comply with AML and KYC regulations and better detect fraud — all while delivering a definitive yes/no decision in seconds*"[41].

4.2.11     We understand that the ID Document that would be accepted as evidence of customer identification includes a passport, driving licence or identity card. Jumio then verifies[42]:

(a)     that the ID document is "*authentic and valid*"; and

(b)     the customer's identity by comparing the ID Document provided with a live photo taken by the customer, using artificial intelligence ("**AI**") powered facial recognition. This includes confirming the "*person holding the ID* [is] *the same person shown in the ID photo*" and that "*the person holding the ID* [is] *physically present during the transaction*".

4.2.12     In addition, the Exchange also undertake screening of prospective customers on behalf of the Exchange, to identify any individuals that are Politically Exposed Persons ("**PEP**"), subject to

---

[39] This is an example of the KYC Questionnaire. We understand that during the Relevant Period, the questions (and number of questions) on the questionnaire changed (for example, during this time the number of question ranged from 8 to 16)
[40] https://www.jumio.com/
[41] https://www.jumio.com/products/identity-verification/
[42] Exhibit 4.1, slide 5

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                          Independent forensic review of Mazars LLP

sanctions or subject to adverse media. We understand that the Exchange utilises a third party software provider, "ComplyAdvantage" to undertake this screening process.

### Stage 3: Customer risk assessment

4.2.13   On completion of Stages 1 and 2, the Exchange will assess the information provided and assign a Risk Rating to each customer which, as explained in Section 3.2 above, reflects the Exchange's assessment of the risk associated with onboarding that customer and is derived from the customer's Risk Score.

### Risk Score

4.2.14   The Risk Score is a number between 0 and 99 that reflects the Exchange's perceived risk of accepting a customer. The higher the Risk Score, the higher the perceived risk to the Exchange of onboarding that customer.

4.2.15   Each response provided by the customer in the KYC Questionnaire is assigned a Risk Score based on a risk model formulated by the Exchange. We set out an overview of the considerations involved in the Exchange's risk model in Figure 4.3 below.

Figure 4.3: Risk model assessment[43]



---

**mazars**

### Risk Rating

4.2.16    The Risk Rating is classified as "*low*", "*medium*", "*high*" or "*ultra-high*" and corresponds to the Risk Score as follows:

(a)    if the customer's Risk Score is between 0 and 30, the Risk Rating is "low" ("**Low Risk**");

(b)    if the customer's Risk Score is between 31 and 59, the Risk Rating is "medium" ("**Medium Risk**");

(c)    if the customer's Risk Score is between 60 and 75, the Risk Rating is "high" ("**High Risk**"); and

(d)    if the customer's Risk Score is between 76 and 99, the Risk Rating is "ultra-high" ("**Ultra-High Risk**").

### Stage 4: Customer acceptance approval or escalation

4.2.17    The involvement of the Exchange's compliance team in the onboarding process for each customer is primarily driven by the Risk Rating assigned to that customer, whereby:

(a)    if the customer is High Risk or Ultra-High Risk, the compliance team are required to manually review the customer's application and accept or reject them; and

(b)    if the customer is Low Risk or Medium Risk, the compliance team are not necessarily required to manually review the customer's application but may do so if compliance issues are identified or as part of the Exchange's quality control procedures and ongoing compliance monitoring.

4.2.18    We set out in Figure 4.4 below the Exchange's approval or escalation process in further detail.

**In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds**

**mazars**                              Independent forensic review of Mazars LLP

Figure 4.4: Approval or escalation process[44]



**mazars**                                          Independent forensic review of Mazars LLP

# 5    Instruction 2: Our review of the Relevant Customers' accounts on the HEX Customer Database

## 5.1    Introduction

5.1.1    As explained in Section 1.3 above, we have been instructed to identify whether an account exists on the HEX Customer Database for each of the Relevant Customers.

5.1.2    Our approach to addressing this instruction was to search the HEX Customer Database for the HIDs listed in the Customer Action Schedule (which, as described in Section 1.4 above, are unique codes attributed to each customer account). In doing so, we:

   (a)    obtained an extract of certain information contained in the HEX Customer Database[45] (the "**HEX Customer Database Download**").  We explain the process by which we obtained the HEX Customer Database Download and the work undertaken to review the accuracy of this document in **Section 5.2**; and

   (b)    identified the accounts on the HEX Customer Database Download corresponding to the Relevant Customers.  We set out the results of our work in **Section 5.3**.

## 5.2    The HEX Customer Database Download

5.2.1    As explained in Section 3.2 above, the User Page provides a number of criteria by which one can search the HEX Customer Database including, *inter alia*, HID, customer name, type of account[46], Tier of customer and the date the account was created.

5.2.2    Using the User Page, it is possible to extract information from the HEX Customer Database and download this in an Excel[47] file.

5.2.3    The process by which the HEX Customer Database Download was created is as follows[48]:

---

[45] In particular, information provided in the User Page relating to all customers that the Exchange classifies as "Tier 1"
[46] Either "*personal*" or "*corporate*".
[47] Excel is a spreadsheet program from Microsoft that enables users to format, organize and calculate data in a spreadsheet
[48] As explained above, our work in this regard was undertaken by personnel of the service company of the Exchange who have the relevant system access at our and CANDEY's direction.  We directed and observed this work for the duration of the task

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                    Independent forensic review of Mazars LLP

(a)  Step 1: We sought to obtain an extract of all customer accounts that were classified as "Tier 1" on the HEX Customer Database (i.e. by applying only this filter to the search criteria on the User Page)[49]. This produced summary information for 21,005 accounts;

(b)  Step 2: In order to extract this summary information from the HEX Customer Database, it was necessary to divide the data into smaller sections[50]. We filtered the data further by reference to certain time periods (i.e. by applying dates to the filter in respect the date the account was created). These time periods were[51, 52]:

   (i)  from the inception of the Exchange[53] to 28 April 2021. This produced summary information for 3,395 accounts;

   (ii)  from 28 April 2021 to 6 May 2021. This produced summary information for 2,989 accounts;

   (iii)  from 6 May 2021 to 30 June 2021. This produced summary information for 3,159 accounts;

   (iv)  from 30 June 2021 to 7 November 2021. This produced summary information for 3,253 accounts;

   (v)  from 7 November 2021 to 30 November 2021. This produced summary information for 2,095 accounts;

   (vi)  from 30 November 2021 to 31 March 2022. This produced summary information for 2,821 accounts; and

   (vii)  from 31 March 2022 to 15 December 2023 (the date we completed our work). This produced summary information for 3,293 accounts;

(c)  Step 3: Once the data was downloaded by reference to these time periods, we combined all of the data described in Step 2 above (being all customer accounts that were classified as "Tier 1" on the HEX Customer Database) into one spreadsheet; and

---

[49] We understand from our conversations with personnel of the service company of the Exchange that all of the Relevant Customers were "Tier 1" customers. We sought to verify this during the course of our work – see Section 5.3 below

[50] As the HEX Customer Database could not facilitate the extract of the volume of data related to all "Tier 1" customers of the Exchange

[51] The time periods listed below were identified by trial and error

[52] In order to confirm that we were not "double counting" any days by filtering the data into certain time periods, we sought to reconcile (i) the number of accounts for which information was obtained for each period (totalling (i) to (vii) above, which equates to 21,005 accounts); with (ii) the total number of Tier 1 accounts in the HEX Customer Database (which also equates to 21,005 accounts)

[53] This was achieved by not applying a date to the filter "Created Date From"

---

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**

Independent forensic review of Mazars LLP

(d) <u>Step 4</u>: Using Excel analytics[54], we sought to match the HID per the Customer Action Schedule to the HID per the HEX Customer Database Download. We summarise our findings in this regard in Section 5.3.

5.2.4 In order to confirm that our approach to addressing this instruction was appropriate, we undertook a manual check of the HIDs for a sample of 250 of the Relevant Customers. This involved observing personnel of the service company of the Exchange (who has the relevant system access) inputting one HID at a time, at our and CANDEY's direction and confirming that a corresponding account existed for this HID (by viewing this directly on the HEX Customer Database).

5.2.5 The sample of HIDs, which was of our choosing and was first provided to the personnel of the service company of the Exchange at the time of undertaking our work, included[55]:

(a) the first 150 HIDs on the Customer Action Schedule ("**Customer Account Sample 1**"). We had initially planned to undertake this manual process for all HIDs included in the Customer Action Schedule. However, we identified that we would not have been able to complete our work in the available time. We therefore enquired about other approaches to addressing our instructions, which resulted in us obtaining the HEX Customer Database Download (as described above).

For Customer Account Sample 1, we observed personnel of the service company of the Exchange input one HID at a time into the HEX Customer Database, at our and CANDEY's direction in order to confirm that an account existed for that HID in the HEX Customer Database. We set out the results of this sample testing in **Appendix 5.1a**; and

(b) a sample of 100 additional HIDs included in the Customer Action Schedule ("**Customer Account Sample 2**"). In order to select this sample of HIDs, we applied a non-statistical sampling approach using systematic selection, by selecting every 34th HID reference in the Customer Action Schedule (excluding the first 150 items) to sample test.

For Customer Account Sample 2, we observed personnel of the service company of the Exchange input one HID at a time into the HEX Customer Database, at our and CANDEY's direction in order to confirm that (i) an account existed for that HID in the

---

[54] Specifically, the Excel functionality "VLOOKUP". "VLOOKUP" is a search function commonly used in data analytics that identifies and matches specific data vertically across a spreadsheet

[55] For present purposes we have tested a total sample of 250 HIDs. Should the Court require a more extensive sample to be tested, we could extend our testing

Case 1:23-cv-01103-LAK Document 207-5 Filed 02/04/25 Page 32 of 40

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

mazars                                                    Independent forensic review of Mazars LLP

HEX Customer Database; and (ii) the details in the HEX Customer Database Download matched the information in the HEX Customer Database[56]. We set out the results of this sample testing in **Appendix 5.1b**.

5.2.6    In our sample, we did not identify any discrepancy between the information on the HEX Customer Database Download and the information obtained "manually" (by searching one HID at a time in the User Page).

## 5.3    The results of our work

5.3.1    Using the HEX Customer Database Download, we sought to confirm:

(a)    that an account exists in the HEX Customer Database for each of the Relevant Customers;

(b)    whether the account is a "personal" or "corporate" account;

(c)    the Tier classification of that customer[57]; and

(d)    the date their account was created.

5.3.2    We set out the results of our work in this regard in **Appendix 5.2**. In summary, based on our review of the information contained in the HEX Customer Database, we identified that:

(a)    for each of the Relevant Customers, an account exists in the HEX Customer Database;

(b)    the Relevant Customers:

(i)    comprise 3,521 personal accounts and 18 corporate accounts; and

(ii)    are all Tier 1 customers; and

(c)    all of the Relevant Customers' accounts were created between 23 April 2021 and 22 August 2023.

---

[56] In particular, the customer name, account type and "tier" of customer
[57] As noted in Section 3.2 above, every customer on the HEX Customer Database is classified by reference to the stage of onboarding undertaken

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

**mazars**                                        Independent forensic review of Mazars LLP

# 6    Instruction 3: Our detailed review of the customer onboarding information and the financial data in respect of a sample of the Relevant Customers

## 6.1    Introduction

6.1.1    As explained in Section 1.3 above, we have been instructed to identify and isolate a sample of the Relevant Customers from the Customer Action Schedule and for that sample, to:

(a)    verify the existence of KYC onboarding information;

(b)    verify the financial data contained in the Customer Action Schedule against the live data on the HEX Customer Database; and

(c)    verify the redemptions made by the Relevant Customers to the bank statements of the Exchange.

6.1.2    In this Section we set out:

(a)    the methodology we have adopted to select the sample of customers to be reviewed (**Section 6.2**); and

(b)    the procedures we performed in respect of the customer onboarding information and the financial data in respect of a sample of the Relevant Customers (**Section 6.3**).

## 6.2    Sample selection methodology

6.2.1    For present purposes we have tested a total sample of 50 HIDs ("**KYC and Financial Data Sample**"). Consistent with the approach described in Section 5 above, the sample we selected was first provided to the personnel of the service company of the Exchange at the time of undertaking our work. Should the Court require a more extensive sample to be tested, we could extend our testing.

6.2.2    In order to select a sample of the Relevant Customers, we applied a non-statistical sampling approach using systematic selection, by following the below steps:

(a)    we first randomised the order of the HID references in the Customer Action Schedule by:

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

mazars                                          Independent forensic review of Mazars LLP

     (i)    allocating a randomly generated number to each HID reference, using the Excel function "=rand()", which generates a random number between 0 and 1 to each HID reference in the Customer Action Schedule;

     (ii)   recalculating the formula in (i); and

     (iii)  sorting the Customer Action Schedule according to the randomly generated number in (ii) from smallest to largest; and

(b)   we then selected every 71st HID reference in the Customer Action Schedule in (iii) to form part of our sample.

6.2.3   The Customer Action Schedule contains 3,539 customers, therefore by taking the 71st HID, our sample consists of 50 customers[59].

## 6.3   The procedures we performed in respect of the sample of the Relevant Customers

6.3.1   As explained above, we have been instructed to consider both (i) the KYC information obtained by the Exchange in respect of the sample of Relevant Customers; and (ii) certain financial information in respect of these customers.

*Our review of the KYC information obtained by the Exchange*

6.3.2   For each HID included in our sample, we have reviewed the "Profile" tab of the HID Dashboard, and considered:

(a)   whether an account exists in the HEX Customer Database for each HID;

(b)   whether the account is enabled;

(c)   the Tier of the account;

(d)   whether the account is "*personal*" or "*corporate*";

(e)   the customer's full name, email address, citizenship and country of residence;

(f)   the customer's source of income and source of wealth;

(g)   the Risk Score and Risk Rating allocated to the customer; and

---

[58] 71 x 50 = 3,550

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

mazars

Independent forensic review of Mazars LLP

(h)     the ID documents available for each customer and the testing undertaken by Jumio.

6.3.3    We set out the results of our work in this regard in **Appendix 6.1**. In summary, we identified that for each HID that forms part of our sample:

(a)     an account exists in the HEX Customer Database;

(b)     the Exchange holds copies[59] of an ID document, which have been verified by Jumio as being "authentic"[60]; and

(c)     a facial recognition test was undertaken by Jumio, the purpose of which is, as noted in paragraph 4.2.11 above, to confirm that the person holding the ID is (i) the same person shown in the ID photo; and (ii) physically present during the onboarding process.

6.3.4    In addition, for each customer tested as part of this sample, we also attach at Exhibit 6.1 excerpts of the "Risk Scoring" tab on the HID Database, which includes the responses provided by each customer to the KYC Questionnaire and any review comments added to their account by the compliance team.

### Our review of the financial information in respect of these customers

6.3.5    For each HID included in our sample, we have reviewed the "Deposits" and "Withdrawals" tabs of the HID Dashboard and sought to agree the information in the HEX Customer Database with the information in the Customer Action Schedule in respect of each customer's:

(a)     HCN balance;

(b)     HDO balance;

(c)     total deposits; and

(d)     total redemptions.

6.3.6    In respect of the redemptions effected by customers in this sample, we have also sought to agree the amounts of the redemptions to bank statements of the Exchange[61].

---

[59] Via Jumio

[60] For each of our sample, we sought to confirm that the name on the ID Document matches the name on the HEX Customer Database. Whilst we were able to do this for the majority of the sample, there were a number of HIDs which related to Chinese nationals, whose names were included in their ID documents and the HEX Customer Database in Chinese characters. For these individuals, we confirmed that the document number on the ID Document agrees to the document number in the HEX Customer Database. The detail of this work is provided in Appendix 6.1

[61] The redacted bank statements in respect of these redemptions were provided to me and are set out at Exhibit 6.2

**mazars**                                        Independent forensic review of Mazars LLP

6.3.7    We set out the results of our work in Appendix 6.1[52]. In summary, we identified:

(a)    the HCN balance and HDO balance in the HEX Customer Database reconciled to the amounts noted in the Customer Action Schedule (when timing differences are taken into consideration).

In this regard, in undertaking this work, we sought to agree the financial data in the Customer Action Schedule (which we are instructed was compiled as at 10 November 2023) to the "live" HEX Database as at the date of our work (15 December 2023). Given there was ongoing trading activity of HCN and HDO balances between 10 November 2023 and 15 December 2023, for certain customer accounts, there were reconciling items (relating to trades that these customers had effected in this time period)[53]. When these trades are taken into consideration, we did not identify any discrepancies between the HCN and HDO balances in the HEX Customer Database compared with the Customer Action Schedule;

(b)    the total deposits and total redemptions in the HEX Customer Database agreed to the amounts noted in the Customer Action Schedule; and

(c)    the total redemptions in the HEX Customer Database (and the Customer Action Schedule) agreed to the Exchange's bank statements that were provided to us[54]. These bank statements include:

(i)    Mercantile Bank International Corp ("**Mercantile Bank**"), which we understand is a "Custody Account"[55]; and

---

[52] As noted in Section 1.4 above, we are instructed that the customer information that we have reviewed and the underlying KYC documents we have verified them to are confidential. Therefore, whilst we reviewed unredacted information on the HEX Customer Database, we are instructed that it must be redacted for the purposes of the report. The information in Appendix 6.1 and the supporting documentation (in particular, Exhibits 6.1 and 6.2) is therefore redacted

[53] We confirmed each of these reconciling items to the HEX Database. Further details are provided in Appendix 6.1

[54] The bank statements provided to us are hard copies of the bank statements held by the service company of the Exchange. We are instructed that the Exchange no longer has access to these accounts online as they have been closed as a result of the seizures

[55] We are instructed that prior to the seizures, Mercantile Bank was one of the banking partners for the Exchange, where the Exchange had an account holding part of its stable coin reserve (the "**Relevant Mercantile Bank Account**"). We are also instructed that the Relevant Mercantile Bank Account was a "custodian" account, rather than a standard bank account, in order to safeguard customer funds. In this regard, we have been provided with a document titled "*MERCANTILE BANK INTERNATIONAL CORP. ONLINE CUSTODY & BANKING SERVICES AGREEMENT*", dated September 2022 (the "**Mercantile Bank Custody Agreement**", Exhibit 6.3), which we are instructed sets out the terms and conditions applicable to the Relevant Mercantile Bank Account. We have not read the full terms and conditions of the Mercantile Bank Custody Agreement and we have not been instructed to undertake any further procedures in relation to Relevant Mercantile Bank Account. We have been instructed to review paragraph 6.2 of the Mercantile Custody Agreement which states: "*In furtherance of its responsibilities as Custodian, and subject to the limitations and qualifications of this Agreement, Client instructs Custodian to: (i) Safekeep Fiat Currency and Digital Asset amounts transferred into the Custody Account (the "Custody Funds") (ii) Monitor and maintain the Custodial Funds; (iii) Manage the Custodial Funds in accordance with Section 6.3 of this Agreement; (iv) Keep timely and accurate records regarding the deposit, disbursement and investment of the Custodial Funds; and, (v) Prepare such periodic statements regarding and access to information pertaining to the Custodial Funds in the frequency and manner contemplated in this Agreement*". We have also been provided with an earlier version of the Mercantile Bank Custody Agreement, dated June 2020.

In the matter of United States v Kwok, et al 23 CR 118 (SDNY) with respect to 41(g)
Customer Action for the return of their Himalaya Exchange Funds

Independent forensic review of Mazars LLP

**mazars**

    (ii)    FV Bank International INC ("**FV Bank**", the "**Relevant FV Bank Account**"), which we understand is also a "Custody Account"[55].

---

We have reviewed paragraph 6.2 of both documents and have not noted any differences in these terms. We are instructed that the DoJ's seizures of the stable coin reserve were (partly) from the Relevant Mercantile Bank Account

[55] We are instructed that FV Bank was also one of the banking partners for the Exchange, where the Exchange had an account holding part of its stable coin reserve (the "**Relevant FV Bank Account**"). We are also instructed that the Relevant FV Bank Account was a "custodian" account, rather than a standard bank account, in order to safeguard customer funds. In this regard, we have been provided with (i) a document titled "*Custody Agreement* [sic]", undated (the "**FV Bank Custody Agreement**", Exhibit 6.4), which we are instructed sets out the terms and conditions applicable to the Relevant FV Bank Account; and (ii) a document titled "*Business Account Application*" (the "**FV Bank Business Account Application**", Exhibit 6.5) which we are instructed reflects the Exchange's application to open the Relevant FV Bank Account. We have not read the full terms and conditions of the FV Bank Custody Agreement and we have not been instructed to undertake any further procedures in relation to Relevant FV Bank Account. We have been instructed to review the Section titled "*Representations, Warranties, and Covenants*" on page 22 of the FV Bank Custody Agreement which states: "*FV Bank will safekeep the Custodial Assets and segregate data of all Custodial Assets from both the (i) property of FV Bank, and (ii) recorded assets of other customers of FV Bank. FV Bank is a custodian of the Custodial Assets stored by you in the Custody Account, and FV Bank has no right, interest, or title in such Custodial Assets, and will not reflect such Custodial Assets as an asset on the balance sheet of FV Bank, except as may be required by regulatory bodies in specified accounting reports. FV Bank may not grant a security interest in your Custodial Assets held in your Custody Account. FV Bank will not, directly or indirectly, lend, pledge, hypothecate or re-hypothecate any Custodial Assets without you accepting an agreement for FV Bank to do so*". With respect to the FV Bank Business Account Application, we have been instructed to review the question "*What is the purpose of opening a bank account with FV Bank?*" (set out on page 1). We note that the stated purpose of the account according to this document is "*To hold the proceeds of the sale of our Himalaya Dollar*". We are instructed that the DoJ's seizures of the stable coin reserve were (partly) from the Relevant FV Bank Account

**mazars**

# 7 Instruction 4: Illustrative customer onboarding

## 7.1 Introduction

7.1.1 In this Section, we set out our observations on the two illustrative customer onboarding tests we performed at the Exchange.

7.1.2 We performed these tests to assess the compliance of the customer onboarding process described in Section 4 above. Both tests were conducted at the premises of the service company of the Exchange[87], which we visited on 14 and 15 December 2023. Our instructing solicitors from CANDEY were also present at the same time.

## 7.2 First illustrative customer onboarding test

7.2.1 The first illustrative customer onboarding test ("**Test 1**") was undertaken using the United States (a Restricted Country) as the country of residence and citizenship. Test 1 comprised the following steps:

(a) accessing the Exchange's website and selecting the "*Register*" tab;

(b) entering illustrative Key Registration Information, including:

(i) an illustrative name, date of birth and address;

(ii) trying to select the "*United States*" in the citizenship category dropdown list. However, this was not possible as an option for United States was not on the list; and

(iii) trying to select the "*United States*" in the country of residence category drop down. However, this was not possible as an option for United States was not on the list.

7.2.2 As explained in paragraph 4.2.1 above, it is only once all Key Registration Information has been submitted (which must include the customer's citizenship and country of residence) that the new customer is able to progress to the next stage of the onboarding process.

7.2.3 Therefore, Test 1 did not permit progression to the next stage of the onboarding process, which is in line with our understanding of the Exchange's customer registration policy.

---

[87] We have been instructed not to disclose the address of the service company of the Exchange for the purposes of this report

**mazars**                                           Independent forensic review of Mazars LLP

## 7.3    Second illustrative customer onboarding test

7.3.1    The second illustrative customer onboarding test ("**Test 2**") was undertaken using France (which is not considered a Restricted Country) as the country of residence and citizenship. Test 2 comprised of the following steps:

    (a)    accessing the Exchange's website and selecting the "*Register*" tab;

    (b)    entering illustrative Key Registration Information, including:

        (i)    an illustrative name, date of birth and address;

        (ii)    selecting "*France*" in the citizenship category dropdown list; and

        (iii)    selecting "*France*" in the country of residence category dropdown list.

7.3.2    Once the above illustrative Key Registration Information was submitted, the next steps of Test 2 consisted of:

    (a)    providing answers to three security questions;

    (b)    providing and verifying an email address, where the email address became verified once we confirmed the activation link;

    (c)    providing and verifying a phone number, where the phone number became verified once we inputted the 6-digit verification code; and

    (d)    providing confirmation that we were not a resident of the US, Japan, citizen or resident of Canada or any other jurisdiction where the laws of such jurisdiction prohibits the holding or use of cryptocurrencies.

7.3.3    Once the above steps were completed, it is our understanding that the Test 2 illustrative customer would be classified as "Tier 0" on the Exchange's HEX Customer Database at this stage in the customer onboarding process.  In line with our understanding of the Exchange's onboarding processes, we were not able to make deposits or trade with this illustrative customer account.

7.3.4    The next steps of Test 2 consisted of:

    (a)    completing the KYC Questionnaire, which involved selecting options from the multiple-choice questions;

**mazars**

(b)    uploading a scan of an ID document (in this case we uploaded a front and back scan of a French driving license[68]); and

(c)    uploading a live photo.

7.3.5    The Exchange's onboarding system flagged our Test 2 as "*auto-rejected*" as the name on the Key Registration Information and the ID documents provided were not a match.

---

[68] The personal ID document of a member of the Mazars team