# SARAFA ZELLAN

43 West 43rd Street, Suite 370 | New York, NY 10036
212.785.7577 | 646.868.8266 (fax)
www.sarafazellan.com

February 3, 2026

**By ECF Filing**
Honorable Analisa Torres
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007

> Re:  *United States v. Ho Wan Kwok, et al.*
> 23-CR-118 (AT)

Dear Judge Torres:

Together with Joshua Dratel and John Kaley, I respectfully submit this letter on behalf of Miles Guo (a/k/a "Ho Wan Kwok"), pursuant to this Court's Order dated January 8, 2026 (ECF No. 784), and subsequent order extending the filing deadline (ECF No. 798), to set forth Mr. Guo's objections to the Preliminary Order of Forfeiture ("POF") entered on August 11, 2025 (ECF No. 720).

In its July 28, 2025, letter motion to the Court requesting entry of the POF (ECF No. 716) (Gov. Mtn.), the Government makes two distinct requests: (1) for entry of a money judgment of $1.3 billion against Mr. Guo; and (2) for forfeiture of Mr. Guo's interest in the specific property listed in the preliminary order of forfeiture (the "Specific Property"). As to the second request, Mr. Guo consistently has taken no position with respect to any personal interest he may have in the Specific Property. Mr. Guo reconfirms here that he does not assert a personal interest in the Specific Property and supports return of the Specific Property to its rightful owners.

## I.     Introduction and Summary of Argument

There are multiple reasons why the Court should decline to enter a money judgment in the amount of $1.3 billion as to Mr. Guo. First, the Government has not adduced evidence sufficient to establish the scope of the fraud, nor has the Government identified who exactly was defrauded. Second, the Government has not established that Mr. Guo personally obtained the $1.3 billion in purported crime proceeds that forms the basis of the Government's forfeiture request. Third, acquitted conduct cannot be the basis for imposing forfeiture liability. Finally, Mr. Guo is entitled to have whatever forfeiture amount

SARAFA ZELLAN

this Court determines is applicable offset by the very substantial value of cash and other assets already seized and/or in the possession of the Government, the Bankruptcy Trustee, and possibly others. Attached hereto as Exhibit A is a summary of the more than $1 billion in cash that the Government has already recovered in connection with the conduct at issue in this criminal prosecution. We address the relevant background and legal framework of this matter as well as each of these arguments in turn.

## II.     Relevant Background and Legal Framework

On July 16, 2024, following a lengthy trial, a jury found Mr. Guo guilty of ten of thirteen counts set forth in the Third Superseding Indictment (the "Indictment") in this case. Mr. Guo maintains that he is not guilty of any of the charged offenses. For purposes of this motion, however, and without waiving any of his rights, including all of his appellate rights, while Mr. Guo disagrees with the jury's verdict he accepts it as he must for present purposes.

The jury acquitted Mr. Guo of Count Five (wire fraud in connection with GTV Private Placement, in violation of 18 U.S.C. §§1343 and 2), Count Six (securities fraud in connection with GTV Private Placement, in violation of 15 U.S.C. §§78j(b) & 78ff, 17 C.F.R. §240.10b-5, 18 U.S.C. §2), and Count Twelve (unlawful monetary transactions, in violation of 18 U.S.C. §§1957 and 2). The POF recites the inclusion of these counts in the Indictment but does not acknowledge that the jury found Mr. Guo not guilty of them.

The jury did not make any factual determination as to whether the Specific Property or any other property is forfeitable; that is, there has been no factual finding with respect to any nexus between the Specific Property and the offenses of conviction, or any determination as to the amount of criminal proceeds, if any, that Mr. Guo personally obtained.

The Government contends that the $1.3 billion money judgment it seeks represents "a conservative estimate of the amount of funds sent by individual victims to certain arms of the G Enterprise's frauds: GTV, the Farms, G Clubs, and Himalaya Exchange." Gov. Mtn. at 3. According to the exhibit cited by the Government in support of this number, the $1.3 billion figure consists of: $411 million to GTV/Voice of Guo; $110 million to the Farms; $240 million to G Clubs; and $517 million to Himalaya Exchange. GXZ 26. Even assuming that this $1.3 billion figure accurately represents the amount of money investors and customers directed to the named entities, whether or not the entirety of these funds constitutes proceeds of fraud and/or racketeering activity is a question distinct from the jury's verdict and has yet to be determined.

In that context, hundreds of petitions have been filed pursuant to 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2(c) asserting third-party claims to hundreds of millions of dollars seized by the Government, which petitioners maintain are superior to any right, title or interest in the Specific Property claimed by Mr. Guo, who makes no such claim, or the Government.

SARAFA ZELLAN

The Government concedes that it has not made any determination as to individual victim losses or compensation in this case, and that calculation of such losses or compensation for purposes of restitution is impracticable (see ECF No. 785 at 5).

Finally, thousands of Himalaya Exchange customers and dozens of others who have written to the Court, to the Government, and to undersigned counsel directly have expressly stated that they are not victims of fraud or any other wrongdoing by Mr. Guo, but rather seek return of property seized by the Government.

Against this backdrop, it falls to the Court, pursuant to Federal Rule of Criminal Procedure 32.2(b)(1)(a), to determine "what property is subject to forfeiture under the applicable statute." Since the Government seeks forfeiture of specific property, this includes determining "whether the government has established the requisite nexus between the property and the offense," and, since the Government also seeks a personal money judgement against Mr. Guo, it includes determining "the amount of money that the defendant will be ordered to pay." *Id.*

As the Second Circuit has recognized, "[c]omputing a forfeiture amount is not an 'exact science.'" *United States v. Rainford,* 110 F.4th 455, 488 (2d Cir. 2024) (quoting *United States v. Treacy,* 639 F.3d 32, 48 (2d Cir. 2011)). "The district court must make only a 'reasonable estimate of the loss, given the available information.' It may 'use general points of reference as a starting point for calculating the losses or gains from [the criminal activity] and may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding.'" *Id.* (internal citation omitted).

**III.    The Scope of the Fraud for Purposes of Forfeiture is Unresolved – and Significantly Less than the Government Asserts – Because of the Volume of Purported "Victims" Who Affirmatively Deny That They are "Victims"**

An essential aspect of forfeiture that is unresolved in this case is the *scope* of the fraud, and therefore the scope of "proceeds" subject to forfeiture. This case is extremely unusual, if not unique, in that it does not present a categorical fraud in which every investor claims either reliance on the alleged misrepresentations or that such misrepresentations were material to the specific investor's decision to contribute.

Instead, unlike nearly all fraud cases, many investors in the various vehicles affirmatively *deny* that they are, in fact, *victims* of any fraud by Mr. Guo. As discussed below, in some instances, the investors assert that they have suffered economically from *the Government's* conduct, and not Mr. Guo's.[1]

---

[1]  This is not a sufficiency argument, or an attempt to relitigate the jury's verdict, which Mr. Guo acknowledges for purposes of sentencing, and forfeiture within that context. Rather, it involves defining what precisely the jury found, *i.e.*, which investors were defrauded, and therefore what constitutes the proceeds of unlawful activity.



As a result – again dissimilar from the vast majority of fraud cases – delineating the *extent* of the fraud is a necessary prerequisite to determining an appropriate total for purposes of forfeiture because, as set forth below, a significant number of investors were *not* deprived of money or property by fraud. In turn, their investments do not represent the "proceeds" of illegal activity and are not subject to forfeiture. Among that diverse group are some individuals and entities that have filed petitions pursuant to 21 U.S.C. §853(n).

Certainly the government has not proved, as it must in order to justify forfeiture, that all or even most of the investors were defrauded in this case. Indeed, the government's proof was limited to five or six witnesses who testified in that regard. While in an ordinary case, there might be a basis to presume that other investors were similarly deceived, in this case that is not a viable presumption in light of the number and variety of investors who have disclaimed victim status.

The divergence between investors who were defrauded, and those who insist they were not, is illustrated in *United States v. Miller*, 997 F.2d 1010 (2d Cir. 1993), in which the defendants, two lawyers, were accused of deceiving investors they represented (for the purpose of purchasing apartments available during a co-op conversion) by securing for themselves certain opportunities to purchase other apartments in the building without informing the investors. The Second Circuit, however, reversed the convictions, pointing out that the principal of the investor group that hired the two lawyers testified that

> he never asked to invest more money in the [apartment complex] than that expended for the 114 apartments purchased by the Group;  there was nothing wrong with [the defendants and a co-conspirator] making a personal investment in the [building's] apartments;  he had no expectation regarding the possibility of such a personal investment by [the defendant lawyers];  and "it was very much within [the defendants'] cards to do a deal, and if it wouldn't be with my group, it would be with a European group out there."

*Id.* at 1014. The principal of the investor group also testified "that he was satisfied with [defendant's] representation; and that he would not have any problem retaining [defendant] to represent him again." *Id.* at 1015.

While the Court in *Miller* characterized its decision to reverse as based on the government's failure to allege a property interest that defendants obtained through fraud, the language of the opinion, in addition to the section quoted above, clearly reflected a lack of sufficient evidence that any of the investors' expectations upon which the investors relied were abrogated, or that any of the uses to which their money was spent by defendants were material to the investors who were allegedly defrauded.

As the Court summarized in *Miller*, while

> the government contend[ed] that [defendants] diverted to their own benefit

SARAFA ZELLAN

> property intended for the Group; to wit, the Apartments and the profits
> resulting from their resale . . . the government does not surmount the
> obstacle posed by [the witness's] uncontradicted testimony, which
> undercuts any understanding as to this specific agency relationship that
> precluded parallel investments by [defendants] in [the apartment
> complex's] apartments in general, or the eight Apartments in particular.

*Id*. at 1020.

Thus, while ordinarily reliance and materiality would be subject to a "reasonable person" standard, *Miller* establishes otherwise when – as here with many of the investors – the purported "victim" specifically and affirmatively disavows one or the other element, thereby vitiating the allegations of fraud with respect to that particular person's investment.

More recently, in *United States v. Rainford*, 110 F.4th 455 (2d Cir. 2024), the Second Circuit expressed the same reservations with respect to blanket assertions of forfeiture based on a universe of transactions that were not uniformly fraudulent. In *Rainford*, the government's position was based on a witness's statement that 40 percent of defendant's law firm's cases were of the "slip and fall" variety – but even that should have been reduced by another 20 percent (of that subtotal) because only 80 percent of those cases were fraudulent. *Id*. at 489.

Thus, the Court in *Rainford* vacated the forfeiture judgment in part because "even if the government's allegations about [the witness's] statements had been corroborated, the government arrived at the forfeiture amount by crediting only part of [that] statement." *Id*.; *see also id*. ([n]either the government nor the district court has explained why the initial forfeiture request of $1.6 million should be cut by 60 percent but the resulting $644,000 should not be cut by another 20 percent to account for slip-and-fall claims that were not fraudulent").

Those same principles apply here as well. The individual investors' expectations and reliance are critical to distinguishing between victims of fraud and those who were not victimized, and whose investments cannot be included in any forfeiture judgment.

The scope of the fraud here is diminished in material respects by four categories of persons who expressly disavow any status as "victims" of any fraud:

> (1) the 6,512 persons maintaining cryptocurrency accounts with the Himalaya Exchange. *See, e.g.*, Response of 6,512 Claimants as Members of the Himalaya Exchange and Their Counsel to Individual Motions, October 22, 2025 (ECF No. 761) ("*HX Response*");
>
> (2) the 324 investors in the Hamilton Opportunity Fund SPC ("Hamilton"). *See, e.g.*, Supplemental Third-Party Petition to Adjudicate Petitioner's Interest in Forfeited Property and to Amend the Preliminary Order of Forfeiture Entered as to Defendant

SARAFA ZELLAN

Miles Guo, October 22, 2025 (ECF No. 756) ("*Hamilton Supplemental*"); Third-party Petition to Adjudicate Petitioner's Interest in Forfeited Property and to Amend the Preliminary Order of Forfeiture, April 7, 2025 (ECF No. 674) ("*Hamilton Petition*");

(3) the investors who wrote the government disclaiming victim status, provided as discovery at USAO_00112534-USAO_00112564;

(4) the investors who have contacted defense counsel disclaiming victim status.

Added to that significant number are those purported victims whom the Government has failed to identify, but who may be included in any of those four classes of *non*-victims. Consequently, beyond the witnesses at trial, the number of victims – and therefore the total "proceeds" subject to forfeiture – may potentially be far narrower than what the Government claims in its POF.

Given the abundant proof that a considerable number of supposed "victims" reject that classification, it is incumbent upon the Government to establish the parameters of the fraud with sufficient specificity to permit the Court to conclude with the requisite confidence that the forfeiture total is accurate.

A.    *The Members of the Himalaya Exchange*

Through their counsel, the 6,512 members of the Himalaya Exchange – representing approximately two-thirds of Himalaya Exchange members, *see HX Response*, at 3 – have objected to forfeiture of their accounts (and the assets within them) as proceeds of any fraud. As the *HX Response* states, "[m]any investors in the Himalaya Exchange (HEX) have expressed frustration at being labeled as victims." *Id.* at 2.

Elaborating, the Himalaya Exchange petitioners explicitly reject the Government's theory of forfeiture: "[t]he criminal case against [Mr. Guo and his co-defendants] rests on the assertion that they defrauded investors, yet many of these investors insist they were not defrauded and reject the victim label." *Id.*; *see also id.* at 3 (petitioners "align with individual investor motions rejecting victim status").

In addition, the Himalaya Exchange petitioners effectively concur with Mr. Guo that "[p]rosecutors have not identified specific victims or quantified their alleged losses, which is critical in this context to substantiate fraud claims." *Id.* at 3.[2]

Moreover, the Himalaya Exchange petitioners maintain that the only economic harm they suffered was due to the Government's inappropriate intervention: "[t]here is no evidence in the record

---

[2]  In asserting an additional position congruent with Mr. Guo's, the *HX Response* adds that petitioners' counsel "shares the movants' concerns regarding the excessive expenses" incurred in the banktruptcy litigation. *HX Response*, at 7.

showing that HEX investors suffered losses, except for reputational and financial harm to HEX caused by the government's actions . . ." in seizing petitioners' accounts. *Id*. at 2.

Indeed, "[t]here is consensus among investors that they were not defrauded by Kwok, Je, or Wang, but rather harmed by the U.S. government's actions, which seized their investments." *Id*. at 3; *see also id*. (government "ironically caused the very financial harm it aimed to prevent"). Further, it need be emphasized that Mr. Guo never received these monies. These investors' money was held in their own accounts, in their own names, and should be refunded to them.

**B.    *The Hamilton Petitioners***

The Hamilton petitioners advance a similar position. As a threshold matter, the Hamilton petitioners agree that

> in order to prove a right to forfeiture, it is not enough for the Government to claim (without proving) that the funds are part of criminal activity. Rather, the Government must demonstrate that the property it claims is forfeited was obtained by, belonged to, or was controlled by, the defendant.

*Hamilton Supplemental*, at 9 ¶ 18.[3]

The Hamilton petitioners' property – totaling $89,992,861.75, *see Hamilton Petition*, at 8 ¶ 20 – "is comprised solely of funds that were lawfully invested by the M&A Fund Investors, has no nexus to the conduct charged in either criminal case, and therefore lies wholly outside the scope of property subject to forfeiture in either proceeding." *Id*. at 4-5; *see also id*. at 2 (citations omitted); 10 n.6 (investment was "legitimate" and "regulated"); 13 ¶¶ 23-24; 14 ¶ 25 (petitioner invested their own funds in a vehicle "wholly unrelated to the fraudulent schemes alleged in the [Indictment]") (citation omitted).

Also, "the Government has never alleged, let alone proved, that Defendant Guo possessed any ownership interest in, or exercised any control over, Account 2770 or the funds held therein." *Id*. at 10 n. 6. The *Hamilton Supplemental* further reviews the trial record to confirm "Petitioner's position that Defendant Guo had no ownership interest in Account 2770 or the funds therein – there was no evidence in the written record or presented at Defendant Guo's trial that Defendant Guo was a signatory on Account 2770, owned Account 2770, or operated Account 2770." *Id*. at 8 ¶ 16.

Nor was the Hamilton petitioners' funds used to commit any of the crimes charged, *id*. at 14-26, and "there is no evidence that any of the funds in Account 2770 belonged to Defendant Guo or were ever commingled with tainted funds, such that the Government can argue that seizing Petitioner's Property satisfies the requirements of 21 U.S.C. §853." *Id*. at 12 ¶ 22 (citation omitted); *see also id*. at 15 ¶ 27

---

[3] The Hamilton petitioners also agree that "[t]his case presents a unique forfeiture posture . . ." *Hamilton Supplemental*, at 1.

SARAFA ZELLAN

("[t]here is no evidence that Defendant Guo ever used, directed, or exercised any control over these funds, nor that the funds were part of, or the proceeds of, any of Defendant Guo's criminal activities").

As a result, "Petitioner's interest in Petitioner's Property is both vested in Petitioner and superior to any right that Defendant Guo, Defendant Wang, or the Government could claim in Petitioner's Property, because Defendant Guo, Defendant Wang and/or the Government never possessed a legal or equitable interest in Petitioner's Property." *Id*. at 7 ¶ 12; *see also id*. at 11 ¶ 20 (citing *United States v. Elias*, 154 F.4th 56 (2d Cir. 2025)).

Moreover, like the Himalaya Exchange petitioners, the Hamilton petitioners' position is that they have suffered financially not because of Mr. Guo, but because of the Government's interference in the transaction for which the Hamilton petitioners' funds were invested. As the *Hamilton Supplement* recounts, "[w]hile the transaction did close (Guo Trial, 6/17/2024, 2794:25-2795:4), [the seller] never received the investment money because '[t]he money was seized in transit by the U.S. Marshals.' Guo Trial, 6/17/2024, 2796:14-23." *Id*. at 15 ¶ 26 (footnote omitted).[4]

## C. The Investors Who Have Either Filed Petitions Pursuant to 21 U.S.C. § 853(n) or Written the Government Disclaiming Victim Status

The public electronic docket in this case includes petitions pursuant to 21 U.S.C. §853(n) from 126 individuals (not including the Hamilton or Himalaya Exchange petitioners) involving claims totaling $28,579,803.58. Those petitions, and that total, cast further doubt on the forfeiture amount the Government seeks herein.

In addition, discovery produced by the Government included (at least)[5] one folder containing 31 emails containing complaints by investors that Mr. Guo did not defraud them. That folder is denominated by Bates numbers USAO_00112534-USAO_00112564. Most of the emails do not enumerate the amount of the investment each individual made, so a total is impossible to derive from them. However, those communications should further diminish the potential forfeiture total even if the amount of investment cannot be quantified.

## D. The Investors Who Have Contacted Defense Counsel

Coverage of the January 20, 2026, pre-sentencing conference conducted by the Court generated a number of emails to defense counsel from persons who identified themselves as investors in some of the vehicles that were the subject of the trial herein, and who denied they were victimized.

---

[4] The footnote adds that the Hamilton petitioners were subjected to an arbitration proceeding instituted by the sellers due to the Hamilton petitioners' inability to close the transaction because of the government's seizure of the funds allocated to that purchase. *Hamilton Supplemental*, at 15 n.12.
[5] There may be more among the 64 terabytes of discovery, as counsel's review continues. The specific production described above is the folder counsel has found thus far.

SARAFA ZELLAN

Also, some have informed counsel that to the extent they lodged complaints to U.S. or other authorities regarding Mr. Guo, those complaints were compelled – and in some instances wholly authored by – agents of the People's Republic of China ("PRC"). Some of the correspondents suffered interrogations and detention by PRC authorities in the process.

Counsel have recently been in contact with an attorney for 12 such persons, have received documents and other materials related to those persons, and are in the process of verifying those accounts, as well as others made separately to counsel from other persons. Counsel is also mindful that some of the persons involved have requested confidentiality because they fear retaliation by the PRC. That applies even to some of the individuals living in the U.S. (while others reside in China and elsewhere).

As a result, counsel do not presently have a specific number of persons counsel can reliably list as *non*-victims, or the amount of money they invested. However, counsel continue to receive such emails and will catalogue those instances that are verified once that process is complete.

### E.    *The Unknown Number of Investors Who Deny They Are Victims*

The discussion above, particularly with respect to sections A, C, and D, begs the question of how many more persons do not consider themselves victims of any fraud by Mr. Guo. Some may be unaware of the forfeiture proceedings; some may be afraid to come forward because they fear retribution from the PRC if they contradict the PRC's narrative that has endeavored to discredit Mr. Guo for political reasons; and some may not have the means or sophistication to understand their rights pursuant to 21 U.S.C. §853(n).

Regardless the reason, it is logical and reasonable to conclude that in this most unusual case the categories listed above do not represent *all* of the persons in each category (except for the Hamilton investors). That "unknown" renders it even more imperative that the Government be held to its burden to identify victims and the basis for claiming that their investments are subject to forfeiture.

At the very least, those investors in the categories described above must be eliminated from consideration for forfeiture. In turn, given the unprecedented nature of the circumstances in this case, the Government must establish with precision just who constitutes a "victim" in this case.

## IV.    The Government Has Not Established that Mr. Guo Personally Obtained $1.3 Billion of Crime Proceeds

Another factor limiting the extent of any money judgment imposed in this case is the fact that Mr. Guo can only be ordered to forfeit assets that he personally obtained. In *Honeycutt v. United States*, 581 U.S. 443 (2017), the U.S. Supreme Court rejected the imposition of joint and several liability on a defendant "for property that his co-conspirator derived from the crime but that the defendant himself did not acquire." *Id.* at 445. The Supreme Court decided *Honeycutt* in the context of a drug conspiracy where forfeiture was imposed pursuant to 21 U.S.C. § 853, which mandates forfeiture of "any property

SARAFA ZELLAN

constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" certain drug crimes. In *United States v. Elias*, 154 F.4th 56 (2d Cir. 2025), the Second Circuit extended the holding of *Honeycutt* to forfeiture under 18 U.S.C. § 981(a)(1)(C), one of the statutes at issue here, reasoning that the statute in *Honeycutt* was "functionally the same" as §981(a)(1)(C). *Id.* at 59. Earlier, in *United States v. Tanner*, 942 F.3d 60 (2d Cir. 2019), the Second Circuit applied the holding of *Honeycutt* in the context of a money laundering conspiracy where forfeiture was imposed pursuant to 18 U.S.C. § 982(a)(1), another forfeiture statute at issue in this case. *Id.* at 68. We submit that the reasoning of *Honeycutt* applies equally to forfeiture under the criminal RICO statute, 18 U.S.C. § 1963(a), the third forfeiture statute that applies in this case.

Accordingly, Mr. Guo can only be held liable to forfeit the value of tainted proceeds to the extent that he at some point *personally* obtained them. The Second Circuit has made it clear that, post-*Honeycutt*, a district court may no longer routinely order forfeiture of proceeds obtained by co-conspirators, even if reasonably foreseeable to the defendant. *United States v. Papas*, 715 Fed. Appx. 88, 91 (2d Cir. 2018). Rather, the district court "must now determine a . . . forfeiture amount owed by defendant based only on his *personal* proceeds from the offense." *Id.* (remanding for a new forfeiture calculation in light of *Honeycutt*) (emphasis added).

In post-*Honeycutt* cases where the Second Circuit has upheld forfeiture orders, the evidence that the defendant at some point personally obtained tainted proceeds has been clear. For instance, in *United States v. Pastore*, 2022 WL 2068434, at *7 (2d Cir. June 8, 2022), the Government demonstrated during trial that the defendant personally received illegal gambling payments delivered by runners. In *United States v. Glenn*, 794 Fed.Appx. 19, 22 (2d Cir. 2019), the uncontested facts in the PSR described a robbery where both defendant and his co-conspirator filled their duffel bags with stolen goods and fled the store. In *Tanner*, while the Second Circuit vacated separate forfeiture orders requiring each defendant in a money laundering conspiracy to forfeit $9.7 million – precluding double recovery – it held that a defendant who actively participated in the money laundering conspiracy and personally wired $9.7 million in four separate transactions could be held jointly and severally liable for that amount. *Tanner*, 942 F.3d at 68.

Here, the evidence falls far short of establishing that Mr. Guo personally obtained the $1.3 billion that the Government claims represents the total amount of money sent by individuals to GTV, the Farms, G Clubs, and the Himalaya Exchange. To the contrary, with respect to the GTV Private Placement, VOG, G-Coin, and G-Dollar funds that were disgorged to the SEC, it is apparent that Mr. Guo did not possess or control those funds as they were disgorged by three distinct entities – GTV Media Group, Inc., Saraca Media Group, Inc., and Voice of Guo Media, Inc. – where Mr. Guo maintained no formal role. Similarly, the nearly $600 million in cash seized by the Government (see Ex. A) was held in accounts maintained and controlled by others. During trial, for instance, the Government called as a witness James Collins, the Chairman and CEO of Mercantile Global Exchange, which provided banking services for G Clubs, G Fashion, and Himalaya Exchange, among others, and from which the Government seized hundreds of millions of dollars that it now seeks to forfeit. See Ex. A. Mr. Collins testified that his financial institution – a regulated entity – determined through its due diligence process that Mr. Guo was not the ultimate beneficial owner of G Clubs, nor was he the source of funds for G Clubs or G Fashion. Trial Tr. at 2842.

SARAFA ZELLAN

Mr. Collins further testified that Mr. Guo exercised no operational control over G Clubs, G Fashion, or Himalaya Exchange. Trial Tr. at 2843.

The analyses set forth in numerous §853(n) petitions filed in this case are also instructive here, insofar as they explain the evidentiary deficiencies linking Mr. Guo to the seized accounts. For instance, in their Supplemental Third Party Petition to Adjudicate Petitioners' Interest in Forfeited Property and to Amend the Preliminary Order of Forfeiture Entered as to Defendant Miles Guo, petitioners Hamilton Investment Management, Ltd. (BVI) and Hamilton Investment Management, Ltd. (UK) succinctly debunk the notion that any evidence in this case ties the accounts at issue in that petition to Mr. Guo. See ECF No. 760 at ¶¶13-23.

Similarly, the petitions filed on behalf of thousands of customers of the Himalaya Exchange documenting the transactions engaged in by those customers further undermine the notion that Mr. Guo ever personally obtained funds deposited with the Himalaya Exchange. *See, e.g.*, ECF No. 612 and supporting exhibits.

The Government's own sentencing memorandum as to Mr. Guo's co-defendant, Yvette Wang, undermines any argument that the Government may now attempt to make that Mr. Guo exercised operational control over the entities involved in this case. According to the Government, Ms. Wang "was the day-to-day boss" of these entities, "[s]he was calling the shots," she "was the conductor" who exercised "control over every aspect of the operations of the various entities." See ECF No. 476 at 28.

In short, the Government has yet to present evidence sufficient to establish that Mr. Guo personally obtained or directly controlled the funds it now seeks to order Mr. Guo personally to forfeit. Mr. Guo did not hold title to the Mahwah residence or to any of the vehicles listed in the POF. Title to the Bugatti, for instance, never even transferred to G Club, the purchaser of the vehicle, as G Club never accepted delivery of the Bugatti. See ECF No. 749 (Post Oak Motors, LLC's Verified Petition for Determination of Third-Party Interest in Property Subject to Preliminary Order of Forfeiture). In fact, as set out in the § 853(n) petition of Post Oak Motors, LLC, G Club paid Post Oak Motors for the Bugatti but Post Oak maintained possession, custody, and control of the vehicle at its dealership until it was seized by the U.S. Marshals. ECF No. 749 at 2. Clearly Mr. Guo did not personally obtain the Bugatti and thus is not in a position to forfeit it. Without competent evidence establishing that Mr. Guo personally obtained the Bugatti or any other Specific Property to be forfeited, or that Mr. Guo personally obtained $1.3 billion in criminal proceeds, the Government's request for a $1.3 billion money judgment against Mr. Guo fails as a matter of law.

## V.    Acquitted Conduct Should Not Be Considered in the Forfeiture Determination

In addition to the infirmities discussed above, the Government's effort to collect from Mr. Guo alleged proceeds of the GTV Private Placement (see Gov. Mtn. at 4) also is misguided in light of the jury's acquittal of Mr. Guo of both wire fraud and securities fraud in connection with the GTV Private Placement.

SARAFA ZELLAN

While the Government relies on *United States v. Watts*, 519 U.S. 148, 151 (1997) (*per curiam*) for the proposition that "the Court may consider at sentencing the GTV-related facts from the trial record[,]" Gov Mtn. at 3, in the nearly 30 years since *Watts* was decided the landscape regarding the treatment of acquitted conduct at sentencing – which plainly includes forfeiture – has changed dramatically. This is true with respect to the Sentencing Guidelines and reflected in doubts expressed by Supreme Court Justices, both of which manifest appreciation of the constitutional dissonance in sentencing a defendant for conduct for which the jury acquitted.

### A.    *The 2024 Sentencing Guidelines Amendment*

The U.S. Sentencing Commission, as part of its 2024 amendments cycle, revised §1B1.3 to add subsection (c), which eliminated acquitted conduct from consideration in calculating a sentencing guidelines range. *See* Amendment 826, available at  https://www.ussc.gov/guidelines/amendment/826.

Amendment 826, effective November 1, 2024, provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction."  U.S.S.G. §1B1.3(c).

As Judge Carlton W. Reeves, Chair of the Sentencing Commission declared in announcing the amendment, "Not guilty means not guilty[.]"  April 17 2024, Sentencing Commission News Release, "Commission Votes Unanimously to Pass Package of Reforms Including Limit on Use of Acquitted Conduct in Sentencing Guidelines," available at https://ww w.ussc.gov/about/news/press-releases/april-17-2024.

A year earlier, when the Amendment was first circulated, Judge Reeves remarked that "'[w]hat conduct judges can consider when using the guidelines' is . . . 'of foundational and of fundamental importance to the operation of the entire federal justice system.'"  *Id.* (Chair Reeves quoting Prof. Douglas Berman), available at https://www.ussc.gov/sites/default/files/pdf/amendm ent-process/public-hearings-andmeetings/20230405/20230405_transcript.pdf.

### B.    *The Reservations Expressed by Supreme Court Justices Regarding Using Acquitted Conduct for Purposes of Sentencing*

The Sentencing Commission's action also removed an obstacle to the Supreme Court's consideration of the issue. *See McClinton v. United States*, 600 U.S. ___, 143 S. Ct. 2400 (2023) (Sotomayor, J., *statement respecting the denial of certiorari*) (citations omitted); *id.*, at 2403 (Kavanaugh, J., joined by Gorsuch, J., and Barrett, J., *statement respecting the denial of certiorari*).

In *McClinton v. United States*, 600 U.S. ___, 143 S. Ct. 2400 (2023), in denying the petition for *certiorari*, both Justice Sotomayor and Justice Kavanaugh expressed interest in revisiting *Watts*. For example, Justice Sotomayor pointed out that "[a]s many jurists have noted, the use of acquitted conduct to increase a defendant's Sentencing Guidelines range and sentence[] raises important questions that go to the fairness and perceived fairness of the criminal justice system."  143 S. Ct. at 2401 (Sotomayor, J.,

SARAFA ZELLAN

*statement respecting the denial of certiorari*), *citing  Jones v. United States*, 574 U. S. 948, 949-950 (2014) (Scalia, J., joined by Thomas and Ginsburg, JJ., *dissenting from denial of certiorari*);  *United States v. Bell*, 808 F. 3d 926, 928 (D.C. Cir. 2015) (Kavanaugh, J., *concurring in denial of reh'g en banc*);  *United States v. Sabillon-Umana*, 772 F. 3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J.);  *Watts*, 519 U. S. at 170 (Kennedy, J., *dissenting*) (footnotes omitted).[6]

Justice Sotomayor also explained that "[t]he Court's denial of certiorari today should not be misinterpreted[]" because "[t]he Sentencing Commission, which is responsible for the Sentencing Guidelines, has announced that it will resolve questions around acquitted-conduct sentencing in the coming year."  143 S. Ct. at 2403. Justice Sotomayor added that "[i]f the Commission does not act expeditiously or chooses not to act, however, this Court may need to take up the constitutional issues presented."  *Id.; see also United States v. Coleman*, 138 F.4th 489, 511-512 (7th Cir.), *cert. denied*, 146 S. Ct. 275 (2025) ("In denying the petition for certiorari in *McClinton*, four Supreme Court justices encouraged the United States Sentencing Commission to resolve questions around the use of acquitted conduct at sentencing . . . Ten months later, the Sentencing Commission heeded the call").[7]

Justice Sotomayor elaborated that "[t]here are also concerns about procedural fairness and accuracy when the State gets a second bite at the apple with evidence that did not convince the jury coupled with a lower standard of proof."  143 S. Ct. at 2402. Justice Sotomayor also noted (with a string of citations) that "[m]any other state and federal judges have questioned the practice."  143 S. Ct. at 2401 n.2 (Sotomayor, J., *statement respecting the denial of certiorari*) (citations omitted).

In addition, in *McClinton*, Justice Sotomayor observed that

> acquitted-conduct sentencing also raises questions about the public's perception that justice is being done, a concern that is vital to the legitimacy of the criminal justice system. Various jurists have observed

---

[6]  In *Bell*, cited by Justice Sotomayor, Justice Kavanaugh, while serving on the District of Columbia Court of Appeals, recognized that "[a]llowing judges to rely on acquitted or uncharged conduct to impose higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."  808 F. 3d at 928 (Kavanaugh, J., *concurring in denial of reh'g en banc*). Likewise, Justice Gorsuch, when he served on the U.S. Court of Appeals for the Tenth Circuit, in *United States v. Sabillon-Umana* (also cited by Justice Sotomayor), questioned the assumption "that a district judge may either decrease or increase a defendant's sentence (within the statutorily authorized range) based on facts the judge finds without the aid of a jury or the defendant's consent."  772 F. 3d at 1331.

[7]  Justice Kavanaugh echoed that "the Court's denial of certiorari today should not be misinterpreted[,]" 143 S. Ct. at 2403 (Kavanaugh, J., *statement respecting the denial of certiorari*), adding that "[t]he use of acquitted conduct to alter a defendant's Sentencing Guidelines range raises important questions."  *Id.* Again, though, Justice Kavanaugh noted that because "the Sentencing Commission is currently considering the issue[,]" *id.*, it would be "appropriate for this Court to wait for the Sentencing Commission's determination before the Court decides whether to grant *certiorari* in a case involving the use of acquitted conduct."  *Id.*

Honorable Analisa Torres
February 3, 2026
Page 14

SARAFA ZELLAN

> that the woman on the street would be quite taken aback to learn about this practice. *See, e.g., United States v. Canania*, 532 F. 3d 764, 778 (8th Cir. 2008) (Bright, J., *concurring*).

*Id*., at 2402-03.

*Watts*, of course, was decided without the benefit of these subsequent developments.[8] Amendment 826 reflects the resolution of the issue and clearly prohibits the use of acquitted conduct at sentencing. *See also United States v. Johnson*, 754 F. Supp.3d 305, 312-13 (E.D.N.Y. 2024) (noting, in light of the promulgation of Amendment 826, and citing *McClinton*, that "[t]he practice of sentencing defendants based on acquitted conduct is now firmly disfavored").

Nor can it be disputed that forfeiture is criminal and punitive in character, and therefore a component of sentencing to which Amendment 826 and the reservations expressed by the Supreme Court Justices and other jurists apply. Just last year the Second Circuit, in *United States v. Elias*, 154 F.4th 56 (2d Cir. 2025), citing *United States v. Peters*, 732 F.3d 93, 98 (2d Cir. 2013), added the parenthetical that "Criminal forfeiture . . . is a *form of punishment*, separate and apart from any restitutive measures imposed during sentencing." *Elias*, 154 F.4th at 63 (other citation omitted) (emphasis added).[9]

Here, in seeking to include the GTV Private Placement funds in the forfeiture judgment, the Government attempts to circumvent not only the letter and spirit of Amendment 826, and the constitutional protections it vindicates, but also the clear and consistent momentum undermining *Watts*.[10]

---

[8] Even *Watts* did not *mandate* consideration of acquitted conduct at sentencing; rather, it held only that there existed "no prohibition against considering . . . acquitted conduct[.]" 519 U.S. at 152-155.

[9] Reinforcing the criminal character of forfeiture, even restitution – long regarded as "remedial," *see Elias*, 154 F.4th at 63 – has now been recognized by the Supreme Court as "criminal punishment." *Ellingburg v. United States*, 2026 WL 135982, at *2, ___ S. Ct. ___, 607 U.S. ___ (January 20, 2026). Indeed, even before *Ellingburg*, the Second Circuit ruled that "restitution is not permitted for loss caused by 'relevant conduct,' even though such conduct may be 'properly included in offense level calculation' under the Sentencing Guidelines." *United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013), *quoting United States v. Lussier*, 104 F.3d 32, 33 (2d Cir.1997).

[10] Even prior to *Watts* Judge Oakes noted in reluctant concurrence (bound by prevailing Circuit law) the incongruity of permitting acquitted conduct to contribute to a defendant's punishment:

> we hold that a person's sentence for crimes of which he has been convicted may be multiplied fourfold by taking into account conduct of which he has been acquitted. This is jurisprudence reminiscent of Alice in Wonderland. "Acquittal first, sentence afterwards."

*United States v. Frias*, 39 F.3d 391, 392-394 (2d Cir. 1994) (Oakes, J., *concurring*).

SARAFA ZELLAN

**C.    *There Was Not a Sufficient Nexus Between the GTV Private Placement and Any of the Offenses for Which Mr. Guo Was Convicted***

Even in the absence of Amendment 826, a sufficient nexus does not exist to justify forfeiture of the funds related to the GTV Private Placement. Pursuant to Rule 32.2 "if the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A) (emphasis added); *United States v. Capoccia*, 503 F.3d 103, 116 (2d Cir. 2007) ("[t]he violation on which the forfeiture is based must be the specific violations of which [the defendant] was convicted, not some other, separate . . . violations").

Indeed, in *Capoccia*, the Second Circuit pointed out that "[r]equiring the government to link assets to specific crimes of conviction is not only consistent with the punitive purposes of criminal forfeiture but also implements Congress's intent in enacting [the Civil Asset Forfeiture Reform Act ("CAFRA")]." *Id.* (internal citation omitted). In fact, "[t]he legislative history of [CAFRA] suggests that §2641(c) was designed to prevent abuse of the civil forfeiture process in part by encouraging the government to seek forfeiture through criminal proceedings, where it would have to link targeted property to a specific criminal conviction." *Id.* (*citing* H.R. Rep. 106-192, at 8 (1999); 146 Cong. Rec. S1753–02.

Nor do *Capoccia* or *United States v. Fruchter*, 411 F.3d 377 (2d Cir. 2005) permit forfeiture of *all* proceeds generated by a racketeering enterprise – including those unrelated to racketeering activity – simply because defendant was convicted of a RICO conspiracy. In *United States v. Morrison*, 656 F.Supp.2d 338 (E.D.N.Y. 2009), the Court explained that

> *Fruchter* held that acquitted conduct could form the basis for a forfeiture of "'proceeds' derived from racketeering activity," 411 F.3d at 384 (quoting 18 U.S.C. §1963(a)(3)), provided that the court finds by a preponderance of the evidence that such activity was reasonably foreseeable to the defendant. *See also Capoccia*, 503 F.3d at 117-18 ("[W]e have held that a defendant may be required to forfeit all proceeds of the racketeering enterprise forming the basis of his conviction, including *proceeds of particular racketeering activities* of which the defendant was not convicted.") (emphasis added). These cases do not hold that all proceeds are forfeitable. In fact, the quoted language supports the opposition conclusion, viz. only "proceeds derived from racketeering activity" are forfeitable. *Fruchter*, 411 F.3d at 384 (internal quotation marks and citation omitted).

*Id.* at 345 n.13.

Here, the Government has failed to satisfy its burden of establishing the requisite nexus – even by a preponderance of the evidence – between the funds derived from the GTV Private Placement and

SARAFA ZELLAN

non-acquitted conduct.

Indeed, all the evidence cited by the Government, Gov. Mtn. at 3-4, constitutes testimony regarding *acquitted conduct*. *See, e.g.*, Trial Tr. 209 (Le Zhou); *id.* at 701 (Patrick Chin); *id.* at 2376-77 (Minran Wu); *id.* at 4465-67, 4471-72 (Wei Chen); *id.* at 1350-58, 1365-73 (Ya Li). Each witness testified regarding the GTV Private Placement, and in particular whether they were induced into investment by misrepresentation – conduct for which Mr. Guo was acquitted on Counts 5 and 6. Thus, consideration of this conduct with respect to forfeiture is proscribed because the requisite nexus is absent.

In addition, in calculating forfeiture, the "Government's word is not evidence." *United States v. Rainford*, 110 F.4th 455, 489 (2d Cir. 2024). Thus, the Government's assertions that "Guo then continued to defraud his followers with a series of interconnected schemes, including the the GTV private placement in 2020," and that "the GTV placement was connected with and integral to the other arms of the G Enteprise," Gov. Mtn. at 3, are neither evidentiary nor conclusive. Nor are they substantiated; as a result, they are unpersuasive. *See Rainford*, 110 F.4th at 489 (while a "district court may take 'general points of reference as a starting point for calculating the losses or gains,' [*United States v.*] *Treacy*, 639 F.3d 32, 48 [(2d Cir. 2011)], [] an unsubstantiated government claim is not a 'point[ ] of reference'").

Further, the trial evidence the Government cites does not establish by a preponderance that the funds connected to the GTV Private Placement were "obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture." *See* 18 U.S.C. §981(a)(2)(A). Indeed, the Government argues that "Guo fraudulently induced [investors] into investing in GTV." Gov. Mtn. at 3.

That, however, misstates the issue, which is not whether investments in the GTV Private Placement were fraudulently induced, which would constitute a "separate violation," and acquitted conduct, but whether the funds related to the GTV Private Placement were obtained as a *result* of a convicted offense.

These issues are conflated further in the Government's citations to trial testimony. For example, Patrick Chin's testimony was that he would likely not have invested in GTV if he had known that GTV investor funds were to be re-invested by a hedge fund. Dkt 716 at 3 (*citing* Trial Tr. at 701). The same is true of the testimony of Minran Wu, who testified that if he had known that investments made in GTV were to be reinvested in a hedge fund he would not have invested in GTV. *Id.* (*citing* Trial Tr. 2376-77).

Yet that testimony fails to establish a nexus between the convicted offense(s) and the funds and instead relates solely to the elements of the counts for which Mr. Guo was acquitted. The Government also cites testimony from Ya Li that the "[r]einvestment rule is once you received the refund from SEC [for the GTV private placement], within 45 days you should invest this money back to the investment project and then you can get five percent of H Coin." Trial Tr. 244; *see also* Gov. Mtn. at 3. That testimony, too, undercuts the Government's argument that a requisite nexus exists by which the GTV funds were "obtained . . . as a result of the offense giving rise to forfeiture," as any statements made regarding reinvestment were made only *after* the GTV Private Placement funds were recovered by the SEC and set to be re-distributed, making it impossible that the GTV funds were gained as a "result" of

**SARAFA ZELLAN**

another offense.

The Government additionally asserts that because the Farm loan and G Clubs schemes were promoted in videos posted on the GTV platform, the Court should find the required nexus. Gov. Mtn. at 3. That contention improperly conflates the media platform itself, on which Mr. Guo posted videos discussing other investment opportunities, with the GTV Private Placement through which investments were made into the platform. The same analysis applies to the money laundering conspiracy conviction, on Count Three. The Government cannot sweep under the umbrella of money laundering the funds involved in the alleged GTV fraud on which Mr. Guo was acquitted. By its verdict on the GTV fraud counts, the jury determined that the GTV money was not derived from specified unlawful activity. Of course, that is not to say that other alleged fraud proceeds could not have established money laundering. The longstanding rule is clear that for a multi-object conspiracy, the insufficiency of evidence with respect to one prong does not warrant reversal of a conviction because the jury is presumed to have returned its verdict on the objective for which there was sufficient evidence. *See Griffin v. United States*, 502 U.S. 46 (1992). Conversely, here, the jury is presumed to have reached a guilty verdict on the objectives for which it found sufficient evidence – not the objective involving the GTV Private Placement, given the jury's acquittal on those specific counts.

Consequently, the nexus required for forfeiture is absent with respect to the counts for which Mr. Guo was acquitted, namely those relating to the GTV Private Placement. The Government cannot rest its claim on the other counts – RICO and money laundering conspiracy – on the alleged GTV fraud as to which Mr. Guo was acquitted.

## VI.    Other Funds Should Be Offset Against Any Money Judgment Against Mr. Guo

### A.    *The SEC Has Already Obtained $486,745,063 in Disgorgement for the Same Conduct at Issue Here*

Even if Amendment 826 did not prohibit inclusion of acquitted conduct within forfeiture, and/or there existed a sufficient nexus between the GTV Private Placement and any offense of conviction, the Government acknowledges that "the actual funds derived from the GTV private placement were recovered by the SEC, which established a fair fund for distribution to victims." Dkt 716 at n. 2. Thus, the Government continues, "[i]f the Court were to deduct the GTV private placement funds from the forfeiture amount, approximately $411 million should be deducted. *See* GXZ 26 at 2." *Id.* In fact, as discussed below, the recovery by the SEC is substantially higher than the $411 million cited by the Government.

On September 13, 2021, the United States Securities and Exchange Commission (the "SEC"), in Administrative Proceeding File No. 3-20537, entered an order ("SEC Order") simultaneously instituting cease-and-desist proceedings against GTV Media Group, Inc. ("GTV"), Saraca Media Group, Inc. ("Saraca"), and Voice of Guo Media, Inc. ("VOG") (collectively, "Respondents"), and settling those proceedings pursuant to offers of settlement submitted by the Respondents. See Ex. B (SEC Order). GTV and Saraca agreed to jointly and severally disgorge $434,134,141, and VOG agreed to disgorge

SARAFA ZELLAN

$53,610,922, providing for a combined total of $486,745,063 in disgorgement to be paid within 14 days of the SEC Order's entry. *Id.*[11] The SEC subsequently dispersed disgorged funds to investors via a Fair Fund it established for that purpose.

The SEC Order concerned conduct directly at issue in this case. Specifically, it addressed the sale of approximately $339 million worth of stock in GTV, to more than 1,000 investors, between April 2020 and June 2020 through publicly available videos posted on GTV's websites as well as multiple social media platforms. *Id.* at ¶¶11-13. The SEC Order also specifically addressed the transfer of $100 million of the stock offering proceeds to a hedge fund, a major focus of the Government's case here. *Id.* at ¶14. In addition, the SEC Order addressed the purchase of GTV stock by VOG on behalf of prospective investors who wished to invest less than $100,000, with VOG ultimately selling approximately $114 in GTV stock to more than 4,500 investors. *Id.* at ¶¶15-21. This conduct overlaps with the so-called Farm Loan Program charged in this case. Finally, the SEC Order also addressed the sale of approximately $34 million in G-Coins and G-Dollars from April 2020 through June 2020. *Id.* at ¶¶ 25-27. This conduct overlaps with the Himalaya Exchange allegations in this case. *See, e.g.,* Trial Tr. at 26.[12]

There can be no dispute that the nearly $487 million collected by the SEC pursuant to the SEC Order represents proceeds of the same "enterprise" that the Government claims is responsible for the $1.3 billion in proceeds it now seeks to recover a second time in the form of a personal money judgment against Mr. Guo. Yet it cites no authority for the proposition that it should be permitted to recover the same alleged proceeds two times from two separate parties. To the contrary, relevant authority indicates that any funds already collected should offset any personal money judgment entered as to Mr. Guo.

For instance, in *United States v. Kalish*, 626 F.3d 165 (2d Cir. 2010), the Second Circuit recognized "that once some *payment* has been made by way of restitution, a defendant would be in a position to argue that such a payment should be a credit against any then remaining forfeiture amount. The forfeiture amount represents 'ill-gotten' gains, and it is at least arguable that any money returned to a victim has reduced the amount of 'ill-gotten' gains remaining in the defendant's possession." *Id.* at 169-70 (quoting *United States v. Emerson*, 128 F.3d 557, 566 (7th Cir. 1997). More recently, in *United States v. Carlyle*, 776 Fed. Appx. 565 (11th Cir. 2019), the Eleventh Circuit held that the district court did not err in ordering that the value of any assets or proceeds forfeited by a co-defendant must be offset against the defendant's forfeiture liability, ensuring that the government could in no event collect more than the total amount of proceeds from the fraud scheme. *Id.* at 572. "The offset provision was particularly important to ensure that the government did not over-collect for this scheme because this Court has already affirmed [co-defendant's] forfeiture money judgment, holding him jointly and severally liable with [defendant] for $1.8 million, in 216, before *Honeycutt* was decided. Without this

---

[11] The parties also agreed to pay a combined total of $17,688,365 in prejudgment interest and $35,000,000 in civil penalties. See Ex. B at 8-9.

[12] In the Government's opening statement, AUSA Micah Ferguson stated "At first he [Guo] called them G Coin and G Dollar, then they became H Coin and H Dollar – H Coin for Himalaya Coin, H Dollar for Himalaya Dollar." Trial Tr. at 26.

SARAFA ZELLAN

offset provision, the government could have recovered $3.2 million, when the loss was only $1.8 million." *Id.* (internal citation omitted). Simply put, the Government cannot recover twice.[13]

**B.    Cash Assets Seized and Otherwise in Possession of the Government**

To the extent this Court finds that a money judgment is appropriate as to Mr. Guo, it also should be offset by the more than $1 billion already in the Government's possession in connection with this case. Exhibit A, attached hereto, provides a chart of the cash accounts designated by the Government as Specific Property to be forfeited, along with money disgorged pursuant to the SEC Order and funds forfeited by Haithem Khaled as a condition of his non-prosecution agreement. See Trial Tr. 2036-37. The cash in the seized accounts totals $646,551,016.93, the amount disgorged to the SEC totals $486,745,063.00, and the amount forfeited by Mr. Khaled is $2,700,000. Ex. A. The combined value of these assets is $1,135,996,079.93. This amount does not include any of the many other items of Specific Property listed in the POF that are not cash accounts.

As noted, there are numerous pending petitions pursuant to 21 U.S.C. § 853(n) in which petitioners claim interests in some of the seized assets. Should any petitions be adjudicated in the petitioners' favor, that adjudication itself would remove the property from the universe of criminal proceeds and reduce the $1.3 billion sum proffered by the Government. Should any petitions be deemed invalid and the money deemed forfeitable, that money should in turn be offset against any money judgment imposed as to Mr. Guo.

**C.    The Funds and/or Assets in the Bankruptcy Trustee's Possession Should Be Used to Satisfy Mr. Guo's Forfeiture Obligations, as the U.S. Government Has Primary Title to Any Forfeitable Funds or Assets**

Finally, the funds and assets in the Bankruptcy Trustee's possession that are among the items the Government deems forfeitable in this case (including the Mahwah mansion) should be used to reduce any forfeiture obligation imposed upon Mr. Guo rather than be distributed to debtors in inferior position to the U.S. Government. Among the statutes the Government cites as basis for forfeiture is 18 U.S.C. §1963, which states that "All right, title, and interest in property described in subsection (a) *vests in the United States upon the commission of the act giving rise to forfeiture under this section*." (Emphasis added). The same is true for 18 U.S.C. §981 (also cited by the Government), which includes the same

---

[13]  Double recovery of fraud proceeds via criminal forfeiture also arguably would run afoul of the Excessive Fines Clause of the U.S. Constitution. U.S. Const. amend. VIII. As the court in *Carlyle* recognized, "[a] forfeiture order imposed at the end of a criminal proceeding due to a conviction constitutes a fine that is subject to the Excessive Fines Clause." 776 Fed. Appx. 572. Recovery of the same alleged proceeds from two different parties as part of a criminal forfeiture imposed at sentencing would clearly be excessive. It should not be permitted here with respect to disgorged funds already collected by the SEC, nor with respect to other alleged proceeds already in the Government's possession or that are otherwise returned to purported victims.

Honorable Analisa Torres
February 3, 2026
Page 20

SARAFA ZELLAN

language at §981(f).[14]

As the Second Circuit explained more recently in *United States v. Daugerdas*, 892 F.3d 545 (2d Cir. 2018), "[u]nder the 'relation-back' doctrine of §853(c), the Government's interest in the proceeds of a fraud vests as soon as those proceeds come into existence, and is therefore superior to that of any subsequent third-party recipient of those funds (unless the third party is a bona fide purchaser for value)." *Id*. at 548; *see also Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 627 (1989).[15]

Thus, under the applicable forfeiture authorities, the Government in this criminal case possesses an interest in any forfeitable assets currently in the Trustee's custody (or which the Trustee might obtain) that is superior to that of any creditor in the bankruptcy proceeding. *See Luis v. United States*, 578 U.S. 5, 16 (2016) ("[i]f we analogize to bankruptcy law, the Government, by application of §853(c)'s relation-back provision, became something like a secured creditor with a lien on the defendant's tainted assets superior to that of most any other party"). *See also* 21 U.S.C. §853(n)(6)(A) (requiring that any third party's interest in any forfeited property must have been superior to the defendant's "at the time of the commission of the acts which gave rise to the forfeiture").

As set forth in Mr. Guo's prior September 4, 2025, letter motion seeking to preserve the value of forfeitable assets (ECF No. 724) – a request for relief he restates herein – requiring the USAO SDNY to obtain custody of the assets in the Trustee's possession will make them available to investors in and customers of the various entities involved in this case. In its application for the POF, the Government professed, as it has throughout this case, that recompensing investors is its principal objective. Transfer of those funds and assets for disposition and distribution in this case certainly promotes that goal. *See, e.g.*, Transcript, April 8, 2025, at 7-8 (ECF No. 684).

Indeed, also as set forth in Mr. Guo's motion to preserve the value of forfeitable assets, the Trustee's continued custody and control of those funds and assets would frustrate the goal of returning property to investors and customers of the entities involved in this case, given the rapid rate at which assets are being swallowed up by professional fees incurred in the bankruptcy proceedings.

To the extent the Government declines to assert its superior right to forfeitable assets in the custody and control of the Bankruptcy Trustee, the value of such assets should also be offset against any money judgment entered in this case. Similarly, to the extent the Government has declined to pursue

---

[14] These provisions codify the "relation back" theory that has been in effect for centuries. *See United States v. 1,960 Bags of Coffee*, 12 U.S. 398, 399 (1814) ("[t]he forfeiture occurs at the moment of committing the offence. The statute says whenever the act is done, the thing shall be forfeited"). *See also United States v. Stowell*, 133 U.S. 1 (1890) (denominating it the "taint theory").

[15] Courts have recognized that "[t]he RICO forfeiture statute, 18 U.S.C. §1963, and [21 U.S.C.] §853 are 'are so similar in legislative history and in plain language as to warrant similar interpretation.'" *United States v. Egan*, No. 10 Cr. 191 (JFK), 2015 WL 4772688, at *5 (S.D.N.Y. Aug. 13, 2015), *aff'd*, 654 Fed. Appx. 520 (2d Cir. 2016) *quoting DSI Assocs. LLC v. United States*, 496 F.3d 175, 183 n. 11 (2d Cir.2007) (internal quotation marks omitted).

SARAFA ZELLAN

other potentially forfeitable assets in this case – such as any proceeds of alleged unlawful activity retained by witnesses and others including Ya Li, Sara Wei, Haithem Khaled, Qidong Xia, and Kyle Bass, the value of those funds should also be offset against any money judgment entered here.

**VII.    Conclusion**

For all of the reasons discussed herein, we respectfully submit that the Government has not met its evidentiary burden to support entry of the money judgment it requests here. Even if the Court does conclude that a money judgment is appropriate, the value of any such judgment should not exceed $164,003,920.07, which represents the difference between the $1.3 billion figure requested by the Government and the $1,135,996,079.93 already obtained by the Government in connection with this case. Further, any order imposing such money judgment should provide for it to be offset by the value of the sale of other Specific Property in the POF, and any other assets that the Government obtains in connection with this case.

Respectfully submitted,

Melinda Sarafa
Joshua Dratel
John Kaley

cc: All counsel via ECF